**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| **BRENT RAY BREWER,** | : | |
| | : | |
| | : | CIVIL ACTION |
| Petitioner, | : | No. 2:15-CV-50-J |
| v. | : | |
| | : | **THIS IS A CAPITAL CASE** |
| **WILLIAM STEPHENS,** | : | |
| **Director, Criminal Institutions Division,** | : | |
| **Texas Department of Criminal Justice.** | : | |
| Respondent. | | |

---

**AMENDED PETITION FOR WRIT OF HABEAS CORPUS
BY A PRISONER IN STATE CUSTODY
PURSUANT TO 28 U.S.C. § 2254 *et seq.***

PHILIP ALAN WISCHKAEMPER
TX Bar No. 21802750
Law Office of Philip Wischkaemper
915 Texas Avenue
Lubbock, TX 79401
(806)763-9900
miglit@aol.com

SHAWN NOLAN
PA Bar No. 53565
PETER WALKER
TX Bar No. 24075445
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
shawn_nolan@fd.org
peter_walker@fd.org

December 9, 2015

## PRELIMINARY STATEMENT

Petitioner submits herein his amended petition, including claims for relief, supporting facts and references to principles of law necessary to establish entitlement on the claims.  Petitioner still wishes to brief the points of law supporting his claims in a Memorandum of Law and respectfully requests that the Court permit him to do so at a later date and with an enlargement of the page limit.

Petitioner has filed a preliminary Appendix, and now submits an amended Appendix.  The amended Appendix contains a table of contents.  Citations to the exhibits in this pleading will correspond to the names in the table of contents.

Petitioner Brent Brewer will be referred to by name or as "Petitioner."  Notes of testimony of state court proceedings in the Reporter's Record will be cited as [Volume number] RR [page number].  Pleadings and orders that are part of the Clerk's Record in the 47th District Court of Randall County will be referred to as named in the record, with reference to CR, followed by page number, when available.

None of the orders or opinions from the state courts in this case are published.  The opinion of the Texas Court of Criminal Appeals denying appellate relief is *Brewer v. State*, No. AP-76,378, 2011 WL 5881612, at *8 (Tex. Crim. App. Nov. 23, 2011).  The order of the Court of Criminal Appeals denying habeas relief is *Ex Parte Brewer*, No. WR-46,587-02, 2014 WL 5388114 (Tex. Crim. App. Sept. 17, 2014) (Habeas Op.).

All other citations are either self-explanatory or will be explained.   All emphasis in this Petition is supplied unless otherwise indicated; parallel citations are omitted.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ ii

TABLE OF CONTENTS ...................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

PROCEDURAL HISTORY .................................................................................................... 4

STANDARD OF REVIEW .................................................................................................... 6

    A.    General Standards .............................................................................................. 6

    B.    Because the Last Reasoned State-Court Opinion Was Adopted Nearly Verbatim from Respondent's Proposed Order, AEDPA Deference Should Not Apply to Those Claims that Were Adjudicated on the Merits in State-Habeas Proceedings. ..... 8

CLAIMS FOR RELIEF ...................................................................................................... 11

I.    Trial counsel rendered ineffective assistance of counsel in failing to effectively challenging unreliable "expert" testimony on future dangerousness at Mr. Brewer's capital sentencing trial, in violation of the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 668 (1984). ....................................................................................... 11

    A.    The *Strickland* Standard Provides Clearly Established Supreme Court Precedent. ..... 11

    B.    Counsel Failed to Effectively Challenge the Prosecution's Now-Discredited "Expert," Dr. Richard Coons, Resulting in the Admission of Unreliable, Unscientific, and Highly Prejudicial Testimony. ................................................ 11

        1.    Counsel Failed to Object to the Admission of Dr. Coons's Testimony ........ 13

        2.    There Is a Reasonable Probability That This Failure to Exclude Dr. Coons's Testimony Affected At Least One Juror's Decision on Future Dangerousness. ................................................................................. 20

        3.    The State Court Found Counsel's Performance Deficient, But Unreasonably Adjudicated the Prejudice Prong of the Claim. ......................................... 22

    C.    Trial counsel failed to investigate, develop, or present an alternative expert opinion on petitioner's future dangerousness. ........................................... 23

        1.    Counsel Had in Their Possession a Persuasive Future Dangerousness Assessment and Retained an Expert Who Could Have Conducted An Assessment. ................................................................................... 24

        2.    Counsel's Failure to Develop and Present an Alternative Expert Opinion on Future Dangerousness Was Deficient. ............................................... 28

        3.    There Is a Reasonable Likelihood that Dr. Edens's Opinion Would Have Changed One Juror's Decision. ...................................................... 29

    D.    Admission of Dr. Coons's uniquely unscientific, unreliable testimony violated the Due Process Clause of the Fourteenth Amendment and the heightened reliability standard under the Eighth Amendment. ........................................... 29

    1.    The Fourteenth and Eighth Amendments Demand "Heightened Reliability" in Capital Sentencing Proceedings.................................................................30

    2.    *Barefoot v. Estelle* Does Not Foreclose Case-Specific Constitutional Challenges to Individual Unreliable Experts....................................................30

    3.    Dr. Coons's Testimony Is So Unreliable It Violates Due Process and the Eighth Amendment................................................................................31

    4.    In the Alternative, Counsel Were Ineffective in Failing to Preserve This Challenge.............................................................................................32

E.    Counsel Failed to Investigate and Examine Dr. Coons on the Basis For His Scientifically Unreliable Opinion........................................................33

F.    Counsel Was Ineffective for Failing to Investigate Dr. Coons's Credentials; The Prosecution Denied Mr. Brewer His Right to Due Process By Eliciting False and Misleading Evidence About Dr. Coons's Experience and Credentials. .................34

II.    The State violated the dictates of *Napue v. Illinois* by failing to disclose the evidence it had in its possession casting doubt on the reliability and accuracy of the autopsy findings of Dr. Ralph Erdmann and by presenting false and misleading evidence; the trial court erred in admitting Dr. Erdmann's testimony from the 1991 trial, in violation of Petitioner's rights to confrontation; counsel rendered ineffective assistance. .........................36

A.    *Napue / Giglio* Violation ..................................................................................37

B.    Ineffective Assistance.........................................................................................50

    1.    Impeachment............................................................................................50

    2.    Failure to Present Available Expert Medical Testimony Regarding Erdmann's Autopsy Results In This Case. ...........................................53

    3.    Failure to Present Available Expert Testimony and Testimony of Special Erdmann Prosecutors Turner and Phelps.......................................54

    4.    Failure to Move for the Recusal of District Attorney Farren.......................55

    5.    Failure to Conduct a Reasonable Investigation Before Advising Mr. Brewer. ............................................................................................56

C.    Prejudice............................................................................................................58

III.    Petitioner was denied his right to effective assistance of counsel when appellate counsel failed to raise and litigate the trial court's blanket admission of transcripts and exhibits from Mr. Brewer's first trial..........................................................................................58

A.    Introduction .....................................................................................................58

B.    Petitioner's Sixth Amendment Confrontation Clause Rights and Eighth Amendment Rights to Heightened Procedural Safeguards Were Violated. ...............59

C.    Petitioner Was Denied His Right to the Effective Assistance of Appellate Counsel..............................................................................................................61

IV.    Trial counsel rendered ineffective assistance by failing to conduct an investigation into the prior bad acts presented by the State to support its case on Petitioner's alleged future

dangerousness and failed to affirmatively present evidence that Mr. Brewer had never been the subject of investigation while incarcerated on Death Row .......................... 63

    A.    The State's Future Dangerousness Presentation ............................................. 63

    B.    Counsel Rendered Ineffective Assistance. .................................................... 66

    C.    Deficient Performance ................................................................................. 67

        1.    Failure To Investigate 404(b) Evidence .......................................... 67

        2.    Failure To Present Evidence From The Texas Department of Criminal Justice Demonstrating Mr. Brewer Lack of Criminal And Violent Activity .. 74

        3.    Failure To Investigate 404(b) Evidence Prior To Advising Mr. Brewer To Testify. ....................................................................................... 74

    D.    Prejudice ...................................................................................................... 75

V.    Trial counsel's failure to investigate, develop, and present compelling mitigating evidence violated petitioner's right to effective assistance. .......................................... 76

    A.    Trial counsel were ineffective for failing to investigate and present mitigating evidence of Petitioner's background. ............................................................ 76

        1.    Deficient Performance .................................................................... 76

        2.    Counsel's Failure Prejudiced Petitioner .......................................... 82

    B.    Trial counsel were ineffective for failing to investigate and present evidence of Petitioner's mental illness. ........................................................................... 95

        1.    Deficient Performance .................................................................... 96

        2.    Counsel's failure prejudiced Petitioner. ........................................... 97

    C.    Trial counsel were ineffective for failing to investigate and present evidence regarding Kristie Nystrom ........................................................................... 101

        1.    Deficient Performance ................................................................... 101

        2.    Prejudice ..................................................................................... 102

VI.    Counsel were ineffective for failing to investigate, develop, and present evidence that Kristie Nystrom had a larger role in the crime. .......................................................... 103

    A.    Counsel failed to impeach Skee Callen and Kristie Nystrom with Skee's past statements that Kristie had stabbed the victim and failed to elicit remorse testimony; that failure prejudiced Mr. Brewer. ...................................... 103

VII.    The State violated Petitioner's due process and fair trial rights by suppressing favorable *Brady* evidence; the trial court erred by failing to order the disclosure of this evidence; and trial counsel was ineffective for failing to request or obtain it through their own investigation. ......................................................................................................... 105

VIII.    The State violated Mr. Brewer's constitutional rights to due process and a fair trial by presenting false and misleading testimony regarding conditions of confinement.  Trial counsel was ineffective for failing to introduce evidence rebutting this testimony. Appellate counsel was ineffective for failing to raise this issue on appeal. ............................. 109

IX.     Petitioner's conviction and sentence are unconstitutional due to the cumulative effect of trial counsel's inadequate representation, the State's misconduct and the court errors described above. .................................................................................................................114

X.      Petitioner was tried and sentenced to death under an unconstitutional statutory scheme; the trial court erred in denying the defense motion to declare Texas Code Crim. Proc. 37.071 unconstitutional; appellate counsel was ineffective for failure to raise this claim......115

        A.      The Presentation of Evidence of "Extraneous" Conduct Violates the Fifth, Sixth, Eighth and Fourteenth Amendments..................................................................115

        B.      The Jury's Determination of Special Issue One Lacks the Guided Discretion Required by the Eighth and Fourteenth Amendments, Because the Terms of the Question are Vague and Undefined, and the Use of "Probability" Undermines the State's Burden of Proof...........................................................................................116

        C.      The Statute Requires An Unconstitutional Instruction that Ten or More Jurors Must Agree on a Life Sentence, Whereas the Jury Must Unanimously Decide on a Death Sentence. ...............................................................................................117

XI.     The trial court violated Petitioner's rights by failing to excuse unqualified jurors from the panel. ............................................................................................................................119

XII.    The trial court violated Petitioner's rights by allowing automatic death penalty jurors to remain on the jury and by allowing jurors, who by their answers to questions, should have been excluded. ........................................................................................................120

XIII.   The State's failure to provide Petitioner with a new trial after his death sentence was vacated by the U.S. Supreme Court as required by Texas law in place at the time of his conviction violated the Ex Post Facto Clause and counsel rendered ineffective assistance.121

XIV.    Mr. Brewer's execution after a prolonged stay on death row violates due process and is a cruel and unusual punishment under the Constitution and international law........................122

PRAYER FOR RELIEF ...........................................................................................................123

## INTRODUCTION

Mr. Brewer is currently on Death Row for the 1990 murder of Robert Laminack in Amarillo, Texas. Very little in the way of a defense was presented by Mr. Brewer's 1991 attorneys. A token mitigation case—his mother and sister—and a psychologist who did not evaluate Mr. Brewer but testified that future dangerousness assessment is akin to a coin toss, did not persuade the jury. Years later, this Court reversed Mr. Brewer's sentence of death and ordered a new sentencing hearing, an opinion upheld by the United States Supreme Court.

Unfortunately, in 2009, very little in the way of a defense was presented by Mr. Brewer's new attorneys. In fact, their presentation mirrored the failed presentation from 1991. Again, Mr. Brewer's mother and sister testified and were the sum total of the mitigation case. Combined they were on the witness stand for a total of twenty-eight (28) minutes. Karen Brewer's entire testimony, direct and cross, took twenty-one minutes; Billie Ann's, seven.

As in 1991, a psychologist who did not evaluate Mr. Brewer testified generally about what a proper future dangerousness evaluation entails. Indeed, one of Brent's 2009 attorneys admits that the defense team "relied heavily on the work done by the 1991 defense team" and used that trial, in part, as a blueprint for their efforts in 2009. As in 1991, Mr. Brewer's lawyers in 2009 did not investigate the prior bad acts the State used to support its case that he posed a future danger.

This despite the fact that counsel admits that "our theory of defense was that Mr. Brewer did not pose a future danger." The State's future dangerousness case went to the jury virtually unopposed. And counsel failed to present the affirmative evidence of Brent's nineteen years of excellent behavior on death-row to support its chosen theory of defense.

The only difference in the two presentations, apart from nineteen years, was that the defense now had Mr. Brewer's excellent institutional record to present. And they presented the testimony of Mr. Brewer.

1

The other common denominator between the 1991 and 2009 sentencing hearings was that in both trials, the State presented the testimony of two of the most discredited and notorious forensic experts in the state of Texas: Richard Coons, M.D., whose so-called methodology for assessing whether a person poses a future danger has been deemed inadmissible in Texas because it is scientifically unreliable and inaccurate; and the report and 1991 testimony of Ralph Erdmann, M.D., who stands convicted of numerous counts of aggravated perjury and falsifying public records. Indeed, Dr. Erdmann falsified autopsy reports, lab reports, tailored his testimony to fit the State's theory of the case and wrote autopsy reports about bodies he never autopsied. Much of his criminal activity took place during the same time period that he conducted the autopsy in this case.

In fact, four of Dr. Erdmann's seven convictions were the result of prosecutions initiated by the prosecutor in this case. Tellingly, when Mr. Brewer filed for post-conviction relief in or around 1997, and raised as an issue the reliability of Dr. Erdmann's work in this case, the prosecutor filed a motion to withdraw, stating that "it would be virtually impossible" for him to continue the defend the conviction in this because he would have to "vouch for the credibility and reliability" of Dr. Erdmann whom he "prosecuted for aggravated perjury and tampering with evidence." *See* Motion To Withdraw from Writ of Habeas Corpus Proceeding, Aug. 22, 1997, at 4-5. The motion was granted, and a special prosecutor was appointed.

In other words, the man who prosecuted Mr. Brewer in 2009 could not and would not be party to a case where the State had to prop up and allege that Erdmann's work was credible, reliable, and accurate. In 1997, he properly would not vouch for Erdmann's work in this case. He knew that Erdmann had lied under oath. He knew that Erdmann had falsified a slew of autopsy reports. He knew that Erdmann harvested and sold organs without permission and he knew he was incompetent.

Yet, in 2009, he didn't bat an eye in presenting as reliable the same autopsy report he would not defend twelve years earlier. None of this evidence made its way to Mr. Brewer's 2009 jury. And counsel, who had at their disposal a veritable arsenal of impeachment evidence for use in cross-examining Dr. Natarajan about Dr. Erdmann, used none of it. In short, Brent was left defenseless.

And it was no better with Dr. Coons. In 2009, as in 1991, Dr. Coons never laid eyes on Brent until he arrived in court to testify. He did not evaluate him and he only had before him the information the State provided to him about the offense. He testified that this nineteen year old had no conscience. Relying upon methodology that has been universally ridiculed by his peers, Dr. Coons predicted in 1991 that Brent would commit acts of violence and become a gang member. Mr. Brewer's near-impeccable conduct reflected in his institutional record proves otherwise. In 2009, he again predicted that Brent would pose a future danger. As of this writing, Dr. Coons is again wrong.

Worse still, despite staking their strategy on excluding Dr. Coons' testimony, trial counsel failed to lodge a proper objection, precluding the Texas Court of Criminal Appeals from weighing in on the admissibility of Coons' flawed methodology in this case. Just a year later, weighing the same dubious methodology Dr. Coons utilized in this case, the Texas Court of Criminal Appeals discredited Dr. Coons, calling his brand of pseudoscience "unreliable." As with Dr. Erdmann, the defense failed to mount a challenge to Dr. Coons' conclusions about Mr. Brewer.

If this were not enough for Mr. Brewer to overcome, the reason the trial imploded on the defense is because they were not prepared. A few short weeks before the start of jury selection, the defense team's mitigation investigator sent a team-wide email expressing his concern that they were woefully unprepared: "[w]e have not asked for a single continuance nor have we consulted with a single expert in any real depth…my concern is that we haven't had any experts give a real run at any of their particular areas…Finally, we haven't been able to prepare any of these experts and we will have very scant time prior to the merits. If another few months helps us ensure that Brent's rights

are protected and to increase the likelihood that his life is saved, I think we should take it." Email of

Rob Cowie, May 15, 2009. Despite this warning, the defense failed to file a continuance motion.

As detailed in the claims presented below, Mr. Brewer received lousy representation and was

condemned in large part on the testimony of a criminal and an expert who utilized junk science to

reach his conclusion that Mr. Brewer poses a future danger. He is entitled to relief.

## PROCEDURAL HISTORY

On April 26, 1990, Petitioner Brent Ray Brewer was nineteen years old, in relapse just weeks

after an involuntary commitment to a state hospital for depression, and without a roof over his

head. At the hospital, he had met Kristie Nystrom. In the course of a botched robbery, Kristie and

Brent killed Robert Doyle Laminack.

In a jury trial in the 47th District Court, Randall County ("trial court"), Petitioner was

convicted of capital murder on June 3, 1991. 1 CR 2 (conviction), 1 CR 4 (sentence). His sentence

was vacated in 2007. *See Brewer v. Quarterman*, 550 U.S. 286 (2007), *aff'g Brewer v. Dretke*, 2004 WL

173212 (N.D. Tex. 2004).

On April 15, 2008, Mr. Brewer was appointed the West Texas Regional Public Defender as

counsel. 1 CR 11. Initially, the head of that office, Jack Stoffregen, handled the case. 1 RR Evid.

Hr'g 250. In March 2009, attorney Edward Ray Keith, Jr., was assigned to represent Mr. Brewer in

place of attorney Stoffregen, less than four months before jury selection began. Attorney Anthony

C. Odiorne also represented Mr. Brewer. 1 RR Evid. Hr'g 49. They received the assistance of

mitigation specialist Robert Cowie and investigator Albert Miraval. *Id.*

Following individual voir dire and jury selection, the trial court, Judge Hal Miner presiding,

held Mr. Brewer's resentencing trial from August 10, 2009 to August 14, 2009. Attorneys Keith and

Odiorne represented Mr. Brewer at the trial. The jury answered the three special issues mandated by

Texas Code of Criminal Procedure article 37.071 requiring the death sentence. 2 CR 610-14. On

November 23, 2011, the Texas Court of Criminal Appeals ("CCA") affirmed the sentence. Appeal Op. at *8. Appellate counsel John Bennett represented Mr. Brewer on direct appeal. 2 CR 618.

On September 10, 2009, the trial court appointed Richard L. Wardroup to represent Mr. Brewer in his state post-conviction proceedings under Texas Code of Criminal Procedure 11.071. 2 CR 609. On January 20, 2012, the CCA found that attorney Wardroup had failed to timely file an application, but granted a new date to file upon a showing of good cause under Article 11.071 § 4A.

On July 20, 2012, Petitioner filed an application for writ of habeas corpus. On January 9, 2013, visiting senior judge Judge Dick Alcala was assigned the case. On March 14, 2013, Richard Wardroup was permitted to withdraw as writ counsel and was replaced by Hilary Sheard. On August 20 and 21, 2013, an evidentiary hearing was held in Randall County, Texas to address the issue of trial counsel's performance with respect to the State's star expert witness, Dr. Richard Coons. Keith, Odiorne, and Coons testified. *See* Findings of Fact and Conclusions of Law, Ex Parte Brewer, No. W-6997-A-2, at *3-4 (47th Tex. Dist. Ct. Mar. 3, 2014) (Alcala, J.) ("FFCL").

The trial court ordered the parties to prepare findings of fact and conclusions of law. *Id.* at 5. On March 3, 2014, the trial court adopted the State's proposed findings and conclusions without modification.

On September 17, 2014, the CCA denied Petitioner's application for writ of habeas corpus under Texas Code of Criminal Procedure 11.071. Habeas Op. at *1. The order adopted all of the trial court's findings of fact and conclusions of law, but two: "We agree with the trial judge's recommendation and adopt the trial judge's findings and conclusions, except for paragraphs 1 and 2 on page 81."[1] The CCA's unpublished order further noted that Judge Johnson "would grant" Mr. Brewer the writ. *Id.*

---

[1] The conclusions of law the CCA did not adopt pertained to Petitioner's challenge to the State's use of the autopsy report and prior testimony of notoriously discredited pathologist Dr. Ralph Erdmann.

## JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 2254.  Petitioner, Brent Brewer is in the custody of the Texas Department of Criminal Justice under a sentence of death.

## GROUNDS FOR RELIEF

By his Petition for a Writ of Habeas Corpus, Petitioner asserts that his sentence violates the Fifth, Sixth, Eighth and Fourteenth Amendments, and should be vacated for each of the reasons set forth herein.

## STANDARD OF REVIEW

### A.     General Standards

This Court's review is conducted pursuant to the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  While AEDPA places certain limitations on a federal court's ability to grant habeas relief, the writ of habeas corpus remains "a safeguard against imprisonment of those held in violation of the law" that requires federal courts to be "vigilant and independent" in reviewing habeas corpus petitions.  *Harrington v. Richter*, 562 U.S. 86, 91 (2011).

28 U.S.C. § 2254(d), which provides the standard of review for federal courts reviewing habeas petitions challenging state convictions, states:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As the text of § 2254(d) makes clear, AEDPA's deferential standard of review applies only to those claims that were adjudicated on the merits in state court.  For any claim as to which the state courts

have not reached the merits, "the claim is reviewed *de novo*." *Cone v. Bell*, 556 U.S. 449, 472 (2009). Similarly, if a state court renders a decision on only part of a federal claim (*e.g.*, only on the prejudice prong of an ineffective assistance of counsel claim), only that part of the claim ruled upon by the state court receives AEDPA deference. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*."); *accord Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (reviewing prejudice prong *de novo*); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (same).

For any claim a state court has ruled on the merits, a federal court may still grant relief under § 2254(d)(1) and/or (d)(2). Under § 2254(d)(1), a federal court may grant relief where the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions at the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court ruling is "contrary to" clearly established federal law where it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 412-13. Under the "'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

A court may grant relief under § 2254(d)(2) where a state-court merits determination results in an unreasonable determination of the facts, meaning it is "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "Even in the context of federal habeas, deference does not imply abandonment or abdication of

judicial review," however, and "does not by definition preclude relief." *Id.*; *accord Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015).

The relevant adjudication for the claims raised on direct appeal in this case is the opinion of the Texas Court of Criminal Appeals. *See* Appeal Op. For any claim adjudicated in state-habeas proceedings, the relevant adjudication is the Randall County district court's Findings of Fact and Conclusions of Law (FFCL), as adopted by the Texas Court of Criminal Appeals.

> **B.      Because the Last Reasoned State-Court Opinion Was Adopted Nearly Verbatim from Respondent's Proposed Order, AEDPA Deference Should Not Apply to Those Claims that Were Adjudicated on the Merits in State-Habeas Proceedings.**

Much of Mr. Brewer's federal habeas petition was raised and adjudicated in his amended state-habeas petition. Because the state court's order denying these claims was a verbatim adoption of a lengthy proposed order written by Respondent's attorneys, Petitioner submits that this Court should exercise *de novo* review over these claims and should not defer to the state court's purported factual findings. Deferring to an order drafted by a party-opponent is not required by AEDPA and is inconsistent with due process.

Mr. Brewer acknowledges that the Fifth Circuit has declined to extend less AEDPA deference to state court factual findings where those findings are verbatim adoptions of proposed orders written by the State. The Fifth Circuit has recognized that the Supreme Court has "not considered the lawfulness" of such whole-cloth adoptions, and has therefore declined to provide any less deference. *See Green v. Thaler*, 699 F.3d 404, 416 (5th Cir. 2012) (assigning error to district court for "according the state court's decision less deference as a result of the *ex parte* request to the State for a proposed order and the subsequent adoption thereof"). The Supreme Court, however, has at least questioned whether such a practice is proper. *See Jefferson v. Upton*, 560 U.S. 284, 293-94 (2010) (vacating denial of habeas petition in pre-AEDPA case and remanding for district court to determine whether presumption of correctness applied to factual findings in state-court order

adopted verbatim from proposed order authored by Respondent's attorneys where court solicited the proposed order *ex parte* and gave petitioner no opportunity to criticize proposed findings or submit his own proposed order).

Although it appears that the Texas state-habeas courts have made a practice of denying relief by adopting Respondent's proposed orders,[2] a practice is not legitimate merely because it is repeated. In non-habeas cases, the United States Supreme Court has criticized the adoption of a party's proposed order as a court's reasoned opinion on multiple occasions. *See Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985) ("We, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties . . . . We are also aware of the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact when they have already been informed that the judge has decided in their favor."); *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 657 n.4 (1964) (noting that lawyer-drafted orders "won't be worth the paper they are written on as far as assisting the court of appeals in determining why the judge decided the case.").

These concerns are still more pronounced in a state court's adjudication of a capital habeas case. A state-habeas court's order necessarily deals with the possible violation of a person's constitutional rights in the course of a criminal trial, and our legal system has long accorded more—not less—protection to the rights of criminal defendants. *See, e.g., Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (discussing the heightened beyond-reasonable-doubt standard). And, as the Supreme Court has oft expressed, "death is different," meaning that procedural and substantive safeguards in

---

[2] A 2002 study of Texas capital habeas cases under Article 11.071 found that in the "211 cases in which the prosecution's proposed findings of fact were available for review, the trial court entered findings of fact and conclusions of law which were identical or virtually identical to the prosecutor's in 189 (90%) of the cases." Tex. Defender Serv., *Lethal Indifference: The Fatal Combination of Incompetent Attorneys and Unaccountable Courts in Texas Death Penalty Appeals* 54 (2002), *available at*

capital cases must be robust to prevent the imposition of a death sentence that is arbitrary and capricious. *See, e.g., Ring v. Arizona*, 536 U.S. 584, 605-06 (2002).

Respondent and Petitioner each submitted proposed orders to the state-habeas court.  The state- court adopted Respondent's order nearly verbatim.  Undersigned counsel have been unable to identify anything of substance—even a single sentence—authored by the state-habeas court.

Mr. Brewer recognizes that Circuit precedent suggests that this Court should give deference even to a state habeas court's order that parroted Respondent's proposed order.  Mr. Brewer contends that such precedent is erroneous, and submits that a state-court decision concerning the constitutional rights of a criminal defendant in a death penalty case should not be accorded deference by the federal courts when it is the mere adoption of an order written unilaterally by his adversary.

## CLAIMS FOR RELIEF

I. **TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO EFFECTIVELY CHALLENGING UNRELIABLE "EXPERT" TESTIMONY ON FUTURE DANGEROUSNESS AT MR. BREWER'S CAPITAL SENTENCING TRIAL, IN VIOLATION OF THE SIXTH AMENDMENT AND *STRICKLAND V. WASHINGTON*, 466 U.S. 668 (1984).**

### A. The *Strickland* Standard Provides Clearly Established Supreme Court Precedent.

Trial counsel rendered ineffective assistance in violation of Petitioner's rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution by failing to effectively counter and impeach the testimony of Dr. Coons. The Sixth Amendment mandates that counsel "has a duty to bring to bear such skill and knowledge as will render the trial a *reliable* adversarial testing process." *Strickland v. Washington*, 466 U.S. 668, 688 (1984) (emphasis added). When counsel fails in this duty, and that failure "[falls] below an objective standard of reasonableness," *Strickland* requires that the court find the mistake constitutionally deficient. *Id. Strickland* further requires that a defendant show prejudice, that is, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

### B. Counsel Failed to Effectively Challenge the Prosecution's Now-Discredited "Expert," Dr. Richard Coons, Resulting in the Admission of Unreliable, Unscientific, and Highly Prejudicial Testimony.

On May 13, 2009, nearly four months before trial, defense counsel received notice that psychiatrist Dr. Richard Coons would testify for the State. 1 CR 340-41. The news was hardly a surprise: Dr. Coons had testified frequently for the State in capital cases. *See* 23 RR 174. Moreover, he had testified at Mr. Brewer's original trial in May 1991. 18 RR—1991 Trial 721-737. At the first trial, Dr. Coons stated his opinion without examining Mr. Brewer, *id.* at 737, and without articulating a method for his prediction of future danger, *id.* at 727. He based this opinion on a seemingly random assemblage of facts and unprovable conjecture: hypothetical scenarios posed by the prosecution, *id.* at 731, Mr. Brewer's supposed lack of "conscience," *id.* at 733, the necessity of joining a prison gang, *id.* at 736, and Mr. Brewer's "preference for a knife," *id.* at 734.

Prior to Mr. Brewer's resentencing, counsel formed an obvious strategy with regard to Dr. Coons: exclude his testimony by attacking his lack of methodology. *See* FFCL at 8; 2 RR Evid. Hr'g 64, 69, 255, 277. Counsel indicated that he would seek to prove that Dr. Coons was a "charlatan." 25 RR 216. Yet, counsel inexplicably failed to object to the admission of Dr. Coons's testimony based on his qualifications prior to trial or at a timely point during trial. As the Texas Court of Criminal Appeals found, counsel for Mr. Brewer "never lodged any objection to the reliability of Dr. Coons's testimony during the hearing, or, as far as we can tell, at any other point before or during Dr. Coon[s]'s testimony." *Brewer v. State*, No. AP-76,378, 2011 WL 5881612, at *7 (Tex. Crim. App. Nov. 23, 2011). Even when counsel belatedly objected, counsel "never stated what aspect of [the evidentiary rule] he was relying upon." *Id.* at *8. That is, trial counsel never "let the trial judge know what he want[ed] and why he is entitled to it." *Id.* at *7 (quoting *Neal v. State*, 256 S.W.3d 264, 279 (Tex. Crim. App. 2008)). In state habeas proceedings, counsel admitted the errors, and the state habeas court found the errors constitutionally deficient. FFCL at 73.

