IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| BRENT RAY BREWER, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 2:15-cv-00050-Z-BR |
| | § | *CAPITAL CASE* |
| LORIE DAVIS, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT DAVIS'S ANSWER
## WITH BRIEF IN SUPPORT

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

MARK PENLEY
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

ERICH DRYDEN
Assistant Attorney General
Criminal Appeals Division
*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400
*erich.dryden@oag.texas.gov*

*Attorneys for Respondent*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... v

ANSWER ............................................................................................................... 1

BREWER'S ALLEGATIONS .................................................................................. 1

STATEMENT OF THE CASE ................................................................................ 3

STATEMENT OF FACTS ...................................................................................... 5

    I.     State's Evidence ................................................................................... 5

         A.     Facts of the crime ................................................................ 5

         B.     Additional evidence of future dangerousness .................... 7

    II.    Defense's Evidence ............................................................................ 12

STANDARD OF REVIEW ...................................................................................... 18

    I.     Evidence Barred by *Pinholster* ....................................................... 20

    II.    Counsel Effectively Challenged Dr. Coons. ..................................... 24

         A.     State court findings ............................................................. 24

         B.     The standard ........................................................................ 30

         C.     Brewer's allegation that the trial court erred in admitting Dr. Coons's testimony is procedurally defaulted. ........................................................................... 32

         D.     Trial counsel challenged Dr. Coons during voir dire. Nonetheless, the trial court was going to admit his testimony. ........................................................................... 34

         E.     Trial counsel effectively challenged Dr. Coons during trial. .......................................................................... 42

              1.     Counsel thoroughly cross-examined Dr. Coons. ................................................................ 42

2.      Trial counsel were not ineffective for not
        utilizing another expert. ............................................. 47

F.      Brewer's claims regarding Dr. Coons's credentials
        have no merit. ...................................................................... 53

III.    Brewer's Claims Pertaining to Dr. Erdmann's Autopsy
        Report and Prior Testimony and Dr. Natarajan's
        Testimony Are Meritless. ................................................ 56

A.      Brewer's claims that his due process rights were
        violated by the knowing presentation of false
        testimony and that the trial court erred in admitting
        evidence concerning Dr. Erdmann's autopsy are
        procedurally barred. ...................................................... 58

B.      Brewer's confrontation claim is meritless. ..................... 59

C.      At any rate, Brewer's claims are meritless. ..................... 61

1.      The State did not knowingly present false or
        misleading testimony. ................................................ 61

2.      Trial counsel were not ineffective. .......................... 71

IV.     Appellate Counsel Was Not Ineffective for Not Challenging
        the Admission of the 1991 Transcripts. ........................... 75

V.      Brewer's Claim that Trial Counsel Were Ineffective for Not
        Rebutting His Prior Bad Acts Has No Merit and Is in Part
        Defaulted. ......................................................................... 81

A.      Some of these allegations are defaulted. ......................... 81

B.      Brewer's claims lack merit........................................... 85

1.      Counsel did elicit evidence that Brewer was
        never the subject of an investigation. .................... 85

2.      Counsel effectively challenged the
        State's case. ............................................................ 87

3.      Counsel were not ineffective for not rebutting
        specific witnesses. ................................................. 88

          a.      **Aimee Long** ........................................ 88

          b.      **Ronald Mosher and Ammy Valles** ................ 90

          c.      **Kevin Lewis** ...................................... 92

      4.      **The claims regarding Albert Brewer are meritless.** ...................................... 94

          a.      **Evidence of Alert's poor behavior was presented.** ................................... 94

          b.      **Brewer's claim that counsel failed to delve into Albert's military history fails for several reasons.** ........................... 96

**VI.**    **Brewer's Claim that Counsel Failed to Investigate and Present Mitigating Evidence Is Meritless.** ................... 99

    **A.**    **State court findings** ............................... 100

    **B.**    **Brewer's claims are meritless.** ..................... 101

      1.      **Counsel presented sufficient mitigating evidence.** ..................................... 101

      2.      **The instant case is not similar to *Walbey* or *Lewis*.** ...................................... 109

      3.      **Likewise, *Andrus* is not on point.** ........... 115

      4.      **Counsel were not ineffective for not presenting expert evidence that Brewer suffers from mental-health problems.** ................ 123

      5.      **Counsel made a wise decision not to focus on Nystrom's influence.** ................... 131

    **C.**    **Brewer's claim that the state court decision is unreasonable has no merit.** ................. 132

**VII.**   **Brewer's Additional Claims Pertaining to Nystrom Are Meritless and in Part Defaulted.** ................. 134

VIII.   Brewer's Claims that the State Presented False and
        Misleading Testimony about Conditions of Confinement
        and that Trial and Appellate Counsel Were Ineffective
        Have No Merit. ................................................................ 139

IX.     Brewer's Claim of Cumulative Error Does Not State a
        Basis for Relief. ............................................................... 148

X.      Brewer's Challenges to Article 37.0711 Are Defaulted and
        Meritless. ......................................................................... 149

XI.     Brewer's Claim that the Trial Court Improperly Allowed
        Thirteen Unqualified Jurors to Remain on the Jury Panel
        Is Procedurally Defaulted, Conclusory, and Invalid. ............ 152

XII.    Brewer's Rights Were Not Violated by the Trial Court's
        Decision Not to Grant the Defense's Challenges for Cause.... 153

XIII.   There Was No Ex Post Violation. ..................................... 155

XIV.    Brewer's Claim that His Death Sentence After a Prolonged
        Stay on Death Row Constitutes Cruel and Unusual
        Punishment Has Been Consistently Rejected. ........................ 160

CONCLUSION ...................................................................... 160

CERTIFICATE OF SERVICE ............................................. 161

iv

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Johnson*, 211 F.3d 895 (5th Cir. 2000) ...................................... 151, 160

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564 (1985) ................................ 20

*Andrus v. Texas*, 140 S. Ct. 1875 (June 15, 2020) ............................................ Passim

*Atkins v. Virginia*, 536 U.S. 304 (2002) ................................................................ 131

*Ayestas v. Davis*, 138 S. Ct. 1080 (2018) ............................................................... 51

*Balentine v. Thaler*, 626 F.3d 842 (5th Cir. 2010) ................................................ 82

*Banks v. Dretke*, 540 U.S. 668 (2004)................................................................... 136

*Barbee v. Davis*, 660 F. App'x 293 (5th Cir. 2016) ............................................... 85

*Barefoot v. Estelle,* 463 U.S. 880 (1983) ......................................................... 35, 41, 46

*Barrientes v. Johnson,* 221 F.3d 741 (5th Cir. 2000)............................................... 40

*Beatty v. Stephens*, 759 F.3d 455 (5th Cir. 2014)..................................... 69–70, 148

*Blanton v. Quarterman*, 543 F.3d 230 (5th Cir. 2008) ........................................... 113

*Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996).................................................. 62, 66

*Bradshaw v. Richey*, 546 U.S. 74 (2005) ............................................................... 23

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................ Passim

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) .......................................................... 40

*Buck v. Davis*, 137 S. Ct. 759 (2017) .................................................................... 42

*Buntion v. State*, 482 S.W.3d 58 (Tex. Crim. App. 2016) ...................................... 147

*Busby v. Dretke,* 359 F.3d 708 (5th Cir. 2004).................................................. Passim

*Byrd v. Workman*, 645 F.3d 1159 (10th Cir. 2011) .................................................. 40

*Canales v. Stephens*, 765 F.3d 551 (5th Cir. 2014) ............................................ 85, 140

*Carty v. Thaler*, 583 F.3d 244 (5th Cir. 2009) ........................................................ 86

*Charles v. Thaler*, 629 F.3d 494 (5th Cir. 2011) ...................................................... 58

*Clark v. Johnson,* 202 F.3d 760 (5th Cir. 2000) ............................................ 61, 62, 64

*Clark v. State*, 994 S.W.2d 166 (Tex. Crim. App. 1999) ......................................... 156

*Coble v. State,* 330 S.W.3d 253 (Tex. Crim. App. 2010) .................................... Passim

*Coble v. Davis*, 728 F. App'x 297 (5th Cir.),
    *cert. denied*, 139 S. Ct. 338 (2018) ....................................................... 41

*Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007) ......................................... 75, 148

*Collins v. Youngblood,* 497 U.S. 37 (1990) ............................................ 156, 157, 158

*Cook v. State*, 858 S.W.2d 467 (Tex. Crim. App. 1993) ........................................... 35

*Cooks v. United States*, 461 F.2d 530 (5th Cir. 1972) ............................................. 37

*Coleman v. Thompson*, 501 U.S. 722 (1991) ..................................................... Passim

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ......................................................... Passim

*Cupit v. Whitley*, 28 F.3d 532 (5th Cir. 1994) ................................................... 33, 138

*Crawford v. Washington,* 541 U.S. 36 (2004) ................................................... 59, 78

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ................ 35, 41

*Davila v. Davis*, 650 F. App'x 860 (5th Cir. 2016),
    *aff'd on other grounds*, 137 S. Ct. 2058 (2017) ................................................... 151

*Devoe v. Davis*, No. A-14-CA-151-SS, 2016 WL 5408169
    (W.D. Tex. Sept. 27, 2016) ................................................................. 145

*Dorsey v. Quarterman*, 494 F.3d 527 (5th Cir. 2007) ................................. 33, 58, 139

*Druery v. Thaler*, 647 F.3d 535 (5th Cir. 2011) ...................................... 127, 128, 151

*Espada v. State*, No. AP-75,219, 2008 WL 4809235
    (Tex. Crim. App. Nov. 5, 2008) ................................................................. 35

*Estelle v. McGuire*, 502 U.S. 62 (1991) ...................................................... 33

*Estrada v. State,* 313 S.W.3d 274 (Tex. Crim. App. 2009) ........................ 140, 146–47

*Evans v. Davis*, 875 F.3d 210 (5th Cir. 2017) .......................................... 133

*Evitts v. Lucey*, 469 U.S. 387 (1985) ......................................................... 76

*Ex parte Brown*, 205 S.W.3d 538 (Tex. Crim. App. 2006) ........................ 133

*Ex parte Coty*, 418 S.W. 3d 59 (Tex. Crim. App. 2014) ............................ 64

*Ex parte Ramey*, 382 S.W.3d 396 (Tex. Crim. App. 2012) ........................ 33

*Fearance v. Scott*, 56 F.3d 633 (5th Cir. 1995) ........................................ 81

*Freeman v. Stephens*, 614 F. App'x 180 (5th Cir. 2015) .......................... 128

*Finley v. Johnson*, 243 F.3d 215 (5th Cir. 2001) ................................... 32–33

*Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999) ................................... 34, 140

*Fuller v. Johnson*, 114 F.3d 491 (5th Cir. 1997) ................................. 54, 61

*Garland v. Maggio*, 717 F.2d 199 (5th Cir. 1983) ................................... 37

*Garza v. Stephens*, 738 F.3d 669 (5th Cir. 2013) ................................... 82

*Green v. Johnson*, 46 F.Supp.2d 614 (N. D. Tex. 1999) ............................ 39

*Grim v. Fisher*, 816 F.3d 296 (5th Cir. 2011) ......................................... 60

*Grimes v. State*, 807 S.W.2d 582 (Tex. Crim. App. 1991) ........................ 157

*Hardy v. Cross*, 565 U.S. 65 (2011) ......................................................... 18

*Harris v. Reed*, 489 U.S. 255 (1989) ................................... 33, 34, 81, 140

*Harrington v. Richter*, 562 U.S. 86 (2011) ....................................... Passim

*Hatten v. Quarterman*, 570 F.3d 595 (5th Cir. 2009) ............................... 59

*Hensley v. Roden*, 755 F.3d 724 (1st Cir. 2014),
    *cert. denied*, 135 S. Ct. 964 (2015) ................................................. 60

*Hernandez v. Stephens*, 537 F. App'x 531 (5th Cir. 2013) ........................................ 85

*Hill v. Davis*, 781 F. App'x 277 (5th Cir.),
   *cert. denied*, 140 S. Ct. 389 (2019) ................................................................... 149

*Hinton v. Alabama*, 571 U.S. 263 (2014) .................................................................. 31

*Holland v. Jackson*, 542 U.S. 649 (2004) ........................................................... 23, 91

*Hudson v. Quarterman*, 273 F. App'x 331 (5th Cir. 2008) ...................................... 20

*Hughes v. Dretke*, 412 F.3d 582 (5th Cir. 2005)..................................................... 150

*Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008).............................................. 82

*Hutcherson v. State*, 373 S.W.3d 179 (Tex. App.—Amarillo 2012, pet. ref'd) .......... 79

*Irvin v. Dowd*, 366 U.S. 717 (1961) ....................................................................... 154

*Jackson v. Dretke*, 181 F. App'x 400 (5th Cir. 2006) .............................................. 150

*Jefferson v. Upton*, 560 U.S. 284 (2010) .................................................................. 20

*Johnson v. Cockrell*, 306 F.3d 249 (5th Cir. 2002) ................................................. 128

*Jones v. United States*, 527 U.S. 373 (1999) .......................................................... 151

*Kansas v. Cheever*, 571 U.S. 87 (2013)..................................................................... 48

*Kernan v. Hinojosa*, 136 S. Ct. 1603 (2016) .............................................................. 18

*Koch v. Puckett*, 907 F.2d 524 (5th Cir. 1990) ........................................ 143, 152, 155

*Kutzner v. Johnson*, 242 F.3d 605 (5th Cir. 2001) ................................................... 66

*Kyles v. Whitley*, 514 U.S. 419 (1995) ..................................................................... 70

*Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1998) ................................. 35, 48

*Langley v. Prince*, 926 F.3d 145 (5th Cir. 2019),
   *cert. denied*, 19-6413, 2020 WL 1906607 (U.S. Apr. 20, 2020) ......................... 133

*Leal v. Dretke*, 428 F.3d 543 (5th Cir. 2005).......................................................... 150

*Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003)..................................................... Passim

*Lewis v. Johnson*, 2000 WL 35549205 (5th Cir. 2000) ........................................... 113

*Lindsey v. Washington,* 301 U.S. 397 (1937) ................................................... 157, 158

*Martinez v. Davis*, 653 F. App'x 308 (5th Cir. 2016),
    *judgment vacated on other grounds*, 137 S. Ct. 1432 (2017) ............................ 60

*Martinez v. Dretke*, 404 F.3d 878 (5th Cir. 2005) ........................................... 127, 128

*Manning v. Epps*, 688 F.3d 177 (5th Cir. 2012) ....................................................... 97

*Martinez v. Ryan,* 566 U.S. 1 (2012) ........................................................ 82, 83, 90, 91

*Martinez v. State*, 311 S.W.3d 104 (Tex. App.—Amarillo, 2010, pet. ref'd)............. 77

*Martinez v. State*, 327 S.W.3d 727 (Tex. Crim. App. 2010)...................................... 78

*Mays v. State*, 318 S.W.3d 368 (Tex. Crim. App. 2010)......................................... 151

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ............................................ 60

*Miller v. Dretke*, 431 F.3d 241 (5th Cir. 2005) ....................................................... 138

*Miller v. Johnson*, 200 F.3d 274 (5th Cir. 2000)........................................................ 88

*Mitchell v. Kelly*, 520 F. App'x 329 (6th Cir.),
    *cert. denied*, 571 U.S. 922 (2013) ................................................................... 60

*Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998) ....................................... 129

*Murphy v. Florida*, 421 U.S. 794 (1975) ................................................................. 154

*Murray v. Carrier*, 477 U.S. 478 (1986) ................................................................... 59

*Napue v. Illinois*, 360 U.S. 264 (1959) ................................................................Passim

*Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002)....................................... 19, 32, 40, 132

*Nelson v. Davis*, 952 F.3d 651 (5th Cir. 2020) ......................................................... 23

*Newberry v. Stephens*, 756 F.3d 850 (5th Cir. 2014) ................................................ 85

*Nobles v. Johnson*, 127 F.3d 409 (5th Cir. 1997)............................................... 70, 148

*Norman v. Stephens*, 817 F.3d 226 (5th Cir. 2016) ................................................... 91

*Ochoa v. Davis*, No. 3:09-CV-2277-K, 2016 WL 5122107 (N.D. Tex. 2016)............. 59

*Pape v. Thaler*, 645 F.3d 281 (5th Cir. 2011)....................................................... 74, 99

*Patton v. Yount*, 467 U.S. 1025 (1984) ...................................................................... 154

*Paredes v. State*, 129 S.W.3d 530 (Tex. Crim. App. 2004)...................................... 151

*Parr v. Thaler*, 481 F. App'x 872 (5th Cir. 2012) .................................................... 150

*Peugh v. U.S.*, 569 U.S. 530 (2013) .......................................................................... 159

*Perry v. Quarterman*, 314 F. App'x 663 (5th Cir. 2009) ......................................... 113

*Pondexter v. Quarterman*, 537 F.3d 511 (5th Cir. 2008) ........................................... 51

*Pyles v. State*, 755 S.W.2d 98 (Tex. Crim. App. 1988) ............................................. 35

*Ramey v. State*, No. AP-75,678, 2009 WL 335276
   (Tex. Crim. App. Feb. 11, 2009) .......................................................................... 35

*Ramirez v. State*, 815 S.W.2d 636 (Tex. Crim. App. 1991)....................................... 77

*Reed v. Quarterman*, 504 F.3d 465 (5th Cir. 2007) ................................................. 160

*Ring v. Arizona,* 536 U.S. 584 (2002) ............................................................... 149, 151

*Roberts v. Thaler*, 681 F.3d 597 (5th Cir. 2012) ....................................................... 41

*Rojas v. State,* 981 S.W.2d 690 (Tex. Crim. App. 1998) ........................................... 33

*Ross v. Estelle*, 694 F.2d 1008 (5th Cir. 1983) ........................................... 76, 152, 155

*Ross v. Oklahoma*, 487 U.S. 81 (1988) .................................................................... 153

*Rowell v. Dretke*, 398 F.3d 370 (5th Cir. 2005)....................................................... 151

*Ruiz v. Davis*, --- F. App'x---, 2020 WL 3815296 (5th Cir. July 8, 2020) .............. 145

*Ruiz v. Davis*, 850 F.3d 225 (5th Cir. 2017) ........................................................... 160

*Russeau v. State*, 171 S.W.3d 871 (Tex. Crim. App. 2005)........................... 77–78, 151

*Sawyer v. Whitley*, 505 U.S. 333 (1992) ..................................................... 82

*Sears v. Upton,* 561 U.S. 945 (2010)......................................................... 130

*Sells v. Stephens*, 536 F. App'x 483 (5th Cir. 2013)............................... 98, 107

*ShisInday v. Quarterman*, 511 F.3d 514 (5th Cir. 2007) ......................... 160

*Smith v. Robbins*, 528 U.S. 259 (2000) ...................................................... 76

*Spence v. Johnson*, 80 F.3d 989 (5th Cir. 1996)................................... 87, 90

*Sprouse v. Stephens*, 748 F.3d 609 (5th Cir. 2014).......................... 150, 151

*Strickland v. Washington,* 466 U.S. 668 (1984)............................... Passim

*Strickler v. Greene*, 527 U.S. 263 (1999) ................................................. 70

*Suniga v. State*, AP-77,041, 2019 WL 1051548 (Tex. Crim. App. 2019),
   *cert. denied*, 140 S. Ct. 375 (2019) ...................................................... 79

*Teague v. Lane*, 489 U.S. 288 (1989)................................ 150, 151, 159, 160

*Thomas v. Vannoy*, 898 F.3d 561 (5th Cir. 2018),
   *cert. denied*, 139 S. Ct. 1321 (2019) ................................................... 133

*Tong v. State*, 25 S.W.3d 707 (Tex. Crim. App. 2000) ............................ 152

*Turner v. Quarterman*, 481 F.3d 292 (5th Cir. 2007)............................ 148

*Trevino v. Johnson*, 168 F.3d 173 (5th Cir. 1999) .................................. 20

*Trevino v. Thaler,* 569 U.S. 413 (2013) ........................................ 82, 83, 90

*Trottie v. Stephens*, 720 F.3d 231 (5th Cir. 2013)...................... 23, 86, 109

*United States v. Agurs*, 427 U.S. 97 (1976).............................................. 137

*United States v. Brown*, 650 F.3d 581 (5th Cir. 2011) ............................ 70

*United States v. Fields*, 761 F.3d 443 (5th Cir. 2014) ............... 52, 127, 128

*United States v. Fields*, 565 F.3d 290 (5th Cir. 2009) ............................. 37

*United States v. Fields*, 483 F.3d 313 (5th Cir. 2008) ............................................... 59

*United States v. Jones*, 930 F.3d 366 (5th Cir. 2019) ................................................. 60

*United States v. Martinez–Mercado*, 888 F.2d 1484 (5th Cir. 1989)..................... 143

*United States v. Phillips*, 210 F.3d 345 (5th Cir. 2000) ........................................... 76

*United States v. Runyan*, 290 F.3d 223 (5th Cir. 2002) ........................................... 70

*United States v. Snarr*, 704 F.3d 368 (5th Cir. 2013) ............................................. 153

*United States v. Thomas*, 724 F.3d 632 (5th Cir. 2013) ......................................... 148

*Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001) ...................................................... 20

*Vasquez v. Thaler*, 389 F. App'x 419 (5th Cir. 2010) ............................................. 129

*Velez v. State*, No. AP-76,051, 2012 WL 2130890
    (Tex. Crim. App. June 13, 2012) ............................................................................ 140

*Walbey v. Quarterman*, 309 F. App'x 795 (5th Cir. 2009) ................................. Passim

*Ward v. State*, AP-74,695, 2007 WL 1492080 (Tex. Crim. App. May 23, 2007) ....... 35

*Ward v. Stephens*, 777 F.3d 250 (5th Cir. 2015)........................................ 51, 96, 109

*Weaver v. Graham*, 450 U.S. 24 (1981) .................................................................... 158

*White v. Johnson*, 79 F.3d 432 (5th Cir. 1996) ....................................................... 160

*Wiggins v. Smith*, 539 U.S. 510 (2003) ............................................................... 32, 129

*Williams v. Collins*, 16 F.3d 626 (5th Cir. 1994). .................................................... 80

*Williams v. Stephens*, 761 F.3d 561 (5th Cir. 2014) ................................................. 41

(*Michael*) *Williams v. Taylor*, 529 U.S. 420 (2000) ............................................. 23, 91

(*Terry*) *Williams v. Taylor*, 529 U.S. 362 (2000)................................................. Passim

*Wilson v. Sellers*, 138 S. Ct. 1188 (2018) ............................................................... 133

*Wong v. Belmontes*, 558 U.S. 15 (2009) ................................................................. 126

*Wood v. State*, 299 S.W.3d 200 (Tex. App.—Austin, 2009, pet. ref'd)...................... 77

*Woodford v. Visciotti*, 537 U.S. 19 (2002)................................................... 19

*Yohey v. Collins*, 985 F.2d 222 (5th Cir. 1993) ................................. 39, 148

*Zant v. Stephens*, 462 U.S. 862 (1983) ........................................ 98

**Constitutional Provisions, Statutes, and Rules**

U.S. Const. amend. V ...................................................... 69

U.S. Const. amend. VI ................................................... 69, 153

U.S. Const. amend. VIII ................................................. Passim

U.S. Const. amend. XIV ................................................. 69, 152

28 U.S.C. § 2241 ............................................................ 1

28 U.S.C. § 2244 ........................................................... 97

28 U.S.C. § 2254............................................................ Passim

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).................. Passim

Northern District Local Rule CV 56.7 ................................... 115

Tex. Code Crim. Proc. art. 37.0711 .......................................... 2, 147, 149

Tex. Code Crim Proc. art. 44.29 ................................... 156, 157

Tex. Penal Code § 9.01..................................................... 157

Tex. Penal Code § 12.31.................................................. 156, 157

Tex. Penal Code § 19.03.................................................. 156, 157

Tex. R. Ev. 702 ............................................................ 26, 36

Tex. R. Ev. 703 ........................................................... 76

Tex. R. Ev. 804 ........................................................... 78

## ANSWER

Petitioner Brent Ray Brewer was convicted and sentenced to death in Texas state court for the brutal murder of Robert Laminack. After the grant of federal habeas relief, Brewer received a new punishment hearing. Once again he was sentenced to death, and he now challenges that presumptively valid sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. Brewer presents fourteen claims, and numerous sub-claims, in the instant petition. Several of these allegations are procedurally barred, and all are meritless. In short, Brewer was not deprived of any constitutional right. Therefore, he is not entitled to habeas relief.

## BREWER'S ALLEGATIONS

The Director understands Brewer to raise the following grounds for federal habeas corpus relief:

1.  Trial counsel were ineffective for failing to challenge expert testimony from Dr. Richard Coons regarding his future dangerousness.

2.  The State failed to disclose evidence casting doubt on the reliability of the autopsy findings by Dr. Ralph Erdmann and presented false and misleading testimony; the trial court erred in admitting Dr. Erdmann's testimony; and trial counsel were ineffective for failing to challenge the evidence.

3.  Appellate counsel was ineffective for failing to challenge the trial court's admission of transcripts and evidence from the first trial.

4.  Trial counsel were ineffective for failing to conduct an investigation into Brewer's prior bad acts and failed to present evidence that he had never been the subject of an investigation while on death row.

5.  Trial counsel were ineffective for failing to investigate and present mitigating evidence.

1

6.     Trial counsel were ineffective for failing to investigate and present evidence that Kristie Nystrom had a larger role in the crime.

7.     The State suppressed favorable evidence; the trial court erred by failing to order the disclosure of the evidence; and trial counsel were ineffective for failing to request or obtain the evidence.

8.     The State presented false and misleading testimony regarding conditions of confinement in prison; trial counsel were ineffective for failing to present evidence rebutting this testimony; and appellate counsel was ineffective for failing to raise this issue.

9.     His conviction and sentence are unconstitutional due to the cumulative errors by trial counsel, the State, and the trial court.

10.    He was tried under an unconstitutional statutory scheme; the trial court erred in denying his motion declaring Texas Code of Criminal Procedure Article 37.0711 unconstitutional; and appellate counsel was ineffective for failing to raise this claim.

11.    The trial court erred in failing to excuse unqualified jurors from the venire.

12.    The trial court erred by allowing jurors who should have been excluded for cause to remain on the jury.

13.    The State's failure to provide him with a new trial on both guilt-innocence and punishment as required by Texas law at the time of the offense violated the Ex Post Facto Clause.

14.    His execution after a prolonged stay on death row constitutes cruel and unusual punishment.

## STATEMENT OF THE CASE

In 1991, Brewer was convicted and sentenced to death for murdering Robert Doyle Laminack while in the course of committing and attempting to commit robbery. CR1 1, 253, 289–94.[1] The Texas Court of Criminal Appeals (CCA) affirmed Brewer's conviction and sentence. *Brewer v. State,* No. 71,307, slip op. (Tex. Crim. App. June 22, 1994) (not designated for publication), *cert. denied*, 514 U.S. 1020 (1995). A state habeas application was subsequently denied. *Ex parte Brewer*, No. 46,587-01, 50 S.W.3d 492 (Tex. Crim. App. Jan. 31, 2001), *cert. denied*, 534 U.S. 955 (2001).

Brewer sought federal habeas relief, and this Court conditionally granted Brewer relief pertaining to the punishment phase of his trial. *Brewer v. Dretke*, No. 2:01-cv-0112-J, 2004 WL 1732312 (N.D. Tex. Aug. 2, 2004). The Fifth Circuit reversed this Court's grant of habeas relief. *Brewer v. Dretke*, 442 F.3d 273 (5th Cir. 2006). The United States Supreme Court then reversed the Fifth Circuit's decision. *Brewer v. Quarterman*, 550 U.S. 286 (2007).

Brewer was re-tried on punishment in 2009 and again sentenced to death. 2 CR2 602–05, 610–14; 25 RR 239–40. The CCA affirmed Brewer's sentence.

---

[1]      "CR1" refers to the clerk's record of pleadings and documents filed with the court during Brewer's first trial in 1991, followed by page number(s). "CR2" refers to the clerk's record of pleadings and documents filed with the court during Brewer's second trial in 2009, preceded by volume number and followed by page number(s). "RR" refers to the state record of transcribed trial proceedings from Brewer's 2009 trial, preceded by volume number and followed by page number(s). "SHCR" refers to the state habeas record from Brewer's state habeas proceeding following his 2009 re-trial, preceded by volume number and followed by page number(s). "SHH" refers to the record of the state habeas hearing, preceded by volume number and followed by page number(s). "SHCR2" refers to the state habeas record from Brewer's second state habeas proceeding after his re-trial, followed by page number(s).

*Brewer v. State*, No. AP-76,378, 2011 WL 5881612 (Tex. Crim. App. Nov. 23, 2011) (not designated for publication).

Brewer then filed a state habeas corpus application challenging his re-trial. 2 SHCR 63. Following an evidentiary hearing, the trial court submitted findings of fact and conclusions of law recommending that Brewer be denied habeas relief. 10 SHCR 3070–169. The CCA adopted most of the trial court's findings and conclusions and denied Brewer habeas corpus relief. *Ex parte Brewer*, No. 46,587-02, 2014 WL 5388114 (Tex. Crim. App. Sep. 17, 2014) (not designated for publication).

Brewer filed a federal habeas petition in this Court, Docket Entry (DE) 19 & 31, and the Director answered, DE 40. Brewer then filed a motion to stay and abate these proceedings to return to state court to exhaust various claims. DE 53. Ultimately, this Court granted the motion. DE 67 & 76. Brewer returned to state court and filed a subsequent habeas application. *See* SHCR2. The CCA dismissed the application as an abuse of the writ without considering the merits. *Ex parte Brewer*, No. 46,587-03, 2019 WL 5420444 (Tex. Crim. App. Oct. 23, 2019) (not designated for publication); DE 93. On March 30, 2020, Brewer filed his second amended petition in this Court. DE 103. Brewer has also filed a motion for discovery and an evidentiary hearing, which is currently pending. DE 94.

## STATEMENT OF FACTS

### I.     State's Evidence

#### A.     Facts of the crime

Brewer met Kristie Nystrom at a state hospital in Big Spring, Texas.  22 RR 173–74; 25 RR 65–67.  The two developed a relationship and met up in Amarillo when they were discharged.  22 RR 176–77.  Ultimately, they moved to an apartment leased by Michelle Christian and Charlotte Clarkson.  21 RR 251–52; 22 RR 186; 25 RR 70. However, they were not paying the girls any money for rent.  21 RR 253; 22 RR 189– 90.  Christian subsequently found an eviction notice on her door stating that Brewer and Nystrom had to vacate the premises.  21 RR 255–56; 25 RR 72.  One night, Brewer suggested "rolling" someone, which meant he and Nystrom would rob someone and take the person's money and/or car.  21 RR 259–61, 266–67; 22 RR 191–94.

On the night of April 26, 1990, Brewer and Nystrom first attempted to carry out their plan when Nystrom approached Ivy Craig outside of Mr. Wonderful's Bar. 21 RR 109–11; 22 RR 195–96; 25 RR 74.  Nystrom asked Craig if she could give her and Brewer a ride.  21 RR 109–11; 22 RR 196–97; 25 RR 75.  Craig was suspicious of the two, told Nystrom "no," got in her car, and left.  21 RR 110–16; 22 RR 197; 25 RR 75.  The pair then spotted Mr. Laminack in an alley outside of his business, Amarillo Flooring Company.  22 RR 198–99; 25 RR 77.  According to Nystrom, Brewer put his arm around her, approached Mr. Laminack, and asked him if he could give them a ride to the Salvation Army because his girlfriend was cold and they needed a place to stay.  22 RR 198–99.  Mr. Laminack—by all accounts a compassionate and empathetic

man who enjoyed helping others—told Brewer and Nystrom to get in his truck and he would take them to the Salvation Army.  22 RR 201; 25 RR 77–78.

Mr. Laminack went inside, told his daughter Anita that he was taking two kids to the Salvation Army, and would be back shortly.  21 RR 127–30; 22 RR 201.  He then got in his truck and drove off.  21 RR 133, 135–36; 22 RR 202.  Nystrom was in the front passenger seat, and Brewer was in the back seat toward the middle.  21 RR 134–35; 22 RR 201–02; 25 RR 78.  Soon after Mr. Laminack began to drive, Brewer reached around Mr. Laminack and started stabbing him in his neck with a butterfly knife.  22 RR 206; 25 RR 79, 154–55.  Mr. Laminack begged for his life, stating: "[P]lease don't kill me, boy.  Please don't kill me."  22 RR 95, 208.  Brewer told Mr. Laminack to give Nystrom his wallet and keys.  22 RR 209; 25 RR 156, 158.  Mr. Laminack gave Nystrom his wallet and tried to give her the keys but became unconscious.  22 RR 210.  The truck stopped, and Brewer grabbed the keys.  25 RR 81, 160–61, 169.  Brewer and Nystrom got out of the truck and fled, but Brewer dropped his knife at the scene.  21 RR 163; 22 RR 211; 25 RR 81, 85, 162, 164.

The two ran back to Christian's apartment.  22 RR 212; 25 RR 85.  Christian saw they were both covered in blood.  21 RR 271–73.  They told Christian that Brewer cut his hand while they were trying to climb a chain-link fence.  21 RR 272–73.  In fact, Brewer had badly cut his hand on his own knife while attacking Mr. Laminack.  25 RR 85–86, 164, 167.  After they changed clothes, a friend of Brewer's, Stephen Callen, took them to Palo Duro Canyon Hospital so that Brewer could get stitches.  21 RR 275–76; 22 RR 69–71, 213; 25 RR 86–87.  While there, Nystrom told Callen

6

that Mr. Laminack said "please don't kill me."  Callen said that Brewer smirked and giggled in response.  22 RR 72.  After Brewer received the stitches, he and Nystrom gathered their possessions, bought bus tickets with the money they took from Mr. Laminack's wallet, and traveled to the Dallas area.  21 RR 277–79; 22 RR 214–17; 25 RR 87–89.  They were arrested a few weeks later.  22 RR 218–19.

The autopsy showed that Mr. Laminack died due to hemorrhaging caused by sharp force injuries in the neck region.  23 RR 32–33.  Brewer struck Mr. Laminack's left carotid artery and right internal jugular vein.  Mr. Laminack also sustained defensive wounds to his left hand and sharp force injuries to his neck and right shoulder.  23 RR 35–37.  Blood found on the knife recovered at the crime scene was consistent with that from both Mr. Laminack and Brewer.  21 RR 242–44.  Brewer's blood and fingerprints were also found inside Mr. Laminack's truck.  21 RR 210–11, 225.  At trial, Brewer admitted his guilt for the murder.  25 RR 70–89, 150–69.

