IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| BRENT RAY BREWER, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | 2:15-CV-50-Z-BR |
| | § | |
| DIRECTOR, TDCJ-CID | § | |
| | § | |
| Respondent. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## TO DENY PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

Brent Ray Brewer, a Texas prisoner sentenced to death for capital murder, petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In June 1991, a Randall County jury convicted Brewer for the April 1990 fatal stabbing of Robert Laminack in the course of a robbery. *See State v. Brewer*, AP-71,307 (Tex. Crim. App. June 22, 1994). This Court subsequently granted federal habeas corpus relief as to Brewer's death sentence only. *Brewer v. Dretke*, 2004 WL 1732312 (N.D. Tex. Aug. 2, 2004). Following a retrial as to punishment in 2009, a different Randall County jury answered the Texas capital sentencing special issues and the state trial court again imposed a sentence of death. *Brewer v. State*, AP-76,378, 2011 WL 5881612 (Tex. Crim. App. Nov. 23, 2011). Brewer has again petitioned for federal habeas corpus relief. It is the recommendation of the undersigned Magistrate Judge that Brewer is entitled to neither federal habeas corpus relief nor a Certificate of Appealability.

## I.      BACKGROUND

### A. The Offense

There is no genuine dispute as to the details of Brewer's capital offense. During his 2009

1

retrial, Brewer took the stand and described in graphic detail how he and his accomplice Kristie

Lynn Nystrom approached Laminack late one evening in April 1990, asked for a ride, and fatally

stabbed Laminack while he attempted to drive them a short distance in Amarillo.[1]

---

[1] Brewer's account of Laminack's murder appears at pages 76-86 and 147-69 in Volume 25 of 28 in the court reporter's record from his 2009 retrial (henceforth "25/28 R.R.", which is located at ECF no. 125-13). Brewer admitted that he fatally stabbed Laminack after asking Laminack for a ride and that his purpose in doing so was to obtain Laminack's vehicle. (26/28 R.R. 73, 77-79). Brewer described his assault on Laminack as "frantic" and explained that Nystrom sat in the front seat beside Laminack and held his right arm while Brewer sat behind Laminack, grabbed and attempted to pull Laminack into the back seat, and stabbed him multiple times in the neck. (25/28 R.R. 79-83, 152-55). In a significantly revealing disclosure, Brewer admitted that he stabbed Laminack multiple times and the fatal assault was all but over prior to the time he demanded that Laminack hand over his wallet and keys. (25/28 R.R. 80-83, 154-61, 169). Brewer also testified that he was sober at the time he killed Laminack. (25/28 R.R. 68).

Neither Brewer nor Nystrom testified during Brewer's original 1991 capital murder trial. At that trial, prosecutors utilized testimony from a series of investigating law enforcement officers, blood spatter experts, and other forensic experts, who relied upon crime scene photographs, autopsy photographs and reports, and other physical evidence in an attempt to re-create the capital offense. Those witnesses speculated that someone seated in the passenger seat behind Laminack had reached forward, grabbed Laminack, and fatally stabbed him with a butterfly knife found at the crime scene. Testimony of Bill Leonard, Volume 15 of 21 in the court reporter's record from Brewer's 1991 capital murder trial (henceforth "15/21 R.R.", which is located at EF no. 124-10), 69-93 (describing the crime scene when he arrived and found Laminack's lifeless body slumped over the steering wheel inside his pickup truck and a bloody butterfly knife on the street beside the passenger side of the vehicle); testimony of Modeina Holmes, (15/21 R.R. 126-40) (identifying various photographs taken at the crime scene); the testimony of Joe Allen, (15/21 R.R. 141-61) (describing the blood droplets he observed and which appeared in the videotape of the crime scene that prosecutors played for the jury); testimony of Greg Soltis, (15/21 R.R. 161-259 and 16/21 R.R. 261-82, 307-09, and 413-24) (describing blood stains, blood spatter, blood droplets, bloody fingerprints, and other items shown in photographs and the videotape of the crime scene which he observed); testimony of Keith Howland, (16/21 R.R. 310-40) (describing the results of blood testing done on blood stains and swabs taken from various locations inside Laminack's pickup truck. as well as from various items found at the scene); testimony of Michael Vick, (16/21 R.R. 342-60) (describing the results of DNA testing done on various items found at the crime scene as well as various locations within Laminack's pickup truck); testimony of Dr. Ralph Erdmann, (16/21 R.P. 361-91) (describing the results of Laminack's autopsy, *i.e.*, concluding Laminack died from exsanguination after suffering stab wounds to the neck that damaged both the left carotid artery and the right deep jugular vein); testimony of Joseph Brown, (16/21 R.R. 392-412) (describing results of fingerprint analysis of items found at crime scene, including presence of Brewer's fingerprint on a door handle and door frame of the pickup, as well as the knife found at the crime scene); testimony of Bobby Henderson, (17/21 R.R. 486-546) (describing his analysis of blood spatter observed inside Laminack's pickup truck, suggesting that someone or something had been located directly next to Laminack's right side during the fatal assault and also suggesting that the person who attacked Laminack was right handed). In addition, two other witnesses testified they observed both Brewer and Nystrom covered in blood shortly after the fatal assault on Laminack and that Brewer had suffered a serious wound to his hand that required medical attention. Testimony of Michelle Francis, (16/21 R.R. 424-43); testimony of Stephen John Callen, III, (17/21 R.R. 447-86). In addition, Callen also testified that, shortly after Laminack's murder, Brewer admitted to him that he (Brewer) had stabbed a man in the neck four or five times and had obtained about $140 in cash. (17/21 R.R. 457-58).

During Brewer's 2009 retrial, both Nystrom and Brewer testified. Nystrom's account of the events leading up to and including Laminack's murder, which Brewer subsequently, and very accurately, described as "sanitized," appears at 22/28 R.R. 194-212. Nystrom described herself as sitting and looking out the front passenger window of Laminack's pickup truck while Brewer grabbed and stabbed Laminack. (22/28 R.R. 201-10). Nystrom also recalled that Laminack said "don't kill me" while Brewer was stabbing him, and Brewer replied "I don't want to kill you

### B. The Indictment

A Randall County grand jury indicted Brewer on May 22, 1990 on a charge of capital murder, *i.e.*, fatally stabbing Laminack with a knife while in the course of attempting to commit and committing the robbery of Laminack.[2]

### C. 1991 Capital Murder Trial

#### 1. Guilt-Innocence Phase of Trial

Brewer and Nystrom were separately convicted of capital murder in 1991 in connection with the fatal stabbing of Laminack.[3]

---

mister. I just want your money." (22/28 R.R. 206-08).

[2] Numerous copies of Brewer's indictment returned May 22, 1990 in Randall County cause no. 6997-A appear in the record currently before this Court. Examples include pp. 15-16 of 167 in ECF no. 126-5 and pp. 20-21 of 356 in ECF no. 122-23.

[3] The forensic evidence presented during the guilt-innocence phase of Brewer's 1991 capital murder trial is summarized in note 1 *supra*.

In addition, the jury also heard testimony at the guilt-innocence phase of trial from: (1) Ivy Craig regarding Nystrom and Brewer's unsuccessful attempt to solicit a ride from her just minutes before Laminack's murder (which both Nystrom and Brewer testified in 2009 was part of a plan on their part to purloin Craig's vehicle), testimony of Ivy Elaine Craig, (15/21 R.R. 28-50); (2) Laminack's daughter that moments before his murder, Laminack advised her that he was giving a young couple a ride to the Salvation Army and she looked outside and saw two persons inside her father's truck before he drove off for the final time from her place of business, testimony of Anita Piper, (15/21 R.R. 51-69); (3) Laminack's widow regarding the amount of money Laminack was carrying on his person the night in question and Laminack's need to wear the glasses found inside the pickup truck after the murder, testimony of Miriam Gwendolyn Laminack, (15/21 R.R. 112-25); (4) a young woman with whom Brewer and Nystrom were staying at the time of the murder regarding a conversation in which Nystrom described a plan to lure a victim to a motel where Brewer and she could rob the victim, and the bloody appearance and "crazy" demeanor of both Brewer and Nystrom when they arrived back at the young woman's apartment minutes after Laminack's murder, testimony of Michelle Francis, (16/21 R.R. 424-43); and (5) Brewer and Nystrom's highly inculpatory admissions that they had robbed and stabbed a man, testimony of Stephen John Callen, III, (17/21 R.R. 447-86).

Significantly, at Brewer's 2009 retrial Callen repeated the same basic testimony he had given at the 1991 capital murder trial regarding Brewer's admissions to Callen on the night of Laminack's murder that he (Brewer) and Nystrom had robbed and stabbed a man. Compare 1991 testimony of Stephen John Callen, III, (17/21 R.R. 447-86) with the 2009 testimony of Stephen John Callen, III, (22/28 R.R. 67-74). Significantly during his testimony at both trials, Callen testified without contradiction that Brewer recounted to Callen that Laminack had begged "please don't kill me" while Brewer was stabbing him. (17/21 R.R. 461-62; 22/28 R.R. 71). In his own testimony at the 2009 retrial, Brewer expressly admitted that Callen's 2009 trial testimony was fully accurate. (25/28 R.R. 86).

During the 1991 capital murder trial, Callen also testified without contradiction that Brewer smirked as he described his victim begging for his life. (17/21 R.R. 471). Callen also corroborated Francis' testimony at the 1991 trial that both Brewer and Nystrom appeared nervous and emotional (*i.e.*, they were crying) when they returned to

3

## 2. Punishment Phase of 1991 Trial

### a. The Prosecution's Evidence

At the punishment phase of Brewer's 1991 trial, the jury heard testimony from prosecution witnesses establishing that: (1) while attending middle school in Cedar Hill, Texas, Brewer was twice sent to an alternative school – the first time after he threatened another student with a buck knife and the second time after he fought with a child in physical education class[4]; (2) when he was a high school student in Mississippi, Brewer once picked up and shoved a diminutive former girlfriend against a bank of lockers, injuring her to the extent that she suffered three displaced vertebral discs leaving her arm paralyzed for two months, requiring her to undergo extensive physical therapy, and causing her physical issues that continued to linger years later, including at the time of Brewer's 1991 trial[5]; (3) in a separate incident just months after the shoving episode, Brewer threatened to kill the same former girlfriend[6]; (4) in January 1989, Brewer was arrested for carrying a concealed weapon, specifically a hunting knife, while Brewer was driving a vehicle registered to a couple named Greenman late at night in a high-crime area in Naples, Florida[7]; (5) in July 1989, Brewer beat his biological father Albert Brewer about the head with a broom while

---

Francis' apartment shortly after the murder. (17/21 R.R. 472-73). Callen added at the 1991 trial that, when he drove both Nystrom and Brewer to the hospital that same night to get medical treatment for Brewer's wounded hand, neither Nystrom nor Brewer appeared to still be nervous. (17/21 R.R. 472-73).

[4] Testimony of Kathleen Bailey (former assistant superintendent Cedar Hill ISD), (18/21 R.R. 636-56). Bailey also testified about an incident when Brewer was in the ninth grade in which he threw a stapler in math class and made threats.

[5] Testimony of Amy Forrester (Brewer's former girlfriend), (18/21 R.R. 592-608).

[6] Testimony of Cecil Beasley (former principal of Brewer's Mississippi high school), (18/21 R.R. 609-35). Beasley also testified that Brewer had a temper and could get very angry. (18/21 R.R. 633).

[7] Testimony of Ronald Mosher (Naples. Florida, police officer), (18/21 R.R. 657-72). Officer Mosher testified that the Greenmans (John and Amy) used several different drivers and were known to engage in narcotics trafficking. On cross-examination, officer Mosher admitted that Brewer did not resist arrest, and did not threaten anyone and the knife in question was observed near the console in the front seat, not on Brewer's person.

4

defending his biological mother from an assault by Albert Brewer, resulting in Albert Brewer suffering a broken jaw and facial and head injuries that necessitated surgery and a hospital stay of several weeks[8]; (6) around the time of Brewer's arraignment for Laminack's capital murder, Brewer was photographed shooting the finger while exiting the courthouse[9]; (7) while awaiting trial in the county jail for Laminack's capital murder, Brewer became involved in a confrontation with another inmate and threatened to stab the other inmate in the eye with a pencil[10]; and (8) a mental health expert (Dr. Richard E. Coons) who believed, despite not having evaluated Brewer, that there was a probability Brewer would be violent in the future.[11]

### b. The Defense's Evidence

Brewer's trial counsel presented testimony at the punishment phase of trial from: (1) a

---

[8] Testimony of Richard Lepicher (the deputy sheriff who responded to a domestic disturbance call at the Brewer home in Monroe County, Mississippi, and discovered Albert Brewer bleeding about the mouth, nose, and side of the head when he arrived at the scene), (18/21 R.R. 578-94). Lepicher also testified that: (1) Brewer's mother, who had remarried Albert Brewer, informed him that Brewer intervened when Albert Brewer began assaulting her; (2) there had been other episodes of violence at the Brewer home that resulted in calls to the police, including incidents in which Albert Brewer had become drunk and violent; and (3) months after the broom incident, he observed that Albert Brewer still had problems with muscle control on his right side. Nonetheless, Lepicher testified that no charges were ever brought against anyone as a result of the broom incident.

A physician who treated Albert Brewer following the broom incident testified without contradiction that: (1) Albert Brewer suffered several injuries in the broom incident, including bruises to the left chest and shoulder, a small laceration to the left scalp, a large laceration to the base of the nose, limitations to his speech ability and weakness to the right side of his face, and slow movement on the right side of its body; (2) Albert Brewer's injuries included a compound depressed skull fracture in the left temporal frontal area that required surgery to repair a laceration to the dural membrane; (3) Albert Brewer was discharged from the hospital on July 27, 1989, while still experiencing weakness in the feet and right side; but (4) by October 1989, he cleared Albert Brewer to return to work. Testimony of Dr. Walter W. Echman, 18/21 694-704.

[9] Testimony of Henry Burgess (the photographer who took the photograph in question), (18/21 R.R. 673-77). Burgess identified State Exhibit no. 202, which was admitted into evidence at the 1991 trial, as the photograph he took of Brewer on the date in question, which Burgess believed to have been sometime around the date of Brewer's arraignment.

[10] Testimony of Kevin Long (the inmate whom Brewer threatened), (18/21 705-20). Long also testified that during his pretrial detention, Brewer informed Long that Laminack begged Brewer not to kill him, saying "please boy, don't kill me."

[11] Testimony of Dr. Richard E. Coons, (18/21 R.R. 721-36).

Texas Justice of the Peace who had sent Brewer to Big Spring Hospital for a mental health evaluation at the request of Brewer's family after Brewer wrote a note threatening suicide[12]; (2) Brewer's biological father, who testified (a) he had no contact with Brewer until Brewer was age fifteen, (b) he showed his younger son more affection than he showed Brewer and Brewer resented it, (c) he was more harsh toward Brewer, (d) on one occasion he was arrested for assaulting Brewer, (e) on the occasion of the broom episode, he was violent toward Brewer's mother and threatened to kill Brewer, and (f) Brewer apologized for beating him with the broom and he forgave Brewer for doing so[13]; (3) a resident of the apartment complex where Brewer and Nystrom stayed after they left Big Spring Hospital, who testified Brewer was not violent and was not on drugs[14]; (4) one of Brewer's roommates at the apartment in Amarillo, who testified that on the night of the murder, Brewer told her that a third person named "James" had stabbed Laminack and that he (Brewer) cut his hand when he attempted to grab the knife[15]; (5) another of Brewer's roommates, who testified that Nystrom "controlled" Brewer[16]; (6) Brewer's mother, who testified (a) she divorced Brewer's biological father Albert Brewer when Brewer was two years old, (b) she later married Brewer's step father Dan Bartlett, who was verbally and physically abusive toward her and Brewer, (c) Bartlett showed favoritism toward Brewer's younger sister, (d) Brewer did well in school until the fifth grade when he had to undergo back surgery, (e) prior to his back surgery, Brewer was good in sports and had many friends but, after his surgery, he struggled in school and

---

[12] Testimony of China Long (Howard County, Texas Justice of the Peace), (18/21 R.R. 755-65).

[13] Testimony of Albert Brewer (Brewer's biological father), (18/21 R.R. 768-88).

[14] Testimony of Carol Burks (resident of Raintree Apartments in Amarillo in 1990), (18/21 R.R. 790-804).

[15] Testimony of DeDe Bishop (Brewer's roommate), (18.21 R.R. 805-12).

[16] Testimony of Michelle Francis (Brewer's roommate), (18/21 R.R. 613-18).

was held back, (f) in junior high school, Brewer began smoking pot, (g) Brewer helped to take care of his younger sister, (h) in 1990 while in the hospital in Big Spring, Brewer informed her that he had decided to turn his life around, he wanted to get rids of drugs, and he planned to seek counseling in Abilene once he left the hospital, and (i) Nystrom controlled Brewer[17]; (7) Brewer's younger sister, who testified that Brewer took care of her and that Nystrom controlled Brewer[18]; (8) a clinical psychologist, who testified that (a) mental health professionals have no special powers when it comes to predicting future dangerousness, (b) the general consensus in the mental health profession is that an evaluation of an individual is needed to make a prediction of future dangerousness, and (c) common sense and logic are as good a guide to the future dangerousness issue as an expert opinion.[19]

### 3. The Verdict

The jury began its deliberations at the punishment phase of Brewer's first trial at 3:24 PM on June 1, 1991. The jury returned its verdict at 6:42 PM the same date, and the trial court imposed a sentence of death in accordance with the jury's answers to the Texas capital sentencing special issues.[20]

### D. Initial Direct Appeal

Brewer appealed his 1991 conviction and sentence. The Texas Court of Criminal Appeals ("TCCA") affirmed Petitioner's capital murder conviction and sentence of death. *Brewer v. State*, AP-71,307 (Tex. Crim. App. June 22, 1994).

---

[17] Testimony of Karon Brewer (Brewer's mother), (18/21 R.R. 819-37).

[18] Testimony of Billie Ann Bartlett (Brewer's younger half-sister), (18/21 R.R. 848-40).

[19] Testimony of Dr. Randall Price, (18/21 R.R. 841-51).

[20] (19/21 R.R. 900-03).

### E. Initial State Habeas Corpus Proceeding

The TCCA subsequently denied Petitioner's initial application for state habeas corpus relief.[21]

*Ex parte Brewer*, 50 S.W.3d 492 (Tex. Crim. App. 2001).

### F. First Federal Habeas Corpus Proceeding

This Court granted federal habeas corpus relief as to Brewer's sentence after concluding the state trial court's punishment phase jury instructions violated his federal constitutional rights. *Brewer v. Dretke*, 2004 WL 1732312 (N.D. Tex. Aug. 2, 2004). The United States Court of Appeals for the Fifth Circuit reversed. *Brewer v. Dretke*, 410 F.3d 773 (5th Cir. 2005), *superseded* 442 F.3d 273 (5th Cir. 2006). The United States Supreme Court granted certiorari and reversed the Fifth Circuit. *Brewer v. Quarterman*, 550 U.S. 286 (2007). The Fifth Circuit then remanded to this Court for entry of judgment. *Brewer v. Quarterman*, 512 F.3d 210 (5th Cir. 2007).

### G. 2009 Retrial as to Sentencing

#### 1. The Prosecution's Evidence

At Brewer's August 2009 retrial as to punishment, the prosecution presented many of the same witnesses it had presented at Brewer's first capital murder trial.[22]

---

[21] Brewer's initial state habeas corpus application was filed on August 19, 1997 by attorney Richard Keffler. A copy of that application appears among the state court records filed in this case in ECF no. 125-17. Among the many exhibits that attorney Keffler attached to Brewer's first state habeas application were a detailed report by Dr. Mark Cunningham identifying additional mitigating evidence not presented at Brewer's first trial, a report by a forensic pathologist criticizing aspects of Laminack's autopsy report, and various documents addressing the criminal convictions of Dr. Ralph Erdmann (who performed Laminack's autopsy and testified at Brewer's first trial) for misconduct in connection with other autopsies.

[22] For example, Laminack's widow again testified concerning the amount of cash he had on his person on the day of the murder and the fact that he wore his glasses all the time (the same glasses found on the floorboard of the pickup truck after his murder); this time, however, she also testified extensively regarding he relationship with her late-husband and the impact of Laminack's murder on her entire family. Testimony of Miriam Gwendolyn Laminack, (21/28 R.R. 58-81, 246-47).

Laminack's daughter again testified regarding her conversation with Laminack shortly before he left to give

Brewer and Nystrom a ride; this time, she also testified about the events that transpired after Laminack failed to return home that same night. Testimony of Anita Laminack Piper, (21/28 R.R. 119-43).

Ivy Elaine Craig again testified concerning her encounter with Nystrom (whom Craig testified was "angry" and "adamant" and aggressively demanded a ride) on the same evening as Laminack's murder. Testimony of Ivy Elaine Craig, (21/28 R.R. 105-08).

A Randall County Sheriff's Department supervisor identified numerous crime scene photographs and a diagram of the area in Amarillo where the murder occurred that had been admitted into evidence during the first trial. Testimony of Byron Towndrow, (21/28 R.R. 83-103).

A former Amarillo Police Officer, now employed at the FBI's lab in Quantico, Virginia, again identified numerous crime scene photographs, fingerprint cards, and other physical evidence collected from inside Laminack's pickup truck (including a finding that Brewer's bloody fingerprint was found on the butterfly knife found at the crime scene); he also testified about the results of blood stain analysis and blood comparisons done on blood swabbed from various locations within and without Laminack's vehicle, as well as blood found on various items found within and without the vehicle (including findings that both Laminack's and Brewer's blood were found on the butterfly knife); he also presented expert blood spatter testimony regarding the patterns found inside Laminack's vehicle. Testimony of Greg Soltis, (21/28 R.R. 146-245).

One of the two young women with whom Brewer and Nystrom stayed during April 1990 just prior to the murder testified again about (1) a conversation she overheard in which Nystrom described a plan to Brewer in which Nystrom would lure a victim to a motel room where they could rob him, and (2) the nervous demeanor both Nystrom and Brewer exhibits when they returned covered in blood to the apartment the night of Laminack's murder, as well as Brewer's hand injury. Testimony of Michelle Francis Christian, (21/28 R.R. 248-88).

After the trial court heard testimony from two witnesses concerning the unavailability of former prosecution witness Richard Lepicier due to impending orthopedic surgery [testimony of Gil Farren, (22/28 R.R. 15-18), and testimony of Ron Jennings, (22/28 R.R. 2-0-30)], the state trial court permitted the prosecution to read Lepicier's testimony from Brewer's 1991 trial into the record, which focused primarily upon Lepicier's observations on the date in July 1989 when he responded to a domestic disturbance call and found Albert Brewer incapacitated on the kitchen floor after Brewer had beaten him with a broom while defending his mother. Testimony of Richard Lepicier, (22/28 R.R. 40-59).

The same photographer who took a photograph of Brewer shooting the finger while exiting the courthouse around the time of his arraignment for Laminack's capital murder (State Ex. No. 202) again identified that photograph. Testimony of Henry Bargas, (22/28 R.R. 60-64).

Stephen Callen III again testified that (1) Brewer and Nystrom told him they had killed a man for $140, and (2) Brewer smirked and giggled when he described his victim begging for his life. Testimony of Stephen Callen III, (22/28 R.R. 67-74).

Brewer's former high school girlfriend again testified that (1) after she broke up with Brewer he threatened her more than once, (2) on one occasion, their verbal altercations in the school hallway escalated and Brewer picked her up and shoved her back against a locker, causing her to sustain three displaced vertebral discs, pinched nerves in her arm, all of which left her without the use of her arm for several months, and (3) in addition to threatening and assaulting her, Brewer also threatened to kill her new boyfriend. Testimony of Aimee Diane Long, (22/28 R.R. 75-88).

A former Randall County Jail inmate again testified (1) he briefly shared a cell with Brewer, (2) Brewer explained that he had been arrested for a murder, and (3) Brewer said that his victim had begged "please don't kill me, Boy" as Brewer stabbed him. Testimony of Kevin Lewis, (22/28 R.R. 91-125). On cross-examination, Lewis admitted that (1) he had convictions for DWI, delivery of marijuana, and non-payment of child support, (2) he had been friends with Skee Callen in high school but later drifted apart, and (3) he sometimes went into the business run

In addition, the prosecution also presented testimony from Kristie Nystrom that (1) she had refused to testify during Brewer's first trial; (2) she later pleaded guilty to capital murder and received a life sentence; (3) she was now testifying in an effort to obtain favorable parole consideration following her own conviction for capital murder in connection with Laminack's murder; (4) she went to Big Spring Hospital voluntarily in 1990 for drug rehab; (5) she met Brewer there; (6) after she left that hospital, she and Brewer moved to the Raintree Apartment after the person in Amarillo with whom they were staying forced them to leave; (7) she worked at a topless bar to earn money while Brewer did not work; (8) she gave all her money to Brewer; (9) Brewer told her he wanted to roll someone to get money; (10) Brewer told her to ask a woman for a ride, but the woman slammed her door in Nystrom's face and locked it; (11) later they saw a man in an alley whom she identified as Laminack; (12) they approached him and Brewer asked him for a ride; (13) Laminack agreed to give them a ride and told them to get inside his truck; (14) Brewer told her to get into the front seat and she did; (15) Laminack went inside to tell his daughter; (16) Laminack returned a few minutes later and began driving; (17) the truck started to go out of control as Brewer attacked Laminack, whose hands were not on the steering wheel; (18) she sat on

---

by the Laminack family, *i.e.*, Amarillo Flooring, to buy tile. (22/28 R.R. 105-25).

After hearing testimony establishing that a witness from the 1991 trial had died [testimony of Ron Jennings, (22/28 R.R. 131-34)], the state trial court admitted her earlier trial testimony into evidence regarding Brewer's assignments to an alternative school on two occasions in middle school after he threatened another student with a knife and fought with a child in physical education class. Testimony of Kathleen Bailey, (22/28 R.R. 136-53).

The former Naples, Florida police officer who arrested Brewer for possession of a concealed weapon again testified that (1) he arrested Brewer who was driving a vehicle owned by the Greenmans when he observed the handle of a hunting knife located between the driver's seat and console of the vehicle and (2) Brewer subsequently pleaded guilty to that charge. Testimony of Ronald Mosher, (22/28 R.R. 230-40).

Finally, Dr. Coons again opined that (1) based upon his interviews with inmates, prison guards, and warden, he believed that many reports on prison violence greatly understated the amount of violence within the prison system and (2) despite Brewer's lack of violent behavior during his nearly two-decade stay on death row, based upon Brewer's suicidal conduct and history of violence, he believed there was a probability that Brewer would commit criminal acts of violence in the future. Testimony of Dr. Richard E. Coons, (23/28 R.R. 196-237). On cross-examination, Dr. Coons admitted that he had not evaluated Brewer and he had done no studies to ascertain whether any of his other predictions of future dangerousness in capital cases had been borne out by subsequent events. (23/28 R.R. 225, 229).

Laminack's thigh to try and reach the brakes; (19) when she hit the brake, the truck stalled and she slid back into her seat; (20) Brewer had Laminack around the neck, Laminack was trying to grab Brewer's hands, and Brewer was cutting Laminack; (21) Laminack said "don't kill me"; (22) Brewer responded "I don't want to kill you mister. I just want your money"; (23) Brewer then told Laminack to hand his wallet to Nystrom and he did so; (24) Brewer then told Laminack to hand over his keys but she had to retrieve them; (25) both she and Brewer exited the passenger side of the pickup; and (26) she later flushed Laminack's wallet down a toilet after removing his money.[23]

The Lubbock County Medical Examiner testified regarding Laminack's injuries based upon his review of Laminack's autopsy report, autopsy photographs, witness statements, and the 1991 testimony of the medical examiner who actually performed Laminack's autopsy.[24]

A Texas Department of Criminal Justice ("TDCJ") correctional officer testified about an incident in June 2007 in which Brewer broke open a razor and attempted to cut his own wrists.[25]

Another TDCJ correctional officer testified regarding the conditions under which inmates are housed on death row and explained that Brewer had only one major disciplinary violation during his years on death row, *i.e.*, a March 2000 violation for possession of marijuana, a charge to which Brewer pleaded guilty and received a 15-day cell restriction.[26]

---

[23] Testimony of Kristie Lynn Nystrom, (22/28 R.R. 168-225).

[24] Testimony of Dr. Sridha Natarajian, (23/28 R.R. 19-66). Like Dr. Erdmann, who testified at Brewer's 1991 trial, Dr. Natarajian concluded that Laminack died from massive blood loss resulting from stab wounds to his neck, which damaged both the carotid artery and the internal jugular vein, two vital blood vessels. (23/28 R.R. 32-47). Dr. Natarajian also testified (1) Laminack's wounds, as shown in the autopsy photographs were consistent with the double-edged blade found at the crime scene, and (2) Laminack also suffered defensive type wounds to his left hand. (23/28 R.R. 43-54).

[25] Testimony of Russell Pinckard, (23/28 R.R. 73-86). Pinckard also testified that Brewer gave no explanation for his conduct. On cross-examination, Pinckard testified that during his fifteen years working on death row, Brewer had never given him any problems and the same was true for other guards. (23/28 R.R. 86).

[26] Testimony of Stephen Bryant, (23/28 R.R. 87-125). Bryant explained that: (1) death row inmates are classified into three groups based upon their history of disciplinary violations; (2) death row inmates remain in their

An investigator for the special prosecutor's unit in Huntsville identified a videotape that showed daily activity on Texas' death row, including the procedure for moving death row inmates, and discussed the differences between conditions on death row and in the general prison population.[27]

### 2. The Defense's Evidence

Brewer's trial counsel presented testimony from forensic psychologist Dr. John Edens that (1) he was the primary author of an academic study that concluded there was little accuracy to mental health professional's predictions of future dangerousness in capital cases; (2) his study focused on inmates who had been removed from death row and placed in the general prison population; (3) as a general rule, past behavior is a good predictor of future behavior; and (4) the highly subjective methodology employed by Dr. Coons had no basis in legitimate science.[28]

A Randall County Jail correctional officer and the Administrator of the Randall County Jail both testified that Brewer had not been written up for any disciplinary violations during his current stay at the jail.[29]

Brewer's mother testified that (1) Brewer was very active in team sports until he was

---

cells 22 hours of each day, take their meals in their cells, and recreate and shower individually, not in groups; (3) Brewer was classified as Level 1, *i.e.*, the lowest level of seriousness, when Brewer was transferred back to Randall County to stand trial a second time; and (4) Brewer had very few disciplinary violations during his stay on death row. (23/28 R.R. 101, 115, 125). Bryant also testified that while some death row inmates had once been allowed to work in various jobs within the TDCJ system, that was no longer the case. (23/28 R.R. 102-03). Finally, Bryant testified that despite Brewer's suicide attempt in 2000, which was noted as having resulted from Brewer's frustration over his court case, he could recall no specific incidents involving Brewer, and Brewer's only mental health contacts during his time on death row had been routine 90-day screenings. (23/28 R.R. 89, 106-08).

[27] Testimony of A.P. Merillat, (23/28 R.R. 129-69). Merillat testified that inmates in the general prison population, including those serving life sentences, are not segregated from other inmates and have considerably more freedom than inmates housed on death row. (23/28 R.R. 149-61). Merillat also testified that criminal acts of violence do take place within TDCJ, including on death row. (23/28 R.R. 164). He did not recall ever investigating Brewer for any offense. (23/28 R.R. 166).

[28] Testimony of Dr. John Edens, (23/28 R.R. 11-69).

[29] Testimony of Scott Thomas Castleberry, (24/28 R.R. 74-76); testimony of Captain Debbie Uhruh, (24/28 R.R. 105-07).

diagnosed with scoliosis and had to undergo back surgery to fuse several of his vertebrae and put a rod in his back, which caused a severe change in Brewer's life; (2) Brewer did not know his biological father until he reached age fifteen; (3) Brewer's biological father abused Brewer physically and emotionally; and (4) on one occasion, Brewer defended her from an assault by Brewer's biological father by hitting his father over the head with a broom.[30]

Brewer's younger sister testified that (1) she and Brewer enjoyed a good childhood in Cedar Park, Texas; (2) her parents divorced when she was eleven and Brewer was fourteen or fifteen; and (3) when Brewer was seventeen, she, Brewer, and their mother moved to Mississippi to be with Brewer's biological father, who beat and fought with Brewer.[31]

A former correctional officer on Texas death row who worked there from 1977 through 2002 testified that (1) while assaults took place and weapons were available on death row, there was more opportunity for violence in the general prison population than on death row, and (2) he did not recall ever writing Brewer up for a disciplinary infraction.[32]

A different former Texas death row correctional officer testified that he was once assaulted while working death row when an inmate (not Brewer) threw hot water on him.[33]

Finally, Brewer took the stand and testified that: (1) he was only nineteen years old in April 1990; (2) his biological father Albert Brewer was not in his life until he reached age fifteen; (3) his biological father went to Vietnam and returned a different person; (4) his mother married Don Bartlett, who gave all his attention to Brewer's younger sister Billie Anne while giving Brewer

---

[30] Testimony of Karon Brewer, (24/28 R.R. 77-94). On cross-examination, Brewer's mother acknowledged Brewer's marijuana use. (24/28 R.R. 94).

[31] Testimony of Billie Anne Young, (24/28 R.R. 96-102).

[32] Testimony of Jared Wilson, (25/28 R.R. 16-27).

