

NORTHERN DISTRICT OF TEXAS
FILED

FEB – 8 2022

CLERK, U.S. DISTRICT COURT
By_____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

BRENT RAY BREWER,        §
       §
       Petitioner,        §
       §
v.        §        2:15-CV-050-Z-BR
       §
DIRECTOR, TDCJ-CID,        §
       §
       Respondent.        §

## ORDER

On September 30, 2021, the United States Magistrate Judge entered a Findings, Conclusions, and Recommendation ("FCR") that denied Petitioner Brent Ray Brewer's ("Petitioner") Second Amended Petition for Writ of Habeas Corpus and a Certificate of Appealability. *See* ECF Nos. 103, 131. Petitioner and Respondent Texas Department of Criminal Justice ("TDCJ") Director ("Respondent") objected to the FCR. *See* ECF Nos. 138, 139. After an independent review of the pleadings, files, records, and objections, the Court **OVERRULES** Petitioner's and Respondent's objections. The Court **ADOPTS** the Magistrate Judge's FCR. The Court **DENIES** the Second Amended Petition for Writ of Habeas Corpus, the request for an evidentiary hearing, and a Certificate of Appealability.

### BACKGROUND

Petitioner's "future dangerousness" is the root of his petition to this Court. Petitioner was convicted in 1991, retried on punishment in 2009, and resentenced to death later that same year. At every interval, the evidence and testimony affirmed and reaffirmed his callous disregard for human life and "future dangerousness" to society. Three issues are before this Court today: (1) Petitioner's ineffective assistance of trial counsel ("IATC") claims against his 2009 counsel; (2)

Petitioner's *Napue* claim; and (3) the suppression of accomplice Kristie Nystrom's Big Spring State Hospital records ("Nystrom's 1990 Medical Records") at Petitioner's 2009 resentencing trial. After an examination of the issues Petitioner presents, the Court **DENIES** Petitioner's application for habeas relief.

### PETITIONER'S OBJECTIONS

Section I of the FCR details this case's procedural history. Neither party objects to Section I. The Court thus relies on the factual accuracy of the Magistrate Judge's procedural chronology.

### 1. Petitioner's General Objections

Petitioner objects to the state habeas court's failure to hold an evidentiary hearing on his habeas claims. ECF No. 139 at 6–7. The Court finds the Magistrate Judge correctly concluded this objection fails to identify a legitimate basis for federal habeas relief. Infirmities in a state habeas proceeding — including an assertion that due process was denied — does not entitle one to federal habeas relief. *Rockwell v. Davis*, 853 F.3d 758, 761 n.5 (5th Cir. 2017); *Kinsel v. Cain*, 647 F.3d 265, 273 & n.23 (5th Cir. 2011). The state habeas court's failure to hold an evidentiary hearing on Petitioner's claims does not render that court's factual findings or legal conclusions inherently suspect. *Richards v. Quarterman*, 566 F.3d 553, 563 (5th Cir. 2009). The Court **OVERRULES** Petitioner's objections to the Magistrate Judge's deference to the state habeas court's factual findings.

### 2. Petitioner's IATC Objection Concerning Dr. Coons's Testimony

Petitioner argues IATC as a ground for federal habeas relief. His argument is based on 2009 trial counsel's varied attempts to exclude, cross-examine, and rebut Prosecution opinion testimony by expert Dr. Richard Coons. ECF No. 139 at 8, 10. The state habeas court held an

evidentiary hearing on this same IATC claim. It heard extensive testimony concerning Petitioner's "future dangerousness" from Dr. Coons and Petitioner's 2009 trial counsel. The state habeas court ultimately rejected Petitioner's IATC claims.

The Magistrate Judge reviewed the record from Petitioner's 1991 and 2009 trials. She also reviewed the record from Petitioner's multiple state habeas proceedings. The Magistrate Judge concluded Petitioner's 2009 trial counsel acted in an objectively reasonable manner when they: (1) attempted to exclude Dr. Coons's opinion testimony by attacking his methodology; (2) declined to have a mental-health expert evaluate Petitioner in order to opine on future dangerousness; (3) used Dr. Edens to rebut Dr. Coons's expert-opinion testimony about future violence; (4) focused their cross-examination of Dr. Coons on his future-violence testimony and 1991 prediction that Petitioner would be violent during his incarceration; and (5) failed to predict the Texas Court of Criminal Appeals would reverse decades of case law and — for the first time — rule Dr. Coons's opinions inadmissible as not founded on reliable scientific principles. ECF No. 131 at 107–19.

The Court finds the Magistrate Judge did not err when she applied the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") standard of review to Petitioner's IATC claim.[1] The Magistrate Judge correctly concluded that Petitioner's 2009 trial counsel acted in an objectively reasonable manner when they chose to seek, exclude, discredit, and rebut Dr. Coons's expert testimony about future dangerousness by: (1) arguing Dr. Coons's "highly subjective methodology" was not based on reliable scientific methodology; and (2) presenting evidence Dr. Coons's testimony about Petitioner's predicted future violence was that. ECF No. 131 at 114.

---

[1] The Court also finds the Magistrate Judge did not err by applying a de novo standard of review to this expanded IATC claim. ECF No. 131 at 114–19. The Magistrate Judge conducted an alternative de novo review of this IATC claim. Petitioner's federal habeas counsel submitted numerous documents to this Court. Petitioner failed to present those documents to the state habeas court during his second state habeas proceeding when that court adjudicated his analogous IATC claim on the merits. The submission of those documents necessitated the Magistrate Judge's review.