This unprofessional lapse had serious consequences. Had counsel raised a proper challenge, Dr. Coons's testimony likely would have been excluded. That is the lesson of *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010), which—in a case strikingly similar to Mr. Brewer's—held that "the prosecution did not satisfy its burden of showing the scientific reliability of Dr. Coons's methodology for predicting future dangerousness by clear and convincing evidence during the gatekeeping hearing in this particular case." *Id.* at 279. The exclusion of Dr. Coons's unreliable testimony would have had a tremendous impact on the jury's considerations, because Dr. Coons exerted a uniquely powerful influence on the jury's decisionmaking. Furthermore, the exclusion of Dr. Coons's testimony would have had an even greater impact were it not for counsel's many other unprofessional errors. Had counsel rebutted the State's aggravating circumstances and presented an

adequate social history following a reasonable mitigation investigation, the exclusion of Coons would have had an even greater likelihood of altering the outcome.

### 1. Counsel Failed to Object to the Admission of Dr. Coons's Testimony.

Where counsel's strategy is to exclude unreliable expert testimony, failure to use the only available legal means to accomplish that end falls below prevailing professional norms.

### a. Texas Law Governing the Admission of Expert Testimony on Future Dangerousness

Texas law provided clear substantive and procedural rules for excluding expert testimony on future dangerousness. Texas has adopted the standards enunciated in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), in interpreting its evidentiary rules for the admission of expert opinions. *See* Tex. R. Evid. 702, 705. *Daubert* requires a judge to "act as a true 'gatekeeper' when addressing the reliability and relevance of expert testimony." *Coble*, 330 S.W.3d at 272 (citing *Daubert*, 509 U.S. at 589-92). Thus, under Texas Rule of Evidence 702,

> in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Coble*, 330 S.W.3d at 272 (quoting *Daubert*, 509 U.S. at 590). Texas courts have reinforced these standards with specific criteria: "To be considered reliable, evidence from a scientific theory must satisfy three criteria: "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Coble*, 330 S.W.3d at 273 (quoting *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)).

These substantive rules are accompanied by simple procedures for raising the challenge. As the Court of Criminal Appeals reiterated in Mr. Brewer's direct appeal:

> To preserve error regarding the admission of evidence, a party must object in a timely fashion and state the specific ground for objection, if the ground is not apparent from the context. The ground for objection, unless apparent from the context, must be stated with "sufficient specificity to make the trial court aware of the complaint."

*Brewer v. State*, No. AP-76,378, 2011 WL 5881612, at *6 (Tex. Crim. App. Nov. 23, 2011) (citing Tex. R. Evid. 103(a)(1)). These rules were well established at the time counsel represented Mr. Brewer for his resentencing, and should have been known and utilized by counsel in executing their strategy.

### b. Counsel Raised No Specific Challenge to Dr. Coons's Unreliable Methodology at Any Point

Counsel took two actions prior to trial, neither sufficient to object to the admission of Dr. Coons's testimony. First, on May 1, 2008, well before the State had identified Dr. Coons as an expert, counsel filed a "Motion to Allow Voir Dire of Expert Witness Pursuant to Rule 705(B) Texas Rules of Evidence," 1 CR 15-16, which was granted, 1 CR 66. Second, counsel filed a generic three-page "Motion in Limine to Exclude Psychiatric or Psychological Testimony Concerning Future Dangerousness" prior to trial, which asserted that all psychiatric or psychological predictions concerning future dangerousness are inadmissible, because they are unreliable, irrelevant, and more prejudicial than probative. 1 CR 191-193. The motion also referred to "reasons set forth . . . in the attached *Memorandum of Law*," but counsel failed to attach any supporting brief. *See id.* The court denied the motion, 1 CR 350, and the defense stated that it would seek to revisit the issue, 1 Supp. RR 56. Counsel waited to "revisit" the issue until after Dr. Coons was sworn in, actually on the stand, and in the presence of the jury; only then did they ask for a "702, 705" hearing. 23 RR 172. The trial court asked counsel if they were trying to create a delay, and informed the jury that he would "need about ten minutes" for the hearing. *Id.* Even then, counsel failed to lodge an objection at the conclusion of the hearing.

At the *voir dire* hearing, Dr. Coons recited his education and experience as a forensic psychiatrist. 23 RR 174. He claimed to have treated several thousand private patients and to have

done "probably 95 percent of the criminal forensic psychiatry in Travis County . . . and many more areas."

The State then questioned Dr. Coons in an attempt to establish that he was able to testify as an expert. Parroting *Kelly* and *Nenno*, the State first asked whether psychiatry was a valid science, which Dr. Coons affirmed. 23 RR 175. Next, the State asked whether there are "one or more valid methods of applying this valid science to, for instance, looking at an individual and reaching conclusions about their behavior and why and how they behave the way they do and how they might behave in the future" 23 RR 176-77. Dr. Coons's response did not discuss methods and instead stated that psychiatrists are "required to do many of these things." 23 RR 177. Apparently satisfied that this cleared *Kelly*'s second hurdle even though Dr. Coons had identified no method, the State finally asked Dr. Coons whether "in addition to being a scientific field of science [sic] and a valid field of science, and in addition to having one or more methods of applying that science in various ways, was a – was one or more valid methods used in your preparation to provide an expert opinion in this case." 23 RR 177. To this, Dr. Coons responded, "Yes. You know much is written and much is read about the issues of danger and so forth. My methodology involves the concept that the past is the best predictor of the future." 23 RR 178. "With that in mind," Dr. Coons "look[s] at": "the individual's history of violence"; "the individual's attitude about violence"; "the incident offense"; "the person's personality [and] usual form of behavior"; "the issue of conscience"; and "the society that they will be in." *Id.* Dr. Coons further stated that his method could be performed "without actually examining the individual in question" so long as there was "enough data." *Id.*

In its disjointed cross-examination, defense counsel failed to press Dr. Coons on the key question on which their entire strategy hung: whether his opinion was based on a valid method for assessing future dangerousness within his field of forensic psychiatry. *See Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998). Defense counsel elicited from Dr. Coons that in his training he

had received practical experience in, and heard lectures about, how to assess someone's risk of violence.  23 RR 180-181.  Turning to Dr. Coons's methodology, defense counsel elicited some information, but failed to ask about crucial facts.  Dr. Coons admitted that it would be possible to assess whether somebody would be a risk in the future only within "a reasonable period of time," "depend[ing] on the case."  23 RR 181.  When defense counsel asked, "what steps did you take in formulating your opinion," Dr. Coons's bizarre answer was, "Both."  *Id.*  Counsel did not follow up.  When asked how he interprets the statutory term "criminal acts of violence," Dr. Coons stated that he included *threats* of bodily harm, sexual assault, physical injury or death.  23 RR 182.  Dr. Coons conceded that this definition differs from how "it's generally written about," *id.*, and acknowledged that "folks who write about predictions of dangerousness" do not "generally" agree,  23 RR 183.  Counsel followed up:

> Q. You have a different definition of criminal act of violence than other people in this field?
>
> A. Well, basically what theirs is, is they -- they are dealing with -- with -- well, yes, I guess I do. Theirs is restricted to -- to serious institutional violence, and they're talking about injury or murder.

*Id.*  Counsel did not ask whether any others *do* share Dr. Coons's methodology or whether any authority in his field supports his method.  When questioned about his potential rate of error, Dr. Coons simply responded, "I'm not a statistician."  *Id.* He admitted that he did not know the error rates in the field of risk assessment, and dismissed such research on the basis of "their data is poor, so error rates . . . they're almost meaningless."  23 RR 184.  Nonetheless he agreed that in a valid scientific discipline, determining whether the predictions were accurate is important.  *Id.*

Dr. Coons also asserted—in seemingly contradictory statements—both that the literature in question does not follow up on predictions, and that those who do such research have "bum data." 23 RR 186.  According to Dr. Coons, there is "a huge amount of violence in the penitentiary [that] goes unreported and so neither I nor they have that data."  23 RR 186.  Dr. Coons claimed that he

16

was "well aware of violence from people who have been convicted of capital murder." 23 RR 186.

When pressed further about the accuracy of his predictions, Dr. Coons readily admitted: "Can't be certain. I have an opinion that's quite strong, but there is way more violence than any of the literature that I've seen demonstrates." 23 RR 187. In support of this assertion, Dr. Coons stated that he had spoken to "probably several thousand people who've been in the Texas Department of Corrections[,] who've been in prison, and I've asked many of them about violence in prison." He went on to explain that he did not recall anyone denying the existence of violence in prison, but that it was not reported because of fears of retaliation, so "all that unreported data is not available to the folks who write all of these little articles." 23 RR 188. Dr. Coons confirmed that he had not interviewed Mr. Brewer. 23 RR 190-91.

On redirect examination, Dr. Coons noted that he belongs to the American Academy of Psychiatry and the Law, and that he knows that "they have presentations at their annual meeting . . . and in their publications" but did not know whether that organization had a specific opinion on the assessment of the probability of future dangerousness. Nonetheless, he stated that: "There are many people that are members who do exactly this sort of work." 23 RR 192.

Quizzed by the defense as to whether there are "specific standards that govern how to make these predictions of future dangerousness," Dr. Coons was equivocal, stating that it is done in a variety of ways, with some people using "instruments . . . to determine the personality of the individual and so forth." He asserted that "the areas that I have discussed are . . . routinely used," but could not say whether his method has been generally accepted by the scientific community. 23 RR 195. Defense counsel concluded his examination and the court then announced that "I'm going to hold that Dr. Coons is qualified and that the . . . psychiatric field of future dangerousness is a valid scientific theory and that . . . the technique he used to apply it was valid, and that it was applied validly here in this Brewer case." 23 RR 196. There was no argument or objection from the defense

17

at this point, nor any evidence offered to rebut Dr. Coons's testimony on *voir dire*. It was only later, after Dr. Coons had testified before the jury, that defense counsel belatedly moved to strike his trial testimony:

> I would like to re-urge our motion and ask that the testimony of Dr. Coons be stricken under 702 and 705. Under the 5th, 6th, 8th and 14th Amendment[s] of the U.S. Constitution, specifically under the 6th Amendment, confrontation clause, *Crawford* and *Melendez-Diaz versus Massachusetts*.
>
> He was asked to assume facts that were not in evidence before this jury, which violates the 8th Amendment of due process[ sic], confrontation, the right to a jury trial under the United States and Texas Constitutions. I'm aware that this Court issued an instruction. However, we do not feel that the instruction was adequate. In addition to striking Dr. Coons' testimony, we would move for a mistrial.

23 RR 239-40. Even then, counsel never clearly stated the specific grounds for the objection.

In sum, as the Texas Court of Criminal Appeals found, counsel for Mr. Brewer "never lodged any objection to the reliability of Dr. Coons's testimony during the hearing, or, as far as we can tell, at any other point before or during Dr. Coon[s]'s testimony." *Brewer v. State*, No. AP-76,378, 2011 WL 5881612, at *7 (Tex. Crim. App. Nov. 23, 2011).

> ### c.   Dr. Coons's testimony failed to satisfy standards for admissibility.

The State did not meet its burden to demonstrate the reliability of Dr. Coons's purported "expert" opinion by clear and convincing evidence. The State's proffer that Dr. Coons used a valid method within his scientifically valid field depended solely on Dr. Coons's say-so. The State never elicited or argued the lack of factual or theoretical support for Dr. Coons's statements. *See* 23 RR 201. Despite the fact that the hearing was convened pursuant to Texas Rule of Evidence 705(b) for the purpose of examining "the underlying facts or data," neither the State nor defense counsel asked about the underlying facts or data Dr. Coons used in forming his opinion. The State therefore failed to demonstrate that Dr. Coons properly applied the principles in his field in forming his opinion.

*Coble* is highly instructive on this point.  In *Coble*, as in this case, Dr. Coons was retained as the State's expert for the purpose of offering his opinion on the defendant's future dangerousness. 330 S.W.3d at 270.  Dr. Coons gave nearly identical testimony about his method.  That is, he relied upon psychiatric principles when he evaluates defendants for "future dangerousness" for capital murder trials; his method is premised on the belief that "the best predictor of the future is the past"; and he relied on the same six factors in forming his opinion.  *Id.* at 270-71.  Just as in this case, the State did not show "whether others rely upon this method, and . . . any psychiatric or psychology books or articles . . . use his factors." *Id.* at 271.  Given these similarities, the Court of Criminal Appeals's analysis is especially forceful here:

> From this record, we cannot tell what principles of forensic psychiatry Dr. Coons might have relied upon because he cited no books, articles, journals, or even other forensic psychiatrists who practice in this area.
>
> There is no objective source material in this record to substantiate Dr. Coons's methodology as one that is appropriate in the practice of forensic psychiatry.  He asserted that his testimony properly relied upon and utilized the principles involved in the field of psychiatry, but this is simply the *ipse dixit* of the witness.  Dr. Coons agreed that his methodology is idiosyncratic and one that he has developed and used on his own for the past twenty to thirty years.  Although there is a significant body of literature concerning the empirical accuracy of clinical predictions versus actuarial and risk assessment predictions, Dr. Coons did not cite or rely upon any of these studies.

*Id.* at 277-78.  The *Coble* Court also dissected the unreliable foundations of Dr. Coons's idiosyncratic six-factor method:

> These factors sound like common-sense ones that the jury would consider on its own, but are they ones that the forensic psychiatric community accepts as valid?  Have these factors been empirically validated as appropriate ones by forensic psychiatrists?  And have the predictions based upon those factors been verified as accurate over time?  Some of Dr. Coons's factors have great intuitive appeal to jurors and judges, but are they actually accurate predictors of future behavior?  Dr. Coons . . . has never gone back to see whether his prior predictions of future dangerousness have, in fact, been accurate.

*Id.* at 278-79.  In sum, the *Coble* Court concluded that Dr. Coons's testimony was too unreliable to be admitted: "Based upon the specific problems and omissions cited above, we conclude that the

prosecution did not satisfy its burden of showing the scientific reliability of Dr. Coons's methodology for predicting future dangerousness by clear and convincing evidence during the *Daubert/Kelly* gatekeeping hearing in this particular case." *Id.* at 279.

The affidavit of Dr. John Edens, who testified for the defense before the jury about the shortcomings of Dr. Coons's approach, further underscores how unreliable Dr. Coons's testimony was. July 9, 2012 Affidavit of John F. Edens, Ph.D. Concerning Resentencing. Dr. Edens calls Dr. Coons's method "a case study in how *not* to conduct a scientifically informed evaluation of the likelihood that a capital defendant will engage in acts of criminal violence if not given a death sentence":

> Dr. Coons's approach ignores or dismisses a number of relevant scientific findings, including (a) evidence regarding base rates of prison violence (i.e., the known frequency of violent acts that are committed by inmates in prison systems), (b) risk and protective factors related to prison violence (i.e., characteristics that have been identified in research that either increase or decrease the likelihood of a violent act occurring in the future), and (c) evidence suggesting that capital inmates who are transferred from death row into general population prison settings are no more prone to violence post-transfer than they were pre-transfer. Instead, Dr. Coons chose to focus on his own idiosyncratic experiences as a forensic mental health examiner and intuitive interpretations of anecdotal information (e.g., the use of a knife to commit the capital offense, the use of a cutting device in a suicide attempt) to inform his opinions concerning the likelihood that someone with a background similar to Mr. Brewer would engage in criminal acts of violence in the future if not sentenced to death.

Edens Resentencing Aff. ¶ 10. Therefore, but for counsel's failure to object, the testimony would have been properly excluded or the error would have at least been preserved for disposition in accordance with *Coble*.

### 2. There Is a Reasonable Probability That This Failure to Exclude Dr. Coons's Testimony Affected At Least One Juror's Decision on Future Dangerousness.

But for counsel's failure to challenge Dr. Coons's testimony, the jury would not have heard testimony that Mr. Brewer lacked a "conscience," 23 RR 222, and that violence "doesn't seem to bother him." 23 RR 221. Moreover, the jury heard someone labeled an "expert" with a lengthy list

of credentials and experience state that he had formed an opinion—expressed without doubt—that Mr. Brewer would probably commit criminal acts of violence in the future.  23 RR 219.  That "expert" testimony on future dangerousness was especially powerful because, due to counsel's other errors, *see infra* Part I.C, there was no defense expert to provide a counterweight.

The impact of Dr. Coons's testimony was particularly powerful.  As *Coble* concluded, "scientific" expert testimony can have a high persuasive value:

> Indeed, some studies have shown that juror reliance on an expert's credentials is directly proportional to the complexity of the information represented: the more complex the information, the more the jury looks to the background, experience, and status of the expert himself rather than to the content of his testimony.  There is also some evidence that jurors value medical expertise higher than other scientific expertise; thus, even when the information is identical, jurors find evidence from a doctor more persuasive than the very same testimony from a psychologist.  Furthermore, evidence that corresponds to firmly held beliefs may be particularly persuasive to jurors.  Thus, an expert's appeal to the juror's own common sense may be considerably more persuasive than a counterintuitive and complex, but empirically verified, theory.[3]

Dr. John Edens also emphasizes the powerful impact of medical testimony, particularly in the form of subjective opinion testimony:

> Unfortunately, there is considerable evidence to suggest that jurors are unduly influenced by exactly the type of evidence provided by experts such as Dr. Coons in the Brewer case, as well as unduly influenced by the testimony of medical doctors relative to other experts. Clinical opinion testimony concerning violence risk has been shown to have a more pronounced effect on the decision-making of laypersons than does more scientifically defensible risk assessment evidence. This finding must also be considered in the context of research evidence that capital jurors are already predisposed to grossly overestimate the likelihood of future violence posed by capital defendants.

Affidavit of John Edens, Ph.D. Regarding 2009 Resentencing ¶ 12.

---

[3]*Coble*, 330 S.W.3d at 281 (citing Joel Cooper et al., *Complex Scientific Testimony: How Do Jurors Make Decisions?*, 20 Law & Hum. Behav.. 379, 379 (1996); Jeff Greenberg & April Wursten, *The Psychologist and the Psychiatrist as Expert Witnesses: Perceived Credibility and Influence*, 19 Prof. Psych. Res. & Prac. 373, 378 (1988); *See* C. Robert Showalter & Richard J. Bonnie, *Psychiatrists and Capital Sentencing: Risks and Responsibilities in a Unique Legal Setting*, 12 Bull. Am. Acad. Psych. & L. 159, 165 (1984) (noting that jurors tend to overvalue predictions that confirm their pre-existing beliefs)).

Here, there was testimony from an expert who was not only a doctor but a graduate of the University of Texas School of Law who had been licensed to practice law, and apparently a physician that the Board of Law Examiners would consult to evaluate who is fit to practice law. 23 RR 196-200. These credentials lent a semblance of credibility to Dr. Coons "idiosyncratic" approach. *See Satterwhite v. Texas*, 486 U.S. 249, 258 (1988) ("The finding of future dangerousness was critical to the death sentence. Dr. Grigson was the only psychiatrist to testify in this issue, and the prosecution placed significant weight on his powerful and unequivocal testimony."); *Flores v. Johnson*, 210 F.3d 456, 465-66 (5th Cir. 2000) (Garza, J., concurring) ("juries are almost always persuaded" when a doctor predicts someone to be a future danger).

Moreover, Dr. Coons's testimony was even more significant in the absence of an alternative defense opinion on future dangerousness. Again, comparison with *Coble* is useful. There, in spite of the erroneous admission of Dr. Coons's unreliable testimony, the CCA concluded the testimony was harmless in part because another psychiatrist had presented an alternative opinion. *Coble*, 330 S.W.3d at 282. Here, by contrast, Mr. Brewer did not receive the benefit of an alternative opinion. Instead, his defense was exposed to the brunt of Dr. Coons's unreliable testimony. In any case, Dr. Edens was asked to explain the concept of the actuarial assessment of risk factors only to rebut Dr. Coons's *method*; he was not asked to offer his own *conclusion* as to whether Mr. Brewer was a future danger. *See generally* 24 RR 11-73. Indeed, the State exploited this discrepancy in closing—between Dr. Coons's "professional opinion," on the one hand, and Dr. Edens's nit-picking about methodology, on the other. 25 RR 199-200. In the prosecutor's colorful metaphor: "It's kind of like standing in the wreckage of your living room describing to someone the plywood you could have put on your window before the hurricane arrived. Does it make sense to you? No." 25 RR 200.

> **3.      The State Court Found Counsel's Performance Deficient, But Unreasonably Adjudicated the Prejudice Prong of the Claim.**

The CCA found that trial counsel failed to object on direct appeal, a finding now entitled to AEDPA deference. But the state court rejected the claim on prejudice grounds. The state court failed to apply the prejudice analysis from *Strickland*. FFCL at 73 (applying a five-step, state-law harmless-error rule instead of *Strickland*'s second prong); *Williams*, 523 U.S. at 397 (applying the wrong prejudice test is "contrary to" and "an unreasonable application of" *Strickland*). The state court's test deviated from *Strickland* by treating harm as a matter of sufficiency of the evidence. FFCL at 73 ("The applicant has failed to establish that the result of the re-sentencing trial would have been different"; Counsel Odiorne's actions "his actions did not prejudice the outcome of the re-sentencing trial"); *Strickland*, 466 U.S. at 693 ("[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."). This Court should conduct *de novo* review of the prejudice prong.

### C.    Trial counsel failed to investigate, develop, or present an alternative expert opinion on petitioner's future dangerousness.

Trial counsel rendered ineffective assistance in violation of Petitioner's rights as guaranteed by the Sixth and Fourteenth Amendments by failing to investigate, retain and present an expert on future dangerousness who would evaluate Petitioner using appropriate peer reviewed risk assessment tools to rebut the State's future dangerousness expert, Dr. Coons.

Here, counsel ignored the obvious need to develop an expert assessment of Mr. Brewer on the future dangerousness issue prior to trial. "'Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence.' This was such a case." *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011)). In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the Supreme Court recognized that consultation with experts was a necessary result of the Court's decision a year earlier in *Barefoot*, because *Barefoot* "relied, in part, on the assumption that the factfinder would have before it both the views of the prosecutor's psychiatrists and the 'opposing views of the defendant's doctors' and

would therefore be competent to 'uncover, recognize, and take due account of . . . shortcomings' in predictions on this point." *Id.* at 84 (quoting *Barefoot*, 463 U.S. at 899).  Consequently, "[w]ithout a psychiatrist's assistance, the defendant cannot offer a well-informed expert's opposing view, and thereby loses a significant opportunity to raise in the jurors' minds questions about the State's proof of an aggravating factor." *Id.*

1.  **Counsel Had in Their Possession a Persuasive Future Dangerousness Assessment and Retained an Expert Who Could Have Conducted An Assessment.**

Counsel possessed Dr. Mark D. Cunningham's psychological evaluation of Mr. Brewer conducted in 1996 during Mr. Brewer's post-conviction proceedings. Psychological  Evaluation  of Factors Relevant to Capital Sentencing on Brent Ray Brewer by Dr. Mark D. Cunningham, January 17, 1996. Dr. Cunningham was retained by the Federal Public Defender of the Northern District of Texas to consider, among other issues, "[w]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  Report at 2. Dr. Cunningham based his evaluation on a clinical and forensic examination of Mr. Brewer over the course of two days, as well as interviews with Mr. Brewer's stepfather Don Bartlett, mother Karen Brewer, father Albert, sister Billie Ann Bartlett, and maternal grandmother Gerry Ford.  *Id.* at 1.

Dr. Cunningham reviewed three approaches in his evaluation of Mr. Brewer: actuarial, intensive clinical interviewing, and hypothetical inference.  Hypothetical inference is the "weakest level of scientific rigor in risk assessment."  Dr. Cunningham compared it to "gazing at the stars and connecting them with lines to create the image of a hunter or a wild beast.  It neglects the reality that many other forms could be created utilizing the same dots."  By contrast, Dr. Cunningham discussed the "extensive inquiry arenas" used to assess psychopathy, which is "most reliably associated" with "sustained proclivity for violence." Id. at 38-39.  Dr. Cunningham noted that, even

using the psychopathy inquiry, Brent displayed less psychopathy than 80% of male prison inmates. *Id.* at 40.

Next, Dr. Cunningham described the benefits of an intensive clinical interview to "create a much more detailed picture of the individual and associated multiple factors which might interact to increase or decrease the probability of violent behavior." *Id.* at 40. Based on his evaluation of Mr. Brewer, Dr. Cunningham identified several pertinent factors for assessing his risk of violence and concluded that these risk factors were unlikely to raise his risk of violence. *Id.* at 41.

Finally, Dr. Cunningham conducted an actuarial analysis of Brent's probability of being a future danger. Central to this analysis is establishing "base rates" or historic percentages for the likelihood a group with similar general characteristics is to commit a future criminal act of violence. Based on a meticulous review of existing literature, Dr. Cunningham established a capital-murder future-violence base rate and a base-rate comparison with other prison groups. *Id.* at 44-45. "[C]apital offenders, whether in prison or on parole[,] pose no special threat to the safety of their fellow man." *Id.* at 45. Having established this base rate for violence, Dr. Cunningham concluded that he did not detect any features in Mr. Brewer which would elevate his likelihood of expected violence above these generally low base rates. *Id.* In sum, Dr. Cunningham concluded:

> The probability that Brent would engage in future acts of criminal violence that would constitute a continuing threat to society while in prison is considered to be quite low . . . . Further, this probability is substantially less than represented by inmates systemwide in the Texas prison system. Brent would not, then, be expected to be a disproportionate risk of violence in prison.

Report at 47.

This report strongly indicated that an opinion based on a scientifically valid risk assessment would be favorable to Mr. Brewer's defense. In fact, from counsel's review of past court opinions, counsel should have known that Dr. Cunningham's report could move the jury. After all, three (3) judges on the Texas Court of Criminal Appeals believed that 1991 trial counsel were ineffective for

failing to secure a future dangerousness expert and further believed that Dr. Cunningham's report

demonstrated that there would have been a reasonable likelihood of a different outcome had they

secured such an expert:

> The most compelling reason for finding trial counsel's performance deficient is that mental health evidence is useful beyond a mitigation special issue. The jury did receive instructions on future dangerousness and the deliberateness with which the offense was committed. And an expert can assist trial counsel in challenging the State's experts during the punishment phase. If the examination had revealed negative evidence that would have been harmful to the applicant and not helpful, then trial counsel could have decided not to present that evidence at trial. That would have prevented the State's exploitation of the evidence. But by deciding before an investigation, trial counsel made an uninformed decision that a majority of this Court endorses with its decision.

> Prejudice results from counsel's deficient performance when the deficient performance is sufficient to undermine the outcome of the trial. The result of [Dr. Cunningham's] examination of the applicant after his trial demonstrates prejudice.

*Ex parte Brewer*, 50 S.W.3d 492, 494 (Tex. Crim. App. 2001) (Price, J., dissenting).

Still, Dr. Cunningham's opinion was out of date. The science of risk assessment, just like

Mr. Brewer, had matured. *See* Cunningham Decl. at 13-14 ("My colleagues and I performed

extensive literature reviews and conducted a number of empirical studies on rates and correlates of

violence in prison between 1998 and 2009 that much increased the empirical foundations of expert

testimony regarding the future violence special issue."). Counsel needed a new opinion, but counsel

did not secure one from the expert they retained, Dr. John Edens.

Dr. Edens affirmed that defense counsel failed to elicit an opinion from him or consult with

him on how a valid risk assessment would apply to Mr. Brewer. Counsel contacted Dr. Edens "a

few weeks prior to the re-sentencing hearing in 2009 and was provided with basic facts concerning

Mr. Brewer's case." Edens Resentencing Aff. ¶ 5. Dr. Edens explains that he "was not asked by

defense counsel to testify as to the relevance of Mr. Brewer's disciplinary history as a risk or

protective factor regarding his likelihood of future violent acts, though I could have addressed this

issue for the jury if requested." *Id.* ¶ 6. In fact, Dr. Edens stated, "My recollection is that I had one

substantive telephone conversation with defense counsel prior to my arrival in Canyon, and I then further discussed the case and my work in the field of risk assessment with one of the attorneys the night before I testified." *Id.* Dr. Edens believed that defense counsel were not seeking an expert opinion because Mr. Brewer's record would "speak for itself." *Id.*

In state post-conviction proceedings, Dr. Edens conducted his own assessment of Mr. Brewer. In that assessment, Dr. Edens concluded, "The accumulated evidence would suggest a very low likelihood that someone such as Mr. Brewer will engage in criminal acts of violence in the future if he is sentenced to life." Edens Aff. Risk Assessment ¶ 10. Dr. Edens weighed the available evidence and evaluated Mr. Brewer "using criteria that have been demonstrated to be valid indicators of violence risk." *Id.* Dr. Edens highlighted certain factors that weighed heavily in his assessment (some of which were unavailable to Dr. Cunningham at the time he produced his report in 1996). Dr. Edens believed that "an absence of significant prison violence over an extensive period of incarceration," Mr. Brewer's "age at time of re-sentencing (39)," and his "educational attainment" indicated "a very low likelihood of such conduct in the future." *Id.* Dr. Edens admitted that "a past history of robbery committed in the context of the capital offense slightly increases the likelihood of prison violence among newly-admitted offenders," but cautioned that "Mr. Brewer is not a 'newly' admitted prisoner: by 2009 he had already served 18 years in prison without engaging in a significant violent incident." *Id.*

Like Dr. Edens, Dr. Cunningham was also available to *consult* and *testify* on his opinion that Mr. Brewer had a  very low likelihood of serious violence during a life term in TDCJ." Cunningham Decl. at 15. As Dr. Cunningham summarized:

> Had I or another qualified expert in violence risk assessment for prison been
> retained and called by the defense, the jury would have learned that the seriousness
> of the offense, including capital murder, is not predictive of prison violence. The jury
> would have learned that age (inversely) is one of the most well-validated and
> powerful predictors of prison misconduct and violence. Thus, at age 39, the
> probability of Mr. Brewer committing acts of violence, something he had not done

in the past 19 years of imprisonment, was both extraordinarily remote and would have continued to decline with age. Other factors, such as Mr. Brewer's achieving a GED high school diploma, also correlate very favorably with lower rates of prison violence and misconduct. Moreover, the fact that he maintains contact with family members and others is another protective factor adding to the improbability that he will become a future danger in prison.

*Id.* at 7.

### 2.   Counsel's Failure to Develop and Present an Alternative Expert Opinion on Future Dangerousness Was Deficient.

Counsel developed a patently unreasonable strategy with regard to the investigation, development, and presentation of their own expert opinion on future dangerousness.  Counsel Ray Keith testified in the state habeas proceeding that he declined to present a defense expert opinion on future dangerousness because he was concerned about appearing inconsistent to the jury: "I did not want to be in that position where the jury sees me attacking Dr. Coons and then yet risking my credibility for putting up someone that they equate in the same way."  2 RR Evid. Hr'g 29 (testimony of attorney Keith).   Counsel purportedly did not want a "firestorm" over his own expert's opinion on future dangerousness. 2 RR Evid. Hr'g 31.