### B.    Additional evidence of future dangerousness

The State presented the transcribed testimony from Brewer's first trial of Richard Lepicier, Deputy Sheriff of Monroe County, Mississippi.  In July of 1989, Lepicier answered a family disturbance call at the home of Albert Brewer, Brewer's biological father.  22 RR 41.  Lepicier found that Albert was bleeding and could not talk.  Albert and Brewer's mother got into an argument, and Brewer got a broom and hit Albert, knocking him to the floor.  While Albert was on the floor, Brewer kept hitting and kicking him.  22 RR 42.  Albert was bleeding from the nose, mouth, and side of the head, and blood was on the floor and wall.  22 RR 44–45.  During cross-

examination, Lepicier stated the incident occurred because Albert had been beating Brewer's mother.  22 RR 48–49.  No charges were filed in the case, and the Sheriff's Office had come to the home on several occasions because Albert was drunk and the family was fighting.  22 RR 50–51, 53.  On re-direct, Lepicier stated that on the night of the incident and even the next morning, Albert was not capable of signing a complaint affidavit.  22 RR 54.  Indeed, Albert was hospitalized for a considerable period of time and developed muscle control and speech problems.  22 RR 56–57.

Henry Bargas, a staff photographer for the Amarillo Globe News in 1990, testified that he took a photograph of Brewer while he was coming out of the court house and getting into a police vehicle.  22 RR 60–61.  The photograph showed Brewer gesturing and giving Bargas "the finger."  22 RR 63–64; SX 202.

Aimee Long testified that she dated Brewer when they were both living in Mississippi.  22 RR 76–77.  At one point, she decided to end the relationship.  22 RR 77.  Afterwards, Brewer threatened to kill Aimee on more than one occasion.  22 RR 80.  In May, toward the end of the school year, she got into an argument with Brewer about their former relationship, and Brewer picked her up and shoved her into some lockers.  She felt a stabbing sensation in between her shoulder blades and sought medical treatment.  22 RR 81.  Tests showed that she had three dislocated discs in her back, and she lost the use of her right arm for a while.  22 RR 82.  Brewer also threatened Aimee's new boyfriend, and her fears intensified after this assault.  22 RR 83–84, 86.  At one point, Aimee and her boyfriend went over to Brewer's house to

retrieve some of her possessions, but she was not successful. Brewer and his family were there, and it was a very unfriendly meeting. 22 RR 86–87.

Kevin Lewis testified that he met Brewer in April of 1990 while they were both in the Randall County Jail. 22 RR 92. He overheard a conversation between Brewer and two others. 22 RR 94. Brewer said he was there for murder and that the murder occurred during a robbery. Brewer stated that as he was stabbing the victim, Mr. Laminack said, "[P]lease don't kill me, boy. Please don't kill me." 22 RR 95. When Brewer made this statement, he showed no emotion. 22 RR 103.

The State next presented the testimony from Kathleen Bailey from Brewer's first trial. Bailey was the assistant principal at Brewer's middle school in Cedar Hill, Texas. 22 RR 137–38. She had problems with Brewer during his seventh-grade year because he threatened a student with a knife. 22 RR 138–39, 141. He also injured another child in a fight. 22 RR 139. As a result, Brewer was sent to an alternative school for a few days. 22 RR 140. She further said Brewer had a temper and displayed mood swings. 22 RR 142. Bailey described another incident where Brewer got angry, threatened a teacher, and was made to leave the class. 22 RR 142–43.

Ronald Mosher, a police officer in Naples, Florida, testified that on January 4, 1989, he encountered Brewer in a car owned by John and Ammy Greenman. 22 RR 232–36. The Greenmans were well known to the police and had threatened to harm officers. Brewer was driving the car because the Greenmans' licenses were suspended. 22 RR 233–35. When Mosher approached, he saw Brewer in the driver's seat, Ammy in the passenger seat, and a knife between the driver's seat and the

center console.  22 RR 235–37.  Brewer was arrested and pled guilty to possession of a concealed weapon.  22 RR 237–38.  Brewer, however, was cooperative.  22 RR 239.

Russell Pinckard, a correctional officer on the Polunsky Unit, testified that he approached Brewer one day and found that he had cut his wrists with a razor blade. 23 RR 73–74, 76–77, 79.  Brewer said he had "cut too deep," but Pinckard said that Brewer had just scratched his wrists.  23 RR 78.  As a result, they took Brewer to the infirmary.  23 RR 79.  On cross-examination, Pinckard testified that Brewer had never given him any problems, and he was not aware of Brewer causing any other guards problems.  23 RR 86.

Stephen Bryant, a captain on the Polunsky Unit, said that while on death row, Brewer had never taken the steps to be a work-capable offender.  22 RR 103; 23 RR 88–89.  Thus, Brewer had been in administrative segregation the whole time.  23 RR 104.  Brewer's medical records document the above suicide attempt but showed that he had no contact with the mental-health department apart from routine rounds. 23 RR 106.  Shortly after Brewer's suicide attempt, he was sent to the University of Texas Medical Branch, out-patient mental-health services.  23 RR 107–08.  The records indicated that Brewer tried to commit suicide because of frustration with his case and being sent back for re-sentencing.  23 RR 109–10.  However, Brewer presented as cheerful and denied any suicidal thoughts or hallucinations.  23 RR 110. Further, Brewer's classification folder showed that he had a few disciplinary violations, one for possession of marijuana, which is a major offense because it is a violation of state law, and Brewer had to breach numerous security measures to

obtain it. 23 RR 111–12. On cross-examination, Bryant testified that Brewer is classified as a level one offender, which means he is among the best-behaved offenders on death row. 23 RR 115. Brewer's disciplinary records showed one offense for possession of two extra state-issued towels, the marijuana possession charge, using vulgar language toward a guard, and refusing to have his hair cut. 23 RR 122–24. Those are the extent of Brewer's violations. 22 RR 125.

A. P. Merillat, investigator for the special prosecution unit out of Huntsville, testified generally about the differences in security measures between general population and death row, the differences in ability to interact with others between general population and death row, and classification procedures. 23 RR 140–63. He said that death row is the most secure area of the Texas prison system and that there are more opportunities to commit criminal acts of violence in general population. 23 RR 162–63. However, he conceded that inmates on death row do commit criminal acts of violence and that he never recalled investigating Brewer. 23 RR 164–66.

Dr. Richard Coons, a psychiatrist, testified about Brewer's risk for committing future acts of violence. The prosecution posed a hypothetical to Dr. Coons. He was asked to assume facts that mirrored those presented by the State against Brewer, and the State asked him if there is a probability that Brewer would commit criminal acts of violence in the future. 23 RR 212–18. Dr. Coons stated, "There is that probability, which I believe to be more likely than not." 23 RR 218. Dr. Coons based his prediction on several factors, specifically Brewer's history of violence; his attitude about violence; the crime itself; Brewer's personality; Brewer's conscience; and where

11

Brewer will be housed in prison.  23 RR 219–23.  On cross-examination, the defense elicited several concessions from Dr. Coons, including that he had no specific data to support his conclusion, that he rarely followed up on inmates to determine if his predictions were accurate, and that he testified in 1991 that Brewer was at risk to commit future acts of violence.  23 RR 224–33.

## II.   Defense's Evidence

The defense first presented John Edens, an associate professor of psychology at Texas A&M University and licensed clinical psychologist.  24 RR 11–13.  He conducted extensive research into the accuracy of predictions of future dangerousness.  24 RR 15–22.  A large study he conducted examining acts of violence by inmates sentenced to death showed that 8 of 155, or five percent, had committed the prison system's definition of a serious assault.  24 RR 28.  He stated that much of the research does not support the argument that inmates convicted of murder pose a future danger.  In fact, studies showed that the rates of subsequent murders by people in prison for murder are lower than others in the general population.  24 RR 32.  He further testified that the type of crime committed is not necessarily a good indicator of how people behave once they are in prison.  24 RR 34–35.

Dr. Edens then questioned Dr. Coons's methodology.  Specifically, Dr. Coons's methods are not "an accurate means of identifying individuals who are going to be violent in prison in the future . . . . Reliance on clinical intuition and subjective impressions about someone within the field of mental health are generally not very good ways of making predictions about people . . . ."  24 RR 36.  Although Dr. Edens

12

did not believe that risk assessment is nonsense, he believed Dr. Coons's statements lacked credibility and support.  24 RR 68–69.

Two Randall County officers, Scott Castleberry and Debbie Unruh, testified that Brewer had never given them any problems or committed any disciplinary violations.  24 RR 74–76, 105–07.  Two TDCJ death-row guards, Jared Wilson and Kyle Rains, testified that acts of violence do occur on death row.  25 RR 19–22, 29–32.  Wilson stated that he did not recall ever having to write Brewer up for any disciplinary infractions.  25 RR 22–23.

Brewer's mother Karen, testified that he was good at sports as a child.  24 RR 80.  But he developed scoliosis and had to have a back operation, which precluded him from engaging in any contact sports.  24 RR 83–84.  Brewer had an "extreme change" at that point; the physical ailment "just flipped his world over."  24 RR 84.  Karen and Albert got back together when Brewer was about fifteen years old, and Brewer started to have more interaction with Albert.  The family moved to Hamilton, Mississippi, which was a bad decision on Karen's part.  Brewer tried to develop a relationship with his father, but Albert "was mean to him, so abusive."  24 RR 85.

Regarding the incident where Brewer assaulted Albert, the issue started with a dispute about Albert not depositing checks into Karen's account.  Brewer went with Albert to the bank, and when they got home, Brewer still had envelopes for bills Karen intended to pay.  Brewer said, "Mom, I didn't put these in the mailbox because Dad stole your check and so the money didn't go into your account."  An argument ensued, and Albert said he had Karen's money and she would not see it again.  Karen

said she "couldn't do this anymore," and Albert grabbed her hair.  Brewer then picked up a broom and hit his father in the head.  Brewer had also witnessed physical violence between Karen and Albert on other occasions.  24 RR 86–90.

Billie Anne Young, the daughter of Karen and Don Bartlett, told the jury that when Karen was married to Don, she and Brewer had a good childhood, played all the time, went to the park, and "did family things."  24 RR 96–98.  When Albert and Karen got back together, she moved with the family to Mississippi.  24 RR 99.  But Billie Anne did not want to make the move and neither did Brewer.  While in Mississippi, she saw fights between Albert and Brewer.  She would try to avoid them by staying in her room, but when she came out, Albert and Brewer "would be fighting, in a headlock, hitting."  She recalled Albert "just beating up on [Brewer] one day."  Karen was also involved, but it was "more screaming and fighting."  24 RR 100.

Brewer was the last witness to testify.  He testified that Albert went to Vietnam, and when he came back, he was not the same person and abused his mom.  They divorced as a result.  Then Karen married Don Bartlett, and they had a daughter, Billie Anne.  25 RR 40.  Don was gone most of the time, but when he was home, he and Brewer did not get along.  25 RR 41.  Billie Anne got most of the attention from Don, whereas Brewer did not get much at all.  25 RR 41–42.  Don would often beat Brewer with a belt or extension cord.  After fourth grade, Brewer learned Don was not his real father.  25 RR 42.

Brewer said that his mother was there for him his entire life.  However, at one point his mother became physically abusive toward his sister and problems developed

14

between Brewer and his mother.  Karen would use Don as the disciplinarian.  25 RR 43.  As he got older, Brewer noticed that Don and his mother were not close, and they would often fight.  25 RR 43–44.

As a kid, Brewer enjoyed sports and art.  25 RR 44.  But he was diagnosed with scoliosis, and he spent several weeks in the hospital following surgery.  25 RR 45–46.  Before the surgery, his friends were his teammates.  25 RR 47.  After the surgery, he could not play sports, so he started hanging out with "stoner types" who smoked marijuana and drank alcohol.  25 RR 48.  This continued throughout his teenage years, and he experimented "with probably everything."  25 RR 49.  He stopped doing his school work and got in trouble at school, namely when he brought his step-father's buck knife to school.  25 RR 49–51, 54.  As a result, he was sent to an alternative program for a few days.  25 RR 50.  He would also frequently run away from home.  25 RR 54.

When Brewer was about fifteen, Albert came back into his life.  When they first met up, they went to a motel room and got drunk.  Brewer also brought some marijuana to smoke.  25 RR 51.  The more Brewer got to know Albert, the more he realized Albert was violent.  25 RR 52.  However, Karen and Don divorced, and she re-married Albert.  25 RR 53–54.  When Brewer was seventeen, they moved to Hamilton, Mississippi.  25 RR 54.  Karen and Albert were driving a truck for work at the time and were gone most days of the week.  In their absence, Brewer was responsible for his sister.  25 RR 55.

Brewer also testified about the incident occurring in Florida. He had run away from home and started spending time with the Greenmans. 25 RR 56–57. The Greenmans did not have a license to drive, so Brewer drove for them. On this occasion, they were at an apartment complex, and officers approached the car. Brewer rolled down the window, and the officer saw a knife between the seats. Brewer pled guilty to possession of the knife, and got approximately thirty days jail time. 25 RR 57. While in Florida, the Greenmans introduced Brewer to crack cocaine, and he started using the drug. 25 RR 58.

Regarding Albert, Brewer testified that he would get mad at his mother and they "would all pay for that." 25 RR 58. Albert would abuse Karen by grabbing her around the throat or grabbing her hair and swinging her around. Brewer also said that his mother's description of the "broom incident" was accurate. 25 RR 59. Karen and Albert were throwing things at each other. Brewer tried to place himself between them and, as an excuse, picked up a broom and started sweeping up the mess on the floor. But then Albert jumped up from the table to grab Karen, and Brewer swung the broom at him. He hit Albert several times, and then either he or his mother called an ambulance or the police. 25 RR 60. Lepicier, who had been to the house several times before, came in, and Brewer told him what happened. 25 RR 61–62. On another occasion, Albert nearly broke Brewer's nose with a piece of fire wood. Brewer went to the police, and Albert spent the weekend in jail. 25 RR 62.

After this incident, Brewer went to Abilene to live with his grandmother. 25 RR 62–63. He started doing drugs and drinking alcohol again, and he became re-

acquainted with friends who did the same.  Brewer stated that he chose to do this and that his daily routine was "staying high."  Brewer also said that he was upset that his mother did not come with him to Abilene.  25 RR 64.  He got "sick of it all" and told his grandmother in a note that he was leaving, i.e., going to commit suicide. 25 RR 64–65.  His grandmother called the authorities, and Brewer was committed to Big Spring State Hospital.  25 RR 65.  While there, he was put into drug treatment and met Nystrom, with whom he developed a relationship.  25 RR 65–67.  He left the hospital and came to Amarillo.  By then, his mother had also moved to Amarillo. 25 RR 68.  Brewer started using drugs again when he met up with a friend, Guy Blackwell.  And a few days after he arrived in Amarillo, he met up with Nystrom. 25 RR 68–69.  He and Nystrom stayed with Blackwell for a few weeks but left because he could not pay rent.  Then they moved to Christian's apartment.  25 RR 69–70.

   Brewer then testified about the events leading up to the crime, the crime itself, and the aftermath.  25 RR 70–81, 85–89, 151–69.  He admitted to murdering Mr. Laminack and stated that Mr. Laminack did nothing to provoke him.  25 RR 82–83.  Regarding Mr. Laminack's family, Brewer said that he did not know at the time how much he had hurt them.  25 RR 83.  "I just – I know there's no way I can fix this. I can't unhurt them.  That's really all I can think of when they testified was that I had no concept of who – that they were a big family and all, like I said.  And I took his life for no reason and there's no excuse."  25 RR 84.

   After Brewer was originally convicted and sentenced to death, he was sent to the Ellis Unit, which used to house death row and is more like general population

17

than Polunsky because multiple inmates could recreate at the same time.  25 RR 89–91.  He also said that he had witnessed violence on Ellis and Polunsky several times.  25 RR 94.  He stated that he had tried to stay out of trouble as much as possible, but the disciplinaries and his suicide attempt are true.  25 RR 95, 99–101.

## STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*, 562 U.S. 86, 97 (2011).  AEDPA "requires a state prisoner seeking federal habeas relief first to 'exhaus[t] the remedies available in the courts of the State.'"  *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016) (per curiam) (alteration in original).  State court adjudication, in turn, requires review under § 2254(d).  *Richter*, 562 U.S. at 98–99.  This section "imposes a highly deferential standard of review for evaluating state court rulings and demands that state court decisions be given the benefit of the doubt,"  *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam) (quotation omitted), and "is limited to the record that was before the state court."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Under § 2254(d), relief may not be granted unless the state court adjudication (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court, (2) "'involved an unreasonable application of' such law," or (3) "'was based on an unreasonable determination of the facts' in light of the record before the

state court." *Richter*, 562 U.S. at 100 (quoting § 2254(d)(1)–(2)) (citing *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A state court decision is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent yet reaches an opposite result. *(Terry) Williams*, 529 U.S. at 405–06. A state court unreasonably applies clearly established federal law if it correctly identifies the governing Supreme Court precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. To analyze unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported[] the state court's decision[] and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 102. Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree" on the correctness of the state court's decision. *Id.* at 101 (quotation omitted).

Further, it is the state court's "ultimate decision" that is to be tested for unreasonableness and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). Indeed, state courts are presumed to "know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). And, even if the state court's decision lacks reasoning, § 2254(d) applies and must be overcome by the inmate. *Richter*, 562 U.S. at 98.

19

AEDPA also provides that state court factual findings "shall be presumed to be correct" unless an inmate carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1). "The presumption of [factual] correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).[2]

## I. Evidence Barred by *Pinholster*

On state habeas review, Brewer included as exhibits the following affidavits, reports, and interviews[3]:

- Dr. John Edens's affidavit re: re-sentencing hearing (July 9, 2012): 3 SHCR 475–81
- Dr. John Edens's affidavit re: risk assessment (July 9, 2012): 3 SHCR 489–98
- Frank Aubuchon's affidavit (July 16, 2012): 4 SHCR 862–70

---

[2]     Brewer argues that "the state court's order denying [his habeas] claims was a verbatim adoption of a lengthy proposed order written by Respondent's attorneys" and, thus, should not be afforded AEDPA deference. DE 103 at 8. Although Brewer "acknowledges that the Fifth Circuit has declined to extend less AEDPA deference to state court factual findings where those findings are verbatim adoptions of proposed orders written by the State," he states that the Supreme Court has questioned this practice. *Id.* at 8–9 (citing *Jefferson v. Upton*, 560 U.S. 284, 293–94 (2010)). In *Jefferson*, the Court recognized that it had sanctioned a lower court's verbatim adoption of the findings submitted by a prevailing party but noted that it had since been critical of the practice. 560 U.S. at 293–94 (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 572 (1985) ("even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.")). Nevertheless, *Jefferson* is easily distinguishable. There, the Court was concerned because the judge had solicited the State's proposed findings ex parte and did not provide the opposing party an opportunity to criticize the findings or to submit their own. 560 U.S. at 294. Nothing similar transpired in Brewer's case. Further, at no point did the Court state that it was overturning *Anderson* or that verbatim adoption was per se unacceptable. And as Brewer recognizes, the Fifth Circuit has rejected his argument. *Hudson v. Quarterman*, 273 F. App'x 331, 335 (5th Cir. 2008) (rejecting assertion that deference was not required because state court adopted respondent's proposed findings and conclusions) (citing *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999)).

[3]     This does not include all exhibits Brewer submitted with his application.

- Pat Kelly's affidavit re: Dr. Erdmann (April 23, 1992): 4 SHCR 982–83
- Dr. Lloyd White's report (May 1, 1997): 4 SHCR 988–90
- Dr. Lloyd White's affidavit (July 17, 2012): 4 SHCR 992–97
- Dr. Erdmann's autopsy report (April 27, 1990): 4 SHCR 1000–07
- Kent Birdsong's affidavit (July 9, 2012): 4 SHCR 1040–41
- Kevin Rush's affidavit (April 3, 1992): 4 SHCR 1046–49
- Darrell Dewey's report to Tommy Turner (June 5, 1992): 4 SHCR 1066–101
- Tommy Turner's affidavit (July 17, 2012): 4 SHCR 1183–85
- Mike Roberts's affidavits (July 13, 2012 & Dec. 11, 1997): 4 SHCR 1187–89
- Donald Wayne Bartlett's affidavit (July 8, 2012): 5 SHCR 1441–45
- Jessie Ford's affidavit (July 9, 2012): 5 SHCR 1447–49
- Rob Cowie's interview with Karen Brewer (April 10, 2008): 5 SHCR 1451
- Billie Anne Young's affidavit (July 9, 2012): 5 SHCR 1453–64
- Brenda Brewer's affidavit (July 6, 2012): 5 SHCR 1466–69
- Karen Brewer's interview (Dec. 20, 1995): 5 SHCR 1471–73
- Susan Brewer's affidavit (July 9, 2012): 5 SHCR 1475–80
- Floyd Israel Brewer's affidavit (July 9, 2012): 5 SHCR 1482–86
- Dane Stovall's affidavit (July 8, 2012): 5 SHCR 1488–89
- Leona Gill's affidavit (July 6, 2012): 5 SHCR 1491–94
- John Rich's affidavit (July 8, 2012): 5 SHCR 1496–97
- Lawrence Renner's affidavit (July 6, 2012): 5 SHCR 1521–26
- Stephen Callen's affidavit (April 27, 1990): 5 SHCR 1528–29
- Stephen Callen's affidavit (May 1, 1990): 5 SHCR 1531–32
- Stephen Callen's affidavit (Aug. 13, 1997): 5 SHCR 1534–36
- Stephen Callen's affidavit (Feb. 25, 1991): 5 SHCR 1538–40
- Juror Michelle Elliot's affidavit (July 18, 2012): 5 SHCR 1544–45

Once in federal court, Brewer attached to his petition the following declarations and exhibits, all of which are new and were not considered by the state court:

- E-mail from investigator Rob Cowie to defense counsel (May 15, 2009): DE 19-4 at 158–59
- Anthony Odiorne's declaration (July 31, 2015): DE 19-4 at 160–65
- Rob Cowie's declaration (July 31, 2015): DE 19-5 at 166–68
- Billie Anne Young's declaration (July 28, 2015): DE 19-5 at 168–76
- Donald Wayne Bartlett's declaration (July 16, 2015): DE 19-5 at 177–80

- Linda Belz's declaration (July 13, 2015): DE 19-5 at 181–83
- Brenda Brewer's declaration (July 28, 2015): DE 19-5 at 184–85
- Corrie Brewer's declaration (July 30, 2015): DE 19-5 at 186–87
- Faye Brewer's declaration (July 28, 2015): DE 19-5 at 188–90
- Raymond Karl Ford's declaration (July 14, 2015): DE 19-5 at 191–93
- Leona Gill's declaration (July 28, 2015): DE 19-5 at 194–95
- Erik Gravely's declaration (July 16, 2015): DE 19-5 at 196–97
- Kevin Lewis's declaration (July 22, 2015): DE 19-5 at 198–99
- Aimee Long's handwritten statement (June 16, 2015): DE 19-5 at 200–02
- Shannon Minnick's declaration (July 9, 2015): DE 19-5 at 203–05
- Ronald Mosher's declaration (July 7, 2015): DE 19-5 at 206
- Kristie Nystrom's declaration (July 16, 2015): DE 19-5 at 207–08
- Ammy Valles's declaration (July 6, 2015): DE 19-5 at 209
- Shane Phelps's declaration (Nov. 30, 2015): DE 32-3 at 274–77
- Brent Brewer's declaration (Nov. 25, 2015): DE 32-3 at 278–81
- Anthony Odiorne's second declaration (Nov. 30, 2015): DE 32-3 at 282–83
- Dr. Mark Cunningham's declaration (Dec. 7, 2015): DE 32-3 at 284 to DE 32-7 at 470
- Tommy Turner's declaration (Dec. 2, 2015): DE 32-7 at 482–84
- Timothy Sullivan's declaration (July 13, 2016): DE 49-2 at 11–15
- Stanley Kemrer's declaration (April 20, 2016): DE 49-2 at 19–20[4]
- Albert Brewer's military records: DE 49-1 & 49-2

Where this new evidence is used to support any claim adjudicated on the merits by the state court, this Court is precluded from considering it. In *Pinholster*, the Supreme Court held that "review under § 2254(d)(1) is *limited to the record that was before the state court* that adjudicated the claim on the merits." 563 U.S. at 181 (emphasis added). Thus, "evidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a

---

[4]     The declarations from Kemrer and Sullivan are included in the appendices Brewer recently attempted to file with this Court. DE 106-3 at 544–51. But this Court denied Brewer leave to file these appendices. DE 107. However, Brewer also submitted these declarations in 2016 when he attached them as exhibits to his motion to supplement the record, which this Court granted. DE 49-2 at 11–20; DE 51.

federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 185. The Fifth Circuit has adhered to this decision and will not review new evidence submitted to the federal court pertaining to claims the state court adjudicated on the merits. *Nelson v. Davis*, 952 F.3d 651, 660–61 (5th Cir. 2020); *Trottie v. Stephens*, 720 F.3d 231, 247 (5th Cir. 2013).

Moreover, consideration of new evidence is cabined by § 2254(e) even where the claim was not adjudicated on the merits. *Pinholster*, 563 U.S. at 186. Section 2254(e)(2)'s bar on new evidence is triggered if the habeas petitioner "has failed to develop the factual basis of a claim in State court proceedings." That opening clause is met if the petitioner "was at fault for failing to develop the factual bases for his claims in state court." *Bradshaw v. Richey*, 546 U.S. 74, 79 (2005) (per curiam). The term "at fault" means a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 432 (2000); *accord Holland v. Jackson*, 542 U.S. 649, 652–53 (2004) (per curiam) (applying § 2254(e)(2) to an ineffective-assistance-of-trial-counsel (IATC) claim). Thus, where Brewer claims that ineffective assistance of habeas counsel can overcome any procedural default, that position, if accepted, necessarily means that state habeas counsel was not diligent in developing the factual basis for his IATC claim(s). And under (*Michael*) *Williams* and *Holland*, counsel's lack of diligence means that Brewer "failed to develop" the claim for purposes of § 2254(e)(2). Thus, if Brewer succeeds in overcoming a procedural default, he will be barred from relying on new evidence, unless he can demonstrate the exception under § 2254(e)(2) applies, which includes a

showing of actual innocence.  *Id.*  Because Brewer was re-tried on punishment and conceded his guilt at trial, this he cannot do.  Consequently, this Court is foreclosed from considering any new evidence.

## II.   Counsel Effectively Challenged Dr. Coons.

Brewer alleges that trial counsel were ineffective for failing to challenge Dr. Coons's testimony.   Brewer claims that counsel failed to adequately rebut Dr. Coons during the voir dire hearing, failed to properly object to Dr. Coons's proposed testimony and preserve error for appeal, and failed to challenge Dr. Coons's testimony when he testified before the jury and rebut his testimony with that from another expert.   Brewer also claims that the trial court's admission of Dr. Coons's testimony was erroneous.   DE 103 at 11–36.   For the reasons addressed below, his claims must be denied.

### A.   State court findings

The State court issued the following findings pertaining to Brewer's claims:

1.    In Claim One (A), [Brewer] contends that trial counsel was ineffective for failing to effectively challenge Dr. Richard Coons. []

2.    The Court finds that the opinion in *Coble v. State,* 330 S.W.3d 253, 270–87 (Tex. Crim. App. 2010), [finding Dr. Coons's testimony erroneous] had not even been issued when this case was re-tried in 2009.

3.    The Court finds pursuant to the November 23, 2011 unpublished opinion of the [CCA], trial counsel Odiorne failed to lodge a timely and specific objection regarding the admission of Dr. Coons'[s] testimony about future dangerousness at the re-sentencing trial.  Thus this issue was not preserved for appellate review.

4.    The Court finds, as a matter of trial strategy, trial counsel Odiorne and Keith reasonably concluded that it was unnecessary to have Dr. Edens or any other expert witness evaluate [Brewer] in order

to make a prediction regarding [Brewer's] future dangerousness for the following reasons: 1) the possibility that the defense might open the door for the State to conduct an independent evaluation [2 SHH 98; 3 SHH 164]; 2) the possibility that the defense would not have an expert witness to testify at the re-sentencing trial about future dangerousness if the evaluation resulted in a negative prediction [3 SHH 134–35]; 3) the possibility that the State would attack the defense expert about his/her future[-]dangerousness evaluation which would reflect poorly on [Brewer] and distract from the defense's attack on Dr. Coons [3 SHH 30–31]; 4) the possibility that the jury would view the defense expert in the same light as Dr. Coons [3 SHH 99–100]; and 5) the possibility that the jury would become "lost in the science" [3 SHH 26]. According to trial counsel Keith, the best evidence to establish that [Brewer] was not a future danger was the fact that [Brewer] had not engaged in any violent criminal activity while incarcerated in prison for approximately eighteen years. [3 SHH 30–31]. Accordingly the Court finds that trial counsel's decision not to have [Brewer] evaluated for future dangerousness was reasonable and plausible in light of all the circumstances.

5.      The Court finds, as a matter of trial strategy, trial counsel Keith's decision to hire a psychologist (i.e. Dr. Edens) and not a psychiatrist to rebut Dr. Coons'[s] testimony regarding future dangerousness at the re-sentencing trial was reasonable and plausible in light of all the circumstances. According to trial counsel Keith, he chose an expert who would attack Dr. Coons'[s] methodology underlying his prediction that [Brewer] would commit criminal acts of violence in the future. [3 SHH 30–31]. Trial counsel Keith did not want an expert who would discuss risk factors of future dangerousness or who would try to evaluate [Brewer] for future dangerousness because he believed the best evidence to establish that [Brewer] was not a future danger was the fact that [Brewer] had not engaged in any violent criminal activity while incarcerated in prison for approximately eighteen years. [3 SHH 26–29, 30–32, 49–50]. In this regard, the following excerpt from Dr. Edens'[s] affidavit clearly shows the trial strategy behind trial counsel Keith hiring him as an expert in this case: "However, my recollection of the events surrounding the 2009 re-sentencing hearing, as well as Mr. Keith's own testimony during the August 2013 evidentiary hearing indicate that he had limited interest in pursuing any of the lines of inquiry I have summarized in this affidavit, having decided that Mr. Brewer's low risk for future violence would be self-evident to jurors based on his lack of institutional aggression during his years on death row. As such, it was clear to me that trial counsel's primary view of my role in the case was simply for me to summarize research findings on

25

the poor predictive validity of prosecution expert witnesses such as Dr. Coons and *not* to address in any depth other issues, such as a general overview of how to conduct a scientifically informed risk assessment, a specific analysis of Mr. Brewer's level of violence risk, or an extensive review of the specific flaws in Dr. Coons'[s] methodology." [9 SHCR 2758]. Based on the above evidence, the Court finds trial counsel Keith was not ineffective for hiring Dr. Edens, and not a psychiatrist, as an expert in this case.

6.     The Court finds from the record that trial counsel Odiorne's trial strategy in regards to the [Rule] 702 hearing was to prevent Dr. Coons from testifying at the re-sentencing trial by attacking his methodology. [2 SHH 64, 69, 255, 277]. If Dr. Coons was allowed to testify at the re-sentencing trial, then the trial strategy was for trial counsel Odiorne to attack Dr. Coons'[s] testimony and methodology on cross-examination and for Dr. Edens to rebut Dr. Coons'[s] testimony on direct examination. [2 SHH 176]; [3 SHH 17]; [7 SHCR 2012–13]. This strategy was reasonable and plausible in light of all the circumstances.

7.     The Court finds, as a matter of trial strategy, trial counsel's decision not to have Dr. Edens testify at Dr. Coons'[s] 702 hearing was reasonable for the following reasons: 1) Dr. Coons would have a preview of Dr. Edens'[s] testimony [3 SHH 13] and 2) Dr. Coons would be able to refine his testimony to minimize Dr. Edens'[s] criticism of his testimony [2 SHH 227]; [3 SHH 147]. Moreover, trial counsel Keith believed it was unnecessary for Dr. Edens to testify at the 702 hearing because the defense had already exposed Dr. Coons'[s] lack of methodology at such hearing. [3 SHH 121, 149]. This trial strategy was reasonable and plausible in light of all the circumstances.

8.     The Court finds from the record that trial counsel Keith adequately prepared for the direct examination of Dr. Edens prior to and during the re-sentencing trial. [3 SHH 70, 72].

9.     The Court finds, as a matter of trial strategy, trial counsel Keith's decision not to have Dr. Edens or any other expert witness specifically discuss [Brewer's] future dangerousness or all the risk factors indicating a likelihood for future dangerousness in front of the jury at the re-sentencing trial was reasonable and plausible in light of all the circumstances. [3 SHH 26–29, 30–32, 49–50; 100]; [9 SHCR 2758]. As trial counsel Keith explained at the evidentiary hearing, "...I did not want attacks on my own expert who might be doing a future dangerousness assessment, after taking on Dr. Coons and attempting to discredit him and then have that reflect negatively on my own client

26

who, in the end, I think was—his record is the best evidence of his lack of future dangerousness, and I did not want a firestorm over my own expert to not only blunt my attack on Dr. Coons but then to reflect poorly on my client." [3 SHH 30–31]. Accordingly, the Court finds trial counsel Keith was not ineffective for failing to have an expert specifically discuss [Brewer's] future dangerousness or all the risk factors for future dangerousness at the re-sentencing trial.

10.    The Court finds, as a matter of trial strategy, trial counsel Keith's failure to have Dr. Edens or any other expert witness testify about actuarial methods for risk assessment was reasonable and plausible in light of all the circumstances. Instead of focusing on different methods for determining future dangerousness, trial counsel Keith wanted the jury to focus on the fact that [Brewer] was a low risk for future violence because he had not committed any criminal acts of violence while incarcerated in prison for approximately eighteen years. Accordingly, the Court finds trial counsel Keith was not ineffective for failing to raise actuarial methods for risk assessment at the re-sentencing trial.

11.    The Court finds from the record that trial counsel adequately investigated and researched Dr. Coons'[s] methodology and CV prior to the re-sentencing hearing. [2 SHH 53, 58–59, 62, 67, 254, 258, 260, 263, 266].

10 SHCR 3074–80 (emphasis in original).

Next, the state court found that counsel effectively challenged Dr. Coons on cross-examination. Specifically: (1) Dr. Coons stated that he had only followed up on "two or three" of the fifty defendants he predicted would be a future danger; (2) Dr. Coons admitted to having no data to support the accuracy of his predictions; (3) Dr. Coons predicted at Brewer's first trial that he would be a future danger; (4) during closing argument, trial counsel argued that Dr. Coons did not care about whether his predictions were accurate: "If you're coming into court 50 times or however many it is he claims to have testified where people's lives are on the line and he doesn't even care to know if his supposed method is correct, that's beyond the

27

pale."; (5) during closing argument, trial counsel argued that Dr. Coons had been wrong about Brewer for the last eighteen years; and (6) trial counsel utilized Dr. Edens to challenge and refute Dr. Coons's testimony regarding predictions of future dangerousness. 10 SHCR 3080–82. Thus, "[i]n light of trial counsel Odiorne's cross-examination of Dr. Coons and closing argument, the Court finds that trial counsel Odiorne effectively challenged Dr. Coons's]s] predictions of future dangerousness at the re-sentencing trial." 10 SHCR 3082. The state court also found that trial counsel effectively challenged Dr. Coons's experience and credentials, "sufficiently established that [Brewer] did not have a record for being criminally violent while in prison," and via Dr. Edens, refuted Dr. Coons's suggestion that unreported prison violence is rife. 10 RR 3082–85.