[33] Testimony of Kyle Rains, (25/28 R.R. 28-34).

none; (5) Bartlett beat Brewer with his belt and an extension cord; (6) his mother and Bartlett fought frequently; (7) he played team sports until he was diagnosed with scoliosis, which necessitated spinal surgery that included the fusion of several of his spine and Brewer spending six-to-eight weeks in a body brace after two-to-three weeks in the hospital; (8) after he was no longer able to play sports, he began to hang with "stoners"; (9) he smoked weed and drank alcohol starting around age twelve-to-thirteen; (10) thereafter he experimented with "everything, stopped doing his school work, and ran away three or four times; (11) he met his biological father at age fifteen and they drank alcohol and smoked pot together; (12) when his mother divorced Don Bartlett and got back together with his biological father, they moved to Mississippi; (13) he was responsible for Billie Anne when they lived in Mississippi because both their parents were on the road five days a week working as truck drivers; (14) Albert Brewer was violent, beat both Brewer and his mother, and on one occasion nearly broke Brewer's nose with a piece of firewood; (15) Brewer ran away to Florida in 1989 for two-to-three months, where the Greenmans introduced him to crack cocaine; (16) on one occasion, Brewer struck his biological father with a broom while defending his mother from an assault by Albert; (17) after that incident, Brewer moved to Abilene to live with his grandmother – where he hung out with stoners and did drugs and alcohol; (18) in 1990, he wrote a suicide note that his family found and resulted in Brewer being referred by a judge to a state hospital; (19) he spent about a month at the state hospital in Big Spring, where he met Kristie Nystrom; (20) when he left the hospital in Big Spring, he moved to a room his mother rented for him from Guy Blackwell; (21) when Nystrom left the hospital in Big Spring, he brought her to live with him and Blackwell; (22) he and Blackwell later fought over Nystrom, so he and Nystrom moved to the Raintree Apartments; (23) he and Nystrom decided to steal a car and attempted to steal Ivy Craig's van, but she drove off before they could do so; (24) he asked

14

Laminack for a ride with the intention of taking Laminack's truck; and (25) he felt remorse for what he had done to both Laminack and his family.[34]

### 3. The Verdict

The jury returned its verdict on August 14, 2009 unanimously finding (1) beyond a reasonable doubt that Brewer deliberately caused the death of Laminack; (2) beyond a reasonable doubt there is a probability Brewer would commit criminal acts of violence that would constitute a continuing threat to society; and (3) taking into consideration all of the evidence, including the circumstances of the offense and Brewer's background, character, and personal moral culpability, there were insufficient mitigating circumstances to warrant that a sentence of life imprisonment be imposed rather than a death sentence.[35]

---

[34] Testimony of Brent Ray Brewer, (25/28 R.R. 37-101).

Brewer's 2009 testimony detailing his fatal assault upon Laminack is described in note 1 *supra*.

Brewer repeatedly asserted that he felt remorse for his murder of Laminack, admitting that he had killed Laminack and expressing sorrow for what he had done: "I took his life for no reason and there's no excuse." (25/28 R.R. 84); "I had no idea I hurt these people." (25/28 R.R. 83); and explaining that he thinks about Laminack on holidays and the anniversary of the murder, understanding that "I can't bring Mr. Laminack back. I can't fix this. I can't do anything to fix this." (25/28 R.R. 98-100). In addition, Brewer testified that: (1) his 2000 suicide attempt resulted from his isolation from other inmates and his belief that he no longer wished to live; (2) since his return to the Randall County Jail, where he has interaction with other inmates, he is now 39 years old and no longer feels that way; and (3) he has tried to behave while in prison. (25/28 R.R. 95-97).

On cross-examination, Brewer: (1) insisted that he had tried to behave since his conviction: "I've already done the worst thing I could ever do. The only way to make a difference at all is to stay out of trouble if I could." (25/28 R.R. 102); (2) admitted that he had done a drawing showing drug paraphernalia (25/28 R.R. 105-06); (3) while awaiting trial in 1991 he wrote a letter to Nystrom in which he wrote "life's most unbearable moments are those we enjoy the most" and in which he offered to take sole responsibility for Laminack's murder (25/28 R.R. 108-11); (4) he admitted that he had threatened someone in 1983 (25/28 R.R. 113-14); (5) he admitted he struck Albert Brewer on the head with a broom while protecting his mother (25/28 R.R. 115-26); (6) he admitted that he was arrested and pleaded guilty to possession of a knife in Florida, but insisted the knife was not his and that the Greenmans for whom he was driving were making purchases of drugs and not selling drugs (25/28 R.R. 127-32); (7) insisted he got counseling while at the hospital in Big Spring (25/28 R.R. 139); (8) admitted that he made up a story about his assault on Laminack on the night of the murder (25/28 R.R. 143).

[35] Volume 2 of the Clerk's Record (henceforth "2 C.R."), pages 602-05 [ECF no. 122-24 & ECF no. 126-5 at 34-37 of 167]; (25/28 R.R. 238-40).

## H. Second Direct Appeal

Brewer again appealed his sentence.[36] The Texas Court of Criminal Appeals ("TCCA")

again affirmed Brewer's death sentence. *Brewer v. State*, AP-76,378, 2011 WL 5881612 (Tex.

Crim. App. Dec. 23, 2011).

## I. Second State Habeas Corpus Proceeding

Brewer also sought state habeas corpus review of his second death sentence.[37] The TCCA

---

[36] Attorney John Bennett filed Brewer's direct appeal brief on March 23, 2011, arguing that: (1) the state trial court quashed the indictment and therefore lacked jurisdiction over Brewer; (2) the trial court erred in admitting evidence of Nystrom's eligibility for release on parole; (3) the trial court erred in responding to a jury note inquiring about parole eligibility by directing the jury to the jury charge, which instructed the jury to disregard parole; (4) the trial court erred in not granting Brewer's challenge for cause to a venire member who was biased and against whom Brewer was forced to exercise a peremptory challenge; and (5) the trial court erred in admitting the testimony of Dr. Coons as to future dangerousness. ECF no. 122-16.

[37] Attorney Richard Wardroup filed Brewer's second state habeas corpus application on July 20, 2012, asserting eighteen broad categories of claims in a 410-page application, including numerous multifaceted claims. [Brewer's second state habeas corpus application appears at ECF no. 88, pp. 17-428. Brewer attached several hundred pages of exhibits to his second state habeas application, which also appear in ECF nos. 88-89.] For instance, in his first claim, Brewer argued that (1) Dr. Coons' 2009 trial testimony was false and misleading, and (2) his trial counsel was ineffective for failing to challenge the admission of Dr. Coons' testimony, as well as failing to challenge Dr. Coons' credentials. In his second state habeas claim, Brewer argued (1) the prosecution withheld potentially beneficial information regarding the conditions of confinement within the TDCJ from his 2009 trial counsel in violation of the rule announced in *Brady v. Maryland*, (2) prosecution witness A.P. Merillat gave false testimony, (3) his trial counsel rendered ineffective assistance by failing to impeach Merillat's testimony, and (4) his state appellate counsel rendered ineffective assistance by failing to raise a point of error arguing Merillat's testimony was false or misleading. In his third state habeas claim, Brewer argued that (1) his trial counsel rendered ineffective assistance by failing to (a) adequately challenge the admission of Laminack's autopsy report and failing to challenge the admission of Dr. Natarajian's testimony that was based in part on Laminack's autopsy report, as well as Dr Erdmann's 1991 trial testimony, and (b) use Dr. Erdmann's intervening convictions for fraud in several other cases to impeach the findings in Laminack's autopsy report, (2) his state appellate counsel rendered ineffective assistance by failing to raise a point of error challenging the admission of Laminack's autopsy report, and (3) Dr. Natarajian testified falsely concerning the validity of Laminack's autopsy report and the autopsy conducted by Dr. Erdmann. Brewer asserted fifteen other claims for relief, including arguments that his trial counsel rendered ineffective assistance by failing to adequately investigate Brewer's background and present available mitigating evidence.

On August 20-21, 2013, the state trial court heard testimony from Dr. Coons and Brewer's two 2009 trial counsel (attorneys Anthony Odiorne and Edward Ray Keith, Jr.) in connection with Brewer's many claims of ineffective assistance of counsel, as well as his complaints about Dr. Coons' 2009 testimony. The verbatim transcription from that hearing appears at ECF no. 126-9 through 126-10. The voluminous exhibits admitted into evidence during Brewer's 2013 state habeas hearing appear at ECF no. 126-11 through 126-14. In addition, Brewer submitted several post-hearing affidavits, most of which attack Dr. Coons' credibility. Brewer's post-hearing submissions are found at ECF nos. 126-17 to 125-18.

On March 8, 2014, the state trial court filed its findings of fact, conclusions of law, and recommendation that Brewer's second state habeas corpus application be denied. The state trial courts' findings and conclusions are

denied state habeas relief. *Ex parte Brewer*, WR-46,587-02, 2014 WL 5388114 (Tex. Crim. App. Sept. 17, 2014).

### J. Return to this Court

Brewer returned to this Court, which granted his motion for a stay and to hold this case in abeyance while he returned to state court in order to exhaust state habeas corpus remedies on new claims. *Brewer v. Davis*, 2018 WL 4585357 (N.D. Tex. Sept. 25, 2018).

### K. Third State Habeas Corpus Proceeding

The TCCA dismissed Brewer's new claims under state writ-abuse principles.[38] *Ex parte Brewer*, WR-46,587-03, 2019 WL 5420444 (Tex. Crim. App. Oct. 23, 2019).

### L. The Latest Return to this Court

On March 30, 2020, Brewer filed his second amended petition for federal habeas corpus relief in this cause, asserting fourteen multifarious claims for relief. ECF no. 103.

Respondent filed his response on July 20, 2020. ECF no. 113.

Brewer filed his reply brief on October 9, 2020. ECF no. 128.

---

erroneously dated "March 8, 2013." The state habeas trial court's findings and conclusions appear at ECF no. 126-19, at 192-294 of 306.

[38] Attorney Philip Alan Wischkaemper filed Brewer's third state habeas corpus application on November 12, 2018, asserting therein three claims for relief. Brewer's third state habeas corpus application appears at ECF nos. 127-1 and 127-3 through 127-15. More specifically, in his third state habeas application Brewer argued that (1) his 2009 trial counsel rendered ineffective assistance by failing to investigate the incidents presented by the prosecution in aggravation (specifically failing to interview Aimee Long prior to Brewer's retrial to discover Brewer was not a violent person, failing to interview Amy Valley – formerly Grossman – regarding her ownership of the knife that formed the basis for Brewer's conviction for possession of a concealed weapon, failing to interview officer Mosher regarding Brewer's failure to resist arrest, and failing to interview Kevin Long regarding the threat Brewer made while awaiting trial in 1999 to show Long started their argument); (2) the prosecution withheld Kristie Nystrom's Big Spring Hospital medical records from Brewer's defense counsel in violation of *Brady*; and (3) the refusal of Texas courts to give Brewer a retrial as to both his guilt-innocence and his sentence following the vacation of his initial death sentence violated ex post facto principles because, at the time of Brewer's capital offense, Texas law provided for a retrial as to both guilt and sentence whenever a death sentence was vacated. Brewer's third state habeas corpus application was accompanied by voluminous exhibits, including a lengthy report by psychologist Dr. Mark Cunningham (found in ECF nos. 127-9 through 127-12) and Kristie Nystrom's medical records from Big Spring Hospital (found in ECF nos. 127-13 through 127-15).

## II.     <u>STANDARD OF REVIEW</u>

Because Brewer filed this federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), this Court's review of his claims for federal habeas corpus relief is governed by AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under the AEDPA standard of review, this Court cannot grant Brewer federal habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. § 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite Supreme Court authority does not, per se, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court

18

decisions contradicts them.'" *Mitchell*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins*, 539 U.S. at 520-21. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("[I]t is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner"). "Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter,* 562 U.S. 86, 101(2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the

holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301(2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, § 2254(e)(1) provides that a federal habeas petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice*, 546 U.S. 333, 338-39 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005)

("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1). It remains unclear at this juncture whether § 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under § 2254(d)(2). *See Wood*, 558 U.S. at 300-01 (choosing not to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

The deference to which state-court factual findings are entitled under AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Absent a showing that there is an absence of available state corrective process or that circumstances exist that render such process ineffective to protect the rights of a petitioner, this Court is statutorily precluded from granting federal habeas corpus relief on any claim that has not been fairly presented to the state courts. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (the exhaustion requirement is designed to avoid the unseemly result of a federal court upsetting a state court conviction without first according the state courts an opportunity to correct a constitutional violation); 28 U.S.C. § 2254(b)(1). Nonetheless, this Court is authorized to deny federal habeas relief on the merits notwithstanding a petitioner's failure to exhaust available state court remedies. *See Rhines v. Weber*, 544 U.S. 269, 277 (2005) (a federal habeas court abuses its discretion if it grants a petitioner a stay when his unexhausted claims are plainly meritless); 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits,

notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). In those instances in which the state courts failed to adjudicate a claim on the merits that Brewer presents to this Court (such as claims (1) the state courts summarily dismissed under the Texas writ-abuse statute or other Texas rules of procedural default or (2) which Brewer failed to fairly present to the state courts), this Court's review of the un-adjudicated claim is de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (de novo review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005) (de novo review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins*, 539 U.S. at 534 (same).

### III.    EX POST FACTO CLAIM

#### A. The Claim

In his thirteenth claim for relief, Brewer argues that the failure of the state trial court to grant him a retrial as to both his guilt-innocence and sentence following this Court's granting of federal habeas corpus relief as to his sentence only violated the constitutional ban on ex post facto laws. (ECF no. 103, at 126-27).

#### B. State Court Disposition

Brewer presented this claim to the state courts for the first time as part of his third claim for relief in his third state habeas corpus application. (ECF no. 127-1). As explained above, the Texas Court of Criminal Appeals summarily dismissed Brewer's third state habeas corpus application. *Ex parte Brewer*, WR-46,587-03, 2019 WL 5420444 (Tex. Crim. App. Oct. 23, 2019).

### C. *De Novo* Review

It is unnecessary for this Court to determine whether Brewer has procedurally defaulted on this claim because the undersigned concludes after de novo review that Brewer's ex post facto claim is legally frivolous.[39] Brewer complains that, following his trial, the Texas Legislature adopted a series of new statutes that ultimately authorized a retrial as to punishment only in capital murder cases where a sentence was invalidated. (ECF no. 103, at 126-17). He contends that he was entitled to a full retrial as to both guilt-innocence and punishment under Texas law as it existed at the time of his 1991 trial and application of the state statutes enacted after his trial (following this Court's ruling that he was entitled to a new punishment hearing) violates ex post facto principles.

Retroactive application of a law violates the United States Constitution's Ex Post Facto Clause only if it either (1) punishes as a crime an act previously committed, which was innocent when committed; (2) makes more burdensome the punishment for a crime after its commission; or

---

[39] The Supreme Court has made clear that federal habeas courts may deny writs of habeas corpus by engaging in de novo review when it is unclear whether AEDPA deference applies because a federal habeas petitioner will not be entitled to a writ of habeas corpus if his claim is rejected on de novo review. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010). The Supreme Court has declined to address an issue of procedural default and chosen, instead, to resolve a claim on the merits, holding that an application for habeas corpus may be denied on the merits notwithstanding a petitioner's failure to exhaust in state court. *See Bell v. Cone*, 543 U. S. 447, 451 n.3 (2005) (citing section 2254(b)(2)). "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *Rhines v. Weber*, 544 U. S. 269, 277 (2005) (quoting 28 U.S.C. § 2254(b)(2)). Writing for four Justices of the United States Supreme Court, Justice Alito explained the rationale underlying a federal habeas court's decision to eschew analysis of a factually and legally convoluted procedural default question in favor of simply addressing the lack of merit in a particular claim as follows:

> In the absence of any legal obligation to consider a preliminary nonmerits issue, a court may choose in some circumstances to bypass the preliminary issue and rest its decision on the merits. *See*, *e.g.*, 28 U.S.C. § 2254(b)(2) (federal habeas court may reject claim on merits without reaching question of exhaustion). Among other things, the court may believe that the merits question is easier, and the court may think that the parties and the public are more likely to be satisfied that justice has been done if the decision is based on the merits instead of what may be viewed as a legal technicality.

*Smith v. Texas*, 550 U. S. 297, 324 (2007) (Justice Alito, with Chief Justice Roberts and Justices Scalia and Thomas, dissenting). A Supreme Court majority employed this very approach in *Lambrix v. Singletary*, 520 U. S. 518, 520 (1997), where the Supreme Court held "[w]e do not mean to suggest that the procedural-bar issue must be resolved first; only that it ordinarily should be. Judicial economy might counsel giving the *Teague* question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."

(3) deprives one charged with a crime of any defense available according to the law at the time the act was committed. *Collins v. Youngblood*, 497 U.S. 37, 42 (1990) (upholding against an ex post facto challenge a Texas statute authorizing the reformation of an illegal sentence without the necessity of re-trying the criminal defendant); *Jackson v. Vannoy*, 981 F.3d 408, 417 (2020). Retroactive application of the Texas statutes in question did not violate any of the foregoing ex post facto principles.

Brewer's reliance on the Supreme Court's holding in *Weaver v. Graham*, 450 U.S. 24 (1981), is unpersuasive. In *Weaver*, the Supreme Court addressed retroactive application of a state statute reducing the availability of good conduct time credits for inmates convicted of criminal offenses prior to the effective date of the statute in question. Thus, the Supreme Court was confronted in *Weaver* with retroactive application of a statute that clearly increased or made more burdensome the punishment for crimes committed prior to its enactment. No such constitutional violation occurred in Brewer's case. In fact, in a footnote in *Weaver*, the Supreme Court took pains to distinguish purely procedural changes, such as the one involved in Brewer's case, from the substantive changes in criminal law at issue in Weaver's case. *See Weaver*, 450 U.S. at 29 n.12 (holding no ex post facto violation occurs if the change effected is merely procedural and does not increase the punishment nor change the ingredients of the offense or the ultimate facts necessary to establish guilt).

### D. Conclusion

For the reasons explained above, Brewer's ex post facto challenge to his retrial as to punishment only is without arguable merit and does not warrant federal habeas corpus relief under a de novo standard of review.

IV.    **EIGHTH AMENDMENT UNDUE DELAY CLAIM**

**A. The Claim**

In his fourteenth and final claim for federal habeas relief, Brewer argues that delay of two decades since his offense somehow now makes his execution a violation of the Eighth Amendment. (ECF no. 103, at 127-28).

**B. Lack of Exhaustion**

Respondent correctly points out that Brewer did not raise this claim on direct appeal or in any of his state habeas corpus applications; thus, the claim is unexhausted. (ECF no. 113, at 160).

**C. *De Novo* Review**

It is unnecessary for this Court to determine whether Brewer has procedurally defaulted on this unexhausted claim because the undersigned concludes after de novo review that this claim is legally frivolous. As Respondent accurately points out, the Fifth Circuit has repeatedly rejected this same claim. *See, e.g., Ruiz v. Davis*, 850 F.3d 225, 228-29 (5th Cir. 2017) (denying a Certificate of Appealability ("CoA") on a claim premised upon the delay between a capital offense and the defendant's scheduled execution and holding that prisoners who have benefitted from the careful and meticulous process of judicial review of a capital sentence may not later complain that the expensive and laborious process of habeas corpus appeals that exists to protect them violates their constitutional rights); *ShisInday v. Quarterman*, 511 F.3d 514, 526 (5th Cir. 2007) (denying a CoA on claim that delay constitutionally precluded the execution of a petitioner who had spent 25 years on death row); *Reed v. Quarterman*, 504 F.3d 465, 488 (5th Cir. 2007) (recognizing that well-settled circuit authority clearly establishes that inordinate delay in executing a condemned prisoner does not violate the Eighth Amendment); *Felder v. Johnson*, 180 F.3d 206, 215 (5th Cir. 1999) (describing as bordering on the legally frivolous the argument that executing a prisoner who

had spent 20 years on death row violated the Constitution); *White v. Johnson*, 79 F.3d 432, 439-40 (5th Cir. 1996) (holding no constitutional violation resulted from inordinate delay in carrying out the execution of a condemned prisoner because there are compelling justifications for the delay between the imposition of a capital sentence and an execution); *Fearance v. Scott*, 56 F.3d 633, 635-40 (5th Cir. 1995) (rejecting the argument that a prisoner who successfully challenged his initial capital sentence could complain of unconstitutional delay in scheduling his execution). Simply put, the Fifth Circuit has been rejecting this same claim as borderline frivolous for almost as long as Brewer has been on death row.

Furthermore, Respondent correctly points out that Brewer's undue delay argument has been held by the Fifth Circuit to be foreclosed by the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989), which forecloses adoption of the new principles of federal constitutional criminal procedure in federal habeas corpus proceedings. Under the holding in *Teague*, federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994). A "new rule" for *Teague* purposes is one that was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then

26

existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the nonretroactivity principle. *Caspari*, 510 U.S. at 390.

The only two exceptions to the *Teague* nonretroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, *i.e.*, a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland*, 521 U.S. at 157. Brewer's proposed new rule barring the execution of a convicted capital murderer after "inordinate delay" resulting from the petitioner's own legal machinations satisfies neither of these two exceptions. A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari*, 510 U.S. at 390. Brewer's conviction became final for *Teague* purposes no later than June 6, 2012, *i.e.*, the ninety-first day after the Texas Court of Criminal Appeals denied Brewer's motion for rehearing following that court's affirmation of his second capital sentence. *See Beard v. Banks*, 542 U.S. 406, 411-12 (2004) (recognizing a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and either the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); *Caspari*, 510 U.S. at 390 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability

of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.")

*Teague* remains applicable after the passage of AEDPA. *See Horn v. Banks*, 536 U.S. 266, 268-72 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell*, 325 F.3d 243, 255 (5th Cir. 2003) (recognizing the continued vitality of the *Teague* nonretroactivity doctrine under AEDPA). As of the date Brewer's conviction and sentence became final for *Teague* purposes no federal court had ever held a condemned prisoner's execution violated the Eighth Amendment because of delay in executing the capital sentence arising from the prisoner's own legal challenges to his sentence. Thus, under *Teague*, Brewer's final claim does not warrant federal habeas corpus relief under even a de novo standard of review. *See White*, 79 F.3d at 437-39 (holding *Teague* foreclosed claim that prolonged incarceration before execution is cruel and unusual punishment).

### D. Conclusion

For the reasons explained above, Brewer's complaint of prolonged incarceration before his execution is foreclosed by *Teague*, without arguable legal merit, and insufficient to warrant federal habeas corpus relief under a de novo standard of review.

## V.    CONSTITUTIONAL CHALLENGES TO CAPITAL SENTENCING SCHEME

### A. The Claims

In his multifarious tenth claim for federal habeas corpus relief, Brewer argues the Texas capital sentencing statute is unconstitutional because: (1) evidence of the defendant's extraneous offenses may be admitted in Texas at the punishment phase of a capital trial even without proof the defendant has been convicted of those offenses, in violation of the Supreme Court's holding in *Ring v. Arizona*, 536 U.S. 584 (2002); (2) the Texas capital sentencing scheme's future dangerousness special issue lacks definitions of key terms, such as "probability," "criminal acts of

violence," and "continuing threat to society"; and (3) the Texas twelve/ten rule violates the Supreme Court's holding in *Caldwell v. Mississippi*, 472 U.S. 320 (1985), because it fails to inform the jury of the effect of, and misleads the jury, a single holdout juror on the jury's punishment phase verdict. (ECF no. 103, at 120-24).[40]

## B. Lack of Exhaustion

Respondent correctly points out that Brewer failed to fairly present the state appellate court with any of these three constitutional challenges to the Texas capital sentencing scheme in either his direct appeal or his multiple state habeas corpus applications. Instead, Brewer argued in his second state habeas corpus application that his state appellate counsel rendered ineffective assistance by failing to raise points of error suggesting that: (1) the Texas capital sentencing scheme unconstitutionally fails to require that aggravating circumstances be alleged in the indictment [Claim 13 in Second State Habeas Application, at 373-81, which is located at ECF 88]; (2) the Texas twelve/ten rule violates the rule announced in *Caldwell v. Mississippi* [Claim 8 in Second State Habeas Application, at 316-45]; and (3) the Texas capital sentencing statute failed to impose a burden of proof on the prosecution to disprove the existence of mitigating evidence sufficient to warrant a life sentence [Claim 14 in Second State Habeas Application, at 381-89]. At no point in his direct appeal or his multiple state habeas corpus proceedings, did Brewer complain about either the admission of evidence of unadjudicated extraneous offenses or the absence of definitions of key terms in the future dangerousness special issue. Thus, Brewer wholly failed to exhaust state remedies with regard to two of his three constitutional challenges to the Texas capital

---

[40] Brewer's companion complaint of ineffective assistance by his state appellate counsel (failing to raise points of error on direct appeal challenging the constitutionality of the Texas capital sentencing statute and capital sentence special issues) will be addressed below in connection with Brewer's multifarious ineffective assistance claims.

sentencing statute and raised his third challenge (*i.e.*, his *Caldwell v. Mississippi* challenge to the Texas twelve/ten rule) only in the context of a claim of ineffective assistance by his state appellate counsel.

### C. *De Novo* Review

It is unnecessary for this Court to determine whether Brewer has procedurally defaulted on his unexhausted challenges to the Texas capital sentencing statute because the undersigned concludes after de novo review that all of these claims lack arguable legal merit.

### 1. Lack of Definitions in Future Dangerousness Special Issue

It is well-settled that the Texas capital sentencing scheme's future dangerousness special issue does not constitutionally require definitions of its key terms, such as "probability," "criminal acts of violence," and "continuing threat to society." *See, e.g.*, *Sprouse v. Stephens*, 748 F.3d 609, 622-23 (5th Cir. 2014) (denying Certificate of Appealability ("CoA") on complaints about the lack of definitions of "probability," "criminal acts of violence," and "continuing threat to society" in a Texas capital sentencing jury charge); *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (holding the terms "probability," "criminal acts of violence," and "continuing threat to society" "have a plain meaning of sufficient content that the discretion left to the jury is no more than that inherent in the jury system itself"); *Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir. 2007) (rejecting claims that the terms "probability," "criminal acts of violence," and "continuing threat to society" were so vague as to preclude a capital sentencing jury's consideration of mitigating evidence); *Leal v. Dretke*, 428 F.3d 543, 552-53 (5th Cir. 2005) (listing numerous Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and "continuing threat to society"). Thus, all of the key terms in his punishment phase jury charge about which Brewer complains have a common understanding in

the sense that they ultimately mean what the jury says by their final verdict they mean and do not require further definition. *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993); *Milton v. Procunier*, 744 F.2d 1091, 1096 (5th Cir. 1984). Brewer's constitutional complaints about the trial court's failure to define the terms "probability," "criminal acts of violence," and "continuing threat to society" have repeatedly been rejected by the Fifth Circuit and are legally frivolous.

### 2. Evidence of Unadjudicated Extraneous Offenses

Likewise, the Fifth Circuit has repeatedly rejected the argument that Texas prosecutors must prove that a criminal defendant was previously convicted of a criminal offense (or prove the defendant committed that offense beyond a reasonable doubt) before presenting evidence at the punishment phase of a capital murder trial showing the defendant engaged in criminal misconduct. *See, e.g., Brown v. Dretke*, 419 F.3d 365, 376-77 (5th Cir. 2005) ("there is no constitutional prohibition on the introduction at a trial's punishment phase of evidence showing that the defendant has engaged in extraneous, unadjudicated criminal conduct"); *Hughes v. Dretke*, 412 F.3d 582, 592-93 (5th Cir. 2005) (holding *Teague* foreclosed claim that jury should not have been permitted to consider evidence of an unadjudicated capital murder at the sentencing phase of trial absent proof beyond a reasonable doubt); *Harris v. Cockrell*, 313 F.3d 238, 246 (5th Cir. 2002) (admission of evidence of an extraneous offense for which the defendant had been acquitted did not violate constitutional due process principles); *Jackson v. Johnson*, 194 F.3d 641, 656 (5th Cir. 1999) (Fifth Circuit authority allows the admission of unadjudicated offenses in death penalty cases without violating due process, equal protection, or the Eighth Amendment); *Vega v. Johnson*, 149 F.3d 354, 359 (5th Cir. 1998) ("Extraneous offenses offered at the punishment phase of a capital trial need not be proven beyond a reasonable doubt."); *Harris v. Johnson*, 81 F.3d 535, 541 (5th Cir. 1996) (use of evidence of unadjudicated extraneous offenses at the sentencing phase of a

Texas capital murder trial does not implicate constitutional concerns).

Insofar as Brewer agues this well-settled line of Fifth Circuit case law was somehow undermined by the Supreme Court's holding in *Ring v. Arizona*, 536 U.S. 584 (2002), Brewer misperceives the nature of the Supreme Court's holding in that case, as well as several other pertinent Supreme Court decisions. More specifically, in *Apprendi v. New Jersey*, 530 U.S. 466 (2000)*,* the Supreme Court struck down on due process grounds a state scheme that permitted a trial judge to make a factual finding based on a preponderance of the evidence regarding the defendant's motive or intent underlying a criminal offense and, based on such a finding, increase the maximum end of the applicable sentencing range for the offense by a factor of one hundred percent. *Apprendi*, 530 U.S. at 497. The Supreme Court's opinion in *Apprendi* emphasized it was merely extending to the state courts the same principles discussed in Justice Stevens' and Justice Scalia's concurring opinions in *Jones v. United States*, 526 U.S. 227, 252-53 311 (1999): other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. Put more simply, the Supreme Court held in *Apprendi* (1) it was unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal is exposed, and (2) all such findings must be established beyond a reasonable doubt. *Id.*

Two years later, in *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court applied the holding and its reasoning in *Apprendi* to strike down a death sentence in a case in which the jury had declined to find the defendant guilty of pre-meditated murder during the guilt-innocence phase of a capital trial (instead finding the defendant guilty only of felony murder) but a trial judge subsequently concluded the defendant should be sentenced to death based upon *factual*

determinations that (1) the offense was committed in expectation of receiving something of pecuniary value (*i.e.*, the fatal shooting of an armored van guard during a robbery), and (2) the foregoing aggravating factor out-weighed the lone mitigating factor favoring a life sentence (*i.e.*, the defendant's minimal criminal record). *Ring*, 536 U.S. at 609. The Supreme Court emphasized, as it had in *Apprendi*, the dispositive question "is not one of form, but of effect": "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact - no matter how the State labels it - must be found by a jury beyond a reasonable doubt." *Id.* at 602. "A defendant may not be exposed to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.* (quoting *Apprendi*, 530 U.S. at 483). Because Ring would not have been subject to the death penalty but for the trial judge's factual determination as to the existence of an aggravating factor, the Supreme Court declared Ring's death sentence violated the right to trial by jury protected by the Sixth Amendment. *Id.* at 609.

The essential elements of the offense of capital murder, as defined by Texas law, are set forth in Sections 19.02(b) and 19.03 of the Texas Penal Code. Capital murder, as so defined by Texas law, is punishable by a sentence of either life imprisonment or death. Applicable Texas law does not include any of the sentencing factors included in the Texas capital sentencing special issues set forth in Article 37.071 of the Texas Code of Criminal Procedure as "essential elements" of the offense of capital murder: "In Texas, the statutory maximum for a capital offense is death. The mitigation issue does not increase the statutory minimum. To the contrary, the mitigation issue is designed to allow for the imposition of a life sentence, which is *less* than the statutory maximum." *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003). Thus, the nature of Brewer's capital sentencing proceeding was vastly different from the sentencing proceedings the

Supreme Court addressed in *Ring*.

In *Blakely v. Washington*, 542 U.S. 296 (2004), the Supreme Court struck down as a violation of the Sixth Amendment's right to jury trial a judge-imposed sentence of imprisonment that exceeded by more than three years the state statutory maximum of 53 months. *Blakely*, 542 U.S. at 303-04. In so ruling, the Supreme Court relied upon its prior holding in *Apprendi,* 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). In *Blakely*, the Supreme Court also relied upon its prior opinion in *Ring*, for the principle "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely*, 542 U.S. at 303 (emphasis added). None of the foregoing legal principles were violated when Brewer's *jury* rendered its verdict during his retrial as to punishment.

Petitioner's capital sentencing *jury* made a key factual determination at the punishment phase of petitioner's trial *beyond a reasonable doubt*; more specifically, finding a probability Brewer would commit criminal acts of violence that would constitute a continuing threat to society. Brewer's *jury* also determined, after taking into consideration all the evidence, including the circumstances of the offense, his character and background, and his personal moral culpability, there was insufficient mitigating circumstance to warrant a life sentence. Thus, the capital sentence imposed upon Brewer pursuant to Texas law was based on jury findings, unlike the judicially-imposed sentences struck down in *Apprendi*, *Ring*, and *Blakely*.

Moreover, the Arizona capital sentencing scheme the Supreme Court addressed in *Ring* relied upon a trial judge's factual findings of "aggravating" factors and directed the trial judge to weigh those aggravating factors against any mitigating factors found to apply to the defendant.

Thus, the Arizona trial judge's factual findings in *Ring* were part of the constitutionally-mandated eligibility determination, *i.e.*, the narrowing function. In contrast, the Texas capital sentencing scheme under which Brewer was tried, convicted, and twice sentenced performed the constitutionally-required narrowing function at the guilt-innocence phase of petitioner's trial and further narrowed the category of those eligible for the death penalty by requiring a jury finding, beyond a reasonable doubt, of future dangerousness. *See Sonnier v. Quarterman*, 476 F.3d 349, 365-67 (5th Cir. 2007) (recognizing the Texas capital sentencing scheme, like the one upheld by the Supreme Court in *Kansas v. Marsh*, 548 U.S. 163 (2006), performs the constitutionally-required narrowing function through its statutory definition of capital murder and further narrows the category of those eligible for the death penalty by requiring an additional fact finding, beyond a reasonable doubt, that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society).

Unlike Arizona's weighing scheme, the Texas capital sentencing scheme performs the constitutionally-mandated narrowing function, *i.e.*, the process of making the "eligibility decision," at the guilt-innocence phase of a capital trial by virtue of the manner with which Texas defines the offense of capital murder in Section 19.03 of the Texas Penal Code. *See Johnson v. Texas*, 509 U.S. 350, 362 (1993) (holding its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different classifications of murder for that purpose); *Lowenfield v. Phelps*, 484 U.S. 231, 243-47 (1988) (comparing the Louisiana and Texas capital murder schemes and noting they each narrow those eligible for the death penalty through narrow statutory definitions of capital murder); *Jurek v. Texas*, 428 U.S. 262, 268-75 (1976) (*plurality opinion* recognizing the Texas capital sentencing scheme narrows

35

the category of murders for which a death sentence may be imposed and this serves the same purpose as the requirements of other statutory schemes that require proof of aggravating circumstances to justify the imposition of the death penalty).

The Texas capital sentencing scheme under which Brewer was convicted and sentenced involved a significantly different approach to capital sentencing than the Arizona scheme involved in *Ring*. By virtue of (1) its guilt-innocence phase determination *beyond a reasonable doubt* that the Brewer committed *capital* murder, as defined by applicable Texas law, and (2) its factual finding of future dangerousness, also made *beyond a reasonable doubt*, Brewer's jury found *beyond a reasonable doubt* the petitioner was *eligible* to receive the death penalty. *Sonnier v. Quarterman*, 476 F.3d at 365-67. In contrast, *Ring*'s jury made no analogous factual findings. Instead, *Ring*'s Arizona jury found beyond a reasonable doubt only that Ring was guilty of "felony murder," a wholly separate offense from the offense of capital murder as defined under Texas law.