The Court independently reviewed Dr. Coons's testimony from Petitioner's 1991 capital-murder trial and 2009 punishment retrial. The Court also reviewed the alternative future-dangerousness evidence that Petitioner posits his 2009 counsel should have presented.

Petitioner's argument is unpersuasive for at least two reasons. First, the primary reason the Texas Court of Criminal Appeals held Dr. Coons's future-dangerousness testimony inadmissible in another trial was because Dr. Coons had not evaluated the defendant for 18 years before he testified. *See Coble v. State*, 330 S.W.3d 253, 279–80 (Tex. Crim. App. 2010) (noting Dr. Coons had not evaluated defendant for 18 years and had lost his notes from that interview when called to testify at defendant's retrial). Second, if Petitioner's 2009 counsel employed Petitioner's federal counsel's strategy, that approach would have waived any complaint Petitioner had with the admission of Dr. Coons's testimony. Had the court admitted Dr. Cunningham's mental-health expert testimony based on an evaluation of Petitioner, then the Prosecution would have been entitled to have its own expert evaluate Petitioner. ECF No. 131 at 114; *Kansas v. Cheever*, 571 U.S. 87, 94 (2013). Petitioner's effort to exclude Dr. Coons's testimony would have failed if Dr. Cunningham testified at Petitioner's 2009 retrial.

Petitioner's 2009 trial counsel sought to avoid a battle of the mental-health experts — with each side expressing divergent opinions on Petitioner's future dangerousness. ECF No. 131 at 114–15. Instead, they sought to focus the jury's attention on verifiable facts relevant to future dangerousness. *Id.* at 114. Petitioner cannot render his 2009 counsel's strategy objectively unreasonable by proposing a different trial strategy now. "There are countless ways to provide effective assistance in any given case." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). The Court independently finds — and agrees with the Magistrate Judge — that the state habeas court

reasonably concluded Petitioner's 2009 trial strategy was objectively reasonable and did not prejudice him. ECF No. 131 at 114.

The Court further finds the state habeas court and Magistrate Judge reasonably concluded that Petitioner's trial counsel's failure to follow the strategy now advocated by Petitioner did not prejudice Petitioner within the meaning of *Strickland*. *Id.* at 119. Dr. Coons's 2009 testimony, Dr. Eden's 2009 testimony, and Dr. Cunningham's report reveal those experts disagreed about how to define "criminal acts of violence" relevant to future dangerousness. Dr. Cunningham and Dr. Edens focused on discrete *acts* of physical violence resulting in either significant physical injury or TDCJ disciplinary actions. By contrast, Dr. Coons's testimony spanned a wider range of possible future criminal misconduct as relevant to future dangerousness. The mental-health experts' differing definitions of "criminal acts of violence" relevant to future dangerousness render their opinions of little practical aid to jurors. A battle of the mental-health experts would have been futile. Petitioner's 2009 trial counsel wisely chose a different approach. His counsel focused the jury's attention on an undisputed fact: other than a single suicide attempt, Petitioner had a largely *non-violent* post-conviction incarceration history. In fact, Petitioner's TDCJ disciplinary record was unremarkable.

Finally, Petitioner's IATC claim fails to adequately consider the new, aggravating evidence presented during Petitioner's 2009 retrial. In Petitioner's 1991 capital-murder trial, the jury viewed crime-scene videos and photographs. In 2009, the jury had additional testimony: accomplice Kristie Nystrom's vivid eyewitness account of Petitioner's attack on Robert Laminack. Petitioner also chose to testify. His testimony only marginally differed from accomplice Nystrom's eyewitness account. Petitioner's testimony indicated he alone held the knife that killed Laminack. Both Petitioner and accomplice Nystrom agreed they attacked Laminack *before* either asked him

5

for his wallet or truck keys. Both Petitioner and accomplice Nystrom testified that Nystrom walked away from Laminack's truck covered in blood, with Laminack's keys and wallet in their possession. Meanwhile, Laminack laid slumped over his steering wheel as he bled to death. Neither Petitioner nor accomplice Nystrom sought to help Laminack.

Although the 2009 jury could assess Petitioner's non-violence during incarceration, the jury also had a detailed account of Laminack's murder. The 1991 trial did not feature such a detailed account. Petitioner's and accomplice Nystrom's 2009 eyewitness testimony painted the murder in a more sinister light than the Prosecution did at the 1991 sentencing. And, in 2009, the jury had the opportunity to assess Petitioner's demeanor as well as the credibility of his assertions of remorse and empathy.

The Court independently concludes there is no reasonable probability that — but for the failure of Petitioner's 2009 trial counsel to present Dr. Cunningham's future-dangerousness opinion testimony — the outcome of Petitioner's 2009 retrial would differ. The Magistrate Judge correctly concluded that Petitioner's IATC claim concerning his 2009 trial counsel's approach to challenging, cross-examining, and rebutting Dr. Coons's testimony lacks merit.