But that apparent strategy was formed without knowing what an expert opinion on future danger would yield because counsel did not seek one out.   Moreover, counsel's stated strategy is contradicted by counsel's actions.   If counsel were concerned about a battle of the experts—in which the State would have a chance to cross-examine the defense's expert—then counsel would have presented *no* expert at all to the jury.   But instead counsel did present expert testimony from Dr. John Edens and the State took the opportunity to cross-examine Dr. Edens at length.  24 RR 37-68.  The state court unreasonably ignored this fact in making its findings. *See* FFCL at 10; *Miller-El v. Dretke*, 545 U.S. 231, 266 (2005) (finding state court unreasonably ignored facts in the state court record).   The State also viewed Dr. John Edens's dry explanation of methodology as an inadequate response to its own presentation of Dr. Coons's opinion. *See* 25 RR 199-200.

When the defense knows that the State's expert will testify on future dangerousness, the only safeguard against error is a countervailing expert's opinion.

> **3.      There Is a Reasonable Likelihood that  Dr. Edens's Opinion Would Have Changed One Juror's Decision.**

The opinions provided by Dr. Edens and Dr. Cunningham demonstrate prejudice from counsel's failure.  Had counsel asked for the information they needed to challenge Dr. Coons's testimony effectively, they would have received a clearly favorable report.  *See* Edens Aff. Risk Assessment; Cunningham Decl. at 7("Mr. Brewer's attorneys in 2009 had available to them a wealth of evidence both demonstrating a very low likelihood of future serious violence and debunking the methodology relied upon by the State's future dangerousness expert. . . ."). That report in turn would have informed counsel's cross-examination of Dr. Coons and presentation of Dr. Edens. Indeed, with the help of Edens' or Cunningham's report, counsel at least would not have missed so many important opportunities to challenge Dr. Coons's testimony.  For example, counsel neglected to elicit testimony on "ageing out," which Dr. Edens considered one of the most decisive factors in deciding that Mr. Brewer had a very low future risk of violence.  *See generally* 24 RR 11-73; Edens Aff. Risk Assessment ¶ 10; *see also* Cunningham Decl. at 123-126 ("The inverse relationship between increasing age and decreasing rates of prison disciplinary infractions and violence is one of the best-established in penology.").

> **D.      Admission of Dr. Coons's uniquely unscientific, unreliable testimony violated the Due Process Clause of the Fourteenth Amendment and the heightened reliability standard under the Eighth Amendment.**

Independent of Petitioner's rights to effective assistance of counsel in challenging the admission of Dr. Coons's testimony, the introduction of "expert" testimony in this case violated Petitioner's Due Process and Eighth Amendment rights.  Based on an unreasonable misreading of the holding in *Barefoot v. Estelle*, 463 U.S. 880 (1983), the state court held that even Petitioner's

*individualized* challenge to Dr. Coons's unreliable testimony *at his trial* was foreclosed . FFCL at 72, 74-75. This Court must now squarely confront the question.

### 1. The Fourteenth and Eighth Amendments Demand "Heightened Reliability" in Capital Sentencing Proceedings.

The United States Constitution does not tolerate the admission of unreliable evidence at a capital sentencing hearing. *See, e.g.*, *Saffle v. Parks*, 494 U.S. 484, 493 (1990) (stating the Supreme Court's "longstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary" (citing *Gregg v. Georgia* , 428 U.S. 153, 190 (1976); *Proffitt v. Florida* , 428 U.S. 242, 252-53 (1976))). Due process demands that evidence have sufficient indicia of reliability before it may be admitted. *See, e.g.*, *Neil v. Biggers,* 409 U.S. 188, 199 (1972).

The need for reliability and accuracy in expert testimony is profound when the subject of the testimony is future dangerousness in a capital case. A jury's assessment of future dangerousness can be affected by many arbitrary factors, highlighting the need to pay special attention to the evidence that is put before the jury regarding this aggravating factor. *See Deck v. Missouri,* 544 U.S. 622, 632-33 (2005); *Riggins v. Nevada*, 504 U.S. 127, 143-44 (1992).

### 2. *Barefoot v. Estelle* Does Not Foreclose Case-Specific Constitutional Challenges to Individual Unreliable Experts.

Nothing in *Barefoot* undermines the constitutional requirement that expert testimony on future dangerousness be reliable. The issue in *Barefoot* was whether psychiatrists can *ever* testify competently about future dangerousness, not whether a particular expert's testimony was constitutionally unreliable. 463 U.S. at 884-85. Barefoot holds only that psychiatric testimony is not per se unconstitutional, *Barefoot*, 463 U.S. at 899 n.6, and that the Court was, "at least as of now," unconvinced that the jury could not distinguish the reliable from the unreliable itself, *id.* at 901 (emphasis added). But the *Barefoot* Court found particular constitutional challenges to expert predictions of future dangerousness viable in spite of its rejection of the categorical challenge.

Indeed, the *Barefoot* Court went on to reject a narrower challenge to the testimony under the "particular circumstances" of that case. *Barefoot*, 463 U.S. at 896 (Third, it is argued that in the particular circumstances of this case, the testimony . . . was so unreliable that the sentence should be set aside. . . . [W]e reject each of these arguments.").

Any other conclusion is contrary to clearly established law. The state court incorrectly characterized *Barefoot* as precluding all constitutional challenges to expert testimony on future dangerousness. *See* FFCL at 74-77 (Dr. Coons's testimony did not violate the Eighth Amendment because "the Court of Criminal Appeals still follows the holding in *Barefoot*."). Therefore, §§ 2254(d)(1) and (2) do not bar this Court from conducting de novo review of this claim and granting relief.

### 3.    Dr. Coons's Testimony Is So Unreliable It Violates Due Process and the Eighth Amendment.

In *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010), the Texas Court of Criminal Appeals held that the methodology utilized by Dr. Coons to reach conclusions about future dangerousness was "unreliable" and thus inadmissible. *Id.* at 270, 279. The methodology employed by Dr. Coons to assess Petitioner is the same methodology found to be scientifically unreliable by the Texas Court of Criminal Appeals. Noting that the issue under Rule 702 is whether Coons's future dangerousness testimony is based upon the scientific principles of forensic psychiatry, the *Coble* Court found that "from this record, we cannot tell what principles of forensic psychiatry Dr. Coons might have relied upon" because he did not cite to any recognized source indicating that his approach "is appropriate in the practice of forensic psychiatry." *Id.* at 277; *see also supra* Part I.B.1.c.

Recently disclosed documents demonstrate that Dr. Coons had already concluded that Brent Brewer posed a future danger *before* he had even reviewed the files on the case. Dr. Coons's file contains notes from his initial call on May 13, 2009 with Randall County district attorney James Farren. Dr. Richard Coons File at 10-11. The notes show that Mr. Farren needed Dr. Coons's

services "ASAP."   The notes reflect that Mr. Farren told Dr. Coons that Mr. Brewer had done "[n]othing wrong in 19 yrs. on ad[ministrative] seg[regation]."   Farren informed Dr. Coons that the prosecution "[p]lan[ned] to use Royce Smithey or AP Merillat"; that the defense "hasn't named psych. expert & today is the last day"; and that Farren would "send rec[ord] for [Dr. Coons's] review."   *Id.* at 10.

The notes further show that Coons was *already* willing to testify to Mr. Brewer's future dangerousness.   Dr. Coons wrote four questions that he apparently designed for the prosecutor to ask him in order to elicit Dr. Coons's opinion that Mr. Brewer was dangerous:

> What do you think of Brent Ray Brewer's conscience – just judging by his crim[inal] rec[ord]?
>
> Has he developed a good conscience while on death row?
>
> His conscience didn't keep him from commit[t]ing this offense did it?
>
> Does he have a conscience which would prevent him from threatening others? Injuring others, arranging for an inmate to injure, ~~intimidate,~~ threaten another inmate?

*Id.* at 11.   The presence of the leading question ("His conscience didn't keep him…") strongly indicates that Dr. Coons was already prepared to offer his opinion without the records.   Nor is there any evidence indicates that Dr. Coons in any way revised his opinion in light of additional data.   At trial, Dr. Coons offered his expert insight: "And so conscience – we know that his conscience doesn't apply to the things that he has done here.   None of that stuff has – has stopped him from . . . doing things."   These records underscore the unreliability in Dr. Coons's purported method. Without any records to support his views, Dr. Coons was already ready to offer his "expert" opinion about Brent Brewer.

   **4.       In the Alternative, Counsel Were Ineffective in Failing to Preserve This Challenge.**

According to the state court's opinion on direct appeal, counsel failed to preserve the constitutional challenge to Dr. Coons's testimony. Counsel was thereby ineffective for failing to raise the issue. While the trial court might have declined to grant a motion based on the foregoing reasoning, counsel's failure to make a timely and sufficient objection deprived Mr. Brewer of the ability to present these arguments concerning the Eighth Amendment on direct appeal.[4]

### E.   Counsel Failed to Investigate and Examine Dr. Coons on the Basis For His Scientifically Unreliable Opinion.

When counsel learned that Dr. Coons would be testifying for the State again at Mr. Brewer's sentencing, counsel was "bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." *Rompilla v. Beard*, 545 U.S. 374, 377 (2005). Attorney Odiorne admits that "[a]t the time of Dr. Coons's testimony in 2009, I had not independently secured a copy of the materials that had been provided to Dr. Coons by the State in preparation for his testimony against Mr. Brewer." He further admits that he "had no strategic or tactical reason for not doing so." Declaration of Anthony Odiorne, Esq., ¶ 18.[5]

Counsel also failed to consult defense counsel's hired expert, Dr. John Edens. Dr. Edens was explicitly brought in for the purpose of preparing to rebut Dr. Coons's methodology. Counsel well knew that the first—and hopefully only—stage at which the defense would challenge Coons's methodology was during the voir dire. Yet counsel failed to consult or use its hired expert to prepare. As Dr. Edens stated:

> Prior to testifying before the jury in 2009, a *Daubert/Kelly* hearing was held regarding the admissibility of Dr. Coons's testimony. Although I was in attendance and observed this hearing, I was not called by the defense to rebut the scientific reliability

---

[4] Texas Rule of Appellate Procedure 33 requires a timely and specific request, objection, or motion that states the grounds for the ruling

[5] Counsel added, "I did not issue a subpoena duces tecum for the records and I did not go to the District Attorney's office and ask for a copy of these materials…I had no strategic or tactical reason for not independently requesting the records he relied upon in forming his opinion." Declaration of Anthony Odiorne, Esq., ¶ 18.

and validity of the risk assessment information that Dr. Coons's relied on to form his opinion about Mr. Brewer's risk for future violence, even though I have published research on this specific topic and had previously testified in a *Daubert/Kelly* hearing challenging the testimony of Dr. Coons earlier that same year.[i]

Edens Aff. Resentencing at ¶ 8.

In addition, counsel failed to consult with Dr. Cunningham, who was also available to offer "consultation with the defense to support [] a defense motion to exclude the testimony of Dr. Richard Coons." Cunningham Decl. at 15. Dr. Cunningham, like Dr. Edens, was prepared to offer support to counsel to attack the "faulty conceptual strategies . . . apparent in the testimony of Dr. Richard Coons" that would lead to "an overestimation of violence risk." *See id.* at 167 (summarizing the faults); *id.* at 167-174. Counsel lacked a strategic basis for rejecting the help of these experts in preparing for their attack on the admissibility of Dr. Coons's testimony.

The consequence of this error was that counsel was unprepared to challenge the admission of Dr. Coons's opinion on future dangerousness. Put another way, counsel's whole strategy of excluding Coons's testimony came down to a belated voir dire hearing at which counsel failed to lodge an objection and at which counsel chose to fly blind. Thus, counsel failed to effectively interrogate Coons regarding what data and materials he was relying on in forming his opinion and whether that method was related to a valid scientific technique—which was the very purpose of the hearing.

F.   **Counsel Was Ineffective for Failing to Investigate Dr. Coons's Credentials; The Prosecution Denied Mr. Brewer His Right to Due Process By Eliciting False and Misleading Evidence About Dr. Coons's Experience and Credentials.**

The State presented evidence that was actually false, which it should have known to be false, and which was material to the central issue in this case: its ability to persuade the jury that Mr.

Brewer was too dangerous to society to live.[6]  Dr. Coons's assertions concerning his professional

activities seem impressive:

> I'm a consultant to the State Board of Law Examiners regarding fitness of bar
> applicants to practice law. I've consulted with – been a witness for the State Bar
> Association. I have – I have dealt with the State Board of Medical Examiners,
> Dental Examiners, Nurse Examiners, Veterinary Examiners about the fitness of
> people that practice in those areas. And I'm on – was on the board of – the
> committee – State Bar Committee that wrote the insanity defense for Texas. I
> was on psychiatric society – Texas Psychiatric Society representative to the
> committee that wrote the mental health commitment laws for Texas. They have
> been amended a little bit since then. And a lot of other stuff.

25 RR 199-200. The State argued that the jury could rely on this "distinguished, eminent expert" in

arriving at its decision as to whether Mr. Brewer should live or die. 25 RR 220-21.  However, as

explained above, Dr. Coons's association with the State Bar Committee dated back over twenty-five

years.  Dr. Coons's own resume shows that his committee work for the "Texas Psychiatric Society"

–actually the Texas Society of Psychiatric Physicians—dates to the early l980s.  The impression

created by Dr. Coons's and actively encouraged by the State, was that several of the licensing boards

for regulated professions in Texas consulted with Dr. Coons. This is belied by reality:

- Dr. Coons has not acted as a consultant for the "State Board of Medical Examiners"
  (sic, actually the Texas Medical Board), and the Board has no records indicating that
  Dr. Coons has "ever been on a list of expert evaluators maintained by the Board, or
  that Dr. Coons has ever been hired by or paid by the Board to perform such
  evaluations."  *See* Correspondence with State Licensing Authorities at 3.
- The State Bar of Texas has no documents indicating that Dr. Coons has ever been a
  "witness for the State Bar Association" in any proceeding.  *See* Correspondence with
  State Licensing Authorities at 18, 39, 40.
- The "Nurse Examiners"—actually the Texas Board of Nursing—are unable to locate
  "anything indicating that Dr. Coons has ever been on our approved provider list [of
  evaluators]" and has "no responsive documents" to an inquiry as to whether Dr.
  Coons has ever worked for it in a consultancy capacity.  *See* Correspondence with
  State Licensing Authorities at 7, 9.

---

[6] Due process prohibits the State from securing a conviction or death sentence through the use of false or misleading
evidence.  *See Napue v. Illinois*, 360 U.S. 264 (1959) ("a conviction obtained through use of false evidence ... must fall
under the Fourteenth Amendment"); *Giglio v. United States*, 405 U.S. 150, 154 (1972) (suppression of material evidence
violated due process whether it resulted from prosecution's negligence or deliberate deception).

The State presented Dr. Coons's gilded resume ("credentials out the kazoo") as a reason to believe him, in spite of the fact that his prior prediction had been demonstrably false:

> Now, we're told [by the defense] that Dr. Coons is a lying perjurer. This is a man who gets in here for money and tells you what we want him to say. That's their evaluation of a man with 38 years of a distinguished career as a psychiatrist, so recognized the governor picks him for various projects.
>
> Credentials out the kazoo [sic], and you're to believe he's a lying perjurer. I'll let you decide which is spin, which is reality. And by the way, he was right 19 or 18 years ago or however long it's been and he's still right today. If I do know what the probability is that he's done something and I know what the probability is in the future, because I have a distinguished, eminent expert and my common sense tells me based on the first 19 years of his life it would be incredible for me not to think that I'm going to continue to see a probability of continued acts.

25 RR 220-21. Given this emphatic restatement of its "distinguished, eminent expert," it is clear that the State placed great emphasis on Dr. Coons's alleged credentials that the State knew or should have known were at best, trumped up, outdated and misleading. Counsel admittedly rendered ineffective assistance by failing to investigate and challenge Dr. Coon's overblown resume. *See* Declaration of Anthony Odiorne, Esq. ¶ 17. Petitioner is entitled to a new sentencing hearing.

## II.   THE STATE VIOLATED THE DICTATES OF *NAPUE V. ILLINOIS* BY FAILING TO DISCLOSE THE EVIDENCE IT HAD IN ITS POSSESSION CASTING DOUBT ON THE RELIABILITY AND ACCURACY OF THE AUTOPSY FINDINGS OF DR. RALPH ERDMANN AND BY PRESENTING FALSE AND MISLEADING EVIDENCE; THE TRIAL COURT ERRED IN ADMITTING DR. ERDMANN'S TESTIMONY FROM THE 1991 TRIAL, IN VIOLATION OF PETITIONER'S RIGHTS TO CONFRONTATION; COUNSEL RENDERED INEFFECTIVE ASSISTANCE.[7]

The State violated Petitioner's right to due process, right to a fair trial and right to be free from cruel and unusual punishment by presenting false and misleading testimony and by withholding from Petitioner the evidence it had casting doubt on the autopsy findings of Dr. Ralph Erdmann, M.D., resulting in a conviction premised upon false or misleading evidence, in violation of Petitioner's rights under the Fifth, Eighth and Fourteenth Amendments of the U.S. Constitution.

---

[7] This claim has been exhausted. *See* State Habeas Petition, at 171-218 (Claim III(A), (B), and (C)). The trial court denied the claims. FFCL at 41-48, 81-85. The CCA adopted did not accept the conclusions of law in ¶¶ 1-2 as to Claim III(A).

The trial court's admission of the Dr. Erdmann's testimony from Petitioner's 1991 trial and its allowing Dr. Natarajan to testify from Erdmann's report, over counsel's objection, violated Petitioner's right to confrontation and due process as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Petitioner is entitled to relief.

Trial counsel rendered ineffective assistance in violation of Petitioner's rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution by failing to file a motion seeking the preclusion of Dr. Erdmann's autopsy report and by failing to utilize in cross-examination of Dr. Natarajan, who testified from Erdmann's report, the wealth of available evidence casting doubt on the reliability, accuracy and integrity of Dr. Erdmann's work. Counsel also rendered ineffective assistance by failing to investigate and discuss this issue with Petitioner prior to advising him to testify in his own defense.

## A.   *Napue / Giglio* Violation

A prosecutor may not introduce evidence that he knows to be false or make false assertions in argument. *Napue v. Illinois*, 360 U.S. 264 (1959); *Caldwell v. Mississippi*, 472 U.S. 320 (1985) (prosecutor's inaccurate remarks in closing argument rendered death sentence fundamentally unfair). This is so whether or not the State knew of the falsity of the testimony. *Giglio v. United States*, 405 U.S. 150, 154 (1972) (suppression of material evidence violated due process whether it resulted from the prosecution's negligence or deliberate deception).

However, the testimony need not be criminally perjurious, but "it is sufficient if the witness's testimony give the trier of fact a false impression." *Ex parte Ghahremani*, 332 S.W. 3d 470, 477-478 (Tex. Crim. App. 2011). In this case the State's presentation of testimony conveying the impression that Dr. Erdmann was performing competent, credible and accurate work could not have been anything but knowing. Nor may the prosecutor present an expert witness's work as reliable and

accurate when he has personally prosecuted the same expert for falsifying autopsy reports and presenting misleading testimony. That is exactly what happened in this case.

Dr. Ralph Erdmann, M.D., a pathologist, conducted the autopsy of Mr. Robert Laminack in 1990. He then testified to Petitioner's jury in 1991 about the results of the autopsy and the cause of death. *See* 16 RR—1991 Trial 361-388. In the 2009 trial, Dr. Erdmann's testimony from 1991 was admitted into evidence and his autopsy results regarding Mr. Laminack were presented through the testimony of Dr. Sridhar Natarajan, M.D. *See* 23 RR 7-64.

The defense objected to Dr. Natarajan offering any opinions based on Dr. Erdmann's autopsy report because it would violate Petitioner's right to confrontation as defined by *Crawford v. Washington*, 541 U.S. 36 (2004), and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). 23 RR 31.

At the time of Mr. Brewer's 2009 trial, Dr. Erdmann was still alive and available[8]. However, by that time, he had lost his medical license and had been convicted of perjury, tampering with evidence and falsifying autopsy reports in countless cases.

Dr. Erdmann's misdeeds were well known to prosecutors long before Mr. Brewer's 1991 trial.  Three years earlier, in 1988, Dr. Erdmann allegedly conducted an autopsy on a Mr. Daugherty, who was badly burned. Erdmann concluded the victim had died of smoke inhalation. *See* Millard Farmer, et al., *Governmental Misconduct and a Dose of Real Justice: An Unabridged Account*, 22 Voice For The Defense, J. Tex. Crim. Def. Lawyer's Assoc., No. 7, 1993 at 25-26 ("Farmer Article"). When this proved false, he changed his opinion to state that Mr. Daugherty died of pneumonia. The police later viewed the body and realized the head had not been autopsied. *Id.*

The police later developed evidence from the interrogation of a suspect in this death that the victim had been shot in the head. The police immediately contacted Dr. Erdmann and asked him to conduct an autopsy on the head. "This was not possible, however, because Erdmann had lost or

---

[8] Dr. Erdmann died on July 23, 2013, at the age of eighty-three (83).

thrown away the head of the victim. As a result, the suspect was never prosecuted for the death of Mr. Daugherty." *Id.* at 25.

One year before the start of Mr. Brewer's trial, the Randall County and Potter County law-enforcement and prosecution personnel met and agreed not to renew Dr. Erdmann's contract in Amarillo because he was performing incomplete autopsies and tailoring his opinions to fit the State's case. *Id.* at 26. And with good reason. Dr. Erdmann was accused of falsifying official findings, obtained financial remuneration for services not performed, and committed perjury in many cases by testifying about results that he fabricated. He committed perjury during the trial of Johnny Rey and submitted a false autopsy report on the body of Hilton Raymond Merriman. The defendant in the Merriman case received a death sentence in Lubbock County in 1992. *Id.* at 14.

And, the Randall County prosecutor's office knew these facts prior to Mr. Brewer's 1991 capital trial. *Id.* Yet they did not inform defense counsel, the court or the jury of Dr. Erdmann's misdeeds and the prosecutor's having cancelled his contract. In a 1989 investigation in Potter County, two years before Mr. Brewer's capital trial, Dr. Erdmann conducted an autopsy and concluded that the cause of death was a fatal head injury. Later, Potter County District Attorney Danny Hill stated that "the officers who were there at the autopsy do no[t] recall him going into the skull." *Id.* at 24.

In a case out of Midland County, "Judge Keeth Jobe has stated that Erdmann phoned in autopsy results to him in a case when the body had never been opened up. When confronted with this fact, Erdmann claimed that he had performed the autopsy by x-ray, which also proved to be false. When Judge Jobe confronted Ralph Erdmann with this further fact, Erdmann stated that he had mistakenly autopsied the wrong body." *Id.* An examination of a timeline of Dr. Erdmann's activities around the time that he conducted the autopsy of Mr. Laminack reveals just how tangled Mr. Brewer's 1991 trial and conviction was with Dr. Erdmann's documented misconduct.

For example, during the week of April 22–28, 1990, Dr. Erdmann conducted an autopsy on Darlene Hall, a pedestrian who had been struck and killed by a car driven by an assistant district attorney from Lubbock County, Texas. The autopsy took place on Sunday.  Dr. Erdmann found that Ms. Hall was not drunk at the time of her death. That afternoon, Dr. Erdmann met behind closed doors with District Attorney Travis Ware and other officials. *See Farmer et al. v Sherrod, et al.* No. 2:92-CV-0017-J, U.S. Dist. Lexis 5526, at *26 (N.D. Tex. March 4, 1993).

District Attorney Ware told Dr. Erdmann that Ms. Hall had a history of alcohol and valium abuse. Two days later, on Tuesday, Lubbock news outlets reported that, according to pathology and toxicology reports and investigating officials, Ms. Hall was intoxicated at the time of her death. *Id.* Dr. Erdmann had submitted a false toxicology report. Farmer Article, at 25.

During this same week Dr. Erdmann performed an autopsy on Mr. Robert Laminack, the victim in this case. He concluded that the cause of death was "homicide; penetrating stab wound to left carotid artery and right deep jugular vein with subsequent massive exsanguination . . . Toxicology examination of blood failed to reveal the presence of toxic/harmful drugs/substances." *See* Dr. Erdmann's Autopsy Report of Robert Laminack, April 27, 1990.

On April 30, 1990, Dr. Erdman falsely testified in Lubbock that he both a) took multiple blood samples and conducted toxicology tests on Darlene Hall and b) concluded that she was drunk and stumbled in front of the assistant DA's car. Assistant DA John Young was charged with a misdemeanor and resigned soon after. *Id.*; Farmer Article at 25. As result of the false autopsy report and the false testimony of Erdmann, Mr. Young escaped justice and was not charged with a felony as a result of Erdmann's skullduggery.

On May 11, 1990, Dr. Erdmann sent a "corrected" toxicology report on Mr. Laminack to Randall County. Though the original report said toxicology tests came back completely negative, now Erdmann was saying that Mr. Laminack had a blood-alcohol-content equivalent to two drinks,

which induced a "subjective feeling of warmth, pleasant social behavior, . . . and early loss of cortical perception." *See* Erdmann Laboratory Letter with Toxicology Correction, May 11, 1990. Two days later, on May 13, 1990, and also for Randall County, Erdmann conducted an autopsy on Hilton Merriman, the autopsy that would ultimately lead to the "retirement" of his medical license and the lodging of seven felony indictments against him. *Farmer* U.S. Dist. Lexis 5526, at *2.

On February 19, 1991, three months before Brent Brewer's trial, Dr. Erdmann's lab submitted a revised autopsy on Mr. Laminack, changing details about the stab wounds: the length of penetration became depth of penetration, and the location of one wound moved from the right fossa to the left. *See* Erdmann Laboratory Letter with Autopsy Corrections (letter signed by Michelle Riley, Feb. 19, 1991). On May 2, 1991, the Randall County DA's office requested that Dr. Erdman provide another copy of Mr. Laminack's autopsy because the original had "disappeared." *See State's Ex Parte Motion to Withdraw from Writ of Habeas Corpus Proceedings* ("Motion To Withdraw").

In October 1991, four months after Mr. Brewer was sentenced to death, a body that Dr. Erdmann had allegedly conducted an autopsy on was exhumed. Dr. Erdmann had found that the deceased, Terri Tosper, had died of "natural causes" resulting from the fact that she had been intoxicated and choked on her own vomit. Farmer Article at 25.   Upon exhumation, it was discovered, again, that an autopsy had not been conducted by Dr. Erdmann. *Id.* Upon examination by another pathologist, the cause of death was changed to homicide, as she had been smothered. *Id.* Eventually, someone was arrested and convicted of her murder. *Id.*

On December 23, 1991, a mere six months after Mr. Brewer was sentenced to death in June of 1991, Dr. Erdmann submitted an autopsy report on Craig Robert Newman. According to Dr. Erdmann, Mr. Newman died of cocaine poisoning. In his autopsy report, Erdmann noted the weight of Mr. Newman's organs, including his spleen. Farmer Article at 25. It turns out Mr. Newman's spleen had been removed years prior to his death. Mr. Newman was exhumed in

February of 1992, and it was discovered that Erdmann had not conducted an autopsy. Dr. Erdmann claimed he had performed a "partial autopsy" and had taken urine and blood samples that supported his conclusion Newman died of cocaine poisoning. Tests taken after the body was exhumed revealed no traces of cocaine and the examining pathologist concluded that Mr. Newman had died of a heart attack. *Id.*

The State knew about Dr. Erdmann's misconduct and perjury well in advance of Mr. Brewer's 1991 trial and his misdeeds were a matter of record come 2009. The District Attorney, Mr. James Farren, who prosecuted Mr. Brewer in 2009, ended up indicting Dr. Erdmann on four felony charges related to his falsification of autopsy reports, perjured testimony and other criminal conduct.

Clearly, prior to Mr. Brewer's 2009 capital re-sentencing hearing, the Criminal District Attorney, James A. Farren, knew that nothing done by Dr. Ralph Erdmann should form the predicate of any criminal conviction, let alone one in a capital case. Having worked as an assistant district attorney for the Potter County District Attorney's Office since the early 1980's, Mr. Farren was in a position to know full well the details of the then developing Erdmann scandal.

He also knew that his predecessor, Mr. Randall Sherrod, had been well aware of Dr. Erdmann's criminal behavior before this case originally went to trial in 1991. During the winter of 1989-1990, "Randall County and Potter County law enforcement and prosecutor personnel met and agreed that Ralph Erdmann's contract to perform autopsies in Amarillo should not be renewed because he was performing incomplete autopsies…and was probably tailoring his opinions to fit the State's cases." Farmer Article at 26.

As early as 1984, Mr. Sherrod knew that local law enforcement officers were vociferous in their disdain of Dr. Erdmann's work. In a letter he received from Amarillo Police Sgt. Modeina Holmes of the Texas Multi-County Special Crimes Unit dated September 24, 1984, she informed Sherrod that Erdmann relied on assistants who were not trained and that for the last three autopsies

42

she witnessed, his assistant was his thirteen-year-old-son: "This child dons gloves and apron and proceeds to finger the wounds on the body and handle evidence." *See* ABA J., Dec. 1993, "Grave Mistakes," at 46. In her letter, Sgt. Holmes referred to previous autopsies, indicating that her complaints were long-standing.

However, she only put in writing what many police officers were expressing privately – that Erdmann was not preserving evidence and stood a good chance of wrecking cases. *Id.* Mr. Sherrod was not receptive:

> Prosecutor Sherrod saw it differently. It was almost ten years before his office quit using Erdmann, after complaints from defense attorneys, families of victims and police officers became so numerous that they gained friendly ears in other counties and investigations were launched.

*Id.* In fact, in a spring 1992 interview, Mr. Sherrod admitted "that he had known for some time that Ralph Erdmann's autopsies were suspect." Farmer Article, at. 26. Despite this knowledge, "Randall Sherrod allowed Erdmann to continue performing autopsies after he had agreed to discontinue the use of Erdmann for reasons of incompetence and bias." *Id.* at 27. That included the autopsy in this case.

Mr. Farren also knew that Mr. Sherrod went to great lengths to protect Dr. Erdmann. Indeed, he went as far as to indict two lawyers who filed legal claims based upon Erdmann's criminal conduct and two law enforcement officers who reported and testified about Erdmann's criminal behavior. Mr. Farren knew that the indictments were enjoined by United States District Court Mary Lou Robinson in March of 1993. He knew that this attempted prosecution was a blatant intimidation tactic. Indeed, the connection is undeniable as the district court noted that both officers were subpoenaed by Farmer to testify regarding Erdmann. Both testified and both were indicted. *See Farmer*, U.S. Dist. Lexis 5526 at *13.

The message sent by the indictments of Mr. Farmer and the two law enforcement officers who had the temerity to testify truthfully against Dr. Erdmann was, as stated by those men in their motion for injunctive relief, readily apparent:

> These indictments speak the following message loud and clear: Whoever you are, if you know anything about the wrongdoing by Ralph Erdmann, Travis Ware, Randy Sherrod or the other defendants in this federal lawsuit, keep it quiet or you will find yourself on the wrong end of a criminal prosecution.