The state court then found that Brewer could not establish prejudice by examining the five factors addressed in *Coble.* 10 SHCR 3086–87; *see Coble*, 330 S.W.3d at 286–87. First, the court determined that "there was ample other evidence (aside from Dr. Coons's testimony) supporting a finding that there was a probability that [Brewer] would commit future acts of violence." 10 SHCR 3087. The court pointed to the following: (1) the brutal facts of the murder and Brewer's comments afterward; (2) Brewer assaulted his father; (3) Brewer assaulted and threatened his ex-girlfriend; (4) Brewer threatened a student with a knife in the seventh grade; (5) Brewer threatened a teacher in the ninth grade; (6) Brewer pled guilty to possessing a knife; (7) Brewer hung out with known drug users who threatened police

officers; and (8) Brewer was found in possession of marijuana while on death row. 10 SHCR 3087–89.

Second, the court found that no other psychiatric testimony was presented, but that this one issue was not determinative of prejudice.  10 SHCR 3089.

Third, the state court found that Dr. Coons's opinion was not particularly powerful or strong because Dr. Coons had no data regarding the accuracy of his predictions; out of the fifty capital offenders Dr. Coons predicted would be a future danger, he had followed up on only two or three to determine if his prediction was accurate; and Dr. Coons stated that he had no research to support his opinion that inmates in general population have more opportunities to commit violence than those on death row.  10 SHCR 3089–90.

Fourth, the state court found that Dr. Coons's testimony was effectively rebutted by Dr. Edens.   Specifically, Dr. Edens testified that (1) Dr. Coons's methodology is not supported by the science and his methodology is not an accurate means of identifying people who will be violent; (2) rates of violence and disciplinaries by inmates convicted of murder are actually lower than those of inmates convicted of other offenses; (3) only five percent of 155 capital murderers studied committed a serious assault while on death row; (4) there is not a big difference between rates of unreported violence in prison versus reported violence; (5) his findings were supported by scientific articles and data; and (6) he was very familiar with the research in his field and used that research, including his own, to support his findings.  10 SHCR 3090–92.

Fifth, the court found that both the State and defense mentioned Dr. Coons's testimony during final argument. However, "trial counsel did an effective job of rebutting the State's closing argument concerning Dr. Coons and future dangerousness." 10 SHCR 3092–93. Considering all these factors, the court found that any error in the admission of Dr. Coons's testimony or trial counsel's alleged failures in effectively challenging Dr. Coons's qualifications and testimony did not deprive Brewer of a fair trial. 10 SHCR 3093.

Finally, the state court found that Brewer's challenge to the admissibility of Dr. Coons's testimony was not cognizable on habeas review and "that the admission of Dr. Coons'[s] testimony did not violate the heightened reliability requirement of the Eighth Amendment." 10 SHCR 3094, 3143–44. For the reasons addressed below, this decision is not objectively unreasonable.

## B.    The standard

Claims of ineffective assistance of counsel are governed under the familiar standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). A defendant's claim that he was denied constitutionally effective assistance requires him to affirmatively prove both that (1) counsel rendered deficient performance, and (2) his actions resulted in actual prejudice. 466 U.S. at 687–88, 690. Importantly, failure to prove either deficient performance or resultant prejudice will defeat an ineffectiveness claim, making it unnecessary to examine the other prong. *Id.* at 687.

To demonstrate deficient performance, Brewer must show that in light of the circumstances as they appeared at the time of the conduct, "counsel's representation

fell below an objective standard of reasonableness," i.e., "prevailing professional norms." *Id*. at 689–90; *see also Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (per curiam) (emphasizing that the "performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances") (citation omitted). The Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight." *Strickland*, 466 U.S. 689–90; *Richter*, 562 U.S. at 105 ("It is 'all too tempting' to 'second-guess' counsel's assistance after conviction or adverse sentence.'"). Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even if deficient performance can be established, Brewer must still affirmatively prove prejudice that is "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id*. at 687. This requires him to show a reasonable probability that but for counsel's deficiencies, "the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id*. Moreover, the question in conducting *Strickland*'s prejudice analysis "is *not* whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently." *Richter*, 562 U.S. at 111 (emphasis added and citations omitted). Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id*. at 112 (citation omitted).

Regarding errors at the sentencing phase of a death-penalty trial, the relevant prejudice inquiry is "whether there is a reasonable probability, that absent the errors, the sentencer [ ] would have concluded the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *see also Neal*, 286 F.3d at 241 ("Stated to the point: Is this additional mitigating evidence so compelling that there is a reasonable probability at least one juror could reasonably have determined that, because of Neal's reduced moral culpability, death was not an appropriate sentence?") (footnote omitted).

Finally, relief is not warranted even if this Court believes Brewer has satisfied *Strickland*.  Instead, Brewer is entitled to relief only if this Court concludes that the state court's determination that Brewer did not satisfy *Strickland* is objectively unreasonable under § 2254(d).  *Richter*, 562 U.S. at 101.  Thus, under the AEDPA, a federal court's review of a state court's resolution of an IATC claim is "doubly deferential."  *Pinholster*, 563 U.S. at 190.

### C.   Brewer's allegation that the trial court erred in admitting Dr. Coons's testimony is procedurally defaulted.

Precedent dictates that procedural default of a petitioner's federal habeas claim occurs where the last state court to consider a claim "clearly and expressly" dismisses it based upon a state procedural rule that provides an adequate basis for denial of relief, independent of the merits.  *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991).  The requirements are satisfied where the court clearly indicates that its dismissal of a particular claim rests upon a state ground that bars relief, and that bar is strictly and regularly followed by the state courts.  *Finley v. Johnson*, 243 F.3d

215, 218 (5th Cir. 2001). The application of an adequate and independent state procedural bar must be honored even if the state court has, in the alternative, reached the merits of the claim. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

Here, the state habeas court applied two procedural defaults. 10 SHCR 3094, 3142–43. The court found that to the extent Brewer was raising a constitutional claim regarding the admissibility of Dr. Coons's testimony, the claim should have been raised on direct appeal.[5] Texas law precludes habeas relief for all record-based claims that are not raised on direct appeal. *See, e.g., Rojas v. State,* 981 S.W.2d 690, 691 (Tex. Crim. App. 1998) (Baird, J., concurring). This bar is recognized as an independent and adequate procedural default. *Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007); *Busby v. Dretke,* 359 F.3d 708, 719 (5th Cir. 2004). The state court also determined that the claim pertained to the admissibility of evidence and, as such, is not cognizable on state habeas review. *Ex parte Ramey*, 382 S.W.3d 396, 397 (Tex. Crim. App. 2012). Indeed, it is not cognizable on federal habeas review. *McGuire*, 502 U.S. at 67; *Cupit v. Whitley*, 28 F.3d 532, 536 (5th Cir. 1994).

In his prior reply, Brewer stated: "Here, the [state] court also adjudicated the claim on the merits—a fact the State fails to mention. It is unclear on which grounds the court relied." DE 48 at 18. To the contrary, as stated, a procedural bar applies

---

[5]     On direct appeal, Brewer did challenge the admissibility of Dr. Coons's testimony. However, his challenge was premised only on state law grounds. *See* Appellant's Brief on Appeal at 81–90. The CCA determined the claim was waived because defense counsel failed to properly object. *Brewer v. State*, 2011 WL 5881612 at *6–*8. In the instant petition, Brewer challenges the admission of Dr. Coons's testimony on both state law and constitutional grounds. DE 103 at 18–20, 29–32. His constitutional challenge is defaulted, and any state law claim is not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

even where a state court alternatively reaches the merits.  *Harris*, 489 U.S. at 264 n.10; *Busby*, 359 F.3d at 718; *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999).

Therefore, Brewer's claim is precluded from federal habeas review unless he can show cause for the default and resulting prejudice, or demonstrate that the court's failure to consider his claim will result in a "fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750; *Busby,* 359 F.3d at 718.  Brewer cannot satisfy his burden because he does not address his default in the instant petition.[6]  Thus, his allegation about the admissibility of Dr. Coons's testimony is procedurally barred.

## D.   Trial counsel challenged Dr. Coons during voir dire. Nonetheless, the trial court was going to admit his testimony.

The first portion of Brewer's claim concerns the defense's supposed failures in not preventing Dr. Coons from testifying.  Brewer contends that counsel failed to properly object, effectively challenge Dr. Coons's voir dire, and counter Dr. Coons's testimony with Dr. Edens or another expert.  Brewer also complains about the

---

[6]      In his prior reply, Brewer stated: "The State's Answer was its first opportunity to raise a procedural bar as an affirmative defense.  The State is therefore wrong to say that Petitioner 'cannot satisfy his burden because he does not address the default.'  This Reply is Petitioner's first opportunity to address the purported bar."  DE 48 at 18 n.10.  However, (1) the state court applied the procedural bar, not the Director, who merely pointed out its application, and (2) because demonstrating "cause and prejudice" is the standard for overcoming a default, the Director cannot respond to that argument unless the petitioner addresses the matter in the first place.  Brewer seeks to have it both ways—by claiming he can only address his default in a reply, he is asserting that he is entitled to make an argument without the Director having an opportunity to answer.  But the true error in Brewer's argument now is that the instant petition is Brewer's *second* amended petition after the Director previously answered the first, and Brewer again does not address his default.  In other words, his "first opportunity" excuse no longer applies.

reliability of Dr. Coons's testimony under *Barefoot v. Estelle*,[7] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[8] and *Coble v. State*.   DE 103 at 11–23.

First, Dr. Coons's testimony was going to be admitted, regardless of counsel's actions or lack thereof.  Texas law at the time of trial was "settled . . . that psychiatric expert opinion testimony of a defendant's future dangerousness may be based solely upon hypothetical questions, without the benefit of an examination of the defendant." *Ward v. State*, AP-74,695, 2007 WL 1492080, at *8 (Tex. Crim. App. May 23, 2007) (not designated for publication) (citing *Cook v. State*, 858 S.W.2d 467, 475 (Tex. Crim. App. 1993), and *Pyles v. State*, 755 S.W.2d 98, 118 (Tex. Crim. App. 1988)).  And in many cases prior to *Coble*, including some shortly before Brewer's re-trial, the CCA had not found error when the trial court overruled various objections to Dr. Coons's testimony.  *Ramey v. State*, No. AP-75,678, 2009 WL 335276, at *14 (Tex. Crim. App. Feb. 11, 2009) (not designated for publication); *Espada v. State*, No. AP-75,219, 2008 WL 4809235, at *8–*9 (Tex. Crim. App. Nov. 5, 2008) (not designated for publication); *Lagrone v. State*, 942 S.W.2d 602, 616 (Tex. Crim. App. 1998).

In his prior reply, Brewer argued that this argument "misses the mark" because the CCA "draws no distinction between pre- and post-*Coble* cases" and the defendants in some of these cases did not raise an objection to the reliability of Dr. Coons's testimony.  DE 48 at 9–10.  He also pointed to a concession by the State on direct appeal that "'under the *Coble* decision (if appropriate objections had been

---

[7]      463 U.S. 880 (1983).

[8]      509 U.S. 579 (1993).

made at trial) the trial judge would have abused his discretion in the instant case by admitting Dr. Coons' testimony at the new sentencing trial.'" *Id.* at 9 (quoting State's Brief on Appeal at 62–63).  But it is Brewer's argument that misses the mark because it is premised on future events, as the State also pointed out on direct appeal: "However, it is important to note that the *Coble* case had not even been decided when this case was tried.  At the time of the instant trial, Dr. Coons'[s] testimony regarding future dangerousness had been successfully relied upon in other Texas capital murder cases."  State's Brief on Appeal at 63.

In his prior reply, Brewer also stated: "Since it would have been error for a court to admit Dr. Coons's testimony over objection, this Court must presume that the trial court would have followed the law and excluded Coons."  DE 48 at 10.  Based on the precedent *following* Brewer's trial, it is likely that a proper objection regarding "reliability" would have led to a finding of error—harmless error, for the reasons discussed herein—by the CCA on direct appeal.  However, the trial court cannot adhere to precedent that does not yet exist.[9]  Given the law at the time of Brewer's trial and the prior CCA opinions pertaining to Dr. Coons, neither the trial court nor

---

[9]    In his reply, Brewer asserted: "*Coble* did not state a new rule; it applied established state evidence law."  DE 48 at 9.  To the contrary, even if the CCA relied on established law, it absolutely set new precedent regarding Dr. Coons.  For instance, on direct appeal in the instant case, the CCA stated:

> Although we have held Dr. Coons's methodology to be unreliable under Rule 702, we did so solely on the basis of . . . whether Dr. Coons's testimony properly applied the principles in his field.  *There are other psychiatrists and psychologists that use methodologies for assessing future dangerousness that differ radically from the methodology employed by Dr. Coons.*

*Brewer v. State*, 2011 WL 5881612, at *6 (emphasis added).  Thus, *Coble* is an opinion specific to Dr. Coons, which was indeed new.

defense counsel could have known *beforehand* that the CCA would subsequently issue its decision in *Coble*.   "'Clairvoyance is not a required attribute of effective representation.'" *Garland v. Maggio*, 717 F.2d 199, 207 (5th Cir. 1983) (quoting *Cooks v. United States*, 461 F.2d 530 (5th Cir. 1972)); *see also United States v. Fields*, 565 F.3d 290, 294 (5th Cir. 2009) ("we have repeatedly held that there is no general duty on the part of defense counsel to anticipate changes in the law") (internal quotations and citations omitted).   Thus, the trial court would not have sustained any objections, even objections regarding "reliability," and counsel would not have prevented Dr. Coons from testifying.   Trial counsel even conceded on habeas review that the defense was not going to change the judge's mind regarding the admissibility of Dr. Coons's testimony because the judge considered him to be a qualified expert. 2 SHH 58–59; 231–32.   Indeed, defense counsel acknowledged that the judge suddenly and unpredictably made his ruling while the defense was still making its case and then immediately let the jury back in.   *See* 2 SHH 210–11; 23 RR 195–96.

Second, during the voir dire, counsel forced Dr. Coons to concede the following: (1) he cannot predict whether a person will be a risk decades down the road; (2) he defines "criminal acts of violence" differently than others in his field in that he believes the phrase incorporates "threats" as well; (3) he has done few "follow-ups" on defendants to determine if his predictions have been accurate; (4) he does not trust the data concerning the accuracy of predictions; (5) his opinions are based on anecdotal evidence of conversations with prison inmates; (6) the American Psychiatric Association does not agree that psychiatrists should provide testimony

regarding future dangerousness; (7) he did not interview Brewer personally; and (8) he did not know if his method had been generally accepted by the scientific community. 23 RR 179–95.

Brewer nonetheless contends that counsel failed to effectively challenge Dr. Coons's underlying methodology during voir dire. DE 103 at 14–18. But he undermines his claim by pointing out what he believes are faulty statements from Dr. Coons on cross-examination. *Id.* at 16 ("Dr. Coons also asserted—in seemingly contradictory statements—both that the literature in question does not follow up on predictions, and that those who do such research have 'bum data.'") (quoting 23 RR 186); *id.* at 17 ("When pressed further about the accuracy of his predictions, Dr. Coons readily admitted: 'Can't be certain. I have an opinion that's quite strong, but there is way more violence than any of the literature that I've seen demonstrates.'") (quoting 23 RR 187); *id.* ("Quizzed by the defense as to whether there are 'specific standards that govern how to make these predictions of future dangerousness,' Dr. Coons was equivocal, stating that it is done in a variety of ways, with some people using 'instruments . . . to determine the personality of the individual and so forth.' . . . . [He] could not say whether his method has been generally accepted by the scientific community.") (quoting 23 RR 195). Thus, Brewer is arguing that counsel's voir dire performance was deficient and, simultaneously, that Dr. Coons's testimony was flawed. Brewer would not be able to provide these examples if counsel did a poor job. His argument "is a quintessential example of attempting to have his cake and eat it

too." *Green v. Johnson*, 46 F.Supp.2d 614, 622–23 (N. D. Tex. 1999) (rejecting habeas claim "[b]ecause of the 'heads I win, tails you lose' quality" of the claim").

Third, Brewer contends that trial counsel were ineffective for failing to rebut Dr. Coons's voir dire testimony with that from Dr. Edens.  Assuming the trial court would have permitted Dr. Edens to testify during voir dire, counsel provided sound reasons for not calling Dr. Edens: counsel did not want to give Dr. Coons a preview of Dr. Edens's testimony or a chance to refine his testimony to minimize Dr. Edens's criticisms.  "Given the almost infinite variety of trial techniques and tactics available to counsel, this Circuit is careful not to second guess legitimate strategic choices." *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993).  Moreover, counsel acknowledged that calling Dr. Edens to the stand would not have made a difference with respect to the trial court's decision to allow Dr. Coons to testify.  2 SHH 92.

Fourth, as stated, Brewer complains about counsel's failure to properly object and preserve error, repeatedly referring to *Coble*. DE 103 at 12, 20.  Although counsel did not preserve error in this case regarding the reliability of Dr. Coons's opinion, that in no way means that Brewer suffered prejudice as a result.  Ultimately, the *Coble* court affirmed the trial court's judgment and sentence because Coble could not show harm based on five other factors.  330 S.W.3d at 286–87.  As shown above, the state court addressed each of these factors in Brewer's case and determined that there was other evidence of future dangerousness; Dr. Coons's testimony was effectively rebutted on cross-examination and by Dr. Edens; his testimony was not particularly powerful or strong; and his testimony was rebutted by the defense during closing

arguments. Because the CCA adopted the trial court's findings on habeas review, there is not a reasonable probability that a proper challenge to Dr. Coons's testimony on appeal would have resulted in reversal.

In his prior reply brief, Brewer argued that the state court findings should not be afforded deference because, rather than assessing prejudice under *Strickland*, the state court focused on *Coble's* "five-factor test" and employed a sufficiency-of-the-evidence standard. DE 48 at 11–12; *see also* DE 103 at 23. This argument is meritless. In *Coble*, the CCA applied a harmless-error analysis to the admission of Dr. Coons's testimony, not a "sufficiency of the evidence" test. 330 S.W.3d at 280–87. A harmless-error test and prejudice assessment are basically no different. *See Byrd v. Workman*, 645 F.3d 1159, 1167 n.9 (10th Cir. 2011) (agreeing with its sister circuits that "*Strickland* prejudice and *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)] harmless error are essentially the same standard"). Indeed, the Fifth Circuit has indicated that the *Strickland* "reasonable probability" prejudice standard is actually more demanding than a harmless-error analysis. *Barrientes v. Johnson,* 221 F.3d 741, 756 (5th Cir. 2000). Consequently, because Brewer cannot meet the *Coble* standard, he certainly cannot satisfy *Strickland*. Moreover, it is the state court's ultimate decision that is tested for reasonableness and not every jot of its reasoning. *Neal*, 286 F.3d at 246. And under § 2254(e), a state court's findings of fact are presumed to be correct, and Brewer has failed to rebut those findings with clear and convincing evidence.

Finally, regarding Brewer's claim that the admission of Dr. Coons's testimony violated the Eighth Amendment, the state court reasonably rejected this claim. The

Fifth Circuit has held that expert testimony regarding predictions of future dangerousness is admissible under *Barefoot* and does not violate due process and that the *Daubert* test does not apply to sentencing proceedings. *Williams v. Stephens*, 761 F.3d 561, 571 (5th Cir. 2014); *Roberts v. Thaler*, 681 F.3d 597, 608–09 (5th Cir. 2012). In his reply, Brewer stated: "Petitioner has taken the narrower stance that [Dr.] Coons's expert opinion in this case violated the Eighth Amendment." DE 48 at 10. The problem for Brewer is that the Fifth Circuit recently rejected this argument regarding Dr. Coons in the *Coble* case, stating that Coble "does not point to a single case in which a court found the admission of unreliable evidence to violate the Eighth Amendment." *Coble v. Davis*, 728 F. App'x 297, 301 (5th Cir.), *cert. denied*, 139 S. Ct. 338 (2018). Thus, Brewer's complaint is meritless.[10]

---

[10]    In his petition, Brewer also refers to a 2016 article from *The Atlantic* addressing the supposed unreliability in predicting future dangerousness. DE 103 at 32–33; DE 106-3 at 556–64. In a portion of this article, Dr. Coons is allegedly quoted as saying that "there is no credible way of evaluating [future dangerousness] to a high degree of likelihood." DE 103 at 33. Brewer argues: "Dr. Coons thereby conceded that at Mr. Brewer's sentencing trial, he had 'no credible way of evaluating [Mr. Brewer's] situation to a high degree of likelihood.' Yet Dr. Coons defended his ability during the state habeas hearing to offer an opinion that Mr. Brewer was 'more likely than not' a future danger." DE 103 at 33. Because this article is new, it is barred under *Pinholster*. Moreover, this article is an exhibit Brewer did not include with his first amended petition, and this Court recently denied Brewer's motion for leave to file his new appendix, which includes this article. DE 106 & 107. At any rate, Brewer's claim that Dr. Coons's opinion has changed and warrants further review is meritless because: (1) brief comments taken from an article arguably designed to provide a point of view are devoid of context and have no value to court proceedings; (2) the article does not state Dr. Coons was speaking directly about any opinion he provided in *this* case; (3) there is a substantial difference between "more likely than not" and "high degree of likelihood," and the article does not assert Dr. Coons now believes the testimony he has provided in all cases was erroneous; and (4) even if Dr. Coons's opinion about predictions of future dangerousness has changed, that has no bearing on whether Brewer was deprived of a fair trial in 2009. Moreover, as shown, the defense forced Dr. Coons to concede on voir dire and cross-examination that his ability to accurately predict future dangerousness years later was limited and that he had predicted at Brewer's first trial that Brewer would be a future danger. Therefore, at best, any revelation from this article is duplicative. Moreover, Brewer

### E.   Trial counsel effectively challenged Dr. Coons during trial.

#### 1.   Counsel thoroughly cross-examined Dr. Coons.

Brewer claims that counsel failed to rebut Dr. Coons's trial testimony by not offering the testimony of an expert, like Dr. Edens, to testify that Brewer presented a low risk for future dangerousness.  DE 103 at 26–29.  Brewer's overall premise is that trial counsel failed to effectively challenge Dr. Coons's testimony at any point. *Id.* at 11, 14.  He has also argued Dr. Coon's testimony was damaging because it was "the linchpin of the prosecution's future[-]dangerousness presentation."  DE 48 at 13–14.  This claim is lacking in merit.

As shown, counsel were well aware of Dr. Coons and the type of testimony he routinely provided.  They obtained his curriculum vitae, reviewed transcripts of his testimony in other cases, received documents from Texas Defender Services (TDS) pertaining to Dr. Coons, and spoke to attorneys at TDS about what Dr. Coons would say.  Counsel also considered Dr. Coons to be a "charlatan."  2 SHH 51–54, 59, 67, 254–59, 266–67, 270, 273.   Counsel further debated how to attack Dr. Coons and whether to offer similar testimony from their side.  3 SHH 10.  Thus, trial counsel were prepared for Dr. Coons.

---

cites *Buck v. Davis*, 137 S. Ct. 759 (2017) for the proposition that Dr. Coons's testimony "heightened the likelihood of prejudice."  DE 103 at 21–22.  *Buck* is clearly not on point because, in that case, the Supreme Court found trial counsel ineffective for presenting an expert who testified that the defendant's race increased the probability of his future dangerousness. 137 S. Ct. at 775–77. Race is not a factor in Brewer's case and is not a matter Dr. Coons addressed.

When Dr. Coons testified on direct examination, the defense objected on at least ten occasions, primarily on the grounds that there was no scientific foundation for the jury.  23 RR 199–221; 2 SHH 213–20.  One objection regarding facts not admitted into evidence—facial injuries to Brewer's father—eventually prompted the State to request to strike that portion from its hypothetical.  23 RR 214–16, 236; 2 SHH 218–19.

Then, as the state court found, defense counsel conducted a thorough cross-examination of Dr. Coons.  The defense forced Dr. Coons to concede the following: (1) he testifies mainly for the prosecution; (2) he did not personally examine Brewer; (3) his scientific prediction is "soft science"; (4) he has never written any articles pertaining to predictions of future dangerousness; (5) he has only followed up on two or three inmates to determine if his prediction was valid; (6) his opinion that there is more opportunity for an inmate to commit violence in general population versus death row is not based on research; (7) he had no statistics demonstrating the accuracy of his predictions; (8) when asked if his findings had been subject to peer review, he said he had only discussed the matter with other peers; and (9) he predicted in 1991 that Brewer would commit criminal acts of violence in the future. 23 RR 223–33.

After Dr. Coons testified, the defense presented Dr. Edens.  Dr. Edens testified that he had engaged in substantial research pertaining to estimations of future dangerousness.  24 RR 18–21.  Again, he stated: (1) of 155 capital murder defendants studied, only five percent had committed serious assaults; (2) past behavior is a good

predictor of future behavior; (3) studies show that the rates of subsequent murders by people in prison for murder are lower than others in the general population; (4) Dr. Coons's testimony to the contrary, there are studies pertaining to what inmates say about their aggressive behavior and rates of victimization; (5) the type of crime committed is not necessarily a good indicator of future violence; (6) convicted murderers are less likely to be written up for disciplinaries than people convicted of other crimes; (7) all capital cases involve horrible crimes, thus it is difficult to narrow the field based on that criteria; and (8) Dr. Coons's methodology of relying on clinical intuition and subjective impressions to make predictions lacks accuracy and is not supported by the science.  24 RR 28–36, 68–69.

During closing argument, the defense's primary theme was that Dr. Coons was wrong in 1991, as evidenced by Brewer's behavior while on death row, and that Dr. Coons would be wrong again.  For instance:

> Can you imagine going to a medical doctor, which Dr. Coons is, and he says you have a horrible disease and it doesn't look good and nothing ever happens, and you go back to him 18 years later and he says, oh, you have a terrible disease and it doesn't look good, well that's what you told me 18 years ago.  What Dr. Coons, in essence, has told you, don't worry, I'm just not right yet.  How outrageous.  How outrageous in making decisions about whether Brent Brewer lives or dies.

25 RR 213.  In sum, trial counsel forced Dr. Coons to admit that other than anecdotal evidence and his opinion, he had no data to back up his prediction.  Trial counsel then presented their own expert who testified that Dr. Coons's method was unsound.  And counsel argued that the jury had no reason to believe that Dr. Coons was right this

time.  Brewer's claim that more should have been done to undermine Dr. Coons rings hollow.

Related, and contrary to Brewer's argument, Dr. Coons was hardly the "linchpin" of the State's case on future dangerousness.  Out of approximately eighteen pages of the final argument by the State, Dr. Coons is mentioned on only five.  25 RR 198–200, 220–21.  The actual substance of his testimony was addressed briefly for less than one full page.  25 RR 199–200.  The State even conceded: "[W]hen we talk about probability, I can't tell you with [certainty] what will happen in the future, neither can Dr. Coons . . ."  25 RR 221.  On the other hand, the State discussed in detail the facts of the crime—the true "linchpin" of the State's case—for approximately nine pages, or about half its final argument.  25 RR 195–98, 201, 203–04, 218–19.  Thus, when viewed in totality—the defense's cross-examination of Dr. Coons, the rebuttal by Dr. Edens, the defense's characterizations of Dr. Coons's opinion, and the fact that the State limited its discussion of his testimony during final argument—Dr. Coons's testimony was not truly substantial.

Finally, another flaw with Brewer's claim is evidenced by an event occurring on state habeas review.  During the state habeas hearing, Brewer's attorney, Hilary Sheard, called Dr. Coons to the stand.  Ms. Sheard wanted to show how an "effective" cross-examination of Dr. Coons should have been conducted to further undermine his credibility.  3 SHH 173–85.  The judge said he would permit it but cautioned her to stay on point.  3 SHH 184.

However, the questioning immediately strayed.  Ms. Sheard began asking Dr. Coons about his qualifications under Texas law, and then she questioned him about his testimony in *Barefoot* to show that an amicus brief filed in that case did not agree with his conclusions.  3 SHH 186–89, 192–97.  A bench conference ensued, in which Ms. Sheard stated her purpose was to force Dr. Coons to admit that he was aware of the amicus brief.  The court questioned why and noted that after fifteen minutes, "I felt we were spinning our wheels and not getting anywhere.  It would be nice if you could ask the question more direct."  3 SHH 197–99.  Ms. Sheard said that she was having trouble "eliciting an answer which allows me to pose my next question."  3 SHH 200.  Nonetheless, Ms. Sheard continued the same questioning but became frustrated with Dr. Coons's responses.  The court then asked: "Counsel . . . are you suggesting that this line of questioning should have been done by Defense Counsel before the jury; is that your point here?"  Ms. Sheard responded: "Yes." 3 SHH 205–06.

This pattern continued for another sixty pages: Ms. Sheard asked questions that had little to do with Brewer's trial; Dr. Coons had trouble understanding Ms. Sheard and provided long answers she did not like; the State objected every now and then; and the Court repeatedly advised Ms. Sheard to move on to another topic or let Dr. Coons finish his answers.  3 SHH 206–66.  At one point, Ms. Sheard, who was clearly exasperated, stated: "Your Honor, I cannot even remember what my question was, but I think that Dr. Coons has more than answered it."  3 SHH 256.  Eventually, the judge said to Ms. Sheard: "I'm going to go back to before Dr. Coons

came in here, and I - - I asked you, why are we doing this, and I'm still wondering."
3 SHH 266.  Ms. Sheard stated that the result of the trial may have been different
had trial counsel "go[ne] into certain areas."  3 SHH 270–71.  The State responded:

> Your honor. I've been doing this about 30 years, and compared to what
> she has obtained from the doctor today, comparing that to what came
> out in the trial, as the Prosecutor, I would have much preferred the jury
> to have heard this testimony than what was actually brought out in the
> trial, and, again, it's just two different attorneys with different theories
> about how to go about representing their client.

3 SHH 271.  After more questioning that had little to do with Brewer's trial or the
issues presented for review, Ms. Sheard finally gave up.  3 SHH 271–85.

It is settled that hindsight is disfavored with IATC claims, but rarely does a
court have an example demonstrating why.  Though not her intention, Ms. Sheard
provided just that.  Her attempt to show how trial counsel should have attacked
Dr. Coons backfired.  Had trial counsel chosen this tactic, the result would have been
disastrous for Brewer.  Now, Brewer is once again asking the Court to grant him
relief by applying more hindsight.  Given the above, his claim should be denied.

### 2.     Trial counsel were not ineffective for not utilizing another expert.

Brewer contends that trial counsel were ineffective for failing to procure
testimony from an expert, Dr. Edens or Dr. Mark Cunningham, that Brewer was not
a future danger.  He claims that the testimony was necessary to rebut Dr. Coons's
opinion.  Brewer believes that trial counsel's failure to do so was unreasonable
because they formed a strategy without obtaining an evaluation.  He further states
that counsel's argument about avoiding a "battle of experts" is inconsistent because

counsel did present an expert, Dr. Edens. DE 103 at 23–29. These claims are meritless.

As an initial matter, in his first federal habeas proceeding in 2004 pertaining to his 1991 trial, Brewer raised the same claim regarding counsel's failure to present expert testimony regarding future dangerousness. This Court rejected it citing in part, and approvingly, counsel's decision not to give the State any excuse to have an expert examine Brewer for future dangerousness. *Brewer v. Dretke*, 2004 WL 1732312, at *10–11; *see also* Section VI, B, 4, *infra*.

Moreover, counsel had a clear strategy; Brewer simply does not agree with it now. But the strategy was more than reasonable: (1) attack Dr. Coons's credibility on cross-examination and via Dr. Edens, and (2) show Dr. Coons was wrong by offering evidence of Brewer's lack of violent history while he has been incarcerated. The defense then premised its final argument on these factors and Brewer's remorse.

After discussing the matter, counsel chose not to have Brewer evaluated and offer additional expert testimony for two reasons. First, another expert evaluation could have opened the door for the State to do an individualized assessment, which might prove to be harmful. 2 SHH 98; *see Kansas v. Cheever*, 571 U.S. 87, 90–98 (2013) (where the defense presented expert evidence about defendant's mental state, the prosecution was permitted to evaluate defendant and present its own rebuttal expert); *Lagrone*, 942 S.W.2d at 611. And had Dr. Edens conducted an assessment of Brewer that came back unfavorable, then the defense would not be able to use him at all. 3 SHH 133–34.

48

In his reply, Brewer complained that counsel could have offered an opinion from Dr. Edens without risking an assessment by the State. DE 48 at 15. His argument ignores the second reason trial counsel chose not to present an opinion from Dr. Edens: counsel feared that offering an expert opinion that Brewer was not a future danger would undermine their overall trial strategy. They knew they were going to vigorously challenge Dr. Coons's opinion by questioning his methodology. Counsel believed it would appear hypocritical to turn around and present an expert who would provide a risk assessment like Dr. Coons's. Trial counsel Keith explained:

> Dr. Cunningham or anyone else of that subject, of course, would not go through merely giving their opinion. They would be subject to attack from the District Attorney, as well, and, essentially, the jury would be confronted with a Prosecution's expert being attacked by us, and the - - the Defense expert being attacked by them, and I - - I did not want to be in that position where the jury sees me attacking Dr. Coons and then yet risking my credibility for putting up someone that they equate in the same way. . . . In the end, I did not want attacks on my own expert who might be doing a future[-]dangerousness assessment, after taking on Dr. Coons and attempting to discredit him and then have that reflect negatively on my own client who, in the end, I think, was - - his record is the best evidence of his lack of future dangerousness, and I did not want a firestorm over my own expert to not only blunt my attack on Dr. Coons but then to reflect poorly on my client.

3 SHH 28–31. He further stated: "I was not confident that the jury would make distinctions between the two [experts], and I felt like they would hold it against me attacking Dr. Coons, in terms of my credibility and in terms of my client's credibility, and so that's the decision I made." 3 SHH 100.

Therefore, counsel believed the right strategy was to draw a contrast between Drs. Coons and Edens. 3 SHH 121 ("What Edens is talking about is science and what Coons is talking about is not . . . I think the contrast between the two is stark."). And

49

because counsel believed that the best evidence showing Brewer was not a future danger was his lack of prison infractions, "My belief was that [the jury] would see that [Dr. Coons], indeed, was not [a good predictor of the future]." 3 SHH 136. Consequently, rather than getting into a "battle of experts," the approach was to bring in one expert to show that the State's expert was no expert at all. 3 SHH 137.[11]

Moreover, Brewer claims that counsel was not truly concerned about inconsistency because they presented an expert, Dr. Edens. However, the potential inconsistency here did not involve presenting an expert, but rather offering expert testimony that might mirror Dr. Coons's. As for his claim that counsel formulated the strategy without having Brewer evaluated, again they risked the possibility that a poor evaluation would preclude Dr. Edens from providing any testimony. Further, when asked why he did not have Brewer evaluated even though evidence pointed to low risk, counsel explained: "I don't think that that analysis would stand alone, if you will, or unattacked or to have other things brought into the equation by the State." 3 SHH 160–61. This decision was sound particularly given the problems with Dr. Cunningham's 1996 assessment of Brewer. *See* Section VI, B, 4, *infra*.