Brewer's first capital sentencing special issue, *i.e.*, the future dangerousness issue, included a "beyond a reasonable doubt" burden of proof squarely placed on the prosecution. Brewer's *jury* made that determination. Thus, no violation of the principles set forth in *Apprendi*, *Ring*, or *Blakely* occurred during his trial. Insofar as Brewer argues his jury's factual finding on the future dangerousness special issue was an essential part of the procedural process under Texas law for determining whether he was *eligible* to receive the death penalty, that argument is foreclosed by the Supreme Court's *express* recognition the Texas capital sentencing scheme accomplishes the eligibility determination, *i.e.* the constitutionally mandated "narrowing function," at the guilt-innocence phase of trial. *Johnson v. Texas*, 509 U.S. at 362; *Jurek v. Texas*, 428 U.S. at 270-71. For the foregoing reasons, Brewer's citations to the Supreme Court's holding in *Ring* are non sequitur. Nothing in *Ring* or any other Supreme Court holding issued to date casts any doubt on

36

the continuing vitality of the long line of Fifth Circuit opinions holding that the use of evidence of unadjudicated extraneous offenses at the sentencing phase of a Texas capital murder trial does not implicate constitutional concerns. *See Muniz v. Johnson*, 132 F.3d 214, 224 (5th Cir. 1998) ("we hold that the admission of unadjudicated offenses at the sentencing phase of a capital trial does not violate the eighth and fourteenth amendments." (quoting *Williams v. Lynaugh*, 814 F.2d 205, 208 (5th Cir. 1987)). This claim is legally frivolous.

### 3. *Caldwell* Challenge to Texas' Twelve/Ten Rule

Brewer argues that his jury was never instructed as to the consequences in the event it was unable to reach either a unanimous verdict in favor of the prosecution or to gain ten votes in favor of the defense on any of the capital sentencing special issues. He contends this effectively misled his jury as to the consequences of a hung jury or even a single holdout juror and violated his constitutional rights. Brewer is in error. The Supreme Court has implicitly rejected his argument. *See Jones v. United States* 527 U.S. 373, 382 (1999) (holding the Eighth Amendment does not require a capital sentencing jury be instructed as to the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict, and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death).

Likewise, the Fifth Circuit has repeatedly rejected the argument that the Texas twelve/ten rule (which requires unanimity for pro-prosecution verdicts but only ten votes to warrant a pro-defense verdict on the Texas capital sentencing special issues) violates the Supreme Court's holding in *Caldwell v. Mississippi* by misleading the jury as to the impact of a hung jury. *See, e.g., Druery v. Thaler*, 647 F.3d 535, 543-44 (5th Cir. 2011) (holding no violation of *Caldwell* resulted

from state trial court's refusal to instruct jury regarding the impact of a hung jury); *Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th Cir. 2005) (holding the same arguments underlying Brewer's tenth claim herein were so legally insubstantial as to be unworthy of a certificate of appealability); *Alexander v. Johnson*, 211 F.3d 895, 897-98 (5th Cir. 2000) (holding *Teague* precluded applying such a rule in a federal habeas context); *Davis v. Scott*, 51 F.3d 457, 466-67 (5th Cir. 1995) (holding the same); *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994) (rejecting application of the Supreme Court's holding in *Mills v. Maryland* to a Texas capital sentencing proceeding).

More significantly, Brewer's reliance upon the Supreme Court's holding in *Caldwell v. Mississippi,* 472 U.S. 320 (1985), is misplaced. In *Caldwell*, the Supreme Court addressed an instance in which a capital murder prosecutor's jury argument suggested, in an erroneous and misleading manner, that the jury was *not* the final arbiter of the defendant's fate.[41] To establish a *Caldwell* violation, "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407 (1989). The Fifth Circuit has repeatedly rejected efforts identical to Brewer's to shoehorn the Supreme Court's holding in *Caldwell*, into the wholly dissimilar context of a Texas capital trial. *See, e.g., Blue v. Thaler*, 665 F.3d 647, 669-70 (5th Cir. 2011) (rejecting Eighth Amendment challenge to Texas twelve/ten rule and holding that proposed new rule advocated by petitioner would be foreclosed by *Teague*); *Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir. 2007) (recognizing Fifth Circuit precedent foreclosed arguments the Eighth Amendment and Due Process Clause of

---

[41] In *Caldwell*, the Supreme Court held the following statement by the prosecution during its closing argument undermined reliable exercise of jury discretion:

> Now, [the defense] would have you believe that you're going to kill this man and they know--they know that your decision is not the final decision. My God, how unfair can they be? Your job is reviewable. They know it.

*Caldwell v. Mississippi*, 472 U.S. at 325 & 329, 105 S.Ct. at 2637 & 2639.

the Fourteenth Amendment mandated jury instructions regarding the effect of a capital sentencing jury's failure to reach a unanimous verdict); *Alexander v. Johnson*, 211 F.3d at 897 n.5 (holding the same); *see also Barrientes v. Johnson*, 221 F.3d 741, 776-78 (5th Cir. 2000) (holding state court voir dire instructions informing the jury that the court would impose sentence, not the jury, but specifically explaining how the jury's answers to the capital sentencing special issues would require the court to impose either a sentence of life or death did not result in a *Caldwell* violation).

### D. Conclusion

For the reasons explained above, Brewer's constitutional challenges to the Texas capital sentencing statute are all foreclosed by well-settled Fifth Circuit precedent, without arguable legal merit, and insufficient to warrant federal habeas corpus relief under a de novo standard of review.

## VI.   DENIAL OF DEFENSE'S CHALLENGES FOR CAUSE

### A. The Claim

In his eleventh claim for federal habeas corpus relief, Brewer complains that the state trial court denied his trial counsel's challenges for cause to thirteen members of the jury venire whom Brewer deemed to be unqualified and this necessitated his counsels' use of thirteen peremptory strikes to remove the objectionable individuals from Brewer's jury (ECF no. 103, at 124).

### B. State Court Disposition

Brewer raised this same complaint for the first time as his seventeenth claim in his second state habeas corpus application (Second State Habeas Application, at 395-405). The state habeas trial court: (1) found that Brewer had failed to allege a denial of his right to an impartial jury; (2) found Brewer could have raised this claim on direct appeal but failed to do so; (3) concluded that Brewer forfeited his complaint about the trial court's rulings on his challenges for cause by failing to raise those complaints during his direct appeal; and (4) concluded, alternatively, that Brewer

failed to establish his right to an impartial jury was violated (Findings of Fact and Conclusions of Law in Second State Habeas Corpus Proceeding, which is located at ECF no. 126-19, at 70-71 & 98). The Texas Court of Criminal Appeals adopted that finding and conclusion when it denied Brewer's second state habeas corpus application. *Ex parte Brewer*, WR-46,587-02, 2014 WL 5388114, *1.

### C. *De Novo* Review

It is unnecessary for this Court to determine whether Brewer procedurally defaulted on his complaints about the state trial court's rulings on his challenges for cause because the undersigned concludes after de novo review that Brewer's claim lacks any arguable legal merit. Respondent correctly points out that insofar as Brewer complains about the state trial court's failure to grant defense challenges for cause made against venire members against whom Brewer later exercised peremptory challenges, Brewer's complaints are *non sequitur*. *See Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) ("So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."). If a criminal defendant exercises a peremptory challenge to exclude an allegedly biased venire member from service on the jury, no constitutional violation occurs. *See United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000) ("[I]f the defendant elects to cure such error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right.").

In support of his eleventh claim for federal habeas relief, Brewer alleges only that his trial counsel employed peremptory challenges to remove thirteen identified members of the jury venire. Brewer does not identify any of these purportedly objectionable jurors who actually served on his petit jury. As a matter of law, therefore, his Sixth Amendment claim lacks any arguable merit. A

defendant's Sixth Amendment right to trial before an impartial jury is not violated or impaired simply because the defendant chooses to use a peremptory challenge to remove a juror who should have been removed for cause. *United States v. Snarr*, 704 F.3d 368, 386 (5th Cir. 2013) (quoting *Martinez-Salazar*, 528 U.S. at 317).

### D. Conclusion

For the reasons explained above, Brewer's eleventh claim for federal habeas relief is foreclosed by well-settled Supreme Court precedent, without arguable legal merit, and insufficient to warrant federal habeas corpus relief under a de novo standard of review.

## VII.    BIASED JUROR CLAIM

### A. The Claim

In his twelfth claim for federal habeas corpus relief, Brewer identifies one juror whom he alleges possessed disqualifying bias and whom the state trial court chose not to dismiss when Brewer raised a challenge for cause. (ECF no. 103, at 125).[42]

### B. State Court Disposition

During individual voir dire of the jury venire, venire member R___ M____ testified under oath in response to questions by the prosecution that: (1) her views on the propriety of the death penalty had changed subsequent to her answering the juror questionnaire in that she had read the Bible and concluded that death could be an appropriate punishment in a case of murder (19/28 R.R. 86-89); (2) she could put aside the fatal stabbing of her brother and decide the case upon the evidence presented at trial (19/28 R.R. 91-92); (3) she understood that the terms "intentional" and

---

[42] Actually, Brewer identified two jurors in his twelfth claim – jurors R____ M_____ and R_____. However, juror R_____ was an alternate juror. Brewer does not allege any facts showing that juror R_____ ever participated in any of the deliberations or cast a vote to render a verdict during Brewer's 2009 retrial. Thus, any error in connection with the state trial court's failure to grant Brewer's challenge for cause to juror R___ was harmless as a matter of law. *See Brecht v. Abrahamson*, 507 U.S. 619, 623-24 (1993) (the test for harmless error in federal court is "whether the error had a substantial and injurious effect or influence in determining the jury's verdict").

"deliberate" meant different things and that, as used in the Texas capital sentencing special issues, the burden of proving that a murder was deliberate is upon the prosecution (19/28 R.R. 98-103); and (4) she understood that mitigating circumstance meant anything that she, as a juror, believed justified a life sentence (19/28 R.R. 106-08). Her voir dire examination by the prosecution concluded with the following exchanges:

> Q: * * * You indicated earlier that you had read the Bible and that it shows that the proper punishment for a murder is death, and you also agree, though, that the Bible says that not every death should be punishable or not every murder should be punishable by death. Were you aware of that?
> A: Yes.
> Q. And, likewise our law says the same thing. We talked about the difference between capital murder and ordinary murder, and some killings can be punished by death, under our law, and some cannot. Would you agree with that?
> A. Yes, I do.
> Q. And even some capital murders, depending on what the facts show, are appropriately punished with life. Would you agree with that?
> A. Yes, I do.
> Q. Hang on. Do you think that's fair or reasonable?
> A. Yes, I do.
> Q. [Name redacted] I have about asked you everything I needed to. Before I pass you over to Mr. – I believe – Odiorne, do you have any questions you would like to ask me?
> A. No, sir.
> Q. This is one of the few opportunities you won't get a bill for asking a question.
> A. I just have a comment. To me, these three questions are like, that's the first step. That's the second. The third one is taking all of it together.
> Q. Absolutely.
> A. And it's fair.
> Q. Right. And in the first two questions, it's the State's burden to prove the answers to those questions beyond a reasonable doubt, and on the third question. Nobody has a burden of proof at all. You just take what you got, and you decide, based upon that, if you think there is enough mitigating circumstances to justify a life sentence. And you are okay with that?
> A. I like that, yes.

(19/28 R.R. 110-11).

On voir dire examination by Brewer's counsel, the same venire member testified in part as follows:

Q. You had mentioned that you had some causes and concerns about the death penalty before you came here today and that you had consulted the Bible and read through that. Tell me a little bit about that. What did you find when you read through there?

A. I found the answers to everything, like I usually do. I found that if a man picks up something and deliberately – with the intention to kill, he is a murderer. He needs to be sentenced to death.

I also found that it is our responsibility and our duty to look at all aspects of this case, all sides, listen carefully and give our – our answer as to what we think.

Q. Okay. And where did you find that in there?

A. It was in Numbers 35:16 through 26, I think it was.

Q. And after having read that, that kind of set your mind at ease, and you feel like your questions have been answered?

A. Total peace with the death penalty.

Q. Okay. I'm guessing you had unease with it before. Why did you feel that way?

A. Because I had never researched it as far. I never had to. I'm a little embarrassed to tell you that I'm a grown woman and never really had to give it much thought, but there is different scriptures that can be taken different ways, and one of them was an eye for an eye and a tooth for a tooth, and that confused me, but I didn't read it – the whole – I didn't take in the whole, scriptures before and after it.

Q. Okay. Tell me a little bit about that now. How do you feel about that, eye for an eye, tooth for a tooth?

A. Well, that's talking about if someone does something wrong to you to turn the other cheek and pray for that person. It also says in an injury – if it's an injury, not murder, not a death, then you are to take an eye for an eye and a tooth for a tooth in that situation.

Q. What about for a murder or a death?

A. For a murder or death, there is situations there, too. If it's an accidental, then they are still to be punished but not with capital punishment.

Q. Okay. What about if it's not accidental?

A. Intentional with malice, they are to be put to death.

Q. Okay. And is that a belief that you firmly hold?

A. Yes, it is.

Q. There is not anything I'm going to say that's going to change your mind about that, is there?

A. The only thing that – when you go to Step 3, you have to take everything into consideration and be fair. That's.

Q. Okay. When you said be fair, what does that mean to you?

A. It means – be fair means to be honest with your feelings and judge – I mean, look at every – every aspect of the situation, all sides of it, and that's fair, weigh it all out because it's a big decision.

Q. Okay.

A. It's huge.

(19/28 R.R. 115-17).

In response to further questions by Brewer's counsel, the same venire member testified that: (1) in the case of an intentional murder with no provocation by the victim and no insanity on the part of the perpetrator, her opinion as to the propriety of the death penalty would depend upon the background of the defendant, which must be considered in answering the third special issue (19/28 R.R. 119-20); (2) she believed there was a difference between intentional and deliberate action in that deliberately means it was done purposely, knowingly while intentional means knowing it would result in death (19/28 R.R. 123-24); (3) intentionally committing capital murder means a person deliberately commits capital murder (19/28 R.R. 124); (4) in answering the future dangerousness special issue, in the case of an intentional and deliberate murder, she would look at whether the defendant was remorseful and would look to the defendant's past behavior as an indicator of his future behavior (19/28 R.R. 124-26); (5) even in the case of an intentional and deliberate murder, she could not be certain the defendant would always commit criminal acts of violence that would constitute a continuing threat to society (19/28 R.R. 125-26); (6) even in the case of an intentional and deliberate murder, where the evidence established the defendant would commit criminal acts of violence that constituted a continuing threat to society, there could be sufficient mitigating circumstances that would justify a life sentence (19/28 R.R. 127-28, 135); and (7) in the months since she answered the juror questionnaire her views on capital punishment had changed and she no longer believed the best justification for the death penalty was "an eye for an eye" (19/28 R.R. 139); (8) she now believed the best arguments in favor of and opposition to the death penalty were in the three Texas capital sentencing special issues (19/28 R.R. 139-40).

At the conclusion of R___ M___'s voir dire examination, Brewer's counsel lodged a challenge for cause, arguing that R___ M___ was substantially impaired in her ability to follow the law because she had testified that she believed murder with malice should result in a death sentence

and "[w]hether she can follow the law is irrelevant since she has made this statement" (19/28 R.R. 151-52). Brewer's counsel argued the venire member R___ M___ would automatically vote to impose the death penalty in every case and was subject to a challenge for cause under the Supreme Court's holding in *Morgan v. Illinois*, 504 U.S. 719 (1992). *Id.* The state trial court denied Brewer's challenge for cause. (19/28 R.R. 152).

Brewer raised a complaint about juror R____ M_____'s service on his jury for the first time as his eighteenth claim in his second state habeas application, arguing juror R_____ M_____ was biased in favor of the death penalty because she indicated she would vote to impose the death penalty in any case of deliberate murder (Second State Habeas Application, at 405-09). The state habeas trial court: (1) found Brewer could have raised this complaint on direct appeal but failed to do so; (2) found Brewer had failed to establish that his right to a fair and impartial jury was violated; (3) concluded Brewer forfeited this complaint by failing to raise it on direct appeal; and (4) concluded, alternatively, that Brewer failed to establish his right to an impartial jury was violated (Findings of Fact and Conclusions of Law in Second State Habeas Corpus Proceeding, at 70-71 & 98). The Texas Court of Criminal Appeals adopted those findings and conclusions when it denied Brewer's second state habeas corpus application. *Ex parte Brewer*, WR-46,587-02, 2014 WL 5388114, *1.

## C. *De Novo* Review

It is unnecessary for this Court to determine whether Brewer procedurally defaulted on his complaint about juror R___ M___'s alleged bias because the undersigned concludes after de novo review that Brewer's claim lacks any arguable legal merit. Contrary to Brewer's assertion, venire member R___ M___ never indicated that she would automatically vote to impose the death penalty in every case in which the defendant was convicted of capital murder. On the contrary, a fair

reading of R___ M___'s voir dire examination by Brewer's counsel summarized above emphasizes her view was just the opposite – that consideration of a wide variety of factors was necessary to answer the Texas capital sentencing special issues and that there could be no automatic response to the mitigation special issue, regardless of how the jury voted on the deliberateness and future dangerousness special issues. (19/28 R.R. 119-20, 124-28, 135). The Supreme Court has long held that a potential juror's personal viewpoints on a wide variety of subjects, including the propriety of the death penalty, do not justify exclusion of that potential juror as biased unless he or she is unable to set aside their viewpoint and render a verdict based on the law and evidence: "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). At no point during her voir dire examination did any party ask R___ M___ whether, regardless of her personal or religious views on capital punishment, she could set aside her views and decide Brewer's case based solely on the applicable law and the evidence presented in court. As a result, Brewer's challenge for cause to R___ M___ was constitutionally insufficient to establish disqualifying bias. *Id.*

In *Adams v. Texas*, 448 U.S. 38 (1980), the Supreme Court emphasized the limitations its previous holding in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), imposed on the ability of the State to exclude members of a jury venire from service on a capital sentencing jury:

> a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Adams v. Texas*, 448 U.S. at 45. The Supreme Court emphasized in *Adams* that the State could, consistent with *Witherspoon*, exclude prospective jurors whose views on capital punishment are

46

such as to make them unable to follow the law or obey their oaths; but excluding jurors on broader grounds based on their opinions concerning the death penalty is impermissible. *Id.* at 44-48.

In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Supreme Court further clarified its holdings in *Witherspoon* and *Adams*, holding the proper inquiry when faced with a venire member who expresses personal, conscientious, or religious views on capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. at 424. The Supreme Court also emphasized that considerable deference is to be given the trial court's first-hand evaluation of the potential juror's demeanor and that no particular magical incantation or word choice need necessarily be followed in interrogating the potential juror in this regard. *Id.* at 430-35.

More recently, the Supreme Court has identified the following "principles of relevance" from its *Witherspoon-Witt* line of opinions:

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (citations omitted). In *Uttecht*, the Supreme Court admonished reviewing courts to defer to the trial court's resolution of questions of bias arising from a potential juror's conflicting voir dire answers because the trial court had the opportunity to observe the demeanor of the potential juror. *Id.* at 20 ("where, as here there is a lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*, the trial

court has broad discretion."). "Courts reviewing claims of *Witherspoon-Witt* error, however, especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." *Id.* at 22. Moreover, judicial determinations of whether a potential juror possesses disqualifying bias is a question of fact to which a federal habeas court is required to give deference. *Skilling v. United States,* 561 U.S. 358, 396 (2010); *Wainwright. Witt*, 469 U.S. at 423-24; *Patton v. Yount*, 467 U.S. 1025, 1036-38 (1984).

Brewer's reliance upon the Supreme Court's holding in *Morgan v. Illinois* is misplaced. *Morgan* held merely that it was constitutional error for a state trial court to deny a defendant the opportunity to conduct voir dire into whether a potential juror would automatically vote to impose the death penalty in every case of capital murder. *Morgan*, 504 U.S. at 729-34. *Morgan* did not establish a new standard for evaluating the propriety of a challenge for cause to a venire member in a capital case. Instead, the Supreme Court took great pains in *Morgan* to reaffirm its prior holdings that: (1) the proper standard for determining when a juror may be excused for cause is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath," *Morgan*, 504 U.S. at 728; (2) a juror who in no case would vote for capital punishment regardless of his or her instructions is not an impartial juror and must be removed for cause, *id. (*citing *Witt* and *Adams*); and (3) a juror who would automatically vote for the death penalty in every capital murder case will fail in good faith to consider the aggravating and mitigating circumstances as the instructions require and must also be excused for cause, *Id.* at 728-29 (citing *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988)).

Brewer alleges no facts showing he was denied the opportunity to voir dire venire member R___ M___ with regard to any aspect of her views on the propriety of capital punishment, much

less on whether she would automatically vote to impose the death penalty in every case of capital murder. On the contrary, this Court's independent de novo review of R\_\_\_ M\_\_\_'s voir dire examination reveals that Brewer's trial counsel examined her extensively on this very topic and was repeatedly informed by R\_\_\_ M\_\_\_ that she considered each of the Texas capital sentencing special issues to be independent of one another and worthy of very careful and deliberate consideration based upon the available evidence (19/28 R.R. 124-28, 135, 139-40). Thus, no *Morgan* error took place with regard to venire member R\_\_\_ M\_\_\_. Furthermore, R\_\_\_ M\_\_ made crystal clear during her voir dire examination that there would be absolutely nothing "automatic" about any of her answers to the capital sentencing special issues.

No rational person reviewing the voir dire examination of R\_\_\_ M\_\_\_ would conclude this potential juror was unable, despite her personal or religious views, to render a verdict based upon the evidence and applicable law. Nor does an objectively reasonable construction of R\_\_\_ M\_\_\_'s voir dire examination support a conclusion that she was predisposed to vote in favor of the death penalty automatically in every case in which the defendant was convicted of capital murder. On the contrary, R\_\_\_ M\_\_\_ repeatedly referred Brewer's counsel back to the Texas capital sentencing special issues when he attempted to interrogate her on the moral justifications for and against capital punishment. (19/28 R.R. 124-28, 135, 139-40). R\_\_\_ M\_\_\_ also repeatedly emphasized throughout her voir dire testimony the need to consider all circumstances when answering the Texas capital sentencing special issues, particularly the mitigation special issue. (19/28 R.R. 110-11, 119-20, 124-28, 135, 139-40). Under such circumstances, Brewer has failed to carry his burden of establishing that the state trial judge's implicit factual determination of no disqualifying bias was erroneous. *See Canfield v. Lumpkin*, 998 F.3d 242, 248 (5th Cir. 2021) (a federal habeas court may reject a state court's factual finding of no disqualifying bias only with

clear and convincing evidence) (citing *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)); *Thomas v. Lumpkin*, 995 F.3d 432, 444-45 (5th Cir. 2021) (an implicit state court finding of no disqualifying bias is entitled to a presumption of reasonableness). R___ M___'s voir dire examination reveals a lack of clear and convincing evidence showing she was biased.

### D. Conclusion

For the reasons explained above, Brewer's twelfth claim for federal habeas relief is foreclosed by well-settled Supreme Court precedent, without arguable legal merit, and insufficient to warrant federal habeas corpus relief under a de novo standard of review.

## VIII.    *GIGLIO/NAPUE* CLAIM AS TO CONDITIONS OF CONFINEMENT

### A. The Claim

In a portion of his eighth claim for federal habeas relief, Brewer argues that he was denied due process of law when the prosecution employed false or misleading testimony from witnesses A.P. Merillat and Stephen Bryant regarding the conditions under which Brewer would be housed if given a life sentence and the details of the remuneration Merillat received in exchange for his trial testimony. (ECF no. 103, 114-19).[43]

### B. State Court Disposition

As explained in Section I.G.1. above, at Brewer's retrial, the prosecution presented testimony from a TDCJ official and a Walker County, Texas criminal investigator regarding (1) the differences generally between the conditions of confinement on TDCJ's death row and those facing inmates in the general prison population, and (2) the opportunities for inmates to engage in

---

[43] Brewer's companion complaints of ineffective assistance by both his trial counsel (failing to rebut alleged errors in the testimony of Merillat and Bryant) and his state appellate counsel (failing to raise points of error on direct appeal challenging the alleged factual errors in Merillat's and Bryant's testimony) will be addressed below in connection with Brewer's multifarious ineffective assistance claims.

violent conduct in both the general prison population and while on death row.[44] To summarize, investigator A.P. Merillat (1) narrated a video played for the jury showing the conditions on TDCJ's death row, and (2) offered testimony contrasting those conditions with what Merillat termed the much less restrictive conditions found in TDCJ's general prison population. Meanwhile, Captain Stephen Bryant testified generally that, even though Brewer did have a suicide attempt while on death row, Brewer had never undergone an intensive mental health evaluation, Brewer had very few disciplinary violations while on death row, and Brewer's only major disciplinary violation while on death row was for possession of marijuana. Thus, the apparent thrust of both of these witnesses' testimony was to blunt the defense's argument that Brewer's non-violent prison record while on death row suggested Brewer would not pose a risk of future violent behavior if he were to receive a life sentence.

Brewer complained about alleged factual errors in the trial testimony of prosecution witnesses Merillat and Bryant in claim 2A in his second state habeas corpus application, arguing both witnesses gave false or misleading testimony regarding the details of the TDCJ's inmate classification system and how it might apply to Brewer if he were to receive a life sentence (Second State Habeas Application, at 120-45). The state trial court reviewed conflicting affidavits from prosecution witness A.P. Merillat [found in ECF no. 126-16, at 166-75] and defense expert Frank AuBuchon [found in ECF no. 126-13, at 29-37]. Significantly, AuBuchon's affidavit included an admission that "neither side asked specific questions as to how the defendant would be managed by the TDCJ if he were to receive a life sentence."[45] The state habeas trial court: (1) found neither Merillat nor Bryant were asked about the details of classification of inmates convicted of capital

---

[44] *See* notes 26-27, *supra*, and accompanying text.

[45] Affidavit of Frank AuBuchon dated July 16, 2012, at p. 7 [ECF no. 126-13, at p. 35].

murder or other conditions of confinement; (2) found there was nothing false about Merillat's trial testimony regarding his rate of compensation for his testimony at Brewer's trial; (3) found Merillat's post-trial affidavit to be credible; (4) concluded Brewer had failed to show there was anything false or misleading about Merillat's trial testimony; and (5) concluded Brewer's state habeas claim 2A had no merit (Findings of Fact and Conclusions of Law in Second State Habeas Corpus Proceeding, at 27-34 & 77-78). The Texas Court of Criminal Appeals adopted these findings and conclusions when it denied Brewer's second state habeas corpus application. *Ex parte Brewer*, WR-46,587-02, 2014 WL 5388114, *1.

### C. Clearly Established Federal Law

A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Napue v. Illinois*, 360 U.S. 264. 269-70 (1959). To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used the testimony in question *knowing* that it was false. *Giglio*, 405 U.S. at 153-54. Thus, the deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with the rudimentary demands of justice and violates due process. *See Giglio*, 405 U.S. 153 (citing *Mooney v. Hologan*, 294 U.S. 103 (1935)); *Napue*, 360 U.S. at 269 (applying *Mooney* to testimony that bore upon a witness's credibility).

### D. AEDPA Analysis

To succeed in this type of due process claim, a defendant must show that the testimony complained of was actually false, the state knew or should have known that it was actually false,

and the false testimony was material. *In re Raby*, 925 F.3d 749, 756 (5th Cir. 2019); *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014) (a conviction obtained through false evidence known to be such by representatives of the State violates a defendant's constitutional rights); *Kinsel v. Cain*, 647 F.3d 265, 271 (5th Cir. 2011) ("The Supreme Court has held that the Due Process Clause is violated when the government knowingly uses perjured testimony to obtain a conviction."); *Reed v. Quarterman*, 504 F.3d at 473 (same). False testimony is material if there is "any reasonable likelihood" that it could have affected the jury's verdict. *Raby*, 925 F.3d at 756; *Canales*, 765 F.3d at 573; *Goodwin v. Johnson*, 132 F.3d 162, 185 (5th Cir. 1997) (citing *Westley v. Johnson*, 83 F.3d 714 (5th Cir. 1996)).

Brewer's *Giglio/Napue* claim fails for at least three separate, and equally compelling, reasons: (1) the state habeas court found as a matter of fact there was nothing false or misleading in the trial testimony of Merillat or Bryant; (2) after independently reviewing the entire record from Brewer's original trial, retrial, multiple direct appeals, and multiple state habeas corpus proceedings, this Court concludes after de novo review the alleged errors in Merillat's trial testimony and Bryant's trial testimony do not meet the materiality standard required for a due process violation; and (3) and most compelling of all, Brewer alleges no facts and presented the state habeas court with no evidence showing the prosecution *knowingly* presented false or misleading testimony from either Merillat or Bryant at Brewer's retrial as to punishment.

### 1. State Court's Factual Finding of No False or Misleading Testimony

The state habeas court's factual finding that Merillat's and Bryant's trial testimony was neither false nor misleading is a factual determination entitled to deference by this federal habeas court pursuant to 28 U.S.C. § 2254(e)(1). *See Schriro*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants

rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. at 240 ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'").

As Respondent accurately describes (ECF no. 113, at 140-45), the debate between Merillat and AuBuchon in their conflicting affidavits before the state habeas court was more one of style than of substance. In his affidavit, AuBuchon repeatedly criticizes Merillat for failing to volunteer additional information about the intricacies of the TDCJ's inmate classification system. Meanwhile, Merillat replies that he could only answer the questions he was asked by the parties' counsel and that he was simply not asked to address many of the subjects AuBuchon argued should have been explained to the jury. AuBuchon does not really disagree, admitting in his affidavit that neither Merillat nor Bryant were asked by either party to address the details of the TDCJ's inmate classification system or to explain precisely how Brewer would be classified if he were to be given a life sentence instead of a death sentence.

This is not the first, nor will it likely be the last, debate between Merillat and AuBuchon or between other experts addressing what the Fifth Circuit has accurately described as the TDCJ's "labyrinthine" and "voluminous and convoluted" prisoner classification system.[46] *See Ruiz v.*

---

[46] One possible source for the arguments directed toward Merillat in Brewer's state and federal habeas pleadings in this case may be found in the Fifth Circuit's opinion in *Ruiz v. Davis* 819 F. App'x 238, 240 (5th Cir. July 7, 2020). In *Ruiz*, the Fifth Circuit explained that during the 2008 capital murder trial of a Texas death row inmate, Merillat had testified erroneously that Ruiz would receive a moderately restrictive classification if sentenced to life without parole but after ten years could be promoted to a less restrictive classification depending on his behavior. This was undisputedly incorrect. TDCJ had changed its classification policy effective September 1, 2005 to disallow this exact reclassification, *i.e.*, to provide that effective that date, inmates convicted of capital murder who received sentences of life without parole would be ineligible for reclassification above the G-3 level. Ruiz sought federal habeas, arguing Merillat had committed the same error during his testimony at the trial of Texas death row inmate Adrian Estrada. On state direct appeal the state confessed error, which both parties admitted was unintentional, and

recommended that Estrada receive a new sentencing hearing. The Texas Court of Criminal Appeals directed that Estrada receive a new trial as to punishment. *Estrada v. State*, 313 S.W.3d 274, 287 (Tex. Crim. App. 2010).

In contrast, Ruiz failed to raise his complaint about Merillat's erroneous testimony either on direct appeal or in his initial state habeas corpus proceeding. When Ruiz did raise his complaint in a subsequent state habeas application, the Texas Court of Criminal Appeals dismissed the claim under state writ-abuse principles. The federal district court held Ruiz had procedurally defaulted on his complaint about Merillat's erroneous testimony. The Fifth Circuit denied Ruiz a Certificate of Appealability on Ruiz's *Giglio/Napus* claim, holding Ruiz could not overcome his procedural default because there was no allegation or evidence showing the prosecution knowingly used false or perjured testimony to secure Ruiz's death sentence. 819 F. App'x at 242-43 & n.4. As Respondent correctly points out, Brewer's capital offense took place long before the 2005 change in TDCJ classification policy, which does not apply to Brewer. Thus, the type of factual error in Merillat's testimony that occurred during the Estrada and Ruiz trials was simply not possible during Brewer's 2009 retrial.

The narrow nature of the holding in *Estrada* has not precluded federal habeas petitioners from mounting a wide range of assaults upon Merillat's credibility, including a number of arguments wholly unrelated to the factual accuracy of his testimony regarding the TDCJ's classification system. As is true of Brewer's attacks upon Merillat's credibility in this case, some of those challenges have been unusual. For example, Texas death row inmate Clinton Lee Young argued in an amended federal habeas pleading that both a *Brady* violation and a *Giglio/Napue* violation had occurred when (1) the prosecution failed to furnish the defense with a copy of Merillat's 2006 *Texas Bar Journal* article prior to Merillat's rebuttal testimony at the punishment phase of Young's March 2003 capital murder, and (2) Merillat testified erroneously regarding the details of the TDCJ's classification system and the level of violence found within the TDCJ generally. The federal district court stayed that federal habeas proceeding to permit Young to return to state court and exhaust those new claims. During Young's subsequent state habeas evidentiary hearing, Young himself interrupted his state habeas counsel's interrogation of Merillat to announce that he wished to withdraw all claims attacking Merillat. *Young v. Stephens*, 2014 WL 509376, *17-*22 (W.D. Tex. Feb. 20, 2014). After the state habeas trial court held a hearing in which Young testified under oath that his waiver of the claims involving Merillat was voluntary, intelligent, and knowing, Young was permitted to withdraw those claims. *Id.* Upon his return to federal court, however, Young reasserted both his *Brady* and *Giglio/Napue* claims. The district court concluded Young's claims were waived and, alternatively, lacked arguable merit. *Id.*, at *35-*39. The Fifth Circuit denied Young a Certificate of Appealability. *Young v. Stevens*, 795 F.3d 484 (5th Cir. 2015).