### 3. Petitioner's Objections Concerning His *Napue* Claim and Dr. Erdmann

Petitioner argues the Prosecution presented false testimony about Laminack's cause of death. ECF No. 139 at 11. Dr. Erdmann performed Laminack's autopsy and provided testimony related to Laminack's death. Petitioner argues Dr. Erdmann's testimony is false as a matter of law because Dr. Erdmann was convicted of multiple felonies involving autopsies unrelated to Laminack's autopsy. *Id.* at 11–14. But Petitioner cites no legal authority to support his argument. He instead presents an Oklahoma investigation — based largely on speculation — that accuses Dr.

Erdmann of having been a Nazi-sympathizer as a teenager. *Id.* at 11. Character assassination, however, does not replace *factual* allegations or *actual* evidence of falsity.

First, Petitioner failed to present the state habeas court or this Court with evidence that highlights inaccuracies in Laminack's autopsy report — at least with respect to Laminack's cause of death. Petitioner's new experts take exception to the wording of Laminack's autopsy report. Yet those same experts do not suggest Laminack died from anything other than what Dr. Erdmann opined in 1991 — or what Dr. Natarajian opined in 2009. Dr. Erdmann's 1991 trial testimony and Dr. Natarajian's 2009 trial testimony also provide no basis to believe multiple stab wounds did not kill Laminack. The crime-scene video, crime-scene photographs, autopsy photographs, and accomplice Nystrom's 2009 eyewitness testimony leave no reasonable doubt that multiple stab wounds killed Laminack.

An arterial injury caused blood to *soak* the interior of Laminack's truck. The autopsy photos reflect same. *See* ECF No. 126 at 2 n.1, 11 n.24. And the blood-spatter experts who testified at both of Petitioner's trials linked the blood spray to Laminack's stab wounds. *Id.* Importantly, accomplice Nystrom's eyewitness testimony corroborates the blood-spatter experts' opinions. None of Petitioner's new experts suggested another cause of death. Petitioner has not presented the Court with evidence that Laminack died from anything other than what Dr. Erdmann concluded in 1991.

Second, Laminack's cause of death was not the issue before the jury in Petitioner's 2009 punishment retrial. The state habeas court repeatedly noted as much in its factual findings during Petitioner's second habeas corpus proceeding. Laminack's cause of death had been determined beyond a reasonable doubt at his 1991 capital-murder trial. Petitioner's 2009 trial counsel did not challenge the evidence that established Laminack's cause of death. They reasonably deemed such

7

a challenge to be inconsistent with their trial strategy to have Petitioner accept responsibility for his offense, express remorse and empathy, and to point to the evidence of his non-violence during incarceration.

Petitioner's federal habeas counsel aver that the 2009 trial team should have challenged Laminack's cause of death like they challenged the Prosecution's future-dangerousness evidence. Yet at his 2009 retrial, Petitioner accepted full responsibility for fatally stabbing Laminack. Petitioner explained that although accomplice Nystrom helped him plan the crime and held Laminack's right arm during the assault, Petitioner *alone* stabbed Laminack.

Third, Petitioner asserts he would not have testified in 2009 had his trial counsel done a better job of attacking Dr. Erdmann's credibility. But even if Petitioner's 2009 trial counsel managed to conceal Dr. Erdmann's autopsy report and 1991 trial testimony, those exclusions would do little to counter evidence of Laminack's cause of death. Petitioner identifies no legal basis to exclude any evidence that establishes Laminack's cause of death — including Dr. Natarajian's 2009 testimony, the crime-scene video, crime-scene photographs, the autopsy photographs, blood-spatter expert testimony, and accomplice Nystrom's eyewitness account.

As the Magistrate Judge noted, the state habeas court's conclusion that Dr. Natarajian's 2009 testimony was admissible under state evidentiary rules binds this Court. ECF No. 131 at 137; *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013) (holding a Texas habeas court's interpretation of evidentiary rules was binding in a federal habeas corpus case). Had Petitioner not testified at his 2009 retrial, the jury would have been left

with the evidence described above. That evidence would likely have alone established that multiple stab wounds killed Laminack.

None of the evidence would have been mitigated had Petitioner not testified in 2009. Petitioner's 2009 testimony sought to reduce his moral culpability. Petitioner accepted responsibility for his capital offense, expressed remorse and empathy, and attempted to humanize himself. Only Petitioner could express palpable remorse for his offense. The Magistrate Judge identified the legal standard for a due-process claim of this nature:

> To succeed in this type of due process claim, a defendant must show that the testimony complained of was actually false, the state knew or should have known that it was actually false, and the false testimony was material. *In re Raby*, 925 F.3d 749, 756 (5th Cir. 2019); *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014) (a conviction obtained through false evidence known to be such by representatives of the State violates a defendant's constitutional rights); *Kinsel v. Cain*, 647 F.3d 265, 271 (5th Cir. 2011) ("The Supreme Court has held that the Due Process Clause is violated when the government knowingly uses perjured testimony to obtain a conviction."); *Reed v. Quarterman*, 504 F.3d at 473 (same). False testimony is material if there is "any reasonable likelihood" that it could have affected the jury's verdict. *Raby*, 925 F.3d at 756; *Canales*, 765 F.3d at 573; *Goodwin v. Johnson*, 132 F.3d 162, 185 (5th Cir. 1997) (citing *Westley v. Johnson*, 83 F.3d 714 (5th Cir. 1996)).

ECF No. 131 at 52.