*See Joint Initial Brief of the Texas Criminal Defense Lawyer's Association and the National Association of Criminal Defense Lawyers In Support of Plaintiff's Motion for a Preliminary Injunction*, at 3.  Mr. Farren knew of the efforts of his colleagues to quell further inquiry into Dr. Erdmann.

And, he knew that while on the witness stand at an exhumation hearing on April 2, 1992, Erdmann invoked his Fifth Amendment rights over two hundred times. *Id.* at 12.

Mr. Farren also knew that in 1992, a Court of Inquiry was convened to investigate whether or not there was probable cause to believe that Dr. Erdmann had committed criminal violations. Tommy Turner, Esq., was appointed Attorney Pro Tem out of the 237 District Court to head the Court of Inquiry. In November 1992, Mr. Turner stated that *"The botched autopsies he's been indicted on so are just a small sample. This guy was a liar." See Ripples of a Pathologist's Misconduct In Graves and Courts of West Texas*, New York Times, November 22, 1992 at 1. Mr. Turner noted that "a fairly quick and narrow examination of Dr. Erdmann's work turned up evidence of about 100 faked autopsies." Id. After Mr. Turner's investigation, District Court Judge John McFall concluded that there was probable cause.

Shane Phelps, Esq., was appointed special prosecutor to investigate and prosecute potential criminal violations by Dr. Erdmann. *See* Affidavit of Shane Phelps, Esquire, at 2.  Mr. Phelps, who is currently in private practice, previously served as Assistant District Attorney in Houston, Harris County, for three years before joining the Texas Attorney General's office as chief of the Prosecutor Assistance and Special Investigations Division.  In 1999, Mr. Phelps was appointed Deputy Attorney

General for Criminal Justice and later served as First Assistant District Attorney for the Brazos

County District Attorney's Office for ten years. *Id.* He also prosecuted four capital cases on behalf

of the State of Texas. *Id.* ¶ 2.

Prior to his appointment as the Erdmann special prosecutor, Mr. Phelps witnessed

Erdmann's misconduct up close as Erdmann falsified the autopsy report of the victim in a case he

prosecuted:

> Sometime in late 1991 or early 1992, I was the special prosecutor in an intoxication
> manslaughter case in Dickens County, Texas. The case was The State of Texas v.
> Vernon Wright, and involved the tragic death of a 14-year old boy named Jesse
> Land. In the course of that prosecution, I learned that the autopsy in the case had
> been performed by Dr. Ralph Erdmann, the Lubbock County pathologist. Dr.
> Erdmann indicated in his autopsy that he had in fact performed an autopsy,
> including "the usual Y-shaped incision," and ruled that the cause of death was a
> broken neck at a specific location in the spine. Not long after undertaking the
> prosecution of the case I became aware that concerns were being raised about the
> integrity of Dr. Erdmann's autopsies. In an abundance of caution, we investigated
> the possibility that Dr. Erdmann had not performed the autopsy in the case as
> indicated in his report and we determined that it was necessary to exhume the body
> of Jesse Land. I attended the autopsy and personally observed that almost none of
> what Dr. Erdmann said he did during the initial autopsy had been done. There was
> no Y-shaped incision on the body, no organs had been removed and weighed, and
> no craniotomy had been performed. The two pathologists assisting in the autopsy,
> Dr. Sparks Veasey and Dr. Linda Norton, performed an autopsy and the results
> regarding the cause of death were completely different than what Dr. Erdmann
> concluded. Dr. Veasey showed me that the neck had not been broken and that Jesse
> had died of brain swelling following a blow to the head as indicated by a subdural
> hematoma. The case was subsequently tried and the defendant convicted.

*Id.* ¶ 2.  Dr. Erdmann was subsequently prosecuted for falsifying his autopsy report in the Land case.

In his role as the Erdmann special prosecutor, Mr. Phelps and a team of detectives identified

more than 100 potentially false autopsies.  Seven bodies were exhumed and examination of these

bodies revealed that Dr. Erdmann had not performed the autopsies as he reported and that he had

falsified these reports. *Id.* ¶ 4.  Dr. Erdmann subsequently entered a no contest plea to seven felony

counts for tampering with governmental records and tampering with evidence. *Id.*

45

On August 22, 1997, six years after Brent's original trial, Mr. Farren filed a motion to withdraw as prosecutor for Brent's habeas corpus proceedings because he and his staff members were or might be necessary witnesses "to establish an essential fact or facts" in the proceedings. *See* Motion To Withdraw at 4. Mr. Farren stated in his motion that "it would be virtually impossible for the undersigned to serve in good faith as the prosecutor in this writ proceeding because, in order to do so, the undersigned would have to vouch for the reliability and credibility of the same Dr. Erdmann, whom the undersigned has prosecuted for aggravated perjury and tampering with evidence." *Id.* at 4-5. The motion was granted, and a special prosecutor was appointed.

In other words, Mr. Farren could not and would not be party to a case where the State had to prop up and allege that Erdmann's work was credible, reliable and accurate. In 1997, he properly would not vouch for Erdmann's work in this case. Indeed, in 1995, Mr. Farren made no bones of the fact that Erdmann had lied during the 1992 trial of Johnny Lee Rey, both about his work on a previous autopsy and by being "less than honest about the tissue samples" in the Rey case itself. *See* Assoc. Press Report, *Former Coroner Accused Of Lying In Texas Trial*, Seattle Times, May 12, 1995.

Regarding his prosecution of Dr. Erdmann, Mr. Farren stated publicly that: "We will be asking for penitentiary time. We believe the evidence will show that he's caused real trauma and emotional damage to the people, and that he's created tremendous costs for the people of Randall County." *See* ABA J., Nov. 1995, *"Erdmann Faces New Legal Woes,* at 32.

Yet, in 2009, he didn't bat an eye in relying upon the same autopsy report and pathologist he would not defend twelve years earlier. None of this evidence was presented to Mr. Brewer's jury and the jury was left with the false and misleading impression that the State actually countenanced the reliability, accuracy and integrity of Dr. Erdmann's work in this case.[9]

---

[9] This fact is made clear by the way Mr. Farren tried to present through Dr. Natarajan that Dr. Erdmann's autopsy in this case comported with the standards utilized by forensic pathologists in conducing autopsies: "And is it your opinion as an expert in the field that that valid method of applying the science of pathology and forensic pathology was used in

And that is exactly the misleading impression the prosecutor wanted Mr. Brewer's jury to believe in 2009, when considering whether to sentence him to death. Mr. Brewer's jury never learned that the man who implored them to sentence Mr. Brewer to death had previously withdrawn from this case because he would not and could not defend Erdmann's autopsy of Mr. Laminack as credible, reliable and accurate. Nor would he, at that time, vouch for the integrity of Dr. Erdmann.

Upon learning that Mr. Farren actually presented Dr. Erdmann's autopsy report in this case to Petitioner's jury, Mr. Phelps, the former special prosecutor who also prosecuted Dr. Erdmann expressed surprise and outrage. Noting that Dr. Erdmann's autopsy of the victim in this case took place in 1991, Mr. Phelps stated:

> It has been reported to me that Mr. Farren used another pathologist to testify from Erdmann's report and present Erdmann's work as in conformance with the scientific method. It is inconceivable to me that any prosecutor or pathologist would rely on any autopsy by Dr. Erdmann, especially from that period of time. I have tried four death penalty cases as a prosecutor and have lectured at seminars for prosecutors on the decision to seek the death penalty and the ethics of death penalty prosecutions. If I had been the prosecutor on the capital re-sentencing of Mr. Brewer, I cannot think of any scenario in which I would have considered trying to rely on a report by Dr. Erdmann in a death penalty case. I do not believe that such a strategy in a death penalty case, or any criminal case for that matter, is consistent with a prosecutor's oath to seek justice. I would not have done it.

*Id.* ¶ 8; *see also* 2d Decl. Tommy Turner ¶ 12 (unethical for Mr. Farren to rely on Dr. Erdmann's autopsy reports in 2009). This same ethic applies to Mr. Farren. He too, should have decided that it was not in the interest of justice to rely upon the autopsy report of a man whom he refused to vouch for in this very case back in 1997 and who was and is the most scandal-ridden, corrupt forensic pathologist in the country.

This is all the more shocking when Farren's actions in 2009 are juxtaposed with the opinion of Mr. Tommy J. Turner, a former Lubbock County prosecutor who served as the Special

---

this case to apply the science and reach conclusions in this particular case?" 23 RR 15. Not surprisingly, Dr. Natarajan answered "yes." *Id.*

Prosecutor in the Court of Inquiry Proceedings concerning Ralph Erdmann. *See* Affidavit of Tommy J. Turner ¶ 2. Mr. Turner, who investigated approximately 300 autopsies which Dr. Erdmann claimed to have performed, states:

> Dr. Erdmann was a completely untruthful person. Even the simplest details of Erdmann's background were almost impossible to confirm because of the different versions of the facts that he had given on different occasions.
>
> ….
>
> I would have gladly testified concerning my knowledge of Dr. Erdmann's practices and reputation in the in the 2009 sentencing hearing of Brent Brewer. I am astonished to hear that a jury was presented with evidence concerning an autopsy and prior testimony of Dr. Erdmann without being alerted to the suspect nature of any matter in which Erdmann was involved.

*Id.* ¶¶ 8, 10. Likewise, the Deputy Chief Medical Examiner for Fulton County, Dr. Kris Sperry, M.D., told the *Dallas Morning Star* that "the problem with the cases that I've examined myself and those I know about are such that it's very difficult to rely on any of his work." *See Pathologist: I'm Human*, Dallas Morning News, May 10, 1992, at 24. Dr. Sperry added, "I don't know how anyone could read one of his reports and trust anything he had to say." *Id.*

Indeed, Dr. Lloyd White, M.D., who is a pathologist and medical examiner, aptly observed the harm in this case that the *Napue* and *Ex Parte Ghahremani* courts sought to avoid:

> In this situation involving Dr. Natarajan's admitted reliance on Erdmann's work, the impression given to the jury of the reliability of the underlying material may well have been misleading.

Affidavit of Lloyd White, M.D. ¶ 6. That is exactly the impression the State wanted.[10]

"A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected." *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996). Indeed, the Due Process Clause prohibits the State from knowingly using perjured or misleading testimony. *see Giglio v. United States*, 405 U.S. 150, 153 (1972); *In Re: Larry Ray Swearington*,

---

[10] The State's failure to disclose to trial counsel the extent of Erdmann's misdeeds and crimes violated Petitioner's right to due process and a fair trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments and constitutes a violation of the dictates of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Petitioner is entitled to relief.

556 F.3d 344, 348-349 (5th Cir. 2009) (authorizing successive petition regarding claim "[t]hat the State sponsored false or misleading testimony of…the Harris County Medical Examiner who testified at trial for the State as to the date of death in violation of his due process rights as set forth in *Giglio*[.]"(citations omitted)).

To establish that the State's use of perjured or misleading testimony violated due process, a petitioner must establish that 1) A State's witness testified falsely or in a misleading manner; 2) the false or misleading testimony was material; and 3) the prosecution knew the testimony to be false or misleading. *Id.* at 153-154. Mr. Brewer easily satisfies this standard. As outlined above, Mr. Farren knew that the testimony he elicited from Dr. Natarajan about Dr. Erdmann's having having complied with accepted forensic practices in his autopsy of the victim, Mr. Laminack, was false or at best, misleading. The false/misleading testimony was material as it established the cause of death.

Another instructive case comes from the CCA. In *Ex parte Coty*, 418 S.W. 3d 59 (Tex. Crim. App. 2014), the Court established a five-prong test for assessing whether or not misconduct by a State forensic examiner, in this case a laboratory technician, leads to an inference that the forensic evidence is false. To establish entitlement to an inference of falsity, the habeas petitioner must establish the following:

> 1) the technician in question is a state actor;
> 2) the technician has committed multiple instances of intentional conduct in another case or cases;
> 3) the technician is the same technician who worked on the petitioner's case;
> 4) the misconduct in the type of misconduct that would have affected the evidence in petitioner's case; and
> 5) the technician handled and processed the evidence in petitioner's case within roughly the same period of time as the other misconduct.

*Id.* at 605.  Once petitioner establishes these predicate facts, "[t]hen the burden shifts to the State to offer evidence demonstrating that the laboratory technician committed no such intentional misconduct in petitioner's case. *Id.*

Mr. Brewer is entitled to an inference of falsity. Dr. Erdmann was a state actor. He had a contract with the Randall County District Attorney's Office to provide services in criminal cases. As detailed, during the period of time in which he allegedly conducted the autopsy in this case, he was involved in committing perjury, falsifying autopsy reports and toxicology reports within the weeks leading up to his work here and in the days shortly thereafter. He satisfies the third prong as well, since Erdmann worked on Mr. Brewer's case. And the misconduct in this case goes to the key issue of cause of death. It is material and would have altered the defense approach taken at trial in 2009.

Mr. Farren's use of Dr. Erdmann's report violates *Napue* and constitutes prosecutorial misconduct. Mr. Brewer is entitled to a new sentencing hearing.

### B.      Ineffective Assistance

Under the long-established standard in *Strickland*, 466 U.S. at 687, ineffective assistance of counsel is established when counsel's performance was deficient because of acts or omissions that were not the result of the exercise of reasonable professional judgment, *id.* at 690, and that deficient performance prejudiced the defense, *id.* at 685-86. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 698.

### 1.      Impeachment

Few medical professionals can ever have been as comprehensively discredited as Dr. Ralph Erdmann. Yet trial counsel failed to file a pretrial motion to preclude the admission of Dr. Erdmann's autopsy report and 1991 testimony in Mr. Brewer's 2009 trial, and failed to question Dr. Natarajan on his knowledge of Dr. Erdmann's history of falsifying autopsy reports, committing perjury, selling harvested organs, losing body parts, tailoring his testimony to fit the prosecution's theory of the case and for billing for autopsies he had not actually performed.

Trial counsel had a wealth of information available to it with which to impeach, if not outright destroy, through Dr. Natarajan, the integrity and reliability of Erdmann's autopsy findings in this case. Not a single question about Dr. Erdmann's convictions for perjury, falsifying autopsy reports or any of the other reprehensible crimes Dr. Erdmann committed was asked by trial counsel.

As detailed above and summarized in footnote 4, the facts available to trial counsel for use against Dr. Natarajan's acceptance of Dr. Erdmann's integrity and reliability was nearly endless.[11] Dr. Natarajan could have been cross-examined about whether he knew that in the same week Erdmann conducted the autopsy of Mr. Laminack, he also conducted an autopsy of Darlene Hall and falsified his results to fit the prosecution's case? Indeed, he could have been asked the following as well: Did you know that eight days after Dr. Erdmann conducted the Laminack autopsy, he lied under oath in a case involving an assistant district attorney? And that his perjured testimony saved this assistant district attorney from a felony conviction? Did you know that only eleven days later, Dr. Erdmann filed a "corrected" toxicology report in this case? Or that thirteen days later Dr. Erdmann conducted the autopsy in the Merriman case that led to his downfall and felony convictions, which, incidentally, was a capital case?

Finally, how do you think Dr. Natarajan would answer the question about whether or not he was comfortable asking the jury to accept the testimony and work of a man who, in addition to lying under oath and falsifying autopsy reports, also harvested organs, often without authorization from

---

[11] He could have asked Dr. Natarajan if he, like Dr. Erdmann, had ever told a judge that he conducted an autopsy by x-ray and then have to admit to the same judge he had lied? Had he ever had to tell a judge that he conducted an autopsy on the wrong body, as Dr. Erdmann did? Had he ever lost the head of a person he autopsied? Was it acceptable for a forensic pathologist to lie to a jury and court? Did he know that Dr. Erdmann had lied under oath countless times? Had he ever falsified toxicology reports in order to help the prosecution, as did Dr. Erdmann? Was it accepted practice for a forensic pathologist to report the weight of various organs when in fact he had not actually conducted an autopsy and had never removed the organs? Did Dr. Erdmann do that? Did you know, Dr. Natarajan, that as in this case, Dr. Erdmann often amended or corrected his reports, often to the benefit of the prosecution? Did he know that the Erdmann special prosecutor believed that Erdmann was a completely untruthful person?

families?[12] And, of course, the investigation of Erdmann Special Prosecutor Tommy J. Turner also

"turned up discrepancies concerning details as basic as where Dr. Erdmann was born, the names of

family members, his medical education and his professional experience." *Id.*[13]

Mr. Turner, in a media interview, also noted that "[e]ven a very quick and narrow

examination of Erdmann's work turned up evidence of about 100 faked autopsies." Mr. Turner has

been quoted to say "We started digging up bodies, and when we were seven for seven we decided

that in the interest of judicial economy we didn't have to go further to prove that this guy was a

liar." *Farmer Article* at 28.   In short, trial counsel could have easily convinced the jury that Dr.

Erdmann was a fraud, a liar and a criminal and not worthy of belief. This line of questioning would

have cast doubt on the integrity of the State's case against Mr. Brewer and would have been a strong

factor for the jury to consider when deciding whether or not to sentence Mr. Brewer to death.

This line of attack on the presentation of Dr. Erdmann's work in this case would not have

conflicted with counsel's strategy – that Mr. Brewer did not pose a future danger. There is no

conceivable strategy or tactics that counsel could have employed that would have included allowing

---

[12] "My investigation also developed evidence that Dr. Erdmann harvested and sold organs and tissue to commercial enterprises, sometimes without authorization of the family of the deceased." Affidavit of Tommy J. Turner ¶ 8.

[13] Darrell Dewey, an investigator looking into Erdmann's background during the early on behalf of a Court of Inquiry specially convened in Lubbock, found many discrepancies in basic information Erdmann had reported on different occasions. He had claimed to be born in Germany, Brownsville, Texas and also in Mexico. He claimed not to remember when or where he obtained US citizenship. He claimed to have been educated in a "German school," or schools, which were actually located in Mexico. Erdmann's own daughter, Rosemartha Cates, cast doubt on whether he had actually graduated from medical school in 1952, as he claimed, and investigator Dewey discovered that in Mexico "degrees are sometimes purchased by the wealthy, without adherence by the schools to requirements of attendance or examination." In conflicting C.V.s, Dr. Erdman had claimed to be enlisted in the U.S. army at the same time he was claiming to have attended University and Medical School. Dr. Erdmann claimed to have been at the University of Texas Southwestern Medical School in Dallas as a resident from 1955-1960, but only appears to have spent one year there. Investigator Dewey could not account at all for Dr. Erdmann's activities for two years, 1955-57, when he was supposedly at Southwestern. Erdmann claimed in one of his C.Vs to have not only attended Southwestern but to have been an instructor there in 1959 and 1960. 101 Dewey found that information to be false. Erdmann received a medical license in Texas in 1959, an unusually long time after graduating medical school in 1952. Erdmann had been evasive when questioned about this. Other details of his professional life given by Erdmann turned out to be false. For example, he claimed to have left an early job at St. Anthony's Hospital in Amarillo because he was drafted into the military, which was untrue. He claimed to have been Chairman of Pathology at St. Joseph's Hospital in South Dakota. He was not. The hospital did even not have a Pathology department.

Dr. Erdmann's testimony to come into evidence unscathed. Counsel rendered deficient performance and Petitioner suffered prejudice.

> **2.      Failure to Present Available Expert Medical Testimony Regarding Erdmann's Autopsy Results In This Case.**

Trial counsel had in their file a letter authored by pathologist and medical examiner Lloyd White, M.D., that was provided to post-conviction counsel in 1997.  In the letter, dated May 1, 1997, Dr. White discusses his review of Dr. Erdmann's autopsy results in this case.

Dr. White voiced a number of concerns about the autopsy and questioned its reliability.  In a 2012 affidavit, also for post-conviction counsel, Dr. White questioned how Dr. Natarajan could affirm Erdmann's work:

> Affirming the work of Dr. Erdmann in this case is a conclusion that is surprising and questionable given what is widely known within the community of forensic pathologists in this state, about Dr. Erdmann's failure to conduct autopsies in full, or at all, and given the known instances in which he falsified autopsy reports. A better answer to this question would therefore have been, "I don't know" or at least, "based on the material before me, I cannot confidently conclude that this autopsy was properly conducted and reported.

Aff. Lloyd White, M.D. ¶ 6. Dr. White added that "I would personally feel great concern if asked to testify on the basis of work done by Dr. Erdmann." *Id.*

Most importantly, Dr. White's observation about the nature of the wounds and what that meant about the crime is extremely beneficial to the defense:

> One point that caught my attention in the context of extensive experience with homicidal stabbings is the paucity of wound, and, in view of the location of several wounds in the area of the neck, the absence of any deep, incised, "cut-throat" type of injuries. All of the stab wounds are relatively shallow. If the intent was to cause death, rather than to injure with the expectation that the victim would survive, I would ordinarily expect to see far more numerous and more severe wounds. The absence of wounds over the posterior body surface (in other words, the back) indicates that the assault most probably originated from the front."

Letter Report of Dr. Lloyd White, M.D., to Rick Keffler, Esq., May 1, 1997, at 2.  Not only does his observation about the paucity of wounds and the absence of deep cuts support the defense that

there was no intent to kill and no plan to do so, but it puts some of the onus on Mr. Brewer's co-defendant, Ms. Kristie Nystrom. This allows counsel to argue that Mr. Brewer is less morally culpable and that he, like Ms. Nystrom, should receive a life sentence.  Dr. White also stated that he or another forensic pathologist would have been available to testify in 2009 for the defense.[14]

No such evidence was presented to Mr. Brewer's jury. Counsel could have no strategic or tactical reason for not presenting this type of evidence, as it is not inconsistent with the defense theory that Mr. Brewer does not pose a future danger.

### 3. Failure to Present Available Expert Testimony and Testimony of Special Erdmann Prosecutors Turner and Phelps.

Counsel also rendered ineffective assistance by failing to present the testimony of the Erdmann Special Prosecutor, Tommy J. Turner. As noted above, Mr. Turner would have testified for the defense in 2009 if counsel had asked for his assistance. *See* Affidavit of Tommy J. Turner, ¶ 10. As detailed above and in his affidavit, Mr. Turner would have been able to tell the jury about the depth and extent of Dr. Erdmann's dishonesty, corruption, professional incompetence and any other information he had regarding Erdmann's practices and reputation. Far from contradicting the defense focus on future dangerousness, this would have provided counsel with another avenue to attack the integrity and reliability of the State's case against Mr. Brewer.

Mr. Brewer alleges that trial counsel rendered ineffective assistance in violation of his right to the effective assistance of counsel as guaranteed by the Sixth Amendment by failing to call as a witness Shane Phelps, Esquire. Mr. Phelps has stated that he was available and willing to testify on behalf of Mr. Brewer consistent with his affidavit. *See* Affidavit of Shane Phelps, at ¶ 12.

---

[14] "In light of the dubious nature of any report prepared by Dr. Erdmann, or autopsy performed by him, I am very surprise[d] that 2009 defense counsel did not retain their own pathologist to assist in their preparation of Mr. Brewer's case. A defense pathologist could have assisted in preparation for a Daubert hearing, or other hearings on pretrial issues, and to sit in on relevant portions of the testimony before the jury in order to aid counsel in their cross-examination of Dr. Natarajan. I personally would have beenable to perform that role, and I am sure that other qualified pathologists would have been similarly available." Affidavit of Lloyd White, M.D., ¶ 15.

### 4.    Failure to Move for the Recusal of District Attorney Farren.

Mr. Brewer also alleges that trial counsel rendered ineffective assistance by failing to move to recuse Mr. Farren given that he had previously withdrawn from this case in state habeas proceedings because, as he admitted in writing, "[i]t would be virtually impossible for the undersigned to serve in good faith as the prosecutor in this writ proceeding because, in order to do so, the undersigned would have to vouch for the reliability and credibility of the same Dr. Erdmann whom the undersigned has prosecuted for aggravated perjury and tampering with evidence." *See Motion To Withdraw From Writ of Habeas Corpus Proceedings*, at 4-5.

One of Mr. Brewer's former counsel, Mr. Anthony Oridone, Esquire, an assistant public defender with the Regional Public Defender for Capital Cases, admits that he and his co-counsel should have been aware of Mr. Farren's motion and should have utilized it to Mr. Brewer's benefit:

> This motion was part of Mr. Brewer's court file and a document that we should have seen and reviewed as part of our preparation and development of Mr. Brewer's 2009 defense.
>
> The information contained in this motion could have been used to seek to preclude Mr. Farren's continued participation in this case and, more importantly, as fodder for cross-examination of Dr. Natarajan.
>
> Moreover, we would have been able to use this motion to challenge the integrity of the State's presentation in this case. We would have been able to argue to the jury that the State knowingly presented to it the work of Dr. Erdmann who it knew was unreliable, tainted, and arguably false.
>
> We would have been able to tell the jury that they should not believe any of the autopsy results reported to them by Dr. Natarajan because all he had to go on was Erdmann's results and that the prosecutor in this case had himself withdrawn from this very case years earlier because he could not do what he now wants you, the jury to do: find credible and reliable the work of Dr. Erdmann.
>
> To the best of my knowledge, at no point in time did we discuss the District Attorney's motion to withdraw and its implications with Mr. Brewer prior to his testifying in 2009.

*See* 2d Aff. Anthony Ordiorne, Esq., at ¶¶ 9-13. Counsel had no strategic or tactical reason for not utilizing this information to Petitioner's advantage. Counsel rendered ineffective assistance by failing to file a recusal motion against Mr. Farren.

> **5.      Failure to Conduct a Reasonable Investigation Before Advising Mr. Brewer.**

Mr. Brewer's attorneys failed to investigate and discuss with Mr. Brewer the readily available evidence that could have been presented to rebut the State's evidence that he would pose a future danger if not executed.  He did not know that witnesses were available, as discussed in *Claim* IV, *infra,* who were available to blunt, if not refute the State's evidence. Nor did his attorneys advise him about the impeachment available for Dr. Natarajan if various defense attempts at excluding Erdmann's report failed. Mr. Brewer's decision to testify, a decision he made grudgingly, was not based upon the reasonable, informed advice of counsel. If properly advised, Mr. Brewer would not have testified. In support of this allegation, Mr. Brewer states that "my attorneys advised that I should testify and admit and apologize for my role in the murder of the victim, Mr. Robert Laminack, and admit to and apologize for the various prior bad acts the State had proffered in support of their argument that I would pose a future danger if not executed."   Brent Brewer Affidavit ¶ 3.  He further avers that

> During the course of [present counsel's] investigation into my case, **they have uncovered a lot of evidence that, if I had been aware existed, would have led me not to testify in my own behalf**. None of the evidence detailed below was provided to or discussed with me by Mr. Keith or Mr. Ordione.
>
> For example, my trial attorneys did not advise me that if called to testify, Aimee LeMaster, now Aimee Young, would have told the jury that I did not intend to hurt her; that she was not paralyzed in her right arm as the District Attorney argued but rather, had a pinched nerve. If asked she would have testified that I did not have a reputation for violence or fighting in school and that I was not dangerous, all counter to what she intimated at trial.
>
> Nor was I advised that the former Randall County inmate who testified against me, Mr. Kevin Lewis, would have testified that he started the argument in the jail, he had

me cornered, he was the aggressor and that he stood up while I remained seated and calm throughout the argument.

My lawyers also did not advise me that the police officer who arrested me in Naples, Florida, when I was a teenager for possession of a knife would have testified that he arrested me only because the knife was in the drive side of the car although it was easily accessible to both myself and the owner of the car, Ammy Greenman. Former officer Mosher would have told the jury that I did not resist arrest and did not act out in any way.

I also was not advised by my attorneys in 2009 that there was a lot of damaging information available concerning the accuracy, veracity and reliability of the work of Dr. Ralph Erdmann, M.D., the pathologist who conducted the autopsy of Mr. Laminack in this case. This information, detailed in my petition for writ of habeas corpus, could have been used to cross-examine Dr. Natarajan, the pathologist who testified in his stead in reliance on Erdmann's report.

At the time of my 2009 re-sentencing, Dr. Erdmann had lost his medical license and had been convicted numerous counts of aggravated perjury and falsifying and tampering with evidence. The pathologist who testified in 2009, Dr. Natarajan, M.D., testified that based on the autopsy report, Dr. Erdmann had complied with the scientific method in my case.

My attorneys did not tell me that they could have cross-examined Dr. Natarajan on Erdmann's history of repeatedly lying under oath about autopsies for which he wrote a report detailing his findings when in fact he had not actually conducted the autopsy, falsifying reports; submitting false toxicology results, losing body parts; lying to judges; and illegally harvesting organs and tissues from people whom he autopsied.

The allegations against Dr. Erdmann are detailed in the petition for writ of habeas corpus that my current attorneys filed on my behalf in August of this year. I was not advised by my 2009 attorneys that this was all fodder for cross-examination of Dr. Natarajan.

My 2009 attorneys also failed to advise me that they would be able to use the information contained in a motion to withdraw from my state court habeas litigation filed by District Attorney James Farren in 1997, for both cross-examination of Natarajan and to challenge the integrity of the State's use of Erdmann's report in my re-sentencing. For example, Mr. Farren wrote "Finally, it would be impossible for the undersigned to serve in good faith as the prosecutor in this writ proceeding because in order to do so, the undersigned would have to vouch for the reliability and credibility of the same Dr. Erdmann whom the undersigned has prosecuted for aggravated perjury and tampering with evidence."

If my attorneys in 2009 had advised me of the availability of the above mentioned facts and evidence, as well as other related information contained in my petition for writ of habeas corpus, I would have chosen not to testify in my own defense.

Brent Brewer Aff. ¶¶ 3-13. Because trial counsel failed to conduct an investigation into the issues discussed above, their advice to Mr. Brewer was uninformed and thus unreasonable. Petitioner suffered prejudice because he would not have testified if properly advised.

### C.    Prejudice

Petitioner suffered prejudice, as detailed above. Because trial counsel failed to conduct an adequate investigation, and failed to do so before advising Petitioner, the actions taken as a result of counsel's deficient performance meant that he appeared before his jury virtually defenseless. Through simple investigation, counsel had available to them a veritable unending supply of impeachment evidence by which to attack Dr. Natarjan's reliance on Dr. Erdmann's autopsy report. They had readily available evidence challenging Mr. Farren's continued participation in the case and to challenge the integrity of the State's presentation given what he knew about Erdmann and his prior prosecution of Erdmann for aggravated perjury and falsifying evidence. Petitioner suffered prejudice and is entitled to a new trial.