---

[11]    In his reply, Brewer argued that trial counsel's decision to avoid a "battle of the experts" was unreasonable, stating: "Counsel Keith stated that he did not want the jury to equate Edens and Coons. That equivalence was unavoidable, however, because Edens—like Coons—asserted that there was a basis for assessing risk of future violence. Counsel Keith elicited this very point. This necessarily invited the jury to compare Edens and Coons on their methodology." DE 48 at 16. This claim is meritless because, other than generically discussing scientific methods for risk assessment and statistics, 24 RR 16–18, 33, 36, Dr. Edens did not go into his specific methodology for assessing risk. Again, his testimony was offered to undermine Dr. Coons's assessment. As for Brewer's claim that counsel "abandoned this strategy of avoiding attack" once they presented Dr. Edens, DE 48 at 16, the prosecution attempted to call into doubt Dr. Edens's testimony only once during final argument. 25 RR 199–200. Thus, counsel's strategy was effective.

"In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 690–91. To the extent counsel's investigation could be considered limited, their decision, as shown, was more than reasonable. At the very least, the state court's decision cannot be deemed unreasonable. *Richter*, 562 U.S. at 105 (If there is *any* "reasonable argument that counsel satisfied *Strickland*'s deferential standard," the state court's denial will be upheld.)

Essentially, Brewer is arguing that more evidence was needed. In his eyes, attacking Dr. Coons's credibility, showing remorse, and presenting evidence of his lack of prison infractions was not enough to demonstrate an absence of future dangerousness. Instead, he is claiming the jury needed to be told he would not likely be a future danger, and *then* the scales would have tipped in his favor. As the Fifth Circuit has admonished:

> [P]erhaps [applicant's] trial counsel could have investigated more, hired different experts, or presented more mitigating witnesses. But as we have said previously, courts must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.

*Ward v. Stephens*, 777 F.3d 250, 265 (5th Cir. 2015) (internal quotation marks and citations omitted), *abrogated on other grounds by Ayestas v. Davis*, 138 S. Ct. 1080 (2018). Counsel presented a sufficient case against a finding of future dangerousness. Its lack of success does not warrant relief. *See Pondexter v. Quarterman*, 537 F.3d 511, 521 (5th Cir. 2008). In fact, at the habeas hearing, the

State pointed out that Dr. Cunningham testified in the Coble case and the jury still returned a death sentence, to which Keith responded that he chose a different strategy for Brewer and "these are all just various ways that a competent attorney might try to use the information to benefit his or her client." 3 SHH 131–32.

Importantly, the Fifth Circuit has rejected the same allegation Brewer is raising. In *United States v. Fields*, the petitioner claimed that trial counsel was ineffective for failing to properly challenge and rebut Dr. Coons's testimony. 761 F.3d 443, 463–65 (5th Cir. 2014). The petitioner also relied on the CCA's opinion in *Coble*. *Id.* at 464. The Fifth Circuit rejected these arguments. First, the court found that counsel elicited concessions from Dr. Coons. Among them,

> Dr. Coons stated that there is a "considerable subjective element" to his opinion; he could not identify a study validating an expert's subjective opinion about a prisoner's future dangerousness; he admitted that his opinion had not been subjected to peer review; he admitted that he could not provide an error rate for his opinion; he admitted that he did not know the APA's position on future dangerousness and that some members of the organization "have difficulty with the issue" . . . .

*Id.* at 463. Thus, "trial counsel undertook precisely what Fields argues he failed to do: he attacked Dr. Coons's methodology and techniques." *Id.* at 464. Next, the court determined that, regardless of *Coble*, counsel's decision not to hire an expert to rebut Dr. Coons was not deficient because "counsel attacked Dr. Coons's methodology and conclusion at length on cross-examination." *Id.* Moreover, "Fields's counsel called multiple prison employees who testified that Fields's behavior had improved during his imprisonment." *Id.* at 465. Finally, the court found no prejudice, in part because "[t]he jury was present for Fields's counsels' cross-examination of Dr. Coons, and

heard the challenges to Dr. Coons's methodology. The jury also heard other testimony that could have lead it to conclude that Fields posed a risk of future dangerousness." *Id.*

Given the Fifth Circuit's rejection of identical claims and similar facts, there is no basis for this Court to grant relief under 28 U.S.C. § 2254. Lastly, Dr. Coons's testimony was not crucial to the State's case; rather, the brutal and senseless facts of the murder were the focus of the State's future-dangerousness case. Moreover, Brewer has a history of violent and threatening behavior that pre-dated the murder, particularly toward school mates and teachers. Also, he was defiant and showed little remorse following the crime. Thus, there is not a reasonable probability that the result of the proceeding would have been different had counsel performed exactly as Brewer now desires. Therefore, relief should be denied.

### F.   Brewer's claims regarding Dr. Coons's credentials have no merit.

Brewer states that the prosecution presented false and misleading testimony about Dr. Coons's credentials, and trial counsel were ineffective for failing to investigate the same. DE 103 at 35–37. Brewer alleges that Dr. Coons lied about his work with the Texas Medical Board, the State Bar of Texas, and the Texas Board of Nurse Examiners. *Id.* at 36–37. The state court rejected these claims finding that counsel did challenge Dr. Coons's qualifications, that Dr. Coons's statements about his credentials were accurate and he did not provide false testimony, and that any alleged false testimony was not material. 10 SHCR 3082–83, 3095, 3145.

To show that the State knowingly presented false or misleading in violation of due process and *Napue v. Illinois*,[12] "a petitioner must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution knew the witness's testimony was false." *Fuller v. Johnson*, 114 F.3d 491, 496 (5th Cir. 1997). Brewer cannot meet this standard because his allegations are misleading. First, Brewer argues that evidence shows Dr. Coons never acted as a consultant or evaluator for the Texas Medical Board and has never been hired by the Board. DE 103 at 36. However, Dr. Coons did not testify that he was a paid consultant for the Board, only that he had "dealt with" them. 23 RR 199. In his affidavit, Dr. Coons said that he has testified before the Board and "provided numerous opinions . . . both favorable and unfavorable from the standpoint of the physicians involved," and that he "assumed" the Board had hired him in one case. 7 SHCR 2020. But, again, he did not make these statements at trial. Further, Brewer's evidence states that Dr. Coons is not in the Board's database. However, it also says: "If . . . an applicant on his own had selected and paid for an evaluation by Dr. Coons, without being requested to do so by the Board, then the Board would not have any database or list that it could search to determine that." 3 SHCR 504. Brewer's evidence, thus, contradicts nothing.

Second, Brewer claims records show Dr. Coons has never been a witness for the State Bar Association in any proceeding. DE 103 at 36. Dr. Coons mentioned that he had been a witness, 23 RR 199, and in his affidavit stated that he was hired

---

[12]     360 U.S. 264 (1959).

by a Texas State Bar lawyer in one case.  7 SHCR 2018–19.  Dr. Coons explained that he testified in El Paso district court about his evaluation of an attorney who sought to reclaim his law license after serving time in prison.  7 SHCR 2019.  Brewer does not refute this because one letter from the State Bar simply says that "no information related to these requests is collected, assembled or maintained" pursuant to the Texas Government Code.  3 SHCR 540.  Another letter states that if Brewer's habeas attorney "believe[s] Dr. Coons may have appeared in a court proceeding, the governmental body that would be the custodian for the information you seek would be the court or the entity which retained him."  3 SHCR 541.  And Brewer never appeared to file a public information request regarding the case Dr. Coons referenced. This evidence does not "belie" Dr. Coons's credentials.

Third, Brewer alleges that evidence shows the Texas Board of Nursing has no documents revealing Dr. Coons was on their provider list or worked as a consultant. DE 103 at 36.  Again, Dr. Coons testified that he had "dealt with" the Nurse Examiners, not that he was a consultant or a provider.  23 RR 199.  And in his affidavit, Dr. Coons said he "dealt with" but never recalled being hired by the Board. 7 SHCR 2019–20.  The lack of an official record pursuant to a public information request does not render his testimony false.

Notably, Dr. Coons testified that he had "dealt with" many Boards and was on several committees, 23 RR 199–200, but Brewer does not claim Dr. Coons's assertions about these other entities were false.  Thus, he is merely cherry-picking Dr. Coons's resume', not asserting a viable constitutional claim.  At any rate, Brewer's *Napue*

complaint fails because (1) two brief sentences about credentials in forty pages of testimony is hardly relevant, let alone material; (2) the import of Dr. Coons's testimony concerned Brewer's future dangerousness, not Dr. Coons's credentials; and (3) defense counsel effectively rebutted Dr. Coons's testimony.  For the same reasons, Brewer shows no *Strickland* prejudice.  Therefore, his claims should be denied.

### III.   Brewer's Claims Pertaining to Dr. Erdmann's Autopsy Report and Prior Testimony and Dr. Natarajan's Testimony Are Meritless.

Brewer alleges that the State violated his constitutional rights by presenting false and misleading testimony and by withholding evidence it had casting doubt on Dr. Ralph Erdmann's autopsy; the trial court's admission of Dr. Erdmann's testimony from Brewer's 1991 trial and decision to permit Dr. Natarajan to testify from Dr. Erdmann's report violated Brewer's constitutional rights; and trial counsel were ineffective by failing to file a motion seeking the preclusion of Dr. Erdmann's autopsy report and by failing to impeach Dr. Natarajan.  He also claims that counsel failed "to investigate and discuss this issue with [Brewer] prior to advising him to testify," and that the prosecutor should have been recused because he knew about Dr. Erdmann's misdeeds.  DE 103 at 37–59.  Brewer's claims involve numerous alleged ethics violations by Dr. Erdmann in other cases, but nothing of significance involving the autopsy performed here.  Still, Brewer believes the evidence was crucial to impeach Dr. Natarajan.

The state court rejected Brewer's claims, finding: Dr. Erdmann's report merely informed the jury about cause of death, which had already been determined by the trial and appellate courts; trial counsel did object when the State re-tendered this

56

evidence; nonetheless, counsel, as a matter of reasonable trial strategy, did not challenge cause of death because part of their defense was for Brewer to take responsibility for the crime; Dr. Erdmann was cross-examined at the original 1991 trial, thus, there was no confrontation violation; trial counsel objected to Dr. Natarajan's testimony on the ground that it violated the Confrontation Clause; counsel were not ineffective for not presenting an expert to impeach Dr. Erdmann's findings or Dr. Natarajan's testimony because the guilt-innocence case was affirmed on appeal; trial counsel were not ineffective for not presenting an expert to challenge Nystrom's culpability because it conflicted with counsel's trial strategy; and Brewer could not demonstrate any prejudice because cause of death was not an issue given that Brewer admitted to murdering Mr. Laminack.  10 SHCR 3110–14.  The state court also found that Dr. Natarajan's testimony about the validity of Dr. Erdmann's autopsy was not false or misleading; Dr. Natarajan's testimony itself was not false; Dr. Natarajan's testimony about cause of death was premised on many factors and not just Dr. Erdmann's report; Brewer submitted no evidence showing Dr. Erdmann failed to follow a standard protocol; and any error did not affect Brewer's sentencing because he admitted to murdering Mr. Laminack.  10 SHCR 3116–17.

The court then concluded: a testifying expert's opinion based in part on a report prepared by a non-testifying expert does not violate the Confrontation Clause; Brewer failed to establish deficient performance or prejudice under *Strickland*; Brewer's *Napue* claim and allegation challenging the trial court's admission of the evidence were forfeited because he did not raise them on direct appeal, and challenges to the

admissibility of evidence are not cognizable on habeas review; Dr. Natarajan's testimony was not false; Brewer failed to provide any evidence showing that Dr. Erdmann's autopsy failed to follow a standard protocol; and Brewer failed to show that any alleged false testimony was material because he admitted to killing Mr. Laminack. 10 SHCR 3150–54. This decision is not objectively unreasonable.

A. **Brewer's claims that his due process rights were violated by the knowing presentation of false evidence and that the trial court erred in admitting evidence concerning Dr. Erdmann's autopsy are procedurally barred.**

As shown, the state court determined that Brewer's claim that the prosecution knowingly presented false testimony should have been raised on direct appeal. 10 SHCR 3116, 3152. The court likewise concluded that the claim regarding the admission of Dr. Erdmann's report should have been raised on direct appeal and was not cognizable. *Id.* For the reasons stated in Section II, C, *supra*, these claims are procedurally barred. *Dorsey*, 494 F.3d at 532. Citing CCA precedent, Brewer has claimed that this bar should not apply where the claim is premised on additional fact gathering. DE 100 at 7; DE 48 at 19–20. But the CCA did not reject these findings by the trial court in its order; thus, the CCA agreed the claims could have been raised on direct appeal, and the bar applies. Moreover, Brewer is improperly asking the federal court to hold that the CCA incorrectly interpreted its own procedural rules. *Charles v. Thaler*, 629 F.3d 494, 500–01 (5th Cir. 2011) ("A federal court lacks authority to rule that a state court incorrectly interpreted its own law.").

Although Brewer does not address his default in his petition, he has previously argued that he can demonstrate cause and prejudice because appellate counsel was

ineffective for failing to raise these claims on direct appeal. DE 48 at 20. But because his underlying claims are patently meritless, he cannot show constitutional ineffectiveness to overcome his default. *See Murray v. Carrier*, 477 U.S. 478, 488–89, 492 (1986). Moreover, the state court found that appellate counsel was not ineffective for failing to raise the underlying claim of the admissibility of Dr. Erdmann's report. 10 SHCR 3114–15. However, Brewer did *not* claim on habeas review that appellate counsel was ineffective for failing to raise his *Napue* claim on direct appeal. 2 SHCR 277–81; *Hatten v. Quarterman*, 570 F.3d 595, 605 (5th Cir. 2009) ("the claim of ineffective assistance of counsel on direct appeal is an independent constitutional violation, which must itself be exhausted using state collateral review procedures"). Thus he cannot use ineffective assistance of appellate counsel to excuse his default of either claim. Therefore, Brewer cannot overcome his default.

### B.   Brewer's confrontation claim is meritless.

Brewer claims that the trial court's decision to allow Dr. Natarajan to testify about Dr. Erdmann's report violated his right to confrontation. DE 103 at 38. This claim is meritless. First, the Fifth Circuit has held that, pursuant to Supreme Court precedent, the Confrontation Clause does not apply to capital sentencing decisions. *United States v. Fields*, 483 F.3d 313, 337 (5th Cir. 2008); *see also Ochoa v. Davis*, No. 3:09-CV-2277-K, 2016 WL 5122107, at *6 (N.D. Tex. Sep. 21, 2016).

Second, since *Crawford v. Washington*,[13] the Supreme Court has not expanded the definition of "testimonial" to autopsy reports. Indeed, the Court has turned away

---

[13]     541 U.S. 36 (2004).

several cases where appellate courts held that the admission of autopsy reports does not violate the Confrontation Clause. *See Hensley v. Roden*, 755 F.3d 724 (1st Cir. 2014) (state court's determination that autopsy report not testimonial is reasonable), *cert. denied*, 135 S. Ct. 964 (2015); *Mitchell v. Kelly*, 520 F. App'x 329 (6th Cir.) (state court's determination that admission of autopsy report did not violate right of confrontation is reasonable) (unpublished), *cert. denied*, 571 U.S. 922 (2013). The Fifth Circuit has likewise indicated there is no clearly established federal law on this issue. *Grim v. Fisher*, 816 F.3d 296, 309–10 (5th Cir. 2011). The Fifth Circuit subsequently recognized conflicting precedent regarding whether autopsy reports are subject to the Confrontation Clause, *see Martinez v. Davis*, 653 F. App'x 308, 319 n.5 (5th Cir. 2016), *judgment vacated on other grounds*, 137 S. Ct. 1432 (2017), including *Melendez-Diaz v. Massachusetts* where the Supreme Court held that the admission of certificates from state laboratory analysts violated the defendant's right to confrontation. 557 U.S. 305, 313–29 (2009); DE 103 at 39. But this only serves to highlight the lack of clearly established federal precedent on the issue. (*Terry*) *Williams*, 529 U.S. at 381 (lower courts cannot establish a principle to satisfy the AEDPA bar where the Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle"). Thus, given the absence of Supreme Court precedent, Brewer's confrontation claim does not merit relief under § 2254(d).

Further, a Confrontation-Clause claim is subject to a harmless error analysis. *United States v. Jones*, 930 F.3d 366, 375 (5th Cir. 2019). For the reasons addressed below, Brewer cannot demonstrate any harm. Thus, his claim must be denied.

## C.  At any rate, Brewer's claims are meritless.[14]

### 1.  The State did not knowingly present false or misleading testimony.

Brewer's primary allegation is that the State knowingly presented false or misleading testimony in violation of due process and *Napue v. Illinois*.  To establish a due process violation, he must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution knew the witness's testimony was false.  *Fuller*, 114 F.3d at 496.  Brewer's claim is premised on a slew of allegations against Dr. Erdmann pertaining to work he performed in other cases, not the instant case.  And Dr. Erdmann did not testify at Brewer's re-trial; Dr. Natarajan testified about the autopsy Dr. Erdmann performed, and he reviewed the autopsy and conducted his own review of all the evidence.

As an initial matter, in *Clark v. Johnson*, the Fifth Circuit rejected a similar claim regarding Dr. Erdmann.  202 F.3d 760 (5th Cir. 2000).  There, the petitioner alleged, like Brewer, that Dr. Erdmann committed perjury based on his misconduct in other cases.  *Id.* at 765–67.  The Fifth Circuit held:

> [T]he overwhelming evidence, including Clark's unassailed confession, comports with Dr. Erdmann's conclusions as to the sequence and extent of the victim's injuries, the sexual assault, and the cause of death.

---

[14]    Brewer states that Dr. Erdmann's prior testimony was admitted at trial.  DE 103 at 39 (citing 23 RR 7–64).  Even though the state court and prosecution said Dr. Erdmann's prior testimony was admitted, *see* 10 SHCR 3111; 23 RR 65, it remains unclear that this occurred.  The State requested to admit all of the testimony from the original trial, and the trial judge, over the defense's objections, said he would allow it.  21 RR 20–36.  But Dr. Erdmann's testimony is not listed as an exhibit in the Master Index or Volume 21.  Further, unlike other prior testimony specifically read into the record—that from Lepicier and Bailey—Dr. Erdmann's testimony was not.  Perhaps it was admitted, but the record does not definitively answer this question.

> Indeed, the record clearly reveals that even without Dr. Erdmann's testimony, each of his conclusions had been independently established by other evidence and testimony. *Furthermore, while Clark refers to evidence that Dr. Erdmann was accused of misconduct in other cases, he has presented no evidence that Dr. Erdmann did so in this case.*

*Id.* at 767 (emphasis added); *see also Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996). Brewer's case is the same. There is no question that Brewer murdered Mr. Laminack, nor any doubt as to how the murder occurred. Brewer also fails to show that Dr. Erdmann engaged in any misdeeds in his case. And, as stated, Dr. Natarajan testified at the re-trial, not Dr. Erdmann. *Clark* forecloses Brewer's allegation.

At any rate, Brewer cannot meet any element of the *Napue* test. First, it truly falters on the materiality prong. Brewer was re-tried on punishment, not guilt-innocence. Dr. Erdmann's report and prior testimony pertained to Mr. Laminack's cause of death. Thus, from a materiality standpoint, the issue is how an autopsy would affect punishment proceedings where guilt is not in doubt. What is clear from Brewer's petition and other pleadings is that he does not know. For instance, challenging an autopsy at punishment is reasonable if residual doubt or lack of deliberation is a viable punishment theme. But there is no doubt that Brewer murdered Mr. Laminack. The evidence conclusively established this fact, and *Brewer admitted at re-trial that he killed Mr. Laminack.* DE 40 at 57; 25 RR 82–84, 150–71. If Brewer's guilt or culpability was an issue and the autopsy critical to that issue, then Brewer's claim might have some relevance. But this is not the case.

In his reply, Brewer responded:

> The State's use of Dr. Erdmann's autopsy report without disclosing its complete unreliability allowed the prosecution to represent that their case had a level of accuracy and integrity that simply did not exist. And the State's contention that the autopsy was immaterial to punishment is belied by the fact that the State felt compelled to rely on this evidence in 2009 when Mr. Brewer's punishment was solely in issue.

DE 48 at 22; DE 100 at 7. The first sentence, which thus far has been Brewer's sole comment on materiality, is meaningless because Brewer is not contending the crime did not happen as the State showed, as the autopsy revealed, or as Brewer himself admitted. In other words, if the autopsy testimony was indeed lacking in "accuracy and integrity," Brewer must still address how that could have affected the outcome of the punishment proceedings, and yet he never does—with the exception of attempting to re-direct culpability to Nystrom in an unexplained manner, which is discussed below. As for the latter sentence, the State relied on the autopsy evidence not to prove Brewer's guilt, but to show exactly how from a scientific standpoint Brewer murdered Mr. Laminack, which is not an issue Brewer has ever attempted to refute or could possibly refute. Indeed, as shown below, another expert Brewer relies on does not contest how Mr. Laminack died.

Moreover, aside from Brewer's admission of guilt, Nystrom also testified that Brewer murdered Mr. Laminack; Brewer's fingerprints and blood were found throughout the truck and on the murder weapon, but there was no testimony that Nystrom's blood was found at the scene; Brewer's hand sustained a deep cut while he was stabbing Mr. Laminack; both he and Nystrom were covered in blood when they returned to Christian's apartment; Nystrom and Brewer told Callen that they killed

a man for $140.00; and Lewis testified that Brewer said he committed the murder. Further, cause of death has never been an issue; Brewer severed the major blood vessels in Mr. Laminack's neck. Assuming for argument's sake that portions of the autopsy were "inaccurate," the crime scene evidence, police testimony, forensic evidence, and autopsy photos were self-explanatory. Brewer's argument seems to be that an alleged "inaccurate" autopsy by itself equates to materiality and, in this circumstance, a true showing of how that that issue altered the outcome is not needed. There is no precedent supporting a presumption of this kind.

Regarding the falsity prong, Brewer argues based on state law that he is "entitled to an inference of falsity" because Dr. Erdmann was a state actor, had contact the with district attorney, and many of the misdeeds he committed in other cases occurred around the same time as he performed the autopsy in this case. DE 103 at 50–51 (citing *Ex parte Coty*, 418 S.W. 3d 59 (Tex. Crim. App. 2014)). Thus, he is arguing he can bypass the requirement that he "show" falsity under the circumstances here. However, he cites no clearly established Supreme Court authority for the proposition that falsity can be presumed under *Napue*.

Moreover, Brewer does nothing to show that the autopsy results in this case were problematic, only that Dr. Erdmann's misdeeds in other cases should have rendered the autopsy suspect. *See Clark*, 202 F.3d at 767. He does rely on a 1997 letter and declaration written by Dr. Lloyd White, who reviewed Dr. Erdmann's autopsy report. 4 SHCR 988–90; DE 103 at 54. In the letter, Dr. White stated that he believed the assault "probably originated from the front," and he postulated that

64

the nature of the wounds may not have indicated that the intent of the perpetrator was to kill. 4 SHCR 989. But he further stated the following: "Comparison with the photographs suggests that the reports are correct with regard to wound location"; "[Dr. Erdmann's] basic conclusion as to cause of death is probably correct"; and "all of the stab and incised wounds suffered by Mr. Laminack are consistent with the knife shown in the photograph, and it is possible that knife could have caused all of these wounds." 4 SHCR 988–89. He also stated that the rapidity of Mr. Laminack's death slightly "puzzled" him and that it was possible Dr. Erdmann either missed or did not correctly describe a more serious vascular injury. 4 SHCR 989. In sum, although Dr. White took issue with some of Dr. Erdmann's findings and mainly the terminology he used in the report, he did not contest cause or manner of death, which is all that matters. Regarding the intent issue, Brewer claims "it puts some of the onus on . . . Kristie Nystrom." DE 103 at 54. As discussed below, this would have been a foolish argument for the defense to make. But it is also a curious remark because Brewer has previously argued that his claim "is not meant to re-direct culpability to his accomplice, Kristie Nystrom. This assertion is a smoke-screen, not what Mr. Brewer has alleged." DE 100 at 7. Obviously, Brewer cannot square these two statements.

Brewer also relies on another declaration from Dr. White submitted on state habeas review. 4 SHCR 992–96; DE 103 at 54. Dr. White cherry-picked Dr. Erdmann's autopsy report to give the appearance of a poor job. But like the 1997 letter, at no point did Dr. White contest the findings about cause or manner of death.

In fact, Dr. White's only mention of the lethal wounds is that he found Dr. Erdmann detailed them in some depth "compared to a relative cursory review of other areas of the body." 4 SHCR 994. The bottom line is that to prove "falsity," Brewer has to actually present evidence of false testimony. Dr. White's statements not only do not support Brewer's claim, they actually support the key findings from the autopsy. At any rate, the fact that Dr. White may have formed a different opinion regarding some portions of Dr. Erdmann's report is unavailing to Brewer. Contradictory or inconsistent opinions do not establish perjury, much less State-sponsored perjury. *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001); *Boyle*, 93 F.3d at 186 ("The fact that other experts disagreed with Dr. Erdmann is insufficient, by itself, to call Dr. Erdmann's testimony into question.").

Importantly, Brewer does not raise any similar complaints about Dr. Natarajan, except that he relied on Dr. Erdmann's report and vouched for its reliability. But Dr. Natarajan also reviewed plenty of other evidence in the case, including autopsy photos, autopsy protocol, crime scene photos, affidavits, police reports, and the synopsis of the Special Crimes Unit. 23 RR 29–30, 59–60. He came to his own conclusions about cause and mechanism of death, which are not suspect. 23 RR 32–33. For instance, during his testimony, the following exchange occurred:

> Q:      And the report provided by Dr. Erdmann, did it indicate any of the - - any conclusions referencing the three areas you mentioned earlier; cause of death, manner of death, mechanism of death, those sorts of things?

> A:      Yes. It mentioned all three.

Q:    All right.    And based on your opportunity to review the photographs, the police reports, the autopsy - - the photographs of the autopsy, and the photographs provided to you gathered - - taken by law enforcement authorities, have you - - as to those three general categories, have you reached any different conclusions than what Dr. Erdmann indicated he reached in his report . . . . Have you reached any different conclusions than Dr. Erdmann's conclusions?

A:    In general, I have the same conclusions as to the cause of death, the manner of death, as well as the mechanism of death.

Q:    What did you believe the cause of death was in this particular case?

A:    The cause of death is due to what we term sharp force injuries, which could be further defined as incised or stab wounds in the region of the neck.

Q:    And the manner of death?

A:    It's a homicide.

Q:    And the mechanism of death?

A:    The mechanism in this case is a bleeding out or a hemorrhaging from vital structures that were struck in the region of the neck, and that blood then coming out.    Sometimes we use the term exsanguination or hemorrhage is the mechanism in this case.

23 RR 31–33.    On cross-examination, the defense asked Dr. Natarajan if his knowledge of the wounds to Mr. Laminack's major blood vessels came from Dr. Erdmann's report.    He responded: "It comes from the report of Dr. Erdmann as well as the locations on - - the wounds on the autopsy photographs would also be consistent with the description that he's provided."  23 RR 62.  For Brewer's claim to succeed, he must show that Dr. Natarajan's testimony was false, not simply that

67

Dr. Erdmann's report was inaccurate or misleading.  Brewer does not come close to making this case.

Moreover, Brewer's claim that the prosecution *knowingly* presented false or misleading testimony is premised on a statement prosecutor Farren made in a motion he filed to withdraw from Brewer's first state habeas proceedings.  4 SHCR 1053–57. Farren filed the motion because Dr. Erdmann was the subject of a habeas claim Brewer raised in his first application, and because Farren had obtained indictments against Dr. Erdmann in other cases, he believed he and others in his office could be called as fact witnesses in the habeas proceeding.  Thus, the Texas Disciplinary Rules of Professional Conduct compelled him to withdraw.  In this motion, he stated:

> [I]t would be virtually impossible for the undersigned to serve in good faith as the prosecutor in this writ proceeding because, in order to do so, the undersigned would have to vouch for the reliability and credibility of the same Dr. Erdmann, whom the undersigned has prosecuted for aggravated perjury and tampering with evidence.

4 SHCR 1056–57.  Brewer argues that Farren would not defend Dr. Erdmann in 1997 but "didn't bat an eye in relying upon the same autopsy report and pathologist he would not defend twelve years earlier," thereby leaving the jury with the false impression "the State actually countenanced the reliability, accuracy and integrity of Dr. Erdmann's work in this case."  DE 103 at 47.  He further states: "Mr. Farren knew that the testimony he elicited from Dr. Natarajan about Dr. Erdmann's having complied with accepted forensic practices in his autopsy of the victim, Mr. Laminack, was false or at best, misleading.  The false/misleading testimony was material as it established the cause of death."  *Id.* at 50.

The problem with this claim is that Farren stated in the first habeas proceeding he could not vouch for Dr. Erdmann's credibility because he had prosecuted Dr. Erdmann for aggravated perjury and tampering with evidence, not because he thought or knew his report and prior testimony in the instant case was false.  Moreover, Farren did not vouch for Dr. Erdmann's credibility; he asked Dr. Natarajan if *he* believed the science applied in this case was valid.  Importantly—and a fact Brewer omits—Dr. Natarajan replied "yes" to this question about validity during a hearing *outside* the presence of the jury.  23 RR 15–18.  Thus, this exchange could not have misled the jury because the jury never heard it, and Dr. Natarajan was not asked the question again before the jury.  Last, the issue here is not whether the prosecution knowingly presented false testimony from Dr. Erdmann but whether the prosecution knowingly presented it from Dr. Natarajan who, as stated, independently reviewed the autopsy and additional evidence in the case.  Brewer presents no evidence satisfying this prong.  His claim is based on supposition and conjecture stemming from issues involving Dr. Erdmann in unrelated cases.  At the very least, the state court's decision is not unreasonable.

Finally, Brewer—in a footnote—tacks onto this claim the following:

> The State's failure to disclose to trial counsel the extent of Erdmann's misdeeds and crimes violated Petitioner's right to due process and a fair trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments and constitutes a violation of the dictates of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  Petitioner is entitled to relief.

DE 103 at 49 n.11.  Brewer never raised this *Brady* claim on habeas review; thus it is unexhausted and procedurally barred.  *Coleman*, 501 U.S. at 735 n.1 (1991); *Beatty*

*v. Stephens*, 759 F.3d 455, 465 (5th Cir. 2014); *Nobles v. Johnson*, 127 F.3d 409, 420, 422 (5th Cir. 1997).

Regardless, this claim is meritless.   To establish a *Brady* violation, the defendant must prove that (1) the prosecution suppressed evidence, (2) it was favorable to the defendant, and (3) it was material.  *United States v. Brown*, 650 F.3d 581, 587–88 (5th Cir. 2011); *see also Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The Government's good or bad faith in withholding the evidence is irrelevant.  *Brown*, 650 F.3d at 588 (citing *Kyles v. Whitley*, 514 U.S. 419, 432 (1995)).  "[E]vidence is not suppressed 'if the defendant knows or should know of the essential facts that would enable him to take advantage of it.'"  *Id.* (quoting *United States v. Runyan*, 290 F.3d 223, 246 (5th Cir. 2002)).  Indeed, "[t]o have been suppressed, the evidence must not have been discoverable through the defendant's due diligence."  *Id.*

Brewer cannot satisfy this test.  Nothing was suppressed because the defense filed a pre-trial motion for production of *Brady* evidence pertaining to Dr. Erdmann, including all evidence of the criminal proceedings against him.  1 CR2 302–04.  The trial court granted the motion, 2 CR2 407, and Brewer presents nothing to show the State failed to comply with this order.  And clearly the defense knew about these issues involving Dr. Erdmann because, in its motion, the defense specifically listed the cause numbers and counties for each proceeding and the sentences Dr. Erdmann received for his offenses.  1 CR2 303.  Further, none of the evidence was material, specifically because Brewer's guilt was not in doubt, the manner and cause of death

was obvious from the trial evidence, and Dr. Natarjaran testified, not Dr. Erdmann. Thus, this claim must also be denied.

### 2.    Trial counsel were not ineffective.

Brewer's IATC claim is that counsel should have called an expert, like Dr. White, to rebut the autopsy testimony and impeach Dr. Natarajan, called some of the attorneys involved in prosecuting Dr. Erdmann, and/or moved to recuse prosecutor Farren.  Brewer also argues that he would not have testified on his own behalf had he known about Dr. Erdmann's misdeeds.  DE 103 at 52–59.  Here, Brewer relies on new declarations, including his own declaration, one from his trial attorney Anthony Odiorne, and one from attorney Shane Phelps who was involved in prosecuting Dr. Erdmann.  All of these declarations are barred under *Pinholster*.

As the state habeas findings and record show, trial counsel attempted to keep Dr. Natarajan from testifying about Dr. Erdmann's report mainly on the grounds that it violated Brewer's right to confrontation.  23 RR 7–58.  Regardless, Brewer's claim fails mainly because his arguments and these declarations evince no appreciation for the defense's trial strategy and the downside to attacking the autopsy testimony.  The trial and habeas record show that Brewer testified for three reasons: to accept responsibility for the murder and show remorse; to highlight his lack of violent activity while on death row; and to place his poor behavior before the crime into context.  *See*, *e.g.*, 2 SHH 70, 83–84, 278–81, 285–86; 3 SHH 10, 55–56, 124.  Brewer's claim to the contrary, now he is arguing that the defense should have tossed that strategy aside and challenged the autopsy to re-direct culpability to Nystrom, despite

overwhelming evidence to the contrary.  Hence, Brewer asserts that Dr. White's 1997 letter "puts some of the onus on Mr. Brewer's co-defendant, Ms. Kristie Nystrom. This allows counsel to argue that Mr. Brewer is less morally culpable and that he, like Ms. Nystrom, should receive a life sentence."  DE 103 at 54–55.  Instead of deciding the fate of a man who had accepted responsibility for his crime, the jury would have been faced with a defendant still defiant after eighteen years and willing to downplay his actions while casting blame to his accomplice.

The idea that blame-shifting or attempting to downplay the horror of the crime would have amounted to a sound trial strategy given Brewer's clear guilt is illogical. This is certainly not a path his attorneys wanted to go down because they considered remorse to be crucial and thought belaboring Mr. Laminack's cause of death would damage their credibility.  7 SHCR 2009, 2013; 2 SHH 279–80; 3 SHH 124.  Lead attorney Keith stated in his habeas affidavit:

> In accordance with the trial strategy and in accordance with the anticipated testimony of Mr. Brewer, I made a decision not to attack or belabor the issue of the Mr. Laminack's death.  I believed that to do so would damage the defense's credibility in other areas.  I also believed that this damage would outweigh any benefit to be gained by disputing the nature of Mr. Laminack's death.