At the October 2009 punishment phase of the capital murder trial of Paul Devoe, Merillat testified that (1) many violent crimes take place inside the TDCJ, and (2) inmates have access to drugs, alcohol, and materials they can fashion into weapons. Devoe brought *Brady* and *Giglio/Napue* claims premised upon assertions that Merillat's trial testimony: (1) overstated the frequency of violence within the TDCJ system; (2) misstated that two inmates who drank alcohol inside a cell and then got involved in a fatal altercation were "cellmates"; and (3) misrepresented the amount of compensation Merillat received for testifying. As Merillat did in this case, he furnished the state habeas court with a detailed affidavit refuting each of the allegations of false testimony made against him. Devoe presented the state habeas court with no controverting affidavit or testimony. The state habeas court concluded Merillat's affidavit was credible, his trial testimony was neither false nor perjurious, and the state had not knowingly presented false or misleading testimony. The federal district court concluded: (1) the state habeas court's factual finding that Merillat had not furnished false or misleading testimony was fully supported by the record before that court; (2) none of the alleged inaccuracies in Merillat's trial testimony were material to the outcome of the punishment phase of Devoe's capital trial; (3) Devoe had failed to establish the prosecution knowingly used any false or misleading testimony from Merillat to secure Devoe's death sentence; and (4) Devoe's *Brady* claim was likewise without arguable merit. *Devoe v. Davis*, 2016 WL 5408169, *15-*19 (W.D. Tex. Sept. 27, 2016). The Fifth Circuit denied Devoe a Certificate of Appealability. *Devoe v. Davis*, 717 F. App'x 419 (5th Cir. Jan. 9, 2018).

In *Chanthakoummane v. Director*, 2018 WL 1288443 (E.D. Tex. 2018), a Texas death row inmate argued his state appellate counsel had rendered ineffective assistance by failing to challenge the admissibility of Merillat's expert testimony regarding TDCJ's classification system and the potential for TDCJ inmates to engage in acts of violence while incarcerated. The state habeas court held that, notwithstanding Merillat's erroneous testimony in *Estrada* and another capital murder trial about the details of the TDCJ's classification system, Merillat's credentials

*Davis*, 819 F. App'x 238, 244 (5th Cir. July 7, 2020) ("The Texas prison classification system is complex." (citing *Garcia v. Stephens*, 357 F.3d 222, 226-29 (5th Cir. 2014)). The fact Brewer's state habeas counsel found one or more experts willing to express an opinion about the minutiae of the TDCJ's inmate classification system divergent from those *unexpressed* by Merillat or Bryant does not establish that Merillat's or Bryant's expert opinions about the general operations of TDCJ's prisoner classification system were false or misleading. *See Clark v. Johnson*, 202 F.3d 760, 766-67 (5th Cir. 2000) (holding that a disagreement between experts regarding the conclusions to be drawn from the physical evidence was insufficient to overcome the presumption of correctness afforded a state habeas court's factual finding that an expert trial witness had not testified falsely at trial or otherwise misled the jury). Merillat's and Bryant's expert opinions regarding the *general* nature in which the TDCJ's prisoner classification system operates are not refuted by AuBuchon's assertions as to the *detailed* machinations of that same system as it might possibly apply to Brewer. Simply put, as AuBuchon admits in his affidavit before the state habeas court, neither Merillat nor Bryant were asked by either party to address the specifics of how Brewer would be treated by the TDCJ's prisoner classification system had Brewer received a life sentence.

The reason for this is readily apparent from even a cursory review of the record from Brewer's retrial: neither Merillat nor Bryant were called to testify about the possible application of the TDCJ's prisoner classification system upon Brewer in the event Brewer received a life sentence. Instead, they were called, and cross-examined, to address a variety of other issues.

---

to testify as an expert on those subjects were not seriously in question. *Chanthakoummane*, 2018 WL 1288443, at *29-*31 (citing *Fuller v. Johnson*, 114 F.3d 491, 498 (5th Cir. 1997) (approving the testimony of another member of Merillat's special prosecution unit as an expert witness)). The district court noted that Merillat's expert testimony had been noted and approved by the Texas Court of Criminal Appeals in numerous criminal trials reviewed by that state appellate court, including cases affirming capital sentences. *Id.*, at *29-*31. The federal district court concluded there was nothing constitutionally deficient nor prejudicial about the failure of that petitioner's state appellate counsel to challenge the admissibility of Merillat's testimony. *Id.* The Fifth Circuit denied a Certificate of Appealability. *Chanthakoummane v. Stephens*, 816 F.3d 62 (5th Cir. 2016).

More specifically, Merillat was called by the prosecution to authenticate a videotape showing the highly restrictive conditions that applied to TDCJ's death row at the Polunsky unit and to testify that those conditions are significantly stricter than those that apply to inmates in the general prison population. The purpose of Merillat's direct testimony was an attempt by the prosecution to counter what it correctly expected Brewer's trial counsel would argue, *i.e.*, that Brewer's lack of a violent record while housed on death row indicated he would not pose a risk of future violent behavior if he received a life sentence. On cross-examination, Brewer's lawyers used Merillat's expertise on prison violence to attempt to establish that there were opportunities for inmates to engage in violence throughout the TDCJ system, including on death row. An article Merillat wrote for the *Texas Bar Journal* discussing the opportunities for violence within the TDCJ, which was published in 2006, appears among the materials before the state habeas court.[47] This article fully supports the state habeas court's conclusion that Brewer's attorneys had an objectively reasonable basis for choosing not to impeach or otherwise attack Merillat's credibility: on cross-examination, they planned to use Merillat's expertise to help build their case supporting a negative answer to the future dangerousness special issue.

For the same reason, attempting to impeach Merillat based upon the level of compensation he received for testifying at Brewer's trial would have been counter-productive for Brewer's trial counsel. Moreover, Brewer's efforts to do so during his second state habeas corpus proceeding failed miserably. Merillat testified accurately at Brewer's trial that he charged a flat rate of $495 a day for each day he was required to be out of the office in order to testify at trials as a prosecution expert, in part to compensate him for his lost vacation days (23.28 R.R. 132-33). During his second

---

[47] A copy of Merillat's article "The Question of Future Dangerousness of Capital Defendants," which appeared in the September 2006 edition of the *Texas Bar Journal*, appears in ECF no. 126-13, at 94-97, and was before the state habeas court when it issued its findings and conclusions in Brewer's second state habeas corpus proceeding.

state habeas proceeding, Brewer did not challenge the flat rate figure Merillat quoted in his trial testimony as factually inaccurate. Instead, Brewer attacked Merillat's credibility by arguing that Merillat's level of compensation made the $495 figure wholly excessive if that figure were intended *solely* to compensate Merillat for his lost vacation days. At no point during Brewer's trial, however, did Merillat testify that compensating him for his lost vacation days was the *only* factor that went into calculating his $495 flat rate fee. If the flat rate Merillat *accurately* quoted during his trial testimony included no consideration whatsoever for his out-of-pocket travel expenses (*i.e.*, his mileage, food, and lodging expenses), then Merillat would be a rare expert witness indeed. Experts for whom federal habeas petitioners seek funding in this Court pursuant to 18 U.S.C. § 3599(g)(2) routinely include requests for such travel expenses when seeking expert funding.

In their testimony during Brewer's second state habeas corpus proceeding, Brewer's trial counsel testified their trial strategy was intended to do certain things, including: (1) establishing that, despite the opportunities for violence on death row, Brewer had a practically exemplary (and particularly non-violent) disciplinary record over nearly two decades of incarceration; (2) showing Dr. Coons had erroneously predicted during Brewer's first trial that Brewer would engage in violent actions and would even join a prison gang; and (3) avoiding having the jury get bogged down in an attempt to understand the complex TDCJ prison classification system and, instead, focusing the jury on something far more tangible and comprehensible, *i.e.*, Brewer's established record of non-violent behavior during his extended incarceration.[48] Thus, AuBuchon's criticisms

---

[48] The testimony of Brewer's former trial counsel, attorney Anthony Odiorne, in Volume 2 of 4 of the Statement of Facts from the evidentiary hearing held August 20, 2013 in Brewer's Second State Habeas Corpus Proceeding, *i.e.*, WR-46,587-02, (henceforth "Second State Habeas Hearing", which appears at ECF no. 126-9), at 48-247. The testimony of Brewer's other 2009 trial counsel, attorney Edward Ray Keith, Jr. appears in volume 2 of 4 from Brewer's Second State Habeas Hearing, at 249-86; and in Volume 3 of 4 from Brewer's Second State Habeas Hearing (which is located at ECF no. 126-10), at 7-172.

Attorney Odiorne testified, in pertinent part, that: (1) the defense chose to have Brewer testify to show his

of the way Merillat and Bryant were questioned by Brewer's trial counsel ignore the reasonable trial strategy Brewer's trial counsel adopted. The things AuBuchon argues should have been addressed by Brewer's trial counsel in their questioning of Merillat and Bryant would have undermined the reasonable trial strategy adopted by Brewer's trial counsel.

Bryant was called by the prosecution to establish that: (1) Brewer's records indicated he had a suicide attempt in June 2007 that was attributed to his frustration with his court case; (2) Brewer received a major disciplinary violation in March 2000 for possession of marijuana, a charge to which he pleaded guilty and for which he received a 15-day cell restriction; and (3) despite his suicide attempt, Brewer's only mental health contacts during his stay on death row had been routine 90-day evaluations. (23/28 R.R. 90-113). On cross-examination, Brewer's trial counsel elicited testimony from Bryant that (1) Brewer had very few disciplinary violations while on death row, and (2) Brewer's classification records showed that when he was transferred back to County custody for retrial as to punishment, Brewer was classified as a Level 1 death row

---

remorse for his offense and his good conduct in prison ever since, in part, because Brewer was the only available witness who could establish his remorse (Second State Habeas Hearing, Volume 2 of 4, at 70-71, 80-81); (2) there were no records of Brewer ever having been investigated or prosecuted by Merillat's special investigations unit in Walker County or any other agency with jurisdiction to conduct such an investigation (*Id.*, at 71, 79); (3) the defense chose not to have Brewer evaluated by a mental health expert because doing so would open Brewer up to being evaluated by a prosecution mental health expert in the event the defense chose to call its evaluating expert (*Id.*, at 98); (4) the defense strategy was to show there were opportunities for violence within the TDCJ but that Brewer had a non-violent record over an extended time period (*Id.*, at 84); (5) the defense presented evidence showing that Dr. Coons' 1991 predictions that Brewer would behave violently if incarcerated had proven to be erroneous (*Id.*, at 185-86).

Attorney Keith testified in part that: (1) the defense's strategy at trial was to show Brewer's conduct while in prison had been remorseful and non-violent (*Id.* at 278, 285); (2) the defense chose not to present its own mental health expert to make a prediction about Brewer's propensity for future violence because that would have turned the issue of future dangerousness into a battle of the experts and the defense wanted to the jury to focus on the reality that Brewer's record of non-violence was clearly established by the evidence – in short, they did not want the jury "to get lost in the science" (Second State Habeas Hearing, Volume 3 of 4, at 24-26, 33, 49, 51, 100); (3) instead, the defense chose to attack Dr. Coons' methodology and to argue that expert predictions of future dangerousness were inherently unreliable (*Id.*, at 27-31, 40, 46, 100, 116-17, 142-43); (4) the defense was well aware of Merillat's position that TDCJ was a violent place and made a strategic decision not to present an expert who would testify that violence could be easily controlled within the prison system (*Id.*, at 54-56); (5) the defense chose not to have Brewer evaluated by Dr. Edens because doing so could open the door to an evaluation by a prosecution mental health expert (*Id.*, at 99); and (6) the defense wanted to focus the jury's attention on Brewer's expressions of remorse and his non-violent conduct over 18 years on death row (*Id.*, at 124, 135-36).

inmate, which meant he had received no violations for 90 days prior to that date. (23/28 R.R. 113-25).

AuBuchon's critique of Captain Bryant's trial testimony is even more trivial than his criticisms of Merillat's testimony. For instance, in paragraph 8 of his affidavit, AuBuchon admits that Bryant did not make any misstatements when Bryant testified that Brewer would have to wait ten years before possibly upgrading from G-3 to G-2 level, but AuBuchon criticizes Bryant for failing to add that Brewer would never be eligible for a further upgrade to level G-1. The short answer to this criticism is that neither party asked Bryant to explain whether Brewer would ever be eligible for an upgrade to level G-1.[49]

In paragraph 9 of his affidavit, AuBuchon points out Bryant testified that TDCJ death row inmates had once been eligible to participate in a work program, but were no longer eligible to do so since TDCJ transferred its death row in 1999 from the Ellis I unit to the Polunsky Unit. AuBuchon criticizes Bryant, who admitted he had worked death row only at the Polunsky unit, for failing to explain that inmate participation in the then-defunct work program at the Ellis I unit had been voluntary. AuBuchon never explains why Bryant, who admitted he had not worked death row at the Ellis I unit, would have had personal knowledge of that aspect of a then-defunct TDCJ program.

In paragraph 10 of his affidavit, AuBuchon complains that when Bryant discussed

---

[49] AuBuchon's criticism of Merillat's and Bryant's testimony at trial for their failure to volunteer information not specifically requested by the attorneys questioning them is more than problematic. For generations, in preparation for depositions, hearings, and trials alike, experienced lawyers have advised their witnesses prior to testifying to listen carefully to each question asked and to answer that question and *only* that question. As best this Court can tell from its review of their testimony at Brewer's retrial, both of these witnesses followed that sage bit of legal wisdom. Moreover, it is this Court's experience that witnesses who volunteer information not germane to the question asked are often confronted with a meritorious objection from opposing counsel that the witness's answer was "non-responsive" and an equally meritorious motion asking the court to strike that unresponsive portion of the witness's answer and to direct the jury to disregard same.

Brewer's suicide attempt, Bryant failed to mention that suicide attempts are not *per se* considered violations of TDCJ disciplinary rules. The short answer to this critique is that Bryant never suggested they were. It is clear from this Court's independent review of Bryant's trial testimony that neither party asked him if they were. In sum, AuBuchon's criticisms of Captain Bryant's trial testimony do not establish there was anything false, *i.e.*, factually inaccurate, or misleading about Bryant's trial testimony.

Finally, this Court again concludes, just as was the case with Merillat, it would have been objectively unreasonable for Brewer's trial counsel to attack Bryant's credibility by cross-examining Bryant in the manner suggested by AuBuchon when the defense planned to use Bryant to help establish that Brewer (1) had a non-violent disciplinary record over the 18 years Brewer had spent on death row, and (2) was classified as a level 1 inmate (*i.e.*, the least problematic classification) at the time Brewer left death row to return to County custody for his retrial. Choosing *not* to attack the credibility of an opposing party's expert or fact witness upon whom you intend to rely to establish your own case is an objectively reasonable legal strategy.

After independently reviewing the entirety of Merillat's and Bryant's trial testimony, this Court agrees with one portion of AuBuchon's state habeas affidavit – neither Merillat nor Bryant were asked to address the specifics of how the TDCJ's inmate classification would impact Brewer in the event Brewer received a life sentence. This Court also finds the only things Merillat definitively opined in that regard were that (1) upon receiving a life sentence, Brewer would enter the TDCJ's classification system as a G-3 inmate, and (2) thereafter, Brewer's housing and work assignments would depend primarily upon his classification rating, not on the fact he had been convicted of capital murder. (23/28 R.R. 157-61). In his affidavit, AuBuchon does not appear to disagree with either of these two assertions; nevertheless, he does attempt to muddy the water quite

a bit by suggesting a number of variables unmentioned by Bryant or Merillat that could potentially impact Brewer's classification status in later years. As explained above, the vast majority of Merillat's trial testimony was spent (1) narrating and authenticating a videotape recording showing the conditions under which death row inmates are housed at the TDCJ's Polunsky Unit, and (2) explaining that, in contrast to the highly restrictive conditions of confinement on death row, inmates in the general TDCJ inmate population endure much less restrictive conditions (23/28 R.R. 144-56). Again, AuBuchon does not controvert those two points.

The undersigned concludes, after an exhaustive review of the record from both of Brewer's trials, as well as his direct appeals, and his multiple state habeas corpus proceedings, the state habeas court's factual finding that there was nothing false or misleading about the trial testimony of Merillat or Bryant at Brewer's 2009 retrial is unassailable.

### 2. Lack of Materiality

For the same reasons, the alleged errors or purportedly misleading aspects of Merillat's and Bryant's trial testimony identified by Brewer and his own expert AuBuchon were not material to the outcome of Brewer's 2009 retrial on punishment. To reiterate, Merillat and Bryant were both called by the prosecution to establish very specific facts, unrelated to the details of the TDCJ's classification system or its possible impact upon Brewer if he received a life sentence. Brewer's defense counsel reasonably chose not to attack Merillat's or Bryant's credibility because they wanted to use those same two witnesses on cross-examination to establish facts that would benefit their attempt to gain a favorable jury verdict on the future dangerousness special issue. By and large, Brewer's defense team accomplished their goals: on cross-examination: Merillat admitted that there were opportunities for violence by TDCJ inmates, including on death row, and he could not recall anyone in his unit ever investigating Brewer for allegedly committing an act of violence

(23/28 R.R. 164-66); Bryant acknowledged on cross-examination that Brewer had very few disciplinary reports over his 18 years on death row and, at the time Brewer was sent back to state court for retrial, Brewer was classified as a level 1 inmate, the least troublesome of all death row inmates (23/28 R.R. 115-25).

Contrary to Brewer's arguments, the prosecution's evidence of Brewer's propensity for future violence involved very little input from either Merillat or Bryant. As explained at length and in detail in Section I.G.1. above, the prosecution presented testimony showing: (1) during his middle school years, Brewer was twice disciplined and sent to an alternative school, once for threatening another student with a knife and another time for fighting with another student; (2) in high school, Brewer angrily picked up and pushed his much smaller former girlfriend against a bank of lockers, resulting in her sustaining significant injuries to her back and spine (including three displaced vertebral discs) that required her to endure months of physical therapy; (3) in his late teens, Brewer broke up a fight between his biological parents by beating his father so badly Albert Brewer sustained a fractured skull and injuries to the lining of his brain that required surgical intervention – injuries for which he was forced to remain in the hospital for several weeks; (4) while working as the driver for a couple making a late night trip to purchase illegal narcotics, Brewer was arrested and pleaded guilty to illegal possession of a hunting knife; (5) the night of his capital offense, while smirking and giggling, Brewer told his friend Skee Callen that Laminack had begged for his life while Brewer fatally assaulted him; (6) after his arrest, Brewer repeated a similar description of his fatal assault on Laminack to a fellow jail inmate; (7) while being transported from the courthouse back to jail after a pretrial hearing prior to his original capital murder trial, Brewer shot the finger at a photo journalist (which photo was admitted into evidence at both trials as State Exhibit 202); and (8) while awaiting trial before his original trial, Brewer

threatened to assault another jail inmate.

At his 2009 retrial, by far the most compelling evidence regarding Brewer's propensity for future violence came from Brewer himself and his accomplice Nystrom. Both of these individuals testified at great length regarding the details of their fatal assault upon Laminack. They disagreed on many details. Nystrom described herself as initially playing a passive role in the assault, sitting and staring out the passenger window while Brewer assaulted Laminack - until it was time to secure Laminack's car keys. Brewer's account of the fatal assault (which clearly fit the physical evidence more logically than Nystrom's self-serving account) had Nystrom sitting directly adjacent to Laminack and holding Laminack's right arm while Brewer grabbed Laminack from behind and repeatedly stabbed and cut Laminack's neck.

Still, there were things on which they agreed. Neither Brewer nor Nystrom denied they were responsible for the lurid crime scene captured in numerous crime scene photographs admitted into evidence. Both Nystrom and Brewer admitted they fled the crime scene on foot despite the fact they had possession of Laminack's truck keys. Both testified their purpose in going out that evening was to secure a means of transportation, *i.e.*, to find a vehicle and take it – most likely by force. More significantly, the preeminent detail these two confessed killers agreed upon was that neither of them ever asked Laminack for his wallet or his keys until *after* Brewer had repeatedly stabbed Laminack in the neck. The ruthlessness with which Nystrom and Brewer dispatched and then abandoned Laminack to bleed to death was self-evident from the lurid nature of the crime scene.

Thus, there was compelling evidence of Brewer's propensity for future violence without any consideration whatsoever of the testimony of either Merillat or Bryant. The evidence clearly established that Brewer engaged in a pattern of escalating violence culminating in Laminack's

brutal murder. Nothing in Merillat's or Bryant's trial testimony on direct examination significantly added to or significantly detracted from that unassailable fact. In fact, when viewed objectively, on cross-examination both of these witnesses furnished testimony that was more helpful to Brewer on the future dangerousness special issue than to the prosecution.

As AuBuchon accurately points out in his affidavit, neither party asked Merillat or Bryant to delve into the intricacies of how the TDCJ classification system might apply to Brewer were he to receive a sentence of life imprisonment. The prosecution presented compelling evidence of Brewer's propensity for future violence separate and apart from the testimony of Merillat and Bryant. The most substantial of which was Brewer's own account of his and Nystrom's capital offense. Under these circumstances, the failure of Bryant and Merillat to volunteer their views on the intricacies of the TDCJ's classification system or to speculate on its possible impact on Brewer were he to receive a life sentence does not create a "reasonable likelihood" that the outcome of Brewer's 2009 retrial as to punishment would have been different had they done so.

### 3. No Showing the Prosecution "Knowingly" Used False or Misleading Testimony

Finally, as Respondent accurately points out, there was no evidence presented to the state habeas court showing that anything in Merillat's or Bryant's trial testimony or any other evidence then available should have alerted the prosecution that anything either of these two witnesses testified to at trial was either factually inaccurate or misleading. As explained above, Merillat and Bryant were called to testify as to specific matters of opinion and fact largely unrelated to the minutiae of the TDCJ's inmate classification system as it might apply to Brewer if he were to receive a sentence of life imprisonment. Also as explained above, the state habeas court reasonably concluded there was nothing factually inaccurate or misleading about their trial testimony.

Instead, Brewer contends that because both Merillat and Bryant are associated with the

prosecution and "members of the prosecution team," their knowledge of the alleged falsity of their own testimony should be attributable to the prosecution. (ECF no. 103, at 118). Not surprisingly, Brewer cites no legal authority in support of his attempt to make every prosecution expert witness a de facto member of the prosecution for purposes of *Brady* and *Giglio/Napue* analysis.[50] On the contrary, it appears well-settled that defense counsel are ordinarily permitted to rely upon the accuracy and efficacy of the objectively reasonable opinions and other information conveyed to them by their own experts. *See Murphy v. Davis*, 901 F.3d 578, 592-93 (5th Cir. 2018) (absent a red flag, it is unreasonable to expect counsel to second-guess their own expert's testimony or objectively reasonable evaluations and opinions); *Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. 2016) (holding the same). The same principle should apply to experts retained by the prosecution.

Brewer argues that careful examination of the TDCJ's classification rules should have alerted the prosecution to potentially ambiguous or misleading aspects of Merillat's or Bryant's testimony. As explained above, however, the prosecution did not call Bryant or Merillat to wax eloquent on the possible ramifications of various hypothetical applications of the TDCJ classification system on Brewer's classification status (in the event he received a life sentence). Nor was there anything inherently suspect in either of Merillat's or Bryant's trial testimony that should have alerted the prosecution to a possible false or misleading aspect to their actual trial testimony. Under such circumstances, the undersigned concludes after de novo review that Brewer has wholly failed to establish that the prosecution *knowingly* used any false or misleading testimony at Brewer's 2009 retrial to secure Brewer's death sentence.

---

[50] Brewer's citation to the Supreme court's opinion in *Pennsylvania v. Ritchie*, 480 U.S. 39, 60-61 (1987), is wholly inapposite to his legal argument. The portion of the Supreme Court opinion to which Brewer cites addresses the propriety of an order directing a state prosecutor to tender to a court for *in camera* inspection records of a child protective services agency relating to accusations of child abuse. There is no dispute that states have a significant interest in maintaining the confidentiality of their records relating to accusations of child abuse. Thus, the subject addressed by the Supreme Court in *Ritchie* simply has no application to Brewer's *Giglio/Napue* claim in this case.

### E. Conclusions

The state habeas court's denial on the merits of Brewer's *Giglio/Napue* claim addressing the testimony of Merillat and Bryant during Brewer's second state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Brewer's trial and second state habeas corpus proceedings. This Court therefore denies relief on this claim.

### IX.    *GIGLIO/NAPUE* CLAIM AS TO LAMINACK'S AUTOPSY RESULTS

### A. The Claim

In a portion of his second claim for federal habeas relief *i.e.*, federal claim 2A, Brewer argues his due process rights were violated when the state trial court admitted: (1) a transcript of the 1991 trial testimony of the medical examiner who conducted Laminack's autopsy, *i.e.*, Dr. Erdmann; (2) Dr. Erdmann's autopsy report on Laminack; and (3) the trial testimony of a different medical examiner, *i.e.*, Dr. Natarajian, whose testimony was based in part on Dr. Erdmann's autopsy report and 1991 trial testimony (ECF no. 103, 38-51). Basically, Brewer argues that, subsequent to his 1991 capital murder trial, it became public knowledge that Dr. Erdmann had engaged in criminal misconduct in several other cases, including falsifying autopsy reports and creating autopsy reports without actually conducting autopsies. Brewer does not, however, allege any specific facts or present any evidence showing that Dr. Erdmann falsified any identified aspect of Laminack's autopsy report or, in fact, failed to conduct Laminack's autopsy. Nor does Brewer identify any specific factual error in either Dr. Erdmann's autopsy report, Dr. Erdmann's 1991 trial testimony, or Dr. Natarajian's 2009 trial testimony regarding the cause of Laminack's death.

**B. Lack of Exhaustion**

As Respondent correctly points out, Brewer did not complain on direct appeal about either the admission of Dr. Erdmann's autopsy report or the admission of Dr. Natarajian's testimony at Brewer's 2009 retrial. Nor did Brewer bring a straight-forward *Giglio/Napue* claim in his second or third state habeas corpus proceedings. Instead, in claim 3A in his second state habeas corpus application, Brewer argued that his trial counsel rendered ineffective assistance by failing to: (1) challenge the admissibility of Dr. Erdmann's autopsy report; (2) challenge the admissibility of Dr. Erdmann's prior testimony; (3) utilize Dr. Erdmann's multiple criminal convictions to impeach the veracity of his autopsy report and 1991 trial testimony; and (4) present expert testimony impeaching Dr. Erdmann's autopsy report and 1991 trial testimony (Second State Habeas Application, at 171-215).

In its findings and conclusions in Brewer's second state habeas corpus proceeding, the state habeas trial court: (1) found the main reason Laminack's autopsy report was admitted into evidence at Brewer's 2009 retrial was to establish Laminack's cause of death, which was a guilt-innocence issue; (2) found Brewer's trial counsel objected when the prosecution re-tendered Laminack's autopsy report and Dr. Edrmann's 1991 trial testimony, both of which had been admitted into evidence in 1991, and the state trial court ruled both the report and prior testimony admissible; (3) found Brewer's trial counsel chose as a matter of trial strategy not to contest the cause of Laminack's death because it was a guilt-innocence issue and the defense's reasonable strategy in 2009 was to have Brewer take responsibility for his actions by admitting his role in Laminack's murder; (4) found Brewer's 2009 trial counsel were not ineffective for failing to challenge Dr. Erdmann's reputation for veracity and competence or for failing to challenge the cause of Laminack's death; (5) found Laminack's autopsy report was not subject to a hearsay

objection; (6) found Brewer's trial counsel did adequately challenge the admission of Laminack's autopsy report and Dr. Erdmann's prior testimony and did object to Dr. Natarajian's testimony because it was based in part on Dr. Erdmann's work; (7) found there was nothing ineffective in the failure of Brewer's 2009 trial counsel to call an expert medical examiner to impeach Dr. Erdmann's findings or Dr. Natarajian's testimony; (8) concluded that admission of an expert's opinion based upon his review of an autopsy report prepared by a non-testifying expert does not violate Confrontation Clause principles; and (9) concluded Brewer's 2009 trial counsel did not render ineffective assistance in connection with the admission of Dr. Edrmann's autopsy report on Laminack, the admission of Dr. Erdmann's prior testimony, or the admission of Dr. Natarajian's testimony. (Findings of Fact and Conclusions of Law in Second State Habeas Corpus Proceeding, at 41-45 & 81-82).

The Texas Court of Criminal Appeals adopted all of the foregoing findings and conclusions but expressly rejected conclusions by the state habeas trial court addressing (1) the application of hearsay principles to autopsy reports, and (2) the propriety of a criminal defendant raising claims on direct appeal or in state habeas arising from the guilt-innocence phase of his trial following a retrial as to punishment only. *Ex parte Brewer*, WR-46,587-02, 2014 WL 5388114, *1.

### C. *De Novo* Review

The federal constitutional principles governing this *Giglio/Napue* claim are the same ones discussed in Sections VIII.C. and VIII.D above. It is unnecessary for this Court to determine whether Brewer has procedurally defaulted on this unexhausted *Giglio/Napue* claim because, as explained below, the undersigned concludes after de novo review that this claim lacks any arguable merit.

Succinctly, Brewer has failed to allege any specific facts, much less furnish any evidence,

69

showing either that: (1) there was anything factually inaccurate or misleading about either Laminack's autopsy report, Dr. Erdmann's 1991 trial testimony relating the cause of Laminack's demise (*i.e.*, multiple stab wounds to the neck and associated massive blood loss), or Dr. Natarajian's 2009 trial testimony regarding the cause of Laminack's death (which reached the same conclusions as Dr. Erdmann's autopsy report and 1991 trial testimony); (2) any alleged error in any of the foregoing materials satisfies the materiality requirement of this *Giglio/Napue* analysis; or (3) the prosecution *knowingly* used any identified false or misleading testimony in 2009 to secure Brewer's death sentence.

### 1. Nothing Factually Inaccurate or Misleading

Despite the strong arguments directed toward Dr. Erdmann in Brewer's pleadings, after de novo review, this Court finds there is no fact-specific allegation or any evidence currently before this Court establishing either that: (1) Dr. Erdmann failed to actually conduct Laminack's autopsy in the manner set forth in Laminack's autopsy report; (2) Dr. Erdmann falsified any aspect of Laminack's autopsy report; (3) there is any material misstatement of fact or opinion contained in Laminack's autopsy report; (4) Dr. Erdmann's conclusions regarding Laminack's cause of death given during his testimony at Brewer's 1991 trial were in any manner factually inaccurate or misleading; (5) there was anything factually inaccurate or misleading about Dr. Natarajian's 2009 trial testimony regarding the cause of Laminack's death; or (6) the prosecution was aware of (or reasonably on notice of any facts showing) anything false or misleading was contained in either Laminack's autopsy report, Dr. Erdmann's 1991 testimony regarding cause of death, or Dr. Natarajian's 2009 testimony regarding cause of death. Simply put, Brewer has failed to allege any facts, much less provide any evidence, showing Laminack died from any cause other than multiple stab wounds to the neck resulting in massive blood loss.

At best, the affidavits and other records Brewer furnished to the state habeas court and this Court establish merely that (1) Dr. Erdmann committed multiple criminal acts of misconduct in connection with *other autopsies* unrelated to Laminack's and was successfully prosecuted for those criminal offenses, and (2) Brewer's new medical experts take issue with some of the word choices employed by Dr. Erdmann in Laminack's autopsy report but offer absolutely no specific allegations suggesting the cause of Laminack's death was anything other than multiple stab wounds to the neck resulting in massive blood loss, *i.e.*, the same cause identified by both Dr. Erdmann and Dr. Natarajian. The crime scene and autopsy photographs admitted into evidence at both of Brewer's capital trials fully support the conclusion reached by Dr. Natarajian, *i.e.*, that Laminack suffered multiple stab wounds to the neck and died as a result of the associated massive blood loss. Brewer has failed to carry his burden of alleging and proving there was any false or misleading evidence regarding the cause of Laminack's death admitted during his 2009 retrial.

### 2. No Materiality

As explained in Section I.A. above, once Brewer completed his testimony at his 2009 retrial, the cause of Laminack's death was simply no longer in any doubt. Brewer admitted in graphic detail how he and Nystrom attacked Laminack and Brewer delivered multiple blows to Laminack's head and neck with the butterfly knife police found at the crime scene. Following the admission of Brewer's 2009 testimony, the testimony of Dr. Natarajian, the 1991 testimony of Dr. Erdmann, and Laminack's autopsy report all became immaterial to any issue before the jury. Furthermore, the crime scene photographs and video, as well as the autopsy photographs admitted into evidence and the forensic expert testimony regarding blood spatter admitted into evidence, fully supported Brewer's account of the crime, as opposed to Nystrom's self-serving account. Finally, neither Nystrom nor Brewer testified that Nystrom delivered any blows to Laminack using

the butterfly knife. Under these circumstances, the undersigned concludes after de novo review that Brewer's conclusory complaints about alleged errors in Dr. Natarajian's 2009 testimony, Dr. Erdmann's 1991 testimony, and Laminack's autopsy report fail to satisfy the materiality prong of *Giglio/Napue* analysis. There is simply no reasonable likelihood that, but for the admission of Dr. Natarajian's 2009 testimony, the transcript of Dr. Erdmann's 1991 testimony, and Laminack's autopsy report, the outcome of Brewer's 2009 trial would have been any different.

### 3. No Knowing Use of Perjured or Misleading Testimony

Brewer alleges no specific facts nor presents any evidence showing the prosecution knowingly used false, perjured, or misleading evidence to secure Brewer's 2009 death sentence. The fact Dr. Erdmann may have committed acts of fraud in connection with other autopsies does not establish that he did so in Laminack's case. Furthermore, the crime scene photographs, the crime scene video, the autopsy photographs, and, most tellingly, Brewer's own 2009 trial testimony fully support the conclusion that Laminack died as a result of massive blood loss caused by multiple stab wounds to the neck. Brewer has neither alleged any specific facts nor presented any evidence suggesting the prosecution was on notice in 2009 that there was anything factually inaccurate or misleading in either (1) Laminack's autopsy report, (2) Dr. Erdmann's 1991 trial testimony regarding the cause of Laminack's death, or (3) Dr. Natarajian's 2009 testimony regarding the cause of Laminack's death. If the prosecution had possessed any doubts as to the cause of Laminack's death, they were most assuredly resolved by Brewer's trial testimony.

### D. Conclusions

After de novo review, the undersigned concludes Brewer's federal claim 2A lacks any arguable merit. This claim does not warrant federal habeas relief.

## X.    *BRADY* CLAIM AS TO NYSTROM'S HOSPITAL RECORDS

### A. The Claim

In his seventh claim for federal habeas relief, Brewer argues that his rights under the Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83, 97 (1963), were violated by virtue of the state trial court's refusal to turn over to Brewer's trial counsel copies of Kristie Nystrom's medical records from the Big Spring Hospital, *i.e.*, the facility where she and Brewer both lived briefly several months prior to their murder of Laminack (ECF no. 103, 110-13).