The Magistrate Judge correctly concluded Petitioner's due-process claim concerning Laminack's autopsy report and Dr. Erdmann's 1991 testimony fails to satisfy any of these requirements. Petitioner's argument that he would have remained silent in 2009 had his counsel discredited Dr. Erdmann's testimony and excluded the autopsy report is irrelevant to his *Napue* claim. Petitioner's argument also ignores that: (1) the state habeas court concluded Dr. Natarajian's 2009 cause-of-death testimony was admissible under Texas evidentiary rules; and (2) accomplice Nystrom largely blamed Petitioner for Laminack's death. Had Petitioner stayed silent, the jury would likely not have answered any of the Texas capital-sentencing special issues in Petitioner's favor.

Petitioner's related argument that his trial counsel failed to cross-examine Dr. Natarajian about the autopsies Dr. Erdmann conducted unrelated to Laminack's death is equally irrelevant to Petitioner's *Napue* claim. Plus, there is no specific factual allegation or evidence before the Court that shows Dr. Natarajian knew about the details of Dr. Erdmann's crimes. An attorney cannot effectively cross-examine an expert witness about matters unrelated to that expert's opinions if the expert lacks knowledge of those ancillary matters.

Regardless of whether Petitioner stayed silent in 2009, Petitioner failed to identify false or misleading testimony presented by the Prosecution during his 2009 retrial. The evidence does not establish that anything other than stab wounds killed Laminack. Dr. Natarajian and the blood-spatter experts reached the same conclusion as to cause of death. Having independently examined the evidence introduced at Petitioner's 1991 and 2009 trials and state habeas corpus proceedings, the Court independently concludes no other cause can rationally explain Laminack's death.

Given the forensic evidence, blood spatter experts' testimony, and accomplice Nystrom's eyewitness testimony, any alleged error in Dr. Erdmann's autopsy report or 1991 testimony regarding cause of death fails to satisfy the materiality prong of the *Giglio/Napue* analysis. All other alleged errors in Laminack's autopsy report or in Dr. Erdmann's 1991 testimony identified by Petitioner also fail to satisfy this prong. The Magistrate Judge correctly concluded no evidence indicated the Prosecution knowingly presented false or misleading cause-of-death evidence at the 2009 retrial. Thus, the Magistrate Judge correctly concluded Petitioner's *Giglio/Napue* claim lacks merit.

### 4. Petitioner's IATC Claim Concerning the Prosecution's Prior Bad-Acts Evidence and Future Dangerousness

Petitioner argues his 2009 trial counsel rendered ineffective assistance by: (a) failing to properly investigate and rebut evidence relating to his prior bad acts; (b) advising Petitioner to

testify; (c) failing to present evidence of his good behavior during incarceration; and (d) failing to present evidence showing his biological father was violent and abusive. ECF No. 103 at 64–78. Petitioner's last two claims are unfounded. Petitioner's 2009 trial counsel presented evidence that demonstrated Petitioner's good behavior during his incarceration and his father's violent and abusive nature. Only the first of these two issues remain.

    A.  *Prior Bad Acts*

Petitioner's own testimony acknowledges as much. ECF No. 131 at 107. Petitioner's 2009 trial counsel had additional evidence on these two evidentiary points, but that evidence did not render their performance objectively unreasonable or prejudice Petitioner within the meaning of *Strickland*. The Magistrate Judge correctly noted Petitioner's 2009 trial counsel presented these points by Petitioner's own trial testimony and the testimony of other witnesses. *Id.* at 130. One cannot base an IATC claim on a failure to present cumulative testimony. *Id.*; *Howard v. Davis*, 959 F.3d 168, 173 (5th Cir. 2020).

Petitioner faults his 2009 trial counsel for failing to interview Aimee Long, Kevin Lewis, Ronald Mosher, and Dr. Coons about Petitioner's bad acts. ECF No. 139 at 14. The Magistrate Judge concluded each of these witnesses provided testimony in 2009 that was substantially similar to their testimony at the punishment phase of Petitioner's 1991 capital-murder trial. ECF No. 131 at 101. Petitioner does not disagree. Instead, he argues that had his 2009 counsel interviewed Long, Lewis, and Mosher, counsel may have elicited minor details from the witnesses that could have cast Petitioner in a better light.

Petitioner's argument ignores that the Prosecution's 2009 case in aggravation was significantly *stronger* than it was in 1991. This was, in large part, due to accomplice Nystrom's decision to testify in 2009. Instead of relying exclusively on blood-spatter and forensic expert

testimony to determine how Laminack's murder occurred, the 2009 jury had accomplice Nystrom's firsthand account of the killing. Additionally, accomplice Nystrom's 2009 eyewitness testimony added new details about the advance planning she and Petitioner engaged in before the murder. Accomplice Nystrom's testimony also detailed that they attacked Laminack without warning *before* asking for his wallet or truck keys. Accomplice Nystrom's 2009 testimony only bolstered the case against Petitioner.