### III.    PETITIONER WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN APPELLATE COUNSEL FAILED TO RAISE AND LITIGATE THE TRIAL COURT'S BLANKET ADMISSION OF TRANSCRIPTS AND EXHIBITS FROM MR. BREWER'S FIRST TRIAL.[15]

### A.    Introduction

At the beginning of Petitioner's 2009 penalty phase retrial, the prosecution moved to reintroduce the transcripts and exhibits from the guilt phase of the original 1991 trial in their entirety. 21 RR 21. Trial counsel objected to the reintroduction of the prior testimony and exhibits by separate written motions. 2 CR 297; 1 CR 540; *see also* 21 RR 22-32, 34 (counsel's argument in support of objections). Counsel's objections were grounded on the Texas Rules of Evidence, the Texas Code of Criminal Procedure, and the State and Federal Constitutions. *Id.* The trial court

---

[15] This claim was exhausted in Petitioner's state habeas proceedings. It was denied by the state habeas trial court in its findings of fact and conclusions of law, which the Texas Court of Criminal Appeals fully adopted. Trial Court Findings of Fact and Conclusions of Law at 65-67, 95-96; *Ex Parte Brewer*, 2014 WL 5388114, at *1.

overruled each of the defense's objections and permitted the prosecution to reintroduce all of the testimony and exhibits from the 1991 trial.  21 RR 33-34.

A significant consequence of the trial court's ruling was that the 1991 testimony of Dr. Ralph Erdmann, the medical examiner who performed the victim's autopsy, was admitted at the 2009 penalty phase.  Subsequent to the 1991 trial (but prior to the 2009 retrial), Dr. Erdmann was removed from his post for gross misconduct and convicted of multiple felony offenses, many of which involved the commission of fraud in his official duties as medical examiner.[16]  In light of the trial court's ruling, defense counsel was unable to cross-examine Dr. Erdmann regarding his misconduct.  A substitute medical examiner who neither performed nor observed the victim's autopsy was instead permitted to testify about Dr. Erdmann's work in the case.  This procedure violated Petitioner's rights under the Confrontation Clause of the Sixth Amendment and the heightened procedural protections required by the Eighth Amendment in death penalty cases.

Although trial counsel's objections were well-preserved, thoroughly litigated, and meritorious, appellate counsel failed to raise them on appeal.  Appellate counsel had no strategic reason for failing to do so.  With respect to the Confrontation Clause argument pertaining to the information originating from Dr. Erdmann's autopsy, appellate counsel has asserted that he does not know why he failed to raise the issue on appeal and believes it to be meritorious.  Affidavit of John Bennett.  Appellate counsel's performance was deficient and this deficiency resulted in prejudice as there is a reasonable probability that Petitioner's sentence would have been reversed on appeal had counsel raised this meritorious issue.

### B.    Petitioner's Sixth Amendment Confrontation Clause Rights and Eighth Amendment Rights to Heightened Procedural Safeguards Were Violated.

---

[1]  For a fuller recounting of Dr. Erdmann's misconduct, see Claim II.

The Confrontation Clause of the Sixth Amendment requires that criminal defendants be permitted to confront and cross-examine testimonial witnesses against them. *Crawford v. Washington*, 541 U.S. 36 (2004); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). Testimony given at a prior proceeding may only be introduced at trial if the defendant had an adequate opportunity to cross-examine the witness at that prior proceeding. *Pointer v. Texas*, 380 U.S. 400, 407 (1965). Further, "[e]ven where the defendant had such an opportunity, [the Supreme Court has] excluded the testimony where the government has not established unavailability of the witness." *Crawford*, 541 U.S. at 57 (citing *Barber v. Page*, 390 U.S. 719, 722-25 (1968). Moreover, the Eighth Amendment requires that capital sentencing proceedings, because of their unique finality and severity, be governed by "heightened procedural protections" to safeguard the rights of capital defendants. *Monge v. California*, 524 U.S. 721, 733 (1998).

The forensic medical testimony at Petitioner's penalty phase retrial was central to the prosecution's case. It touched not only on Petitioner's guilt but also on his relative culpability for purposes of punishment. The prosecution's replacement medical examiner, Dr. Sridhar Natarajan, was permitted to testify as an authoritative expert that the wounds suffered by the victim were consistent with being pulled and stabbed by someone sitting behind him, thus corroborating Petitioner's co-defendant's testimony against him. *See* 23 RR 49. This testimony undoubtedly affected the jury's consideration of Petitioner's relative culpability when deciding whether to sentence him to life or to death.

Because Petitioner was not able to confront and cross-examine Dr. Erdmann, this highly damaging testimony with the veneer of expert medical authority went effectively unchallenged. Dr. Natarajan was able to testify, for example, that the autopsy done by Dr. Erdmann followed normal protocol. 23 RR 33 ("Q: Based on everything that you've been able to review, was the autopsy that was performed in this particular case in any way out of the ordinary or was something that concerns

you as an expert in the field done in this particular autopsy, or on the other hand, was it a relatively normal process that would usually occur in an autopsy?  A: I believe overall, it followed a standard protocol for a forensic autopsy.").  Dr. Natarajan further testified that it was "not unusual" for one forensic medical examiner to review the work and testify on behalf of another medical examiner who actually performed the autopsy.  23 RR 27.

While the jurors were left with the impression that the autopsy in this case followed "standard protocol" and that it was "not unusual" for a substitute medical examiner to testify in a criminal trial, the reality was that the prosecution did not call the medical examiner who performed the autopsy because he had been convicted of multiple felonies as a result of falsifying autopsy results.  Had the jurors heard that the doctor who performed the autopsy in this case was subsequently sent to prison for falsifying autopsy results, there is a substantial possibility that they would have discounted the medical testimony in its entirety.

The jury heard none of this devastating impeachment material, however, because the prosecution was permitted to simply reintroduce the prior transcripts and exhibits from the original guilt phase and Petitioner was therefore not able to cross-examine Dr. Erdmann after his misconduct came to light.  This violation was doubly problematic because the prosecution made no showing that Dr. Erdmann was unavailable to testify for purposes of the Confrontation Clause in 2009.  Although he is now deceased, Dr. Erdmann did not die until July 23, 2010.  He was thus alive and available to testify for purposes of the Confrontation Clause at the time of Petitioner's second penalty phase trial.  Petitioner's rights under the Confrontation Clause and the heightened procedural requirements of the Eighth Amendment were violated.

### C.   Petitioner Was Denied His Right to the Effective Assistance of Appellate Counsel.

The Sixth Amendment additionally requires that criminal defendants be provided the effective assistance of counsel.  A criminal defendant is denied the effective assistance of counsel

whenever counsel's performance falls below "an objective standard of reasonableness" and the defendant suffers prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). *See also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005). Where, as here, the law provides for appellate review of a conviction and sentence as of right, the due process clause of the Fourteenth Amendment entitles the defendant to the effective assistance of counsel on appeal. *Evitts v. Lucey*, 469 U.S. 387 (1985). Claims of ineffective assistance of appellate counsel are reviewed under the same two-part *Strickland* test.

Trial counsel thoroughly litigated the Confrontation Clause issue arising from the prosecution's introduction of the prior guilt phase transcripts and exhibits at the penalty phase retrial. As noted above, trial counsel filed two pretrial motions and made extended argument at the time the prosecution first made its motion to reintroduce the old evidence. Moreover, throughout Dr. Natarajan's testimony, trial counsel made numerous objections on Confrontation Clause grounds regarding the fact that Petitioner was unable to cross-examine Dr. Erdmann. *See, e.g.*, 23 RR 31, 40, 43, 67-69. This issue would therefore have been obvious to any reasonably competent appellate attorney upon reading the trial record. As appellate counsel now acknowledges, he believes the issue to be a meritorious one and had no reason for failing to raise it. Affidavit of John Bennett.

Petitioner was prejudiced as a result of this failure. Had appellate counsel raised this issue, there is a reasonable probability that the direct appeal court would have granted penalty phase relief on this meritorious constitutional claim.

IV.   **TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO CONDUCT AN INVESTIGATION INTO THE PRIOR BAD ACTS PRESENTED BY THE STATE TO SUPPORT ITS CASE ON PETITIONER'S ALLEGED FUTURE DANGEROUSNESS AND FAILED TO AFFIRMATIVELY PRESENT EVIDENCE THAT MR. BREWER HAD NEVER BEEN THE SUBJECT OF INVESTIGATION WHILE INCARCERATED ON DEATH ROW.[17]**

Trial counsel rendered ineffective assistance in violation of Petitioner's rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution by failing to investigate and present the readily available evidence rebutting the State's case on future dangerousness.

Because counsel failed to take this rudimentary investigative step, the State's case on future dangerousness, which was the crux of its argument supporting the death penalty, went unchallenged and left the jury with no choice but to find this statutory aggravating factor. Counsel's deficient performance prejudiced Petitioner entitling him to a new sentencing hearing.

Counsel also rendered ineffective assistance by failing to affirmatively present the evidence it had from the Texas Department of Criminal Justice (TDCJ) indicating that Mr. Brewer had never been the subject of a criminal investigation while incarcerated and was not a gang member. Counsel's deficient performance prejudiced Mr. Brewer.

Finally, counsel's failure to investigate the State's future dangerousness evidence prior to advising Mr. Brewer to testify and take responsibility for every prior bad act the State alleged constitutes deficient performance. Mr. Brewer suffered prejudice as a result.

A.     **The State's Future Dangerousness Presentation.**

The State's 2009 case on future dangerousness was essentially identical to the case in presented in 1991. Thus, in 2009, there were no surprises. For example, in 1991 the State presented

---

[17] This claim was exhausted in Petitioner's state habeas proceedings.  It was denied by the state habeas trial court in its findings of fact and conclusions of law, which the Texas Court of Criminal Appeals adopted.  Trial Court Findings of Fact and Conclusions of Law at 48-54, 85; *Ex Parte Brewer*, No. WR-46,587-02, 2014 WL 5388114, at *1 (Tex. Crim. App. Sept. 17, 2014)

the testimony of Ms. Aimee LeMaster, Mr. Kevin Lewis, Dr. Richard Coons, M.D[18]., and Officer Ronald Mosher. The State presented these same witnesses to prove future dangerousness in 2009.

The State also introduced the 1991 testimony of Mr. Albert Brewer, Brent's father and other testimony from the 1991 trial that concerned an incident where Mr. Brewer hit his father with a broom handle while coming to the defense of his mother. The State couched this incident as a vicious assault while the defense maintained Brent was defending his mother. *See* 21 RR 53.

Indeed, the State followed the blueprint of the 1991 trial and opened with a summary of Mr. Brewer's alleged ascension to murder by focusing on future dangerousness:

> He was 19 years old. That's pretty young. What road did he travel those 19 years to arrive there? You will learn that Brent Ray Brewer, by the time he was 13, was already showing a propensity to threaten folks with violence and he had a -- he had a preference for knives
>
> by the time he was 13. You will learn that by the time he was in high school he was so volatile that when his girlfriend dared to end the relationship with him, she was slammed
>
> into a locker and her arm paralyzed for a period of time as a result of the attack from Brent Ray Brewer.
>
> You will learn that between that event and the murder of Robert Doyle Laminack, that Brent Ray Brewer attacked his father and sent him to the hospital with injuries so severe that he remained there for an extended period of time, unable to talk or speak in a way that anyone could understand him for some time. You will hear evidence that bone fragments have actually been embedded in his brain as a result of this attack. You will learn that his father was not -- this wasn't some wuss. This wasn't some fellow that most people would think about attacking. You will learn that his father at least claims to have been a green beret in Vietnam and been involved in multiple combat and combat action deaths of the enemy. That didn't slow Brent Ray Brewer down, you will learn. Green berets, you will learn, don't scare him. And then eventually, not that long afterwards, you will learn that Brent Ray Brewer culminated -- or reached a culmination in his life of violence from from 13 to 19 in the brutal slaughter of Robert Doyle Laminack for $140.

21 RR 46-47. The defense did nothing to counter the State's narrative.

---

[18] The issue of the propriety of Dr. Coons' testimony and the fact that he should not have been allowed to testify before the jury is addressed in a separate claim.

The State then told the jury that the above narrative was the predicate for its case that Mr. Brewer presents a future danger and should be executed.  21 RR 49.

During Mr. Brewer's ill-advised testimony, it was more of the same: "Okay. So we've got threats with a buck knife, paralyzed Aimee, hospitalized your father, and now, we go to Florida."  25 RR 126. Florida is where Mr. Brewer was arrested for possession of a concealed weapon contained in a car – an incident trial counsel admits they did not investigate. *See* Odiorne Decl. ¶ 13-14.

In closing argument, the State drummed home the same misleading theme.  25 RR 200.

Despite the State's reliance in 2009 on the same conduct presented in 1991 to successfully convince the jury that Mr. Brewer posed a future danger if not executed, one of Mr. Brewer's attorney's reports that he did not believe the above evidence was particularly demonstrative of future dangerousness and did not bother to conduct an investigation into whether there were defenses available.

This is all the more the stunning given the admission of both trial counsel that the defense case centered almost entirely on the fact that Mr. Brewer did not present a future danger in light of his  nineteen years of excellent conduct record while incarcerated. *See* Odiorne Decl. ¶ 9.

Mr. Odiorne also acknowledges that the defense team failed to investigate any of the prior bad acts outlined above and had no strategic or tactical reason for not doing so. *See id.* ¶¶ 11-14. *See also* Cowie Decl. ¶ 6.

In 2009, the State's evidence on future dangerousness included the testimony of Ms. LeMaster (now Long). She testified about an alleged assault that occurred when she was fifteen years old and Mr. Brewer was sixteen years old that took place in the hallway of the high school they attended. The State used this incident to claim that Mr. Brewer had paralyzed Ms. LeMaster's right arm in what it portrayed as a brutal, unprovoked attack. The inference the State sought to leave with the jury was that Mr. Brewer was quick to anger and quick to violence.

Mr. Kevin Lewis testified in 1991 that while incarcerated in the county prison with Mr. Brewer while the latter awaited trial in this case, that Mr. Brewer threatened to stab him in the eye with a pencil during a dispute they had while playing cards. The State used this incident as illustrative of Mr. Brewer's propensity and willingness to stab people.

In 2009, all of the testimony from the 1991 trial, including Mr. Lewis's, was introduced into evidence. In addition, the State presented the testimony of Mr. Lewis and questioned him about admissions Mr. Brewer allegedly made to him back in 1991, and argued to the jury about Mr. Brewer's continued skirmishes while incarcerated pretrial. *See* 21 RR 49.

Officer Mosher testified in both 1991 and 2009 about his arrest of Mr. Brewer back in 1989 in Naples, Florida for carrying a concealed weapon. He arrested Mr. Brewer after a traffic stop and saw a knife positioned between the front driver and passenger seats. The State used this incident to demonstrate – incorrectly – that this was another time Mr. Brewer had in his possession a knife, demonstrating his future dangerousness.

Mr. Brewer's attorneys failed to interview Ms. Long, Mr. Lewis, or Officer Mosher or conduct any investigation into the State's future dangerousness case:

> While our strategy was to present Mr. Brewer's acceptance of responsibility and remorse and to emphasize his nineteen years of good conduct in county jail and on death-row to counter the State's future dangerousness presentation, we did not independently investigate and counter the 404(b) evidence presented by the State of Mr. Brewer's alleged propensity for violence indicating he posed a future danger, relying instead on the previous work done by Mr. Brewer's habeas counsel.

Declaration of Anthony Odiorne, Esq., ¶ 11. As the record reflects, none of Mr. Brewer's former attorneys conducted an investigation into the State's 404(b) evidence and thus there wasn't any other work on this issue the 2009 defense team could rely upon to justify a failure to investigate.

### B.    Counsel Rendered Ineffective Assistance.

Counsel's representation was deficient because he failed to perform the thorough investigation regarding the State's case in support of future dangerousness required by the Sixth

Amendment. *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) ("[s]trategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgements support the limitations on investigation. A decision not to investigate thus "must be directly assessed for reasonableness in all circumstances").

As detailed below, counsel's failure to rebut the State's evidence of future dangerousness with evidence readily available through simple investigation constitutes deficient performance. Indeed, in *Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012), the court found counsel ineffective for, among many reasons, his failure to rebut the State's aggravating evidence. Similarly, as detailed below, the evidence trial counsel failed to even investigate "may not have entirely negated the [future dangerousness finding], it certainly would have softened its edge" *Id.* As the *Hook* court found, " [I]t is difficult to see how counsel could have failed to realize that without examining this readily available information he was seriously compromising his opportunity to respond to a case for aggravation." *Id.* at 1205.

*The American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, 2003*, specifically addresses counsel's role regarding the prosecution's case in aggravation. Guideline 10.11 – The Defense Case Concerning Penalty:

Counsel should prepare for the prosecutor's case at sentencing phase in much the same way as for the prosecutor's case at the guilt/innocence phase. Counsel should use available discovery mechanisms to ascertain the aggravating and rebuttal evidence the prosecution intends to introduce, and then thoroughly investigate to determine whether this evidence can be excluded, rebutted, or undercut. *Id.* at 1064. As counsel has admitted, no such investigation took place. *See* Declaration of Anthony Odiorne, Esq..

C.     **Deficient Performance**

1.     **Failure To Investigate 404(b) Evidence.**

67

Counsel failed to interview Aimee Long. If he had, she would have told him the following:

> As I remember, I broke up with Brent and he became angry. We were in the hallway arguing when Brent shoved me against the locker. My back hit the corner of the row of metal lockers. Brent then walked off.

> As I recall, I was ultimately diagnosed with a pinched nerve.

Statement of Aimee D. Long at 1 (Emphasis added). Ms. Long notes that she had difficult using her right arm for a while but did not characterize her injuries as significant.

Contrary to the impression the State left through her testimony – that he began exhibiting violent tendencies at a young age, Ms. Young, if called to testify, would have doused that line of argument:

> I did not know Brent to be a violent person.

> I never saw him argue or fight with anyone at school. This incident was out of character for Brent.

> I don't think Brent intended to hurt me. I just happened to be near the corner of the lockers, it wasn't like it was planned.

> He wasn't dangerous. He was a teenager, just a kid.

*Id.* at 2. This type of readily available evidence, if presented to Mr. Brewer's jury, would not only have "softened the edge" of this incident, but would have put it in its proper context – a high school argument with no intent to injure or cause harm by a kid without a reputation for violence or aggression.

Trial counsel admits that the defense team did not interview Ms. Long, she provides the type of evidence the jury should have heard and there was no strategic or tactical reason for not conducting this investigation. Odiorne Decl. ¶ 12.

Mr. Brewer's mitigation investigator, Mr. Rob Cowie, states that he did not interview Ms. Long despite the defense team knowing "well in advance of trial that the State intended to call" her. Declaration of Rob Cowie ¶ 7. Informed of what Ms. Young has told current counsel, Mr. Cowie

68

acknowledges that "I would have wanted to investigate this incident make sure it was presented to the jury." *Id.*

The State also presented evidence that in 1989, Mr. Brewer had been arrested in Naples, Florida, for possession of a concealed weapon – a knife found in a car in which he was the driver and the owner of the car was the passenger. The vehicle was owned by John and Ammy Greenman, who hired "wayward young men" to drive for them and also provided them with housing. *See* Declaration of Ammy Valles ¶ 5. In January of 1989, Mr. Brewer was one of those "wayward young men."

Ms. Valles (formerly Greenman) states that "[N]one of the people who drove for us were known to me to carry knives or other weapons or to be violent people." *Id.* ¶ 6. Ms. Valles noted that no one from Mr. Brewer's defense team ever contacted her at any time to discuss Mr. Brewer's arrest in 1989. *Id.* ¶ 7. Indeed, Ms. Valles reports that if she had been approached by a member of Mr. Brewer's defense team prior to the 1991 or 2009 trials, she would have fully cooperated and told them what she remembered about that incident. *Id.* ¶ 8.

Trial counsel acknowledges that the defense team fully expected the State to present this evidence because they did so in the 1991 trial. Yet, no one from the defense team interviewed the Greenman's and there was no strategic or tactical reason for not doing so.  Declaration of Anthony Odiorne, Esq. ¶ 13; *see also* Declaration of Rob Cowie ¶ 8.  In support of this prior bad act, the State presented the testimony of the arresting officer, Ronald Mosher. Officer Mosher described for the jury why he pulled over the car Mr. Brewer was driving and why he was arrested.

Mr. Mosher, who is now retired, was recently interviewed by an investigator for current counsel, and he explains that Mr. Brewer was arrested because the knife was on the driver's side, but was equally accessible to both him and Ms. Greenman (Valles):

> Prior to Brent Brewer's arrest, the Naples Police Department had received information that John Greenman threatened to hurt a member of our police force

with a knife or other weapon. On January 4, 1989, I spotted a car owned by the Greenman's stopped in Naples. I approached the vehicle because of the alleged threat by John Greenman.

Brent Brewer was in the driver's seat of the Greenman's car and Ammy Greenman was in the passenger seat. John Greenman was not in the car. I spotted the handle of a knife sticking out from between the driver's seat and the console.

The knife was easily accessible to both Brent Brewer and Ammy Greenman. But because the concealed weapon was located on the driver's side, closest to Brent Brewer, I arrested him.

During his arrest, he didn't resist, make threats or act violently.

Declaration of Ronald Mosher, July 7, 2015, at 1. This information from the arresting officer places this incident in an entirely different, far less sinister or aggravating context.

Trial counsel admits that the defense team's failure to interview Officer Mosher had no basis in strategy or tactics and that this is the type of evidence he would have wanted to present to Mr. Brewer's jury. *See* Declaration of Anthony Odiorne, Esq. ¶ 14; Declaration of Rob Cowie ¶ 9. This constitutes deficient performance.

The State also presented during its future dangerousness presentation the testimony of Mr. Kevin Lewis. Mr. Lewis had been incarcerated with Mr. Brewer at the Randall County jail while Mr. Brewer awaited trial in 1990 or 1991. He told the 1991 jury about an argument he had with Mr. Brewer during a card game where Mr. Brewer allegedly picked up a pencil and told Mr. Lewis that he was going to stab him in the eye with it. 18 RR—1991 Trial 705. In 2009, the State introduced Mr. Lewis's 1991 trial testimony into evidence and asked him a series of questions about statements Mr. Brewer allegedly made to him. It also argued to the 2009 jury that Mr. Brewer, while incarcerated at the county jail pretrial, had conflicts with other inmates. *See* 21 RR 49.

In preparation for Mr. Brewer's 2009 trial, the defense team did not interview Mr. Lewis. If they had, they would have learned that Mr. Lewis began the argument and stood up quickly while Mr. Brewer remained calm and seated throughout. Declaration of Kevin Lewis. They also would

have learned that no one in the jail thought of Mr. Brewer as threatening and that he got along well with both the inmates and guards. *Id.*

This evidence would have placed this alleged threat with a sharp object into its proper context and would have shown the jury the extent to which the State was attempting to trump up an otherwise weak case on future dangerousness.

The defense team did not interview Mr. Lewis and had no strategic or tactical reason for not doing so. *See* Declaration of Anthony Odiorne, Esq. ¶ 14; *see also* Declaration of Rob Cowie ¶ 6. This too, constitutes deficient performance and Mr. Brewer suffered prejudice.

The defense team's attempt to rebut the State's evidence about Mr. Brewer's assault on his father, Albert, while defending his mother from yet another beating consisted solely of the testimony of Ms. Karen Brewer, Mr. Brewer's mother and Mr. Brewer. As she explained:

> Well, he was basically abusing me. We were in the kitchen and I just said, you know, I can't do this anymore and was just trying to walk away. And I had really long hair and he loved to grab my hair. That's how it would start. And as I walked away and he started grabbing for my hair, Brent was -- I didn't even remember that he was standing -- I didn't realize he was in the kitchen, but he was over there. And he had a broom in his hand and -- it was like an ole cedar broom and plastic. And he -- he hit his dad, but I didn't know what that first lick was, because as he grabbed for my hair, I had wheeled around and just started out of the kitchen because I didn't want to be hit anymore, and I knew he was on the verge.

24 RR 88. She also testified that Brent Brewer had previously witnessed violence between his father and mother. *Id.* at 90. Defense counsel did not, however, develop this line of inquiry and, after failing to ask a single question about the depth of violence in their home or in her relationship with her husband, or about the violence inflicted on Brent by his father, ended his direct examination.[19]

This incident stands out as one of the stronger aspects of the State's case on future dangerousness. The prosecutor hammered home the fact that as a result of this incident, Albert Brewer suffered damage to his brain and was hospitalized for weeks.

---

[19] Karen Brewer testified for a total of twenty-one minutes, from 10:19 a.m. to 10:40 a.m.

There was, however, a factual counter-weight to this incident that easily could have been presented to the jury if counsel had conducted an adequate investigation into this particular incident and Albert Brewer. Albert Brewer had been married at least three times. With each he had at least one child. Each of his former wives and children tell chilling stories of unprovoked and unpredictable violence at his hands. This history lends credence to both Karen and Brent Brewer's testimony about what happened the evening of the broom stick incident.

Rather than demonstrate another incidence of violence on his alleged path to murder, which was the State's argument, this history frames Brent Brewer and his mother as victims of profound and long-standing violence and Brent as stepping in to protect his mother.

For example, as described in Claim V, Billie Ann Young, Brent's younger sister who testified on behalf of her brother in 2009[20] but was hardly asked any questions, provided a poignant vignette of the violence inflicted by Albert in a recent declaration that starkly the constant threat of violence that hung over Brent, his sister, and his mother: *See* Declaration of Billie Ann Young ¶¶ 27-31.

Mr. Brewer's jury heard no such evidence. Thus, they did not understand the history that accompanied Mr. Brewer's hitting Albert in the head with a broom handle. Counsel failed to elicit this type of information from Ms. Young. Indeed, she notes that she was surprised at how few questions she was asked by Brent's lawyers and that in 2009, "mom and I met with Brent's attorneys the day before his re-sentencing and spent only a short amount of time preparing for our testimony." Declaration of Billie Ann Young ¶ 24. Trial counsel admits that he only met with Ms. Young one time prior to her testimony. Odiorne Decl. ¶ 23.[21]

---

[20] Billie Ann testified for only seven minutes, from 10:42 a.m. to 10:49 a.m.

[21] The Regional Public Defender Office is responsible for paying the investigative and travel costs of its employees. Counsel's admission that he was denied funding to conduct what was an important and critical investigative task also constitutesdeficient performance.

Trial counsel's failure to conduct an adequate pretrial investigation meant that the jury did not hear any testimony that it was understood and accepted within the Brewer family that Brent was protecting his mother when he hit his father with the broom handle. *See* Declaration of Brenda Brewer ¶ 14; *see also* Declaration of Faye Brewer ¶ 10.

Finally, because trial counsel failed to investigate how best to counter the State's future dangerousness presentation, the jury never heard the testimony of Ms. Corrie Brewer, a daughter of Albert Brewer whose mother, Patricia Lewis, was married to Albert in the early to mid-1970's. She too, would have been able to tell the jury about the profound domestic violence and beatings inflicted on her and her mother by Albert that permeated their daily existence and follows the pattern of violence later described by Karen Brewer and Billie Ann Young.

Ms. Brewer was born in Germany in 1974. Albert Brewer was still in the military at that time and stationed in Germany. Shortly after she was born, Albert attacked her with a sharp object, furious that she was not a boy. Declaration of Corrie Brewer ¶ 2. Ms. Brewer still bears a scar from Albert's attack and has read a newspaper account of the incident. *Id.*

Albert Brewer was subsequently discharged from the army "Under Conditions Other Than Honorable." Military Record, Section VII – Current And Previous Assignments dated July 26, 1978. Albert was a man who was once again beating on Karen Brewer, Brent's mother, when Brent intervened to protect her. The witness statements outlined above and in Claim V *infra* would have provided the jury with Albert's history of familial and domestic violence, lending credence and the context with which to weigh the testimony of Brent and his mother about what happened the night Brent hit Albert with the broom handle.

None of this evidence made its way to Mr. Brewer's jury. The State's case on future dangerousness went in basically unopposed. Counsel rendered deficient performance and Mr. Brewer suffered prejudice as a result.

2.      **Failure To Present Evidence From The Texas Department of Criminal Justice Demonstrating Mr. Brewer Lack of Criminal And Violent Activity.**

Counsel also failed to present the affirmative evidence of Mr. Brewer's good conduct in prison. For example, the defense team's mitigation investigator secured a letter from the Texas Department of Criminal Justice's (TDCJ) Officer of the Inspector General (OIG). The OIG investigates crime and gang activity within TDCJ. It responded to the defense request by stating that Mr. Brewer had never been the subject of an OIG/TDCJ investigation.

This type of evidence is wholly consistent with the defense theory. Trial counsel has admitted that this is the type of evidence they should have presented to Mr. Brewer's jury:

> We also did not present evidence through our own witness testimony that Mr. Brewer had never been subject of a TDCJ investigation by the Office of the Inspector General. Our mitigation expert, Rob Cowie, procured a letter from OIG stating this fact but we did not present the letter to tell the jury this fact. We had no strategic or tactical reason for presenting this evidence

Declaration of Anthony Odiorne, Esq. ¶ 21. *See* Declaration of Rob Cowie ¶ 12. Petitioner suffered prejudice and is entitled to relief.

3.      **Failure To Investigate 404(b) Evidence Prior To Advising Mr. Brewer To Testify.**

Prior to advising Mr. Brewer that he should testify during the penalty phase and admit, unequivocally, to all of the bad acts alleged by the State, counsel failed to conduct an adequate investigation into the State's evidence. This type of investigation, required by all capital counsel, is basic investigative task that the Sixth Amendment requires counsel to undertake.  As counsel admits,

> We advised Mr. Brewer to testify and admit responsibility for the above 404(b) evidence without first investigating whether there were factual challenges to the State's version of events available to us. We had no strategic or tactical reason for not conducting this investigation before advising Mr. Brewer whether or not he should testify and admit responsibility for the State's 404(b) allegations.

Declaration of Anthony Odiorne, Esq. ¶ 18. As a result, through Mr. Brewer, the defense mistakenly and fatally left the jury with the impression that nothing mitigated the State's evidence in aggravation and the best the defense could offer was a plea for mercy and cries of "he's a changed man."

To a death qualified jury, this plea, with nothing to counter-balance the State's misleading history of escalating violence on the part of Mr. Brewer, was a death knell. This constitutes deficient performance and Mr. Brewer suffered prejudice.

### D.        Prejudice

Given the theory of defense – that Mr. Brewer did not pose a future danger, the failure to investigate and counter the State's presentation of the 404(b) evidence outlined above proved fatal. As did the defense team's failure to affirmatively present, through TDCJ, witnesses to attest to the fact Mr. Brewer had never been the subject of a criminal investigation within TDCJ and was not a gang member.

The jury heard nothing to counter the State's 404(b) evidence. As demonstrated above, simple investigation—interviewing people who the defense knew would be testifying against their client and conducting an independent investigation into Albert Brewer's history of familial violence—would have allowed the defense to effectively counter the State's case on future dangerousness.