7 SHCR 2013.  Co-counsel Odiorne stated in his affidavit:

> [T]he autopsy performed by Dr. Erdmann dealt with the cause of death, which is primarily a guilt/innocence issue and was not an issue in Mr. Brewer's case.  Mr. Brewer's case had been remanded back to the trial court solely for a new punishment hearing.  It was part of our trial strategy to have Brent Brewer testify so he could tell the jury personally about his responsibility for the crime and his remorse for his actions.

7 SHCR 2009.[15]  Indeed, at trial, defense counsel began his final argument with an immediate and blunt concession that Brewer was guilty of capital murder and damaged the lives of Mr. Laminack's family: "There is no excuse.  There is no justification.  It wasn't a mistake.  It wasn't an accident.  It was capital murder." 25 RR 204–05.  And because the defense filed a motion for production of evidence regarding the criminal proceedings against Dr. Erdmann, which the trial court granted, clearly the defense knew about the issues pertaining to Dr. Erdmann but chose not to utilize that evidence.

As stated above, strategic decisions made by counsel should not be easily second-guessed, and "a conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so

---

[15]      Oddly, in his *Pinholster*-barred declaration, Odiorne claims that if the defense had seen the 1997 motion to withdraw that Farren filed, the defense would have been able to inform the jury the State knowingly presented unreliable evidence from Dr. Erdmann, could have cross-examined Dr. Natarajan with it, and could have told the jury not to believe any of the autopsy results.  DE 32-3 at 282–83.  But Odiorne does not explain why this strategy would have been wise in light of the strategy the defense used at trial and that he endorsed on state habeas review.  Nor does he attempt to explain how this could have affected the outcome of the trial.  More importantly, Brewer's state habeas counsel specifically referred to and quoted the Farren motion in his state habeas application, and he attached the motion as an exhibit.  2 SHCR 253–54; 4 SHCR 1053–57.  In his state habeas affidavit, Odiorne addressed Brewer's IATC allegations one by one, including this specific claim ("Response to claim 3(A)"), but he mentioned nothing about Farren's motion.  7 SHCR 2008–10.  Odiorne also states in his declaration that he "was recently provided a copy" of Farren's motion, DE 32-3 at 282, which makes little sense given that he clearly reviewed Brewer's state habeas allegations.  Odiorne's declaration is further flawed because he says that the defense could have used the motion to argue the State knowingly presented Dr. Erdmann's work, which was unreliable, tainted, and arguably false.  *Id.* at 283.  But the defense knew the essential facts about Dr. Erdmann's misdeeds because, as shown above, the defense filed a motion for production of *Brady* evidence regarding the specific criminal proceedings against Dr. Erdmann, and the trial court granted the motion.  1 CR2 302–04; 2 CR2 407.  Odiorne's implied assertion that he was somehow surprised or broadsided by these developments is, consequently, refuted by the record.  Therefore, even if this Court could consider Odiorne's new declaration, it lacks any credibility given these major inconsistencies.

ill chosen that it permeates the entire trial with obvious unfairness." *Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011) (internal quotations and citation omitted). Because Brewer's re-trial pertained only to punishment, and given that he is clearly guilty of capital murder, a tactic attempting to undermine the autopsy results by presenting an expert to challenge them, calling the attorneys who assisted in prosecuting Dr. Erdmann, or attempting to force Farren off the case would have been futile and likely backfired, as attorney Keith feared. Indeed, the State's response would have been two-fold: (1) Dr. Natarajan was testifying, not Dr. Erdmann, and he came to his own independent conclusion about cause and mechanism of death, which is not impeachable based on the evidence, and (2) Brewer had no intention of accepting responsibility for his actions even though he was clearly guilty. Further, had counsel foolishly called Dr. White, the prosecution would have forced him to concede that he actually agreed with the primary findings regarding cause and mechanism of death, which would have eviscerated this strategy and wrecked any ability for the defense to then fall back on remorse and responsibility.

Finally, Brewer's *Pinholster*-barred declaration in which he claims he would not have testified if he knew at trial what he knows now about Dr. Erdmann is the epitome of hindsight. DE 32-3 at 278–80. While it is true that he was under no obligation to testify, he was able to tell his side of the story, describe his background and upbringing, and apologize for his actions. Brewer presents nothing to show a reasonable probability that he would have been sentenced to life had he not testified. Moreover, Brewer is not a credible source for this information—he has every reason

to say this now or speak unfavorably about Dr. Erdmann and his trial counsel. And critically, at no point in his declaration does he say he lied when he admitted to murdering Mr. Laminack, nor does he even dispute the autopsy results. *Id.*

In sum, Brewer cannot demonstrate deficient performance or prejudice. Indeed, Brewer presents no legitimate argument for prejudice. He simply claims counsel had readily available evidence to impeach Dr. Natarajan's testimony and attack Farren's continued participation in the case. DE 103 at 59. But a complaint that counsel failed to use an alternate strategy does not equate to demonstrating a reasonable probability that, but for counsel's errors or omissions, the result of the proceeding would have been different. *Coble v. Quarterman*, 496 F.3d 430, 436–37 (5th Cir. 2007) ("desire to have a specific defense theory presented does not amount to ineffective assistance on federal habeas review"). And, again, it is not sufficient if Brewer satisfies his burden under *Strickland*; Brewer must show that the state court's denial of his *Strickland* claim was objectively unreasonable. This he has failed to do, and habeas relief must be denied.

## IV.   Appellate Counsel Was Not Ineffective for Not Challenging the Admission of the 1991 Transcripts.

Brewer contends that appellate counsel was ineffective for failing to challenge the trial court's admission of records and transcripts from his first trial, namely Dr. Erdmann's testimony. Brewer claims that appellate counsel should have raised the claim because his right to confrontation was violated. DE 103 at 59–63.[16] The

---

[16]    In this section, Brewer claims that his inability to cross-examine Dr. Erdmann violated his right to heightened procedural protections under the Eighth Amendment. DE 103 at 61–62. But this is merely a re-iteration of Brewer's confrontation claim, which

state court rejected this claim finding that Dr. Erdmann's report and testimony were previously challenged during Brewer's first trial and appeal and the judgment was affirmed, and that the admission of the evidence did not violate the Confrontation Clause. 10 SHCR 3114–15, 3134–36, 3150–52, 3164–65. The state court also found not credible an affidavit by appellate counsel John Bennett, in which he stated he did not know why he failed to raise this issue on appeal and that it would have been to Brewer's benefit. 9 SHCR 2765; 10 SHCR 3115. This decision is not unreasonable.

A criminal defendant is constitutionally entitled to effective assistance of counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387 (1985); *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000). The familiar standard set out in *Strickland* to prove that counsel rendered unconstitutionally ineffective assistance applies equally to both trial and appellate attorneys. *Busby*, 359 F.3d at 714 (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). Thus, to obtain relief, Brewer must demonstrate that appellate counsel's performance was deficient and that such deficiency prejudiced his defense. *Strickland*, 466 U.S. at 687. In establishing prejudice, Brewer must show a reasonable probability that he would have prevailed on appeal had counsel raised the omitted claims. *Robbins*, 528 U.S. at 285–87.

Brewer's claim fails for several reasons. First, Dr. Erdmann's autopsy report was not admitted. Regardless, under Texas Rule of Evidence 703, expert opinion can be predicated on inadmissible evidence if of a type reasonably relied upon by experts

---

fails for the reasons addressed above. Brewer now simply attaches an Eighth Amendment complaint to this allegation, which is wholly conclusory. Conclusory allegations do not state a claim for federal habeas corpus relief and are subject to summary dismissal. *Ross v. Estelle*, 694 F.2d 1008, 1011–12 (5th Cir. 1983).

in that field of expertise.  *Ramirez v. State*, 815 S.W.2d 636, 651 (Tex. Crim. App. 1991) (en banc).   And Texas courts have held that it is not a violation of the Confrontation Clause for a second expert to provide his own opinions about the nature and cause of death even when those opinions are based in part on review of the autopsy report and other evidence that may be inadmissible.   *Martinez v. State*, 311 S.W.3d 104, 112 (Tex. App.—Amarillo, 2010, pet. ref'd);   *Wood v. State*, 299 S.W.3d 200, 210–13 (Tex. App.—Austin, 2009, pet. ref'd).   Although disclosure of testimonial statements from an autopsy report may be problematic, *Martinez*, 311 S.W.3d at 112; *Wood*, 299 S.W.3d at 213, that did not transpire here. Dr. Natarajan reviewed Dr. Erdmann's report, but he did not disclose or read from the report.  Rather, he provided *his* opinion about manner and cause of death, and he was subject to cross-examination.   That his opinion was premised in part on Dr. Erdmann's work is of no moment.[17]

Second, Brewer cannot demonstrate deficient performance by appellate counsel because, at the time of appeal, CCA precedent regarding Confrontation Clause violations at punishment was conflicting.  In *Russeau v. State*, the CCA held that the admission at the punishment phase of a capital murder trial of jail

---

[17]     In his reply, Brewer stated: "Dr. Natarajan's opinion was not 'premised in part' [ ] on Dr. Erdmann's work; Dr. Natarajan's opinions were completely dependent on the accuracy, thoroughness, and level of documentation of Dr. Erdmann's work.  As a result, there was no way to meaningfully cross-examine him on the core of his testimony."  DE 48 at 23–24.  But on voir dire examination by *Brewer's counsel*, Dr. Natarajan was specifically asked if his opinion was based "in part" on Dr. Erdmann's report, to which he replied, "Yes."  23 RR 30–31.  He then testified that, based on his review of the evidence, he came to the same general conclusions as Dr. Erdmann regarding cause, manner and mechanism of death, which Brewer has never disputed.  23 RR 32.

disciplinary reports that contained testimonial statements violated the defendant's right to confrontation. 171 S.W.3d 871, 880–81 (Tex. Crim. App. 2005). But in *Coble v. State*, the CCA questioned—albeit without deciding the issue—whether full confrontation rights applied to punishment proceedings, addressing state and federal precedent including that from the Fifth Circuit and Supreme Court. 330 S.W.3d at 290 & n.105. Given this ambiguity at the time of appeal, appellate counsel could not have been ineffective.

Third, Texas Rule of Evidence 804(b)(1)(B) provides that prior testimony of an unavailable witness is not excludable in a criminal trial if the testimony (1) was given as a witness at a trial or hearing of the current or a different proceeding and (2) is now offered against a party who had an opportunity and similar motive to develop it by direct, cross-, or re-direct examination. Further, the CCA has held that there is no Confrontation Clause violation under *Crawford* during a re-trial where the court admits a witness's prior testimony from the original trial if the witness was unavailable and subject to cross-examination during the original trial. *Martinez v. State*, 327 S.W.3d 727, 738 (Tex. Crim. App. 2010).

Here, the state court found that Dr. Erdmann testified at the original trial and was subject to cross-examination. 10 SHCR 3112. Although Dr. Erdmann was still alive at the time of re-trial, Brewer conceded on habeas review that Dr. Erdmann was unavailable. 2 SHCR 263 ("The defense did not hold the prosecution to their burden of proving Dr. Erdmann's unavailability, but it appears it was not a matter of dispute that he was unavailable, in light of the defense's repeated references to *Crawford*.");

78

*see also* 2 SHCR 280.  In his reply, Brewer argued that "it was not possible to cross-examine Dr. Erdmann on his fraud at Petitioner's initial trial because such fraud had not yet come to light."  DE 48 at 24.  Even assuming this is true, Brewer's current complaint pertains to the Confrontation Clause, and he has provided no precedent holding that there is an exception to the case law based on events occurring post-trial. Moreover, because the ultimate issue is whether appellate counsel should have raised the matter on direct appeal, the CCA has rejected a similar claim involving Dr. Natarajan:

> [T]he record reflects that Natarajan testified about his own opinions and conclusions based on his review of the autopsy report along with other evidence, including autopsy photographs and x-rays.  This testimony was not inadmissible on the basis that it might have been incidentally based, to some degree, on hearsay. . . . Consequently, we are persuaded that Natarajan's descriptions of the autopsy photographs, and their presentation to the jury, did not violate the Confrontation Clause.

*Suniga v. State*, AP-77,041, 2019 WL 1051548, at *30 (Tex. Crim. App. Mar. 6, 2019) (not designated for publication), *cert. denied*, 140 S. Ct. 375 (2019); *see also Hutcherson v. State*, 373 S.W.3d 179, 183–84 (Tex. App.—Amarillo 2012, pet. ref'd) (no confrontation violation where the expert's opinion is based on inadmissible hearsay "because the testifying expert's opinion is not hearsay and the testifying expert is available for cross-examination regarding his opinion" and holding "[b]ecause Dr. Natarajan did not disclose the testimonial hearsay upon which his expert opinion was based, the jury only heard the direct, in-court testimony of Natarajan, and appellant's confrontation rights were not violated").  Appellate

counsel is not ineffective for failing to raise a meritless claim. *Williams v. Collins*, 16 F.3d 626, 635 (5th Cir. 1994).

Finally, the main reason Brewer's claim fails is that even had appellate counsel raised this issue, there is not a reasonable probability that the outcome of the appeal would have been different because Brewer cannot demonstrate that any error was harmful. Brewer states: "Had the jurors heard that the doctor who performed the autopsy in this case was subsequently sent to prison for falsifying autopsy results, there is a substantial possibility that they would have discounted the medical testimony in its entirety." DE 103 at 62. But as discussed in the previous section, the autopsy had no bearing on the outcome of the trial because there is no question that Brewer murdered Mr. Laminack. The jury could not and would not have discounted Brewer's obvious guilt.

In his reply, Brewer stated: "[I]n making this argument, the State does not meaningfully engage with Petitioner's argument as to why this error was harmful." DE 48 at 24. To the contrary, as stated in the prior section, Brewer never meaningfully explains how challenging the autopsy would have altered Dr. Natarajan's testimony about cause, manner, and mechanism of death. All he stated was "Dr. Natarajan's testimony spoke to Petitioner's relative culpability and future dangerousness for purposes of the jury's sentencing determination." *Id.* Again, that is not a valid explanation regarding specific prejudice to Brewer, who admitted his guilt and whose attorneys conceded the issue.

In short, Brewer cannot demonstrate any prejudice from appellate counsel's decision not to brief this issue.  Thus, the state court's decision is not unreasonable, and relief should be denied.

## V.   Brewer's Claim that Trial Counsel Were Ineffective for Not Rebutting His Prior Bad Acts Has No Merit and Is in Part Defaulted.

Brewer alleges that trial counsel were ineffective for failing to investigate and rebut his prior bad acts.  He argues that the State's future-dangerousness case went unchallenged, that counsel failed to present evidence showing that Brewer had never been the subject of an investigation while in prison, and that counsel failed to conduct the investigation prior to advising Brewer to testify.  DE 103 at 64.  Portions of these claims are defaulted, and Brewer relies almost entirely on evidence not presented to the state court.  The remaining claims were reasonably rejected by the state court and are without merit.

### A.   Some of these allegations are defaulted.

Federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar.  *Harris*, 489 U.S. at 263.  Where a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas relief absent a showing of cause for the default and actual prejudice, or that the federal court's failure to consider the claim will result in a miscarriage of justice.  *Coleman*, 501 U.S. at 750.  Failure to raise a claim in an initial state habeas corpus application may not be excused for cause unless the claim was not "reasonably available" at the time of the prior petition.  *Fearance v. Scott*, 56 F.3d 633, 636 (5th Cir. 1995).  And a

miscarriage of justice in this context means that the petitioner is actually innocent of the crime of which he was convicted or of his death sentence. *Sawyer v. Whitley*, 505 U.S. 333, 339–40, 349 (1992).

Here, Brewer raises claims pertaining to specific witnesses that were not raised in his original habeas application. He claims that counsel failed to investigate and rebut testimony from Kevin Lewis about his contact with Brewer in jail and from Ronald Mosher and Ammy Valles about Brewer's arrest in Florida for possession of a concealed weapon. DE 103 at 67, 70–72. He also claims that counsel were ineffective for failing to investigate these issues before advising him to testify. *Id.* at 77–78. After this Court granted Brewer a stay, he raised these allegations in his state habeas application dismissed for abuse of the writ. SHCR2 25–28, 42–43; *Ex parte Brewer*, 2019 WL 5420444, at *1. The Fifth Circuit has repeatedly held that Texas's abuse-of-the-writ doctrine is an adequate and independent state ground barring federal habeas review of claims raised in the abusive application. *Garza v. Stephens*, 738 F.3d 669, 675 (5th Cir. 2013); *Balentine v. Thaler*, 626 F.3d 842, 857 (5th Cir. 2010); *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008).

Regarding cause, in his reply, Brewer argued that he was abandoned by state habeas counsel and left unrepresented for two years. DE 48 at 27 n.18. Indeed, Brewer stated that he can overcome his default via the equitable exception announced in *Martinez v. Ryan*[18] and *Trevino v. Thaler*.[19] DE 48 at 27–28. In

---

[18]    566 U.S. 1 (2012).

[19]    569 U.S. 413 (2013).

*Martinez*, the Supreme Court found for the first time an equitable exception to the statement previously asserted in *Coleman* that an error by an attorney in a state postconviction proceeding does not qualify as cause to excuse a procedural default. 566 U.S. at 9.  *Trevino* held that this limited equitable exception generally applies to Texas capital cases.  569 U.S. at 417.  To meet the *Martinez*/*Trevino* exception, Brewer must show that (1) his underlying IATC claim is "substantial," meaning that he "must demonstrate that the claim has some merit," *Martinez,* 566 U.S. at 14; and (2) his initial state habeas counsel was ineffective in failing to present this claim in his first state habeas application.  *See id.*; *Trevino,* 569 U.S. at 429.

Brewer cannot satisfy this exception.  His complaint that he was abandoned and left unrepresented on state habeas review is a misrepresentation of the facts.  On January 12, 2012, Brewer's state habeas counsel, Richard Wardroup, filed an "Agreed Motion to Determine Correct Filing Date for Art. 11.071 or, Alternatively to Permit Continued Representation and Establish a New Set Filing Date."  In this motion, Wardroup explained the following.  He was appointed to be state habeas counsel on September 10, 2009, by the trial judge.  The trial judge died several months later, and on July 21, 2010, the CCA rejected Wardroup's appointment because he was not on the list of attorneys approved to handle capital habeas proceedings.  The CCA ordered the trial court to appoint new counsel, and Wardroup considered himself removed as of that date.  In October of 2011, Wardroup learned that the deadline for filing Brewer's habeas application was approaching and inquired as to whether Brewer had obtained new counsel.  Wardroup, who by then had become qualified to

represent capital defendants on state habeas review, learned no other attorney had been appointed.  On October 11, 2011, the trial court re-appointed Wardroup as counsel.  Although he expected 180 days to complete and file the application, Wardroup learned he had only two weeks to file it but succeeded in obtaining and extension until January 25, 2012.  However, he maintained that this was insufficient time to conduct an investigation and filed the agreed motion in the CCA.  He also wanted to remain as counsel for Brewer because he was familiar with the case, had conducted some investigation, and had met with Brewer.  *See* Agreed Motion and accompanying affidavit of Richard Wardroup, January 12, 2012.

On January 20, 2012, the CCA issued an order explaining the above timeline and that Wardroup's re-appointment did not generate a new 180-day deadline. *See Ex parte Brewer*, No. 46,587-02, Order of January 20, 2012.[20]  However, "given these facts and the peculiar circumstances of this case," the CCA found good cause for Wardroup's failure to timely file an application and granted him 180 days, or until mid-July, 2012, to file Brewer's habeas application.  *Id.*  Thus, Wardroup, who had already conducted some investigation into the case, was given the full time allotted by the statute.  And per his motion and affidavit, Wardroup immediately enlisted the assistance of an investigator and expert to investigate and prepare the habeas application.  *See* Wardroup affidavit at 2–3.

In short, Brewer was never abandoned.  His habeas proceeding was only delayed due to a trial court error and some miscommunication.  Thereafter, Wardroup

---

[20]   The motion Wardroup filed, his affidavit, and the CCA's order are individual documents included with the entire state habeas record rather than within a specific volume.

filed a 410-page habeas application raising sixteen claims for relief, several divided into multiple sub-claims.  1 SHCR 63–472.  As shown in Section I, *supra*, Wardroup included numerous affidavits and exhibits, indeed more than the Director has listed. His state habeas proceeding consists of ten volumes, and although Hilary Sheard took over as habeas counsel, Brewer still received a state court evidentiary hearing regarding the IATC claim Wardroup briefed pertaining to Dr. Coons.  Moreover, the instant IATC claim is only partially defaulted because Wardroup presented the allegations pertaining to Albert Brewer and Aimee Long in the original application.

Finally, the ineffectiveness claims pertaining to Kevin Lewis, Ronald Mosher and Ammy Valles, and Brewer's own testimony are without merit.  Thus, state habeas counsel was not ineffective for failing to raise them.  *Newberry v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014) (prisoner must show a reasonable probability that he would have been granted state habeas relief had his habeas counsel's performance not been deficient); *see also Barbee v. Davis*, 660 F. App'x 293 (5th Cir. 2016).  Moreover, even if Brewer can show cause flowing from habeas counsel's representation, he must still demonstrate "actual prejudice."  *Canales v. Stephens*, 765 F.3d 551, 571 (5th Cir. 2014); *see also Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013).  This he cannot do.  Consequently, these claims are defaulted.

**B.    Brewer's claims lack merit.**

**1.    Counsel did elicit evidence that Brewer was never the subject of an investigation.**

Brewer's contention that trial counsel were ineffective for failing to present evidence that he was never the subject of an investigation or a gang member while in

85

prison, DE 103 at 77–78, is meritless.  The state court rejected this claim, holding that trial counsel's main objective was to show that Brewer had opportunities to commit criminal acts of violence but had not engaged in any such acts.  10 SHCR 3083, 3106–07.  This decision is not unreasonable.

First, Brewer is incorrect.  On cross-examination, Merillat testified that he never recalled having to investigate Brewer.  23 RR 166.  It would have been redundant for the defense to call someone to testify to the same.  Moreover, the State never argued or presented evidence showing that Brewer was a gang member. Second, the defense presented three correctional officers who testified that Brewer had never given them any trouble.  24 RR 74–76, 105–07; 25 RR 23.  When the defense cross-examined Russell Pinckard and Stephen Bryant, Pinckard admitted that Brewer had never given him or any other guards problems, 23 RR 86, and Bryant conceded that Brewer was classified as a level one offender, meaning he was among the best behaved inmates.  23 RR 115.  The defense also highlighted the fact that Brewer's prison infractions had been minor.  23 RR 122–25.  During final argument, counsel said: "I assure you that if Mr. Brewer had done something horrible in prison, you would have heard about it and it would have been used against him."  25 RR 207.

In short, Brewer is complaining that counsel failed to investigate and present similar testimony.  Counsel is not ineffective for failing to present cumulative evidence. *Trottie*, 720 F.3d at 246; *Carty v. Thaler*, 583 F.3d 244, 264 (5th Cir. 2009).

## 2.  Counsel effectively challenged the State's case.

Brewer's claim that counsel failed to rebut the State's case on future dangerousness is premised on declarations from trial counsel Odiorne and investigator Rob Cowie, neither of which were presented to the state court and are barred under *Pinholster*.  DE 103 at 66–67, 69–72, 77–78.  In these declarations, both Odiorne and Cowie state that they did a poor job.[21]  To say the least, they are highly suspect, particularly considering that Odiorne provided an affidavit on state habeas review defending his actions and tactics and testified at the habeas hearing for several hours.  *See Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996) ("[R]ecanting affidavits and witnesses are viewed with extreme suspicion by the courts.") (citation and internal quotations omitted).  Cowie, moreover, complains that the defense never sought a continuance to prepare experts, DE 19-5 at 166–67, but, at the state habeas hearing, trial counsel Keith questioned the need for one because he was comfortable with what he wanted from Dr. Edens.  3 SHH 72.  He also pointed out that the issue of a continuance was a matter of hindsight.  *Id.*

These declarations are also suspect because the record reveals that counsel performed effectively.  For instance, the defense forced the State's witnesses to concede that inmates on death row do commit violent acts but that Brewer did not have a violent prison history.  23 RR 164–68.  And the Director has already shown how defense counsel effectively cross-examined Dr. Coons and rebutted his testimony

---

[21]     Brewer attempted to re-submit these declarations when he recently sought to file his appendix, which this Court denied.  DE 107.  However, he previously filed them when he filed his original petition in 2015.  *See* DE 19-4 at 160–65, DE 19-5 at 166–68.

with Dr. Edens.   Thus, the defense accomplished its goals of (1) demonstrating Brewer's lack of violent history in prison; (2) pointing out the flaws in Dr. Coons's methodology; (3) having Brewer express remorse and accept responsibility for his crime.   There is simply no merit to the contention that the State's case "went unchallenged."

Brewer also claims that counsel failed to conduct this investigation before advising him to take the stand.   This claim is defaulted, as stated above.   Moreover, Brewer cannot overcome his default because he does not explain how counsel's alleged failures would have altered the defense's strategy of placing Brewer on the stand, or how that would have shaped or changed his testimony.   This particular claim must be rejected as conclusory.   *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) ("[C]onclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding.").

### 3. Counsel were not ineffective for not rebutting specific witnesses.

#### a. Aimee Long

Brewer claims that had defense counsel questioned Long, she would have mentioned the incident that resulted in Brewer assaulting her following their breakup, but—per her statement barred under *Pinholster*—she would have "doused" the incident by saying Brewer was not violent, the incident was out of character for him, he did not intend to hurt her, and he was not dangerous.   DE 103 at 69–70. Brewer raised this allegation in his original state habeas application adjudicated on

the merits, 2 SHCR 291–92; 10 SHCR 3117–23, and the state court decision denying relief is not objectively unreasonable.

This claim fails because the assault was not simply a one-time event. Long testified that Brewer threatened to kill her on several occasions both before and after the assault, that Brewer threatened to kill her new boyfriend, and that her fears of Brewer intensified after the assault when he continued to threaten her. Further, the threats and assault did not occur contemporaneously; Brewer threatened Long after she broke up with him up until a few months later when she began dating her new boyfriend, which is when the assault occurred. And the assault was not minor; Brewer dislocated three discs in Long's back pinching a nerve and causing her to lose the use of her right arm for several months. Given all the threats, clearly he did intend to hurt her. Long also had an unpleasant encounter with Brewer and his family when she tried to pick up some of her possessions from his house. Moreover, Long broke up with Brewer because he was possessive. 22 RR 77–87. She also provided this testimony at Brewer's first trial. *See* 18 RR 592–97 (1991 trial record).

The trial evidence thoroughly contradicts Brewer's "new" evidence. It would have made little sense for trial counsel to try to elicit an opinion from Long that the assault was "out of character" for Brewer when Long's description of factual events painted a completely different picture. Cross-examination along these lines would have merely given the State a second opportunity to highlight on re-direct examination Brewer's violent and threatening behavior. The better choice was for counsel to get Long off the stand as quickly as possible, not to question her in the

89

slight chance that she might provide some beneficial testimony, thereby keeping her on the stand and making her testimony more prominent.  Brewer's claim is meritless.

Long's statement is also suspect because it is wholly inconsistent with the facts she provided at *both* trials.  In other words, it is a form of recantation, which is "viewed with extreme suspicion by the courts."  *Spence*, 80 F.3d at 1003.

### b.      Ronald Mosher and Ammy Valles

Brewer raises a defaulted claim that trial counsel were ineffective for failing to interview Ronald Mosher and Ammy Valles about Brewer's arrest for possession of a concealed weapon—a knife—in Florida.  DE 103 at 70–71.  Mosher, who testified at trial, was the arresting officer, and Brewer worked for Valles and her husband, who were selling drugs.  Brewer was a driver for Valles (then Greenman) and her husband, and he was in the driver's seat while Valles was in the passenger seat.  When Mosher approached the car, he saw a knife located between the driver seat and the console and arrested Brewer.  22 RR 232–38.

Brewer submitted declarations from Mosher and Valles with his federal petition.[22]   In his declaration, Mosher states that he arrested Brewer because the

---

[22]      Because this claim is defaulted and was not adjudicated on the merits, *Pinholster* technically does not apply to these declarations.  Nevertheless, this Court cannot consider this new evidence.  In his reply, Brewer argued: "[S]tate habeas counsel's failure to develop the claim under a *Martinez/Trevino* theory provides the basis for excusing any failure to develop under § 2254(e)(2) and may provide an equitable exception to the application of *Pinholster* under § 2254(d)(1)."  DE 48 at 28.  But as explained in Section I, *supra*, state habeas counsel's failure to develop any claims, i.e., where a petitioner alleges habeas counsel is "at fault," forecloses consideration of new evidence under § 2254(e)(2).  Nothing in *Martinez* alters this conclusion.  *Martinez* created a "narrow exception" to the court-created rules of procedural default, allowing state prisoners to pursue a substantial IATC claim if state-habeas counsel unreasonably failed to raise that claim in state court.  566 U.S. at 9.  In modifying the court-created rules of procedural default, *Martinez* did not purport to change

knife was closest to him, but it was just as accessible to Valles.  Brewer did not make any statements about who owned the knife, and he did not resist, make threats, or act violently.  DE 19-5 at 41.  Valles simply states that none of their drivers were known to carry weapons or be violent, and that Brewer's trial attorneys never talked to her.  DE 19-5 at 44.  In his petition, Brewer argues: "This information from the arresting officer places this incident in an entirely different, far less sinister or aggravating context."  DE 103 at 71.

However, Mosher testified at trial that he arrested Brewer because of where the knife was located: between the driver's seat and the console.  22 RR 236–37.  On cross-examination, Mosher stated that Brewer was cooperative when Mosher approached him, that Brewer remained cooperative during his arrest, that Valles was in the car but was not arrested, and that the car belonged to Valles and her husband.  22 RR 239.  Mosher's declaration states essentially the same; it adds nothing of significance.  And even though Mosher asserts in his declaration that the knife was equally accessible to Valles, the jury knew that because it was implied in his testimony.  Further, Brewer testified at trial that the knife was not his; he pled guilty to the offense to avoid going to trial and receiving a longer sentence.  25 RR 129–31.  In short, the trial testimony about this particular event was hardly "sinister."  As stated, trial counsel is not ineffective for failing to present cumulative or redundant evidence.  *Norman v. Stephens*, 817 F.3d 226, 233 (5th Cir. 2016).

---

the AEDPA's independent statutory bar on what evidence federal habeas courts may consider.  In no event did *Martinez* overrule any part of (*Michael*) *Williams* or *Holland*.  The *Martinez* Court concluded that its holding raised no stare decisis concern.  *Id.* at 15.

Valles's declaration adds nothing at all.  And it would not have been wise for counsel to call Valles because she and her then-husband, John Greenman, had a criminal history and poor reputation in the Naples, Florida, area.  Indeed, Mosher testified that he approached the car because he had frequent encounters with the Greenmans, the car was known to belong to them, and he knew they had suspended licenses.  22 RR 236–37.

### c.  Kevin Lewis

Brewer raises a defaulted claim that trial counsel were ineffective for failing to interview Kevin Lewis, a former inmate.  DE 103 at 71–72.  In Brewer's first trial in 1991, Lewis testified that he got into an argument with Brewer, and Brewer threatened to stab him in the eye with a pencil.  18 RR 706–07 (1991 trial, punishment phase testimony from Lewis).  Brewer states that Lewis's 1991 testimony was admitted at his re-trial, but that had trial counsel interviewed Lewis, Lewis would have testified that he started the fight and not Brewer.  DE 103 at 71–72.  Brewer supports his claim with a declaration from Lewis in which he also states that Brewer remained calm during the incident and that Brewer had no problems with any other inmates or guards.  DE 19-5 at 33–34.

However, this claim is meritless for several reasons.  First, Lewis testified at the re-trial about comments Brewer made regarding murdering Mr. Laminack and about whether he, Lewis, knew some individuals who had knowledge of the murder.  22 RR 92–103.  Lewis *did not* testify about the fight between him and Brewer.  Second, Brewer's allegation is premised on the transcript of Lewis's 1991 testimony,

which Brewer claims was introduced into evidence during the re-trial.  But Lewis's 1991 testimony is not among the listed exhibits and was never read into the record. The Director has not located this transcript in the record, and Brewer has never indicated where this transcript was admitted.[23]  When questioning Brewer on cross-examination, the prosecution did reference Lewis's prior testimony regarding supposed conflicts Brewer had with other inmates, but nothing was ever officially reported and the State did not go into specifics.  25 RR 102–03, 113, 132.  Brewer himself briefly referenced the argument with Lewis, only stating "[the prosecution] said something [in the first trial] about having an argument with Kevin Lewis or something." 25 RR 103.  During closing arguments, the State did not mention Lewis, let alone this fight, 25 RR 195–204, 217–24, and defense counsel pointed out that if Brewer had engaged in bad or violent behavior in prison, the State would have presented it.  25 RR 207.  In short, this is an immaterial issue; trial counsel cannot be ineffective for failing to rebut testimony that was never presented.

---

[23]     Brewer states: "In 2009, all of the testimony from the 1991 trial, including Mr. Lewis's, was introduced into evidence."  DE 103 at 67.  Brewer does not provide a record citation revealing where this evidence was admitted.  At the beginning of trial, the prosecution asked the trial court to take judicial notice of the fact that Brewer had been convicted of murder in 1991 and stated: "We would like to tender all of the exhibits, all of the testimony, all of the evidence offered *during the guilt/innocence phase of the trial*."  21 RR 21 (emphasis added). During a long discussion outside the jury's presence, the State sought to offer exhibits admitted at the first trial, and the defense voiced its objections.  21 RR 22–23.  The trial court overruled the defense's objections and, when the jury was brought in, the trial court announced that it was taking judicial notice of Brewer's conviction for capital murder.  21 RR 37.  But Lewis testified at the punishment phase of the 1991 trial, not the guilt/innocence phase.  And although the prosecution read into the record the 1991 testimony from several other witnesses, it did not read Lewis's.  Further, the prosecution did not seek to admit Lewis's 1991 testimony before or after Lewis testified in 2009.  *See* 22 RR 89–125.

Finally, testimony from Lewis that Brewer had no problems with other inmates or guards would have been redundant.  Counsel presented testimony from three correctional officers—Castleberry, Unruh and Wilson—all of whom stated they had contact with Brewer and he caused no problems or they did not recall him causing any problems.  24 RR 74–76, 105–07; 25 RR 19–23.  Again, trial counsel is not ineffective for failing to present cumulative evidence.  Moreover, correctional officers would have had more credibility than another inmate.  This IATC claim is meritless.

### 4.  The claims regarding Albert Brewer are meritless.

#### a.  Evidence of Albert's poor behavior was presented.

Brewer alleges that trial counsel were ineffective for failing to rebut evidence about Brewer's assault on Albert and for not presenting evidence that Albert was abusive toward others in the family.  DE 103 at 72–74.  He supports this claim with declarations from Billie Anne Young, Faye Brewer, Brenda Brewer, and Corrie Brewer that were not presented to the state court and are barred under *Pinholster*. DE 103 at 73–74.