### B. State Court Disposition

The records custodian for the Big Spring Hospital, where Brewer and Nystrom met prior to Laminack's murder, appeared pursuant to a subpoena at the punishment phase of Brewer's 1991 capital murder trial. Grace Martinez was called to testify by the defense and identified documents she had brought with her as including Brewer's and Nystrom's Big Spring medical records. (18/21 R.R. 745). The state trial court ordered the records turned over to Brewer's defense counsel but, when the prosecution requested *in camera* review of the records, the state trial judge granted that request. (18/21 R.R. 746). The trial court then ruled Nystrom's records were not relevant. (*Id.*). Martinez did, however, turn over Brewer's Big Spring medical records to his defense counsel, which stated they were not offering those records for admission. (18/21 R.R. 748, 751).

Prior to Nystrom being called to testify at Brewer's 2009 retrial, the following exchanges took place:

> MR. KEITH: It's our understanding Ms. Nystrom is coming next. And there are records of hers – you may have to help me – there are records of her from the Big Spring Hospital, Your Honor. It is our understanding that they are here. In fact, Mr. Odiorne in looking at the exhibits, picked them up. Realized what they were, put them back down, because it's our understanding that they are under seal. And so she is now testifying, and we would like to be able to look at those records before cross of her.
> THE COURT: Yeah, I can't imagine not.

MR. FARREN: Well, Your Honor, the – the Defense made the same request at the first trial. The Prosecution's response – well, I think the Defense and Prosecution both recognized that those were covered by the Privacy Act and she had not released those records.

THE COURT: Okay.

MR. FARREN: The clerk that came here from Big Spring wanted the Court to order her to release these records, otherwise she was not going to do so, because she believed she needed protection. Judge – Judge Gleason listened to arguments of both Prosecution and Defense and agreed to review her records in chambers and determine whether there was sufficient relevancy to override the Privacy Act protection. He did so on the record stating he did not believe there was sufficient relevancy to do so.

They then went into the records of Mr. Brewer who, of course, would not oppose his counsel having those records. He then ordered the clerk a second time – Judge Gleason ordered the clerk a second time to release Mr. Brewer's records. And it was at that point that Mr. Daffern said he didn't want to introduce them to the jury. He just wanted them introduced into the record for appellate purposes because he believed there were plenary issues in those record [sic].

And so what the record reflects up to this point is, an attempt by the Defense to introduce – to get to Ms. Nystrom's records, which was denied on the grounds that the judge saw no relevancy after reviewing them in camera. He then released Mr. Brewer's records to the Defense to use as they saw fit. And that's where – that's where it was in the first trial.

THE COURT: Do you-all have Mr. Brewer's records?

MR. KEITH: Yes.

MR. ODIORNE: Yes, Your Honor.

THE COURT: You have those records that Judge Gleason reviewed and that were – and that the custodian of records brought up here – from Big Spring brought up here in 1991?

MR. KEITH: I think we have – we don't have the exact ones, but I think we have those records, Judge.

THE COURT: Okay.

MR. ODIORNE: We have ones from Big Springs [sic], but not necessarily those particular ones.

THE COURT: This is a corollary. Are there any records here that you know of that you don't have of Mr. Brewer?

MR. KEITH: Not that I am aware of, Judge.

THE COURT: Okay. You would like the records of Ms. Nystrom?

MR. ODIORNE: Your Honor, that's correct. And in the first trial, Ms. Nystrom did not testify. So therefore there would be much less of a need of relevance on that if she is not testifying.

MR. KEITH: She exercised her 5th, Your Honor.

MR. FARREN: That's correct, Your Honor. She was called in the courtroom the first trial. Her attorney, Mr. Seldon Hale, was present. She claimed the 5th amendment on two or three questions. Was then asked, is it your intention to claim the 5th amendment on each question? She said, yes. And then they wrapped that

up, so she did not testify.

THE COURT: Okay. Let me have – somebody hand me Ms. Nystrom's records. I'm going to review them.

MR. FARREN: Yes, sir.

THE COURT: In view of the fact that she didn't testify, Judge Gleason never really had to reach that question.

MR. FARREN: True, Your Honor. He simply announced that he didn't see relevancy having reviewed them, and that's all I know.

THE COURT: I'm going to keep that in mind. I'm going to look at them. We're going to get started, and I'll make a decision before you begin your cross.

MR. KEITH: Yes, sir.

MR. ODIORNE: Thank you, Your Honor.

THE COURT: Is that okay?

MR. FARREN: That's fine with us, Your Honor.

(22/28 R.R. 160-63).

Prosecution witness Nystrom's testimony on direct at Brewer's 2009 retrial is summarized in detail in Section I.G.1. above. (22/28 R.R. 168-225). After a brief recess, the trial resumed outside the presence of the jury with the following exchanges taking place:

THE COURT: Everybody be seated. I reviewed some of these records. I don't see anything in these records that – that's helpful or relevant to you-all.

MR. FARREN: And, your Honor, out of an abundance of caution, may I inquire of Ms. Nystrom out of the presence of the jury if she wants to – if she wants to release them. I just want her to be aware she doesn't have to.

THE COURT: That's probably appropriate. Let me ask her.

MR. FARREN: Yes, sir.

THE COURT: Ms. Nystrom, in the envelope are your records from the Big Spring State Hospital in 1990. You understand?

THE WITNESS: Yes, sir.

THE COURT: There are medical notes and they're about a half-inch thick. You were there about a month. The – the Defense has requested that they be allowed to review them. Do you wish to give your permission to the Defense team to review these records?

THE WITNESS: No.

THE COURT: Okay. Then having reviewed them in camera and finding no relevance to them – or very little that's even remotely helpful and without her permission, I'm going to leave them sealed.

We'll take a break. Ten till 3:00. Now y'all can have her. Have her back at ten till 3:00, please.

(Recess)
(Open court, defendant present, no jury)

THE COURT: Okay.

MR. KEITH: Your Honor, at this point the Defense would request a longer recess than the 15 minutes we've had. Your Honor, I base that request upon the fact that we have prepared and relied in this case upon the Court's previous order concerning the parole issue. And at this point, I'm asking the Court for more time to make a decision on what I'm going to do in terms of cross-examining this witness, and I need longer than 15 minutes.

THE COURT: How long do you need?

MR. KEITH: Your honor – my request, Judge is that we adjourn at this point. Alternatively, Judge, any – you know, as long as the Court will give me, Your Honor.

THE COURT: And by adjourn, do you mean leave for the night?

MR. KEITH: That is my – that is –

THE COURT: I got you. Okay.

MR. FARREN: If it is of any assistance to the Court, Your Honor, if the Court entertains that request, we have a witness we flew here from Florida. We would like to go ahead and put that witness on this afternoon if – if the Court decides to do that. We have four witnesses tomorrow, two will be fairly brief, two fairly long. If you delay the cross until tomorrow, I certainly think we would still finish easily tomorrow, before the close of day around 5:00. But I would like to get this witness from Florida on to make sure we can get him back to Naples on time.

THE COURT: Can that witness be done fairly quickly?

MR. FARREN: Oh, Mosher? Oh, he's a half hour, maybe, Your Honor.

THE COURT: Okay, let's do that.

      Would you step down, Ms. Nystrom. And you can take her back to the RCSO Jail, and we'll need her in the morning. Thank you.

      Will that give you enough time?

MR. KEITH: Yes. Thank you, Your Honor.

(22/28 R.R. 225-28).

The following day, August 12, 2009, the prosecution continued presenting its witnesses. The prosecution rested at the commencement of proceedings the day after that, *i.e.*, on August 13, 2009. (24/28 R.R. 8). Brewer's trial counsel presented the defense's witnesses but rested without asking that Nystrom be brought to the courthouse for cross-examination.

Brewer did not complain about his request for access to Nystrom's hospital records being denied on direct appeal. He did not include any such complaint in his second state habeas corpus application. In fact, Brewer did not raise any claim relating to Nystrom's medical records until he included a claim that the state trial court had improperly denied his request for access to Nystrom's

records, along with a related *Brady* claim, in his second claim for relief in his third state habeas corpus proceeding (Third State Habeas Application, ECF 127-1 at 44-48). The Texas Court of Criminal Appeals summarily dismissed Brewer's third state habeas corpus application, citing state writ-abuse principles. (ECF 127-2); *Ex parte Brewer*, WR-46,587-03, 2019 WL 5420444, *1.

### C. Clearly Established Federal Law

"'[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Brady*, 373 U.S. at 87). The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment applies even when there has been no request by the accused. *Banks*, 540 U.S. at 690; *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Agurs*, 427 U.S. 97, 107 (1976). This duty also applies to impeachment evidence. *Strickler*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 676 & 685, (1985). The rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor. *Strickler*, 527 U.S. at 280-81; *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). "'[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" *Strickler*, 527 U.S. at 281 (quoting *Kyles*, 514 U.S. at 437).

Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," *i.e.*, prejudice must have ensued from its non-disclosure. *Banks*, 540 U.S. at 691; *Strickler*, 527 U.S. at 281-82. Evidence is "material" under

*Brady* where there exists a "reasonable probability" that had the evidence been disclosed, the result at trial would have been different. *Smith v. Cain*, 565 U.S. 73, 75 (2012); *Cone v. Bell*, 556 U.S. 449, 469-70 (2009); *Banks*, 540 U.S. at 698-99. A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Smith*, 565 U.S. at 75; *Kyles*, 514 U.S. at 434.

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does *not* require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See Bagley*, 473 U.S. at 682 (expressly adopting the "prejudice" prong of the *Strickland* analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*). Second, the materiality standard is *not* a sufficiency of the evidence test. *Kyles*, 514 U.S. at 434-35. Third, once materiality is established, harmless error analysis has no application. *Id.* at 435-36. Finally, materiality must be assessed collectively, not item by item. *Id.* at 436-37.

**D. *De Novo* Review**

It is unnecessary for this Court to determine whether Brewer procedurally defaulted on his *Brady* claim relating to Nystrom's medical records because, as explained below, the undersigned concludes after de novo review this claim lacks arguable merit.[51]

**1. No Prosecutorial Suppression of Evidence**

As explained at length in Section X.B. above, this is not a case in which the prosecution withheld information beneficial to the defense from the defendant's trial counsel. Brewer's 2009

---

[51] Copies of Nystrom's Big Spring Hospital medical records appear as an exhibit to Brewer's third state habeas corpus application, specifically in ECF nos. 127-13, 127-14, and 127-15.

trial counsel were well aware of the existence of Nystrom's medical records from the Big Spring Hospital. It was the state trial court's evidentiary ruling that the records in question could not be released to Brewer's counsel without Nystrom's consent (and Nystrom's refusal to grant such consent) that resulted in the denial of access, not any active or even negligent concealment or withholding on the part of the prosecution.

Brewer's naked assertion, bereft of any citation to applicable state law, that the state trial court erroneously applied state evidentiary rules and state substantive law in denying his trial counsel's request for access to Nystrom's medical records does not furnish a basis for federal habeas corpus relief. A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Darden v. Wainwright*, 477 U.S. 168, 179-83 (1986); *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005). Thus, the question before this Court is not whether the state trial court properly applied state evidentiary rules but, rather, whether Brewer's federal constitutional rights were violated by the state trial court's rulings on evidentiary matters. *See Bigby v. Dretke*, 402 F.3d 551, 563 (5th Cir. 2005) (holding federal habeas review of a state court's evidentiary ruling focuses exclusively on whether the ruling violated the federal Constitution).

> Due process is implicated only for rulings "of such a magnitude" or "so egregious" that they "render the trial fundamentally unfair." It offers no authority to federal habeas courts to review the mine run of evidentiary rulings of state trial courts. Relief will be warranted only when the challenged evidence "played a crucial, critical, and highly significant role in the trial."
>
> The due process inquiry must consider the significance of the challenged evidence "in the context of the entire trial." We have held that the Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial and the errors were not "'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" This is a high hurdle, even without

AEDPA's added level of deference.

*Gonzales v. Thaler,* 643 F.3d 425, 430-31 (5th Cir. 2011) (footnotes omitted).

Brewer cites no legal authority establishing that the state trial court's application of federal and state privacy statutes[52] and state evidentiary rules to Nystrom's medical records rendered Brewer's 2009 trial fundamentally unfair. For the reasons discussed below, denial of access to Nystrom's 18-year-old medical records to Brewer's trial counsel did not render Brewer's 2009 trial fundamentally unfair.

As explained in Section I.G.1. above, the thrust of Nystrom's 2009 testimony was a recitation of how she and Brewer approached Laminack and then murdered him. Nystrom attempted to put a spin on her account that suggested her role in the capital offense was much less significant than Brewer's. As explained in Section I.G.2. above, however, Brewer, gave a detailed account of the murder that was far more consistent with the physical evidence than Nystrom's and that argued Nystrom was an active and aggressive participation in Laminack's murder, including Brewer's testimony that Nystrom sat directly adjacent to Laminack and held his right arm while Brewer grabbed him from behind and stabbed him in the neck. The jury saw all of the forensic evidence, as well as the demeanor of the two eyewitnesses to the offense firsthand. The jury was more than capable of evaluating their relative credibility. The key fact is that Brewer candidly admitted his role in Laminack's murder.

---

[52] For instance, Brewer makes no effort to discuss the applicability, if any, of the Health Insurance Portability and Accountability Act ("HIPAA") (29 U.S.C. §§ 1181 *et seq.* and 42 U.S.C. § 1320d-1 - § 1320d-9), or the Texas Medical Records Privacy Act ("TMRPA") (TEX. HEALTH & SAFETY CODE § 181.001 - § 181.207), to Nystrom's Big Spring Hospital medical records.

## 2. Nystrom's Medical Records were Not Beneficial to the Defense

The prosecution called Nystrom in 2009 to establish the circumstances of Laminack's murder. At that point in Brewer's retrial, it was far from clear whether he would testify. While Nystrom's testimony and Brewer's testimony differed in numerous details (such as which one of them obtained Laminack's truck keys from the ignition), they agreed on the most salient facts. They both testified that on the night in question: (1) they plotted to find a vehicle and were prepared to use force, if necessary, to secure a vehicle; (2) they made an attempt to get a woman to give them a ride, but the woman drove away before they could get inside her vehicle; (3) Laminack agreed to give them a ride to the Salvation Army; (4) after Laminack drove them only a short distance, Brewer grabbed and assaulted Laminack with a knife—the same knife left at the crime scene; and (5) they left the scene with Laminack's wallet, which contained about $140 in cash.

Both Brewer and Nystrom left the Big Spring Hospital several months before the murder of Laminack. There is absolutely nothing in Nystrom's Big Spring Hospital medical records that addresses the facts or circumstances of her and Brewer's capital offense. Nothing in those medical records suggests that she or Brewer were planning to commit such a horrific offense when they were residents of that medical facility seeking to obtain medical treatment for their respective substance abuse problems. Both Nystrom and Brewer candidly admitted during their 2009 testimony that they met while staying at the Big Spring Hospital and they were both seeking treatment for substance abuse problems while they were at that facility.

Nystrom's Big Spring Hospital records show that: (1) she was a patient at that facility from January 26 to February 20, 1990; (2) she received a variety of medications and was tested for a variety of ailments, both physiological and psychiatric in nature; (3) she had a family, marital, and social history consistent with the histories of individuals who develop substance abuse issues; (4)

her medical history was relatively unremarkable; (5) she entered the facility seeking treatment for alcohol and substance abuse problems; (6) shortly after her admission, she was described in her records as experiencing "labile mood swings," "acting out," and "exhibiting unstable behavior"; (8) she was diagnosed with borderline personality disorder; and (8) less than a month later, however, after receiving considerable medical treatment, she was discharged with a staff conclusion that she no longer required hospitalization and staff notes indicating she had articulated plans for continuing to avoid alcohol and narcotics abuse.

Brewer argues that access to Nystrom's Big Spring Hospital medical records would have allowed him to "impeach" her based upon the diagnosis of borderline personality disorder and findings that, at an early point in her stay at that medical facility, Nystrom "acted out," exhibited "labile mood swings," and demonstrated "unstable behavior." Brewer fails to explain how presenting the jury with evidence showing the Big Spring Hospital staff made such observations of Nystrom in January and February of 1990, near the beginning of her stay at that facility, would have proven helpful to the jury in evaluating Nystrom's credibility in 2009, after she had spent almost two decades in the custody of the TDCJ.

Insofar as Brewer now argues that he wanted to "impeach" Nystrom using her Big Spring Hospital medical records, the short answer is that Nystrom offered virtually no testimony in 2009 about her stay at that facility that could have been impeached through the use of the records in question. She and Brewer both admitted they met while they were patients at that facility. They both admitted they went to that facility to seek treatment for their substance abuse problems. Nothing in Nystrom's medical records in question refuted or even addressed her 2009 testimony regarding the circumstances of her and Brewer's murder of Laminack.

### 3. No Materiality

For reasons similar to those discussed at length in Section IX.C.2. above, there is no likelihood that, but for the state trial court's denial of access to defense counsel of Nystrom's medical records, the outcome of Brewer's 2009 retrial would have been any different. Brewer's own testimony established without any doubt that he fatally stabbed Laminack while Nystrom held Laminack's right arm. The physical evidence fully supported Brewer's account of that offense. Both Nystrom and Brewer described their plan to secure a vehicle on the night in question by employing force if necessary. The minor details over which Nystrom and Brewer disagreed in their respective accounts of the murder were irrelevant and immaterial to the outcome of Brewer's 2009 trial. It simply did not matter which one of them removed Laminack's keys from the ignition of his truck after Laminack was bleeding so profusely he was unable to do so. At no point in their trial testimony did either Nystrom or Brewer assert that Nystrom stabbed or cut Laminack's neck. It was undisputed that Laminack's cause of death was multiple stab wounds to the neck. In sum, Brewer's trial testimony rendered Nystrom's testimony immaterial to the issues before the jury at Brewer's 2009 retrial.

Brewer's 2009 trial counsel chose not to challenge the prosecution's theory of how Laminack's murder took place. In fact, Brewer himself furnished testimony at the 2009 retrial that was far more supportive of the prosecution's theory of the murder based on the forensic evidence than did Nystrom's testimony. Thus, even if Brewer's 2009 trial counsel had figured out a way to impeach Nystrom's testimony, there is no likelihood that such impeachment would have had any impact whatsoever on the outcome of Brewer's retrial.

In 1991, Brewer's trial counsel attempted to cast blame for Laminack's murder on Nystrom and to paint Brewer as the victim of Nystrom's malignant leadership. That effort failed.

In 2009, Brewer's defense team was confronted with a 39-year-old defendant whom they reasonably believed it would be difficult to convince a jury to imagine as an impressionable teenager. Brewer's 2009 trial counsel reasonably chose, instead, to have Brewer take the stand and (1) candidly admit his guilt, (2) express his sincere remorse and contrition for what he had done, (3) express empathy for the harm he had done to Laminack and his family, and (4) emphasize Brewer's subsequent and lengthy history of non-violent behavior while in the custody of the TDCJ and state jails. Under such circumstances, there is no likelihood that attacking Nystrom's credibility through the use of her 1990 medical records would have resulted in a different outcome for Brewer's 2009 trial. Such an attack would have been, at best, irrelevant to the arguments Brewer's trial counsel were attempting to make in 2009. Such an attack on Nystrom could also have undermined those very arguments by offering the prosecution the opportunity to counter with its own argument that Brewer's attacks on Nystrom's credibility reflected Brewer's lack of sincere remorse and contrition for his offense. In fact, Brewer's 2009 counsel ultimately chose not to cross-examine Nystrom at all. Brewer does not allege any specific facts showing what, if any, helpful information his trial counsel could have obtained from Nystrom on cross-examination.

In sum, this Court concludes after de novo review that there is no likelihood using her 1990 medical records to attack Nystrom's credibility would have resulted in a different outcome at Brewer's 2009 retrial. Doing so would not have realistically aided Brewer's trial counsel in obtaining favorable answers to either the deliberateness, future dangerousness, or mitigation special issues. Brewer's own testimony rendered Nystrom's testimony largely irrelevant and immaterial to the special issues properly before the jury.

### E. Conclusion

After de novo review, this Court concludes Brewer's federal claim 7 lacks any arguable

merit. This claim does not warrant federal habeas relief.

## XI.    ***BRADY* CLAIM AS TO DR. ERDMANN'S PROSECUTION**

### A. The Claim

In his Section A of his second federal claim, Brewer complains, in part, that the prosecution withheld from the defense information relating to the criminal prosecution of Dr. Erdmann. (ECF no. 103, 38-51). Brewer did not fairly present the state court with a *Brady* claim addressing evidence of Dr. Erdmann's wrongdoing on direct appeal or in any of his state habeas corpus proceedings. Out of an abundance of caution, this Court construes Brewer's arguments in support of this portion of his second federal claim as an attempt to bring an unexhausted *Brady* claim.

### B. *De Novo* Review

Insofar as Brewer's second claim for federal habeas relief can be construed as asserting a claim premised on *Brady*, that claim lacks arguable merit. By 2009, the criminal prosecution of Dr. Erdmann for his falsification of autopsy records was a matter of public knowledge, as is shown by the numerous attachments and exhibits accompanying Brewer's second state habeas corpus application.[53] The state is under no responsibility to direct the defense toward potentially beneficial information or evidence that is either known to the defendant or that could be discovered through the exercise of due diligence. *United States v. Vasquez-Hernandez*, 924 F.3d 164, 171 (5th Cir. 2019); *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004); *Rector v. Johnson*, 120 F.3d 551, 558-59 (5th Cir. 1997). Nor is the state obligated to furnish evidence that is available from other sources. *Rector*, 120 F.3d at 559. Brewer had failed to allege any specific facts showing the

---

[53] More specifically, exhibits 18, 19, 20, and 24 to Brewer's second state habeas corpus application consist of (1) a New York Times article dated in 1992; (2) a Dallas Morning News article published in November 1992; (3) an opinion issued by this Court in March 1993 in a case styled *Farmer v. Sherrod*; and (4) an April 1992 affidavit of Pat Kelly. All discuss Dr. Erdmann's misconduct. Those documents appear in ECF no. 126-13 at 116-20, 122-27, 129-36, and 150-51, respectively, of 417.

prosecution suppressed or withheld any relevant or potentially beneficial information regarding Dr. Erdmann's prosecution from Brewer's 2009 trial counsel.

Furthermore, for the reasons discussed at length in Section IX.C. above, the failure of the prosecution to furnish Brewer's 2009 trial counsel with information regarding Dr. Erdmann's misconduct and criminal prosecution did not violate the rule in *Brady* because any such materials were not material to the outcome of Brewer's retrial. As explained above, there was no legitimate debate in 2009 as to the cause of Laminack's death. Brewer presented the state trial court and the state habeas court (and has presented this Court) with no evidence showing that Dr. Erdmann's 1991 trial testimony or Dr. Natarajian's 2009 trial testimony regarding the cause of Laminack's death was in any way factually inaccurate. In 2009, Brewer stood convicted of capital murder. Brewer's own 2009 trial testimony (identifying himself as the only person who stabbed Laminack in the neck) rendered any argument as to the cause of Laminack's death immaterial to the issues properly before the jury at that trial, which was a purely punishment phase proceeding.

### C. Conclusion

Insofar as Section A of Brewer's second claim for federal habeas relief can be construed as asserting a *Brady* claim, after de novo review, this Court concludes that claim is without arguable merit and does not warrant federal habeas relief.

### XII.    INEFFECTIVE ASSISTANCE BY TRIAL COUNSEL

### A. Overview of the Claims

In his first, second, fourth, fifth, sixth, and eighth federal claims, Brewer asserts a wide variety of complaints about the performance of his 2009 trial counsel. In his ninth claim, Brewer attempts to cumulate the prejudicial impact of those complaints into an independent ground for federal habeas relief. Basically, Brewer complains that his 2009 trial counsel rendered ineffective

assistance by failing to: (1) adequately challenge the admission of Dr. Coons' opinion testimony as to future dangerousness and failing to rebut same (ECF no. 103, 11-37 [claim 1]); (2) adequately challenge the admission of Dr. Erdmann's 1991 trial testimony and failing to rebut same (ECF no. 103, 51-59 [claim 2B]); (3) adequately investigate Brewer's history of adolescent violence and present evidence rebutting same, as well as evidence showing Brewer had never been investigated for violent misconduct while incarcerated (ECF no. 103, 64-78 [claim 4]); (4) adequately investigate Brewer's background and present all available mitigating evidence [ECF no. 103, 79-108 [claim 5]); (5) investigate, impeach prosecution witness Skee Callen, and present evidence showing Nystrom had a larger role in Laminack's murder (ECF no. 103, 108-10 [claim 6]); and (6) rebut false testimony by prosecution witnesses Merillat and Bryant regarding conditions of confinement within the TDCJ (ECF no. 103, 114-19 [claim 8]).

### B. Clearly Established Federal Law

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). In so doing, a convicted defendant has the burden of proof and must overcome a strong presumption that the conduct of his

trial counsel "falls within [a] wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (quoting *Strickland*, 466 U.S. at 688-89). Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *See Wiggins*, 539 U.S. at 523; *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland*, 466 U.S. at 694.

In instances where the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which the petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005).

Under the AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review. The AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow,* 571 U.S. 12, 19 (2013). Under § 2254(d)(1), "'a state

prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White v. Wheeler,* 136 S. Ct. 456, 460 (2015) (quoting *White v. Woodall,* 572 U.S. 415, 419-20 (2014)); *Harrington v. Richter,* 562 U. S. 86, 103 (2011).

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

*Harrington*, 562 U. S. at 101 (citations omitted).

### C. Complaints Regarding Merillat's and Bryant's Testimony

#### 1. The Claim Restated

In his eighth claim for federal habeas relief, Brewer argues that his trial counsel rendered ineffective assistance by failing to rebut the allegedly false testimony of Merillat and Bryant concerning conditions of confinement within the TDCJ. (ECF no. 103, 114-19). More specifically, Brewer argues: "To the extent evidence rebutting the State's false and misleading testimony was available to trial counsel, counsel was ineffective for failing to investigate and present this evidence." *Id.*, at 118.

## 2. State Court Disposition

In claim 2C in his second state habeas corpus application, Brewer argued that his trial counsel rendered ineffective assistance by failing to impeach and rebut the trial testimony of Merillat and Bryant regarding TDCJ conditions. (Second State Habeas Application, at 147-66).

The state habeas court heard testimony from Brewer's 2009 trial counsel that: (1) there was no record in the special prosecutor's office where Merillat worked or in any other state agency indicating Brewer had ever been investigated or charged with a violent offense during his years of incarceration (Second State Habeas Hearing, Vol. 2 of 4, at 70-71, 79); (2) the defense strategy was to show that there were opportunities for inmates to engage in violence within TDCJ but Brewer had a clean disciplinary record and was remorseful (*Id.*, Vol. 2 of 4, at 84, 278, 285; Vol. 3 of 4, at 33, 124, 135-36); (3) the defense chose to have Brewer testify and to use his good behavior in prison and his expressed remorse as bases for seeking a negative answer to the future dangerousness special issue (*Id.*, Vol. 2 of 4, at 70-71, 80-81, 84, 278, 285; Vol. 3 of 4, at 33, 124, 135-36); (4) the defense team expected and planned to use to the defense's advantage Merillat's opinion that prisons are violent places and also to use Merillat and Bryant's testimony to show Brewer's non-violent record during his incarceration (*Id.*, Vol. 2 of 4, 70-71, 79, 84; Vol. 3 of 4, at 54); and (5) for that reason, the defense did not hire a prison conditions expert to opine that Brewer's violent propensity could be controlled in prison (*Id.*, Vol. 3 of 4, at 54-56). In addition, attorneys Odiorne and Keith furnished the state habeas court with affidavits that were consistent with their testimony during the state habeas hearing.[54]

The state habeas trial court: (1) found there was nothing false or misleading in the

---

[54] The affidavits of Brewer's 2009 trial counsel, attorneys Anthony Odiorne and Edward Ray Keith, Jr., were attached as exhibits A and B to the State's answer to Brewer's second state habeas corpus application and appear among the state court records in this case at ECF no. 126-16, at 151-54 and 155-58 of 356, respectively.

testimony of Merillat or Bryant; (2) found as a matter of reasonable trial strategy Brewer's trial counsel decided not to challenge Merillat because part of the defensive theory was to show that Brewer had an exemplary prison record over 18 years; (3) found Merillat's testimony helped establish that Brewer had the opportunity to commit violent acts but chose not to do so; (4) found Brewer's trial counsel were not deficient for failing to object to Merillat's testimony about the TDCJ inmate classification system because Merillat's trial testimony was factually accurate and supported by Merillat's credible post-trial affidavit[55]; (5) found Brewer's trial counsel were not deficient in failing to present a defense expert on the TDCJ inmate classification system because they determined as a matter of reasonable trial strategy to focus the jury's attention on the fact Brewer had a non-violent record over 18 years of incarceration; (6) found Brewer's trial counsel reasonably chose not to challenge the admissibility of Merillat's or Bryant's testimony; (7) found Brewer's trial counsel reasonably chose not to attempt to impeach or object to Merillat's and Bryant's testimony regarding conditions of confinement within TDCJ; (8) found Brewer had failed to establish prejudice based upon his complaints as to how his trial counsel approached the testimony of Merillat and Bryant; and (9) concluded Brewer's ineffective assistance complaint failed to satisfy either prong of *Strickland*. (Findings of Fact and Conclusions of Law in Second State Habeas Corpus Proceeding, at 30-39 & 79). The Texas Court of Criminal Appeals adopted the foregoing findings and conclusions when it denied Brewer's second state habeas corpus application. *Ex parte Brewer*, WR-46,587-02, 2014 WL 5388114, *1.

### 3. AEDPA Review

The state habeas court's findings and conclusions underlying its rejection on the merits of

---

[55] Merillat's affidavit was attached as exhibit D to the State's answer to Brewer's second state habeas corpus application and appears among the state court records in this case at ECF no. 126-16, at 166-75 of 356.

this ineffective assistance claim are unassailable. Both the affidavits and evidentiary hearing testimony of Brewer's 2009 trial counsel fully supported the state habeas court's factual findings and legal conclusions.

### a. No Deficient Performance

Brewer's 2009 trial counsel reasonably believed that they could take advantage of Merillat's well-established reputation as an expert on prison violence to help them convince the jury that Brewer would not pose a risk of future violence if incarcerated. In fact, they did elicit testimony from Merillat on cross-examination that was helpful to the defense on the issue of future dangerousness. The same was true for Captain Bryant. During 18 years of incarceration, Brewer had an almost spotless disciplinary record, save for a suicide attempt and a confession to having smoked marijuana on a single occasion. Brewer's trial counsel believed they could use that fact to gain a favorable verdict on the future dangerousness special issue and that attacking Merillat or Bryant's credibility would be counterproductive. The state habeas court reasonably concluded Brewer's 2009 trial strategy was itself objectively reasonable. Furthermore, after de novo review that included careful review of the entire record from both of Brewer's trials, both of his direct appeals, all three of his state habeas corpus proceedings, and all the new materials accompanying Brewer's federal habeas corpus petition, this Court agrees.

The fact the strategy in question ultimately proved unsuccessful does not make it unreasonable. *See Strickland*, 466 U.S. at 698-99 (recognizing that a reasonable trial strategy need not be a successful one). *Strickland* forbids a reviewing court from second-guessing a trial counsel's objectively reasonable trial strategy. *Thomas v. Lumpkin*, 995 F.3d 432, 447 (5th Cir. 2021) (*Strickland* forbids second-guessing trial strategy as to how to conduct voir dire); *Wardrip v. Lumpkin*, 976 F.3d 467, 477 (5th Cir. 2020) (holding *Strickland* and the AEDPA required

deference to a state court's decision that trial counsel acted reasonably in making an informed choice not to present certain mitigating evidence of the defendant's good behavior while in prison following a prior murder conviction (citing *Harrington*, 562 U.S. at 105)). In light of the lack of success experienced by Brewer's trial counsel in 1991 in their attempt to convince a jury that Brewer did not pose a risk of future dangerousness by casting blame for Laminack's murder on Nystrom, Brewer's 2009 trial counsel reasonably chose an alternative strategy. They instead emphasized Brewer's good conduct during nearly two decades of incarceration. This was a reasonable approach given the evidence in the record showing Brewer had an escalating history of violence during his adolescence and the horrific facts of Laminack's murder. In sum, Brewer's 2009 trial counsel reasonably chose to emphasize Brewer's good conduct in prison in an attempt to convince the jury he was no longer the angry teenager who had brutally murdered Laminack and then shot the finger at a newspaper photographer.

### b. No Prejudice

The state habeas court also reasonably concluded this ineffective assistance complaint failed to satisfy the prejudice prong of *Strickland*. As explained in Section VIII.D. above, on cross-examination both Merillat and Bryant testified in a manner that was very clearly favorable to the defense's strategy. Under such circumstances, attacking their credibility through attempts to impeach them or by offering alternative experts to criticize their testimony on the technical aspects of TDCJ classification policy would likely have proven counterproductive. Furthermore, this Court concludes after de novo review of the entire record now before it that there is no reasonable probability that, but for the failure of Brewer's 2009 trial counsel to aggressively attack the credibility of Merillat and Bryant or challenge their testimony with experts on prison conditions, the outcome of Brewer's 2009 retrial would have been any different. The state habeas court's

similar conclusion was supported by the record before that court, especially the testimony of Brewer's 2009 trial counsel, who gave an objectively reasonable rationale for their strategy.

### 4. Conclusions

The state habeas court's rejection on the merits of Brewer's ineffective assistance complaints about the performance of his 2009 trial counsel vis-a-vis the trial testimony of Merillat and Bryant was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Brewer's 1991 and 2009 trials and second state habeas corpus proceeding. After de novo review, this Court likewise concludes these ineffective assistance complaints fail to satisfy either prong of *Strickland*. Brewer's eighth claim for federal habeas relief is without merit and does not warrant federal habeas relief.

### D. Complaints Regarding Nystrom's and Callen's Testimony

#### 1. The Claim Restated

In his sixth claim for federal habeas corpus relief Brewer complains about the performance of his 2009 trial counsel vis-a-vis the 2009 trial testimony of prosecution witnesses Kristie Nystrom and Skee Callen. More specifically, Brewer faults his 2009 trial counsel for failing to: (1) present evidence showing that Kristie Nystrom played a larger role in Laminack's murder than she testified; (2) impeach Callen's and Nystrom's testimony by showing Callen had once claimed Nystrom confessed that she stabbed Laminack; (3) impeach Callen by showing that he received inducements (including favorable legal treatment from prosecutors and help from police getting a job) for testifying against Brewer; and (4) elicit testimony from Callen that Brewer was weeping when Callen saw him after Laminack's murder. (ECF no. 103, 108-10).