The Magistrate Judge correctly concluded there was no reasonable probability that the minor mitigating details Petitioner's 2009 trial team could have gleaned from interviews would have impacted the jury's answers to the capital-sentencing special issues. For instance, Petitioner argues his former high-school girlfriend could have opined that his assault upon her was "out of character." But Petitioner still assaulted her and caused her serious injury. Her testimony would not change that fact. And the testimony of a former fellow inmate that he had instigated a confrontation with Petitioner would not have altered the fact that Petitioner threatened to shove a pencil in that inmate's eye. As to the knife Petitioner pleaded guilty to illegally possessing in Florida, testimony as to the weapon's true owner would do little to alleviate anything. Such details would have done little to mitigate accomplice Nystrom's eyewitness account of Laminack's murder.

An argument that Petitioner's 2009 counsel should have more thoroughly blamed Petitioner's father for his propensity for violence ignores the possibility that such double-edged evidence could indicate Petitioner is genetically inclined to engage in violence. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (explaining that mitigating evidence is "double-edged" when it might permit an inference that the defendant is not as morally culpable for his behavior but also might suggest that, as the product of his environment, the defendant is likely to continue

to be dangerous in the future); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) ("Although the evidence of Ladd's inadequate supervision as a child might permit an inference that he is not as morally culpable for his behavior, it also might suggest Ladd, as a product of his environment, is likely to continue to be dangerous in the future."). As the Magistrate Judge explained, Petitioner's biological father had little contact with Petitioner during his developmental period.

Petitioner's 2009 counsel could have reasonably concluded that blaming Petitioner's biological father would have conceded the future-dangerousness special issue and required a favorable answer to the mitigation special issue. A failure to present double-edged evidence generally lies within the discretion of trial counsel. *Ayestes v. Davis*, 933 F.3d 384, 392 (5th Cir. 2019). The state habeas court and Magistrate Judge both reasonably concluded Petitioner's 2009 counsel did not need to place blame on Petitioner's father to render effective assistance.

Petitioner argues his 2009 counsel failed to interview his family and various Prosecution witnesses to obtain mitigating evidence. Petitioner, however, fails to identify any new, compelling mitigating evidence available from such interviews unknown to Petitioner himself. *See Burger v. Kemp*, 483 U.S. 776, 795 (1987) ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." (quoting *Strickland*, 466 U.S. at 691)). Absent specific allegations that show Petitioner's counsel unreasonably failed to interview their own client, one cannot fault Petitioner's 2009 counsel with failing to obtain mitigating evidence Petitioner possessed.

Moreover, Defense counsel's alleged failure to interview Prosecution witnesses must be balanced against a basic trial rule: prospective witnesses are not obligated to divulge information to defense counsel. *United States v. Soape*, 169 F.3d 257, 270 n.9 (5th Cir. 1999); *see also United States v. Rice*, 550 F.2d 1364, 1374 (5th Cir. 1977) ("All that a defendant is entitled to is access to a prospective witness. This right, however, exists co-equally with the witnesses' right to refuse to say anything."); *United States v. Dryden*, 423 F.2d 1175, 1177 n.6 (5th Cir. 1970) (a witness may refuse to be interviewed or dictate the circumstances under which he or she will submit to an interview). Petitioner fails to allege specific facts or present evidence that shows it was objectively unreasonable for his 2009 counsel to rely on their interviews with him. Petitioner also fails to allege specific facts or present evidence that shows it was objectively unreasonable for his 2009 counsel to rely on the sworn testimony of Prosecution witnesses when his counsel decided not to interview those witnesses prior to the 2009 retrial.

B. *Trial Testimony*

It was objectively reasonable for Petitioner's 2009 trial counsel to encourage Petitioner to testify at trial. Absent Petitioner's rebuttal testimony, the jury would only have photographic and video evidence of the horrific crime scene and accomplice Nystrom's grisly, eyewitness account of Laminack's murder. Only Petitioner could furnish firsthand testimony as to his remorse, empathy, and non-violence during incarceration. During his second state habeas proceeding, Petitioner's 2009 trial counsel testified that Petitioner's mother was uncooperative in 2009 and his biological father was likely to commit perjury had he been called to testify.

Faced with accomplice Nystrom's eyewitness testimony, Petitioner's 2009 trial counsel chose an objectively reasonable trial strategy. Petitioner himself testified to rebut aspects of the Prosecution's bad-acts evidence and accomplice Nystrom's eyewitness testimony. Petitioner also

testified to express remorse and empathy. That Defense counsel's strategy proved unsuccessful did not render it objectively unreasonable. Again, "[t]here are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. The Magistrate Judge correctly concludes that this IATC claim fails to satisfy either prong of *Strickland*.

### 5. Petitioner's *Wiggins* Claim

Petitioner argues his 2009 trial counsel failed to adequately investigate his background and present mitigating evidence that showed: (a) a mental-health evaluation performed during Petitioner's 1991 trial revealed Petitioner suffered from these problems during Petitioner's early childhood; (b) Petitioner is traumatized by a babysitter who molested him; (c) accomplice Nystrom was manipulative, controlling, and responsible for Petitioner's actions at the time of Laminack's murder; (d) Petitioner had a family history of substance abuse, mental illness, and violence; (e) Petitioner suffered from inadequate nutrition, maternal neglect, and instability during his early childhood; (f) Petitioner's step-father emotionally abandoned him; (g) Petitioner's biological father had only minor contact with Petitioner before Petitioner turned 15, and then turned violent toward Petitioner; and (h) Petitioner suffers from mental illness, including severe depression. ECF No. 131 at 123.