As a result of counsel's admitted failures, the jury did not know that the State's rendition of Mr. Brewer's life from age thirteen (13) through nineteen (19) as a series of escalating violent events was nothing but a trumped up attempt to get the jurors to find Mr. Brewer a future danger, despite all the evidence to the contrary.  Counsel's failure to investigate and present the evidence outlined above doomed Mr. Brewer to a sentence of death. Mr. Brewer is entitled to a new sentencing hearing.

## V.   TRIAL COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP, AND PRESENT COMPELLING MITIGATING EVIDENCE VIOLATED PETITIONER'S RIGHT TO EFFECTIVE ASSISTANCE.[22]

Trial counsel were ineffective for failing to investigate and present mitigating evidence to the jury. Focusing instead on the issue of future dangerousness, counsel failed to conduct a thorough investigation of Mr. Brewer's background. Despite red flags of mental illness, counsel failed to conduct any investigation into Mr. Brewer's mental health. Counsel further failed to investigate the control and influence Kristie Nystrom had over Mr. Brewer, traceable to deep-seated childhood abuse. As a result, the jury never learned the details of Mr. Brewer's chaotic, violent upbringing, or the emotional and physical abuse he suffered at the hands of his mother and father. The jury never heard how the circumstances of impending homelessness and desperation led to his decompensation just before the murder. If the jury had heard the compelling mitigation case that was available, there is a reasonable probability that at least one juror would have voted for a life sentence.

### A.   Trial counsel were ineffective for failing to investigate and present mitigating evidence of Petitioner's background.

#### 1.   Deficient Performance

The Supreme Court has clearly established that counsel in a capital case must conduct a thorough investigation of the defendant's background and identify all reasonably available mitigating evidence. *See Sears v. Upton*, 130 S.Ct. 3259 (2010); *Porter v. McCollum*, 558 U.S. 30 (2009); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000). "In assessing the reasonableness of an attorney's investigation," the Court "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. Mr. Tabler's trial attorneys never conducted that thorough investigation.

---

[22] This claim was presented in state habeas proceedings as Claim IV. *See* FFCL at 48-54, 85.

The Fifth Circuit and others have repeatedly held that controlling Supreme Court precedent required habeas relief in similar capital cases. *See Adams v. Quarterman*, 324 F. App'x 340, 2009 WL 1069330 (5th Cir. April 22, 2009)*; Walbey v.Quarterman*, 309 F. App'x 795, 2009 WL 113778 (5th Cir. Jan. 19, 2009); *see also Williams v. Allen*, 542 F.3d 1326, 1329-30 (11th Cir. 2008); *Gray v. Branker*, 529 F.3d 220, 225-26 (4th Cir. 2008). Applying clearly established federal law, these cases collectively hold that trial counsel in a capital case must make an "informed decision, "[23] about mitigation strategy, and must present "the details,"[24] "the full picture,"[25] the "entire,"[26] "cohesive,"[27] and "complete"[28] story, not a "scattered"[29] narrative that is "[in]accurate"[30] or "misleading,"[31] but "the strongest mitigation case possible."[32]

In *Walbey*, for example, trial counsel presented the petitioner's grandmother and two psychologists at trial, but failed to speak to a number of potential witnesses who had first-hand knowledge of his troubled childhood, failed to correct the grandmother's misleading testimony painting a too-rosy picture of Walbey's past, and failed to rehabilitate misleading cross-examination about whether Walbey fit the criteria for antisocial personality disorder. 309 F. App'x. at 796-97. The Court of Appeals, citing case law "that firmly establishes a duty to investigate the background and character of a capital defendant, along with his family and social circumstances and mental health history," held that counsel's investigation, and hence his performance, was deficient because it was "severely limited." *Id.* at 800-01. *See also Adams*, 342 F. App'x at 347-49; *accord Lewis v. Dretke*, 355 F.3d 364, 367-68 (5th Cir. 2003) (accepting testimony of petitioner's sisters that trial counsel

---

[23] *Adams*, 324 F. App'x at 349.
[24] *Walbey,* 309 F. App'x at 803.
[25] *Gray,* 529 F.3d at 238.
[26] *Id.* at 237.
[27] *Id.* at 235.
[28] *Walbey* 309 F. App'x at 802; *Williams,* 542 F.3d at 1340.
[29] *Gray,* 529 F.3d at 233 n.2.
[30] *Walbey* 309 F. App'x at 802.
[31] *Williams,* 542 F.3d at 1340.
[32] *Id.* at 1340.

never interviewed them, and finding counsel ineffective in capital sentencing for failing to investigate and present evidence of petitioner's abusive childhood); *Moore v. Johnson*, 194 F.3d 586, 616-17 (5th Cir. 1999) (counsel deficient in penalty phase because, although he knew some of petitioner's background, he did not investigate or present mitigating evidence that would have shown abuse and abandonment by family)

As in these cases, trial counsel for Mr. Brewer failed to conduct a constitutionally adequate investigation.

Although counsel were appointed to Mr. Brewer's case in April of 2008, counsel's files reflect that nearly a year passed before the trial team began their investigation in earnest and interviewed any witnesses. Mr. Brewer's trial began five months later, in August of 2009. Both trial counsel and mitigation specialist Rob Cowie point to insufficient time and resources as the reason for their incomplete investigation. Cowie sent an email to the trial team on May 15, 2009, expressing his concerns they were not prepared for trial and needed a continuance. *See* Cowie Decl. ¶ 3-4; May 15, 2009 Email from Rob Cowie. Anthony Odiorne, one of Mr. Brewer's trial attorneys now agrees a continuance was necessary in order to prepare their mitigation case. Odiorne Decl. ¶ 24. Counsel did not request a continuance and, as a result, went to trial without completing a thorough investigation.

Trial counsel's failure to investigate and present the powerful details of Petitioner's childhood and background was particularly unreasonable in light of the tremendous head start they were given in this case. Amongst trial counsel's files was the report of Dr. Mark D. Cunningham, a forensic psychologist who evaluated Mr. Brewer in the mid-1990s as part of post-conviction litigation following the 1991 trial. Report of Mark D. Cunningham. The report provided a roadmap for a mitigation presentation containing a compelling narrative of the neglect, abuse, and abandonment Mr. Brewer suffered in his early years, followed by the abject violence and instability

that accompanied his father's reintroduction to his life. *Id.* The report laid out the compelling details that several witnesses could provide, including Mr. Brewer's half-sister, Billie Ann Young.

Despite the clear importance of developing Ms. Young's testimony, Mr. Odiorne, the attorney tasked with presenting her testimony was not permitted by his supervisors to travel out of state to meet with her. Odiorne Decl. ¶ 23. He met with her for the first and only time the night before she was to testify, and then only met with her briefly. *Id.*; Billie Ann Decl. ¶ 42. Trial counsel failed to interview many of Mr. Brewer's family members and friends, and many interview they did conduct were rushed or cursory.

By counsel's own admission, the narratives and themes in Dr. Cunningham's report are the type of evidence he would have wanted to present to the jury. Odiorne Decl. ¶ 16. Counsel further admits there was no strategic or tactical reason for not presenting the evidence in Dr. Cunningham's report or investigating the leads the report *Id.*

Trial counsel's failure to investigate resulted in the jury's hearing an incomplete and superficial picture of Mr. Brewer's life. The defense called only three witnesses to testify regarding any aspects of Mr. Brewer's life before his incarceration—Mr. Brewer's sister, his mother, and Mr. Brewer himself. The testimony of Mr. Brewer's mother and sister totaled twenty-five transcript pages, including cross-examination, and took only twenty minutes to present. 24 RR 77-103. Trial counsel ensured that the mitigation testimony was superficial and vague. It invoked the idea of mitigation evidence by referring to "abuse," and other token phrases, but this testimony lacked any detail and was "wholly inadequate to present to the jury a true picture of the tortured childhood" experienced by Mr. Brewer. *See Adams*, 355 F.3d at 368..

The picture of Mr. Brewer's childhood developed by trial counsel was so skewed and incomplete that even the defense, in its opening statement, characterized Mr. Brewer's history as a "basically normal childhood." 21 RR 15.

Karen Brewer described Brent's diagnosis of scoliosis and testified that it prevented him from playing the sports he loved. 24 RR 83. Prior to the age of 15, Brent only saw his biological father, Albert Brewer, twice, once at five months of age and then again at five years of age. *Id.* at 84. Karen and Albert reconciled when Brent was 15 years old and they moved from Texas to Hamilton, Mississippi. *Id.* The reconciliation and related move were "a bad decision." *Id.* at 85. The extent of trial counsel's questions regarding Brent's relationship with his father demonstrates the superficial, incomplete nature of Karen's testimony:

> Q:    And how was the relationship between Brent and his father Albert?
> A:    Brent tried and tried, but his father was mean to him, so abusive.

*Id.* at 85. Mrs. Brewer's willingness to open up about these topics suggested they were available to counsel had they asked. Yet, at trial, as in their investigation, counsel left these stones unturned— "Bad decision"? "Abusive"? The jury would never learn anything beyond these conclusory, superficial terms.

Karen Brewer also testified regarding the incident in which Brent struck his father with a broom, explaining that before the incident Albert Brewer had cashed her paycheck and kept the money for himself. *Id.* at 86-88. When she confronted Albert about this, he grabbed her hair and started attacking her, prompting Brent to hit Albert in the head with a broom. *Id.* Trial counsel then elicited testimony from Karen Brewer as to whether Brent had witnessed violence between his parents before. Counsel again showed indifference. *Id.* at 90 ("Q: Had Brent witnessed physical violence between you and Albert before? A: Yes….[P]ass the witness".).

Mr. Brewer's sister Billie Ann Young testified regarding his childhood. Billie Ann testified they had a "good childhood" but things changed after her mother divorced her father, Donald Bartlett. Her mother remarried Albert Brewer and the family moved to Mississippi, which neither Billie Ann nor Brent wanted to do. Billie Ann also testified she witnessed "fights" between Brent and Albert in Mississippi with Albert "just beating up on Brent one day." *Id.* at 100.

Regarding the mitigating circumstances of his background, Mr. Brewer testified that he had vague memories of meeting his father, Albert Brewer, when Brent was 5 years old, and knew his parents had divorced.  25 RR 39-40.  His mother worked for a while in a nursing home before she married Don Bartlett, Billie Ann's Father. *Id.* at 40-41.  Don Bartlett was not involved in Brent's life, favored his daughter Billie Ann, and would beat Brent with an extension cord. *Id.* at 41-42.  Karen and Don would fight about once a week. *Id.* at 44.  Brent played sports growing up until he was diagnosed with scoliosis and underwent surgery implanting a rod in his spine.  *Id.* at 45.  Brent then began smoking marijuana and drinking, which led to experimentation with other drugs and trouble with his grades and behavior in school. *Id.* at 48-51.

Brent's father Albert re-entered Brent's life when Brent was 15.   Brent learned how violent his father was.  Karen and Albert reconciled, which strained Brent's relationship with his mother and caused him to run away several times. Id. at 51-54.  Brent and Albert had a difficult relationship and Albert beat Karen. Id. at 58-59.  Brent hit Albert with a broom once to stop him from beating Karen after which Brent was sent to Abilene, where he lived with his grandmother.  *Id.* at 59-62. Living with his grandmother, Brent got a job at an Exxon station and began to use drugs and alcohol again. *Id.* at 63-64.  Brent then attempted to commit suicide and was committed to Big Spring State Hospital.  *Id.* at 64.  While there, Brent met and developed a relationship with Kristie Nystrom, with whom he continued using drugs once they were released and moved to Amarillo. *Id.* at 66-69.  Brent was broke and unemployed, and Karen paid his rent while Brent was living with Guy Blackwell, after which Brent and Kristie moved in with Charlotte Clarkson and Michelle Francis at the Raintree Apartments, where Karen and Kristie gave him money for rent.  *Id.* at 69-71. Kristie and Brent were kicked out after about three weeks because they were not on the lease, at which point they considered robbing people in motel rooms, but never did.  *Id.* at 71-73.       In    its opening statement, the State called the lack of mitigating evidence to the attention of the jury: "We

think you will hear evidence showing that there is very little in the way of mitigating evidence, and if there is, it is certainly not sufficient to justify anything but the death penalty." 21 RR 50.

Similarly, in closing the State seized on trial counsel's decision to rely on Mr. Brewer's testimony for the vast majority of its limited mitigation presentation:

> "Now, the vast majority of what might be considered mitigation, you heard from the Defendant on the stand… His sister said life was okay until life was fifteen.  His mom said it was okay until he turned five, everything else pretty much came from the Defendant.  Well, why shouldn't you believe the Defendant?"  25 RR 202.

While the jury heard cursory testimony regarding mitigation from Karen Brewer, Billie Ann Young, and Mr. Brewer himself, the powerful and detailed accounts of Mr. Brewer's violent, chaotic and abusive upbringing were never investigated and therefore never presented.

### 2.        Counsel's Failure Prejudiced Petitioner

Because of counsel's inadequate investigation, the jury never heard the powerful, detailed accounts of Mr. Brewer's violent, chaotic, and abusive upbringing now proffered to this Court.

Had the jury heard the compelling mitigating evidence that has now been developed, there is a reasonable probability that a juror would not have reached the same verdict.  *Wiggins*, 539 U.S. at 537.

### a.        Family History of dysfunction, substance abuse and mental illness

A thorough investigation would have revealed a history of substance abuse, mental illness and dysfunction on both the maternal and paternal sides of Brent's family.

On the paternal side of Brent's family, his grandmother was reported to have suffered a mental breakdown, and Brent's paternal uncle James Brewer suffered from anxiety and mood disorders.  Declaration of Faye Brewer at 3.  Brent's cousin suffered from paranoid schizophrenia. *Id.* In addition to Brent's father Albert, discussed below, several of Brent's aunts and uncles were

physically abusive with their partners.  *See* Cunningham 2015 Report 32-34.  Additionally, several of

Brent's paternal aunts and uncles and cousins had long histories of heavy drinking.  *Id*

 Brent's maternal grandparents fought physically before their divorce.  *Id.* at 39.  Brent's

maternal grandmother Gerry Ford went on to marry five more times.  *Id.*  Gerry was dependent on

Valium for at least 10 years and would "doctor shop" for a physician willing to write her

prescriptions for this drug.  *Id.* at 41.  She was diagnosed as bipolar before her death.  Brent's

maternal uncle Karl was chronically unfaithful to his wife and would beat her with his fists.  *Id.*

As discussed in Dr. Cunningham's 2015 report, Mr. Brewer was a product of this disturbed

family system.  Dec. 7, 2015 Declaration of Mark D. Cunningham at 43 (attached as Exhibit XX)

(hereinafter "Cunningham 2015 Report").

### b. Early childhood marked by inadequate nutrition, severe maternal neglect, instability and homelessness

Brent's early childhood was marked by inadequate nutrition, severe neglect by his mother,

instability and a bout of homelessness.

Brent's parents met in 1963 in Leuders, Texas.  Brent's mother, Karen was 12 years old

when they met and Albert was 15.  Julie Machal-Fulks Interview with Karen Brewer, Dec. 20, 1995.

They married in 1968, while Albert was in between tours in Vietnam.  William Albert Brewer

Military Record Section VII – Current and Previous Assignments.  Karen was just 17 years old.

Albert was physically abusive from the start, however, and beat her on a regular basis.  Julie Machal-

Fulks Interview with Karen Brewer. In order to escape from Albert, Karen called the Sheriff's

Department and had Albert detained long enough for her to gather her things and leave.  Albert

returned to the Army and Karen soon found out she was pregnant with Brent.

After Brent was born, Karen struggled to provide for Brent on her own and there was rarely

food in their home. Declaration of Raymond Karl Ford ¶ 15.  Brent's nutrition during these early

childhood years was inadequate, consisting of principally of peanut butter, apples, oatmeal and

macaroni.  Cunningham 1996 Report at 7.  When Brent was still an infant, Karen and Brent moved to Abilene to live with Karen's brother Raymond Karl Ford and his wife Lind Belz.  *Id.*; Declaration of Linda Belz ¶ 4.  However, Karen was a neglectful mother and seemed more interested in chasing men than caring for Brent.  Belz Decl. ¶¶ 5-6.  She would often leave Brent at home with her family to go out to bars, sometimes staying out all night with men.  *Id.*  Brent's diapers would go dirty and unchanged all day, with Karen either not around to change them, or refusing to when she was home. *Id.* ¶ 6.  Once, Karen left Brent unattended and he drank bleach, requiring a trip to the hospital on Dyess Air Force Base.  *Id.* ¶ 7.  Fed up with Karen's partying and bad parenting, Karl Ford soon kicked her out. *Id.* ¶ 8. Karen and Brent stayed with Karen's mother Gerry Ford briefly before living in Karen's car for several weeks.  Ford Decl. ¶ 15.

As a single mother, Karen Brewer often worked two jobs during the first several years of Brent's life in an attempt to make ends meet.  Cunningham 1996 Report at 17.  As a result, she was again extensively absent and Brent was left in the care of various sitters.  *Id.*  Eventually Brent went to live with his maternal grandmother for four to five months between the ages of two and three. Family members recalled that Karen was emotionally troubled and financially stressed during these years.  *Id.* This neglect by Karen in the critically important first months and years of Brent's life reflected a failure to form a secure nurturing attachment to Brent as a baby.  Cunningham 2015 Report at 67.

### c.    Middle Childhood: Brent is rejected by his stepfather; household is in constant state of discord due to Karen's unstable behavior.

As the jury heard at trial, Karen Brewer remarried Don Bartlett, who was not particularly involved with Brent and favored Brent's half-sister Billie Ann.  25 RR 42.  What trial counsel failed to uncover, however, was the severity of that failure to bond and the effect it had on Brent, leaving him feeling ignored, as if he was not part of the family.  Although the family did not go on many

family vacations because they could seldom afford to, Brent was often left behind the few times they did. Billie Ann Decl. ¶ 5. "I remember we went on a vacation to San Antonio when I was eight. Brent wasn't there. We also went to a water tubing park. Brent wasn't there either." *Id.*

According to Billie Ann, Don emotionally neglected Brent. *Id.* at 4. Don would buy treats and candy for his daughter Billie Ann and bring them home to her, without buying anything for Brent. *Id.* "I realized it was wrong because I used to eat my treats in front of Brent. Brent would say to me 'Hey, where's mine?' He looked so hurt. So I made my dad buy him treats too." *Id.*; *see also* Ford Decl. ¶¶ 17-18; Declaration of Sharon Minnick at 6.

Don engaged in virtually no recreational activities with Brent and displayed almost no affection to him, although Brent made efforts to identify with Don and used the last name Bartlett across his elementary school years. Cunningham 1996 Report at 15. When Brent was approximately 8 years old, a neighbor offered to give Don and Brent free tickets to a Dallas Cowboys football game, but even then Don declined to engage in activity with Brent. *Id.* As Karen Brewer recalled: "Brent tried for a long time to be Don's son and finally gave up." *Id.*

Karen dominated both Don and Brent, making clear to Don that she would make all decisions concerning Brent and ordering Don to administer discipline by beating Brent, often with an extension cord. Affidavit of Donald Wayne Bartlett ¶ 11. Don attributes his failure to bond with Brent in part to this. *Id.*

The jury never heard about Karen's controlling, domineering nature, nor did they learn of the almost constant discord and chaos in the household because of her temper and unstable behavior. "They woke me up almost every night with mom screaming at dad. I never knew why. I would hear Karen screaming at Don constantly and he just took it…" Billie Ann Decl. ¶ 3; Declaration of Donald Wayne Bartlett ¶ 6. Karen would take out her displeasure on Don, Brent and

85

Billie Ann when she did not get her way.  Brent' sister Billie Ann Young was Brent's sister Billie Ann

Young was afraid of Karen.  Billie Ann Decl. ¶ 6.

> She once slapped me when I was a kid for asking her for something to eat.  Karen
> yelled at me for two hours once because she thought I didn't do a good enough job
> sweeping.  I had left some dust under the coffee table.  …. Once, my mom physically
> dragged me out of bed by my hair in the middle of the night because I hadn't cleaned
> the dishes from dinner.

*Id.*  Billie Ann Young always suspected Karen was bipolar. *Id.*

In addition to ordering Don to physically discipline the children, Karen would administer it

herself as well, spanking the children when they were younger, then beating them with a belt or

electric cord as they got older.  *Id.* ¶ 11.  However, her beatings went beyond simple discipline and

constituted physical abuse. Brent would often intervene when his mother was beating his sister. *Id.*

> Another time my mother was hitting my in the face and Brent grabbed her hand and
> said "if you hit her in the face again, I'm going to hit you back."  Brent was just
> talking.  He'd never hit my mother, but he was just trying to make a point.  My
> mother had Brent arrested for making threats and had him locked up in a juvenile
> jail.  I remember Brent calling up in tears begging mom to let him come home.

*Id.* ¶ 12.

Brent listened to heavy metal bands and grew his hair long.  Karen, believing this music was

encouraging him to do drugs, cut up all of his cassette tapes with a pair of scissors. *Id.* ¶ 7.  Another

time, believing his long hair was contributing to his getting in trouble, she came up behind Brent and

hacked off his hair with a pair of scissors.  *Id.*  After Karen forced Brent to go to school like this, a

teacher who lived near the family took pity on Brent and evened his hair. *Id.*

To escape his home, Brent would often run away, staying with friends, for weeks and even a

month or more at a time.  *See* Minnick Decl. ¶ 10; Declaration of Erik Gravely ¶ 6.   After one fight

with Don when Brent was 13 or 14, he ran away and stayed in a friend's garage for three weeks.

Billie Ann Decl. ¶ 13.  Although he did not know where Brent was, Karen and Don never called the

police nor made any attempt to find him.  *Id.*

### d.      Traumatic Sexual Experiences

Trial counsel also failed to investigate and present evidence of traumatic sexual experiences Brent suffered as a child, even though Dr. Cunningham's 1996 report clearly made counsel aware of these incidents. *See* Cunningham 1996 Report at 21.

Brent was "extraordinarily disturbed" by sex play that occurred between him and a male friend when he was 10-12 years old. They began by watching pornographic videos that belonged to the friend's father and progressing to genital fondling and oral stimulation. Brent described feelings of peer alienation because of this. *Id.*

Around the age of 12 or 13, Brent was sexually abused by a babysitter who was in then high school. She initiated breast and mutual genital fondling with him. Brent described the traumatic nature of the incident to Dr. Cunningham:

> I didn't really associate it with being with a girl. It was right about the same time that
> that happened with Scott. It felt like Scott's hand touching me. I felt weird about it.
> I was just a kid.

*Id.* Dr. Cunningham's 1996 report not only alerted trial counsel to these incidents, but also made clear the traumatic impact these experiences had on Brent. As discussed below, a mental health expert such as Dr. Cunningham could have explained to the jury the impact these experiences had on Brent. Instead, due to trial counsel's ineffectiveness, the jury never even learned these incidents occurred.

### e.      Albert Brewer

The jury learned that Albert Brewer abandoned Brent before Brent was born, and that once they reunited when Brent was 15, Albert was "mean" and "abusive." 24 RR 85. However, the jury never heard the powerful details of Albert's emotional and physical abuse of the family. Nor did they hear about the horrific abuse Albert perpetrated against his other partners and children. A complete and accurate picture of Albert would have not only informed the jury regarding the

severity of abuse Brent suffered but would have dramatically recast the incident in which Brent struck him with a broom.

After the Vietnam war, Albert returned home and was diagnosed with post-traumatic stress disorder.  18 RR—1991 trial 778-79.  He began drinking more heavily and taking more drugs and his physical and emotional abuse of those around him grew even worse.  Declaration of Brenda Brewer at 2.  Albert remarried Patricia Lewis, and in 1974 they had a daughter, Corrie Brewer.  Declaration of Corrie Brewer at 1.  On the day Corrie was born, Albert stabbed her with an ice pick because she was a girl and he had wanted a son.  *Id.*  Albert beat Patricia daily.  On one occasion, Patricia cooked dinner for Albert and his friends.  *Id.*  Albert beat Patricia and threw the dinner at her. *Id.*  Corrie Brewer recalled that Albert bought her a horse, then stabbed the horse in the chest in anger.  She reported dodging unopened beer cans he threw at her.  Ultimately, Patricia and Corrie fled the marriage.  Corrie reported that they were so frightened of Albert that they traveled from place to place for 10 years to keep him from finding them.  Patricia carried a gun and  slept with it under her pillow in case Albert broke in.  Both Corrie and Patricia have enduring anxiety symptoms from Albert's abuse.  Corrie Brewer has been diagnosed with agoraphobia and PTSD.

After his marriage to Patricia, Albert sexually assaulted his own niece, Susan Brewer, forced her into a relationship, and father a child with her, a boy named Floyd Israel Brewer.  Susan Brewer Aff. ¶¶ 3,10.

> Albert was the worst man I ever met in my life.  He beat me to a bloody pulp for
> seven years.  When he was home, he'd beat me every day.  Albert was the meanest
> man I've ever met, and I've met a lot.  Other men abused me, but not like Albert.
> Albert would tell me all the time that he would kill me and no one would come
> looking….

*Id.*

Floyd Israel Brewer also recalled Albert's abuse of Susan.  "Albert used to take my mom and hold her down on the ground, then he'd take his knee and drop it down on her temple."  Affidavit of Floyd Israel Brewer at 3.

Although Karen Brewer knew firsthand the abuse and violence Albert Brewer was capable of, Brent was sent to live with his father for a summer around when Brent was 15 years old.   There, Brent was exposed to his father's abuse of Susan and Floyd Israel, including the fight that caused Susan to flee.

> Brent was still living with us when I finally left Albert.  Albert kicked Israel across the room because of some nail polish.  I was putting nail polish on, and I had some clear nail polish… Albert even put some on himself.  And Israel was curious about it, so I was going to put the same thing on him.  Albert kicked Israel in the stomach so hard he hit the wall.  That was the last time .  I told Brent I was sorry but we had to leave.

Susan Brewer Aff. ¶ 20.

> Brent was also exposed to his father's perversions and sexual inappropriateness.

> Albert wanted me to have sex with a dog.  And when Brent was 15, he wanted me to have sex with Brent so he could watch.  Brent and I talked about it and neither of us wanted to, so I said no.  I got beat for that.  It came down to Albert trying to make me have sex with Brent.  We didn't want to, but I was scared he might make us, so I told Brent to leave.  When Albert was back with Karen, Albert tried to make [Floyd] Israel sleep with Karen so he could watch.

*Id.* ¶ 19.

The jury also never heard testimony of Albert's disturbing history of violence towards animals.  In addition to stabbing his daughter's horse in the chest, *see* Affidavit of Corrie Brewer ¶ 5, Albert also told Susan Brewer that he killed chickens on the farm he grew up on because he liked to hear their necks snap.  Susan Brewer Aff. ¶ 6.  Floyd Israel could have testified regarding Albert Brewer's practice of poisoning neighborhood dogs to kill them.  Affidavit of Floyd Israel Brewer ¶ 13.  Albert would cut the ears off the dogs he killed and made a necklace of the ears.  *Id.*

> **f.      Albert reenters Brent's life, exposes him to physical and emotional abuse.**

Around the time Brent was 15, Albert and Karen began speaking again, and Brent saw his father for the second time since he was five years old. *Id.* ¶ 15. At one of their meetings, Albert bought a carton of cigarettes and alcohol for Brent in an attempt to bond with his teenage son. *Id.* Although Brent did not know his father, he assumed that any connection he could form with him would be better than the relationship he had with his step-father. Minnick Decl. ¶ 11. However, Brent could never have predicted the abuse and violence Albert would introduce into his life.

In 1986, Karen divorced Don to be with Albert. Don and Billie Ann were both saw the divorce as the end of the constant fighting. Billie Ann Decl. ¶ 16; Donald Wayne Bartlett Decl. ¶ 22. "[W]hen Karen told me she wanted a divorce, it was the happiest day of my life." *Id.* Karen and Brent moved to an apartment, which Albert would later move into, and Billie Ann would visit on the weekends. Billie Ann Decl. ¶ 17. After the divorce, Brent was no longer welcome in his former home. Billie Ann Aff. ¶ 17.

In May 1987, Karen and Albert remarried and moved to Mississippi, where Albert's family was, taking Brent and Billie Ann with them. Billie Ann Decl. ¶ 19. Before the move Albert went through all their belongings and threw out anything related to Don Bartlett, including the family's baby picture albums. *Id.* Brent sneaked away and recovered some of these things, including the baby albums. *Id.* The children did not want to move to Mississippi and cried for much of the drive there. *Id.*

> When we lived in Cedar Hill we weren't rich or anything, but in Hamilton we were poor. We went from living in a pretty nice, brick house in the suburbs to a rundown shack in the fields. It was freezing in the winter and burning hot in the summer. We had a washing machine but no dryer. We had to dry all out clothes on a line, even in the winter. The house had only two bedrooms. Karen and Albert sept in one and I got the other one. Brent's bedroom was the dining room. You had to walk through his bedroom to get to the bathroom or go into the kitchen. He had no privacy.

*Id.* ¶ 20.

Albert became physically and verbally abusive to his new family almost immediately after the move. *Id.* ¶ 27.  Albert was physically abusive to Karen on an almost daily basis, including slapping her, twisting her arm, pushing her against the wall and elbowing her.  Report of Mark Cunningham, Ph.D.  One time, her broke Karen's finger trying to pull her wedding ring off. *Id.*; *see also* Billie Ann Decl.¶ 28.  He would scream at Billie Ann, calling her a slut and a whore, and would verbally abuse Brent nearly constantly.  Cunningham Report at 13; Billie Ann Decl.¶ 27.

According to Karen, Albert would hit Brent with his fists about twice a month. Cunningham report at 13.  On at least two of those occasions, Brent's was left with bruises all over his face from Albert's fists.  *Id.*

> Albert had a .22-caliber pistol that he always carried around. He used to it threaten us with it. He was always swinging it around on his finger by the trigger guard. He'd say, "I'll kill every mother fucker around me." It was just crazy talk. He'd wave it around when he got mad.

> Brent got so tired of Albert threatening people with that .22 that took it behind the house and broke the gun. Albert pieced the gun back together but you had to cock it to make it go off because the trigger didn't work anymore.

> My brother breaking Albert's gun probably saved Albert's life. Albert and my mom were fighting when Albert started to hit her. Brent jumped in and Albert punched him. Brent grabbed Albert in a headlock and they wrestled. I grabbed Albert's pistol and aimed it at him and tried to fire it. I was trying to kill him. But since Brent had broken it, I couldn't get it to fire. So I dropped the gun and picked up a box fan and struck Albert on the back with it. My mom eventually separated Albert and Brent. Albert threw a piece of firewood through a window as he left. Like most times when Albert beat up Brent or mom, the police weren't called.