Brewer raised this claim in his original habeas application, which the state court rejected on the merits, specifically highlighting the evidence presented of Albert's poor behavior.  2 SHCR 292–93, 296, 298–99, 335–38; 10 SHCR 3117–23, 3154. This decision is not unreasonable.  Defense counsel called Karen Brewer, Billie Anne Young, and Brewer himself to testify.[24]  They stated that Albert was abusive

---

[24]      In his petition, Brewer appears to claim that he was underfunded and, thus, counsel deficiently investigated/prepared for these witnesses.  DE 103 at 74 n.22.  But "[c]ounsel was

and started the fight that led to Brewer hitting Albert because he was only protecting his mother.  24 RR 85–90, 99–100; 25 RR 51–62, 123.  Further, the 1991 testimony from Lepicier that was read into the record revealed that Albert started the fight, was abusive toward Brewer, and was a problem drinker.  22 RR 48–53.

In addition, trial counsel presented the following evidence.  Karen Brewer testified that she made a bad decision to move to Mississippi.  Brewer tried hard, but Albert "was mean to him, so abusive."  Brewer witnessed physical violence between his parents on a number of other occasions.  24 RR 85–90.  Billie Anne testified that she witnessed fights between Albert and Brewer.  She would come out of her room and "they'd be fighting, in a headlock, hitting."  She also recalled "Albert hitting Brent, just beating him up one day."  24 RR 100.  Brewer testified that Albert would get mad at his mother and they "would all pay for it."  Albert was physically and emotionally abusive toward Karen.  Albert would grab Karen around her throat or pull her hair and swing her around.  Lepicier had been to the house several times because Albert was beating on Brewer or his mother.  On one occasion, Albert nearly broke Brewer's nose with a piece of wood, resulting in his arrest.  25 RR 58–59, 62.

Thus, the jury knew that Albert was an abusive man.  The evidence Brewer now presents merely expands on what the jury heard.  Brewer's claim is that counsel failed to present duplicative evidence, which as shown, is inadequate to demonstrate ineffective assistance.  Moreover, as the Fifth Circuit has admonished, arguments that come down to a matter of degrees, i.e., that counsel failed to investigate and

---

entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107.

present "enough" mitigating evidence, "are even less susceptible to judicial second-guessing." *Ward*, 777 F.3d at 265. And that is what Brewer's claim comes down to—counsel failed to present enough evidence to his liking. This allegation is inadequate to demonstrate ineffectiveness.

   **b.   Brewer's claim that counsel failed to delve into Albert's military history fails for several reasons.**

Brewer raises a claim that trial counsel failed to present evidence pertaining to Albert's poor behavior while in the military, specifically an incident where he allegedly assaulted Stanley Kemrer, a fellow soldier, with a knife and descriptions of other bad behavior such as fighting, heavy drinking, allegedly committing war crimes while in Vietnam, and being discharged from the military under conditions "other than honorable." DE 103 at 74–76. He supports his claims with several documents, one being a declaration from Kemrer that is new. *Id.*

In his prior amended petition, Brewer briefly referenced Albert's discharge from the military "[u]nder conditions other than honorable." DE 19 at 59; DE 31 at 73. But he did not go into the matter in any other detail as he does in the instant second amended petition. On August 5, 2016, Brewer filed a motion to supplement the record with specific details about Albert's military record that included the Kemrer declaration, a declaration from Timothy Sullivan whom Albert allegedly sexually assaulted, references to transcripts from court-martial proceedings, supposed evidence of Brewer's abuse toward his first wife, and other details of his poor behavior while in the military. DE 49 at 4–10. To the extent the instant claim

96

was first presented in this motion to supplement, it is barred under the statute-of-limitations provision of 28 U.S.C. § 2244(d)(1)(A) because the limitations period expired on September 17, 2015, one year after the CCA denied Brewer's original habeas application, and excluding the time his state habeas application was pending under § 2244(d)(2). And given that this evidence was clearly available via the exercise of due diligence, Brewer is not entitled to equitable tolling of the limitations period. *Manning v. Epps*, 688 F.3d 177, 183–86 (5th Cir. 2012).

Moreover, arguably this claim is exhausted because, throughout his original state habeas application, Brewer repeatedly referenced counsel's failure to present evidence of Albert's military service in Vietnam, how it turned him into a violent man who enjoyed killing, and that it gave him Post Traumatic Stress Disorder (PTSD). 2 SHCR 289–90, 306–10, 315, 318, 337. Brewer did not get into the specifics of Albert's discharge, court-martial proceedings, or the incidents involving Kemrer and Sullivan, but the topic itself was raised often. Because Brewer's original application was adjudicated on the merits, his new evidence is barred under *Pinholster*.

At any rate, this claim has no merit. Although this evidence paints Albert in a bad light, none of it pertains to Brewer himself. Brewer is not providing evidence of other instances where Albert abused him, his mother, or his sister. Indeed, Brewer and Albert had no contact while Albert was in the Army; it was only years later when Brewer was approximately fifteen-years old that he became re-acquainted with Albert. Albert was not in Brewer's life when Brewer was a child, and Brewer did not learn Don Bartlett was not his real father until after the fourth grade. 25 RR 39–40,

42.  Counsel can hardly be faulted for not presenting this evidence because Albert's conduct in the Army sheds no light on *Brewer's character, record, or the circumstances of the offense.  Cf. Zant v. Stephens*, 462 U.S. 862, 879 (1983) ("What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.") (emphasis in original).  The evidence is, therefore, insufficient to demonstrate prejudice.  *See Sells v. Stephens*, 536 F. App'x 483, 494 (5th Cir. 2013) (trial counsel not ineffective for failing to present irrelevant evidence; "[Petitioner] points to the mass of affidavits and reports he has since mustered as the mitigating evidence which a reasonable investigation should have uncovered.  However, much of this evidence is of a type that would not have shed any real mitigating light on [Petitioner's] background.").

Moreover, the evidence that Brewer's counsel presented—testimony that Albert seized Brewer in a headlock and beat him, repeatedly grabbed Karen by the throat and swung her around by her hair, nearly broke Brewer's nose with a piece of firewood, and was arrested for domestic abuse—was sufficiently graphic.  Additional testimony pertaining to Albert's character was unneeded because the jury knew what he was like.

Further, one of trial counsel's primary themes was that Brewer accepted responsibility for the murder.  Counsel could have attempted to paint Albert as the primary negative influence on Brewer by digging into every aspect of his past, but that would have only undermined the defense's strategy of Brewer shouldering the blame.  And it likely would not have worked because the counter-argument is

98

obvious—Brewer was in high school before Albert entered the picture and, thus, Albert had no impact on Brewer's formative years.  Clearly, Brewer wishes in hindsight that trial counsel had focused on Albert as the key figure for mitigation purposes.  But this tactic would have conflicted with the defense's strategy while providing little in return.  At the very least, counsel's decision to forego this route should not be second-guessed.  *Pape*, 645 F.3d at 291 ("we may not, in hindsight, second-guess counsel's strategy . . . merely because an alternative course of action existed during trial").

Finally, Brewer cannot demonstrate any prejudice.  Brewer's upbringing and background was hardly of a nature sufficient to mitigate his brutal and senseless murder of Mr. Laminack.  As shown in the Statement of Facts, *supra*, Brewer had a history of violence and threatening behavior pre-dating the murder, particularly toward his former girlfriend, other school mates, and teachers.  He also has a history of drug use and associating with drug dealers.  And following the crime, he was defiant and exhibited little remorse.  There is not a reasonable probability that this additional evidence would have persuaded the jury to answer the special issues such that Brewer would have received a life sentence.

## VI.   Brewer's Claim that Counsel Failed to Investigate and Present Mitigating Evidence Is Meritless.

Brewer contends that counsel were ineffective for failing to investigate and present mitigating evidence.  Relying primarily on evidence he never presented to the state court—numerous declarations from family members and friends, and a recent mental-health report by Dr. Mark Cunningham—Brewer claims that counsel failed

to present a comprehensive overview of his life, which would have demonstrated more family dysfunction and abuse than counsel presented at trial. Brewer also argues that counsel failed to investigate and present evidence that he has mental-health problems. He further contends that counsel failed to demonstrate the deleterious influence Nystrom exerted over him. DE 103 at 79–108. These claims lack merit.

### A.     State court findings

The state court made the following findings regarding Brewer's claims: trial counsel (1) used an in-house investigator to develop mitigating evidence and trial strategy; (2) received and reviewed the transcript of the 1991 trial, which assisted the defense in the investigation into both mitigating evidence and the State's case; (3) reviewed the notes from Brewer's prior attorneys to develop mitigating evidence; and (4) traveled to Mississippi to meet with Brewer's family about mitigating evidence. 10 SHCR 3117–18 (citing 7 SHCR 2009, 2013–14).

The state court then summarized all the evidence presented by Brewer's trial counsel, and found that (1) "most of the unoffered mitigating evidence that [Brewer] complains about . . . was not substantially different in strength and subject matter from the mitigating evidence actually presented at the re-sentencing trial"; (2) "trial counsel . . . properly investigated and presented strong mitigating evidence at the re-sentencing trial that called for a sentence of less than death"; (3) trial counsel's strategy "pertaining to the investigation of mitigating evidence and the presentation of mitigating evidence was reasonable and plausible in light of all the circumstances"; and (4) "[Brewer] has failed to establish any prejudice . . . in light of the thorough

investigation of mitigating and aggravating evidence prior to the re-sentencing trial and in light of the presentation of strong mitigating evidence at the re-sentencing trial." 10 SHCR 3119–23. This decision is not objectively unreasonable.

### B.    Brewer's claims are meritless.

#### 1.    Counsel presented sufficient mitigating evidence.

As stated, Brewer's claim, with a few exceptions, relies almost exclusively on a slew of declarations he never presented to the state court. *See* DE 103 at 81–107; *see also* Section I, *supra*. This Court cannot consider them under *Pinholster*. But Brewer's claim fails nonetheless. First, much of the evidence Brewer argues counsel failed to offer was in fact presented at trial in one form or another. For example:

| What Brewer alleges counsel failed to present | What counsel did present |
|---|---|
| Testimony that Don Bartlett rejected Brewer, left Brewer out of activities, and showed him no affection. DE 103 at 87–88. | Brewer testified that his relationship with Don was not good. Billie Anne got most of Don's attention, whereas Brewer did not receive any. Brewer said that he and Don got into fights on many occasions, and Don would beat him with a belt or extension cord. 25 RR 41–42. |
| Testimony from Billie Anne that she was afraid of Karen Brewer, thought Karen was bi-polar, and was abused by Karen. On one occasion, Brewer intervened and was placed in juvenile detention. DE 103 at 88–89. | Brewer testified that his mother got physical with Billie Anne "most of the time." At this point, Brewer and his mother started having problems. 25 RR 43.[25] |

---

[25]    In his reply, Brewer stated: "The jury heard no testimony regarding Billie Ann's suspicions that Karen Brewer suffered from bi[-]polar disorder. Indeed, the jury heard no evidence of the family history of mental illness, instability, and dysfunction that was readily available to trial counsel." DE 48 at 30. At no point has the Director asserted that Billie Anne testified Karen was bi-polar; Billie Anne testified about the troubled relationship between Brewer and his mother, which, as shown, Brewer somewhat contradicted when he testified. But the notion that the jury heard no evidence of the family history of instability and dysfunction is clearly refuted by the record.

| | |
|---|---|
| Testimony that, when he lived with Don, Brewer would often run away from home to avoid conflicts with his parents, and his mother and Don made no attempt to find him. DE 103 at 89. | Brewer testified that he ran away from home several times and would be gone for a month or two. His mother came looking for him once but never again. But his behavior at this time was bad; he was smoking marijuana and not doing his school work. 25 RR 53–54. |
| Testimony that when Albert got back from Vietnam, he was diagnosed with PTSD, drank heavily, and used drugs. DE 103 at 92. | Brewer testified that when Albert got back from Vietnam, he changed and started abusing his mother. 25 RR 40. Lepicier's prior testimony also confirmed that Albert was a problem drinker. 22 RR 50–51. |
| Testimony that when Albert re-entered Brewer's life, he exposed Brewer to cigarettes and alcohol. DE 103 at 94–95. | Brewer testified that the first time he got re-acquainted with Albert, they bought some beer, went to a motel room, and got drunk. Brewer also brought some marijuana and smoked it. 25 RR 51–52. |
| Testimony that Brewer and Billie Anne did not want to move to Mississippi with Albert. DE 103 at 95. | Billie Anne testified to the same at trial. 24 RR 100.[26] |
| Testimony that Albert became physically and verbally abusive to Karen, Brewer, and Billie Anne almost immediately upon their arrival in Mississippi. Albert would hit Brewer in the face about twice a month. DE 103 at 95–96. | Karen said that she made a bad decision to move to Mississippi. Brewer tried hard, but Albert "was mean to him, so abusive." She described the incident where Brewer hit Albert and said that it started because Albert grabbed her by the hair following an argument. Brewer witnessed physical violence between them on a number of other occasions. 24 RR 85–90. Billie Anne testified that she witnessed fights between Albert and Brewer. She would come out of her room and "they'd be fighting, in a headlock, hitting." She also recalled "Albert |

---

[26]     In his reply, Brewer stated: "A thorough investigation would have yielded compelling details, including the severe emotional impact of the move on Mr. Brewer and his sister and the harmful and disruptive effect Albert Brewer had on their lives after the move." DE 48 at 31. Brewer then quotes from Billie Anne's declaration—barred under *Pinholster*—that they cried in the car all the way to Mississippi, and Albert threw out some of their baby picture albums, which Brewer recovered. *Id.* This latter information hardly transforms the move to Mississippi into compelling mitigating evidence. Regarding how Albert behaved after the move, that evidence was presented to the jury, as shown herein.

|  | hitting Brent, just beating him up one day." 24 RR 100.  Brewer testified that Albert would get mad at his mother and they "would all pay for it."  Albert was physically and emotionally abusive toward Karen.  Albert would grab Karen around her throat or pull her hair and swing her around.  Brewer hit Albert with the broom when he jumped up from the kitchen table and tried to grab Karen.  Lepicier had been to the house several times because Albert was beating Brewer or his mother.  On one occasion, Albert nearly broke Brewer's nose with a piece of fire wood.  Brewer went to the police, and Lepicier arrested Albert.  25 RR 58–59, 62. |
| --- | --- |
| Testimony that Brewer tried to stop Albert from beating Karen, which made Brewer the victim of abuse.  DE 103 at 96. | As shown, the jury heard about Brewer's attempts to intervene on his mother's behalf.  24 RR 86–90; 25 RR 60, 123. |
| Testimony that Albert got a job as a truck driver, and Albert and Karen would be gone most of the time.  Brewer had to care for Billie Anne, and they often did not have food.  DE 103 at 96–97. | Brewer testified that when his mother and Albert were on the road, he was responsible for taking care of Billie Anne.  25 RR 55. |

Second, some of Brewer's new evidence is contradicted by evidence presented or elicited at trial.  For instance:

| **What Brewer alleges counsel failed to present** | **The contradictory evidence presented** |
| --- | --- |
| Testimony that Brewer's early childhood was marked by maternal neglect, instability, and rejection by his parents.  DE 103 at 86–88. | Billie Anne testified that she and Brewer had a good childhood when they lived with Don.  The played all the time, went to the park, and did family things.  This changed when Don and Karen divorced.  24 RR 98.[27] |

---

[27]    In his reply, Brewer stated: "[T]hese supposed inconsistencies show that counsel gave an incomplete and inaccurate impression of Mr. Brewer's background, leading jurors to believe he had a "good childhood."  DE 48 at 31 (citing 24 RR 98).  The inconsistency was not the fault of trial counsel.  As Brewer acknowledges, the information about a "good childhood"

| | |
|---|---|
| Testimony that Karen struggled to provide for Brewer. She would run off and neglect him, and she was emotionally troubled. DE 103 at 86–87. | Brewer testified his mother "was the one that was there for me my whole life." As far as he remembered, she did not "go off"; she was consistently in his life. 25 RR 43. |
| Testimony that when Karen was married to Don, the house was in a constant state of chaos and discord brought on primarily by Karen's unstable and domineering behavior, which in turn affected Brewer's behavior. DE 103 at 87–89. | Brewer testified that he started having problems in his middle years after being diagnosed with scoliosis. But he conceded that the problems were his fault. He started hanging out with "stoner types" who drank alcohol and smoked marijuana; he experimented "with probably everything"; he stopped doing his school work; he got in trouble at school for pointing a knife at another student; and he was not well-behaved. 25 RR 48–51. |
| Testimony that when Brewer went to live with his grandmother in Abilene, his grandmother was as unstable, domineering, and aggressive as Karen. She created chaos in the house, was diagnosed as bi-polar, and essentially drove Brewer to depression and ultimately a suicide attempt. DE 103 at 97–98. | Brewer testified that when he went to Abilene, he became re-acquainted with friends who mainly did drugs and alcohol. But this was his choice. Brewer's daily routine primarily involved "staying high" most of the time. Eventually, he got sick of life, and wrote a note to his grandmother saying he was sorry and that he was going to commit suicide. 25 RR 64–65. Brewer did not characterize any of this as his grandmother's fault. |
| Testimony that Brewer's downfall was also due to Nystrom's bad influence on him after he met her in Big Spring State Hospital and met up with her in Amarillo. DE 103 at 98, 106–08. | Brewer testified that once he got out of the hospital, he came to Amarillo and started doing drugs and alcohol after he met Guy Blackwell, who was a heavy drinker. At one point, they got into a fight after Blackwell took Nystrom to a bar. 25 RR 72–74. Therefore, per Brewer, the supposed bad influence was Blackwell, not Nystrom. 25 RR 110–11. |

came straight from Billie Anne. If Billie Anne believed otherwise, she should have said so when she had the chance, not years later.

Third, the alleged evidence that did not come out at trial and is not contradicted is insignificant. In a 1996 assessment by Dr. Cunningham, Brewer said that, during his pubescent years, he was "disturbed" by some "sex play" between him and male friend of the same age. This began with watching pornographic videos and progressed into mutual genital fondling and oral stimulation. Brewer further claimed that he was "abused" by a female babysitter who initiated breast and mutual genital stimulation. Brewer said that he "felt weird about it" and did not really associate the experience with being with a girl. Dr. Cunningham noted that "same sex play" and adolescent masturbation is "not particularly unusual" and "unremarkable." Brewer, however, was upset for revealing the information because he did not want his mother finding out and expressed fears about being considered homosexual. *See* DE 19-2, 1996 Cunningham report, at 54–55. This interview was conducted long before Brewer's re-trial. The fact that Brewer testified and did not bring up these matters indicates (1) he did not consider them important and/or (2) he did not want to delve into them for personal reasons. At any rate, this is not mitigating evidence sufficient to mitigate capital murder. *See also* Section VI, B, 4, *infra* (discussing additional problems with the report).

In his reply, Brewer said that the Director took Dr. Cunningham's statements out of context. DE 48 at 32. But the context is as follows:

> Same sex play in early adolescence is not particularly unusual and is not an indicator of future homosexual orientation. Adolescent masturbation is similar[ly] unremarkable. Brent has had no insight regarding the benign meaning of these activities and thus incorporated them into his identity in a fashion that increased self[-]repudiation, feelings of social alienation, and anticipation of peer rejection.

DE 19-2 at 55.  In other words, Dr. Cunningham stated that what happened to Brewer was not bad, only that Brewer interpreted it that way.  This is hardly compelling mitigating evidence along the lines of actual traumatic sexual abuse.  Moreover, there is no elaboration regarding whether it would be unusual for a twelve-year old to have odd feelings about this.  But Brewer then stated: "Dr. Cunningham's reports make clear the sexual abuse Brent suffered at the hands of a babysitter was traumatic." DE 48 at 32.  Dr. Cunningham actually stated that that such abuse "has been associated in the research literature" with various emotional and mental-health difficulties.  But even to the extent this was an actual trauma for Brewer, again, this is not compelling evidence sufficient to mitigate the heinous murder of Mr. Laminack. Moreover, explaining this evidence would have required calling Dr. Cunningham, which counsel did not want to do for the reasons addressed in Section II, *supra*.

Regarding Brewer not bringing up these matters when he testified, Brewer stated there is no evidence he did not want these matters investigated or that he was uncooperative, counsel was obligated to investigate anyway, and, "Mr. Brewer was not responsible for deciding what mitigation should have been presented."  DE 48 at 32–33.  Thus, Brewer believes that he was under no obligation to bring up this matter despite testifying for close to 140 pages.  Brewer has also not shown that counsel was unaware of this issue; he merely assumes it.  More importantly, Brewer's claim that he "was not responsible for what mitigation evidence should have been presented" flies in the face of *Strickland*, where the Court stated:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.

> Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.

466 U.S. at 691. The notion that Brewer had no say in what was presented is clearly meritless.

Next, Brewer contends that counsel should have presented evidence that Albert Brewer abused his first wife, Patricia, and their daughter Corrie; that Brewer lived with Albert for one summer when he was fifteen-years old and was exposed to Albert's abuse of other family members, sexual perversions, and animal cruelty; and that Albert sexually assaulted and fathered a child with his niece Susan, physically abused Susan and their child Israel, and wanted Brewer and Susan to have sex, which did not happen. DE 103 at 92–94. But as explained in Section V above, evidence of Albert's behavior directed at others in the family reflects poorly on his own character, but it has little relevance to Brewer himself, who had no contact with Albert until he was fifteen. Brewer does not even show that he was around Albert when many of these events allegedly occurred. If these instances were directed at Brewer, that would be another matter. Because they were not, this is evidence of little mitigating value. *See Sells*, 536 F. App'x at 494. And based on the testimony from Brewer, Karen, Billie Anne, and Lepicier, the jury was well aware that Albert was abusive and often displayed vile behavior.[28]

---

[28]   In this portion of his claim, Brewer references in further detail Albert's bad behavior while he was in the military, including evidence pertaining to his supposed court martial and a declaration from Timothy Sullivan, who claims Albert sexually abused him. DE 103 at 91–92. The Director addressed this issue in the prior section; it is irrelevant because it pertains to what Albert did to others, and Brewer had no contact with Albert at the time.

In his reply, Brewer said that counsel still had an obligation to investigate and present this type of evidence.  DE 48 at 33.  He stated: "Such evidence would have not only bolstered the allegations of physical abuse that Brent and his family members suffered at Albert's hands, but would have effectively conveyed to the jury the severity of that abuse by showing Albert's true character and the horrific violence he was capable of."  *Id.* at 34.  But the jury heard about the instances of abuse from Albert and knew what he was like.  What Albert was "capable" of doing or may have done to others does not transform any instance of abuse directed toward Brewer, such as nearly breaking Brewer's nose with a piece of wood, to be something worse than how it was actually described at trial.  Brewer also stated: "[T]he State's argument is refuted by the record. As set forth in the Amended Petition and Dr. Cunningham's report, exposure to his father's sexual perversity, pervasive violence and threats against other family members had a traumatic effect on Mr. Brewer and disrupted his development."  *Id.*  But this argument fails for several reasons: (1) Dr. Cunningham would have had to provide that testimony, but counsel made a strategic decision not to call another expert, (2) Dr. Cunningham's 1996 report has many other problems, as shown herein; and (3) the defense's strategy centered on highlighting Brewer's prison conduct and Brewer shouldering the blame for his actions, not pointing a finger at anyone else to excuse or explain away his conduct.

In short, trial counsel presented much of the evidence Brewer claims was missing, other trial testimony contradicts Brewer's proposed evidence, and some of the new evidence is irrelevant.  Brewer cannot demonstrate ineffectiveness just

because he believes counsel failed to do more.  *See Trottie*, 720 F.3d at 248 ("[A]lthough the jury may not have had all of the facts that Trottie now wishes it had, Trottie's counsel did offer meaningful information regarding Trottie's childhood and how it may have impacted Trottie's decisions on the day of the incident.").  Again, this Court should not second-guess claims that come down to a matter of degrees, i.e. that counsel failed to present "enough" mitigating evidence.  *Ward*, 777 F.3d at 265.

## 2. The instant case is not similar to *Walbey*[29] or *Lewis*.[30]

Throughout this portion of his claim, Brewer compares the instant case to *Walbey v. Quarterman*.  DE 103 at 80–81, 99–100.  This case is easily distinguishable. Walbey's trial counsel did not discuss mitigation with a psychologist, interview Walbey's mother, or investigate Walbey's relationship to the victim.  The Fifth Circuit concluded that trial counsel rendered ineffective assistance in part because counsel failed to discover and present evidence that would have explained Walbey's antisocial personality.  Walbey's counsel hired a mental-health expert one week before trial, and no mitigation investigation was conducted.  309 F. App'x at 797.  Walbey's attorney therefore overlooked evidence of Walbey's abandonment by the murder victim, who was his former foster mother, as well as evidence of Walbey's harsh childhood of "bloodcurdling" neglect and abuse.  *Id.* at 797, 803.  Walbey's counsel was also unprepared to challenge his own expert's admission that Walbey could be diagnosed with antisocial personality disorder, even though the expert disagreed with

---

[29]   *Walbey v. Quarterman*, 309 F. App'x 795 (5th Cir. 2009).

[30]   *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003).

such a diagnosis.  *Id.* at 804.  The Fifth Circuit, in several extensive paragraphs,

described the evidence counsel failed to investigate and present, two of which stated:

> The records admitted about Walbey's childhood during the hearing
> before the magistrate judge describe a nightmarish hell of cruelty and
> neglect.  Walbey was made to drink beer and smoke "joints" by ages two
> and a half to three and was left filthy, alone, and with unexplained
> marks on his body during the same time; was found wandering alone
> along a highway service road at age five; was kidnapped by his father—
> who abused his mother and had a drug and alcohol addiction—and
> hidden from his mother from ages five to ten; was repeatedly physically
> and mentally abused by his father and paternal grandmother, including
> a beating with a doubled over belt that lasted for forty-five minutes and
> broke the buckle; was forced to eat garbage while living in abandoned
> houses when he was locked out by (or ran away from) his father during
> the period of his kidnapping; was reunited with his mother after being
> discovered in an orphanage; took to petty theft; was hospitalized with a
> possible diagnosis of schizophrenia at age twelve, but did not receive the
> recommended follow-up care for that diagnosis because his mother "did
> not have the time"; and was abused by his mother—who had a drinking
> problem—when she drank.
>
> At age thirteen, Walbey ran away from this environment and lived in
> vacant apartments, feeding himself by stealing food.  He was
> hospitalized at the same age and ultimately diagnosed with an
> adjustment disorder secondary to stressful home life.  The psychological
> profile constructed at the time indicated an extreme sensitivity to
> rejection and abandonment, low self-esteem, and an impoverished
> relationships with others.  His mother refused treatment for him after
> his discharge from the hospital, despite being advised that he required
> continuing and long-term follow-up care.  He was arrested for burglary,
> and the police had to issue a subpoena for the arrest of his mother
> because they could not contact her.

*Id.* at 797–98.

The facts of this case are nothing like *Walbey*.  Brewer's counsel had "an in-

house investigator and mitigator as part of [the] defense team."  7 SHCR 2009.  Trial

counsel Keith stated:

> Prior to trial I traveled to Mississippi to meet with Brent Brewer's family members. I met with Billie Ann Brewer on two occasions. Karen Brewer did not make herself available to me. Due to concern that Karen Brewer would not appear at trial, I started the process of obtaining out of State subpoenas through a Mississippi Court.

7 SHCR 2014. Counsel was able to track down Karen and presented her as a witness. Counsel also presented Brewer's sister and Brewer himself. As shown above, through these witnesses, the defense presented Brewer's history to the jury. And because *Brewer himself* testified, he was not precluded from giving the jury any information pertaining to his past and upbringing that he considered important. Indeed, as stated, his testimony comprises nearly 140 pages of the record.

What Brewer fails to recognize is that the defense's strategy was to have Brewer accept responsibility for his crime and show remorse, which is one of the main reasons he testified. A "kitchen sink" mitigation strategy based on presenting dozens of witnesses to show more dysfunction within the extended family might have only distracted from the message defense counsel tried to convey to the jury. For instance, during final argument, counsel stated: "Mr. Brewer's childhood, you've listened to. Did Mr. Brewer have the worst childhood in the world? Of course not. Is it an excuse for what he did? Of course not." 25 RR 214. It is possible that the hindsight approach Brewer now desires would have appeared to be just that to the jury—an excuse.

Moreover, as shown in the Statement of Facts, counsel presented Dr. Edens to rebut Dr. Coons. And, importantly, counsel also presented several jail/prison guards to demonstrate that Brewer had not been violent or problematic while incarcerated. On cross-examination, counsel elicited similar testimony from the State's witnesses

Pinckard and Bryant.  This was arguably the most significant mitigating evidence because (1) the question for the jury is whether the defendant will be a future danger while incarcerated and (2) evidence directly bearing on that issue already exists in a capital punishment re-trial.  During final argument, counsel stated that the prosecution had failed to prove Brewer was a future danger because "[e]verything [the State] can point to is on the table of horror, and it's what Brent Brewer did from age 13 to 19."  25 RR 215–16.  Counsel then argued:

> A jury in 1991 had to make a prediction about the future and the future conduct of Brent Brewer.  You folks have 18 year's worth of evidence of that conduct.  You don't have to look into crystal balls or listen to charlatans like Dr. Coons.  You folks can examine the evidence and what's been put before you.  Brent Brewer is clearly not a future danger.

25 RR 216.  Counsel's strategy was sound and the investigation reasonable considering all the circumstances.

Finally, *Walbey* is not on point given the sheer breadth of mitigating evidence counsel failed to present in that case.  Despite Brewer's attempts to claim otherwise, evidence of the childhood "horror" in *Walbey* simply is not present here, which is why counsel conceded that fact.  Thus, although counsel could have called more witnesses to provide extra details about Brewer's family and childhood, none of what he offers comes close to what was missing in *Walbey*.  To the extent that any minor detail was overlooked, "[w]hile in hindsight, it is easy to say that trial counsel could have done more, we find the state habeas court reasonable in its conclusion that trial counsel performed reasonably based on the context and circumstances at the time of the

112

representation." *Blanton v. Quarterman*, 543 F.3d 230, 239 (5th Cir. 2008); *see also Perry v. Quarterman,* 314 F. App'x 663, 668 (5th Cir. 2009) (distinguishing *Walbey*).

Brewer has also likened his case to *Lewis v. Dretke.  See* DE 48 at 29; DE 103 at 80–81.  Again, this case is not on point.  In *Lewis*, the Fifth Circuit remanded the case to the district court for an evidentiary hearing to determine if counsel was ineffective for failing to investigate and present mitigating evidence.  *Lewis v. Johnson*, No. 96-10616, 2000 WL 35549205, at *3–*4 (5th Cir. Dec. 21, 2000).  In doing so, the court noted the following: (1) the case was remarkably similar to (*Terry*) *Williams v. Taylor* because  "like Williams's counsel, Lewis's counsel did not begin to prepare for the punishment phase of trial until one week before trial began" and spent a short amount of time interviewing punishment witnesses made "more troubling because counsel had eight months to prepare for trial in which they called no guilt-phase witnesses"; (2) counsel presented only one punishment witness whose testimony consisted of a mere sixteen pages of the transcript when in fact there were many other witnesses willing to testify; (3) federal habeas counsel found that "Lewis suffered from severe childhood physical, psychological, and sexual abuse, and experts have found neurological impairments" which were "equally as disturbing and relevant to mitigation as that in *(Terry) Williams*"; (4) "as in *(Terry) Williams*, this failure to introduce evidence was admittedly based on counsel's erroneous understanding of state law" that evidence of abuse was not relevant under the Texas special issues; and (5) the trial court granted the defense funds for a psychologist, but Lewis never underwent any testing.  *Id.* at *2–*3.

113

Following remand and a hearing, the district court denied Lewis habeas relief. *Lewis*, 355 F.3d at 365.  The Fifth Circuit reversed the district court's judgment first stating that Lewis's trial attorney had a vague recollection about her investigation into mitigating evidence, contrasted with the very specific testimony from Lewis's three sisters.  *Id.* at 367–68.  The Fifth Circuit also rejected the notion that counsel's mitigation decisions amounted to trial strategy.  *Id.* at 368.  The Fifth Circuit then described the evidence that was omitted:

> [T]he testimony of Lewis's sisters is remarkably consistent.  Each testified that their (and Lewis's) father beat all of them with extension cords, switches, sticks, or anything else within his reach.  They testified further that he regularly made them undress, then whipped them in the area of their genitals, and that this conduct occurred at least every other day.  According to Lewis's sisters, all of the children lived in constant fear of their father's rages, particularly when he was unable to get the drugs to which he was addicted. . . .
>
> There is abundant record evidence that Lewis's father was a violent drug abuser; that he shot Lewis's mother in the stomach and leg, almost killing her; and that, in the presence of Lewis and the other children, he beat their mother on numerous occasions.  Additionally, medical records in evidence show that the children made numerous trips to the hospital emergency rooms for treatment of injuries that were consistent with the described beatings.  The record reveals, inter alia, that Lewis had to be hospitalized for cuts on his penis and for an infection he developed when a hypodermic needle was stuck into his foot.  And these records also reflect that Lewis's sister, Arlisa, was treated for severe burns on her back and that their mother had suffered a gunshot wound.  This record evidence is consistent with the testimony of the sisters, as is the evidence of approximately seven "domestic disturbance" calls to 911 from the Lewis household between 1975 and 1978.

*Id.* at 368–69.

There is no similarity between *Lewis* and the instant case.  Here, counsel did not spend a short amount of time investigating the punishment case because this re-

trial involved only punishment.  Counsel presented eight witnesses whose testimony comprises nearly two volumes of the reporter's record.  There was no mistake of law which led counsel to forgo presenting any evidence.  And as explained above, counsel made a strategic decision not to have a future-dangerousness assessment done by Dr. Edens or Dr. Cunningham out of concern that it could backfire.   More importantly, in light of the substantial evidence counsel presented, the purportedly omitted evidence in this case does not compare to the evidence omitted in *Lewis* as described by the Fifth Circuit.

### 3.   Likewise, *Andrus*[31] is not on point.

In a document just filed with this Court, Brewer added the Supreme Court's recent decision in *Andrus v. Texas* as a supplemental authority, which Brewer argues supports the instant claim as well as the claim addressed in Section V, *supra*.  *See* DE 110.   Notably, Brewer did not seek permission from this Court to file a supplemental pleading or new authority under Northern District Local Rule CV 56.7, which states: "Except for the motions, responses, replies, briefs, and appendices required by these rules, a party may not, without the permission of the presiding judge, file supplemental pleadings, briefs, authorities, or evidence."  But the Director will address *Andrus*, which is clearly distinguishable.   There, trial counsel called Andrus's mother who painted a comparatively serene picture of Andrus's life stating that Andrus had an excellent relationship with his siblings and grandparents and that he did not have access to pills or drugs.  140 S. Ct. at 1878.   Counsel then called

---

[31]    *Andrus v. Texas*, 140 S. Ct. 1875 (June 15, 2020).