## 2. State Court Disposition

On cross-examination by defense counsel at Brewer's 1991 trial, Callen admitted that he had given police a statement in which he stated that Nystrom told him that she had stabbed the victim. (17/21 R.R. 479, which is located at ECF no. 124-12). But he insisted that statement was in error. *Id.* He also testified that he later corrected the error in his statement. (17/21 R.R. 480). Callen also denied having received any benefit in exchange for his testimony against Brewer. (17/21 R.R. 481-82). At Brewer's 2009 trial, Callen testified on direct that Nystrom told him "they" had killed a man for $140; defense counsel did not cross-examine Callen. (22/28 R.R. 70-71, 74). As explained in Section I.G. above, both Nystrom and Brewer testified at Brewer's 2009 retrial. Neither testified that Nystrom stabbed Laminack.

In his sixth claim in his second state habeas corpus application, Brewer presented the same complaints about his 2009 trial counsel's handling of the testimony and cross-examination of prosecution witnesses Nystrom and Callen (Second State Habeas Application, at 302-07).

Brewer's 2009 trial counsel, attorneys Anthony Odiorne and Edward Ray Keith, Jr., each responded to Brewer's complaints in affidavits that were attached to the State's Answer to Brewer's Second State Habeas Application. Attorney Odiorne stated in his affidavit that (1) part of the defense strategy was to have Brewer himself testify "so he could tell the jury personally about his responsibility for the crime and his remorse for his actions," and (2) impeaching Skee Callen regarding his statement about Nystrom's involvement in the murder would not be consistent with the defense strategy. (ECF no. 126-16, at p. 152 of 356). Attorney Keith stated in his affidavit that: (1) "the basic defensive theory included Mr. Brewer's acceptance of responsibility for the murder"; (2) Keith made the decision not to challenge the prosecution's blood spatter expert because Brewer was going to take the stand and admit he stabbed Laminack; (3) in view of that

strategy, Keith made the decision not to attack the prosecution's blood spatter analysis or to suggest alternative theories for how the blood ended up where it was found; and (4) he believed it would damage the defense's credibility with the jury to do otherwise. (ECF no. 126-16, at p. 157 of 356).

The state habeas trial court: (1) found, as a matter of trial strategy, Brewer's 2009 counsel reasonably concluded it was unnecessary to impeach Callen and Nystrom with Callen's earlier statement indicating Nystrom had said that she stabbed Laminack; (2) found Callen's statement in question did not affirmatively establish that Nystrom had stabbed Laminack; (3) found it was reasonable for Brewer's 2009 trial counsel to believe that impeaching Callen would be inconsistent with their trial strategy of having Brewer take the stand and admit his guilt; (4) found as a matter of trial strategy, Brewer's 2009 counsel reasonably concluded it was unnecessary to elicit testimony from Callen regarding Brewer's crying because Brewer was going to testify himself that he was remorseful for his actions; (5) found Brewer's 2009 counsel reasonably believed this was a better strategy and would have a greater impact on the jury; (6) found the foregoing strategic decisions were all reasonable; (7) found Brewer had failed to establish any prejudice arising from his 2009 trial counsel's strategic decisions on these subjects because Brewer testified and expressed remorse for his actions; and (8) concluded Brewer's complaints about his 2009 trial counsels' actions vis-a-vis Nystrom and Callen failed to satisfy either prong of *Strickland* (Findings of Fact and Conclusions of Law in Second State Habeas Corpus Proceeding, at 56-58 & 86). The Texas Court of Criminal Appeals adopted the foregoing findings and conclusions when it denied Brewer's second state habeas corpus application. *Ex parte Brewer*, WR-46,587-02, 2014 WL 5388114, *1.

### 3. AEDPA Review

The state habeas court's findings and conclusions underlying its rejection on the merits of

this ineffective assistance claim are unassailable. The affidavits of Brewer's 2009 trial counsel fully supported the state habeas court's factual findings and legal conclusions, as do the records from Brewer's 1991 and 2009 trials.

### a. No Deficient Performance

Brewer's 2009 trial counsel reasonably believed that the best strategy available to them was to have Brewer take the stand, admit his guilt, express his sincere remorse and contrition for his crime, demonstrate empathy for the family of his victim, and explain that he had a non-violent record ever since. That is precisely what Brewer did when he testified in 2009.

This was a reasonable trial strategy for a number of reasons. First, in 1991 the jury had convicted Brewer of capital murder and answered all of the punishment phase special issues in a manner favorable to the prosecution without hearing any testimony from Brewer or Nystrom. This necessarily meant that, after viewing the lurid crime scene evidence and listening to expert testimony at the guilt-innocence phase of Brewer's 1991 trial, the jury concluded beyond a reasonable doubt that Brewer intentionally murdered Laminack in the course of committing or attempting to commit a robbery. At the conclusion of the punishment phase of Brewer's 1991 trial, the jury concluded beyond a reasonable doubt that both (1) Brewer committed Laminack's murder deliberately, and (2) there was a probability Brewer would commit criminal acts of violence that would constitute a continuing threat to society. In 2009, Brewer's trial counsel confronted the reality that they would once again face the same horrific crime scene photographs and videos and the same expert forensic testimony interpreting the crime scene that had been presented during the guilt-innocence phase of Brewer's 1991 trial. Likewise, Brewer's 2009 trial counsel confronted the prospect they would face the same evidence presented during the punishment phase of Brewer's 1991 trial showing Brewer had engaged in an escalating pattern of violence during his

adolescence. That evidence included testimony showing Brewer had (1) once shoved his diminutive ex-girlfriend against a locker so forcefully that he caused damage to three of her vertebral discs, and (2) once broke up a fight between his parents by beating his biological father with a broom so hard the older man sustained a depressed skull fracture and injuries to the lining of his brain that required emergency surgery and a hospital stay of several weeks.

Second, in addition to the foregoing evidence, in 2009 the defense confronted the prospect that Nystrom would testify and identify Brewer as the person who fatally stabbed Laminack. Third, by 2009, Brewer was 39 years old and no longer resembled an impressionable teenager. Finally, unlike 1991, when Dr. Coons had been free to speculate that Brewer would pose a risk of future violence if convicted, the defense now had documented proof that, over a period of nearly two decades, Brewer had been a non-violent inmate inside the TDCJ, save for a single suicide attempt.

Under these circumstances, it was eminently reasonable for Brewer's 2009 trial counsel to choose a strategy that emphasized Brewer's non-violent history as an inmate and attempted to convince the jury that Brewer was no longer the angry teenager who had murdered Laminack and, following his arrest, shot the finger at a photographer.

The state habeas court reasonably concluded that Brewer's 2009 trial counsel (1) adopted an objectively reasonable trial strategy, and (2) reasonably concluded that attacking Callen's credibility or suggesting that Nystrom had stabbed Laminack would prove counterproductive. After conducting a de novo review of the entire record in this federal habeas proceeding, this Court agrees and concludes that Brewer's 2009 trial counsel reasonably determined that having Brewer himself testify and describe the circumstances of Laminack's murder was a more effective way to counter the self-serving aspects of Nystrom's testimony than having Callen suggest that Nystrom once said she had stabbed Laminack.

### b. No Prejudice

The state habeas court also reasonably concluded that this ineffective assistance claim failed to satisfy the prejudice prong of *Strickland.* Attacking Callen's credibility and implying that Nystrom had stabbed Laminack (when in fact she had not) proved to be an unsuccessful strategy in 1991. During Brewer's 2009 trial, there was no testimony from either of the eyewitnesses to Laminack's murder suggesting that Nystrom had stabbed Laminack. On the contrary, Brewer testified Nystrom sat directly adjacent to Laminack and held Laminack's right arm while Brewer grabbed Laminack from behind and stabbed him in the neck. Brewer's testimony in that regard was fully supported by the forensic evidence. Brewer testified without contradiction that he sustained a severe cut to his own hand while fighting for control of the knife with Laminack. In contrast, there was no testimony in 2009 suggesting that Nystrom sustained any physical injuries during the fatal assault.

After de novo review of the entire record, this Court concludes there is no reasonable probability that, but for failure of Brewer's trial counsel to cross-examine and impeach Callen using his prior statement to police suggesting Nystrom confessed to stabbing Laminack, the outcome of Brewer's 2009 retrial would have been any different. The same is true for Brewer's complaint that his 2009 trial counsel did not cross-examine Nystrom on her alleged statement to Callen. Brewer's 1991 trial counsel attempted to impeach Callen in the manner Brewer now urges. It proved unhelpful. Doing so again in 2009 would only have undermined the strategy of Brewer's 2009 trial counsel.

### 4. Conclusions

The state habeas court's rejection on the merits of Brewer's ineffective assistance complaints about the performance of his 2009 trial counsel vis-a-vis the trial testimony of Nystrom

and Callen was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Brewer's 1991 and 2009 trials and second state habeas corpus proceeding. After de novo review, this Court likewise concludes these ineffective assistance complaints fail to satisfy either prong of *Strickland*. Brewer's sixth claim for federal habeas relief is without merit and does not warrant federal habeas relief.

### E. Complaints Regarding Brewer's Prior Bad Acts & History of Good Behavior

#### 1. The Claim Restated

In his fourth claim for federal habeas relief, Brewer argues that his 2009 trial counsel rendered ineffective assistance by: (1) failing to properly investigate (in part, by not interviewing prosecution witnesses who testified at the punishment phase of his 1991 trial) and rebut prosecution evidence relating to Brewer's prior bad acts, *i.e.*, his history of violence; (2) failing to present evidence showing Brewer had a history of good behavior while incarcerated and was not a gang member; (3) failing to present evidence showing his biological father was violent and abusive; and (4) advising Brewer to testify. (ECF no. 103, 64-78).

#### 2. State Court Disposition

Brewer presented a similar complaint of ineffective assistance by his 2009 trial counsel as his first claim in his third state habeas corpus application (Third State Habeas Application, 17-44 [ECF no. 127-1, 24-51 of 585]). The Texas Court of Criminal Appeals summarily dismissed Brewer's third state habeas application, citing state writ-abuse principles. *Ex parte Brewer*, WR-46,587-03, 2019 WL 5420444, *1. It is unnecessary to determine whether Brewer has procedurally defaulted on this ineffective assistance claim because this Court concludes after de novo review

that this claim is without arguable merit.

### 3. *De Novo* Review

Because the state courts did not address the merits of this ineffective assistance claim, this Court's review is necessarily de novo. *See Porter*, 558 U.S. at 39 (de novo review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla*, 545 U. S. at 390 (de novo review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins*, 539 U.S. at 534 (same).

### a. No Deficient Performance

Insofar as Brewer complains that his 2009 defense team failed to interview prosecution witnesses who had testified at the punishment phase of his 1991 trial, Brewer fails to allege any specific facts showing it was objectively unreasonable for his 2009 trial counsel to believe these witnesses would present the same or very similar testimony in 2009 to what they had testified in 1991. By and large, that is exactly what they did.[56] Brewer does not allege any facts or present any

---

[56] There is a striking consistency between the trial testimony of the prosecution witnesses who testified in 1991 and the same witnesses when they appeared and testified at Brewer's 2009 retrial. In addition, in several instances, the state trial court permitted the prosecution in 2009 to read into the record the testimony of witnesses from 1991 when those witnesses were not available. This is what happened with the 1991 trial testimony of both Richard Lepicher (22/28 R.R. 40-59 [ECF no. 125-10]) and Kathleen Bailey (22/28 R.R. 136-53 [ECF no. 125-10]). This Court's independent review of the records from both of Brewer's trials reveals no significant differences in the relevant testimony of the prosecution witnesses who testified in both proceedings.

For example, Amy Forrester (1991) and Aimee Diane Long (2009) (the same person despite dissimilar spelling) testified at both of Brewer's trials that Brewer responded to her breaking up with him while they were in high school by threatening her on multiple occasions, threatening her new boyfriend, and on one occasion pushing her against a bank of lockers hard enough to cause damage to her spine, including three displaced vertebral discs, a pinched nerve, and loss of the full use of her right arm for several months. (*Compare* 18/21 R.R. 592-608 [ECF no. 124-13] with 22/28 R.R. 75-88 [ECF no. 125-10]).

Ronald Mosher testified in 1991 that: (1) he arrested Brewer in January 1989 for carrying a concealed weapon, *i.e.*, a seven-inch hunting knife; (2) Brewer did not threaten anyone with the knife and did not resist arrest; and (3) at the time of Brewer's arrest he was driving for the Greenmans, a couple known to frequent areas where

evidence showing that, but for the failure of his trial counsel or defense team to interview these witnesses prior to their 2009 trial testimony, their 2009 testimony would have been significantly different.

While Brewer argues that his former high school girlfriend (whom he shoved into a bank of lockers, injuring her spine) was willing to testify Brewer's actions in assaulting her were inconsistent with her understanding of Brewer's character, this concession hardly diminishes the impact of her testimony at both trials regarding the physical ailments she sustained as a result of Brewer's violent act toward her. The same holds for her highly speculative assertion that Brewer did not intend to hurt her. Those assertions must be judged in light of the fact that this same witness apparently has never recanted her trial testimony that Brewer threatened her on multiple occasions and, at least once, threatened to kill both her and her new boyfriend. Furthermore, Brewer admitted on cross-examination that he had shoved Aimee. (25/28 R.R. 114). As explained above, the objectively reasonable strategy adopted by Brewer's 2009 trial counsel was to focus the jury's attention not on Brewer's behavior as an angry adolescent but, instead, on Brewer's good behavior while in prison and his sincere remorse for his offense. Brewer's 2009 trial counsel could reasonably have believed that engaging in a game of semantics with Brewer's former high school girlfriend would not further their trial strategy.

A more fundamental problem with Brewer's complaints about his 2009 trial counsel's failure to interview prosecution witnesses as to Brewer's prior bad acts is that Brewer himself

---

narcotics trafficking took place. (18/21 R.R. 657-72 [ECF no. 124-13]). In 2009, Mosher testified to the same facts as he had in 1991, explained he observed the knife handle between the driver's seat and the console, and added that Brewer pleaded guilty to possession of a concealed weapon following the arrest in question. (22/28 R.R. 230-40 [ECF no. 125-10]).

Freelance photographer Henry Bargas testified briefly at both Brewer's 1991 trial (18/21 R.R. 673-77 [ECF no. 124-13]) and 2009 trial (22/28 R.R. 60-64 [ECF no. 125-10]) to identify State Exhibit no. 202, *i.e.*, the photograph showing Brewer shooting the finger at Bargas, that was admitted into evidence at both trials.

testified extensively in 2009 in rebuttal to many of the incidents described by these prosecution witnesses. For example, Brewer testified that: (1) the knife he was arrested for carrying in Florida did not belong to him; (2) his guilty plea to that charge resulted from his desire to avoid prosecution for a more serious offense; and (3) he was driving the Greenmans to buy drugs when he was arrested for carrying a concealed weapon (25/28 R.R. 56-58, 127-32). Given the fact Brewer also testified that the Greenmans (the couple in Florida for whom Brewer was driving when arrested for carrying a concealed weapon) introduced him to crack while he was but a teenager (25/28 R.R. 58), Brewer's 2009 trial counsel could reasonably have believed it was better to have Brewer himself explain the circumstances of his Florida arrest than to call the former Mrs. Greenman (now Ms. Valles) to testify the knife in question belonged to her. The possibility the prosecution might impeach Ms. Valles on cross-examination had to occur to Brewer's 2009 trial counsel.

Nor would Ms. Valles' testimony have changed the fact Brewer entered a guilty plea to the concealed weapon charge. Brewer identifies no legal authority suggesting that ownership of the knife in question was an element under Florida law of the concealed weapon charge to which he pleaded guilty. Brewer's 2009 trial counsel could reasonably have believed calling Ms. Valles to contest the irrelevant issue of the knife's ownership would detract from their strategy of focusing the jury on Brewer's good conduct in prison and remorse for his capital offense.

The testimony of prosecution witness Richard Lepicher at both of Brewer's trials established: (1) Brewer's biological father, Albert, had a history of violence and alcohol abuse; (2) Albert had been responsible for starting the 1986 altercation with Brewer's mother that culminated in Brewer assaulting Albert with a broom in an effort to protect his mother from Albert's assault; and (3) no criminal charges were ever brought against Brewer as a result of the broom incident. (18/21 R.R. 678-94 & 22/28 R.R. 40-59). In his 2009 trial testimony Brewer himself: (1) furnished

additional background to the incident in question, emphasizing that he acted to protect his mother from Albert; (2) testified Albert was an abusive alcoholic who likely suffered from some form of post-traumatic stress disorder after serving multiple tours in Vietnam; and (3) testified that, prior to the fight between his parents, Albert had once struck Brewer in the face with a piece of wood, causing Brewer to suffer severe facial injuries. (25/28 R.R. 39-40, 59-62, 115, 118-26). Given the extent of Albert's head injuries, Brewer's 2009 trial counsel reasonably have could have believed that it would be more impactful for the jury to hear additional details about the 1986 fight between Brewer and Albert from Brewer himself rather than from Brewer's mother and sister or from Lepicher, even assuming that Lepicher was available to testify in 2009. In fact, Lepicher did not testify at the 2009 trial; his testimony from 1991 was read to the jury in 2009.

In both their affidavits and testimony before the state habeas court in Brewer's second state habeas proceeding, his 2009 trial counsel made clear it was their trial strategy to have Brewer testify and explain to the jury his acceptance of responsibility for his crime. (Second State Habeas Hearing, Volume 2 of 4, at 70; Volume 3 of 4, at 124, 135-36). Brewer's lead 2009 trial counsel also testified he believed Brewer himself was the only available witness who could testify with authority as to Brewer's remorse for what he had done. (Second State Habeas Hearing, Volume 2 of 4, at 80-81). In the course of his trial testimony, Brewer extensively discussed his upbringing, furnished a fairly detailed chronology of his life, and made attempts to ameliorate the most damaging aspects of the prosecution's bad acts evidence. Brewer explained that: (1) both his biological and adoptive fathers were violent and abusive; (2) he suffered a serious injury as a child, which led the discovery that he had a spinal problem; (3) he and his sister experienced a very unstable childhood; (4) the knife he was arrested for carrying in Florida did not belong to him; and (5) he was defending his mother from his violent biological father when he struck Albert with a

broom. (25/28 R.R. 39-64, 113-15, 118-32).

Brewer also faults his 2009 trial counsel for failing to have Brewer's mother and sister testify that Brewer had witnessed violence between his biological mother and biological father prior to the incident in which Brewer broke up a fight between his biological parents by beating Albert with a broom. Brewer himself testified, however, that Albert was violent and beat his mother on many occasions. (25/28 R.R. 40, 62). Brewer also testified extensively regarding the circumstances of the incident in which he beat Albert with a broom. (25/28 R.R. 60-62, 127-32). This Court finds it was objectively reasonable for Brewer's 2009 trial counsel to use Brewer's own testimony to rebut most of the prosecution's bad acts evidence.

Brewer also faults his 2009 trial counsel for failing to interview and challenge prosecution witness Kevin Lewis regarding the circumstances under which Brewer threatened Lewis while they were both jail inmates prior to Brewer's 1991 trial. Brewer argues that Lewis could have testified that he started the hostile verbal exchange that escalated into Brewer threatening to shove a pencil in Lewis's eye. Given the fact Brewer did not deny making the threat, his 2009 trial counsel could reasonably have believed that eliciting testimony about who started the verbal altercation would be of only minimal rebuttal value and, once again, could take the jury's focus off Brewer's otherwise non-violent prison record and sincere remorse for his capital offense.

In sum, it was objectively reasonable for Brewer's 2009 trial counsel to choose the strategy of having Brewer himself take the stand and rebut the more problematic aspects of the prosecution's testimony about Brewer's history of violence as an adolescent and teenager, *i.e.*, the so-called "bad acts" evidence. Brewer's 2009 trial counsel were well aware that Brewer had remained mute at his 1991 trial, been convicted of capital murder, and received a sentence of death. All this happened despite (1) the absence of any eyewitness testimony identifying Brewer as

Laminack's assailant, and (2) the fact Brewer was only 20 years old in 1991, young enough his 1991 trial counsel could reasonably argue Brewer was an impressionable young man manipulated by a seductive, domineering, slightly older woman. In 2009, Brewer's trial counsel had neither of those two strategic advantages. Thus, the strategic decision by Brewer's 2009 trial counsel to advise the 39-year-old Brewer to take the stand, admit his guilt, express his sincere remorse for his capital offense, demonstrate his empathy for the family of his victim, and emphasize his good behavior over nearly two decades in prison was objectively reasonable.

As explained above, choosing the strategy now advocated by Brewer's federal habeas counsel (*i.e.*, having Brewer remain mute once again before the jury and calling other witnesses to attempt to confront the prosecution's bad acts evidence) would likely have been less effective in terms of countering the prosecution's "bad acts" evidence. It would also would have deprived the jury of the opportunity to see firsthand as Brewer (1) expressed his sincere remorse and contrition for his capital offense, and (2) demonstrated empathy for his victim and his victim's family.

Insofar as Brewer complains that his 2009 trial counsel failed to present evidence showing Brewer's good behavior while incarcerated, that complaint is based upon a faulty factual premise. Brewer himself testified that he had been on his best behavior since his 1991 conviction. (25/28 R.R. 100-02). As explained in Section XII.C. above, prosecution witnesses Merillat and Bryant testified on cross-examination that (1) there was no record of Merillat's special prosecution unit ever having investigated Brewer during Brewer's TDCJ incarceration, and (2) Brewer's TDCJ disciplinary record was relatively clean, containing only a charge of having once smoked marijuana. (23/28 R.R. 111, 115, 125, 166). While prosecution witness Bryant did mention Brewer's 2007 suicide attempt, he did so in the context of discussing Brewer's *medical* records, not Brewer's disciplinary records. (23/28 R.R. 105-10). No witness testified Brewer was charged

with a disciplinary infraction in connection with his suicide attempt. Brewer himself explained to the jury that he took pills and cut his wrists because he was feeling depressed due to his isolation from other inmates but, since his return to the County jail to await his retrial, he had contact with other people and no longer wanted to die. (25/28 R.R. 95-97).

### b. No Prejudice

Likewise, because Brewer himself testified extensively in 2009 regarding his life history and the circumstances surrounding the prosecution's bad acts evidence, Brewer can show no prejudice arising from his trial counsels' failure to have other witnesses attempt to address the same bad acts. In sum, Brewer was not prejudiced within the meaning of *Strickland* by his 2009 trial counsels' failure to present cumulative testimony to rebut the prosecution's bad acts evidence. A failure to present cumulative testimony cannot be the basis of a claim of ineffective assistance. *Howard v. Davis*, 959 F.3d 168, 173 (5th Cir. 2020) (citing *Richards v. Quarterman*, 566 F.3d 553, 568 (5th Cir. 2009)); *Norman v. Stephens*, 817 F.3d 226, 233 (5th Cir. 2016) (defendant was not prejudiced by failure of counsel to present cumulative evidence).

### 4. Conclusions

After de novo review, this Court concludes all of the ineffective assistance complaints contained in Brewer's fourth claim for federal habeas relief fail to satisfy both prongs of *Strickland*. Brewer's fourth claim for federal habeas relief is without arguable merit.

### F. Complaints Regarding Dr. Coons' Testimony

### 1. The Claim Restated

In his first federal habeas claim, Brewer argues that his 2009 trial counsel failed to adequately: (1) challenge the admission of Dr. Coons' opinion testimony on the issue of future dangerousness; (2) impeach Dr. Coons; and (3) rebut Dr. Coons' opinion. (ECF no. 103, 11-37).

Among the arguments Brewer asserts in this claim are complaints that his trial counsel did not: (1) present expert testimony during the *Daubert* hearing challenging the scientific validity of Dr. Coons' method for determining future dangerousness; (2) present opinion testimony from a qualified mental health expert who evaluated Brewer in order to rebut Dr. Coons' opinion on Brewer's future dangerousness; and (3) attack Dr. Coons' credentials and experience.

### 2. State Court Disposition

Prior to Dr. Coons testifying at Brewer's 2009 retrial, Brewer's trial counsel filed a motion in limine regarding Dr. Coons' testimony. They also requested a *Daubert* hearing, during which they questioned Dr. Coons and argued Dr. Coons' opinions were not based on valid theory and were unverifiable and scientifically unreliable. (23/28 R.R. 172-96). At the conclusion of that hearing, the state trial court overruled Brewer's objections and ruled Dr. Coons was qualified to testify and express his opinion. (23/28 R.R. 196). During Dr. Coons' ensuing testimony, Brewer's counsel made multiple objections to him offering his opinion as to Brewer's future dangerousness. (23/28 R.R. 199, 205-08, 211-12, 214-16, 221). On cross-examination, Brewer's trial counsel elicited testimony that Dr. Coons had never examined Brewer and had never done any studies to determine the reliability or accuracy of his prior predictions of future dangerousness in criminal defendants. (23/28 R.R. 223-37). After Dr. Coons left the stand, Brewer's trial counsel made another objection to the admission of Dr. Coons' testimony, raising several grounds, including constitutional claims, all of which the trial court overruled. (23/28 R.R. 239-40).

In his fifth point of error on direct appeal, Brewer argued the state trial court erred in admitting Dr. Coons' opinion testimony. (Second Appellant's Brief, AP-76,378, at 81-90, which is located at ECF no. 122-16). The Texas Court of Criminal Appeals held the trial court's adverse ruling on Brewer's motions in limine, Brewer's request for a *Daubert* hearing, and Brewer's post-

testimony objection were insufficient to preserve for state appellate review Brewer's complaint about the admission of Dr. Coons' testimony. *Brewer v. State*, AP-76,378, 2011 WL 5881612, *6-*8.

In claims 1A and 1B in his second state habeas corpus application, Brewer argued his 2009 trial counsel rendered ineffective assistance by failing to adequately challenge the admission of Dr. Coons' opinion testimony and failing to adequately impeach, rebut, and counter Dr. Coons' opinion. (Second State Habeas Application, at 15-111). In a related claim, 1C, Brewer alleged that Dr. Coons testified falsely regarding work he had done for the State Bar. (*Id.*, at 111-20).

In his affidavit submitted to the state habeas court, Brewer's 2009 lead trial counsel stated that: (1) he had reviewed Dr. Coons' CV and believed he was unqualified to render his opinion testimony; (2) he cross-examined Dr. Coons outside the jury's presence and attempted to have his testimony excluded by the trial court; and (3) he made what he believed were timely objections during Dr. Coons' testimony. (ECF no. 126-16, at p. 151 of 356). Attorney Keith stated in his affidavit that: (1) the defense strategy was to attempt to exclude Dr. Coons' testimony based on his methodology; (2) failing that, the defense planned to show and argue that Dr. Coons' assertions were demonstrably wrong; (3) they challenged his methods and made manifest to the jury that Dr. Coons had been wrong in the past about Brewer; (4) they did this in part through the testimony of their own expert, Dr. Edens. (ECF no. 126-16, at p. 157 of 356).

During his extensive testimony at the evidentiary hearing in Brewer's second state habeas proceeding, attorney Odiorne testified that (1) he knew Dr. Coons' reputation and obtained copies of Dr. Coons' testimony in prior death penalty cases (Second State Habeas Hearing, Vol. 2 of 4, at 51-57); (2) his research revealed no problems with Dr. Coons' CV and he believed Dr. Coons would be qualified by the court as an expert (*Id.*, at 58-59); (3) the state trial court ruled Dr. Coons

was qualified to testify as an expert before Odiorne had the opportunity to delve into the bases for Dr. Coons' opinions (*Id.*, at 59, 66); (4) he did not believe calling Dr. Edens to testify at the *Daubert* hearing would have changed the trial judge's ruling admitting Dr. Coons' testimony (*Id.*, at 61, 92); (5) the defense made the decision not to have Brewer evaluated by a mental health expert because it could open the door to Brewer being interviewed and evaluated by a prosecution mental health expert (*Id.*, at 98); (6) he did not cross-examine Dr. Coons regarding his methodology because he did not believe it would have affected Dr. Coons' opinion (*Id.*, at 103-06, 175); (7) instead, he chose to have Dr. Edens attack Dr. Coons' methodology (*Id.*, at 176, 209); (8) the defense brought out on cross-examination that Dr. Coons had erroneously predicted in 1991 that Brewer would be violent in prison (*Id.*, at 186); (9) the defense's primary method of countering Dr. Coons' testimony was presenting Dr. Edens' testimony suggesting that Dr. Coons' methodology was flawed, *i.e.*, unreliable and unscientific (*Id.*, at 94, 176, 209); (10) he objected numerous times to Dr. Coons' testimony (*Id.*, at 213-22); and (11) he did not believe that additional objections would have prevented Dr. Coons from testifying (*Id.*, at 232).

Brewer's co-counsel, attorney Keith, testified that: (1) he researched Dr. Coons through the Texas Defender Service and felt there was no basis for Dr. Coons' response to the prosecution's hypothetical regarding Brewer's propensity for future violence (Second State Habeas Hearing, Vol. 2 of 4, at 254-66); (2) he was unaware that Dr. Coons had ever fabricated anything like Dr. Erdmann (*Id.*, at 263); (3) at the time of Brewer's 2009 retrial, he was not familiar with the events at the 2008 retrial of Billy Wayne Coble (*Id.*, at 269); (4) the defense did not plan to use Dr. Edens to attempt to keep Dr. Coons from testifying but, rather, to use Dr. Edens to rebut Dr. Coons' methodology, in part, because having Dr. Edens testify at the *Daubert* hearing would have tipped off Dr. Coons prior to his trial testimony as to exactly how the defense planned to attack his opinion

on Brewer's future dangerousness (*Id.*, Vol. 2 of 4, at 277; Vol. 3 of 4, at 24, 27, 142-43, 147-48); (5) the defense's focus was on attacking Dr. Coons' methodology and showing Brewer had displayed non-violent behavior in prison and was remorseful (*Id.*, Vol. 2 of 4, at 277-78, 285; Vol. 3 of 4, at 33, 124, 135-36); (6) the defense did not ask Dr. Edens to evaluate Brewer and did not use experts on future dangerousness, like Dr. Cunningham or Dr. Sorenson, to rebut Dr. Coons' opinion because doing so would turn the future dangerousness question into a battle of experts, *i.e.*, the defense's expert would be doing the same thing as Dr. Coons (*Id.*, Vol. 3 of 4, at 26-31, 33, 46, 49, 51, 99); (7) instead, the defense wanted to focus the jury's attention on Brewer's good behavior inside prison (*Id.*, at 33, 124, 135-36); and (8) Dr. Cunningham testified for the defense at the 2008 Coble retrial and the jury still returned a death sentence (*Id.*, at 132).

Dr. Coons testified during Brewer's state habeas hearing that: (1) he believed a diagnosis could be made without an evaluation if enough information were available (Second State Habeas Hearing, Vol. 3 of 4, at 209, 211-12); (2) he has sought to evaluate the accuracy of his predictions of future dangerousness in only a few cases and cannot verify same (*Id.*, at 218-21, 226, 228, 230, 232); (3) the consensus is that there is a lot of violence in jails and much of it is unreported (*Id.*, at 228-29); (4) he believed Dr. Cunningham and other prison violence psychologists look at an extremely narrow range of conduct they consider to be "violent" and disregard a lot of unreported violence that does not result in disciplinary charges (*Id.*, at 229-30, 233, 240); (5) he has consulted with a number of state agencies and licensing boards over the years, most often to address professionals or applicants who have a history of substance abuse, and believed he had undersold his credentials when he testified at Brewer's 2009 trial (*Id.*, at 256-59, 263); and (6) he has consulted in about 150 potential capital cases and has rejected about 100 of those as not warranting capital punishment (*Id.*, at 247).

The state habeas trial court: (1) found Brewer's 2009 trial counsel adopted a reasonable trial strategy of not having Brewer evaluated by a defense mental health expert because of concerns that: (a) doing so might open the door to Brewer being evaluated by a prosecution expert; (b) the result of such an evaluation might be unhelpful to the defense; (c) having a defense expert testify on his own opinion of Brewer's future dangerousness would detract from their attack upon Dr. Coons' opinion as unscientific; (d) there was a possibility the jury would view the defense's future dangerousness expert in the same vein as Dr. Coons and the jury would "get lost in the science"; and (e) the defense wanted to focus the jury's attention on Brewer's non-violent behavior while in prison; (2) found the defense reasonably chose Dr. Edens, a psychologist rather than a psychiatrist, to challenge Dr. Coons' methodology; (3) found the defense reasonably chose to attack Dr. Coons' methodology rather than attempting to have a defense expert address risk factors and make a different assessment of Brewer's propensity for future violence; (4) found the defense's primary strategy at the hearing addressing the admissibility of Dr. Coons' testimony (*i.e.*, the "*Daubert* hearing*") was to assert that Dr. Coons' methodology was unsound; (5) found the defense strategy was to cross-examine Dr. Coons and rebut Dr. Coons' opinion with Dr. Edens' testimony, which was reasonable; (6) found Brewer's trial counsel reasonably chose not to have Dr. Edens testify at the 702 hearing on Dr. Coons' opinion because doing so could have tipped off Dr. Coons as to the method the defense planned to use to rebut his opinion; (7) found the defense reasonably investigated Dr. Coons' methodology and CV prior to trial; (8) found Brewer's trial counsel effectively challenged Dr. Coons' opinion on future dangerousness by eliciting testimony on cross-examination admitting Dr. Coons had followed up on his past predictions of future violence in only a few isolated cases and Dr. Coons had no statistics establishing the accuracy of his methodology; (9) found the defense reasonably attacked Dr. Coons' opinion by emphasizing those

112

admissions during closing argument; (10) found it was reasonable for Brewer's trial counsel not to cross-examine Dr. Coons about the *Barefoot* case because the Supreme Court's opinion in that case allowed the admission of opinions such as Dr. Coons' on future dangerousness; (11) found the defense also rebutted Dr. Coons' opinion by showing Brewer had not engaged in any violence while in prison; (12) found the defense acted reasonably in relying on Brewer's own testimony, and that of prosecution witnesses Merillat and Bryant, to establish Brewer's non-violent prison record; (13) found Brewer failed to establish prejudice with regard to his trial counsels' rebuttal and cross-examination of Dr. Coons; (14) found there was ample other evidence of Brewer's future dangerousness beyond Dr. Coons' opinion; (15) found Dr. Coons' opinion regarding future dangerousness was not particularly powerful, certain, or strong and was effectively rebutted by Dr. Edens; (16) found Dr. Coons testified credibly and accurately regarding his experience and credentials; (17) concluded Brewer's complaints about his 2009 trial counsels' failure to impeach Dr. Coons for allegedly misrepresenting his credentials failed to satisfy either prong of *Strickland*; (18) concluded Brewer's complaints about his trial counsel's handling of Dr. Coons' testimony failed to satisfy both prongs of *Strickland* (Findings of Fact and Conclusions of Law in Second State Habeas Corpus Proceeding, at 6-26 & 71-76). The Texas Court of Criminal Appeals adopted the foregoing findings and conclusions when it denied Brewer's second state habeas corpus application. *Ex parte Brewer*, WR-46,587-02, 2014 WL 5388114, *1.