### A. *Petitioner's Mental Health*

Petitioner's 2009 counsel made a reasonable strategic decision not to present mental-health evidence like that offered by Dr. Cunningham. Such evidence would have required Petitioner to undergo a mental-health evaluation, and the trial would have turned into a battle of the mental-health experts. Instead, the 2009 counsel chose a reasonable alternative strategy: (1) confront the jury with Petitioner's non-violence during incarceration by cross-examination of Prosecution experts; (2) present Dr. Edens's expert testimony that questioned the scientific validity and lack of

15

efficacy of future violence predictions; and (3) argue Petitioner had proven Dr. Coons's predications false. ECF No. 131 at 125. After de novo review, the Court concludes the strategy Petitioner's 2009 counsel adopted was objectively reasonable and did not prejudice Petitioner within the meaning of *Strickland*.

Contrary to the cases cited by Petitioner (*e.g.*, *Wiggins*, *Porter*, and *Williams*), Petitioner does not present evidence that shows he suffered from diminished intellectual capacity or severe mental illness of which the jury was unaware in 2009. Petitioner testified about his suicide attempt and depression. There is no suggestion in the record that Petitioner suffers from an intellectual disability or that he functions anywhere below the average range of intellectual functioning. Petitioner's mental-health records from the TDCJ introduced during his 2009 retrial showed no mental-health referrals despite his suicide attempt.

### B.  *Petitioner's Childhood Molestation*

The psychological impact of Petitioner's new childhood-molestation allegation does not appear to have affected his ability to function in school or society. During his 2009 testimony, Petitioner did not refer to that incident as significantly impacting him. Instead, Petitioner and his mother blamed Petitioner's diagnosis with a congenital back condition as the event that triggered Petitioner's experimentation with drugs and subsequent academic and behavioral decline.

### C.  *Nystrom's Responsibility for Laminack's Murder*

Petitioner's 2009 counsel likewise reasonably chose not to blame accomplice Nystrom for Laminack's murder. A 1991 effort to do so failed miserably. By 2009, Petitioner was no longer an impressionable young man barely out of his teens. Nor was Nystrom any longer a twenty-one-year-old exotic dancer. Both had spent the better part of two decades in prison. It was objectively

reasonable for Petitioner's 2009 trial counsel to confront that reality and, instead, focus the jury's attention on Petitioner's demonstrated record of non-violence during incarceration.

The Prosecution would most likely have rebutted an attempt to blame accomplice Nystrom for Laminack's death with arguments that Petitioner was neither remorseful nor sincere in his attempt to accept responsibility for his crime. Attacking accomplice Nystrom would have undermined Petitioner's 2009 trial counsel's primary strategy. In hindsight, one can easily complain that trial counsel failed to pursue every defensive strategy. But *Strickland* review demands the Court disregard hindsight's distorting impact. 466 U.S. at 689; *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). Trial counsel should avoid taking logically inconsistent positions before the jury. Advancing inconsistent positions invites counterarguments that can eviscerate one's best arguments, thereby reducing his credibility.

D. *The Evidence Would Have Been of Little — If Any — Value*

When evaluating the *Strickland* prejudice prong in the context of a capital habeas proceeding, this Court must consider the totality of the available mitigation evidence. The Court considers mitigation evidence adduced at trial as well as in the habeas proceeding and balances it against the evidence in aggravation. *Andrus v. Texas*, 140 S. Ct. 1875, 1886 (2020). After de novo review, the Court concludes the state habeas court and Magistrate Judge correctly found Petitioner's *Wiggins* claim fails to satisfy *Strickland*'s prejudice prong. Presenting a mental-health based defense at Petitioner's 2009 retrial would have required him to submit to a mental-health evaluation by a Prosecution clinician who would likely have expressed an opinion like the one presented by Dr. Coons in 2009. Such a strategic approach would also have deflected the jury's attention from the far more salient fact that Petitioner's non-violence during incarceration.

The new mitigating evidence Petitioner avers his family or Prosecution witnesses could have presented in 2009 had only minor mitigating value. Some of it — particularly the evidence of his biological father's propensity for violence and abusive conduct — had the potential to be double-edged. Double-edged evidence could have hurt Petitioner's chances for a favorable verdict on the future-dangerousness special issue far more than it could have helped him on the mitigation special issue. And it would have done little to offset the impact of accomplice Nystrom's eyewitness account of Laminack's murder. The Magistrate Judge correctly concluded this IATC claim fails to satisfy either prong of *Strickland* and lacks merit.

### 6. Petitioner's Objections Concerning IATC in Nystrom's Role and Petitioner's Remorse

Petitioner argues his 2009 trial counsel rendered ineffective assistance by failing to: (1) impeach Nystrom and Prosecution witness Skee Callen with a statement Callen made to police suggesting Nystrom stabbed Laminack; and (2) elicit testimony showing Petitioner's remorse for his crime. ECF No. 139 at 27.

A. *IATC: Callen's Statement*

On cross-examination by Defense counsel at Petitioner's 1991 trial, Callen admitted that he gave the police a statement that Nystrom told him she had stabbed the victim. ECF No. 124-12 at 36. Callen, however, insisted that statement was in error. *Id.* Callen also testified that he later corrected the error in his statement. *Id.* at 36–37.