Billie Ann Decl. ¶ 29-31.

Brent tried to stop Albert from beating his mother several other times as well, becoming the victim of the physical abuse instead.  Cunningham Report at 13-14.

After the family moved to Mississippi, Karen and Albert began working as long-haul truck drivers together.  Billie Ann Decl. ¶ 22; *see also* Declaration of Leona Gill ¶ 3.  As a result, the pair

would be on the road, away from home, for days at a time, leaving Brent and Billie Ann to care for themselves.

> There was never any food in our house. I remember driving a stupid El Camino car that mom and Albert left for us to use. The car wasn't registered and I later found out it was stolen. When we drove the car to the store to pick up groceries, Brent and I always put the tailgate down so it covered the license plate and expired registration tag. We would go to Derwood's Country Store where our family had a charge account. I remember mom once screamed at me for spending too much money on groceries. I wasn't buying junk food, I was getting stuff like green beans and soap.

*Id.* ¶ 22.  Karen and Albert also rarely bought the children clothes. *Id.* at 23.  Don Bartlett would give Billie Ann the free T-shirts he received from audio companies and she pass them on to Brent because his clothes were so ratty.  *Id.*

Despite the neglect, Billie Ann preferred when Albert and Karen were on the road.  Brent stepped in to fill the role of caretaker, and the house was peaceful without the daily chaos and fighting between Albert and Karen.  *Id.* at 26.  After Karen failed the 8th grade, Karen arranged for Billie Ann to stay with a friend's family during the week while Albert and Karen were away driving. Declaration of Leona Gill ¶ 2.  Brent, however, was left alone. *Id.*

When Karen Brewer was not on the road, her domineering, unstable behavior continued. Once, in a rage, she stabbed Brent's waterbed with a pair of scissors.  Billie Ann Decl.¶ 7.  The bed leaked all over the house. *Id.*

Following the incident in which Brent intervened to defend Karen by striking Albert with a broom, Karen sent Brent to live with his her mother Gerry Ford in Abilene.  Brent's grandmother was as unstable, domineering and aggressive as Karen.  Declaration of Linda Belz ¶ 10; Billie Ann Decl.¶ 10.  Family meals with Gerry Ford's family almost always devolved into a screaming match between Gerry, her sister, and her mother.  The fights were bad enough that Gerry's husband would walk out of the house.

> We used to go down to Eastland to visit her family, like for Thanksgiving, and I wasn't used to the fighting. I'd get up and go outside, go pick up pecans or

something. The women would all get going so bad, you'd think they were going to get in a fist fight or something. Gerry's mother and her two daughters, they'd get into it a few times throughout the day.

Affidavit of Jessie Ford at 1.

When Karen was a child, Gerry Ford beat Karen and would grab her by her hair and drag Karen down the hallway. Billie Ann Decl.¶ 10.  Before her death, Gerry was diagnosed as bipolar.

Living with his grandmother, Brent's depression deepened and his drug use worsened.  After Gerry Ford further drove down Brent's self esteem, he attempted suicide.  Brent wrote a suicide note explaining how he had "failed" his mother and sister, and how he loved them "more than anything in the world," but that "Grandma really showed me how much of a burden I've been." Brent Brewer Suicide Note at 1.  Brent was discovered by his grandmother before he could carry out his plan and was involuntarily committed to Big Spring State Hospital.

Initially, Brent made excellent progress at Big Spring.  Notes from his stay indicated that from his admittance on January 16, 1990 through around February 9, 1990, Brent was "adjust[ing] well to unit routine," "interact[ing] friendly with others," "work[ing] on accepting responsibility, resentment toward authority…He acknowledges being dependent as well… very bright student who picks up concepts fast," "very excited about taking his GED test, has been studying thoroughly, shows up to class on time, and has helped some of the other students with their math."  Brent Brewer Progress Notes from Big Spring Excerpt at 399-406.

Brent's progress became regress after he met Kristie Nystrom, another patient at Big Spring. Brent's treatment notes changed dramatically after he "paired off" with Kristie.  He "[did] not participate, slumped in chair, counseled 2x re: inappropriate behavior on the unit, pairing off & lack of involvement & lack of involvement in group." *Id.*

On February 13, 1990, Brent was discharged from Big Spring for refusing to end his relationship to Kristie Nystrom while in treatment. *Id.* at 410-11.  Approximately two weeks later,

Kristie joined Brent in Amarillo.   Declaration of Kristie Nystrom ¶ 6.   Kristie worked at a cafeteria, then at a strip club and Brent was unemployed.   The couple stayed at friends' apartments.; they were effectively homeless.   The morning of the murder, they were forced to leave the apartment of Charlotte Clarkson and Michelle Francis. Nystrom Decl. ¶ 6.

There is a reasonable probability that, if counsel had conducted the background investigation that the Constitution requires, and presented its results at the penalty phase, the jurors would have chosen life over death.

The *Walbey* court found prejudice in similar circumstances.   It observed that "*Williams* [*v. Taylor*] stands for the proposition that counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented."   *Id.* at 802.   The mitigating evidence introduced at trial was substantially incomplete and some of it was inaccurate; as the magistrate judge had observed, it was "scant, bereft in scope and detail."   *Id.* at 803.   Neither the brutality of the crime nor the possibility that some of the undiscovered mitigating evidence might have been unhelpful could ameliorate the prejudice created by counsel's deficiencies.   *Id.* at 804-05.   The court accordingly granted *habeas* relief.   *Id.* at 806.   *See also Adams*, 342 F. App'x 340.

In *Wessinger*, the defendant's brother had been previously contacted and interviewed. However, the court found that an adequate investigation would have uncovered, not only a neurocognitive disorder, but a family history of "poverty, alcoholism, violence, and struggle."   2015 Westlaw 4527245 at *8-9.   The court found a reasonable probability that the undiscovered evidence would have caused a different outcome and granted relief.   *Id.* at *9.[33]

---

[33] *See also Foust*, 655 F.3d at 539 (unpresented evidence ⧠paints an altogether different picture of [the petitioner's] childhood); *Johnson v. Mitchell*, 585 F.3d at 943 (prejudice established because new evidence "differ[ed] in a substantial way 'in strength and subject matter' from the evidence actually presented at sentencing."); *Johnson v. Bagley*, 544 F.3d at 602 (state court rejection of claim unreasonable because trial counsel⧠s investigation "only scratched the surface of [petitioner's] horrific childhood"); *Williams v. Allen*, 542 F.3d at 1342 (evidence counsel failed to uncover "paints a vastly different picture of [petitioner's] background than that created by [his mother's] abbreviated testimony."); *Gray*, 529 F.3d at 235-38 (prejudice found where counsel failed to provide the "full" and "cohesive" picture); *Walbey*, 309 F. App'x at

The evidence of Mr. Brewer's background now proffered differs substantially in both strength and subject matter from the scant, cursory evidence presented by trial counsel. *Johnson v. Mitchell*, 585 F.3d at 943.

The jury heard nothing of the traumatic sexual experiences Brent suffered; the details of his early childhood, including neglect, inadequate nutrition and homelessness; or the family history of substance abuse, dysfunction and mental illness. Although the jury was informed that Albert abused Brent, for example, this conclusory and superficial testimony failed to convey the severity of the abuse. This evidence would have been extremely compelling for several reasons: First, such evidence would have provided important and powerful details regarding Albert's sadistic nature and the severity of the abuse Brent suffered. *See, e.g., Walbey*, 355 F.3d at 369. And second, and more specifically, this evidence would have provided critical context for Brent's ultimate intervention in the fight between Albert and Karen, in which Brent struck his father with a broom. Evidence pertaining to Brent's father Albert was of critical importance, as the State relied heavily on this incident to argue Brent's propensity for violence. A complete history of the Albert's abuse and violence would have placed this incident in a very different and mitigating context than was presented by the state at the 2009 sentencing trial.

There is a reasonable probability that if the jurors had learned the powerful details of Mr. Brewer's violent, traumatic upbringing, at least one juror would not have voted for death. Trial counsel's deficient investigation and presentation of Mr. Brewer's background and upbringing, alone and in combination with other deficiencies set forth in this pleading, deprived Mr. Brewer of the effective assistance of counsel and prejudiced him. This Court should therefore grant habeas relief.

**B.     Trial counsel were ineffective for failing to investigate and present evidence of Petitioner's mental illness.**

---

802, 803 (prejudice found where trial counsel failed to present "the details" of a "complete" story, and instead presented an "inaccurate" one).

Despite overwhelming red flags and indicia of mental illness, trial counsel conducted no investigation into Mr. Brewer's mental health and never sought to have him evaluated by a mental health expert.  As a result, the jury never learned that at the time of the offense, Mr. Brewer suffered from severe anxiety and major depression and was decompensating psychologically, in the midst of an abandonment crisis.  The jury also never learned how those conditions impaired Mr. Brewer's judgment at the time of the offense.

### 1.    Deficient Performance

The red flags indicating the need for investigation into Mr. Brewer's mental health in this case were overwhelming.  At Mr. Brewer's 1991 trial, the defense introduced evidence that he suffered from severe depression and just three months before the crime was involuntarily committed to a psychiatric hospital after making suicide threats. 18 RR—1991 Trial 755-67.

Dr. Cunningham's 1996 report alerted counsel not only to Mr. Brewer's mental health issues, but also to his family's history of mental illness.  Additionally, counsel knew or should have known that Mr. Brewer attempted suicide while on death row in 2007.

Despite these overwhelming indicia of mental illness, trial counsel failed to perform any investigation into or present any evidence of Mr. Brewer's mental health.

The Supreme Court has repeatedly found investigations deficient, and the deficiencies prejudicial, in part, because counsel failed to uncover mitigating mental health evidence.  *See Rompilla*, 545 U.S. at 391 (adequate investigation would have disclosed mental health mitigation); *Wiggins*, 539 U.S. at 535 (adequate investigation would have uncovered petitioner's "diminished mental capacities"); *Williams*, 529 U.S. at 396 (constitutionally adequate investigation would have disclosed that petitioner was "borderline mentally retarded").  The Court has reaffirmed these principles in its recent opinions.  *See Sears*, 130 S. Ct. at 3267 ("proper analysis of prejudice under *Strickland* would have taken into account the newly uncovered evidence of Sears' 'significant' mental

and psychological impairments," along with other evidence); *Porter*, 130 S. Ct. at 454 (deficient investigation prejudicial, in part, because it failed to uncover petitioner's "brain abnormality"); *cf. Hinton v. Alabama*, 131 S. Ct. 1081, 1089 (2014) (where counsel's deficiency deprived defendant of expert testimony to replace inadequate expert, deficiency was prejudicial because there was a reasonable probability that adequate expert could have raised a reasonable doubt).

As in *Miller*, trial counsel ignored the glaring indicia that an investigation into Mr. Brewer's mental health was necessary and failed to have Mr. Brewer evaluated by an expert.  Trial counsel also failed to present any of the mental health evidence available to them. Trial counsel admits that the defense team did no investigation of Mr. Brewer's mental health.  Odiorne Decl. ¶ 16 ; *see also* Cowie Decl. ¶ 11. Trial counsel further admits that the defense team's failure to investigate mental health and have Mr. Brewer evaluated had no basis in strategy or tactics.  Ordione Decl. ¶ 16.  The diagnoses in Dr. Cunningham's report were the type of evidence trial counsel would have wanted to present, even if possibly through a different expert. *Id.*

### 2.    Counsel's failure prejudiced Petitioner.

A reasonable investigation into Mr. Brewer's mental health would have revealed a wealth of mitigating evidence.

Such an investigation would have explained the impact Mr. Brewer's violent, chaotic upbringing had on his psychological functioning.  Among other repercussions of his upbringing, Mr. Brewer suffered from brain dysfunction, which the jury did not learn about, that represented a critically important mitigating factor concerning Mr. Brewer's judgment and decision-making capability.

Such an investigation would have also revealed that at the time of the offense, Mr. Brewer was in the midst of an abandonment crisis, was decompensating, and suffered from major depression, severe anxiety, and dysthymia. This evidence would have been particularly powerful, as it

is both mitigating independent of any nexus to the commission of the offense, but would have also reduced Mr. Brewer's moral culpability by demonstrating his severely impaired judgment at the time of the offense.

### a.      Impact of Mr. Brewer's upbringing

The testimony of a mental health expert could have helped the jury understand how Mr. Brewer's traumatic upbringing affected him.

Dr. Cunningham identified 34 formative influences and compromising factors in Mr. Brewer's background, each with negative implications on Mr. Brewer's development: 1) Transgenerational family dysfunction and distress; 2) Hereditary predisposition for alcohol and drug abuse/dependence; 3) Hereditary predisposition to psychological disorder and personality pathology; 4) Maternal stress during pregnancy; 5) Pneumonia during pregnancy; 6) Fetal distress and birth complications; 7) Inadequate nutrition in early childhood; 8) Attention Deficit Hyperactivity Disorder; 9) Head  injury with skull fracture; 10) Skull overgrowth; 11) Mistreatment with chemotherapy; 12) Scoliosis and spinal injury; 13) Inhalant abuse; 14) Childhood onset alcohol and drug abuse; 15) Chronic stress in childhood; 16) Youthfulness at offense; 17) Teenage mother; 18) Functional abandonment by father; 19) Disrupted primary attachment; 20) Mother's psychological vulnerabilities; 21) Rejection by father figures; 22) Neglect; 23) Verbal and physical abuse; 24) Father's alcohol and drug abuse/dependence; 25) Father's sexual perversity; 26) Father's weapons carrying and family violence; 27) Peer alienation; 28) Traumatic sexual exposures; 29) Corruptive influences; 30) Childhood onset alcohol and drug abuse; 31) Dependency on dominant females; 32) Synergistic pathology with psychological vulnerabilities of codefendant; 33) Abandonment Crisis; 34) Psychological disorders proximate to offense.

Brent's development was impacted and impaired by each of these 34 factors.  *Id.*  They "acted singly and cumulatively/synergistically to deflect his life trajectory toward psychological

disorder, interpersonal dependence, poor judgment/impulsivity, disturbed values," and substance abuse.  *Id.* at 115.

As a result of several of these factors, including a history of head injury, Mr. Brewer suffered from brain dysfunction, which can cause impulsivity, judgment deficits, emotional dyscontrol, and behavioral disturbance.  *Id.* at 62

Dr. Cunningham's report also identified several recurrent traumatic exposures throughout Brent's childhood including:  disrupted primary attachment; inadequate nutrition and neglect in early childhood; mother's emotional volatility and chronic hostility; physical and emotional abuse; emotional and supervisory neglect in middle childhood and teens; family violence; learning problems in school; father's sexual perversity; father's violence and homicidal threats; and peer alienation.  *Id.* at 61.  As Dr. Cunningham addresses in his report, these experiences did more than simply create bad memories.  Rather, they altered the chemistry and architecture of Mr. Brewer's brain.

### b.      Mental health and decompensation at time of the offense

Mr. Brewer's background also resulted in severe abandonment fears and a dependence on domineering women.  Testimony regarding both of these would have been particularly helpful in contextualizing and understanding Mr. Brewer's behavior at the time of the offense.

Dr. Cunningham described Brent's behavior in the time leading up to the offense as an abandonment crisis of increasing desperation.  *Id.* at 107.  Brent's fear of abandonment stemmed from a number of factors in his background including abandonment by his father and rejection by his step-father.  *Id.* at 73. As discussed above, in the weeks leading up to the offense, Brent faced increasingly dire circumstances, and in response deteriorated psychologically.

Mr. Brewer's history of relationships with other controlling women and domineering women, combined with his fear of abandonment and emotional neglect, left him particularly vulnerable to manipulation by Kristie Nystrom.  His dependency on Ms. Nystrom "served to

undermine the quality of his judgment regarding their circumstances and increase his impulsivity."
*Id.* at 106.

Additionally, Mr. Brewer suffered from attention deficit hyperactivity disorder, polysubstance abuse, anxiety disorder, major depression, and dysthymia. *Id.* at 114.

Testimony about Mr. Brewer's abandonment, panic, and psychological disorders would have been mitigating in two different ways.  First, such evidence would have gone directly to both the deliberateness of the offense and Mr. Brewer's moral culpability, raising "grave doubts regarding his capacity to engage in 'careful and thorough considerations; characterized by awareness of the consequences; willful, slow, unhurried, and steady as though allowing time for a decision.'" *Id.* at 115.

Second, evidence of these psychological disorders would have been mitigating, independent of any nexus with Mr. Brewer's commission of the offense.  *See Tenard v. Dretke,* 542 U.S. 274 (2004). In his 2015 report, Dr. Cunningham described the symptoms of these disorders, including, for example, the feelings of worthlessness and inappropriate guilt that come with Major Depression, and the poor self-esteem and feelings of hopelessness of dysthymia.  Cunningham Report at 114.  As Dr. Cunningham explains, "description of Brent's experience of the symptoms of pain and distress accompanying these psychological disorders could have had much impact on his jury's ability to subjectively appreciate his psychological status at the time of the offense.  In other words, it is not the diagnostic label of a psychological disorder that conveys its experience, rather its symptom experience." *Id.* at 115.

Moreover, a mental health expert such as Dr. Cunningham could have explained that Mr. Brewer's 2007 suicide attempt and suicidal ideation was genuine and the result of his severe depression, rather than an act of manipulation or the result of an obsession with death, as Dr. Coons testified.  23 RR 220-23.

There is a reasonable probability that, if the jurors had understood that Mr. Brewer's mental illness and background significantly impacted his judgment and decision-making capability, at least one juror would have seen Mr. Brewer as less morally culpable and voted in favor of life. There is also a reasonable probability that at least one juror would have recognized the independent sympathetic nature of Mr. Brewer's history of mental illness and voted in favor of life. This Court should accordingly grant relief.

### C. Trial counsel were ineffective for failing to investigate and present evidence regarding Kristie Nystrom.

#### 1. Deficient Performance

Trial counsel failed to interview several witnesses who observed Mr. Brewer and Kristie Nystrom together and could provide testify regarding Ms. Nystrom's controlling, aggressive nature and her control over him.

The records in trial counsel's file made clear the negative impact Kristie Nystrom had on Mr. Brewer and the lengths he would go to appease her. As discussed above, Mr. Brewer's treatment reversed course once he met Kristie and fell under her influence, as he went from being a cooperative, reflective patient, to a withdrawn, defiant one. *See* Big Spring Progress Notes at 399-411. Dr. Cunningham's report further indicated that Mr. Brewer had a history of dependence on, and vulnerability to, relationships with dominant, controlling females and Mr. Brewer's relationship with Kristie was merely an extension of that pattern. Cunningham 1996 Report at 29.

Nevertheless, trial counsel admits that the defense team failed to interview any of the individuals who had contact with Mr. Brewer and Ms. Nystrom after their flight from Amarillo. Odiorne Decl. ¶ 15. Trial counsel further admits that evidence of Mr. Nystrom's control over Mr. Brewer would have been helpful to present both affirmatively and during cross examination of Ms. Nystrom. Trial counsel admits the defense team had no strategic or tactical reason for not interviewing such witnesses.

Additionally, trial counsel failed to introduce the evidence that was available to them, including testimony from the 1991 trial portraying Ms. Nystrom as aggressive and taking a very active role in the commission of the crime. *See, e.g.,* 15 RR 37 (Ivy Craig); *see also* Claim VI.

Furthermore, as discussed above, an investigation of Mr. Brewer's mental health would have revealed that his family background, rejection by father figures and other factors resulted in his dependency on controlling, dominant women such as Ms. Nystrom, and this dependency, combined with Mr. Brewer's fears of abandonment, made him particularly vulnerable to being manipulated by her.

### 2.    Prejudice

Petitioner was prejudiced by trial counsel's failures. A thorough investigation would have yielded ample evidence regarding Kristie Nystrom's domineering nature and the profound control she exercised over Mr. Brewer. Such evidence would have rebutted the State's theory that Mr. Brewer had been the principal actor in the murder and was merely accompanied by Ms. Nystrom.

Those who observed Mr. Brewer and Ms. Nystrom during their short time together described her much like the other women in Brent's life: controlling, domineering and aggressive. Brent's sister Billie Ann Young went to dinner with the two after they fled Amarillo. "Kristie controlled the conversation. Brent barely got a word in. She was over-talking him the whole night." Billie Ann Decl. ¶ 38. Erik Gravely also described Kristie as controlling and Brent as willing to do anything to make her happy. Declaration of Erik Gravely ¶ 8. "It seemed like if things were going her way then everything was fine, as long as she got her own way. But as soon as things went bad she became demanding and abrasive." *Id.*

"Brent's developmental and social immaturity markedly, interacting with his dependency on Kristie, served to undermine the quality of his judgment regarding their circumstances and increase his impulsivity." Cunningham 2015 at 107.

Evidence that Mr. Brewer had a history of and vulnerability to relationships with controlling domineering women would have also mitigated against the aggravating argument that Mr. Brewer acted largely alone in committing the murder.  The failure to investigate and present this evidence resulted in a sentence in which there can be no confidence.  The failure to adequately investigate and present issues regarding Kristie Nystrom independently prejudiced Petitioner.

To an even greater extent, the combination of all counsel's failures in investigating, developing, and presenting Petitioner's mitigation case—as alleged in this claim—cumulatively prejudiced Mr. Brewer.

## VI.  COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE THAT KRISTIE NYSTROM HAD A LARGER ROLE IN THE CRIME.

A crucial aspect of the State's case in the 1991 trial and again in the 2009 sentencing was the theory that Mr. Brewer had been the principal planner and aggressor in the crime.  But multiple pieces of evidence pointed to a different story.  Kristie Nystrom was the dominant, manipulative personality in the relationship and had also stabbed Robert Laminack.  The key witness in developing this alternative story—which could reduce Mr. Brewer's blameworthiness in the eyes of the jury—was Skee Callen.

### Counsel failed to impeach Skee Callen and Kristie Nystrom with Skee's past statements that Kristie had stabbed the victim and failed to elicit remorse testimony; that failure prejudiced Mr. Brewer.[34]

Stephen J. "Skee" Callen, III, an acquaintance of Mr. Brewer and Ms. Nystrom, testified at both Mr. Brewer's 1991 trial, and at the 2009 resentencing.[35]  In 1991, he testified that Mr. Brewer said that he had stabbed the victim, and that co-defendant Kristie Nystrom steered and stopped the truck in which they were driving. On cross-examination, he testified that an earlier statement he had given, in which he indicated that it was Kristie who stabbed Mr. Laminack, was in error. 17 RR—

---

[34] Petitioner presented this claim in state habeas as Claim VI.
[35] 17 RR—1991 Trial 447-86; 22 RR 67-75.

1991 Trial 479. *See* Stephen Callen Affidavit Apr. 27, 1990. He testified that a Sergeant Hudson had called him into the police station to "get it fixed." 17 RR—1991 Trial 480.  He denied that the police had "taken care of" any tickets for him, got him a job, or provided him with any other benefit. 17 RR—1991 Trial 481.  In 2009, Skee testified that Kristie said that "they" killed a man, 22 RR 70-71, but it was not clarified whether Ms. Nystrom or Mr. Brewer or both did the actual stabbing. On both occasions that he testified, he stated that Mr. Brewer had smirked and giggled when Ms. Nystrom had mentioned that the victim, Mr. Laminack, had said, "please don't kill me." 17 RR—1991 Trial 471; 22 RR 72.

In 1991, he also testified that both Mr. Brewer and Ms. Nystrom had been nervous and upset when he first saw them when they returned to the apartment where they had been staying, and that both were crying. Mr. Brewer had continued crying while telling him that he had stabbed Mr. Laminack. 17 RR—1991 Trial 472. On both occasions he also explained to the jury that he had helped drive Ms. Nystrom and Mr. Brewer to the hospital to get a wound in Mr. Brewer's hand stitched, and to the bus station, from whence they left Amarillo.

When Skee testified at the resentencing hearing, the jury was left unaware, not only that he had given a statement prior to the first trial stating that Mr. Brewer and Ms. Nystrom said that Ms. Nystrom stabbed Mr. Laminack, but that he had given a subsequent statement in 1997, stating that both Mr. Brewer and Ms. Nystrom had said that they stabbed Mr. Laminack..  Stephen Callen Affidavit, Aug. 13, 1997 ("The fact remains that Kristie did tell me she had stabbed the man."). Skee explained that he had met Mr. Brewer and Ms. Nystrom at an apartment building where they were staying. They had told him about the murder and he had given them rides to the hospital and the bus station.

Inexplicably, the defense made no attempt to put this 1997 statement to Skee, and to have him confirm that he had now twice made sworn statements that Ms. Nystrom had stabbed Mr.

Laminack. Nor did they use those statements to impeach Ms. Nystrom when she was on the witness stand. Defense counsel also failed to elicit from Skee the fact that Mr. Brewer had been crying after the attack on Mr. Laminack, thereby leaving the jury with the impression that Mr. Brewer had only "smirked and giggled," 22 RR 72, about the offense. The evidence of crying would have been valuable to demonstrate that Mr. Brewer felt remorse, and was not a cold-hearted killer.[36]

"The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland*, 466 U.S. at 698. Here, Mr. Brewer's trial was rendered unfair by the failure of his counsel to take the simplest steps to investigate and establish impeachment evidence for Skee and Ms. Nystrom, and the ultimate conclusion that Ms. Nystrom had admitted to stabbing Mr. Laminack. Also failing to elicit Skee's prior statement that Mr. Brewer had been upset and crying after the stabbing deprived Mr. Brewer of evidence of remorse which, given the paltry mitigation case presented, would have been valuable.

## VII. THE STATE VIOLATED PETITIONER'S DUE PROCESS AND FAIR TRIAL RIGHTS BY SUPPRESSING FAVORABLE *BRADY* EVIDENCE; THE TRIAL COURT ERRED BY FAILING TO ORDER THE DISCLOSURE OF THIS EVIDENCE; AND TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO REQUEST OR OBTAIN IT THROUGH THEIR OWN INVESTIGATION.

At trial, the State suppressed Kristie Nystrom's Big Spring State Hospital records, which contained a wealth of impeachment evidence that would have not only undermined her credibility, but also raised serious doubts concerning the State's theory that Ms. Nystrom's role in Mr. Laminack's death was relatively small compared to Mr. Brewer's.

---

[36] Defense counsel also do not appear to have investigated Skee in any respect, and particularly with regard to any inducements offered or pressure placed on him by law enforcement. When interviewed by Anthony Pagan of the Federal Public Defender Office prior to giving his 1997 affidavit, Skee indicated that law enforcement officers had talked about helping him find a job, had pressured him, and had not wanted him to talk to the defense. If there was in fact any assistance given, or pressure put upon this witness, those facts must be disclosed forthwith in accordance with the State's continuing duty of disclosure under *Brady v. Maryland,* and *DA Office v. Osborne, 557* U.S. 52, 94-95 (2009).

"The suppression by the prosecution of evidence favorable to an accused… violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).   The rule in Brady encompasses both impeachment and exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 683-84 (1985).   A prosecutor's failure to disclose Brady material requires a new trial where (1) the State failed to disclose evidence (irrespective of the prosecutor's intent); (2) the withheld evidence is favorable to the defendant; and (3) the evidence is material to guilt or punishment.   See *Strickler v. Greene*, 527 U.S. 263, 280-82 (1999); *Kyles v. Whitley*, 514 U.S. 419,432-433 (1995).

At trial, defense counsel filed a motion requesting disclosure of all exculpatory and mitigating evidence.  1 CR 22.  The Court granted this motion.  However, the State failed to provide records pertaining to Ms. Nystrom, including her records from Big Spring State Hospital.  During the trial, defense counsel specifically requested access to Ms. Nystrom's Big Spring State Hospital records in order to review them before she testified. 22 RR 160.  Although the State had obtained the records and had a copy in the court room, the State refused to turn them over, citing Ms. Nystrom's privacy interests.  *Id.* at 162.  The trial court announced it would conduct an *in camera* review and determine whether the records should be provided to the defense. *Id.* at 163.  At the conclusion of Ms. Nystrom's direct examination, after reviewing the records, the trial court announced it found nothing "helpful or relevant" to the defense and did not order the State to disclose them.  Counsel then stated he had no questions for Ms. Nystrom and she was dismissed.

The trial court erred in finding the records did not contain favorable or exculpatory evidence.  The records contained a wealth of impeachment evidence that would have undermined the credibility of Ms. Nystrom, a key witness for the State.  For example, one physician wrote that "Ms. Nystrom has poor impulse control as well as being manipulative."  Kristie Nystrom Big Spring

Hospital Records at 10 ("Nystrom Big Spring Records").[37]   "She employs numerous attention seeking mechanisms that include over-dramatization, lack of honesty, and unhealthy relationships/dependencies on males," the note went on.   The records also noted that her "liabilities include . . . her resistance to authority, her defensiveness, and her projection of blame to others." *Id.* at 23-24.   Additionally, Ms. Nystrom was diagnosed with borderline personality disorder due to her "behavior, labile mood swings, and generally unstable behavior." *Id.* at 10.

The State suppressed this evidence.   Despite the trial court's order and the constitutional obligation to disclose all material evidence, the State failed to provide these records to the defense, arguing they were private files Ms. Nystrom had not chosen to release.   The State failed to alert the court to, or disclose to defense counsel, the clearly favorable and material nature of the evidence.

Evidence is favorable if it is impeaching.   *Strickler v. Greene*, 527 U.S. 263, 28-82. Clearly this evidence would have been impeaching to Ms. Nystrom by undermining her credibility. The records include notations that Ms. Nystrom lacked honesty and was prone to "over-dramatization." Nystrom Big Spring Records at 10.   Beyond demonstrating her general propensity for dishonesty, the records also contained evidence would have revealed Ms. Nystrom's tendency to shift blame to others and shown her role in the murder was likely more larger than her testimony indicated.   For example, the records noted that Ms. Nystrom was manipulative, had "unhealthy relationships with males," was defensive, and noted her "projection of blame to others."   Id. at 10, 23-24.   Such evidence could have been used to show that Brent's role in the crime was the result of his being manipulated by Ms. Nystrom, thus lessening his moral culpability.   Additionally, such evidence would have allowed trial counsel to attack Ms. Nystrom's testimony implicating Brent as another instance of her "projection of blame to others,"

---

[37] Due to the sensitive nature of these records, Petitioner will file them with the Court separately.

The evidence in these records was material.  The records clearly undermine the credibility of Ms. Nystrom, who as a key witness for the State.  As the only living person besides Mr. Brewer in the truck, Ms. Nystrom was the only witness who could provide a first-hand account of how the crime occurred, which was undoubtedly damaging to Mr. Brewer.   Ms. Nystrom's testimony also indicated that the plan to commit a robbery was initially Mr. Brewer's idea, and that Ms. Nystrom only ended up accompanying him to act as bait. 22 RR 191 ("Brent said he was going to go roll somebody.").   Additionally, in their closing argument, the State stressed the importance of Ms. Nystrom's in with regards to the issue of deliberateness.  25 RR 222. Thus, impeachment of Ms. Nystrom would have benefited Mr. Brewer by undermining the credibility of a witness whose testimony both was essential to the State's theory.[38]   Because this evidence could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *Kyles*, 514 U.S. at 435, Mr. Brewer is entitled to relief.