Andrus's biological father who had been in and out of prison and had not seen Andrus in six years, although he stated that Andrus had been good around him during the one year they spent together. *Id.* at 1879. The defense then rested, but after the trial court questioned this move, counsel called more witnesses, including Dr. Roache who briefly testified about the general effects of drugs on the brain and a prison counselor who testified that Andrus started showing remorse recently, although the State noted that the remorse started around the time of trial. *Id.* Lastly, contrary to what his mother stated, Andrus himself testified "that his mother had started selling drugs when he was around six years old, and that he and his siblings were often home alone when they were growing up. He also explained that he first started using drugs regularly around the time he was 15." *Id.* Counsel's questioning of Andrus's childhood consisted of four total pages in the transcript. *Id.* Andrus was convicted and sentenced to death. *Id.*

On state habeas review, the trial court held an eight-day evidentiary hearing regarding Andrus's claim that counsel failed to investigate and present mitigating evidence. *Id.* The trial court characterized this as a "tidal wave of information ... with regard to mitigation." *Id.* Andrus's childhood was "marked by extreme neglect and privation, a family environment filled with violence and abuse." *Id.* He was raised in a neighborhood known for its violence and drug use. *Id.* Andrus's mother had him when she was only seventeen-years old, her second of five children from multiple and absent fathers, one of whom raped Andrus's half sister. *Id.* These men physically abused Andrus's mother, and all had criminal histories and used drugs.

*Id.* Contrary to what Andrus's mother stated at trial, she sold drugs and engaged in prostitution. *Id.* She made drug deals in the house in front of Andrus and his siblings, she was usually high on drugs and disoriented, and she often left the children to fend for themselves without any food. *Id.* at 1879–80. After her boyfriend was killed in a shooting, she became increasingly dependent on drugs, went on extreme drug binges, and continued to neglect her children. *Id.* at 1880. As a result, when he was only twelve, Andrus assumed responsibility for the household including taking care of his special-needs brother, cooking meals, cleaning the house, putting his siblings to bed, getting them up for school each morning, and helping them with their homework. *Id.* His siblings viewed him as the "protective older brother" who was "very caring and very loving." *Id.*

Nonetheless, Andrus struggled with his own mental-health issues, being diagnosed with "affective psychosis" around age ten or eleven. *Id.* At age sixteen, Andrus was sent to the Texas Youth Commission (TYC) for participating as a lookout in a robbery. *Id.* There, he was prescribed psychotropic drugs that had serious side effects, he spent long periods in isolation for reporting to staff that he was hearing voices telling him to do bad things, and he inflicted harm on himself and threatened suicide. *Id.* After eighteen months in TYC, he was sent to an adult facility. Shortly after Andrus was released, he committed the instant murder. *Id.* While in jail awaiting trial, Andrus attempted suicide and used his own blood to smear messages on the walls "beseeching the world to '[j]ust let [him] die.'" *Id.* The trial court found counsel ineffective for failing to investigate and present "ample mitigating evidence"

at the punishment phase of Andrus's trial. *Id.* at 1880–81. The CCA disagreed and held in an opinion without elaboration that Andrus failed to meet his burden under *Strickland*. *Id.* at 1881.

The Supreme Court granted certiorari, vacated the lower court's decision, and remanded—finding the following. Trial counsel "by his own admissions at the habeas hearing, [was] barely acquainted with the witnesses who testified during the case in mitigation." *Id.* at 1882. For instance, counsel first met Andrus's mother when she was subpoenaed to testify; first met Andrus's father the day he testified; did not meet Dr. Roache until just before voir dire; and met the counselor only part way through the trial. *Id.* Dr. Roache stated that he was "struck" by counsel's lack of familiarity with the pertinent issues. *Id.*

Counsel acknowledged many times at the hearing that he was unprepared and uninformed about the circumstances of Andrus's life. *Id.* Counsel did not know that Andrus had attempted suicide while in jail, did not know about his bad experiences in TYC, and failed to talk to Andrus's siblings "all of whom had disturbing stories about Andrus'[s] upbringing." *Id.* A psychologist testified that Andrus suffered "pronounced trauma" and PTSD from severe neglect and "exposure to domestic violence, substance abuse, and death in his childhood." *Id.* Counsel further ignored Andrus's mental-health issues of "affective psychosis" and possible schizophrenia, even though his mitigation expert documented that Andrus had been diagnosed with a serious mental-health condition. *Id.* at 1882–83. "The untapped body of mitigating evidence was, as the habeas hearing revealed, simply vast." *Id.* at 1883.

Next, the Court found that counsel's performance reflected inattention rather than "reasoned strategic judgment," which was "all the more alarming" because counsel chose to concede guilt, present no evidence at that phase, and "train his efforts on the case in mitigation." *Id.* The Court also found that, due to a lack of preparedness, counsel's mitigating evidence "unwittingly aided the State's case in aggravation." *Id.* Andrus's mother said that Andrus fell into drugs by his own choice, drugs were not available in the house, and she would have intervened if he had used drugs. *Id.* When Andrus took the stand, he stated that his mother was untruthful, but counsel made no effort to "probe the accuracy" of her testimony, and counsel later admitted that he did not even know beforehand what the mother would say due to his lack of preparedness. *Id.* Moreover, the mitigation specialist, who briefly interviewed Andrus's mother, informed counsel that she had concerns about Andrus's mother's testimony because she was not cooperative and likely not motivated by Andrus's best interests. *Id.* at 1883–84. For instance, the investigator learned the mother had taken out a $10,000 life insurance policy on Andrus that she would collect if he was executed. *Id.* at 1884. Counsel disregarded these warnings. *Id.*

Counsel made matters worse by undermining Andrus's testimony. After Andrus testified that his mother sold drugs out of the home, counsel stated to Andrus that he heard his mother testify and she did not say anything about selling drugs. *Id.* The Court asserted that regardless of counsel's intentions, "the jury could have understood counsel's statements to insinuate that Andrus was lying. Counsel did

nothing to dislodge that suggestion, and the damaging exchange occurred only because defense counsel had called a hostile witness in the first place." *Id.*

The Court then found that counsel failed to investigate the State's future-dangerousness case. For instance, the State presented evidence that Andrus had acted aggressively in TYC and in pre-trial detention. *Id.* However, an investigation would have shown his behavior was "notably mild, and the harms he sustained severe." *Id.* Further, the State presented evidence that Andrus had committed a knifepoint robbery of a dry-cleaning business. But Andrus professed his innocence, the State did not charge him, the lone witness later recanted, and Andrus was picked out of an unreliable photo array. *Id.* at 1885. Again, counsel did not investigate or challenge any of these matters. *Id.* Thus, counsel "relinquished the first of only two procedural pathways for opposing the State's pursuit of the death penalty." *Id.*

Having determined that counsel was deficient, the Court found that the CCA's brief order lacked clarity regarding whether it considered *Strickland's* prejudice prong. Although the concurrence did so, that opinion "did not garner a majority of the [CCA]," and it is possible the CCA rejected the claim on the deficiency prong. *Id.* at 1886–87. Thus, "[g]iven the uncertainty as to whether the [CCA] adequately conducted that weighty and record-intensive analysis in the first instance," the Court remanded for the CCA to address *Strickland* prejudice. *Id.* at 1887.

Brewer's case does not compare with *Andrus* in any regard. Having been tried before, counsel knew about Brewer's background and upbringing, and, except for Brewer and Albert, the family members who testified at his re-trial also testified at

the original trial.[32]  As stated, a thorough mitigation investigation was conducted, and counsel were prepared.  Brewer himself testified for an extended period of time about his entire life and the crime, as discussed above.  There was no conflicting testimony between Brewer or his family members, and counsel did not elicit any damaging testimony.  Before presenting their mitigation case, counsel contested via extensive cross-examination the State's future-dangerousness case and then presented Dr. Edens to refute the reliability of Dr. Coons's prediction.

Further, state habeas review did not reveal a "tidal wave" of unpresented mitigating evidence, and counsel did not concede to any failures, let alone the multiple failures that Andrus's counsel acknowledged.  Indeed, the state habeas court did not see the need to conduct a hearing on the instant claim despite conducting one regarding Dr. Coons.  The state trial court did not find counsel ineffective, as did the court in *Andrus*.  *Id.* at 1878.  The court found that counsel were not deficient, that any unpresented evidence was not significantly stronger or different than that presented at trial, and that no prejudice ensued.  The CCA adopted those findings and denied relief.  It is also clear that the state courts resolved the prejudice issue.

Moreover, as stated in the prior section, the circumstances of the re-trial have no similarity to those in *Andrus*.  Counsel's focus here was to show Brewer had demonstrated good behavior while on death row and, thus, was not a future danger,

---

[32]   The Director notes that the punishment-phase evidence presented in the instant case by both sides was similar to that presented at Brewer's original 1991 trial, including the witnesses who testified.  *See* 18 RR 592–844 (punishment phase from 1991 trial).  The main differences in the re-trial are that a mitigation special issue was submitted, Albert did not testify, Brewer did, and the defense relied heavily on Brewer's testimony and eighteen-year prison disciplinary history to support its case that he was not a future danger.

to show that Brewer was remorseful, and to have Brewer accept responsibility for the murder. This specific strategy was reflected in the witnesses counsel presented, the type of evidence presented, and the arguments counsel made to the jury. On the other hand, Andrus's counsel actually had no strategy, abandoning the guilt phase in favor of punishment and then presenting an incoherent and damaging mitigation case that revealed "inattention" rather than "reasoned strategic judgment." *Id.* at 1883. "Despite repeated questioning, counsel never offered, and no evidence supports, any tactical rationale for the pervasive oversights and lapses here." *Id.* The same cannot be said in this case because even at the evidentiary hearing, counsel explained their strategy on several occasions. 2 SHH 70, 83–84, 278–81, 285–86; 3 SHH 10, 55–56, 124. In hindsight, Brewer may not agree with his counsel's strategy, but it was reasonable under the circumstances and not the product of "inattention."

Moreover, as in *Lewis* and *Walbey*, the unpresented evidence in *Andrus* was of a wholly different quality than that in the instant case. Andrus was born into a horrid environment; his only caretaker exposed him to drugs and violence and then abandoned him; as a child he was forced to become the parent of his siblings; he experienced extreme harm and deprivation while in TYC; he was suicidal; and he had significant mental-health disorders. Here, the defense contested the State's punishment case and effectively presented significant evidence of its own. The allegedly uninvestigated and unpresented evidence does not rise to the level of tragedy and hardship Andrus endured. And as shown below, the mental-health issues supposedly affecting Brewer are clearly double-edged.

122

Finally, *Andrus* is an opinion off an appeal from state habeas review where the Court exercised its direct supervisory authority.  AEDPA deference to the state court decision did not apply as it does in Brewer's case.  And because *Andrus* had not been decided when the CCA denied Brewer relief, it cannot render the CCA's decision objectively unreasonable under § 2254(d).  For these reasons, *Andrus* is not on point, and neither the instant claim nor that addressed in the prior section merit relief.

### 4.   Counsel were not ineffective for not presenting expert evidence that Brewer suffers from mental-health problems.

Brewer claims that counsel were ineffective for not presenting evidence that he suffers from mental-health issues.   His claim is largely premised on Dr. Cunningham's 1996 assessment.[33]  Petition at 100–06.

First, in Brewer's federal habeas proceeding in 2004, this Court rejected the same claim Brewer is raising.   As he does now, Brewer relied back then on Dr. Cunningham's 1996 report in support of a claim that trial counsel failed to investigate and present expert testimony.  This Court found that Dr. Cunningham's testing "was described as 'problematic' and revealed malingering" which "tended to undermine the reliability of these test results concerning [Brewer's] state of mind before the offense or trial."  *Brewer v. Dretke*, 2004 WL 1732312, at *10; *see also* DE 19-2 at 37, 40.  This Court also found that Dr. Cunningham's diagnoses were available to counsel in Brewer's Big Spring State Hospital records.  *Brewer v. Dretke*,

---

[33]    In Brewer's reply, he also relied heavily on the suspect declaration from Odiorne, which is barred under *Pinholster*.  DE 48 at 35–36.  And as stated previously, Odiorne addressed each state habeas claim, including the instant one, 7 SHCR 2009, and he provided nothing resembling this new declaration.

2004 WL 1732312, at *10.   Next, this Court determined that counsel made a reasonable decision not to have Brewer evaluated because "[t]hey did not want to give the [S]tate any excuse to evaluate Brewer in order to prove his future dangerousness." *Id.*  This was not an "idle danger" because the prosecution sought to use psychiatric evidence against Brewer, namely Dr. Coons, but were "hampered" in the ability to do so because the defense's tactic—like the one here—kept the prosecution from developing this evidence and allowed the defense to argue the State's expert lacked critical information. *Id.* at *11.  Finally, Brewer himself concurred that developing expert evidence would not be in his best interests. *Id.*  The circumstances here are the same, and this Court should again reject Brewer's allegation.

Second, the Director explained above why counsel chose not to call an expert to testify about a personal evaluation of Brewer.  Counsel believed that Brewer's record of prison violence, or lack thereof, was the best evidence refuting the State's case and that presenting their own risk assessment would undermine their strategy of attacking Dr. Coons's credibility.  In his reply, Brewer stated: "The State confuses trial counsel's reason for not having Mr. Brewer evaluated by a future[-]dangerousness expert [ ] with a reason for failing to have Mr. Brewer evaluated by a mental[-]health expert in support of the mitigation special issue.  These are distinct issues."  DE 48 at 35.  He further stated that "[t]he overwhelming majority of the evidence would have been mitigating independent of any nexus with Mr. Brewer's commission of the offense." *Id.* at 36.  The flaw with this argument is that Brewer's argument about mental-health issues is premised on Dr. Cunningham's report.

DE 19-2.  In this forty-seven-page report, Dr. Cunningham performed a detailed and extensive ten-page risk assessment of Brewer, *id.* at 71–80, concluding not only that Brewer presented a very low risk for future dangerousness but also that "[i]t is unlikely that [Brewer's] conduct in the offense was committed deliberately as that term [ ] is defined in the Jury Instructions."  *Id.* at 81.  Since Brewer now wishes that Dr. Cunningham had testified, counsel would have been faced with presenting a risk assessment conflicting with their trial strategy *and* an expert who believed Brewer did not act deliberately *when even Brewer admitted he acted deliberately*.  This would have given the State ample ammunition with which to cross-examine Dr. Cunningham and point out that Brewer was not in fact taking responsibility for anything.  And contrary to Brewer's claim that the evidence is "independent of any nexus" regarding Brewer committing the offense, Dr. Cunningham's report speaks directly to this nexus.

Third, the jury knew that Brewer had some mental-health issues because evidence was presented that he attempted suicide twice, had substance abuse problems, and was committed to Big Spring State Hospital.  Again, Brewer's complaint amounts to counsel not offering more evidence.  At any rate, trying to explain away Brewer's behavior as the product of psychological problems would have conflicted with the defense's strategy of Brewer accepting responsibility for his actions and showing remorse.

Fourth, despite Brewer's suicide attempts, Bryant testified that Brewer's TDCJ mental-health records showed that he had no prior contact with the mental-

health department in seventeen years, other than routine rounds.  23 RR 106.  Had defense counsel premised their strategy on Brewer's mental health, the State would have used this evidence to undermine Brewer's argument.  Trial counsel also agreed that various suicide notes Brewer wrote could be construed to show Brewer was upset not because he was truly remorseful but because he got caught and feared dying. 2 SHH 199–203; 3 SHH 125–28.  *See Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (when evaluating prejudice, a reviewing court must "consider all the relevant evidence that the jury would have had before it if [the inmate] had pursued a different path–not just the . . . evidence [the inmate] could have presented, but also the . . . evidence that almost certainly would have come in with it.").

Fifth, this evidence is not necessarily helpful.  As this Court previously found, this report characterized Brewer as malingering and "overstating his difficulties." DE 19-2 at 37.  Further, Brewer states that the jury did not learn that he suffered from a brain dysfunction that affected his judgment and decision making.  He claims that, at the time of the offense, he was also suffering from depression, anxiety, and abandonment crisis.  "This evidence would have been particularly powerful, as it is both mitigating independent of any nexus to the commission of the offense, but would have also reduced Mr. Brewer's moral culpability *by demonstrating his severely impaired judgment at the time of the offense*."  DE 103 at 102–03 (emphasis added); *see also id* at 102 ("Mr. Brewer suffered from brain dysfunction, which the jury did not learn about, that represented a critically important mitigating factor concerning *Mr. Brewer's judgment and decision-making capability*.") (emphasis added); *id*. at 104

("As a result of several of these factors, including a history of head injury, Mr. Brewer suffered from brain dysfunction, which can cause impulsivity, judgment deficits, emotional dyscontrol, and behavioral disturbance."). Dr. Cunningham's 1996 report also stated that Brewer suffers from disorders that "raise[] grave doubts regarding his capacity to engage in careful and thorough considerations . . . characterized by awareness of the consequences." DE 19-2 at 71. The report noted that Brewer potentially has impulse control issues, a head injury, and neuropsychological deficits commonly seen among murderers. *Id.* at 41–45.

The notion that the jury would have been reassured to learn that Brewer has long-standing impairments that affect his judgment and impulsivity is unavailing. The Fifth Circuit has repeatedly held that trial counsel's failure to present evidence of brain impairments does not result in prejudice due its double-edged nature. *Fields*, 761 F.3d at 459 (noting that evidence of mental illness "can lead a jury to conclude that a defendant poses a future risk of violence"); *Druery v. Thaler*, 647 F.3d 535, 541–52 (5th Cir. 2011) (approvingly quoting state court finding that "[p]resentation of some type of brain injury could indicate that [petitioner's] violent behavior was of a permanent nature not induced by drug use, suggesting he could be a future threat to those in prison"); *Martinez v. Dretke*, 404 F.3d 878, 890 (5th Cir. 2005) (evidence that petitioner suffered from organic brain damage "associated with poor impulse control and a violent propensity, would have substantiated the [S]tate's evidence and increased the likelihood of a future dangerousness finding").

Brewer also refers to a mammoth report from Dr. Cunningham, DE 32-3 to DE 32-7 at 284–470, which was not presented to the state court and is barred under *Pinholster*. Nonetheless, Brewer believes this evidence could have only helped him, without any regard to its pitfalls. For instance, Brewer says that Dr. Cunningham identified thirty-four factors "each with negative implications on Mr. Brewer's development." DE 103 at 103. Among them: "Transgenerational family dysfunction and distress"; "Hereditary predisposition for alcohol and drug abuse/dependence"; "Hereditary predisposition to psychological disorder and personality pathology"; "Head injury with skull fracture"; "Attention Deficit Hyperactivity Disorder"; "Skull overgrowth"; "Childhood onset alcohol and drug abuse"; and "Psychological disorders proximate to offense." *Id.* Although this evidence can be mitigating, the jury also could have interpreted it as revealing that Brewer was damaged from birth and a product of enduring familial dysfunction from which he would never recover, as addressed in *Fields*, *Druery*, and *Martinez*. *See also Freeman v. Stephens*, 614 F. App'x 180, 186 (5th Cir. 2015) ("Given the expert reports, we cannot conclude that Freeman's attorneys unreasonably failed to pursue a more detailed investigation into possible toxic exposure or mental illness because the circumstances and available information indicated that it would have been unproductive or possibly even harmful."); *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) ("[E]ven if [petitioner's] recent claims about [his alleged brain injury, abusive childhood, and drug and alcohol problems] [are] true, it could all be read by the jury to support,

rather than detract, from his future dangerousness."). Instead, by not focusing heavily on these issues, counsel avoided the potential downside to this evidence.

Regarding the issue of this evidence being double-edged, Brewer stated in his reply that the Director's argument "fails because it misunderstands Texas's capital sentencing scheme and misapplies *Strickland*." DE 48 at 36. He then asserted: "Under the Texas capital sentencing scheme, mitigation and future dangerousness are two distinct issues, answered sequentially and never weighed against each other by the jury. Thus a juror could find sufficient mitigation regardless of the strength of the evidence supporting the future[-]dangerousness issue." *Id.* at 37 (citations omitted). But under Supreme Court precedent, it is settled on habeas review that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534; *see also Pinholster*, 563 U.S. at 198; *Vasquez v. Thaler*, 389 F. App'x 419, 428 (5th Cir. 2010) ("Naturally, the power of the newly amplified case to mitigate a jury's selected punishment will be contingent on other factors in the case, such as the circumstances of the crime."); *Mosley v. State*, 983 S.W.2d 249, 263 n.18 (Tex. Crim. App. 1998) ("In determining whether to dispense mercy to a defendant after it has already found the eligibility factors in the State's favor, the jury is not, and should not be, required to look at mitigating evidence in a vacuum."). The double-edged component to this evidence is one this Court can clearly take into account.

Also in his reply, Brewer stated that the Supreme Court "has granted relief in cases involving precisely these sorts of powerful mitigating evidence without ever

suggesting that any potential 'double-edged' quality was relevant." DE 48 at 37.  The cases he refers to, *Sears v. Upton*[34] and (*Terry*) *Williams v. Taylor*, pertained IATC claims where the non-presented evidence was on a different level than what was not offered here.  In *Sears*, the evidence revealed Sears was sexually abused by a cousin; was subjected to age-inappropriate military-style drills by his father; was severely learning disabled and behaviorally handicapped by the time he reached high school; had "significant frontal lobe abnormalities"; suffered severe head injuries; and was in the first percentile of cognitive functioning on several tests "making him among the most impaired individuals in the population in terms of ability to suppress competing impulses and conform behavior only to relevant stimuli." *Sears*, 561 U.S. at 948–49.

In (*Terry*) *Williams*, records showed that

> Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

529 U.S. at 395 (footnote omitted).  Other evidence showed Williams's home was covered with trash and urine; he and his siblings had no clothes and were under the influence of whiskey; his parents were usually intoxicated; and Williams was "borderline mentally retarded." *Id.* at 395–96 & n.19.

The instant case is dissimilar, as discussed above.  But, in his reply, Brewer then incorrectly stated: "There is no "double-edged" evidence exception to *Strickland*

---

[34]     561 U.S. 945 (2010).

prejudice.  DE 48 at 37.  To the contrary, in *Pinholster*, the Court rejected a similar IATC claim on prejudice grounds stating: "The new evidence relating to Pinholster's family—their more serious substance abuse, mental illness, and criminal problems [ ]—is also by no means clearly mitigating, as the jury might have concluded that Pinholster was simply beyond rehabilitation."  536 U.S. at 291 (citing *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (recognizing that mitigating evidence can be a "two-edged sword" that juries might find to show future dangerousness)).  Brewer's arguments, thus, are not meritorious.

> ### 5.   Counsel made a wise decision not to focus on Nystrom's influence.

Brewer complains that counsel failed to investigate and present evidence that Nystrom had a negative influence on Brewer.  He alleges that she was controlling and domineering, and that he was susceptible to her manipulation.  He believes that this evidence would have rebutted the State's case that Brewer was the principal actor.  DE 103 at 106–08.

Even though Brewer presented this claim to the state court, 2 SHCR 294, 299, 302, 340–41, he now relies on unsworn declarations never presented to the state court and barred under *Pinholster*.  DE 103 at 106–08.  Regardless, this claim has no merit. The Director addressed above the flaw if counsel had attempted a blame-shifting strategy as a form of mitigation.  Brewer was guilty, and the jury knew it.  If the jury was not inclined to spare Brewer after he took responsibility for his crime, it certainly would not have done so had counsel tried to deflect blame to a woman Brewer knew for only three months before he committed murder.  This claim is meritless.

**C.   Brewer's claim that the state court decision is unreasonable has no merit.**

In his reply, Brewer argued that the state court's denial of this claim is unreasonable.  Much of this argument is premised on rehashing the facts discussed at length above.  DE 48 at 38.  But he also argued the state court failed to conduct the proper analysis:

> [T]he state court summarized the evidence presented at trial, immediately followed by the determination that "most of the unoffered mitigating evidence" was not substantially different. [ ]. The state court never addressed, discussed, identified or acknowledged what the newly discovered evidence was or could have been. The Supreme Court has made clear that such an analysis is "contrary to, or involved an unreasonable application of, clearly established Federal law." [ ] Thus, because the state court's conducted a "truncated" prejudice analysis and failed to evaluate the totality of the available mitigating evidence adduced in the postconviction proceeding, the state court's decision was contrary to clearly established federal law.

*Id.* at 39 (citations omitted) (footnote added).  However, it is binding law in this circuit that the AEDPA authorizes a federal habeas court to review the state court's decision and not the written decision explaining that opinion.  *Neal*, 286 F.3d at 246 (citing 28 U.S.C. § 2254(d)).  Recently, the Fifth Circuit, specifically referring to *Richter*, explained the scope of a federal court's review of a state court decision, stating:

> Importantly, whether the state court's decision involved an unreasonable application of Supreme Court precedent does not depend solely on the state habeas court's actual analysis. Section 2254(d) requires us to "determine what arguments or theories supported or, ... *could have supported*, the state court's decision." We are therefore tasked with considering not only the arguments and theories the state habeas court actually relied upon to reach its ultimate decision but also all the arguments and theories it could have relied upon.

*Evans v. Davis*, 875 F.3d 210, 216 (5th Cir. 2017) (emphasis in original) (quoting *Richter*, 562 U.S. at 102).[35]

Thus, Brewer's suggestion that the state court decision is unreasonable because it did not specifically address in detail the mitigating evidence he offered is refuted by Supreme Court and Fifth Circuit precedent. The focus is on the ultimate conclusion, and if any objectively reasonable theory supported or could have supported the decision, relief must be denied. The state habeas court's analysis in no way fails this test.

Finally, Brewer's argument falters for two additional reasons. First, the state habeas court may not have specifically addressed Brewer's evidence, but the court said: "[M]ost of the unoffered mitigating evidence that [Brewer] complains about . . . was not substantially different in strength and subject matter from the mitigating evidence actually presented at the re-sentencing trial." 10 SHCR 3123. Brewer seems to suggest that the evidence was never considered at all, when this finding reveals otherwise. Second, and more importantly, the CCA held as follows when it denied relief: "Based upon the trial court's findings and conclusions *and our own*

---

[35]     Should Brewer subsequently claim that the "look through" doctrine of *Wilson v. Sellers*, 138 S. Ct. 1188 (2018), applies here rather than *Richter*, that argument has no merit. The *Wilson* standard is applicable only where the state high court's decision is "unexplained" and there is a lower state court decision providing a "relevant rationale." *Id.* at 1192. Here, the CCA's order denying habeas relief is not unexplained, *Ex parte Brewer*, 2014 WL 5388114, at *1, and there is no lower state court decision because state court findings and conclusions are not binding on the CCA, *Ex parte Brown*, 205 S.W.3d 538, 546 (Tex. Crim. App. 2006). Moreover, the Fifth Circuit has generally rejected the argument that *Wilson* applies in circumstances akin to Brewer's. *Langley v. Prince*, 926 F.3d 145, 163 (5th Cir. 2019) (en banc), *cert. denied*, 19-6413, 2020 WL 1906607 (U.S. Apr. 20, 2020); *Thomas v. Vannoy*, 898 F.3d 561, 568 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1321 (2019).

*review of the record*, relief is denied.  *Ex parte Brewer*, 2014 WL 5388114, at *1 (emphasis added).  Given this assertion, Brewer cannot show that the CCA did not consider all the evidence in its own review.  There was no error in the analysis or decision, and relief should be denied.

## VII.   Brewer's Additional Claims Pertaining to Nystrom Are Meritless and in Part Defaulted.

Brewer's next two claims also pertain to Kristie Nystrom.  First, he alleges that trial counsel were ineffective for failing to impeach Nystrom with a prior statement and affidavit from Callen that Nystrom said she also stabbed Mr. Laminack and that Brewer cried after the offense.  DE 103 at 108–10; *see* 5 SHCR 1527–36.  This claim is meritless.  Defense counsel completed affidavits explaining that they did not want to impeach Nystrom with Callen's prior statements because the statements conflicted with their trial strategy of having Brewer take personal responsibility for the crime and show remorse.  7 SHCR 2009, 2014.  Counsel Keith believed that attempting to come up with different theories about how the crime occurred would only damage their credibility.  7 SHCR 2014.  The state court found that trial counsel acted reasonably because (1) Callen's statements did not affirmatively show Nystrom stabbed Mr. Laminack; (2) it was reasonable for counsel to conclude that Callen's statements were inconsistent with counsel's strategy; and (3) it was unnecessary for counsel to elicit testimony that Brewer was crying after the offense because the better strategy was for Brewer to personally express remorse to the jury.  10 SHCR 3126–27.  This decision is not objectively unreasonable.

134

The Director addressed above why a decision to present evidence shifting the blame to Nystrom would have been unwise.  Having been convicted of capital murder, Brewer's guilt was not in doubt nor an issue in 2009.  And he admitted at re-trial that he murdered Mr. Laminack.  Counsel made a tactical decision not to question Brewer's guilt, which should not be second-guessed.  Instead, counsel focused on Brewer's prison behavior since the crime, accepting responsibility for the crime, and showing remorse.  As counsel rightly questioned, that strategy is undermined if the defense is simultaneously advancing alternative theories about the offense.

Moreover, in his 1997 affidavit, Callen stated: "The fact remains that Kristie did tell me she had stabbed the man.  *Brent told me he had, too, so I don't really know who to believe*.  I was just trying to stay on the side of the law."  5 SHCR 1536 (emphasis added).  In other words, Callen did not let Brewer off the hook; he just said that both admitted involvement.  Had counsel tried to impeach Nystrom with this statement, the State would have pointed out that Callen's statement incriminated Brewer as well.  Thus, the defense would have forfeited its strategy of accepting responsibility for the murder with no gain to show for it.[36]  As for Callen's statement that Brewer cried after the offense, this is insignificant because the State could have easily argued that Brewer cried not out of remorse but because he feared getting caught.  Moreover, Brewer expressed remorse on the witness stand; thus the evidence was cumulative.  In light of the cumulative nature of the Callen statements, as well

---

[36]     In 2004, this Court also rejected a similar claim pertaining the Callen.  *Brewer v. Dretke*, 2004 WL 1732312, at *12.

135

the ease of rebuttal by the State, there was no reasonable probability of a different result had they been utilized.[37]

In his second claim, Brewer alleges that the State suppressed Nystrom's medical records from Big Spring State Hospital; the trial court erred in failing to order the disclosure of these records; and trial counsel were ineffective for failing to obtain them.  DE 103 at 110–13.  Brewer claims that the records "contained a wealth of impeachment evidence that would have undermined the credibility of Ms. Nystrom, a key witness for the State," including poor impulse control, being manipulative, having unhealthy relationships with males, projecting blame, and having borderline personality disorder.  *Id.* at 111–12.

Brewer raised this claim in his application dismissed for abuse of the writ.  SHCR2 44–48; *Ex parte Brewer*, 2019 WL 5420444, at *1.  Thus, the claim is defaulted.  Because this is a *Brady* claim, Brewer cannot overcome the default unless he can meet the cause and prejudice standard—proving "suppression" and "materiality"—under *Banks v. Dretke*, 540 U.S. 668, 691 (2004).  This he cannot do.

---

[37]    In a footnote, Brewer states the following:

> When interviewed by Anthony Pagan of the Federal Public Defender Office prior to giving his 1997 affidavit, [Callen] indicated that law enforcement officers had talked about helping him find a job, had pressured him, and had not wanted him to talk to the defense.  If there was in fact any assistance given, or pressure put upon this witness, those facts must be disclosed forthwith in accordance with the State's continuing duty of disclosure . . .

DE 103 at 110 n.37.  Brewer provides no citation for this information.  Brewer's state habeas application includes four affidavits from Callen, but none mention these matters.  5 SHCR 1528–40.  To the extent this is a claim for relief, it is unexhausted and procedurally defaulted.  Moreover, it is clearly speculative and conclusory.

At Brewer's original trial in 1991, Nystrom's records were sealed by the trial judge because he did not see their relevance since Nystrom did not testify. At the re-trial, defense counsel requested to review them because Nystrom would be testifying. The judge advised the defense that he would make a decision on their request prior to cross-examination. When the State ended its direct examination of Nystrom, the judge asked Nystrom if she would give the defense permission to review her records. She responded, "No." The judge, having reviewed the records in camera, left them sealed because he found no relevance to them "or very little that's even remotely helpful." 22 RR 159–63, 226.

Because nothing was suppressed, Brewer is not raising a valid claim under *Brady v. Maryland*. Nystrom's medical records were not even in the State's possession; they were under seal with the trial court. The defense obviously knew this because counsel sought a ruling from the court. *See United States v. Agurs*, 427 U.S. 97, 103 (1976) (*Brady* applies to "information which had been known to the prosecution but unknown to the defense"). Brewer recently claimed in his motion for a hearing on this issue that "the record contradicts this assertion, and suggests that trial prosecutor Mr. Farren possessed the records and handed a copy to the judge when he requested them." *See* DE 94 at 33 (citing 22 RR 163). This may be true, but he also ignored this statement from defense counsel when the matter was discussed:

> It's our understanding Ms. Nystrom is coming next, and there are records of hers . . . from the Big Spring Hospital, Your Honor. It is our understanding that they are here. *In fact, Mr. Odiorne in looking at the exhibits, picked them up, realized what they were, put them back down, because it's our understanding that they are under seal.* And so she is

> now testifying, and we would like to be able to look at those records
> before cross of her.

22 RR 160 (emphasis added). Thus, the defense had access to them, at least momentarily, but did not look at the records knowing they were under seal. The issue here is the trial court's decision to seal records, not suppression by the State. Read properly, Brewer's claim is that the trial court erred in ruling that the evidence would remain under seal, which is an evidentiary issue not cognizable on federal habeas review. *Cupit*, 28 F.3d at 536.[38] And Brewer has failed to demonstrate that the admission of these records rendered his trial unfair. *See* DE 48 at 41.

Finally, Brewer's claim fails because he is arguing that the evidence was crucial to place more blame on Nystrom. As stated above, defense counsel said they had no intention of implementing a blame-shifting strategy. Trying to point the finger at Nystrom when it is clear Brewer committed the murder would have only damaged the defense's credibility. And the idea that the evidence was needed to undermine Nystrom's credibility is illogical given that Nystrom was Brewer's accomplice and is serving a life sentence for this crime. Thus, the jury had all the evidence it needed to question her credibility. *Miller v. Dretke*, 431 F.3d 241, 251 (5th Cir. 2005) ("If the evidence provides only incremental impeachment value, it does not rise to the level of *Brady* materiality."). Because Brewer can demonstrate neither suppression nor materiality, this claim is both procedurally barred and substantively meritless on de novo review.

---

[38]   Brewer suggests in the alternative that to the extent the records were available, counsel were ineffective for failing to impeach Nystrom with them. DE 103 at 108. But Brewer's counsel were not ineffective because they in fact requested the records.