### 3. AEDPA Review

The state habeas court's findings and conclusions underlying its rejection on the merits of this ineffective assistance claim are unassailable. The affidavits and state habeas testimony of Brewer's 2009 trial counsel fully supported the state habeas court's factual findings and legal conclusions, as do the records from Brewer's 1991 and 2009 trials. Brewer's 2009 trial counsel

gave detailed explanations during their state habeas hearing testimony for the objectively reasonable trial strategy they adopted regarding Dr. Coons' opinion testimony.

Brewer's 2009 trial counsel reasonably believed that the best strategy for countering the opinion testimony of Dr. Coons was to: (1) employ Dr. Edens' expert testimony and cross-examination of Dr. Coons to show (a) there was no scientific or statistical support for Dr. Coons' highly subjective methodology for predicting future dangerousness, and (b) in 1991, Dr. Coons had erroneously predicted Brewer would be violent if incarcerated, respectively; (2) show prosecution witnesses Merillat and Bryant corroborated Brewer's own testimony showing Brewer's non-violent record while incarcerated; and (3) not present their own expert prediction on the future dangerousness issue because doing so would undermine their attack on Dr. Coons' methodology and opinion, potentially require Brewer to submit to an evaluation by a prosecution expert, and distract from the concrete evidence showing Brewer's non-violent record during nearly two decades of incarceration. This Court concludes after de novo review that the state habeas court's findings and conclusions on these subjects were objectively reasonable.

Having Brewer evaluated by a defense mental health expert who testified about Brewer's propensity for future violence would likely have required Brewer to submit to an evaluation by a prosecution expert (possibly even Dr. Coons). It is well-established that when a criminal defendant seeks to introduce mental health evidence through a psychological expert, the prosecution is entitled to have its own expert examine and evaluate the defendant. *Kansas v. Cheever*, 571 U.S. 87, 94 (2013). It was reasonable for Brewer's 2009 trial counsel to wish to avoid that possibility. Such an evaluation could have proven problematic for a number of reasons. As noted by the state habeas court, the defense's mental health expert could have concluded Brewer did pose a risk of future dangerousness, despite his non-violent prison record. Alternatively, a prosecution mental

health expert might have concluded Brewer displayed antisocial or borderline personality disorder, a diagnosis that could foreseeably have damaged the defense on the future dangerousness, as well as the mitigation, special issue. Given Brewer's history of escalating adolescent violence leading to Laminack's murder, a diagnosis of antisocial personality disorder was a possibility.

Likewise, it was reasonable for the state habeas court to conclude that the strategic approach chosen by Brewer's 2009 trial counsel to attempt to exclude Dr. Coons' opinion was objectively reasonable. Brewer's trial counsel filed motions and requested a hearing to address the admissibility of Dr. Coons' opinion on future dangerousness, but recognized the practical reality that his testimony was likely to be admitted. It had been admitted at Brewer's original trial in 1991. By the time of Brewer's 2009 retrial, Dr. Coons had testified in many Texas capital murder trials and related proceedings.[57] In some of the cases, Dr. Coons had evaluated the defendant personally. In others, as was true in Brewer's case, he had not done so. In almost all of those cases, the admissibility of his opinion on future dangerousness was challenged at trial and on appeal or in a subsequent state or federal habeas corpus proceeding.

The undeniable fact confronting Brewer's 2009 trial counsel was that at the time of Brewer's retrial no Texas court, trial or appellate, had ever ruled inadmissible Dr. Coons' opinions on future dangerousness. The first such ruling came a year *after* Brewer's retrial in the case of

---

[57] In another death penalty habeas case currently pending before this Court, the parties filed trial transcripts from over a dozen state or federal trials or hearings in which Dr. Coons testified on the topic of a defendant's future dangerousness. *See Holberg v. Lumpkin*, cause no. 2:15-CV-285-Z, at ECF nos. 220, 221, 271, 272, 311. These transcripts show Dr. Coons' opinions on future dangerousness were admitted in judicial proceedings in the following cases: (1) George E. Clark (Travis County Oct. 31, 1978); (2) Thomas Barefoot (W.D. Tex. July 28, 1982); (3) James C.L. Davis (Travis County Oct. 10-11, 1984); (4) Billy W. Coble (McLennan County Oct. 20, 1989); (5) James E. Bigby (Tarrant County May 7, 1991); (6) Brent R. Brewer (Randall County May 31, 1991); (7) Jeff Emery (Brazos County Nov. 25, 1991); (8) John A. Alba (Collin County May 5, 1992); (9) Ronald C. Chambers [*for the defense*] (Dallas County June 23-34, 1992); (10) Steven B. Alvarado (El Paso County Oct. 5, 1993); (11) Robert J. Anderson (Potter County Nov. 15, 1993); (12) Michael N. Blair (Midland County Sept. 29, 1994); (13) John D. Battaglia (Dallas County April 2002); (14) Guy L. Allen (Travis County Mar. 18, 2004); (15) Billy W. Coble (McLennan County Aug, 28, 2008); (16) Paul G. DeVoe (Travis County Oct. 7, 2009). Pursuant to Rule 201, FED. R. EVID., this Court takes judicial notice of the contents of the foregoing trial and hearing transcripts contained in its public records.

*Coble v. State*, 330 S.W.3d 253, 270-87 (Tex. Crim. App. 2010). Brewer's 2009 trial counsel cannot reasonably be faulted for failing to anticipate the very narrow holding of the TCCA in *Coble*, a case in which Dr. Coons testified after evaluating the defendant prior to an initial trial but in which he did not conduct a second evaluation prior to Coble's retrial. Clairvoyance is not a required attribute of effective assistance. *United States v. Fields*, 565 F.3d 290, 295 (5th Cir. 2009); *Sharp v. Johnson*, 107 F.3d 282, 289 n.28 (5th Cir. 1997).

The state habeas court reasonably concluded that Brewer's 2009 trial counsel acted in an objectively reasonable manner in filing a motion in limine, requesting a hearing on the admissibility of Dr. Coons' opinion, attempting to challenge the efficacy of that opinion, and making numerous objections to the admission of Dr. Coons' testimony. That Brewer's 2009 trial counsel failed to predict the exact procedure they needed to follow to preserve error regarding the admission of Dr. Coons' testimony, *i.e.*, the procedure employed in the *Coble* case during a 2008 retrial, does not mean their efforts attempting to do so were objectively unreasonable. Even in Coble's 2008 retrial, Dr. Coons' opinions were admitted. There was no logical reason for Brewer's 2009 trial counsel to believe the procedural path chosen by Coble's trial counsel in 2008 would ultimately prove *partially* successful on direct appeal (the TCCA held the trial court error in admitting Dr. Coons' opinion at Coble's retrial was harmless). In sum, Brewer's 2009 trial counsel cannot reasonably be faulted for failing to follow the same strategy that had proved unsuccessful during Coble's 2008 retrial.

The state habeas court also reasonably concluded that Brewer's trial counsel did mount an effective effort to rebut or counter Dr. Coons' opinion on future dangerousness. Dr. Edens challenged Dr. Coons' methodology for determining future dangerousness. On cross-examination, Dr. Coons admitted he could identify no standardized or scientific bases for his subjective

116

decision-making on the subject. Dr. Coons also admitted he had done virtually no follow-up research to verify the accuracy of his previous predictions on future dangerousness. The fact Brewer had a non-violent record over nearly two decades inside TDCJ was not seriously in dispute. Likewise, Brewer's 2009 trial counsel used both prosecution witnesses and defense witnesses to support their contention that TDCJ is a dangerous place, including death row.

The state habeas court also reasonably concluded there was a wealth of other evidence, besides Dr. Coons' less than convincing opinion, supporting the jury's 2009 verdict on the future dangerousness special issue. As explained above, the crime scene photos and video were quite stark and graphic. Brewer's and Nystrom's 2009 accounts of Laminack's violent murder were equally disturbing - they both made clear their surprise attack on Laminack commenced *before* either of them asked their victim to turn over his wallet or keys. Despite the apparent success of Brewer's trial counsels' efforts to rebut Dr. Coons' opinion, the jury returned a verdict on future dangerousness favorable to the prosecution. This Court concludes after de novo review, as did the state habeas court, there is no reasonable probability that, but for the failure of Brewer's trial counsel to pursue a very different strategy for addressing Dr. Coons' testimony, the outcome of Brewer's 2009 trial would have been any different. Under these circumstances, the state habeas court reasonably concluded that Brewer's complaints about his 2009 trial counsels' trial strategy and actual behavior toward Dr. Coons fail to satisfy either prong of *Strickland.*

Furthermore, this Court concludes after de novo review it was objectively reasonable for Brewer's 2009 trial counsel to choose to employ Dr. Edens' testimony to rebut Dr. Coons' methodology but not to attempt to exclude Dr. Coons' opinions. As of 2009, no Texas court identified by Brewer or located by this Court through independent research had ruled Dr. Coons' opinions on future dangerousness inadmissible. Having Dr. Edens attack Dr. Coons' methodology

117

during the Daubert hearing would have informed Dr. Coons as to the precise manner the defense planned to use to attack his opinion in Brewer's case. It was reasonable for Brewer's trial counsel to choose to keep that card close to their vests.

It was likewise objectively reasonable for Brewer's 2009 trial counsel *not* to attempt to attack Dr. Coons' credibility based on assertions that he had distorted his credentials. When questioned by Brewer's state habeas counsel at the evidentiary hearing in Brewer's second state habeas proceeding, Dr. Coons gave detailed accounts of his work for a variety of state agencies and licensing boards, most of which had taken place a considerable time before he testified at Brewer's 2009 retrial. (Second State Habeas Hearing, Vol. 3 of 4, at 256-63). Other than presenting the state habeas court with copies of correspondence from various state boards and agencies reporting that those entities could not locate copies of contracts or records indicating payments having been made to Dr. Coons, Brewer's state habeas counsel presented no evidence suggesting there was anything illegitimate about Dr. Coons' CV or inaccurate about his testimony at Brewer's retrial concerning his credentials or experience. The short answer to these complaints is Dr. Coons never testified in 2009 that he had ever entered into any formal written contracts with the agencies or boards in question. Instead, at Brewer's state habeas hearing, Dr. Coons testified without contradiction that he had worked for the boards and agencies in question on an ad hoc basis, a case at a time. *Id.* Brewer's 2009 trial counsel reviewed Dr. Coons' CV and found nothing therein that they believed furnished a basis for attacking Dr. Coons' credibility. (*Id.*, Vol. 2 of 4, at 53-58, 263). The state habeas court reasonably found Dr. Coons testified accurately and credibly in 2009 regarding his experience and credentials (Findings of Fact and Conclusions of Law in Second State Habeas Corpus Proceeding, at 26). Brewer presented the state habeas court, and presents this Court, with no clear and convincing evidence showing otherwise.

### 4. Conclusions

The state habeas court's rejection on the merits of Brewer's ineffective assistance complaints about the performance of his 2009 trial counsel vis-a-vis the trial testimony of Dr. Coons was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Brewer's 1991 and 2009 trials and second state habeas corpus proceeding. Likewise, after de novo review, this Court concludes all of these ineffective assistance complaints fail to satisfy either prong of *Strickland*. Brewer's first claim for federal habeas relief is without merit and does not warrant federal habeas relief.

### G. Complaints Regarding Admission of Autopsy Report & Related Testimony

#### 1. The Claim Restated

In his federal habeas claim 2B, Brewer argues that his 2009 trial counsel failed to adequately challenge the admission of Laminack's autopsy report, the 1991 testimony of Dr. Erdmann, and the 2009 testimony of Dr. Natarajian regarding Laminack's cause of death (ECF no. 103, 51-59). More specifically, Brewer complains his 2009 trial counsel failed to: (1) use Dr. Erdmann's criminal convictions to impeach Dr. Erdmann's 1991 trial testimony; (2) present expert testimony attacking Dr. Erdmann's autopsy findings; (3) present testimony concerning Dr. Erdmann's criminal malfeasance; (4) move for the recusal of District Attorney Farren; and (5) adequately investigate before advising Brewer to testify.

#### 2. State Court Disposition

Brewer presented an expanded version of these same complaints as claim 3A in his second state habeas corpus application. (Second State Habeas Application, at 184-215).

In their affidavits addressing Brewer's second state habeas application, both attorneys Odiorne and Keith stated that: (1) they made a decision not to challenge the prosecution's evidence regarding cause of death because, while they objected to the prosecution's presentation of the evidence from the 1991 trial, they believed it was a guilt-innocence phase issue; (2) the defense's strategy was to have Brewer testify, admit his guilt, and express remorse for his offense; and (3) any benefit that might be gained from attacking the evidence establishing cause of death would likely be outweighed by the potential damage to the credibility of the defense. (ECF no. 126-16, at 152 & 156 of 356). In their testimony at the evidentiary hearing held in Brewer's second state habeas proceeding, they echoed and elaborated on the same strategic reasoning. (Second State Habeas Hearing, Volume 2 of 4, at 70, 80-81, 84, 278; Volume 3 of 4, at 124, 135-36).

The state habeas trial court: (1) found as a matter of reasonable trial strategy, Brewer's 2009 trial counsel decided not to challenge the evidence of Laminack's cause of death because doing so was inconsistent with the trial strategy to have Brewer accept responsibility for his actions and admit his guilt; (2) found, in light of the defense's reasonable trial strategy, Brewer's trial counsel were not ineffective for failing to attack Dr. Erdmann's credibility; (3) concluded that, because Dr. Erdmann was cross-examined at the time of his 1991 testimony, there was no viable Confrontation Clause challenge to admission of his 1991 testimony in 2009; (4) found Laminack's autopsy report was not subject to a hearsay objection; (5) found Brewer's 2009 trial counsel did object to the admission of the autopsy report and 1991 trial testimony; (6) found Brewer's 2009 trial counsel were not ineffective for failing to present expert testimony challenging the accuracy of Dr. Erdmann's autopsy report and 1991 trial testimony; (7) found Brewer had failed to show he was prejudiced by his counsels' conduct vis-a-vis evidence of cause of death; and (8) concluded Brewer's state claim 3A failed to satisfy either prong of *Strickland* (Findings of Fact and

Conclusions of Law in Second State Habeas Corpus Proceeding, at 41-45 & 82). The Texas Court of Criminal Appeals adopted these findings and conclusions when it denied Brewer's second state habeas application. *Ex parte Brewer*, WR-46,587-02, 2014 WL 5388114, *1.

### 3. AEDPA Review

The state habeas court's findings and conclusions underlying its rejection on the merits of this ineffective assistance claim are unassailable. The affidavits and state habeas testimony of Brewer's 2009 trial counsel fully supported the state habeas court's factual findings and legal conclusions, as do the records from Brewer's 1991 and 2009 trials.

For the same reasons discussed in Section XII.E. above, the state habeas court reasonably concluded Brewer's 2009 trial counsel adopted an objectively reasonable trial strategy when they advised Brewer to accept responsibility for his offense, take the stand, admit his guilt, express his remorse, and point to his good behavior in prison. The state habeas court also reasonably concluded Brewer was not prejudiced thereby. Attacking Dr. Erdmann's credibility, the accuracy of Laminack's autopsy report, or Dr. Natarajian's 2009 testimony could have greatly undermined the credibility of the defense at Brewer's 2009 retrial. Given that Brewer's and Nystrom's 2009 testimony rendered moot any issue regarding the cause of Laminack's death, Brewer's trial counsel reasonably concluded that attacking the autopsy report, Dr. Erdmann's 1991 testimony, or Dr. Natarajian's 2009 testimony was potentially harmful and unlikely to furnish any tangible benefit.

As explained in Section IX. above, Brewer has failed to allege any specific facts or to present any evidence to either the state habeas court or this Court establishing that Laminack's cause of death was anything other than what Dr. Erdmann and Dr. Natarajian testified, *i.e.*, multiple stab wounds to the neck causing a fatal blood loss.

Brewer complains that his 2009 trial counsel failed to adequately investigate the case and

erroneously advised him to testify in 2009. Had Brewer again chosen to stand mute at his 2009 retrial, however, the jury would have heard all of the same evidence the jury heard in 1991, as well as Nystrom's self-serving account of Laminack's murder. In addition, as explained in Section XII.E. above, absent Brewer's own testimony in 2009, a considerable amount of mitigating evidence that had been presented in 1991 would not have been before the jury in 2009. As attorney Keith explained during his testimony at the state habeas hearing, in 2009 Brewer's mother was no longer an effective witness and Brewer's biological father appeared intent on committing perjury. (Second State Habeas Hearing, Volume 3 of 4, at 142, 156-57). Brewer's testimony was needed in 2009 to furnish a comprehensive overview of Brewer's background and to present considerable mitigating evidence not otherwise available. Under such circumstances, this Court concludes there is no reasonable probability the outcome of Brewer's 2009 trial would have been any different had Brewer not testified.

Brewer complains that his trial counsel failed to move to recuse District Attorney Farren. Brewer does not, however, allege any specific facts or present any evidence showing the identity of the prosecuting attorneys had any impact on the outcome of Brewer's 2009 retrial. This Court concludes after de novo review that Brewer was not prejudiced within the meaning of *Strickland* by his 2009 trial counsels' failure to move to recuse District Attorney Farren.

After de novo review, and for many of the same reasons discussed in Sections IX. and XII.E. above, this Court agrees with the state habeas court that Brewer's complaints regarding his trial counsel's handling of the autopsy report, Dr. Erdmann's 1991 trial testimony, and Dr. Natarajian's 2009 testimony all fail to satisfy both prongs of *Strickland*.

### 4. Conclusions

The state habeas court's rejection on the merits of Brewer's ineffective assistance

complaints about the performance of his 2009 trial counsel vis-a-vis Laminack's autopsy report, Dr. Erdmann's 1991 trial testimony, and Dr. Natarajian's 2009 trial testimony was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Brewer's 1991 and 2009 trials and second state habeas corpus proceeding. Likewise, after de novo review, this Court concludes these ineffective assistance complaints fail to satisfy either prong of *Strickland*. Brewer's claim 2B for federal habeas relief is without merit and does not warrant habeas relief.

### H. Failure to Investigate Brewer's Background & Present Mitigating Evidence

#### 1. The Claim Restated

In his fifth federal habeas claim, Brewer argues that his 2009 trial counsel failed to adequately investigate Brewer's background and present mitigating evidence showing that: (1) Brewer had a family history of substance abuse, mental illness, and violence; (2) Brewer's early childhood was characterized by inadequate nutrition, severe maternal neglect, and instability; (3) Brewer was emotionally abandoned by his step-father; (4) Brewer was traumatized when he was ten-to-twelve years old when a female babysitter molested him; (5) Brewer's biological father Albert had only minor contact with Brewer prior to Brewer reaching age fifteen, but thereafter was abusive and violent toward Brewer; (6) Brewer suffers from mental illness, including severe depression (which had led to multiple instances of suicidal ideation and at least one attempt), and at the time of his capital offense, Brewer was in the midst of an abandonment crisis, decompensating, and suffering major depression, severe anxiety, and dysthymia; (7) a mental health evaluation of Brewer performed after Brewer's 1991 trial revealed that Brewer suffered from all of the foregoing problems during his childhood; and (8) Nystrom was manipulative,

controlling, and responsible for Brewer's actions at the time of their capital offense. (ECF no. 103, 79-108).

## 2. State Court Disposition

Brewer presented an expanded version of this same claim as his fourth claim in his second state habeas corpus application. (Second State Habeas Application, at 225-92).

In their affidavits filed in the state habeas court, Brewer's 2009 trial counsel stated: (1) they reviewed the record from Brewer's first trial and the notes and records of Brewer's prior counsel (trial and state habeas), as well as retaining the services of both a mitigation specialist and an investigator; (2) they made a conscious decision not to call Albert Brewer to testify because they believed he would commit perjury; (3) attorney Keith traveled to Mississippi and met with Brewer's sister Billie Ann on two occasions prior to trial; and (4) Keith also attempted to meet with Brewer's mother, and, when she did not make herself available, he started the process of obtaining a subpoena to ensure her appearance at trial. (ECF no. 126-16, at 152 & 156-57 of 356).

At the evidentiary hearing in Brewer's second state habeas proceeding, attorney Odiorne testified without contradiction that: (1) the only available evidence of Brewer's remorse came from Brewer himself (Second State Habeas Hearing, Volume 2 of 4, at 70, 80-81); (2) the defense's strategy was to show there were opportunities for violence in prison but Brewer had a record of consistently behaving non-violently (*Id.*, at 70, 84); (3) the defense team made the decision not to have Brewer evaluated by a testifying mental health expert because doing so would open Brewer up to evaluation by a prosecution expert (*Id.*, at 98); (4) evidence focusing the jury on Brewer's suicide attempt and underlying depression could have been spun by the prosecution as indicating Brewer was fascinated by death and support a prosecution argument that Brewer's depression reflected his remorse over getting caught rather than for his offense (*Id.*, at 198-202); and (5) the

defense did move for a continuance for the purpose of obtaining more time to develop its mitigation case (*Id.*, at 187).

Attorney Keith testified at the same hearing, also without contradiction, that: (1) the defense's strategy was to show Brewer's behavior in prison was good and that Brewer was remorseful for his offense (*Id.*, at 278, 285); (2) the defense chose not to have a mental health expert like Dr. Edens, Dr. Cunningham, or Dr. Sorenson make a negative prediction about Brewer's future dangerousness because they feared the jury would view such a prediction in the same vein as Dr. Coons' affirmative prediction and "get lost in the science" (Second State Habeas Hearing, Volume 3 of 4, at 26-31, 51, 99-100, 114-17); (3) the defense did not repeat the same trial strategy as Brewer's 1991 trial counsel (*Id.*, at 33); (4) instead, the defense's strategy was to show that Dr. Coons had been wrong in 1991 when he predicted Brewer would behave violently in prison and emphasize Brewer's remorse and record of good behavior in prison (*Id.*, at 33, 124, 135-36, 142-43); (5) instead of attempting to explain in detail to the jury precisely why Dr. Coons' methodology was flawed, they used Dr. Edens to testify that Dr. Coons' methodology was unscientific (*Id.*, at 46); (6) the defense team did not want the jury focusing on risk factors necessary for an accurate prediction of future violence – they wanted the jury to focus on the concrete fact that Brewer had behaved nonviolently throughout his TDCJ incarceration (*Id.*, at 49); (7) the defense wanted to stay away from Albert's Brewer's 1991 trial testimony because they believed it was perjured and they feared Albert would perjure himself if called to testify in 2009 (*Id.*, at 80, 142); (8) the defense wanted to show that Brewer had a good relationship with his sister and had earned a GED while in Big Spring (*Id.*, at 80); (9) the defense did not wish to emphasize Brewer's suicide attempt because doing so could be spun by the prosecution as showing Brewer was intent on taking human life (*Id.*, at 127-28, 130); (10) Dr. Cunningham testified at the Coble

retrial to counter Dr. Coons, but the jury returned a verdict on the capital sentencing special issues authorizing Coble's death penalty (*Id.*, at 132); (11) he did not believe Brewer's jury would be impressed by the admission of scientific articles addressing risk assessments for prison inmates (*Id.*, at 137-38); (12) Brewer's mother's demeanor in 2009 was such that defense counsel were leery of asking her too many questions (*Id.*, at 156-57); and (13) he did not believe Dr. Coons would change his affirmative prediction of future dangerousness if the hypothetical question asked by the prosecution were changed (*Id.*, at 158).

The state habeas court found Brewer's 2009 trial counsel: (1) used an investigator and a mitigation specialist to attempt to secure mitigating evidence, as well as undertaking review of Brewer's 1991 trial transcript, traveling to Mississippi to interview Brewer's family, and reviewing the notes of Brewer's original trial counsel; (2) made a reasonable decision not to call Albert Brewer to testify based on their mitigation investigation, which revealed Albert Brewer would commit perjury if called to testify; (3) presented an extensive case in mitigation, including Brewer's own testimony regarding his life history; (4) presented substantial testimony showing Brewer had been an exemplary inmate; (5) presented evidence showing Brewer had the opportunity to commit acts of violence while incarcerated but had not done so; (6) called Dr. Edens to refute Dr. Coons' opinion regarding future dangerousness and challenge Dr. Coons' methodology; (7) most of the unoffered mitigating evidence identified by Brewer in his second state habeas application was not substantially different from the mitigating evidence Brewer's 2009 trial counsel actually presented; (8) the investigation of Brewer's background and trial strategy for presenting mitigating evidence employed by Brewer's 2009 trial counsel were objectively reasonable; and (9) Brewer failed to show prejudice in connection with his 2009 trial counsels' presentation of mitigating evidence. (Findings of Fact and Conclusions of Law in Second

126

State Habeas Corpus Proceeding, at 48-54). The state habeas court also concluded Brewer's complaints about his 2009 trial counsels' investigation and presentation of mitigating evidence failed to satisfy either prong of *Strickland* (*Id.*, at 85). The Texas Court of Criminal Appeals adopted those findings and conclusions when it denied Brewer's second state habeas corpus application. *Ex parte Brewer*, WR-46,587-02, 2014 WL 5388114, *1.

### 3. Clearly Established Federal Law

Complaints about a trial counsel's failure to investigate the defendant's background and to present available mitigating evidence are quite common. In the context of penalty phase mitigation in capital cases, the Supreme Court has held that it is unreasonable not to investigate further when counsel has information available to him that suggests additional mitigating evidence - such as mental illness or a history of childhood abuse - may be available. *See, e.g., Porter v. McCollum*, 558 U.S. 30, 39-40 (2009) (trial counsel failed to interview any witnesses or to request any of the defendant's school, medical, or military records and ignored information in a report on the defendant's competency evaluation suggesting possible mitigating evidence - including evidence of mental illness - could be gleaned from investigation into the defendant's family background and military service); *Wiggins v. Smith*, 539, U.S. 510, 524-26 (2003) (counsel failed to investigate the defendant's background beyond review of summary records from competency evaluation, presentence report, and records from the state foster care system, failed to compile a social history of the defendant, and presented no mitigating evidence concerning the defendant's background); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (counsel failed to conduct even a cursory investigation into the defendant's background that would have shown the defendant's parents had been imprisoned for the criminal neglect of the defendant and his siblings, the defendant had been severely beaten by his father, and had been returned to his parents' custody after they were released

from prison). Such claims are commonly referred to as *Wiggins* claims.

With regard to the prejudice prong of *Strickland*, the Supreme Court held the petitioners in *Wiggins*, *Porter*, and *Williams* were prejudiced by the failure of their trial counsel to fully investigate, develop and present available mitigating evidence. More specifically, the Supreme Court found in *Wiggins* that his trial counsel failed to discover, develop, and present available mitigating evidence showing:

> Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case. Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.

*Wiggins,* 539 U.S. at 253.

In *Porter*, the new mitigating evidence undiscovered and undeveloped by trial counsel included lay and expert testimony showing: (1) Porter routinely witnessed his father beat his mother, one time so severely that she had to go to the hospital and lost a child; (2) Porter's father was violent every weekend and Porter was his father's favorite target, particularly when Porter tried to protect his mother; (3) on one occasion, Porter's father shot at him for coming home late but missed and beat Porter instead; (4) Porter attended classes for slow learners until he left school at age 12 or 13; (5) to escape his horrible family life, Porter enlisted in the Army at age 17 and fought in the Korean War; (6) Porter suffered a gunshot wound to the leg, yet fought heroically through two battles; (7) after the war, Porter suffered dreadful nightmares and would attempt to climb his bedroom walls at night with knives; (8) Porter developed a serious drinking problem and began drinking so heavily that he would get into fights and not remember them at all; (9) Porter suffered from brain damage that could manifest in impulsive, violent behavior; (10) at the time of the capital offense, Porter was substantially impaired in his ability to conform his conduct to the

law and suffered from an extreme mental or emotional disturbance; and (11) Porter had substantial difficulties with reading, writing, and memory. *Porter*, 558 U.S. at 449-51.

Prejudice was established in *Williams* through testimony showing trial counsel failed to discover and develop available mitigating evidence showing: (1) Williams experienced a nightmarish childhood; (2) Williams' parents had been imprisoned for criminal neglect of Williams and his siblings; (3) Williams had been severely beaten by his father, committed to the custody of the social services bureau for two years during his parents' incarceration, and then returned to his parents after they were released from prison; (4) Williams was borderline mentally retarded and did not advance beyond the sixth grade in school; (5) Williams received commendations for helping to crack a prison drug ring and for returning a guard's missing wallet; (6) Williams was among the inmates least likely to act in a violent, dangerous or provocative way; (7) Williams seemed to thrive in a more regimented and structured environment; and (8) Williams earned a carpentry degree while in prison. *Williams,* 529 U.S. at 395-96.

### 4. AEDPA Analysis

Establishing deficient performance under *Strickland* requires more, however, than a mere showing that a criminal defendant's trial counsel could have done more investigation or presented additional mitigating evidence. *See Thomas v. Lumpkin*, 995 F.3d 432, 454 (5th Cir. 2021) ("Our concern is not whether counsel at trial could have done more. This is often, almost always, the case."). Rather the evaluation of trial counsel's performance turns on the objective reasonableness of the scope of said counsel's investigation, which in turn depends to a great extent upon the information furnished to trial counsel by the defendant himself, information furnished by those family members and other individuals who knew the defendant and whom the defendant's defense team interviewed, and the information contained in the defendant's school, medical, employment,

and institutional records obtained by the defense team prior to trial. *See Burger v. Kemp*, 483 U.S. 776, 795 (1987) ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.") (quoting *Strickland*, 466 U.S. at 691)). Moreover, the fact that a particular strategic approach to presenting mitigating evidence ultimately proved unsuccessful does not render it unreasonable. *Thomas*, 995 F.3d at 455 (citing *Strickland*, 466 U.S. at 689).

As explained in Sections I.G.2. and XII.E. above, Brewer's 2009 trial counsel used Brewer's own testimony to present a nearly comprehensive account of Brewer's background. The state habeas court reasonably found that almost all of the "new" mitigating evidence identified by Brewer in his voluminous second state habeas application and its exhibits actually had been presented in one form or another during Brewer's 2009 retrial. Brewer's trial counsel cannot reasonably be faulted for failing to present cumulative mitigating evidence. *Howard*, 959 F.3d at 173; *Norman*, 817 F.3d at 233.

Brewer's 2009 testimony gave a detailed account of his troubled childhood, including the difficulties he experienced growing up in an unstable family environment, unloved by his violent, abusive stepfather and largely ignored by his neglectful mother. Brewer also testified, as had Albert Brewer in 1991, that Brewer had virtually no contact with his biological father until Brewer reached age fifteen. Brewer also testified that his biological father was violent and abusive toward him and his mother, even to the point that Brewer had to violently intercede on one occasion to protect his mother from an assault by his biological father. Brewer's 2009 trial counsel could reasonably have believed that additional testimony emphasizing those aspects of Brewer's

background that showed him to be the product of a violent, abusive, homelife could prove problematic. Failure to present evidence that is double-edged in nature generally lies within the discretion of trial counsel. *See Ayestes v. Davis*, 933 F.3d 384, 392 (5th Cir. 2019) ("this Court has repeatedly denied claims of ineffective assistance of counsel for failure to present 'double edged' evidence where counsel has made an informed decision not to present it." (quoting *Hopkins v. Cockrell* 325 F.3d 579, 586 (5th Cir. 2003)), *cert. denied*, 140 S. Ct. 1107 (2020); *Smith v. Davis*, 927 F.3d 313, 337 (5th Cir. 2019) (defense counsel acted reasonably in choosing not to present mental health evidence because doing so could have opened the door to evidence showing the defendant displayed antisocial personality disorder and had confessed to feigning mental illness while incarcerated), *cert. denied*, 140 S. Ct. 1299 (2020).

Likewise, the state habeas court reasonably concluded Brewer's 2009 trial counsel acted reasonably when they chose not to have Brewer evaluated by a *testifying* mental health expert. As explained in Section XII.F.3. above, doing so would have opened Brewer up to evaluation by a prosecution mental health expert. *Cheever*, 571 U.S. at 94. It could also have opened a potential Pandora's box of possibly harmful consequences. *Smith*, 927 F.3d at 337. In addition, Brewer's 2009 trial counsel could reasonably have concluded that pursuing the same strategic approach that had proven unsuccessful at the 2008 retrial in Coble (*i.e.*, using a defense expert to unsuccessfully attack the admissibility of Dr. Coons' opinion in a pretrial hearing and then calling a mental health expert (Dr. Cunningham) to render an opposing opinion on future dangerousness) was less efficacious than having Dr. Edens challenge Dr. Coons' methodology *after* Dr. Coons had testified.

In 2008, the defense strategy at Coble's retrial had failed to exclude Dr. Coons' opinion and ultimately resulted in the return of a second death sentence for Coble. Brewer's 2009 trial counsel cannot reasonably be faulted for choosing an alternative, objectively reasonable, trial

strategy, *i.e.*, one which used the defense expert to attack Dr. Coons' methodology and eschewed using a defense expert to present a differing opinion as to future dangerousness. As explained in Section XII.F. above, as of 2009, Dr. Coons' opinion as to future dangerousness had never been ruled inadmissible by any Texas trial or appellate court. It was therefore reasonable for Brewer's trial counsel to expect Dr. Coons' opinion would be admitted at Brewer's retrial, just as it had been in 1991.

Brewer's 2009 trial counsel had a very compelling argument as to future dangerousness and strong evidence supporting same at their disposal: testimony from multiple jail and prison officials establishing Brewer's nearly two decades of good behavior in TDCJ and jail custody. Attempting to focus the jury on that concrete fact, rather than offering a controverting expert opinion on future dangerousness, was eminently reasonable.