Petitioner's 2009 counsel could have reasonably concluded that eliciting the same testimony from Callen in 2009 would not benefit Petitioner. Petitioner argues his 2009 counsel should have attempted to use Callen's statement to police as a basis to argue Nystrom stabbed Laminack. ECF No. 139 at 28. But the 1991 efforts to blame Nystrom for Laminack's death failed. Petitioner's federal habeas counsel does not demonstrate how the same attempt would have

resulted in a different outcome in the 2009 trial. Plus, Petitioner's 2009 testimony recounts how

he killed Laminack. Petitioner never suggested Nystrom stabbed Laminack. Petitioner, in effect,

asserts his 2009 counsel should have attempted to prove a "fact" they knew to be false. Petitioner's

2009 counsel were not required to do so. *See United States v. Chronic*, 466 U.S. 648, 656 n.19

(1984) (stating "the Sixth Amendment does not require that counsel do what is impossible or

unethical"). The Court agrees with the Magistrate Judge and finds the IATC claim concerning

Nystrom's role void of merit. ECF No. 131 at 99–100. The Magistrate Judge correctly concluded

Petitioner's IATC claim concerning Nystrom's role lacks merit. ECF No. 131 at 99–100.

      B. *IATC: Petitioner's Remorse*

      As the Magistrate Judge recounted, Petitioner testified extensively at his 2009 retrial and

repeatedly expressed remorse for his crime. ECF No. 131 at 15 n.34. In both 1991 and 2009, Callen

testified that Petitioner smirked when he recounted how Laminack pleaded for his life while

Petitioner stabbed him. 22/28 R.R. 67–74. Petitioner argues his 2009 trial counsel should have

elicited testimony from Callen that Petitioner cried after he murdered Laminack. ECF No. 139 at

28. Callen's ambiguous observation, however, does not confirm whether Petitioner wept out of

remorse or from fear of his own impending apprehension. Given Petitioner's own extensive 2009

testimony expressing his remorse, one cannot fault Petitioner's trial counsel for relying on his own

testimony. The Magistrate Judge correctly concluded Petitioner's IATC claim regarding his

remorse is without merit. ECF No. 131 at 100.

### 7.  Petitioner's Objections Concerning IATC in Nystrom's Role and Petitioner's Remorse

      In his seventh claim for federal habeas relief, Petitioner argues the state trial court violated

his rights under *Brady v. Maryland*, 373 U.S. 83, 97 (1963), by suppressing Nystrom's 1990

Medical Records. ECF No. 139 at 30. Petitioner avers the suppression denied him due process

because the medical records contained impeachment material. *Id.* at 30. The Magistrate Judge rejected Petitioner's *Brady* claim on the merits, concluding the Prosecution had not "withheld" the records in question within the meaning of *Brady*. ECF No. 131 at 78–79.

The Magistrate Judge based her rejection on the fact that: (1) all parties were aware of the existence of Nystrom's 1990 Medical Records in 2009; and (2) the state trial court conducted an in-camera review before ruling the records would not be disclosed to the Defense and the records would not have benefitted Petitioner in 2009. *Id.* at 73–85. Petitioner does not suggest Nystrom's 1990 Medical Records mention Laminack's murder — which took place after Nystrom left the drug-treatment facility in Big Spring — or anything which might have foreshadowed Nystrom's subsequent involvement in Laminack's murder.

Petitioner argues he could have used notations in Nystrom's 1990 Medical Records to impugn Nystrom's credibility. ECF No. 139 at 30. But the medical records were created before Laminack's murder. Petitioner's federal habeas pleadings and objections fail to cite legal authority that demonstrates how a fact witness's medical records relating to the witness's drug-dependency treatment months before a criminal offense may be used to impeach testimony about that offense given during a subsequent criminal trial. Unlike Texas Rule of Evidence 412 — which identifies circumstances in which evidence of a witness's prior sexual behavior may be admissible in a sexual-assault case — Petitioner identifies no similar rule authorizing use of the information contained in Nystrom's 1990 Medical Records to impeach her 2009 testimony. And Petitioner fails to identify an aspect of Nystrom's 2009 testimony of circumstances surrounding Laminack's murder that could refute information Nystrom's 1990 Medical Records contain.[2]

---

[2] This is not a case where a witness' testimony that he or she was injured on a specific date could be impeached by medical records showing the witness suffered the injuries in question before the defendant's alleged assault.

Petitioner also ignores that Nystrom's 1990 Medical Records were nearly 20 years old in 2009. The passage of time greatly reduced any impeachment value those records contained. For example, the Medical Records contained negative comments about Nystrom's character. But those comments were made at a time when Nystrom underwent drug-dependency treatment. ECF No. 139 at 30. Nystrom had been in TDCJ custody for nearly two decades by 2009. She was presumably clean during most of her incarceration. In fact, Nystrom testified she was approaching the date of her eligibility for release on parole. Petitioner does not allege a single fact that shows Nystrom still battled drug dependency in 2009.

Additionally, Petitioner fails to mention facts that demonstrate Nystrom was responsible for creating the diagnostic notations identified in her 1990 Medical Records. Big Spring State Hospital staff made those notations. The hospital staff's notations did not directly correspond to any of Nystrom's 2009 trial testimony about the details of Laminack's murder. Evidence is "material" under *Brady* where there exists a "reasonable probability" that — had the evidence been disclosed — the result at trial would have differed. *Smith v. Cain*, 565 U.S. 73, 75 (2012); *Cone v. Bell*, 556 U.S. 449, 469–70 (2009). After de novo review, the Court independently concludes Petitioner fails to satisfy the materiality prong of *Brady* analysis.