To the extent this Court finds that the trial court's *in camera* review renders Brady inapplicable, the trial court's determination the records contained no "helpful or relevant" material was clearly erroneous and the resulting failure to make the records available to the defense violated Mr. Brewer's to due process and a fair trial.   To the extent these records were available to trial counsel, trial counsel's failure to impeach Ms. Nystrom with this evidence violated Mr. Brewer's right to due process and the effective assistance of counsel.

---

[38] Additionally, the evidence in these records would have supported Petitioner's mitigation case. See Claim V *supra*.

**VIII.   THE STATE VIOLATED MR. BREWER'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY PRESENTING FALSE AND MISLEADING TESTIMONY REGARDING CONDITIONS OF CONFINEMENT.   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INTRODUCE EVIDENCE REBUTTING THIS TESTIMONY.   APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS ISSUE ON APPEAL.** [39]

In this case, the State introduced false and misleading testimony regarding the conditions of confinement Mr. Brewer would be subject to if sentenced to life in prison.  The jury was led to believe that Mr. Brewer would be eligible for significantly less restrictive custody than he actually would, including that Mr. Brewer could be housed outside the prison fence with little to no supervision.  The State relied heavily on this testimony, later arguing that Mr. Brewer's good behavior while on death row was only because of the high security restrictions he lived under.  A life sentence would mean a move to general population, where he would be under less restriction, and free to commit acts of violence, the State argued.  Trial counsel failed to introduce any evidence rebutting this false and misleading testimony.  Although the Texas Court of Criminal Appeals had recently reversed a death sentence in another case based on similarly flawed testimony from the same witness, appellate counsel failed to raise this claim.

Due process prohibits the State from securing a death sentence when it uses false evidence, including false testimony, to obtain a conviction. *Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue*, 360 U.S. at 269; *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997); *Blackmon v. Scott*, 22 F.3d 560, 565 (5th Cir. 1994). Indeed, there is a duty upon the state to correct false evidence even if not solicited by the state. *Napue*, 360 U.S. at 269. This duty to correct extends even when the state allows the jury to receive materially false impression. *See Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *Davis v. State*, 831 S.W.2d 426, 439 (Tex. Crim. App. 1992) (finding violation of due process when DA's questioning knowingly created false impression that witness volunteered to correct her

---

[39] Petitioner presented these claims in his state habeas proceedings as Claims II(A), (B), (C), & (D).  The trial court denied the claims on the merits.  FFCL 26-41, 76-81.

testimony).  Even where the State has fulfilled its duty to disclose evidence known to be false, the State can violate due process by capitalizing on the false evidence and encouraging the jury to rely on it.  *See United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977) (holding prosecutor violated due process by using false testimony in his closing to procure a conviction).  Habeas relief is warranted if there is a reasonable likelihood that the false testimony could have affected the jury's determination.  *United States v. Bagley*, 473 U.S. 667, 678-79 & n.9 (1985); *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993).  To prevail, a petitioner must show (1) the testimony was actually false or highly misleading; (2) the State knew or should have known the testimony was false or highly misleading; and (3) the testimony was material.  *Napue*, 360 U.S. at 269-72.

In this case, the State presented false and misleading testimony regarding the conditions of confinement Mr. Brewer would be subject to if sentenced to life.  This gave the jury the impression Mr. Brewer would be subject to much less restrictive conditions and have greater opportunities to commit acts of violence than he actually would.  The State also presented misleading testimony regarding remuneration received by A.P. Merillat for his testimony.  Trial counsel's failure to rebut this false and misleading testimony or properly object to its admission violated Mr. Brewer's right to effective assistance of counsel.  Additionally, direct appeal counsel's failure to raise the issue violated Mr. Brewer's right to effective assistance of counsel.

The State presented the testimony of A. P. Merillat and Captain Stephen Bryant on conditions, classification, and security in Texas prisons.  Bryant set out the five levels of custody that pertain to a general population inmate: G1, "which is the best behavior. Much like an outside trustee [sic], with little to no supervision"; G2, "a minimum custody that will have a little bit of supervision."; G3, "an offender who has fifty or more years sentence, and would have to serve as a G3 for ten years in order — before he's eligible to upgrade to a G2"; G4, "They're chronic rule

violators" and G5, which "would be a little bit more assaultive in nature [but h]adn't had a reoccurrence of those assaults in order to be placed in administrative segregation." 23 RR 99-100.

Mr. Merillat testified that he worked for the Special Prosecution Unit investigating criminal offenses in prison units.  23 RR 129130.  Merillat claimed to have visited "practically every [prison] unit in the State of Texas many times over," including death row, which is at the Polunsky Unit. 23 RR 132.  Merillat claimed to be familiar with the procedures and operations of the prison units, including death row.  Merillat testified that inmate movement varies depending on the prisoner's classification, and that a "Gl" inmate has more freedom than a "G4" would.  Merillat also testified that an inmate convicted of capital murder and sentenced to life "will go anywhere there's a bed available for that particular classification." 23 RR 161. He went on to state that those inmates "are restricted in the kind of work they can do, but not where they're housed or how they co-mingle with other inmates." 23 RR 162.

Mr. Merillat and Mr. Bryant misled the jury to believe that Mr. Brewer would enter as a G3 inmate and could be assigned any of those levels, including the less restrictive levels of G2 or G1. This raised the specter that Mr. Brewer could become an "outside trustee, with little to no supervision."  This was simply not the case.

This was not true.  Mr. Brewer would be restricted to cellblock housing or a dormitory wholly contained within the main prison building and would most likely not be housed with inmates of a less restrictive custody.  Aff. Frank AuBuchon ¶ 5.[40]  Although the jury was shown a video containing footage of a TDCJ factory, it would be nearly impossible for Mr. Brewer or any other G3 offender to work in a TDCJ factory.  *See id.* ¶ 6. As an inmate convicted of capital murder, Mr. Brewer could never rise to the level of a G1 offender. AuBuchon ¶ 5.  Rather, the least restrictive level of custody Mr. Brewer would ever be under was G2. *Id.*  Bryant testified that an inmate

---

[40] The affidavit was originally introduced in state habeas proceedings as Exhibit 10.

convicted of capital murder and sentenced to life would enter TDCJ as a G3 and have to wait 10 years before becoming eligible for a less restrictive classification.   23 RR 99.   However, the testimony of both Bryant and Merillat omitted the fact that, if sentenced to life, the 18 years Mr. Brewer has already served in TDCJ would not count towards that total, and the 10-year requirement would begin anew.  Aubuchon ¶ 16.  So Mr. Brewer would be nearly fifty years old before he would be eligible for any status less restrictive than G3.  As stated in Claim I, Mr. Brewer would have "aged out" of any likelihood of committing an act of violence by that point.

Merillat also gave false testimony about the remuneration he received from Randall County. Merillat testified he received no reimbursement beyond the cost of the one vacation day he took in order to leave his regular employment with the Special Prosecution Unit to testify. 23 RR 132-33. But Merillat billed and was paid for two days of work at $495 per day. This rate per day reflects an annual income of $128,000, whereas Merillat was earning only $51,515. He was receiving close to 2.5 times his daily pay.  Rather than learning of Mr. Merillat's profit, however, the jury was left with the impression that his testimony in this case did not confer any benefit above his ordinary public salary.

The State knew or should have known this testimony was false and misleading.  TDCJ policy regarding the classification and security measures an offender will be subject to are not technical or obscure facts; they are essential to ascertaining which defendants will pose a threat of future danger. The State, at a minimum, should have known the current TDCJ policy, available on the TDCJ website and relevant to the jury's decision.[41]

Additionally, Merillat and Bryant were members of the prosecution team themselves, and presented to the jury as having extensive experience and knowledge of TDCJ procedures and

---

[41] The American Bar Association Standards support the common-sense notion that the prosecutors knew or should have known the correct and current policy, given its importance in the future dangerousness inquiry. See ABA Prosecution Function, Standard 3-6.2(a) Information Relevant to Sentencing (requiring prosecutor to provide the sentencing court with "complete and accurate information for use in the presentence report [and to] take steps to present the complete and correct information to the court and to defense counsel.").

policies.  They should have known their testimony was false and misleading. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 60-61 (1987).

The testimony of Merillat and Bryant was very relevant to the jury's critical decision on the question of future dangerousness, so there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976).  Faced with Mr. Brewer's record of good behavior while incarcerated on death row, the State relied heavily on the argument that Mr. Brewer had only failed to commit acts of violence because the tight security of death row had not allowed any opportunity to.  25 RR 198-99. If he were sentenced to life, the less restrictive conditions of general population, the State argued, would allow Mr. Brewer to pose a danger.  25 RR 199.

What is more, the two notes sent out by the jury regarding the question of whether Mr. Brewer was eligible for parole, 25 RR 227-28, showed clear concern about Mr. Brewer's long-term future and his supervision.  A juror confronted with the testimony of Merillat and Bryant would have been left with the strong impression that Mr. Brewer was only a few steps away from unsupervised access to the outside world if sentenced to life, and on that basis voted for death.

To the extent evidence rebutting the State's false and misleading testimony was available to trial counsel, counsel was ineffective for failing to investigate and present this evidence.  Appellate counsel failed to raise this issue on direct appeal.  Had direct appeal counsel raised this claim, there is a reasonable probability Mr. Brewer would have prevailed on his appeal.

A year before appellate counsel filed Mr. Brewer's direct appeal brief, the CCA granted relief in a capital case in light of similar false and misleading testimony by Merillat.  *See Estrada v. State*, 313 S.W.3d 274, 286 (Tex. Crim. App. 2009). In *Estrada*, the defendant faced either the death penalty or life without parole.  Merillat testified that Estrada could obtain a less restrictive classification than a G3. *Id.*  This was incorrect: TDCJ policies prohibited anyone convicted of capital murder and

sentenced to life without parole from obtaining such a classification.  The State agreed this was a "constitutionally intolerable" situation and conceded penalty phase relief.  313 S.W.3d at 287.  *See also Velez v. State,* 2012 Tex. Crim. App. Unpub. LEXIS 607 (Tex. Crim. App. June 13, 2012)(same). Although Estrada and Velez faced life without parole, Merillat provided false and misleading testimony that the defendants could obtain less restrictive classifications than they actually could. The situation in this case is no different.  Had counsel raised this issue, one on which the CCA had recently reversed a death sentence based on very similar testimony by the same witness, there is a reasonable probability he would have prevailed on direct appeal.

## IX.   PETITIONER'S CONVICTION AND SENTENCE ARE UNCONSTITUTIONAL DUE TO THE CUMULATIVE EFFECT OF TRIAL COUNSEL'S INADEQUATE REPRESENTATION, THE STATE'S MISCONDUCT AND THE COURT ERRORS DESCRIBED ABOVE.

Petitioner's conviction and sentence were the product of multiple, egregious constitutional violations by the State, the trial court, and trial counsel.  As set out above, each of these violations was of such magnitude as to undermine the reliability of the verdicts and require relief.  However, even if this Court determines that Petitioner failed to meet his burden to prove the prejudice resulting from any one of these violations, it is well-established that this Court must also examine whether the cumulative effect of these errors violated Petitioner's right to due process of law.  *See, e.g., Spence v. Johnson,* 80 F.3d 989, 1000-01 (5th Cir. 2004) (relief is warranted for cumulative error when "the constitutional errors committed in the state trial court so 'fatally infected the trial' that they violated the trial's 'fundamental fairness.'"); *Taylor v. Kentucky,* 436 U.S. 478, 487-88 & n.15 (1978); *Chambers v. Mississippi,* 410 U.S. 284, 290 n.3 (1973).

**X.   PETITIONER WAS TRIED AND SENTENCED TO DEATH UNDER AN UNCONSTITUTIONAL STATUTORY SCHEME; THE TRIAL COURT ERRED IN DENYING THE DEFENSE MOTION TO DECLARE TEXAS CODE CRIM. PROC. 37.071 UNCONSTITUTIONAL; APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILURE TO RAISE THIS CLAIM.[42]**

In pretrial motions, defense counsel challenged the constitutionality of Texas Code Crim. Proc. Art. 37.071, the capital sentencing statute, on several grounds. The trial court erred in denying the motions. The capital sentencing scheme, on its face and as applied to Petitioner, violates the Fifth, Sixth, Eighth and Fourteenth Amendments in multiple ways. These issues were preserved in the record. Appellate counsel was ineffective for failure to review the record and raise these preserved issues on appeal.

**A.   The Presentation of Evidence of "Extraneous" Conduct Violates the Fifth, Sixth, Eighth and Fourteenth Amendments.**

Under Articles 37.07 and 37.071, the State is permitted wide latitude to introduce evidence of "extraneous" offenses during the penalty phase. The State may introduce "any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act." Tex. Code Crim. Proc. Art. 37.07 §3 (a)(1), including "an extraneous crime or bad act that has not resulted in a final conviction in a court of record or a probated or suspended sentence," Art. 37.07 § 3(g). Normal evidentiary rules are relaxed during the penalty phase, so that the State may introduce "any evidence the court deems relevant to sentence." Art. 37.071 §2 (a)(1). The "extraneous" evidence may be considered by the jury in deciding both of the special issues.

The presentation of extraneous conduct to support a finding of the first special issue violates the Fifth Amendment's presumption of innocence, the Sixth Amendment's jury trial guarantee, and creates a risk of arbitrary and unreliable capital sentencing in violation of the Eighth and Fourteenth

---

[42] These claims were presented in Petitioner's state habeas petition as Claims VIII, XI-XVI, which the trial court denied. FFCL 89-95.

Amendments. The Supreme Court has held that death-eligibility factors are the functional equivalent of elements of a greater offense, and must be found by the jury beyond a reasonable doubt. *Ring v. Arizona*, 536 U.S. 584, 609 (2002). The sentencing scheme, however, permits the prosecution to offer evidence of unadjudicated offenses and charges that did not lead to a conviction, and does not require the jury to find beyond a reasonable doubt that the defendant is guilty of those offenses, before the jury may consider them in deciding the special issues. Instead, the jury must decide the first special issue, a broad question about "continuing threat to society," beyond a reasonable doubt; the jury may also consider the extraneous offenses in considering the second special issue. This collective consideration of unadjudicated offenses and charges that have not led to a conviction invites arbitrariness into the capital sentencing decision, because there are no procedural safeguards attached to the extraneous offenses.[43]

    This issue was raised by the defense pretrial. *See* Motion to Quash Indictment on Grounds that Tex. Code Crim. Proc. Art. 37.071(2) is Unconstitutional, 1 CR 107; Motion to Preclude the Death Penalty as a Sentencing Option and to Declare Tex. Code Crim. Proc. 37.071 Unconstitutional (*Ring v. Arizona*), 1 CR 142. The trial court erred in denying the motions. Appellate counsel was ineffective for failing to review the record and raise this meritorious, preserved issue.

    **B.**     **The Jury's Determination of Special Issue One Lacks the Guided Discretion Required by the Eighth and Fourteenth Amendments, Because the Terms of the Question are Vague and Undefined, and the Use of "Probability" Undermines the State's Burden of Proof.**

    The first special issue is unconstitutionally vague, and fails to provide the Constitutionally-required guided discretion to the sentencing jury. Neither the statute nor the required jury charge

---

[43] Petitioner's case, of course, shows precisely those dangers. As described in Claim I *supra*, Petitioner's sentencing jury considered evidence of unadjudicated extraneous conduct that was unsubstantiated

define the terms "probability," "criminal acts of violence," or "continuing threat to society."[44] Moreover, the use of "probability" in an issue that the jury is instructed to determine beyond a reasonable doubt undermines the State's burden of proof.

This issue was raised by the defense pretrial. *See* Motion to Declare the Capital Sentencing Statute Unconstitutional Because it Allows Juries to Decide Future Dangerousness Based Solely on the Factors of the Case, 1 CR 122. The trial court erred in denying this motion. Appellate counsel was ineffective for failing to review the record and raise this meritorious, preserved issue.

**C.     The Statute Requires An Unconstitutional Instruction that Ten or More Jurors Must Agree on a Life Sentence, Whereas the Jury Must Unanimously Decide on a Death Sentence.**

The sentencing statute requires the jury to be instructed: (1) that the prosecution must prove the first special issue beyond a reasonable doubt; (2) the jury shall return a verdict of "yes" or "no" on the first special issue; (3) the jury may not return a "yes" verdict unless it is unanimous, and it may not return a "no" verdict unless 10 or more jurors agree. *See* Tex. Code Crim. Proc. Art. 37.071 Sec. 2(c)&(d).

The instructions on the second special issue, the mitigation question, are similar. The statute requires the jury to be instructed: (1) the jury shall return an answer of "yes" or "no"; (2) the jury may not return a "no" unless it is unanimous, and may not return a "yes" unless at least ten jurors agree. Tex. Code Crim. Proc. Art. 37.071 Sec. 2(e)(2).

---

[44]As an example of the vagueness of the term, the Texas Court of Criminal Appeals has held both that "society" means prison society to which any life- or death-sentenced prisoner would be confined, *and*, conversely, that it includes society at large. *See, e.g., Berry v. State*, 233 S.W. 3d 847 (Tex. Crim. App. 2007) (vacating death sentence for lack of sufficient evidence of future dangerousness where defendant is dangerous only toward her own children, and it is "very unlikely" she will have more children while sentenced to life imprisonment); *cf. Martinez v. State*, 327 S.W. 3d 727, 735 (Tex. Crim. App. 2010) (future dangerousness special issue is construed as whether a defendant would be a threat "whether in or out of prison"). To the extent the Texas Court of Criminal Appeals follows the *Martinez* approach, including society at large in the future danger assessment, that injects unconstitutional arbitrariness into capital sentencing, because juries, who believe that they are deciding between a sentence of life without parole and death, are invited to consider the possibility of the defendant being release back into society.

The statute bars the jury from being instructed that if the jury is unable to reach a unanimous or at-least-ten verdict on either of the special issues, the trial court is required to sentence the defendant to life in prison.   Tex. Code Crim. Proc. Art. 37.071 Sec. 2(a) (barring instruction on the effect of a failure to agree); Sec. 2(g) (life sentence required if jury is unable to agree).

The statute and the confusing instructions create a farcical scenario in which the opposite of "unanimous" is "ten people agree."   Clearly, deliberations in a jury room on a death sentence could reach multiple outcomes that fall into neither category: a vote of 9-3, 8-4, 7-5, and so on.   However, juries are given no instruction on how to proceed if that likely scenario plays out.   The statute and instructions create an unconstitutional risk of arbitrary and unreliable capital sentencing in violation of the Eighth Amendment.   They also create an unconstitutional risk of jury coercion, wherein the jurors perceive that they must reach a certain result.   *See Jenkins v. United States*, 380 U.S. 445, 446 (1965).   The instructions are also inconsistent with *Wiggins*, which held that a death sentence cannot stand if one single juror strikes a different balance in weighing the mitigating circumstances.   *Wiggins*, 529 U.S. at 537.

This portion of the jury instruction, which suggests that it requires the agreement of 10 out of 12 jurors to find "no" on the first special issue and to find "yes" on special issue two, unconstitutionally diminished each juror's individual sense of responsibility in the sentencing process in violation of the Eighth Amendment.   The plain language of the statute creates the impression that one juror's dissent from the remaining members of the jury, without the agreement of at least one other juror, would be insufficient to make a difference in the determination of either of these special issues or the ultimate sentence the jury imposes.   Just such confusion occurred in this case.   *See* Affidavit of Michele Elliot.

For this reason, this instruction is also a violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985).  Moreover, by actively misleading potential holdout jurors to believe their individual votes will not change the outcome, the jury instruction injects arbitrariness and unfairness into the penalty phase, in violation of Petitioner's due process rights.

This issue was raised by the defense pretrial.  *See* Motion to Declare the "10-12 Rule" Unconstitutional, 1 CR 162.  The trial court erred in denying the motion.  Appellate counsel was ineffective for failing to review the record and raise this meritorious, preserved issue.

## XI.  THE TRIAL COURT VIOLATED PETITIONER'S RIGHTS BY FAILING TO EXCUSE UNQUALIFIED JURORS FROM THE PANEL.[45]

The trial court violated Petitioner's right to a fair trial and due process as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution by failing to excuse unqualified jurors from the panel.

The trial court allowed thirteen unqualified jurors to remain on the panel, forcing defense counsel to burn thirteen peremptory strikes. These thirteen jurors ranged from automatic death jurors to those who could not consider mitigating evidence once someone has been convicted of first degree murder, to a juror who thought death appropriate for vehicular homicide and one who believed in an eye for an eye.

These specific jurors should have been excused: Juror Coburn; Juror Dugger; Juror Williams; Juror Foss; Juror Copeland; Juror Workman; Juror Jackson; Juror Woodin; Juror Love; Juror Gandy; Juror Haskell; Juror Tull; and Juror Yeary.

On July 13, 2009, Petitioner requested additional peremptory strikes. This request was denied. 17 RR 7. Petitioner is entitled to relief.

---

[45] This claim was raised in Petitioner's state habeas petition as Claim XVII, which the trial court denied on the merits. FFCL 71-72, 97-98.

**XII.   THE TRIAL COURT VIOLATED PETITIONER'S RIGHTS BY ALLOWING AUTOMATIC DEATH PENALTY JURORS TO REMAIN ON THE JURY AND BY ALLOWING JURORS, WHO BY THEIR ANSWERS TO QUESTIONS, SHOULD HAVE BEEN EXCLUDED.[46]**

The trial court violated Petitioner's right to a fair trial and due process as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution by allowing automatic death jurors to sit on Petitioner's jury and by allowing jurors who otherwise should have been excluded for cause to sit in judgment of Petitioner.

Automatic death jurors must be excluded from jury participation. *Morgan v. Illinois*, 504 U.S. 719 (1992). In this case, at least two such jurors sat on Petitioner's jury, Juror Morgan and Juror Robinson. Others may have also been empaneled.

Because counsel had to burn peremptory challenges on jurors who should have been removed for cause, Petitioner had no strikes left when Juror Morgan and Juror Robinson were questioned. Juror Morgan told the court that she would always vote for death in a case where the defendant was convicted of capital murder. 19 RR 116; 19 RR 122. Juror Robinson told the court that she believed in "an eye for an eye" and that there were "not really" any circumstances that in her mind would justify a life sentence for first degree murder. 20 RR 83.

Upon information and belief, many of the seated jurors – Martinez, Trogden, Treat, Zavatsky, Eberly, Frazier, Lafleur, Elliot, Davis, Escobar, Morgan, and Francis – also should have been removed for cause but were not because the defense had burned its peremptory strikes on jurors the court refused to strike.  And, the court had denied a defense request for additional peremptory strikes.

The presence of even a single automatic death juror deprives a defendant of his or her right to an impartial juror. *Morgan v. Illinois*, 504 U.S. at 729. Petitioner is entitled to relief.

---

[46]  This claim was raised in Petitioner's state habeas petition as Claim XVIII, which the trial court denied on the merits. FFCL 71-72, 97-98.

**XIII.   THE STATE'S FAILURE TO PROVIDE PETITIONER WITH A NEW TRIAL AFTER HIS DEATH SENTENCE WAS VACATED BY THE U.S. SUPREME COURT AS REQUIRED BY TEXAS LAW IN PLACE AT THE TIME OF HIS CONVICTION VIOLATED THE EX POST FACTO CLAUSE AND COUNSEL RENDERED INEFFECTIVE ASSISTANCE.**

At the time of the crime and of Mr. Brewer's sentencing[47] Texas law provided that in case of reversal based on error in the punishment phase only, the effect would be a new punishment phase only, *except* in the case of capital murder[48] in which case an entire new trial would be awarded[49].

Fifteen days after Mr. Brewer's sentencing, the law was revised such that the invalidation of a capital-murder sentence based on penalty-phase error only would result in the award of a new penalty phase only. The effective date was September 1, 1991, and that it applied only to offenses every element of which occurred on or after that date.[50]

In 1993, the non-retroactivity element of the 1991 revisions pertaining to capital crimes was explicitly repealed, so that the invalidation of a capital-murder sentence would result in the award of a new penalty phase only, no matter when the crime occurred.[51] The provision of a new penalty phase only in this case violates the Constitution's prohibition. A law violates the Clause "if it is both retrospective and more onerous than the law in effect on the date of the offense." *Weaver v. Graham*, 450 U.S. 24, 30-31 (1981).[52] Mr. Brewer's award of a new penalty phase only, rather than an entire new trial was unconstitutional. The failure of trial and appellate counsel to raise this issue left Mr. Brewer without the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments.  Petitioner is entitled to a new trial.

---

[47] A jury sentenced Mr. Brewer to die on June 1, 1991, after finding him guilty of a crime committed on April 26, 1990.

[48] (Tex. Penal Code § 19.03)

[49] 1987 Tex. ALS 179, 1987 Tex. Gen. Laws 179, 1987 Tex. SB 43 (amending Tex. Code Crim. Proc. art. 44.29).

[50] 1991 Tex. ALS 838, 1991 Tex. Gen. Laws 838, 1991 Tex. SB 880

[51] 1993 Tex. ALS 781, 1993 Tex. Gen. Laws 781, 1993 Tex. Ch 781, 1993 Tex. HB 798.

[52] The deprivation of an entire new trial is a new legal consequence attached to an act committed before the 1993 revisions

XIV.   **MR. BREWER'S EXECUTION AFTER A PROLONGED STAY ON DEATH ROW VIOLATES DUE PROCESS AND IS A CRUEL AND UNUSUAL PUNISHMENT UNDER THE CONSTITUTION AND INTERNATIONAL LAW.**

Mr. Brewer has been incarcerated for twenty-five years.   Incarcerated at nineteen (19), sentenced to die at twenty-one (21), Mr. Brewer is now forty-five (45) years old.  His execution after the passage of so much time violates the Constitution and international law.  In *Lackey v. Texas*, 514 U.S. 1045 (1995), in a memorandum respecting the denial of certiorari, Justices Stevens and Breyer recognized the merit of claims that inordinate delays in the execution of sentence in capital cases violates the Eighth Amendment to the United States Constitution.   Constitutional concerns over prolonged delay in execution have a long lineage.   *In re Medley*, 134 U.S. 160 (1890) (holding uncertainty and delay in execution, along with the infliction of solitary confinement amounted to an ex post facto violation).[53]

A prolonged wait on death row for execution of a death sentence violates the Eighth Amendment for at least two reasons. First, awaiting execution for an extended period of time constitutes cruel and unusual punishment because it subjects one to extraordinary psychological duress and extreme physical and social restrictions inherent in confinement on death row.[54]  This past Term, the Supreme Court has breathed new life into this old idea.   *Glossip v. Gross*, 135 S. Ct. 2726, 2755, 2764-72 (2015) (Breyer, J., dissenting); *Davis v. Ayala*, 135 S. Ct. 2187, 2208 (2015) (Kennedy, J., concurring) ("Years on end of near-total isolation exact a terrible price." (citation

---

[53] International law independently prohibits excessive delays.  *See Pratt & Morgan v. The Attorney General of Jamaica*, [1994] 4 All ER 769. *State* v. *Makwanyane* 1995 (3) SA391 (CC) (S. Afr.); *Catholic Commission for Justice & Peace in Zimbabwe v. Attorney–General*, [1993] 1 Zim. L. R. 242, 282 (inordinate delays unconstitutional); *Soering v. United Kingdom*, 11 Eur. Ct. H. R. (ser. A), p. 439 (1989) (extradition of murder suspect to United States would violate the European Convention on Human Rights in light of risk of delay before execution); *United States v. Burns*, [2001] 1 S.C.R. 283, 353, ¶ 123 (similar). But international law also reveals a shared heritage and a lens on the view of our Constitution's framers: delays in execution in 1789 would have been understood as cruel and unusual.

[54] *See, e.g., Johnson v. Bredesen*, 558 U. S. 1067, 1069 (2009) (Stevens, J., statement respecting denial of certiorari) (delay "subjects death row inmates to decades of especially severe, dehumanizing conditions of confinement"); *Furman v. Georgia*, 408 U.S. 238, 288 (1972) (Brennan, J., concurring) (The "long wait between the imposition of sentence and the actual infliction of death" is"inevitable" and often "exacts a frightful toll."); *Solesbee* v. *Balkcom*, 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting) ("In the history of murder, the onset of insanity while awaiting execution of a death sentence is not a rare phenomenon").

omitted)).   This is especially true of Mr. Brewer's confinement in the Polunsky Unit, where conditions of administrative segregation "are virtual incubators of psychoses-seeding illness in otherwise healthy inmates and exacerbating illness in those already suffering from mental infirmities." *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 907 (S.D. Tex. 1999).   Second, capital punishment must serve the valid social purposes of, *inter alia,* retribution and deterrence, *Gregg v. Georgia*, 428 U.S. 153 (1976), but it no longer does so when so much time passes from judgment to execution.   *See Glossip*, 135 S. Ct. at 2767-70 (Breyer, J., dissenting).

**PRAYER FOR RELIEF**

WHEREFORE, based upon the foregoing, Petitioner respectfully requests that the Court grant him the following relief:

(1)   Such discovery as is necessary for full and fair resolution of the claims contained in this Petition;

(2)   Leave to file a Memorandum of Law in support of this Petition;

(3)   An evidentiary hearing on all claims involving disputed issues of fact;

(4)   Should it assist the Court, a status conference to discuss timing of the above;

(5)   Issue a Writ of Habeas Corpus to vacate Petitioner's unlawful sentence.

Respectfully submitted,

/s/ Peter J. Walker

| | |
|---|---|
| PHILIP ALAN WISCHKAEMPER | SHAWN NOLAN |
| TX Bar No. 21802750 | PA Bar No. 53565 |
| Law Office of Philip Wischkaemper | PETER WALKER |
| 915 Texas Avenue | TX Bar No. 24075445 |
| Lubbock, TX 79401 | Assistant Federal Defenders |
| (806)763-9900 | Federal Community Defender for the |
| miglit@aol.com | Eastern District of Pennsylvania |
| | Suite 545 West, The Curtis Center |
| | 601 Walnut Street |
| | Philadelphia, PA 19106 |
| | (215) 928-0520 |
| | shawn_nolan@fd.org |
| December 9, 2015 | peter_walker@fd.org |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I served the foregoing motion on the following by operation of the electronic case filing system:

Erich Dryden
Assistant Attorney General
Office of the Attorney General of Texas
Post Office Box 12548
Austin, Texas 78711-2548

/s/ Peter J. Walker
Peter J. Walker

December 9, 2015