## VIII. Brewer's Claims that the State Presented False and Misleading Testimony About Conditions of Confinement and that Trial and Appellate Counsel Were Ineffective Have No Merit.

Brewer alleges that the State presented false and misleading testimony that, if sentenced to life in prison, Brewer would be eligible "for significantly less restrictive custody than he actually would, including that Mr. Brewer could be housed outside the prison fence with little to no supervision." DE 103 at 114. He also claims that trial counsel failed to introduce any evidence rebutting this testimony, and that appellate counsel was ineffective for not raising the issue on appeal. *Id.* at 118–19. Brewer's claims pertain to testimony by the State's witnesses Bryant and Merillat, who testified in part about how capital murderers sentenced to life in prison are classified. *See* 23 RR 88–169. Brewer particularly takes exception to two statements by Merillat: (1) that a convicted murderer sentenced to life "will go anywhere there's a bed available for that particular classification," and (2) those inmates "are restricted in the kind of work they can do, but not where they're housed or how they co-mingle with other inmates." DE 103 at 116 (citing 23 RR 161–62). He also claims that Merillat lied about his remuneration for appearing at trial. *Id.* at 117. The state court properly rejected these claims, including the ineffectiveness claims. 10 SHCR 3095–3110, 3145–50.

As an initial matter, the state court found that Brewer defaulted his allegation that the State knowingly presented false testimony because he could have raised the claim on direct appeal and failed to do so. 10 SHCR 3145–46. Thus, this claim is procedurally barred. *Dorsey*, 494 F.3d at 532; *Busby*, 359 F.3d at 719. The arguments

Brewer has previously made in response to this bar are that the state court did not plainly apply it because it also reached the merits and that an extra-record claim cannot be raised on direct appeal.  DE 48 at 41–42.  The former argument is foreclosed under *Harris*, *Busby*, and *Fisher*, and the CCA adopted the state court's finding thereby disagreeing with the latter argument.  Moreover, Brewer's allegation that this is an "extra-record claim" is not based on any new evidence, such as a recantation from Merillat, but on an affidavit from Frank Aubuchon about classification procedures, which has always been available to Brewer.  In fact, the main state case Brewer relies on, *Estrada v. State*,[39] is one where Merillat provided unintentionally false testimony, and the issue was addressed by the CCA on direct appeal.  313 S.W.3d at 286–88.  The error that occurred in *Estrada* and *Velez* did not occur here.  Brewer's arguments are meritless, and the claim is defaulted.

Next, Brewer's claim requires that he show: "1) the testimony was actually false, 2) the state knew it was false, and 3) the testimony was material . . . . The testimony is material if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Canales*, 765 F.3d at 573 (citations and internal quotations omitted).  Brewer's claim fails because, as the state court found, none of the disputed testimony was false.

Here, neither Merillat nor Bryant were asked whether an inmate given a life sentence for capital murder (1) will remain at a G3 level for a minimum of ten years; (2) can ever rise to a G1 level; and (3) will not be allowed to work on a job without

---

[39]    313 S.W.3d 274 (Tex. Crim. App. 2009); *see also Velez v. State*, No. AP-76,051, 2012 WL 2130890 (Tex. Crim. App. June 13, 2012).

armed supervision.  10 SHCR 3097; *see also* 7 SHCR 2030–31.  Merillat also provided an affidavit on state habeas review, which the state court found to be credible. Merillat said that when asked if capital murderers sentenced to life are sent to a "special unit," he "responded in the negative" but with these qualifications: (1) capital murderers sentenced to life in prison are assigned a "default" G3 classification; (2) G3 inmates cannot be housed in minimum security locations; and (3) G3 inmates are incorporated into the general population with certain restrictions on housing and work.  But they are not sent to a "special unit."  7 SHCR 2024, 2026; 10 SHCR 3100. In his affidavit, Aubuchon  stated that Merillat's testimony about where inmates are housed was misleading because G3 offenders cannot be assigned a less restrictive custody for at least ten years.  4 SHCR 863.  Merillat did not disagree with the statement about the ten-year requirement, but the restriction in custody "did not alter my testimony concerning *where* a G3 offender would be housed, according to his classification, nor does it render my testimony false or misleading."  Specifically, "[a]n inmate offender designated G3 [], regardless of the requirement that he serve ten years flat before becoming eligible for less restrictive custody will *still* be assigned to *any* unit that has a bed available for *that particular classification*."  7 SHCR 2026; 10 SHCR 3101 (emphases in original).  Merillat then stated:

> Parenthetically, I note that Mr. Aubuchon's affidavit confirms the truth and accuracy of my in-court testimony concerning the placement of G3 offenders, like [Brewer], in "housing areas that are specifically designated for General Population Level III G3 custody offenders" which may be dependent on population levels and availability, when he states that G3 offenders "can be housed only with other G3 offenders, *except* when there are not enough G3 offenders to fill a cellblock, in which case

G2 and G3 offenders may be mixed in one cellblock area." (emphasis added). This is substantially what I told the jury.

7 SHCR 2027. Merillat further asserted that had he been asked about the "ten-year rule," his testimony would have been consistent with Aubuchon's affidavit. *Id.* Indeed, although not asked, Bryant volunteered the information about the ten-year rule to the jury. 23 RR 99.[40]

As for Merillat's assertion that inmates "are restricted in the kind of work they can do, but not where they're housed or how they co-mingle with other inmates," he explained that conditions like overcrowding may require housing G3 and G2 offenders together. But this exception is not allowed without the approval of the State Classification Committee. The rules do permit certain interaction between G3, G2, and G1 offenders. "Thus, my testimony was accurate and true, particularly when I observed in general terms that G3 offenders 'start out' under these conditions and, according to existing regulations, are permitted limited contact with offenders with a less restrictive custody status . . ." 7 SHCR 2028–29; 10 SHCR 3102–03.

Brewer's claim that Merillat lied about his remuneration is also meritless. He argues that because Merillat said he charged the State $495.00 per day for his expert services, he was charging 2.5 times his daily pay. Thus, he complains, the jury did not learn that Merillat profited from his testimony. DE 103 at 117. But as Merillat

---

[40]    In his petition, Brewer states: "[T]he testimony of both Bryant and Merillat omitted the fact that, if sentenced to life, the 18 years Mr. Brewer has already served in TDCJ would not count towards that total, and the 10-year requirement would begin anew." DE 103 at 117. But neither Bryant nor Merillat stated or even inferred that that the ten-year rule did not apply because Brewer had already served that time. Brewer's suggestion that the jury was given this impression by a topic never broached is conjecture.

142

explained, he charges $495.00 for his expert services because he is required to "burn" a vacation day when he testifies and has to deal with the inconvenience of traveling. 23 RR 132–33; 7 SHCR 2029.  Thus, he did not receive any additional benefit; the fee reflected compensation for what he lost.  At any rate, Brewer has failed to show how this is material or otherwise affected the outcome of the trial.

In his reply, Brewer argued that "the State does not address or explain Merillat's unambiguous testimony that when inmates convicted of capital murder and sentenced to life first enter the prison system they are not restricted regarding 'where they're housed.'"  DE 48 at 42.  The Director addressed this above; Merillat stated his testimony was in fact accurate.  At best, Brewer's complaint is that Aubuchon provided contradictory or inconsistent information about some of these matters, but as stated, contradictory or inconsistent testimony from or between prosecution witnesses do not, standing alone, establish perjury. *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990); *United States v. Martinez–Mercado*, 888 F.2d 1484, 1492 (5th Cir. 1989) (holding that the omission of certain facts from the reports and written statements of the prosecution's witnesses, alone, is not adequate to put the prosecution on notice of perjury on their part, much less establish such perjury in fact occurred).  Moreover, Brewer is simply nitpicking Merillat's testimony.  Hypothetical testimony about where Brewer *could* potentially be housed, whether right or wrong, does not rise to the level of material evidence sufficient to sway the jury.

Brewer then argued: "[T]he State does not address Merillat's false testimony that Mr. Brewer would be allowed to work in a furniture workshop or similar factory

in prison if sentenced to life." DE 48 at 42. Brewer's claim is misleading. Merillat testified that inmates *in general population* are allowed to work in certain factories, without mentioning Brewer or G3 inmates. 23 RR 158. He then asserted that inmates sentenced to life in prison *are* restricted in the kind of work they can do. 23 RR 162. In his affidavit, Aubuchon leapt to many conclusions, one being that Merillat was talking about G3 offenders. Aubuchon stated: "[I]t would be virtually impossible for a G3 offender to be assigned to any factory within TDCJ because of the work restrictions placed on these offenders. G3 offenders are restricted to where they can work within the main building of the prison unit." 4 SHCR 863–64. The latter sentence mirrors exactly what Merillat said. And in his affidavit, Merillat asserted, in reply to Aubuchon, that had he been asked more specific questions about work assignments, "I would have truthfully and honestly told the jury how a G3 offender is indeed restricted in the kind of jobs he or she can be assigned to." 7 SHCR 2030–31; *see also id.* at 2031 ("Aubuchon's ill-informed half-baked suggestion that I gave the jury some kind of false impression through omission as a result of my having failed to volunteer this additional information is totally without merit."). Thus, this is not a case of a witness providing false testimony, let alone one where the prosecution knowingly presented such testimony. Instead, Brewer takes certain statements out of context, complains about omissions, takes Aubuchon's affidavit at face value while discounting Merillat's, and then speculates about what the jury was thinking. As stated, any contradictory information provided by Aubuchon, even if

believed, is insufficient to demonstrate a viable claim. Brewer's *Napue* claim is also undermined by *Devoe v. Davis*, where the federal district court held:

> [T]his Court independently concludes Petitioner has failed to allege any specific facts showing the prosecution knowingly elicited any factually inaccurate or misleading testimony from Merillat during Petitioner's 2009 capital murder trial. The fact Merillat may have testified erroneously in other cases regarding the details of the TDCJ's inmate classification system does not in any way establish a [ ] *Napue* violation where there is no showing Merillat testified erroneously during Petitioner's 2009 trial.

No. A-14-CA-151-SS, 2016 WL 5408169, at *18 (W.D. Tex. Sept. 27, 2016); *see also Ruiz v. Davis*, --- F. App'x ---, 2020 WL 3815296, at *3 n.5 (5th Cir. July 8, 2020).

Regarding Brewer's ineffectiveness claims, he simply says "[t]o the extent evidence rebutting the State's false and misleading testimony was available to trial counsel, counsel was ineffective for failing to investigate and present this evidence." DE 103 at 118. Brewer does not explain how counsel should have rebutted the testimony. Thus, his allegation is conclusory. Moreover, counsel believed that Merillat's testimony would support the defense's case that Brewer had not committed acts of violence in prison despite the opportunity to do so and chose not to challenge Merillat as a matter of sound trial strategy. 7 SHCR 2008–09, 2013; 10 SHCR 3099–3100, 3103–04; 3105–07. In his affidavit, trial counsel Keith stated:

> I and the defense team were familiar with the type of testimony Mr. Merillat offers at trial. Based upon our investigation of the facts of this case, Mr. Brewer's record at both the Polunsky and Ellis Units and Mr. Merillat, the basic defensive strategy in this area was that if Mr. Merillat testified in his normal manner it would demonstrate that Mr. Brewer, while in this environment described by Merillat, was not a part of any violence, moreover not the things described by Merillat. According to Merillat's testimony, Mr. Brewer would have had every

145

opportunity for violence and mayhem, yet he chose not to engage in this behavior.

7 SHCR 2013.  For example, on cross-examination, Merillat conceded the following: (1) inmates on death row do, by choice, commit acts of violence despite the enhanced security; (2) prior to 1999, death row was on the Ellis Unit, which was more like a general population unit than Polunsky; and (3) he never recalled having to investigate Brewer. 23 RR 164–69. The defense's decision to use Merillat's testimony to its benefit, given that Brewer had been incarcerated for eighteen years, was reasonable under the circumstances and should not be second-guessed.  Indeed, had counsel chosen Brewer's tactic of nitpicking Merillat's testimony to assure the jury that Brewer would never have an opportunity to harm anyone, that could have implied that Brewer required strict confinement to prevent him from committing any violence.  Moreover, Merillat did not provide much testimony specific to Brewer; his testimony was primarily limited to prison classification and environment.  In other words, he did not provide any evidence pertaining to the central issue of Brewer's future dangerousness.  Thus, Brewer cannot demonstrate prejudice.

Finally, Brewer's claim that appellate counsel was ineffective for failing to raise this issue fails because, as shown, the State did not knowingly provide false testimony.  Also, as the state court found, counsel did not object to Merillat's testimony for strategic reasons; thus, error would not have been preserved for appeal. 10 SHCR 3108–09.  Moreover, Brewer's claim is premised on the CCA's decision in *Estrada v. State* where the State conceded error because Merillat provided testimony about the "ten-year rule" that was unintentionally false. DE 103 at 118–19; *Estrada*,

146

313 S.W.3d at 286–87.  The "ten-year rule" changed effective September 1, 2005, to preclude those capital offenders *sentenced to life without parole* from ever achieving a classification higher than G3, *Estrada*, 313 S.W.3d at 287, although the CCA mentioned that "it appears that before September 1, 2005, a sentenced-to-life-with-the-possibility-of-parole capital murderer could have obtained a lower and less restrictive G-3 status after ten years."  *Id.*  Merillat testified that the "ten-year rule" applied to Estrada when it did not, *id.*, and Brewer contends that "[t]he situation in this case is no different."  DE 103 at 119.  Brewer is incorrect.  *Estrada* is not on point because (1) Merillat did not provide any testimony about this rule, and, more importantly, (2) the new TDCJ rule does not apply to Brewer because at the time he committed his capital offense—April 26, 1990—he was parole eligible if sentenced to life, which includes his 2009 re-trial.  *See Buntion v. State*, 482 S.W.3d 58, 108 (Tex. Crim. App. 2016) ("[T]hose defendants convicted at trial of capital-murder offenses occurring before September 1, 1991 are eligible for life imprisonment with the possibility of parole . . .") (Alcala, J., concurring); *see also* Tex. Code Crim. Proc. art. 37.0711, Section 1 (procedure in a capital case for an offense committed before September 1, 1991 "whether the sentencing procedure is part of the original trial of the offense, an award of a new trial for both the guilt or innocence stage and the punishment stage of the trial, or an award of a new trial only for the punishment stage of the trial").[41]  Because *Estrada* would have afforded Brewer no relief,

---

[41]     In his petition, Brewer states the jury sent out two notes regarding whether Brewer was eligible for parole, thus showing concern about his long-term future and supervision. DE 103 at 118 (citing 25 RR 227–28).  "A juror confronted with the testimony of Merillat and Bryant would have been left with the strong impression that Mr. Brewer was only a few steps

appellate counsel could not have been ineffective for failing to raise it.  Thus, the state court's denial of relief is not unreasonable.

## IX.    Brewer's Claim of Cumulative Error Does Not State a Basis for Relief.

Brewer alleges that his constitutional rights were violated due to the cumulative effect of the State's, trial court's, and trial counsel's errors.  DE 103 at 119.  This claim fails for two reasons.  First, Brewer never raised a cumulative-error claim on direct appeal or state habeas review.  Therefore, the claim is unexhausted and procedurally barred.  *Coleman*, 501 U.S. at 735 n.1 (1991); *Beatty*, 759 F.3d at 465; *Nobles*, 127 F.3d at 420, 422.  Second, the Fifth Circuit has repeatedly held that individual errors not of constitutional dimension cannot be cumulated to form an error worthy of relief.  *United States v. Thomas*, 724 F.3d 632, 648 (5th Cir. 2013) ("there is no precedent supporting the idea that a series of 'errors' that fail to meet the standard of objectively unreasonable can somehow cumulate to meet the high burden set forth in *Strickland*"); *Coble*, 496 F.3d at 440; *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007) ("[W]here individual allegations of error are not of constitutional stature or are not errors, there is 'nothing to cumulate.'") (quoting *Yohey*, 985 F.2d at 229).  As shown, none of Brewer's claims have merit; thus cumulation would afford Brewer no relief.  Finally, the Fifth Circuit has recognized that the Supreme Court has never accepted cumulative error as a valid constitutional

---

away from unsupervised access to the outside world if sentenced to life, and on that basis voted for death." *Id.*  The problem with this argument is that, as shown, Brewer was parole eligible if he had been sentenced to life, so any concern the jury had was justified.  Brewer's latter statement about the impression conveyed to the jury is conjecture because neither witness testified or implied anything close to Brewer's claim.

claim.  *Hill v. Davis*, 781 F. App'x 277, 280–81 (5th Cir.), *cert. denied*, 140 S. Ct. 389 (2019).  Thus, Brewer's cumulative-error claim must be denied.

## X.    Brewer's Challenges to Article 37.0711 Are Defaulted and Meritless.

Brewer alleges that he was tried and sentenced to death under an unconstitutional statutory scheme; the trial court erred in denying his motion to declare Article 37.0711 unconstitutional; and appellate counsel was ineffective for failing to challenge the statute.  Brewer challenges the statute on three grounds: (1) it permits the admission at punishment of unadjudicated extraneous offenses without requiring the State to prove the offenses beyond a reasonable doubt, in violation of *Ring v. Arizona*[42]; (2) it is vague because it does not define the terms "probability," "criminal acts of violence," or "continuing threat to society"; and (3) it requires ten or more jurors to answer the future-dangerousness special issue "No" or the mitigation special issue "Yes" (the "10-12" rule).  DE 103 at 120–24.

First, with regard to Brewer's claims that the statute itself is unconstitutional and the trial court erred in denying his motion declaring the statute unconstitutional, these claims are unexhausted and procedurally barred.  Brewer did not raise those legal challenges in his state habeas application; rather he presented these challenges solely as claims of ineffective assistance of appellate counsel.  2 SHCR 435–43.

Second, Brewer did not present his first challenge to the statute—that the statute permits the admission of unadjudicated extraneous offenses—in his state habeas application.   Although he briefly referred to the topic in his habeas

---

[42]     536 U.S. 584 (2002).

application, he claimed that appellate counsel was ineffective for failing to challenge Texas's death-penalty scheme because it does not require that certain terms be defined in the indictment. 2 SHCR 435–43. The instant allegation is not the same; thus, it is unexhausted and procedurally barred. To the extent it is exhausted, the state court properly rejected it. 10 SHCR 3161–62. The Fifth Circuit has held that the Constitution does not require that the State prove unadjudicated extraneous offenses beyond a reasonable doubt at punishment, and it has rejected the argument premised on *Ring*. *See, e.g., Parr v. Thaler*, 481 F. App'x 872, 879 (5th Cir. 2012); *Jackson v. Dretke*, 181 F. App'x 400, 410 (5th Cir. 2006). The Fifth Circuit has also found this claim to be barred under the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). *Hughes v. Dretke*, 412 F.3d 582, 593 (5th Cir. 2005).

Third, regarding Brewer's claim about the failure to define the three terms above, he did not raise this specific claim on state habeas review. Rather, he referenced the issue in his claim that appellate counsel failed to challenge the Texas statute for not requiring that the terms be defined in the indictment. 2 SHCR 435–43. Thus, it is unexhausted and procedurally barred. Regardless, the Fifth Circuit has repeatedly denied this claim, *Sprouse v. Stephens*, 748 F.3d 609, 622–23 (5th Cir. 2014) (rejecting claim that the terms "probability," "criminal acts of violence," or "continuing threat to society" must be defined); *Leal v. Dretke*, 428 F.3d 543, 552–53 (5th Cir. 2005) (listing numerous Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of

violence," and "continuing threat to society"), and has determined the claim is *Teague*-barred, *Rowell v. Dretke*, 398 F.3d 370, 378–79 (5th Cir. 2005).

Fourth, the state court rejected Brewer's challenge to Texas's "10-12 Rule." 10 SHCR 3158–59. This decision is not unreasonable because both the United States Supreme Court and Fifth Circuit have rejected the claim that jurors must be informed of the effect of one holdout juror, despite the requirements of the statute. *Jones v. United States*, 527 U.S. 373, 382 (1999); *Davila v. Davis*, 650 F. App'x 860, 871–72 (5th Cir. 2016), *aff'd on other grounds*, 137 S. Ct. 2058 (2017); *Sprouse*, 748 F.3d at 623; *Druery*, 647 F.3d at 542–44. The Fifth Circuit has also held this claim is *Teague*-barred. *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000).

Lastly, the state court's rejection of Brewer's claims that appellate counsel was ineffective for failing to raise these issues on appeal is not objectively unreasonable. 10 SHCR 3132–34, 3158–64. The CCA has repeatedly rejected these claims. *Coble*, 330 S.W.3d at 297 ("[A]ppellant argues that the statutory 'future dangerousness' special issue is unconstitutional because the terms 'probability,' 'criminal acts of violence,' and 'society' are not defined. We have repeatedly rejected these claims."); *Mays v. State*, 318 S.W.3d 368, 397 (Tex. Crim. App. 2010) ("We have previously held that the '10–12 Rule' is constitutional and that no Supreme Court precedent requires the trial judge to inform the jurors of the effect of a 'holdout' juror."); *Russeau*, 171 S.W.3d at 885–86 (*Ring* does not require that special issues be pled in indictment; also rejecting challenge to the "10-12" rule); *Paredes v. State*, 129 S.W.3d 530, 541 (Tex. Crim. App. 2004) ("The admission of unadjudicated extraneous offenses at the

punishment phase of a capital case does not violate due process."); *Tong v. State*, 25 S.W.3d 707, 711 (Tex. Crim. App. 2000) (en banc) (the statute allows for the admission of unadjudicated extraneous offenses and does not violate the Fourteenth Amendment). Therefore, these claims would not have succeeded on appeal.

## XI. Brewer's Claim that the Trial Court Improperly Allowed Thirteen Unqualified Jurors to Remain on the Jury Panel Is Procedurally Defaulted, Conclusory, and Invalid.

Brewer alleges that the trial court violated his rights by allowing unqualified jurors to remain on the panel, forcing the defense to "burn" thirteen peremptory strikes. Brewer states: "These thirteen jurors ranged from automatic death jurors to those who could not consider mitigating evidence once someone has been convicted of first degree murder, to a juror who thought death appropriate for vehicular homicide and one who believed in an eye for an eye." He then lists the jurors. DE 103 at 124.

Brewer raised this allegation on state habeas review, and the state court found that Brewer forfeited the claim because he should have raised it on direct appeal. 10 SHCR 3139–40, 3166–67. Therefore, the claim is procedurally barred.

Moreover, the state court determined that the trial judge's decision not to remove these prospective jurors did not violate Brewer's constitutional rights. *Id.* This decision is not unreasonable because Brewer has failed to present any briefing to support his claim, other than naming the jurors and providing vague references to some of their testimony. Conclusory allegations do not state a claim for federal habeas corpus relief and are subject to summary dismissal. *Koch*, 907 F.2d at 530; *Ross*, 694 F.2d at 1011–12.

Finally, this is not a valid constitutional claim.  In *Ross v. Oklahoma*, the Supreme Court held:

> We have long recognized that peremptory challenges are not of constitutional dimension.  They are a means to achieve the end of an impartial jury.  So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

487 U.S. 81, 88 (1988) (citations omitted).  Thus, a trial court's erroneous refusal to grant a defendant's challenge for cause, thereby possibly forcing the defense to use a peremptory strike, is only grounds for reversal if the defendant establishes that the jury which actually sat to decide his guilt or innocence was not impartial.  *United States v. Snarr*, 704 F.3d 368, 386 (5th Cir. 2013).  Brewer has not made this showing, and his claim must be denied.

## XII.  Brewer's Rights Were Not Violated by the Trial Court's Decision Not to Grant the Defense's Challenges for Cause.

Brewer also contends that because he had to exercise peremptory strikes on jurors who should have been removed for cause, "automatic death jurors" were allowed to sit on his jury.  Brewer specifically refers to two jurors he challenged for cause: Robinson and Morgan.  However, he also lists the others who were on his jury, and he claims they all should have been removed for cause.  DE 103 at 125.

Brewer raised the claim pertaining to jurors Robinson and Morgan on habeas review.  2 SHCR 467–71.  The state court found that the claim should have been raised on direct appeal but was not and, thus, was forfeited.  10 SHCR 3139–40, 3166–67.  Therefore, the claim is procedurally defaulted.  The state court also found that the trial court did not violate Brewer's rights, and this decision is not objectively

unreasonable. *Id.* Additionally, it does not appear Brewer ever raised a claim, either on direct appeal or habeas review, specifically challenging the other jurors who sat on his jury.[43]   This portion of his claim is, consequently, unexhausted and procedurally defaulted.

Brewer's claim also has no merit. To prove a juror was biased, a petitioner must show that the juror had such a fixed opinion that the juror could not judge impartially. *See Patton v. Yount*, 467 U.S. 1025, 1035 (1984). Preconceived notions as to guilt or innocence are not adequate to show bias. *See Murphy v. Florida*, 421 U.S. 794, 800 (1975). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961).

Here, juror Morgan did not say she would *always* vote for death if a defendant was convicted of capital murder. She said the Bible instructed her that it was her responsibility to look at all aspects of the case, listen carefully, and give her answer, 19 RR 115; she would take everything into consideration and be fair, 19 RR 117, 135; remorse is important to her, 19 RR 126; she could find sufficient mitigating circumstances even if she found the defendant acted deliberately and was a future

---

[43]   In his petition, Brewer's frames this allegation as follows: "Upon information and belief, many of the seated jurors – Martinez, Trogden, Treat, Zavatsky, Eberly, Frazier, Lafleur, Elliot, Davis, Escobar, Morgan, and Francis – also should have been removed for cause but were not because the defense had burned its peremptory strikes on jurors the court refused to strike." DE 103 at 125. He also complains that the court "denied a defense request for additional peremptory strikes." *Id.* On state habeas review, Brewer alleged that he was forced to exercise peremptory strikes against thirteen veniremembers who should have been removed for cause, 2 SHCR 457–67, but he did not claim that because he had to exercise peremptory strikes against these veniremembers, he was unable to remove those who sat on the jury, aside from Morgan and Robinson, the latter being the alternate juror.

danger, 19 RR 128; not every juror has to agree on what evidence is mitigating, 19 RR 130, 148; her questionnaire response that she believes in "an eye for an eye" is no longer her position, 19 RR 139; and if the other eleven jurors agreed on a special issue and she did not, she would not change her vote.  19 RR 146.  Thus, the trial judge's denial of the defense's challenge for cause was not erroneous.

Regarding juror Robinson, she was the alternate juror, 20 RR 97–98, and Brewer has presented nothing to show she cast a vote.  Regardless, Robinson affirmed that she could listen to all the facts and evidence, put aside her personal feelings, and answer the special issues based on the evidence.  20 RR 57–59, 74.  She also said that a life sentence is a "possibility" depending on the circumstances even if a person deliberately killed another, 20 RR 83, and she would need to hear evidence proving that Brewer acted deliberately regardless of the jury's determination at the first trial that Brewer acted intentionally.  20 RR 65–66.  Thus, the trial court's denial of the defense's challenge for cause of Robinson was not in error.

As for the other jurors Brewer mentions, he does not point to any evidence or portions in the record demonstrating their supposed biases.  This aspect of his claim is must be rejected as conclusory.  *Koch*, 907 F.2d at 530; *Ross*, 694 F.2d at 1011–12.

## XIII.  There Was No Ex Post Facto Violation.

In his next claim, Brewer alleges a violation of the Ex Post Facto Clause.  At the time Brewer committed capital murder, Texas law provided that where reversal is granted based on error occurring only during punishment, the defendant shall be granted a new trial on both guilt-innocence and punishment.  However, effective

September 1, 1991, the law changed to permit a new trial as to punishment only with regard to capital offenses, and in 1993, the law was made retroactive to all capital murder defendants. Brewer claims that this change resulted in an ex post facto violation. DE 103 at 126–27.

First, Brewer did not raise this claim in his subsequent application the CCA dismissed for abuse of the writ. SHCR2 49–50; *Ex parte Brewer*, 2019 WL 5420444, at *1. Thus, the claim is procedurally barred.

Second, Brewer's claim has no merit. Effective September 1, 1991, the Texas Legislature enacted Texas Code of Criminal Procedure, Article 44.29(c), which conferred upon the CCA the power to remand a death-penalty case for a hearing on punishment only. *Clark v. State*, 994 S.W.2d 166, 167 (Tex. Crim. App. 1999). A 1993 provision enacted by the legislature applied the law to offenses occurring before, on, or after the effective date. *Id.* at 168.

However, the change in the law did not result in an ex post facto violation. Any statute which punishes as a crime, an act previously committed, which was innocent when done, or which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with a crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto. *Collins v. Youngblood,* 497 U.S. 37, 42, 52 (1990). The instant case presents no such statutory change. Clearly, capital murder was an offense when Brewer committed the act in question, and a death sentence was a potential punishment. *See* Tex. Penal Code §§ 12.31 & 19.03 (Vernon's 1990). The statute did

not alter the punishment or available defenses for capital murder. *See* Tex. Penal Code §§ 19.03, 12.31, 9.01 *et seq.* (Vernon's 1990). As in *Youngblood,* where the statutory change allowed reformation of improper verdicts, the statutory change that Brewer complains of does not fall within the Supreme Court's definition of ex post facto. *Youngblood,* 497 U.S. at 52; *see also Grimes v. State*, 807 S.W.2d 582, 586–87 (Tex. Crim. App. 1991) (finding that companion statute for non-capital cases, Article 44.29(b), did not violate Ex Post Facto Clause and citing *Youngblood*).

In his reply, Brewer relied on *Lindsey v. Washington*[44] for the proposition that he was deprived of "all opportunity" to receive a lesser sentence. 301 U.S. at 402; DE 48 at 44. In *Lindsey*, the defendant was convicted of grand larceny, and at the time of his offense, the law provided that the defendant could be sentenced to a term up to fifteen years imprisonment. 301 U.S. at 398. Before the defendant was sentenced, the law changed and made the maximum fifteen-year sentence mandatory. *Id.* at 398–400. The Court held this was a violation of the Ex Post Facto Clause because the defendant no longer had the opportunity to be sentenced to a term less than fifteen years. *Id.* at 401. The Court stated: "It is plainly to the substantial disadvantage of petitioners to be deprived of all opportunity to receive a sentence which would give them freedom from custody and control prior to the expiration of the fifteen-year term." *Id.* at 401–02. In his reply, Brewer latched on to the phrase "all opportunity" and stated that he was deprived of the opportunity to "receive no further punishment." DE 48 at 44. Brewer, however, misconstrues the precedent.

---

[44]    301 U.S. 397 (1937).

As Brewer concedes, the law at the time of his offense required a new trial on both guilt-innocence and punishment if the appellate court reversed on a punishment issue.  DE 103 at 126 & n.52.  It appears Brewer is arguing that because a full re-trial carried the possibility of a "not guilty" verdict and thus no punishment at all, he was deprived of "all opportunity" to receive that lesser sentence.  But per *Youngblood*, the Ex Post Facto Clause is concerned with (1) punishing actions as crimes that were innocent when committed; (2) making more burdensome the punishment for a crime after its commission; or (3) depriving a defendant of a defense available when he committed the crime.  The first and third factors clearly do not apply here, thus Brewer's claim must rest on the second.  However, even if Brewer had received a full re-trial, the punishment for *the crime*, i.e., a guilty verdict, still would have been life or death.  Indeed, in *Weaver v. Graham*, on which Brewer also relies, the Court noted that "[w]hen a court engages in ex post facto analysis, [it should be] concerned solely with whether a statute assigns *more disadvantageous criminal or penal consequences to an act than did the law in place when the act occurred*, [and] it is irrelevant whether the statutory change touches any vested rights."  450 U.S. 24, 29 n.13 (1981) (emphasis added).  The *Youngblood* Court also held the following regarding its original understanding of the Ex Post Facto Clause: "Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts."  497 U.S. at 43.  Even *Lindsey* fails to support Brewer's claim.  301 U.S. at 401 ("The Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer.").

Thus, Brewer's claim is not that the potential punishment for his crime changed between his trials, but that he was deprived of second opportunity to prove his innocence, which, as a consequence, would lead to no punishment at all. This argument is, of course, contingent on a different guilt-innocence verdict, which is completely speculative and not a relevant factor to an ex post facto claim. *Cf. Peugh v. U.S.*, 569 U.S. 530, 539 (2013) ("[W]e have made it clear that mere speculation or conjecture that a change in law will retrospectively increase the punishment for a crime will not suffice to establish a violation of the Ex Post Facto Clause."). Indeed, Brewer's claim is a clear distortion of the precedent, which is concerned with retroactive punishment changes where a defendant has been convicted of the crime charged. That is not the case here; thus, Brewer's claim is meritless.

Further, because the Supreme Court has never held that this change in Texas law violates the Ex Post Facto Clause, Brewer is seeking a new rule of constitutional law barred under *Teague v. Lane*.

Finally, Brewer alleges that trial and appellate counsel were ineffective for failing to raise this issue. DE 103 at 126–27. Brewer raised these claims in his abusive habeas application. SHCR2 at 50. For the reasons stated, these claims are defaulted. Moreover, because Brewer's ex post facto argument has no merit, neither trial nor appellate counsel could have been ineffective for failing to raise this matter.

## XIV.   Brewer's Claim that His Death Sentence After a Prolonged Stay on Death Row Constitutes Cruel and Unusual Punishment Has Been Consistently Rejected.

Finally, Brewer alleges that his execution after a prolonged stay on death row constitutes cruel and unusual punishment in violation of the Eighth Amendment. DE 103 at 127–28.  Brewer did not raise this claim on either direct appeal or state habeas review.  Therefore, it is unexhausted and procedurally barred.  Regardless, the Fifth Circuit has repeatedly rejected this claim. *Ruiz v. Davis*, 850 F.3d 225, 228–29 (5th Cir. 2017); *ShisInday v. Quarterman*, 511 F.3d 514, 526 (5th Cir. 2007); *Reed v. Quarterman*, 504 F.3d 465, 488 (5th Cir. 2007).  The Fifth Circuit has also found this claim to be *Teague*-barred. *White v. Johnson*, 79 F.3d 432, 438–39 (5th Cir. 1996). The claim must be denied.

## CONCLUSION

For the above reasons, the Director respectfully requests that Brewer's federal habeas petition be denied with prejudice.  Furthermore, because the resolution of Brewer's claims is not debatable among jurists of reason, the Court should deny a certificate of appealability.  *See Alexander*, 211 F.3d at 898 (explaining that the district court has the power to sua sponte deny a certificate of appealability without prior briefing and argument by counsel).

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

160

MARK PENLEY
Deputy Attorney General for
Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division


/s/ Erich Dryden
\*ERICH DRYDEN
\*Attorney-in-Charge                    Assistant Attorney General
State Bar No. 24008786

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400
(512) 320-8132 (Fax)

ATTORNEYS FOR RESPONDENT


## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the above and foregoing Answer has been served electronically to Philip Wischkaemper, Peter Walker, and Shawn Nolan, counsel for Petitioner, on this the 20th day of July, 2020.


/s/ Erich Dryden
ERICH DRYDEN
Assistant Attorney General

161