The state habeas court reasonably concluded there was no reasonable probability that, but for the failure of Brewer's 2009 trial counsel to present the legitimately new mitigating evidence Brewer identified in his second state habeas application (*e.g.*, Brewer's evidence that he was fondled by a teenage babysitter when Brewer was ten or twelve years old), the outcome of Brewer's retrial would have been any different. The thrust of the defense's evidence and argument at Brewer's retrial was focusing the jury's attention on Brewer's excellent behavior *as an adult* in TDCJ custody. Brewer's 2009 trial counsel could reasonably have believed testimony detailing Brewer's childhood molestation would detract from the thrust of their defensive strategy.

Furthermore, there was evidence in the trial record that tended to show Brewer had not suffered any long-lasting negative effects from his fondling incident. Brewer's educational records showed he had an IQ of 115. (22/28 R.R. 154). Prosecution witness Bryant testified, without contradiction, that Brewer's TDCJ medical records showed, despite Brewer's 2007 suicide

attempt, there was no indication Brewer had ever been evaluated or treated for any mental health problems during his incarceration – all of his contacts with TDCJ mental health professionals had been limited to routine mental health screenings. (23/28 R.R. 105-10).

After de novo review of the entire record from Brewer's trial, direct appeals, state habeas corpus proceedings, and Brewer's pleadings in his federal habeas corpus proceeding, this Court concludes there is no reasonable probability that, but for the failure of Brewer's 2009 trial counsel to present any of Brewer's legitimately new mitigating evidence, the outcome of his retrial would have been any different. As explained in Section I.G. above, Brewer's and Nystrom's 2009 testimony was graphic and grisly, as were the crime scene photographs and videos. As explained in Section XII.F.3. above, Brewer's and Nystrom's testimony established they assaulted Laminack without warning *before* either of them asked him to turn over his wallet or keys. They agreed they later walked away from the crime scene with Laminack's keys in their possession, even though their goal and plan on the evening in question had been to obtain the use of a vehicle. There was testimony from multiple witnesses describing Brewer as having smirked or giggled when describing Laminack begging for his life. There was also a photograph showing Brewer shooting the finger at a photographer while being escorted from the courthouse prior to his initial trial. In addition, Brewer's 2009 jury had the firsthand opportunity to evaluate the credibility of Brewer's expressions of remorse and contrition for his offense.

Despite the considerable efforts of Brewer's 2009 trial counsel to refute Dr. Coons' opinion on future dangerousness, and despite Brewer's repeated insistence during his testimony that he was remorseful and sincerely contrite, the jury answered all of the capital sentencing special issues favorably to the prosecution. Under such circumstances, this Court concludes there is no reasonable probability that a different outcome would have resulted had Brewer's 2009 trial

counsel presented all of the testimony and other new evidence Brewer has identified in his current federal pleadings. The state habeas court reasonably concluded Brewer's new mitigating evidence added very little of substance to the case in mitigation actually presented at his 2009 retrial. Most certainly, the "new" mitigating evidence identified by Brewer pales in comparison to the compelling yet unpresented mitigating evidence in *Porter*, *Williams*, and *Wiggins*.

### 5. Conclusions

The state habeas court's rejection on the merits of Brewer's *Wiggins* claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Brewer's 1991 and 2009 trials and second state habeas corpus proceeding. Likewise, after de novo review, this Court concludes these ineffective assistance claim fails to satisfy either prong of *Strickland*. Brewer's fifth claim for federal habeas relief is without merit and does not warrant habeas relief.

### XIII.    INEFFECTIVE ASSISTANCE BY APPELLATE COUNSEL

#### A. Overview of the Claims

In his third, eighth, and tenth claims for federal habeas relief, Brewer complains that his state appellate counsel rendered ineffective assistance by failing to raise points of error on direct appeal complaining of: (1) the state trial court's allegedly erroneous admission in 2009 of the trial transcript and exhibits from Brewer's 1991 trial; (2) the allegedly false testimony of prosecution witnesses A.P. Merillat and Stephen Bryant; and (3) the unconstitutionality of various provisions within the Texas capital sentencing statute. (ECF no. 103, at 59-63, 114-19, 120-24).

#### B. Clearly Established Federal Law

The same two-pronged standard for evaluating ineffective assistance claims against trial

counsel announced in *Strickland* applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins*, 528 U. S. 259, 285 (2000) (holding a petitioner arguing ineffective assistance by his appellate counsel must establish both his appellate counsel's performance was objectively unreasonable and there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal). Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into whether appellate counsel's performance was deficient, *i.e.*, whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and whether appellate counsel's allegedly deficient performance "prejudiced" the petitioner, *i.e.*, whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of the petitioner's appeal would have been different. *Smith v. Robbins*, 528 U. S. at 285. Appellate counsel who files a merits brief need not and should not raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal. *Smith v. Robbins*, 528 U. S. at 288; *Jones v. Barnes*, 463 U. S. 745, 751 (1983). The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U. S. 527, 536 (1986); *Jones v. Barnes*, 463 U. S. at 751-52.

Where, as in Brewer's case, appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more nonfrivolous grounds for relief on appeal and did not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy *both* prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores-Ortega*, 528 U. S. 470, 477, 482 (2000) (holding the dual prongs of *Strickland* apply to complaints of ineffective appellate counsel and recognizing, in cases involving "attorney error," the defendant must show prejudice); *Smith v. Robbins*, 528 U.S. at 287-89

(holding petitioner who argued his appellate counsel rendered ineffective assistance by failing to file a merits brief must satisfy both prongs of *Strickland*).

### C. Failure to Challenge Admission of 1991 Trial Testimony & Exhibits

#### 1. The Claim Restated

In his third claim for federal habeas relief, Brewer argues that his state appellate counsel should have raised a point of error on direct appeal complaining about the state trial court's wholesale admission in 2009 of the testimony and exhibits from Brewer's 1991 capital murder trial and arguing that action violated Brewer's Confrontation Clause rights. (ECF no. 103, 59-63).

#### 2. State Court Disposition

In claims 9A and 9B in his second state habeas corpus application, Brewer complained that his state appellate counsel rendered ineffective assistance by failing to raise points of error complaining about the trial court's (1) denial of Brewer's motion to preclude the prosecution's expected use in 2009 of the 1991 trial transcript, and (2) overruling of Brewer's objections to the admission of the 1991 trial transcript and exhibits. (Second State Habeas Application, 345-55).

The state habeas trial court found: (1) the facts and circumstances of Brewer's capital offense were relevant to the jury's assessment of punishment; (2) the exhibits and trial transcript from the original trial were relevant to the jury's assessment of punishment and did not violate the Confrontation Clause; (3) the retendered evidence from the initial trial had been reviewed by the state appellate court and withstood scrutiny; (4) the retendered evidence had been subject to objections and cross-examination at the guilt-innocence phase of the original trial; (5) Brewer's state appellate counsel did not render ineffective assistance by failing to challenge the trial court's (a) denial of Brewer's motion to preclude the expected use of the 1991 trial transcripts and exhibits, or (b) overruling of Brewer's objections to the prosecution's exhibits from the prior trial; and (6)

the state trial court took judicial notice of Brewer's capital murder conviction and so informed the jury in 2009. (Findings of Fact and Conclusions of Law in Second State Habeas Corpus Proceeding, at 66-67). The state habeas trial court also concluded: (1) in 2009, the state trial court did not have jurisdiction to address the admissibility of the prior trial's exhibits and transcript; (2) Brewer failed to establish a lack of relevancy regarding evidence describing the facts and circumstances of his capital offense; (3) Brewer failed to establish admission of the transcript and exhibits violated the Confrontation Clause; and (4) Brewer's ninth grounds for state habeas relief failed to establish either prong of *Strickland*. (*Id.*, at 95-96). The state habeas court also concluded the admission of Dr. Natarajian's opinion testimony did not violate Confrontation Clause principles. (*Id.*, at 82). The Texas Court of Criminal Appeals adopted those findings and conclusions when it denied Brewer's second state habeas corpus application. *Ex parte Brewer*, WR-46,587-02, 2014 WL 5388114, *1.

### 3. AEDPA Review

The state habeas court concluded that, as a matter of state evidentiary principles, the exhibits and trial transcripts from Brewer's 1991 trial were relevant to the jury's assessment of punishment. (Findings of Fact and Conclusions of Law in Second State Habeas Corpus Proceeding, at 66). The Texas Court of Criminal Appeals' conclusion on this matter of state evidentiary law is binding on this federal habeas court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013) (holding a Texas habeas court's interpretation of evidentiary rules was binding in a federal habeas case); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009) (a state court's interpretation of state law binds a federal court

sitting in habeas corpus). Thus, there was no arguable legal basis for excluding evidence relating to the facts and circumstances of Laminack's murder from the jury at Brewer's 2009 retrial.

At the time Brewer's state appellate counsel was preparing Brewer's second direct appeal brief, it was clear under both clearly established federal and state law that violations of the Confrontation Clause were subject to harmless error analysis. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis); *Smith v. State*, 297 S.W.3d 260, 277 (Tex. Crim. App. 2009) (finding erroneous admission at the punishment phase of a capital murder trial of the defendant's TDCJ disciplinary records violated the Confrontation Clause but concluding the error was harmless); *Clay v. State*, 240 S.W.3d 895, 902 n.9 (Tex. Crim. App. 2007) (a violation of the Confrontation Clause is subject to harmless error analysis) (citing *Van Arsdall*, 475 U.S. at 684)). As the Supreme Court explained in *Van Arsdall*, the Constitution entitles a criminal defendant to a fair trial not a perfect one. 475 U.S. at 681.

Brewer's Confrontation Clause argument, underlying his third claim for federal habeas relief, ignores the fact that in 2009 the prosecution did far more than merely admit the trial testimony of prosecution witnesses from the 1991 trial. As explained in Section I.G.1. above, the prosecution presented live testimony in 2009 from a variety of witnesses *subject to cross-examination* covering much of the same evidence presented during the guilt-innocence and punishment phases of Brewer's 1991 trial. For example, a Randall County sheriff's deputy authenticated crime scene photographs and a diagram of the crime scene. (21/28 R.R. 83-103). The young woman whom Nystrom and Brewer attempted to rob of her vehicle testified about her encounter with them shortly before Laminack's murder. (21/28 R.R. 105-18). Laminack's wife

and daughter testified again about their interactions with Laminack on the night of his murder. (21/28 R.R. 58-81, 119-43, 247). The same prosecution blood spatter expert who testified at Brewer's 1991 trial repeated his testimony regarding his interpretation of the patterns he observed inside Laminack's vehicle. (21/28 R.R. 146-245). One of Brewer's roommates at the time of the murder again testified about what she observed Nystrom and Brewer do and say on the evening of the murder. (21/28 R.R. 248-88). The same photographer who authenticated his photo of Brewer shooting the finger while being escorted from court prior to the 1991 trial did so again. (22/28 R.R. 60-64). Brewer's acquaintance Stephen "Skee" Callen again testified that Nystrom told him they had killed a man for $140 and Brewer smirked and giggled when he described Laminack begging for his life. (22/28 R.R. 67-74). A former Randall County jail inmate again testified that Brewer also recounted to him how Laminack had begged for his life as Brewer stabbed him. (22/28 R.R. 91-125). Brewer's former high school girlfriend again testified that Brewer threatened her on multiple occasions after she broke up with him and he shoved her against a bank of lockers, causing her to suffer a significant back injury. (22/28 R.R. 75-88). A Florida law enforcement officer again testified regarding his arrest of Brewer for carrying a concealed weapon. (22/28 R.R. 230-40).

Dr. Natarajian testified *subject to cross-examination* about his conclusions regarding Laminack's cause of death. (23/28 R.R. 19-66). While Dr. Natarajian testified that he had reviewed Dr. Erdmann's 1991 testimony and Laminack's autopsy report, he also testified that he had reviewed the autopsy photographs and crime scene photographs in formulating his own opinion. More importantly, at no point did Dr. Natarajian recite from or read into the record any portion of Laminack's autopsy report or Dr. Erdmann's 1991 trial testimony. The state habeas court concluded Dr. Natarajian's opinion testimony as to Laminack's cause of death was admissible under Texas evidentiary rules and did not violate the Confrontation Clause. (Findings of Fact and

Conclusions of Law in Second State Habeas Corpus Proceeding, at 82). Moreover, as explained in Sections IX. and XII.G. above, at Brewer's 2009 retrial there was no genuine dispute as to the cause of Laminack's death. There still is none. Nystrom and Brewer both testified without contradiction that Laminack bled profusely after Brewer stabbed him in the neck and Laminack was totally incapacitated by time they left the crime scene. It did not require a medical degree, or the assistance of an expert opinion, to help the jurors to review the crime scene photographs, recall the testimony of Brewer and Nystrom, and conclude Laminack's cause of death was massive blood loss. Likewise, as explained in Section XII.G. above, contesting the cause of Laminack's death was not a matter Brewer's 2009 trial counsel wished to pursue; doing so conflicted with their reasonable trial strategy of having Brewer admit his guilt, accept responsibility for his offense, express remorse, and point to his good behavior in prison.

Prosecution witnesses A.P. Merillat, Stephen Bryant, and Dr. Richard E. Coons all testified in 2009 *subject to cross-examination* in the manner discussed at length in Sections I.G.1., VIII., XII.C., and XII.F. above. Finally, Kristie Nystrom testified in 2009 *subject to cross-examination* about Brewer's fatal stabbing of Laminack. (22/28 R.R. 168-225).

The only testimony from Brewer's 1991 capital murder trial that was read into the record in the presence of the jury in 2009 consisted of the testimony of (1) a Mississippi law enforcement officer concerning the incident in which Brewer beat his biological father while breaking up a fight between his parents (22/28 R.R. 40-59), and (2) a Cedar Hill ISD administrator concerning Brewer's educational and disciplinary records from middle school (22/28 R.R. 136-53). When he testified, Brewer did not controvert or contradict any of the evidence the prosecution presented through the 1991 testimony of either of those two witnesses.

Brewer's state appellate counsel could reasonably have reviewed the record from Brewer's

140

2009 trial and concluded that any error committed by the state trial court in its wholesale admission of the trial transcript and exhibits from Brewer's 1991 trial was harmless under the applicable *Chapman* standard:

> Whether such an error is harmless in a particular case depends on a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall*, 475 U.S. at 684.

The admission of the 1991 trial transcript and exhibits resulted in largely cumulative evidence being before Brewer's 2009 jury. All of the crime scene photographic and video evidence introduced during the 1991 trial were again authenticated in the jury's presence during the 2009 trial. All of the relevant prosecution witnesses from Brewer's 1991 trial testified again, subject to cross-examination, at his 2009 trial. The admission of the 1991 trial testimony of prosecution witness Richard Lepicher (the Mississippi law enforcement officer who arrived at the Brewer residence the night Brewer beat his father Albert with a broom) was wholly consistent with Brewer's own 2009 testimony about both that incident and Albert's alcoholism and propensity for violence. (25/28 R.R. 60-62, 115, 188-26). Likewise, when he testified in 2009, Brewer admitted that he had twice been disciplined in middle school and one of those incidents involved him pointing a buck knife at a fellow student. (25/28 R.R. 50, 113-14). This corroborated the 1991 testimony of a then-unavailable Cedar Hill ISD administrator read into the record in 2009. Under such circumstances, Brewer's state appellate counsel could reasonably have believed that a point of error on direct appeal raising a Confrontation Clause challenge to the state trial court's admission of the transcript and exhibits from Brewer's 1991 trial would have been rejected on harmless error grounds.

Because the prosecution made a showing that the two witnesses whose 1991 testimony was read before the jury in 2009 were both unavailable and had been subject to cross-examination when they testified in 1991, no Confrontation Clause error arose from the admission of their prior testimony. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009) (the Confrontation Clause requires that a witness against a criminal defendant appear at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination); *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004) (Confrontation Clause requires that testimonial statements of a witness who does not appear at trial are inadmissible absent a showing the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination). Likewise, Brewer's complaint about the admission of the 1991 testimony of Dr. Erdmann, which was not read or quoted to the jury in 2009, did not violate Confrontation Clause principles. The parties appear to have agreed during Brewer's second state habeas proceeding that Dr. Erdmann was unavailable in 2009 and the trial transcript clearly reveals he had been subject to cross-examination by Brewer's 1991 trial counsel. (16/21 R.R. 387-88).

Brewer's state appellate counsel could reasonably have believed that the points of error actually included in Brewer's second direct appeal brief challenging (1) the state trial court's admission of Nystrom's testimony regarding her parole eligibility, (2) the trial court's response to the jury's notes regarding parole, and (3) the trial court's admission of Dr. Coons' opinion testimony were plainly stronger than Brewer's proposed Confrontation Clause claim. *See Davila v. Davis*, 137 S. Ct. at 2067 (declining to raise a claim on appeal is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court); *Smith v. Robbins*, 528 U.S. at 288 (to prove ineffective assistance on appeal for failure to raise a claim in a merits brief, a petitioner must show that a particular omitted nonfrivolous issue was clearly

142

stronger than issues that appellate counsel did present); *Medellin v. Dretke*, 371 F.43d 270, 279 (5th Cir. 2004) (failure of appellate counsel to raise a meritless *Batson* claim on direct appeal was not ineffective assistance).

After de novo review, this Court independently concludes there is no reasonable probability that, but for the failure of Brewer's second state appellate counsel to present a Confrontation Clause challenge to the 2009 state trial court's admission of the 1991 trial testimony and exhibits, the outcome of Brewer's second direct appeal would have been any different. In all reasonable likelihood, the state appellate court would have concluded any error in the summary admission of the trial record from 1991 was harmless at best. The prosecution presented all but a handful of witnesses in 2009 whose testimony were included in the 1991 trial records. In Brewer's first direct appeal, the state appellate court found no evidentiary error in the admission of any of the exhibits from Brewer's 1991 trial that were later re-admitted during Brewer's 2009 retrial. The vast majority of those exhibits merely gave context to the criminal charge against Brewer for which he had already been convicted. Nothing in this Court's previous judgment granting Brewer federal habeas relief as to his sentence in anyway reversed, vacated, or otherwise abrogated his conviction for capital murder.

Brewer's reliance in his reply brief on the Supreme Court's holding in *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), is unpersuasive. Brewer argues *Bullcoming* addressed the issue of whether admission of Laminack's autopsy report in 2009 violated the Confrontation Clause in the absence of live testimony from Dr. Erdmann. As the Fifth Circuit and at least one Supreme Court Justice have noted, however, *Bullcoming* did not clearly establish a rule that the *only* person who can authenticate a forensic report is the scientist who prepared the report. *See Grim v. Fisher*, 816 F.3d 296, 307-10 (5th Cir. 2016) (discussing the limited nature of the holding in *Bullcoming*);

*Williams v. Illinois*, 567 U.S. 50, 92-98 (2012) (Breyer, concurring) (noting the ambiguity that exists after *Bullcoming* regarding who can authenticate a forensic report). Moreover, Brewer's state appellate counsel cannot reasonably be faulted for failing to present a Confrontation Clause point of error premised upon the Supreme Court's holding in *Bullcoming*. The Supreme Court handed down its opinion in *Bullcoming* on June 23, 2011. Brewer's second state appellate brief was filed three months earlier, on March 23, 2011. Clairvoyance is not a required attribute of effective assistance. *Fields*, 565 F.3d at 295; *Sharp*, 107 F.3d at 289 n.28.

### 4. Conclusions

The Texas Court of Criminal Appeals' rejection on the merits during the course of Brewer's second state habeas corpus proceeding of Brewer's ineffective assistance complaint about his state appellate counsel's failure to assert a Confrontation Clause challenge to the admission of Brewer's 1991 trial testimony and exhibits during his 2009 retrial was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Brewer's 1991 and 2009 trials, second direct appeal, and second state habeas corpus proceeding. Likewise, after de novo review, this Court concludes this ineffective assistance claim fails to satisfy either prong of *Strickland*. Brewer's third claim for federal habeas relief is without merit and does not warrant habeas relief.

### D. Failure to Challenge Alleged Factual Errors in Merillat's & Bryant's Testimony

### 1. The Claim Restated

In the final portion of his eighth claim for federal habeas relief, Brewer argues that his state appellate counsel rendered ineffective assistance by failing to raise a point of error on direct appeal

challenging the allegedly false testimony of A.P. Merillat and Stephen Bryant at Brewer's 2009 retrial. (ECF no. 103, at 114-19).

### 2. State Court Disposition

Brewer presented a similar ineffective assistance complaint as claim 2D in his second state habeas application. (Second State Habeas Application, at 166-70). The state habeas trial court found: (1) no objections were raised at trial to allegedly false testimony by Merillat; (2) therefore, nothing was preserved for state appellate review; (3) the ineffective assistance arguments against Brewer's trial counsel urged by Brewer in conjunction with this claim were better raised in a state habeas proceeding than on direct appeal; and (4) this complaint failed to satisfy either prong of *Strickland*. (Findings of Fact and Conclusions of Law in Second State Habeas Corpus Proceeding, 39-40). The state habeas court also concluded this ineffective assistance complaint failed to satisfy either prong of *Strickland*. (*Id.*, 80-81). The Texas Court of Criminal Appeals adopted these findings and conclusions when it denied Brewer's second state habeas corpus application. *Ex parte Brewer*, WR-46,587-02, 2014 WL 5388114, *1.

### 3. AEDPA Review

For the reasons discussed at length in Sections VIII. and XII.C. above, the state habeas court reasonably concluded there was nothing factually inaccurate or misleading in Merillat's or Bryant's 2009 testimony regarding the conditions of confinement within TDCJ. Brewer's 2009 trial counsel did not attack the credibility of these two prosecution witnesses because they planned to use their expert testimony on cross-examination to assist the defense in building its case for a negative jury verdict on the future dangerousness special issue. This is precisely what happened. Both Merillat and Bryant gave testimony on cross-examination that benefitted the defense's theory that opportunities exist on death row for inmates to commit acts of violence but Brewer's

145

disciplinary record over 18 years on death row showed he had been non-violent.

It is undisputed there were no timely defense objections at trial identifying any alleged factual error or misleading aspects in Merillat's or Bryant's 2009 trial testimony. Nor has Brewer alleged any specific facts or presented any evidence showing the prosecution knowingly used any false or misleading testimony by either Merillat or Bryant to obtain Brewer's second death sentence. As explained in Section VIII. above, because Brewer's 2009 trial counsel chose a very different strategy from the one employed in 1991, none of the allegedly inaccurate or misleading testimony by Merillat or Bryant identified by Brewer was material to the outcome of Brewer's 2009 retrial. Failure to raise a meritless claim does not constitute ineffective assistance on appeal. *Medellin*, 371 F.43d at 279 (failure of appellate counsel to raise a meritless *Batson* claim on direct appeal was not ineffective assistance). Thus, the state habeas court reasonably concluded this complaint of ineffective assistance by Brewer's state appellate counsel failed to overcome the presumption of reasonableness afforded counsel and failed to satisfy either prong of *Strickland*.

### 4. Conclusions

The Texas Court of Criminal Appeals' rejection on the merits during the course of Brewer's second state habeas corpus proceeding of Brewer's ineffective assistance complaint about his state appellate counsel's failure to assert a point of error complaining about allegedly factually inaccurate or misleading testimony by prosecution witnesses Merillat and Bryant regarding conditions within TDCJ was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Brewer's 1991 and 2009 trials, second direct appeal, and second state habeas corpus proceeding. Likewise, after de novo review, this Court concludes this

ineffective assistance claim fails to satisfy either prong of *Strickland*. The final portion of Brewer's eighth claim for federal habeas relief is without merit and does not warrant habeas relief.

### E. Failure to Challenge Constitutionality of Texas Capital Sentencing Statute

#### 1. The Claim Restated

In the final portion of his tenth claim for federal habeas relief, Brewer argues his state appellate counsel rendered ineffective assistance by failing to raise points of error on direct appeal challenging the constitutionality of various aspects of the Texas capital sentencing statute. (ECF no. 103, 120-24).

#### 2. State Court Disposition

In his eighth and eleventh through sixteenth claims in his second state habeas application, Brewer argued that his state appellate counsel rendered ineffective assistance by failing to assert a wide variety of constitutional challenges to the Texas capital sentencing statute, *i.e.*, Art. 37.0711 of the Texas Code of Criminal Procedure. (Second State Habeas Application, at 316-45, 360-95).

The state habeas court: (1) found the issues raised by these complaints were all purely legal in nature; (2) concluded all of Brewer's constitutional challenges were without merit because the Texas Court of Criminal Appeals had routinely and regularly rejected those same legal arguments; and (3) concluded his state appellate counsel had not rendered ineffective assistance in failing to raise those same meritless claims on direct appeal. (Findings of Fact and Conclusions of Law in Second State Habeas Corpus Proceeding, at 63-65 & 89-95). The Texas Court of Criminal Appeals adopted these findings and conclusions when it denied Brewer's second state habeas corpus application. *Ex parte Brewer*, WR-46,587-02, 2014 WL 5388114, *1.

#### 3. AEDPA Review

For the reasons explained in detail in Section V. above, all of Brewer's constitutional

challenges to the Texas capital sentencing statute are legally frivolous. Furthermore, as accurately noted by the state habeas court in its conclusions rejecting Brewer's complaints of ineffective appellate counsel, by the time Brewer's state appellate counsel prepared Brewer's second direct appeal brief, the Texas Court of Criminal Appeals had rejected each of Brewer's constitutional challenges to the Texas capital sentencing statute on multiple occasions. *See, e.g., Russeau v. State*, 171 S.W.3d 871, 886-87 (Tex. Crim. App. 2005) (rejecting arguments attacking the Texas ten/twelve rule, suggesting *Ring* requires inclusion of aggravating circumstances in an indictment, attacking the absence of a burden of proof on the mitigation special issue, attacking the statute's failure to inform the jury of the consequences of a lone holdout juror, attacking failure of state appellate courts to do sufficiency of evidence review on mitigation special issue, and alleging the failure of the statute to provide for uniform statewide application); *Lucero v. State*, 246 S.W.3d 86, 96 (Tex. Crim. App. 2008) (rejecting challenge to statutory definition of mitigating evidence); *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009) (rejecting challenges to mitigation special issue as open-ended, mitigation special issue's lack of burden of proof, alleged absence of "meaningful appellate review," statutory definition of mitigating evidence, and twelve/ten rule).

The state habeas court reasonably concluded the failure of Brewer's state appellate counsel to raise Brewer's challenges to the constitutionality of the Texas capital sentencing statute was neither deficient performance nor prejudicial within the meaning of *Strickland*. *See Broadnax v. Lumpkin*, 987 F.3d 400, 415 (5th Cir. 2021) (failure of appellate counsel to raise a meritless claim was not ineffective assistance); *Nelson v. Davis*, 952 F.3d 651, 678 (5th Cir. 2020) (failure to raise a meritless argument cannot be the basis for an ineffective assistance claim because there is no possibility the defendant was prejudiced thereby).

### 4. Conclusions

The Texas Court of Criminal Appeals' rejection on the merits during Brewer's second state habeas proceeding of Brewer's complaints that his state appellate counsel failed to assert a variety of constitutional challenges to the Texas capital sentencing statute was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Brewer's 1991 and 2009 trials, second direct appeal, and second state habeas corpus proceeding. Likewise, after de novo review, this Court concludes this ineffective assistance claim fails to satisfy either prong of *Strickland*. The final portion of Brewer's tenth claim for federal habeas relief is without merit and does not warrant habeas relief.

### XIV.   <u>CUMULATIVE ERROR</u>

### 1. The Claim

In his ninth claim for federal habeas relief, Brewer argues the cumulative impact of his 2009 trial counsels' ineffective assistance, his state appellate counsel's ineffective assistance, and errors committed by the state trial court violated his constitutional rights. (ECF no. 103, at 119).

### 2. Lack of Exhaustion

Brewer did not fairly present his cumulative error claim to the state courts, either on direct appeal or in his second or third state habeas corpus applications.

### 3. *De Novo* Review

It is well-settled in this Circuit that the cumulative error doctrine requires a showing that constitutional error occurred during the defendant's state court trial. *See Young v. Stephens*, 795 F.3d 484, 494 (5th Cir. 2015) (noting petitioner's failure to demonstrate any constitutional error

committed during his trial, as required to satisfy the cumulative error doctrine (citing *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007))); *Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007) (federal habeas relief is only available for cumulative errors that are of a constitutional dimension); *Miller v. Johnson*, 200 F.3d 274, 286 n.6 (5th Cir. 2000) (absent constitutional error, there is nothing to cumulate); *Jackson v. Johnson*, 194 F.3d 641, 659 n.59 (5th Cir. 1999) (cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness (citing *Spence v. Johnson*, 80 F.3d 989, 1000 (5th Cir. 1996)); *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where: (1) the individual errors involved matters of constitutional dimension other than violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process" (quoting *Cupp v. Naighten*, 414 U.S. 141, 147 (1973)).

For the reasons discussed at length in Sections XII. and XIII. above, all of Brewer's complaints about the performance of his trial and state appellate counsel fail to satisfy either prong of *Strickland*. For the reasons discussed at length in Sections III. through XI. above, all of Brewer's *Brady*, *Giglio/Napue*, and other substantive constitutional claims lack arguable merit - some border on the frivolous. Thus, under the cumulative error doctrine recognized in this Circuit, there is nothing for this Court to cumulate.

### 4. Conclusion

Brewer's conclusory cumulative error claim is without arguable merit. His ninth claim for federal habeas relief does not warrant federal habeas relief.

## XV.    REQUEST FOR EVIDENTIARY HEARING

Brewer requests that this Court afford him an evidentiary hearing. (ECF no. 103, 128). Insofar as Brewer's claims in this federal habeas corpus proceeding were disposed of on the merits during the course of his direct appeal or state habeas corpus proceedings, he is not entitled to a federal evidentiary hearing to develop new evidence attacking the state appellate or state habeas court's resolution of his claims. Under AEDPA, the proper place for development of the facts supporting a federal habeas claim is the state court. *See Harrington*, 562 U. S. at 103 ("Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding."); *Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (holding AEDPA clearly places the burden on a federal habeas petitioner to raise and litigate as fully as possible his federal claims in state court). Where a petitioner's claims have been rejected on the merits, further factual development in federal court is effectively precluded by virtue of the Supreme Court's holding in *Cullen v. Pinholster*, 563 U. S. 170, 181-82 (2011):

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.

Thus, Brewer is not entitled to a federal evidentiary hearing on any of his claims that were rejected on the merits by the state courts, either on direct appeal or during his state habeas corpus proceedings. *See Halprin v. Davis*, 911 F.3d 247, 255 (5th Cir. 2018) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." (quoting *Cullen*, 563 U.S. at 185)), *cert. denied*, 140 S. Ct. 167 (2019).

With regard to the new factual allegations, new evidence, and new legal arguments Brewer presents to this Court (or which Brewer presented to the state courts only in his third state habeas application that was summarily dismissed by the Texas Court of Criminal Appeals) for which this Court has undertaken de novo review, he is likewise not entitled to an evidentiary hearing. In the course of conducting de novo review of his claims that were not disposed of on the merits by the TCCA, except for those assertions that are refuted by the state courts records now before this Court, this Court has assumed the factual accuracy of (1) all the specific facts alleged by Brewer in support of his claims for relief, and (2) the documents he has presented in support of his claims that were unadjudicated on the merits in the state court. Even when the truth of all of Brewer's new factual allegations supporting his unadjudicated claims is assumed, his claims do not warrant federal habeas relief. *See Schriro v. Landrigan*, 550 U. S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."). Thus, Brewer is not entitled to an evidentiary hearing in this Court with regard to any of his claims which the TCCA did not reject on the merits.

## XVI.  CERTIFICATE OF APPEALABILITY

Under AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under § 2254, the petitioner must obtain a Certificate of Appealability ("CoA"). *Miller-El v. Johnson*, 537 U.S. 322, 335-36 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of appellate review of denial of a habeas petition limited to the

issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted. *Crutcher*, 301 F.3d at 658 n.10; 28 U.S.C. § 2253(c)(3).

A CoA will not be granted unless a petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard*, 542 U.S. at 282; *Miller-El*, 537 U.S. at 336. This Court is required to issue or deny a CoA when it enters a final Order, such as this one, adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484). In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484 (holding when a district court denies a

habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct). This Court did not dispose of any of Brewer's federal habeas corpus claims on procedural grounds. This Court addressed the merits of all of Brewer's claims.

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Thompson v. Davis*, 916 F.3d 444, 453 (5th Cir. 2019); *Halprin*, 911 F.3d at 255. Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Miller-El*, 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."). The deferential standard of review applied to claims of ineffective assistance adjudicated on the merits in the state courts has particular bite in evaluating the appealability of ineffective assistance claims—the Supreme Court requires that federal courts "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt,* 571 U.S. at 15.

Reasonable minds could not disagree with this Court's conclusions that: (1) all of Brewer's complaints of ineffective assistance by his 2009 trial counsel and state appellate counsel fail to satisfy both prongs of *Strickland*; (2) the TCCA reasonably rejected Brewer's *Brady* and *Giglio/Napue* claims; (3) the TCCA reasonably rejected Brewer's constitutional challenges to the state trial court's admission of Dr. Natarajian's 2009 testimony, as well as Brewer's constitutional challenges to the admission of the trial transcript and exhibits from his 1991 trial; (4) Brewer's challenges to the constitutionality of the Texas capital sentencing statute and capital sentencing special issues are legally frivolous; (5) all of Brewer's *Brady* claims fail to satisfy the materiality prong of *Brady* analysis; (6) all of Brewer's *Giglio/Napue* claims fail to satisfy the materiality

prong of *Giglio/Napue* analysis; (7) the TCCA reasonably rejected on the merits all of Brewer's complaints about the state trial court's rulings on Brewer's challenges for cause, including Brewer's claim that venire member R\_\_\_ M\_\_\_ possessed disqualifying bias; and (8) Brewer is not entitled to an evidentiary hearing in this Court.

## XVII.  RECOMMENDATION

For the foregoing reasons it is the recommendation of the undersigned Magistrate Judge that: (1) all relief requested in Brewer's second amended federal habeas corpus petition (ECF no. 103), as supplemented by his reply brief (ECF no. 128), be **DENIED**; (2) Brewer's request for an evidentiary hearing be **DENIED;** and (3) Brewer be **DENIED** a Certificate of Appealability with regard to all of his claims for relief.

## XVIII. INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of these Findings, Conclusions and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED September 30, 2021.

LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE

## \* NOTICE OF RIGHT TO OBJECT \*

Any party may object to these proposed findings, conclusions and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the

Findings, Conclusions and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge and accepted by the district court. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen,* 857 F.2d 275, 276–77 (5th Cir. 1988).