Moreover, as the Magistrate Judge noted, Petitioner does not identify a disclosure exception to state and federal statutes that protect medical records. ECF No. 131 at 80. Insofar as Petitioner asserts a freestanding due-process claim separate from his *Brady* claim, he cites no legal authority recognizing a criminal defendant's due-process right of access to a prosecution fact witness's medical records as impeachment evidence or otherwise. Petitioner also fails to cite legal authority holding that — by taking the stand as a fact witness in a criminal trial — a private citizen waives her right to maintain the privacy of her medical records.

The Court concludes that any error committed by the state trial court's denial of Petitioner's 2009 trial counsel to access Nystrom's 1990 Medical Records was harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 623–24 (1993) (harmless-error test is "whether the error had a substantial and injurious effect or influence in determining the jury's verdict"). Petitioner's *Brady* claim relating to Nystrom's 1990 Big Spring medical records and his due-process claim lack merit.

### RESPONDENT'S OBJECTIONS

Respondent objects to the Magistrate Judge's failure to address procedural-default defenses in Respondent's pleadings. *See* ECF No. 138. As the Magistrate Judge explained, however, this Court is not required to address procedural-default questions, especially when confronted with an array of federal habeas claims lacking any arguable merit. ECF No. 131 at 23; *Broadnax v. Davis*, No. 3:15-CV-1758-N, 2019 WL 3302840, at \*29 n.41 (N.D. Tex. July 23, 2019); *see also Lambrix v. Singletary*, 520 U. S. 518, 520 (1997) ("We do not mean to suggest that the procedural-bar issue must be resolved first; only that it ordinarily should be. Judicial economy might counsel giving the *Teague* question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law.").

The FCR would be convoluted if the Magistrate Judge addressed each of Respondent's procedural-default defenses. For example, every assertion of procedural default by Respondent would require judicial inquiry into: (1) the application of state procedural rules; (2) whether the procedural rule in question is regularly and consistently employed by the state courts, *see Harris v. Reed*, 489 U.S. 255, 262–63 (1989); (3) whether a commonly recognized exception to the procedural-default doctrines applies to the procedural default in question; and (4) whether the limited exception to the procedural-default doctrine recognized in *Martinez v. Ryan*, 556 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), applies to the procedurally defaulted IATC

claim in question. The first two steps require a federal court to delve into the application of state procedural rules. *See Bradshaw*, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). The third and fourth steps require analysis of the potential merits of procedurally defaulted claims. *See Schlup v. Delo*, 513 U.S. 298, 323 (1995)[3]; *Ayestas v. Davis*, 138 S. Ct. 1080, 1087 (2018).[4]

If the Magistrate Judge addressed Respondent's procedural-default defenses, then the need to address the merits of Petitioner's claims would remain. Therefore, the Court need not analyze the procedurally defaulted claims. A disposition of clearly meritless claims on the merits instead of engaging in a lengthy and convoluted procedural-default analysis serves a legitimate public purpose:

> In the absence of any legal obligation to consider a preliminary nonmerits issue, a court may choose in some circumstances to bypass the preliminary issue and rest its decision on the merits. *See, e.g.*, 28 U.S.C. § 2254(b)(2) (federal habeas court may reject claim on merits without reaching question of exhaustion). Among other things, the court may believe that the merits question is easier, and the court may think that the parties and the public are more likely to be satisfied that justice has been done if the decision is based on the merits instead of what may be viewed as a legal technicality.

*Smith v. Texas*, 550 U. S. 297, 324 (2007) (Alito, J., dissenting).

The Court finds that Respondent's objection to the Magistrate Judge's failure to apply procedural default analysis is without merit and overruled.

---

[3] "Actual innocence" within the context of the punishment phase of a capital habeas case requires a showing by clear and convincing evidence that — but for a constitutional error — no reasonable juror would have found the petitioner eligible for the death penalty.

[4] To be entitled to the exception to procedural-default rules recognized in *Martinez* and *Trevino*, a federal habeas petitioner must show that his claim of ineffective assistance by his trial counsel was "substantial" and that his state habeas counsel rendered ineffective assistance in failing to assert same.

CONCLUSION

For the reasons set forth above, the Court **ORDERS**:

1.  The Court **OVERRULES** Petitioner's objections (ECF No. 139) to the Magistrate Judge's FCR;

2.  The Court **OVERRULES** Respondent's objections (ECF No. 138) to the Magistrate Judge's FCR;

3.  The Court **ADOPTS** the Magistrate Judge's FCR (ECF No. 131);

4.  The Court **DENIES** all relief requested in Petitioner's Second Amended Petition for federal habeas corpus relief (ECF No. 103), as supplemented by his reply brief (ECF No. 128);

5.  The Court **DENIES** Brewer's request for an evidentiary hearing;

6.  The Court **DENIES** a Certificate of Appealability regarding all claims for relief; and

7.  The Court **DIRECTS** the United States District Clerk to append a copy of the Magistrate Judge's FCR (ECF No. 131) to this Order.

**SO ORDERED**.

February 8, 2022.

_____

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE